## ORAL ARGUMENT NOT YET SCHEDULED

No. 26-5074

In the United States Court of Appeals
for the District of Columbia Circuit

**J.G.G.** et al.,

*Plaintiffs–Appellees,*

v.

**DONALD J. TRUMP**, in his official capacity
as President of the United States, et al.,

*Defendants–Appellants.*

On Appeal from a Judgment
of the United States District Court
for the District of Columbia

## DEFENDANTS' OPENING BRIEF

**Brett A. Shumate**
Assistant Attorney General

**Yaakov M. Roth**
Principal Deputy Assistant
 Attorney General

**Drew C. Ensign**
Deputy Assistant Attorney
 General

**Tiberius Davis**
Counsel to the Assistant Attorney
 General
Civil Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington DC 20530-0001
(202) 514-2000
tiberius.davis@usdoj.gov

**Anthony Nicastro**
Acting Director
Office of Immigration Litigation

## CERTIFICATE AS TO PARTIES, RULINGS & RELATED CASES

### I.     Parties and Amici

The following were plaintiffs in the district court and are appellees in this appeal.

- J.G.G.

- G.F.F.

- J.G.O.

- W.G.H.

- J.A.V.

- M.Z.V.V., as next friend on behalf of J.A.B.V.

- M.Y.O.R., as next friend on behalf of M.A.O.R.

- M.M.A.A., as next friend on behalf of G.A.A.A.

- D.A.R.H., as next friend on behalf of Andry Jose Hernandez Romero

- Eylan Schilman, as next friend on behalf of T.C.I.

- Liyanara Sanchez, as next friend on behalf of Frengel Reyes Mota

- Dorys Mendoza, as next friend on behalf of M.R.M.

The following were defendants in the district court and are appellants in this appeal.

- Donald J. Trump, in his official capacity as President of the United States

- Todd W. Blanche, Acting Attorney General of the United States, in his official capacity[1]

- Markwayne Mullin, Secretary of the U.S. Department of Homeland Security, in his official capacity[2]

- U.S. Department of Homeland Security

- Todd M. Lyons, Acting Director of U.S. Immigration and Customs Enforcement, in his official capacity[3]

- U.S. Immigration and Customs Enforcement

---

[1] Pamela J. Bondi was named in the complaint below as the officeholder. She is automatically substituted by the current officeholder. Fed. R. App. P. 43(c)(2).

[2] Kristi L. Noem was named in the complaint below as the officeholder. She is automatically substituted by the current officeholder. Fed. R. App. P. 43(c)(2).

[3] Madison Sheahan was named in the complaint below as "Acting Director and Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement, in her official capacity." She is automatically substituted by the current officeholder. Fed. R. App. P. 43(c)(2).

- Marco A. Rubio, Secretary of State, in his official capacity

- U.S. State Department

- Peter B. Hegseth, Secretary of War, in his official capacity

- U.S. Department of War

The following were amici in the district court.

- Mark J. Rozell

- Heidi Kitrosser

- Mitchel A. Sollenberger

- Meghan Kelly[4]

The following were movants in the district court.

- The Honorable Brandon Gill

- Janice Wolk Grenadier[5]

- John W. Keker

- Robert A. Van Nest

- Elliot R. Peters

- Laurie Carr Mims

---

[4] This amicus's participation in the case below was terminated January 16, 2026.

[5] This movant's participation in the case below was terminated March 27, 2025.

iii

- Coolidge Reagan Foundation

- Joshua Hall[6]

- Paul M. Dorsey[7]

- Gloria Browning[8]

- Borealis S. Hedling[9]

## II.    Rulings Under Review

The rulings under review include the following:

- The district court's order of December 22, 2025, at docket entry 214, entered by James E. Boasberg, Chief United States District Judge. It is available in the joint appendix at JA320–21. It does not have an official reporter citation of which undersigned counsel is aware.

---

[6] This movant's participation in the case below was terminated June 4, 2025.

[7] This movant's participation in the case below was terminated July 7, 2025.

[8] This movant's participation in the case below was terminated July 17, 2025.

[9] This movant's participation in the case below was terminated January 16, 2026.

iv

- The district court's memorandum opinion of December 22, 2025, at docket entry 215, entered by James E. Boasberg, Chief United States District Judge. It is available in the joint appendix at JA322–64. Its official reporter citation is *J.G.G. v. Trump*, 813 F. Supp. 3d 126 (D.D.C. 2025).

- The district court's memorandum opinion and order of February 12, 2026, at docket entry 247, entered by James E. Boasberg, Chief United States District Judge. It is available in the joint appendix at JA442–48. It does not have an official reporter citation of which undersigned counsel is aware, but it has an unofficial Westlaw citation of *J.G.G. v. Trump*, Civil Action No. 25-766, 2026 WL 391937 (D.D.C. Feb. 12, 2026).

## III.  Related Cases

### A.    Previous or Pending Review of This Case

- *J.G.G. v. Trump*, Nos. 25-5067 & 25-5068 (D.C. Cir.)

- *J.G.G. v. Trump*, No. 25-5124 (D.C. Cir.)

- *J.G.G. v. Trump*, No. 25-5217 (D.C. Cir.)

- *In re Trump*, No. 25-5452 (D.C. Cir.)

- *J.G.G. v. Trump*, No. 26-5040 (D.C. Cir.)

- *Trump v. J.G.G.*, No. 24A931 (U.S.)

**B.     Related Cases in Other U.S. Courts of Appeals or Courts in the District of Columbia**

- *Robert F. Kennedy Hum. Rts. v. Dep't of State*, No. 25-cv-01774 (D.D.C.)

- *G.F.F. v. Trump*, No. 25-1671 (2d Cir.)

- *Abrego Garcia v. Noem*, No. 25-1345 (4th Cir.)

- *Abrego Garcia v. Noem*, No. 25-1404 (4th Cir.)

- *J.O.P. v. DHS*, No. 25-1519 (4th Cir.)

- *W.M.M. v. Trump*, No. 25-10534 (5th Cir.)

- *J.A.V. v. Trump*, No. 25-40400 (5th Cir.)

- *D.B.U. v. Trump*, No. 25-1164 (10th Cir.)

- *Noem v. Abrego Garcia*, No. 24A949 (U.S.)

- *A.A.R.P. v. Trump*, Nos. 24A1007 & 24-1177 (U.S.)

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS & RELATED CASES........i

TABLE OF AUTHORITIES....................................................................ix

GLOSSARY ........................................................................................xvii

INTRODUCTION ................................................................................ 1

STATEMENT OF JURISDICTION......................................................5

STATEMENT OF THE ISSUES..........................................................6

STATEMENT OF THE CASE .............................................................6

SUMMARY OF ARGUMENT ..........................................................13

STANDARD OF REVIEW.................................................................17

ARGUMENT ......................................................................................18

    I.    The District Court Lacked Habeas Jurisdiction...................18

        A.    The United States never had constructive custody
                of Petitioners at CECOT..............................................19

            1.    The United States lacked control of a
                    foreign prison ......................................................19

            2.    Even under the district court's misguided
                    test, the United States lacked constructive
                    custody .................................................................24

            3.    The district court failed to apply the
                    summary judgment standard..............................36

        B.    In all events, the habeas claims became moot
                when El Salvador released Petitioners........................38

    II.    The Certification of a Habeas Class Was Improper ............44

        A.    Habeas is unsuitable for class adjudication ...............45

B. The All Writs Act does not allow for habeas classes ............................................................................. 50

C. In all events, Petitioners have not established standing for each class member ................................... 54

III. The District Court's Sweeping Injunction Was Improper ............................................................................. 58

CONCLUSION ..................................................................................... 63

## TABLE OF AUTHORITIES

**Cases**

*A.A.R.P. v. Trump,*
   605 U.S. 91 (2025) ..................................................................................52

*Abreu v. Superintendent Smithfield SCI,*
   971 F.3d 403 (3d Cir. 2020) ..................................................................41

*Abu Ali v. Ashcroft,*
   350 F. Supp. 2d 28 (D.D.C. 2004) ............................................19, 24, 26

*Al Hajji v. Obama,*
   Civil Case No. 05-0429, 2009 WL 4251108 (D.D.C. Nov. 23, 2009)....22

*Al Maqaleh v. Gates,*
   605 F.3d 84 (D.C. Cir. 2010) ................................................................20

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ..............................................................................36

*Arnold v. Panora,*
   593 F.2d 161 (1st Cir. 1979) .................................................................56

*Bacilio-Sabastian v. Barr,*
   980 F.3d 480 (5th Cir. 2020) .................................................................43

*Braden v. 30th Judicial Circuit Court of Kentucky,*
   410 U.S. 484 (1973) ..............................................................................30

*Coalition of Clergy, Lawyers & Professors v. Bush,*
   310 F.3d 1153 (9th Cir. 2002) ...............................................................49

*Dellums v. Powell,*
   566 F.2d 216 (D.C. Cir. 1977) ...............................................................45

*Department of Homeland Security v. Thuraissigiam,*
   591 U.S. 103 (2020) ..............................................................................59

*Early v. Blankenship,*
   221 F.3d 1342 (8th Cir. 2000) ...............................................................44

*Fay v. Noia,*
   372 U.S. 391 (1963) ........................................................................ 51, 52

*Frank v. Autovest, LLC,*
   961 F.3d 1185 (D.C. Cir. 2020) ............................................................ 37

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.,*
   527 U.S. 308 (1999) .................................................................................. 51

*Gul v. Obama,*
   652 F.3d 12 (D.C. Cir. 2011) ............................... 21, 38, 39, 40, 41, 56

*Hamama v. Adducci,*
   912 F.3d 869 (6th Cir. 2018) ................................................................. 53

*Hamdi v. Rumsfeld,*
   294 F.3d 598 (4th Cir. 2002) ................................................................. 49

*Harisiades v. Shaughnessy,*
   342 U.S. 580 (1952) .................................................................................. 25

*Harris v. Nelson,*
   394 U.S. 286 (1969) .......................................................................... 51, 52

*Holder v. Humanitarian Law Project,*
   561 U.S. 1 (2010) ...................................................................................... 60

*Hourani v. Mirtchev,*
   796 F.3d 1 (D.C. Cir. 2015) ................................................................... 25

*Huisha-Huisha v. Mayorkas,*
   27 F.4th 718 (D.C. Cir. 2022) ............................................................... 42

*I.M. v. United States Customs & Border Protection,*
   67 F.4th 436 (D.C. Cir. 2023) ............................................. 4, 19, 21, 46

*In re Petitioners Seeking Habeas Corpus Relief in Relation to Prior
   Detentions at Guantanamo Bay,*
   700 F. Supp. 2d 119 (D.D.C. 2010) ............................................... 22, 39

*In re Trump,*
   No. 25-5452, 2026 WL 1042105 (D.C. Cir. Apr. 14, 2026) ................... 34

*J.G.G. v. Trump,*
147 F.4th 1044 (D.C. Cir. 2025) .................................. 1, 10, 34, 42, 60

*J.G.G. v. Trump,*
778 F. Supp. 3d 24 (D.D.C. 2025) ...................................... 10

*J.G.G. v. Trump,*
786 F. Supp. 3d 37 (D.D.C. 2025) ..... 3, 11, 21, 22, 26, 28, 30, 32, 37, 38

*J.G.G. v. Trump,*
813 F. Supp. 3d 126 (D.D.C. 2025) ...................................... v

*J.G.G. v. Trump,*
Civil Action No. 25-766, 2026 WL 391937 (D.D.C. Feb. 12, 2026) ....... v

*J.G.G. v. Trump,*
No. 25-5217, 2025 WL 2317650 (D.C. Cir. Aug. 8, 2025) ............... 1, 12

*J.G.G. v. Trump,*
Nos. 25-5067 & 25-5068, 2025 WL 914682 (D.C. Cir. Mar. 26, 2025) .. 9

*Jennings v. Rodriguez,*
583 U.S. 281 (2018) ................................................... 53

*Johnson v. Eisentrager,*
339 U.S. 763 (1950) ................................................... 20

*Johnson v. Guzman Chavez,*
594 U.S. 523 (2021) ................................................... 53

*Kiobel v. Royal Dutch Petroleum Co.,*
569 U.S. 108 (2013) ................................................ 29, 62

*Kiyemba v. Obama,*
561 F.3d 509 (D.C. Cir. 2009) ..................................... 22, 25, 32

*Klayman v. Judicial Watch, Inc.,*
6 F.4th 1301 (D.C. Cir. 2021) ......................................... 35

*Koki Hirota v. General of the Army MacArthur,*
338 U.S. 197 (1948) ................................................... 20

*LoBue v. Christopher*,
  82 F.3d 1081 (D.C. Cir. 1996) ........................................................ 53, 54

*Lugo v. City of Troy*,
  114 F.4th 80 (2d Cir. 2024) ................................................................. 37

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ....................................................................... 36, 55

*Maleng v. Cook*,
  490 U.S. 488 (1989) ....................................................................... 61, 62

*Mead v. Parker*,
  464 F.2d 1108 (9th Cir. 1972) ............................................................ 53

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) .............................................................................. 58

*Munaf v. Geren*,
  553 U.S. 674 (2008) ........................................................ 19, 25, 32, 59

*Na'im v. Rice*,
  577 F. Supp. 2d 361 (D.D.C. 2008) ................................................... 36

*Napier v. Gertrude*,
  542 F.2d 825 (10th Cir. 1976) ............................................................ 53

*Nielsen v. Preap*,
  586 U.S. 392 (2019) .............................................................................. 53

*Opati v. Sudan*,
  590 U.S. 418 (2020) .............................................................................. 21

*Perez v. Greiner*,
  296 F.3d 123 (2d Cir. 2002) ............................................................... 40

*Preiser v. Rodriguez*,
  411 U.S. 475 (1973) .......................................................................... 4, 59

*Qassim v. Bush*,
  466 F.3d 1073 (D.C. Cir. 2006) ......................................... 50, 51, 55, 61

*Schall v. Martin*,
    467 U.S. 253 (1984) ...................................................................53

*Spencer v. Kemna*,
    523 U.S. 1 (1998) ......................................................................38

*Syngenta Crop Protection, Inc. v. Henson*,
    537 U.S. 28 (2002) ....................................................................50

*Talvera v. Shah*,
    638 F.3d 303 (D.C. Cir. 2011) ................................................36

*Tennessee Hospital Ass'n v. Azar*,
    908 F.3d 1029 (6th Cir. 2018) ................................................17

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ......................................................54, 55, 58

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025) ..........................................................51, 58

*Trump v. Hawaii*,
    585 U.S. 667 (2018) .................................................................28

*Trump v. J.G.G.*,
    604 U.S. 670 (2025) ........................................1, 9, 18, 33, 44

*United States ex rel. Bryant v. Houston*,
    273 F. 915 (2d Cir. 1921) ........................................................47

*United States ex rel. Keefe v. Dulles*,
    222 F.2d 390 (D.C. Cir. 1954) ................................................20

*United States ex rel. Sero v. Preiser*,
    506 F.2d 1115 (2d Cir. 1974) ..................................................53

*United States Parole Commission v. Geraghty*,
    445 U.S. 388 (1980) .................................................................50

*United States v. Cortez*,
    449 U.S. 411 (1981) .................................................................61

*Vallario v. Vandehey,*
  554 F.3d 1259 (10th Cir. 2009) ................................................................. 57

*Vargas v. Lambert,*
  159 F.3d 1161 (9th Cir. 1998) ................................................................... 49

*Wainwright v. Sykes,*
  433 U.S. 72 (1977) ..................................................................................... 52

*Wal-Mart Stores, Inc. v. Dukes,*
  564 U.S. 338 (2011) ................................................................................... 57

*Washington Lawyers' Committee for Civil Rights & Urban Affairs v.*
  *United States Department of Justice,*
  145 F.4th 63 (D.C. Cir. 2025) ................................................................... 17

*Whitmore v. Arkansas,*
  495 U.S. 149 (1990) ............................................................................ 47, 48

*Williams v. Richardson,*
  481 F.2d 358 (8th Cir. 1973) ..................................................................... 53

*Wilson v. Dixon,*
  256 F.2d 536 (9th Cir. 1958) ..................................................................... 48

**Statutes**

28 U.S.C. § 1291 ............................................................................................. 5

28 U.S.C. § 1292 ............................................................................................. 5

28 U.S.C. § 1331 ............................................................................................. 5

28 U.S.C. § 1651 ........................................................................................... 50

28 U.S.C. § 2241 ....................................................................................... 5, 19

28 U.S.C. § 2242 ........................................................................................... 46

28 U.S.C. § 2243 ........................................................................................... 46

8 U.S.C. § 1158 ....................................................................................... 42, 43

8 U.S.C. § 1182 ...................................................................... 40, 42

8 U.S.C. § 1227 ...................................................................... 40, 42

**Court Rules**

Fed. R. App. P. 23 .......................................................................51

Fed. R. App. P. 43 ..........................................................................ii

Fed. R. Civ. P. 23 ......................................................................57

Fed. R. Civ. P. 56 ......................................................................17

Fed. R. Evid. 602...........................................................................35

**Executive Actions**

Proclamation No. 10,886, *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8,327 (Jan. 29, 2025) ....................................................................................... 7

Proclamation No. 10,903, *Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua*, 90 Fed. Reg. 13,033 (Mar. 20, 2025) .......................................................... 8

Proclamation No. 10,949, *Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Threats and Other National Security and Public Safety Threats*, 90 Fed. Reg. 24,497 (June 10, 2025) .......................................................................................42

Proclamation No. 10,998, *Restricting and Limiting the Entry of Foreign Nationals To Protect the Security of the United States*, 90 Fed. Reg. 59,717 (Dec. 19, 2025) ........................................................42

Pub. Notice No. 12,672, *Foreign Terrorist Organization Designations of Tren de Aragua, Mara Salvatrucha, Cartel de Sinaloa, Cartel de Jalisco Nueva Generacion, Carteles Unidos, Cartel del Noreste, Cartel del Golfo, and La Nueva Familia Michoacana*, 90 Fed. Reg. 10,030 (Feb. 20, 2025) .......................................................................... 7

## Other Authorities

3 William Blackstone, *Commentaries on the Laws of England* (1768) .. 46

Note, *Multiparty Federal Habeas Corpus*, 81 Harv. L. Rev. 1482 (1968)
........................................................................................................... 51

Restatement (Third) of Agency §1.01 (Am. L. Inst. 2006) ....................... 19

*United States: Human Rights Situation of Migrants, Refugees, and Asylum Seekers*, Comisión Interamericana de Derechos Humanos, https://www.youtube.com/watch?v=5zJpvgzxnwg.. 7, 21, 26, 31, 32, 35, 43

*Webster's New International Dictionary* (2d ed. 1945) ........................... 46

## GLOSSARY

AEA             Alien Enemies Act

CECOT           Centro de Confinamiento del Terrorismo (the Terrorism

                Confinement Center in El Salvador)

FTO             Foreign Terrorist Organization

TdA             Tren de Argua

## INTRODUCTION

This appeal involves the district court's *fourth* attempt to require Defendants to facilitate the return of illegal aliens who were removed to El Salvador under the Alien Enemies Act ("AEA"). The first three attempts were blocked by this Court or the Supreme Court. The fourth try deserves the same fate: if anything, it is even more unprecedented, baseless, and constitutionally offensive than its prequels.

The Supreme Court vacated the district court's original temporary restraining orders for lack of habeas jurisdiction. *Trump v. J.G.G.*, 604 U.S. 670 (2025). Next, the district court tried to get to the same place by threatening criminal contempt unless Defendants facilitated the aliens' return from El Salvador; this Court granted mandamus relief. *J.G.G. v. Trump*, 147 F.4th 1044 (D.C. Cir. 2025) (per curiam). Unfazed, the district court then ruled that, while lacking habeas jurisdiction over aliens in El Salvador, it could require return under a novel, standalone due-process theory. This Court stayed and then vacated the order and remanded because El Salvador had since released Petitioners and they were returned to Venezuela. *J.G.G. v. Trump*, No. 25-5217, 2025 WL 2317650, at *1 (D.C. Cir. Aug. 8, 2025).

1

Here we go again. In its latest order, the district court reversed its own prior ruling, concluding it *had* acquired habeas jurisdiction over the aliens imprisoned in El Salvador because the United States supposedly exercised "constructive custody" over them the whole time. It further concluded that the aliens' release did not moot the matter due to alleged "collateral consequences" arising from their designation as enemy aliens. As a remedy, the court ordered Defendants to parole into the country any class member who wishes to return for habeas proceedings. Nearly two dozen such aliens—all designated as members of a dangerous foreign terrorist organization ("FTO"), Tren de Aragua ("TdA"), and some with criminal investigations—have since conveyed a desire to return (even though they will be detained pending those proceedings and ultimately removed again). The district court also allowed the remaining Petitioners to file new habeas claims remotely, despite not being in custody and despite the severe practical and security issues attendant with holding mini-trials on sensitive national-security issues from foreign countries.

This Court should reverse and remand with instructions to dismiss. Fundamentally, the district court lacked jurisdiction at least twice over. *First*, as the district court initially recognized—and as declarations from

2

high-ranking American diplomats make clear—the Government never had control over Petitioners detained in El Salvador by Salvadoran officials under Salvadoran law, so there was no constructive custody and no habeas jurisdiction. The court originally recognized that "El Salvador has chosen … to detain Plaintiffs at CECOT, and it can choose to release them as well." *J.G.G. v. Trump*, 786 F. Supp. 3d 37, 57 (D.D.C. 2025). Yet ironically, after El Salvador *did* choose to release them, the court reversed course and declared the United States had constructive custody the whole time. The district court disregarded the documentary evidence and sworn declarations from diplomats in favor of ambiguous, dubious hearsay and a vague report from a U.N. subsidiary body working group. At a minimum, the district court should not have viewed the evidence in the light most favorable to Petitioners at the summary judgment stage. That was flagrant error.

*Second*, Petitioners are (as far as Defendants know) free in their home country of Venezuela or in third countries to which they voluntarily traveled. Any habeas claims are therefore moot. The district court concluded otherwise by speculating about collateral consequences for the entire class. That reasoning flouts binding precedent and is unsupported

3

by the record. It also carries sweeping implications, allowing district courts to assert jurisdiction over countless aliens living freely abroad. But habeas jurisdiction is not a roving license to seek out foreign aliens in foreign territory and bring them *into* United States custody.

Habeas corpus literally means "you have the body," *I.M. v. CBP*, 67 F.4th 436, 440 (D.C. Cir. 2023), and the traditional remedy is release, *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973). Yet the district court's primary habeas remedy here is to return *free* individuals to *custody* so they can challenge their initial removal from the United States. That is backwards.

Even if this Court believes there was jurisdiction, the district court clearly erred by certifying a habeas class of 137 aliens living abroad. To start, habeas is an individual writ, so a habeas class action is an oxymoron with no historical basis. The district court's reliance on the All Writs Act cannot supply a newfound tool of such magnitude, especially when doing so is not necessary to preserve jurisdiction. In all events, certifying a class was improper given the complete absence of evidence that each class member suffered a collateral consequence, which is

4

necessary to assert jurisdiction over the entire class. The district court failed to conduct that inquiry, and that requires reversal on its own.

Finally, the relief ordered was deeply flawed. Allowing a district court to take the extraordinary step of forcing Defendants to return dangerous criminal aliens for additional habeas proceedings would inflict irreparable damage on the United States. And allowing hundreds of aliens to file new habeas petitions while free in foreign countries is both jurisdictionally improper and practically untenable.

This case is an easy call: This Court should reverse the district court's novel, significant, and egregiously incorrect jurisdictional rulings and stop its unprecedented reverse-custody arrangements.

## STATEMENT OF JURISDICTION

Petitioners invoked the district court's subject-matter jurisdiction under 28 U.S.C. §1331 and 28 U.S.C. §2241. JA42. The district court granted partial summary judgment to Petitioners on December 22, 2025, and entered an injunction on February 12, 2026. JA320–64, JA442–48. Defendants timely appealed on March 4, 2026. JA451–52. This Court has jurisdiction under 28 U.S.C. §§1291 and 1292(a)(1).

5

## STATEMENT OF THE ISSUES

1.    Whether the district court erroneously asserted habeas jurisdiction over a class of Petitioners detained by a foreign sovereign.

2.    Whether the district court improperly maintained jurisdiction over the class after Petitioners were released to their home country.

3.    Whether the district court erred in certifying a habeas class even though there was no evidence the class members each continued to suffer collateral consequences for jurisdictional purposes.

4.    Whether the district court's relief was an abuse of discretion because it was impractical, dangerous, and legally flawed.

## STATEMENT OF THE CASE

**The Tren De Argua Threat.** Under prior administrations, hundreds of thousands of Venezuelans illegally entered the country. Some of those Venezuelans were members of the notorious prison gang TdA. JA57 ¶7. TdA's proliferation in the United States has fostered crime and endangered communities, as TdA members have committed murder, robbery, human smuggling, and more. JA47–48 ¶6; JA50–54 ¶¶16–25.

To deal with this unprecedented and dangerous influx of illegal aliens, President Trump declared that a "national emergency exists at

the southern border of the United States" from the unprecedented "illegal entry of aliens." 90 Fed. Reg. 8,327, 8,327 (Jan. 29, 2025). Shortly after, the Secretary of State designated TdA as a "foreign terrorist organization." 90 Fed. Reg. 10,030, 10,030–31 (Feb. 20, 2025).

At the time, however, the Maduro regime was refusing to accept deportees.[10] After Secretary Rubio visited El Salvador in early February, the countries began negotiating an arrangement where El Salvador would accept dangerous TdA members. JA469 ¶3. On March 13 and 14, the nations exchanged a set of nonbinding diplomatic notes whereby El Salvador committed "to accommodate approximately 300" TdA members "for a duration of one year unless or until a determination concerning their long-term disposition is made," in exchange for the United States removing to El Salvador several MS-13 members President Bukele wanted for various crimes. *See* JA226–30; JA469–71 ¶¶4–7. The notes made clear that El Salvador would handle the aliens "under Salvadoran domestic law" and in accordance with its international obligations.

---

[10] *See United States: Human Rights Situation of Migrants, Refugees, and Asylum Seekers*, Comisión Interamericana de Derechos Humanos, https://www.youtube.com/watch?v=5zJpvgzxnwg ("CIDH Video"), at 35:10.

JA226. The United States emphasized that it would retain no decision-making authority. JA469–70 ¶5. On March 22, the United States provided a letter grant "for El Salvador's law enforcement and anticrime needs, which may include costs associated with the detention" of TdA members. JA222–25. Despite some misunderstandings by low-level Salvadoran officials, the countries always understood that El Salvador, not the United States, would retain control over the deportees. JA463–67; JA469–70 ¶¶4–5; JA183 ¶11; JA472 ¶11.

On March 15, 2025, the President issued a Proclamation invoking the AEA to detain and remove members of TdA. 90 Fed. Reg. 13,033. The Proclamation authorizes detention and removal of "all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents." *Id.* §1; *see also id.* §3.

**Initial Proceedings.** Also on March 15, five Venezuelan nationals detained in Texas sued in federal court in the District of Columbia to block Defendants from removing them under the Proclamation. Although they initially sought relief under both the Administrative Procedure Act and habeas corpus, those plaintiffs later dismissed their habeas claims

8

at the district court's suggestion. JA45:1–3. The court granted a temporary restraining order against removal of those named plaintiffs, subsequently certified a class of "[a]ll noncitizens who were, are, or will be subject to the AEA Proclamation," and then issued a second injunction for that class. JA3.

Defendants filed emergency motions for stays pending appeal. This Court issued a divided ruling denying a stay. *J.G.G. v. Trump*, Nos. 25-5067 & 25-5068, 2025 WL 914682, at *1 (D.C. Cir. Mar. 26, 2025) (per curiam). The Supreme Court then vacated the district court's orders for lack of jurisdiction, holding that the claims fell "within the 'core' of the writ of habeas corpus and thus must be brought in habeas," and "[f]or 'core habeas petitions,' 'jurisdiction lies in only one district: the district of confinement,'"—which, here, was not the District of Columbia. *J.G.G.*, 604 U.S. at 672.

**Contempt Proceedings.** By the time the district court issued its second injunction on March 15, some members of the original class had already been removed from the United States. El Salvador detained them under Salvadoran authority. JA182–83 ¶¶9–10.

9

On April 16, the court issued an order finding probable cause that Defendants were in criminal contempt for having failed to return the aliens who had been removed *before* the relevant order issued. JA60. The court offered that Defendants could "purge" their contempt "by asserting custody" of those aliens so they could seek habeas review; otherwise, the court said it would seek criminal prosecution, including by appointing a private prosecutor if necessary. *J.G.G. v. Trump*, 778 F. Supp. 3d 24, 54 (D.D.C. 2025).

Defendants immediately sought relief, explaining that the order required the President either to give up his foreign-affairs power by asserting custody over aliens held by a foreign sovereign, or his prosecutorial power by charging his own officials with contempt. Defendants also explained that there had been no violation of the court's injunction in any event. This Court ultimately vacated the contempt order through a writ of mandamus. *J.G.G.*, 147 F.4th 1044.

**Due-Process Order.** The district court invited plaintiffs to amend their complaint to address factual developments since March 2025. A new set of Petitioners–Plaintiffs, most of whom were confined in El Salvador, then joined the case. JA67–69 ¶¶12–17. They sought a writ of habeas

10

corpus and moved to certify a class consisting of "[a]ll noncitizens in custody at the Terrorism Confinement Center ('CECOT') in El Salvador who were, are, or will be subject to the March 2025 Presidential Proclamation." JA176.

Petitioners sought an injunction directing Defendants to "take all reasonable steps to facilitate (i) the release of the CECOT Subclass from the CECOT prison in El Salvador, and (ii) the return of the CECOT Subclass to the United States." JA173. In opposition, Defendants pointed out that the court lacked habeas jurisdiction because the United States did not have custody over Petitioners. Following discovery, the district court credited a declaration from Ambassador Kozak that the United States had no control over the detained class members and El Salvador had "reasons … to detain [Petitioners] at CECOT," and it was not within the court's "ken" to second-guess those reasons. *J.G.G. v. Trump*, 786 F. Supp. 3d 37, 57 (D.D.C. 2025). Yet the district court concluded that it had jurisdiction in equity over Petitioners' freestanding claim that their removal had violated due process. *Id.* at 59–61. The district court granted a preliminary injunction ordering Defendants to "facilitate the ability of the CECOT Class to seek habeas relief." JA184.

Defendants appealed and sought a stay. This Court administratively stayed the order. In the meantime, on July 18, 2025, El Salvador reached a deal with the Maduro regime, mediated by the United States, to release the class members and allow their transport to Venezuela in exchange for the Maduro regime's release of 10 American prisoners and 80 Venezuelan political prisoners. JA312–13 ¶¶8–9. Due to these "changed circumstances," this Court vacated the order and remanded. *J.G.G.*, 2025 WL 2317650, at *3.

**Order Below.** After a new round of briefing, the district court reversed course, finding that the United States *did* exercise constructive custody of the CECOT detainees such that the court had habeas jurisdiction. JA322. The court also held that Petitioners' release did not moot their claims because their designation under the AEA has "collateral consequences." JA346–47. The court therefore certified the same habeas class and granted partial summary judgment in its favor.

The district court ordered briefing on potential injunctive relief. In the interim, the United States arrested Nicolás Maduro on the basis of an existing indictment. JA370 ¶3. Given this seismic shift in foreign affairs, Defendants made clear that they could not take Petitioners into

custody and return them to the United States during such a fluid situation. JA366. Defendants also made clear that remote hearings were impossible and legally flawed. JA367–68. As Secretary Rubio articulated, any court intervention during this sensitive period could complicate ongoing diplomatic engagements. JA370 ¶4.

Nevertheless, the district court ordered Defendants to transport and parole into the United States any class members who wish to return; those who do not were allowed to file habeas petitions remotely. JA447–48. Petitioners' counsel ultimately reported that 22 class members, including several with criminal investigations, wish to return. JA486, 489; JA456 ¶12. Another 68 reportedly wish to pursue remote hearings. JA489. Defendants moved for a stay pending appeal in the district court; after Petitioners consented, the district court stayed the order pending this appeal. JA462; JA38–39.

## SUMMARY OF ARGUMENT

**I.A.** As the district court itself previously found, it lacked habeas jurisdiction over the class. Habeas jurisdiction requires custody, and custody requires control. As senior diplomats testified under oath, the

United States never had control over Petitioners held in El Salvador, in a Salvadoran prison, by Salvadoran guards. That is dispositive.

Yet after the district court's previous due-process order was vacated, it suddenly reversed course and found that the United States had constructive custody over Petitioners detained by El Salvador. That was wrong. Even under the court's incorrect test, the United States lacked control to produce Petitioners. The nonbinding diplomatic notes made clear that El Salvador was not detaining Petitioners at the "behest" of the United States, nor was it "indifferent" to their detention. Instead, El Salvador committed to accept TdA members in exchange for wanted MS-13 members. Nothing in the notes required *detention*, which is what matters. Given that they had been identified as members of TdA, El Salvador chose to detain Petitioners. This was buttressed by later events, as the United States was unable to retrieve several detainees for months. And only four months after Petitioners were removed, El Salvador allowed their transfer to Venezuela. While the United States mediated, El Salvador had been pushing for an exchange publicly since April. That demonstrates that El Salvador, not the United States, had control.

14

The district court reached the contrary conclusion by discounting the testimony of senior officials it had credited before, reinterpreting the diplomatic notes, emphasizing political statements it had previously discounted, crediting an ambiguous UN report, and indulging several layers of hearsay. On top of all of this, the district court second-guessed and speculated about El Salvador's motives, something it previously said was outside of its ken. In doing so, the district court ignored the summary judgment standard and made factual findings in favor of Petitioners. All of that was wrong and warrants reversal.

**B.**     Even if there were constructive custody, El Salvador released the class members and the Maduro regime transferred them to Venezuela, where they are ostensibly free or have voluntarily relocated to third countries and remain free there. Any habeas claims are therefore moot. The district court, however, determined that collateral consequences from their AEA designations—such as bars on entry, residing in America, or seeking asylum—prevented mootness. But no Petitioner has a right to enter or reside in the United States. And there are numerous other restrictions that may apply to many of the class members. Their membership in a designated FTO, for example, erects a

15

separate legal bar to asylum, which is discretionary and can be denied for any reason. The alleged consequences are thus neither concrete nor likely to be redressed by a hearing. That means the claims are moot, and reversal is necessary for this reason as well.

**II.**    Even if there was jurisdiction, the district court erred in certifying a habeas class. To start, habeas is an individual writ that is not amenable to class certification. The All Writs Act does not allow the district court to skirt that basic reality, and class certification was not required to prevent mootness. At minimum, Rule 23 must guide the analysis, and a court must have jurisdiction over every class member to provide them relief. Here, that would require collateral consequences for each member. Yet there was no evidence that each class member suffered a collateral consequence, as required for jurisdiction over the class. In fact, the district court did not engage in that analysis at all, necessitating reversal of the class certification order and the resulting classwide relief.

**III.**    The district court's sweeping injunction was also improper as an exercise of equitable discretion. To start, ordering the United States to re-detain free individuals is contrary to habeas. Moreover, returning FTO members to the United States would require diplomacy and could

threaten public safety, both contrary to principles of equity. The district court's order allowing up to 137 remote habeas hearings is equally flawed, as no court would have jurisdiction over these new habeas claims, and conducting these sensitive hearings from foreign countries is impractical and untenable. Meanwhile, Petitioners are free in their home country, have no right to be in America, and are likely to be detained and removed again. Their harm is minimal, if cognizable at all, and does not justify the relief ordered. This Court should reverse.

## STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment *de novo* and can affirm only if "there are no genuine disputes of material fact, and the movant is entitled to judgment as a matter of law." *Washington Laws.' Comm. for C.R. & Urb. Affs. v. DOJ*, 145 F.4th 63, 69 (D.C. Cir. 2025) (citing Fed. R. Civ. P. 56(a)). In reviewing a permanent injunction, "legal conclusions are reviewed de novo, and the scope of injunctive relief is reviewed for an abuse of discretion." *Tenn. Hosp. Ass'n v. Azar*, 908 F.3d 1029, 1046 (6th Cir. 2018) (cleaned up).

## ARGUMENT

## I.    The District Court Lacked Habeas Jurisdiction.

The Supreme Court vacated the district court's first order because challenges to AEA designations must be brought in habeas, and habeas jurisdiction requires custody in the district of confinement. *J.G.G.*, 604 U.S. at 673. By the time these Petitioners sought the instant habeas relief in the district court, they were in the custody of a foreign sovereign: El Salvador. Because they were not in U.S. custody when they filed their amended complaint, the district court lacked jurisdiction. And Petitioners are not in *anyone*'s custody now—they are apparently free in their home country, and some have even travelled to third countries. The district court thus never had jurisdiction, and even if it did, Petitioners' claims are now moot.

The district court nonetheless found its way to jurisdiction by holding that (i) the United States exercised "constructive custody" over Petitioners in CECOT; and (ii) various alleged collateral consequences of their AEA designations defeated mootness even after their release. JA328–45. At both steps, the court was wrong on both the law and the facts. It plainly lacked habeas jurisdiction.

### A. The United States never had constructive custody of Petitioners at CECOT.

### 1. The United States lacked control of a foreign prison.

Habeas is available only to those held "in custody under or by color of the authority of the United States." 28 U.S.C. §2241(c)(1). A person is "held 'in custody' by the United States when the United States official charged with his detention has 'the power to produce' him." *Munaf v. Geren,* 553 U.S. 674, 686 (2008). So the dispositive question is whether the alleged custodian can produce the body on command. *See I.M.*, 67 F.4th at 440.

Initially, the district court appreciated that the United States did not exercise custody over detainees in El Salvador. In an about-face, however, the district court concluded that the United States possessed constructive custody over Petitioners detained by El Salvador in CECOT all along. JA330. That was error. Constructive custody requires that "the imprisoning sovereign is the respondent's agent." *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 47 (D.D.C. 2004). And agency requires control. *See* Restatement (Third) of Agency §1.01 (Am. L. Inst. 2006); *id.* cmt. f(1). The United States never had control over Petitioners while they were detained by a foreign sovereign.

To state the obvious, the United States does not control El Salvador. Courts have long rejected habeas petitions from those held by a "foreign jailer," even when the petitioner alleged that American officials played some role in "depriv[ing] the [petitioner] of his liberty." *United States ex rel. Keefe v. Dulles*, 222 F.2d 390, 391 (D.C. Cir. 1954) (no custody when prisoner was detained by French officials allegedly acting as "agents" for American officials). In *Koki Hirota v. General of the Army MacArthur*, for example, the Supreme Court rejected a habeas petition against General MacArthur because the petitioners were Japanese citizens in Japanese custody, even though MacArthur established the military tribunals that convicted them. 338 U.S. 197, 198 (1948) (per curiam). Courts have also rejected habeas where the Government lacked control over the facility. *See Johnson v. Eisentrager*, 339 U.S. 763, 777–78 (1950) (holding that habeas did not extend to enemy aliens detained in a German prison based on conviction by U.S. Military Commission); *Al Maqaleh v. Gates*, 605 F.3d 84, 97 (D.C. Cir. 2010) (no habeas jurisdiction over leased military

20

base because U.S. lacked *de facto* sovereignty).[11] So control over the petitioner's body or the facility is key.

The United States lacks control over a foreign prison controlled by a foreign sovereign and thus lacked custody over Petitioners. As senior U.S. diplomats made clear in sworn testimony, El Salvador is a sovereign nation that detained Petitioners under the sole authority of Salvadoran law, in a Salvadoran prison, on Salvadoran soil, and by Salvadoran officials. JA182–83 ¶¶9–10; JA310 ¶4; JA315–17 ¶¶2–4; *see also Opati v. Sudan*, 590 U.S. 418, 420 (2020) ("The jurisdiction of the nation within its own territory is necessarily exclusive and absolute."). As top-level officials repeatedly testified, the United States never had control over the detainees in CECOT and could not produce them upon command. JA182–83 ¶¶9–10; JA310 ¶4; JA315–17 ¶¶2–4; CIDH Video at 35:10.

Under this Court's precedent, that testimony was entitled to be credited and should have been dispositive. *See Gul v. Obama*, 652 F.3d

---

[11] The district court discounted the Suspension Clause cases as setting the limits on constitutional habeas, not the statute. *J.G.G.*, 786 F. Supp. 3d at 54. But there is no basis to read the statute to extend beyond core habeas. At a minimum, this Court should interpret the custody requirement in the habeas statutes consistently with historical habeas. *I.M.*, 67 F.4th at 442.

21

12, 17–18 & n.* (D.C. Cir. 2011) (crediting declaration that United States no longer had custody of Guantanamo Bay detainees transferred to Afghanistan and Sudan). In *Kiyemba v. Obama*, this Court concluded based on a government declaration that detainees cannot "prevail on the ground that [a] foreign sovereign is an agent of the United States merely because ... the Government 'engages in a dialogue to ascertain or establish what measures the receiving government intends to take pursuant to its own domestic laws....'" 561 F.3d 509, 515 n.7 (D.C. Cir. 2009) (quoting the record); *see also id.* at 521 (Kavanaugh, J., concurring) (stating the declaration suffices "to demonstrate that the proposed transfer of an alien to the custody of a foreign nation is not the same thing as the U.S. Government's maintaining the detainee in U.S. custody"). District courts have consistently applied that precedent in similar circumstances. *See, e.g.*, *In re Petitioners Seeking Habeas Corpus Relief in Relation to Prior Detentions at Guantanamo Bay*, 700 F. Supp. 2d 119, 127–28 (D.D.C. 2010); *Al Hajji v. Obama*, 2009 WL 4251108, at *1–2 (D.D.C. Nov. 23, 2009). Thus, even the district court here originally credited those declarations and found them sufficient to demonstrate a lack of constructive custody. *See J.G.G.*, 786 F. Supp. 3d at 57.

22

Yet the district court later claimed those declarations left open the possibility that the United States had some residual control. JA343. They said nothing of the sort, and no magic words were required to rule out every hypothetical. Plus, the plain import of the declarations was corroborated by the record. First, contemporaneous documents emphasized to Salvadoran officials that they had sole custody and any indications to the contrary were inaccurate. JA463–67. The district court never addressed this evidence. Second, El Salvador let some American officials and non-governmental organizations into CECOT while rejecting others, without consulting the United States, thereby proving the foreign sovereign's unilateral control. JA463; JA182–83 ¶10; JA315–16 ¶2. Third, the United States sought the return of two detainees. What followed was months of negotiations, with one individual being moved without prior notice and only returned after an indictment was secured, and the other released for transfer to Venezuela. JA182–83 ¶¶9–11; JA472 ¶11; JA315–17 ¶¶2–5; JA311–12 ¶7. That gets to the fourth point: El Salvador released all class members into the custody of the Maduro regime on July 8, 2025. JA312–13 ¶¶8–9. All of this evidence demonstrates that El Salvador, not Defendants, had custody and control

23

of the Petitioners. The district court's contention that El Salvador was simply an agent of the United States is unfounded and an affront to a sovereign nation. Focusing on control over the Petitioners, the undisputed evidence makes clear that the United States never had constructive custody.

## 2. Even under the district court's misguided test, the United States lacked constructive custody.

Instead of focusing on control over Petitioners, the district court applied a multi-factor test developed by *Abu Ali*, 350 F. Supp. 2d at 47. Under that test, courts assess constructive custody by analyzing whether (i) the petitioner "was detained at the behest of United States officials; (ii) his ongoing detention is at the direction of the United States enlisting a foreign state as an agent or intermediary who is indifferent to the detention of the prisoner; (iii) he is being detained in the foreign state to deny him an opportunity to assert his rights in a United States tribunal; and (iv) he would be released upon nothing more than a request by the United States." *Id.* at 68.

This Court should reject this freewheeling, multi-factor balancing test for something as important as constructive custody. Several of the factors are inappropriate or have little bearing on custody. The factor

24

asking if detention was intended to evade judicial review, for example, has no bearing on control over the petitioner. If a petitioner is removed to another country where he is at liberty (as the class members here are as far as the United States is aware), there would be no basis for finding constructive custody, even though that course would more effectively evade review. Whether the foreign sovereign is "indifferent" to the prisoner's detention also has little relevance yet threatens to embroil district courts in foreign policy determinations over which they lack constitutional competence. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952) (foreign affairs are "so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference."). Courts should not analyze, much less second-guess, the intentions of foreign sovereigns—to do so "would require federal courts to pass judgment on foreign justice systems and undermine the Government's ability to speak with one voice in this area." *Munaf*, 553 U.S. at 702; *see also Kiyemba*, 561 F.3d at 515; *Hourani v. Mirtchev*, 796 F.3d 1, 11–12 (D.C. Cir. 2015).

Regardless, even under those factors, the district court lacked habeas jurisdiction. *Abu Ali* itself warned that circumstances "where the

25

United States is correctly deemed to be operating through a foreign ally as an intermediary for purposes of habeas jurisdiction will be exceptional, and a federal court's inquiry in such cases will be substantially circumscribed by the separation of the powers." 350 F. Supp. 2d at 41. The district court here did not heed that admonition.

     **a.**    *First,* El Salvador's custody of Petitioners was not solely at the United States' (i) "behest." Indeed, the district court itself previously ruled that El Salvador had "reasons … to detain [Petitioners] at CECOT," could choose to release them, and it was not within the court's "ken" to second-guess those reasons. *J.G.G.*, 786 F. Supp. 3d at 57. That correct ruling was based on the diplomatic notes and the declarations. *Id.* It has since been buttressed by President Bukele's decision to release the detainees to the Maduro regime. JA312–13 ¶¶8–9.

     Yet the district court, looking at the same diplomatic notes and declarations, suddenly changed course to read the notes as "strongly indicat[ing]" control by the United States. JA334–36. That was wrong. The reality is that, at the time, the Maduro regime was refusing to accept deportees, so Defendants needed a third country willing to take aliens who are members of designated FTOs. CIDH Video at 35:10. So in a set

26

of nonbinding diplomatic notes on March 13 and 14, El Salvador agreed "to accommodate approximately 300" members of TdA "for a duration of one year unless or until a determination concerning their long-term disposition is made," in exchange for the United States agreeing to turn over several MS-13 members whom President Bukele "requested" for various crimes. JA226, 228; JA469–71 ¶¶4–7. The notes made clear that El Salvador would handle the aliens "under Salvadoran domestic law" and in accordance with its international obligations. JA226. The United States clarified during the development of the notes that it would retain no decision-making authority. JA469–70 ¶5. On March 22, the United States provided a letter grant "for El Salvador's law enforcement and anticrime needs, which may include costs associated with the detention" of TdA members. JA222–25. But the grant did not have to be used to house the aliens; that remained El Salvador's call. JA470 ¶6. Nothing in the notes or grant required detention or indicated that the United States retained any control; quite the opposite. JA469–71 ¶¶4–7.

The district court latched on to the diplomatic notes' reference to a year-long duration with the possibility of a long-term disposition made prior. JA336. The fact that El Salvador committed to accept Petitioners

27

for up to a year does not suggest their custody was at the United States' behest; indeed, El Salvador released the Petitioners to the Maduro regime just months later. The year-long period would allow the two countries to review the arrangement as necessary, but its inclusion in the notes did not indicate that the United States somehow retained control. JA469–70 ¶5.

Likewise, the court erred in its treatment of out-of-context statements by public officials. JA337–38. Ambiguous political remarks are not sound evidence of the purpose behind executive policy. *See Trump v. Hawaii*, 585 U.S. 667, 701–02 (2018). The district court previously understood that. *See J.G.G.*, 786 F. Supp. 3d at 57.

In the end, the evidence supports that El Salvador did not detain class members solely at the United States' behest. It did so for its own reasons.

**b.** *Second*, and relatedly, El Salvador was not (ii) "indifferent" to Petitioners' detention. Again, the district court previously held that El Salvador had "reasons … to detain [Petitioners] at CECOT" that were outside the court's "ken" to second-guess. *J.G.G.*, 786 F. Supp. 3d at 57. Yet it later changed its tune, reasoning that El Salvador had no part in

selecting Petitioners and Petitioners had no connections to El Salvador. JA338–39. That is not responsive. It does not matter why El Salvador *accepted* Petitioners from U.S. custody. (It did so because it received high-level MS-13 members in exchange. JA226.) The question is why El Salvador *detained* them after receiving them. The district court identified nothing showing the United States directed that detention. Once El Salvador accepted identified TdA members, it makes sense that it would choose to detain them where it detained other violent gang members, albeit in a separate part of the prison segregated from Salvadoran prisoners. JA469–70 ¶5. The district court discounted that reason because it "simply raises the question of why El Salvador allowed Plaintiffs into its country in the first place." JA339. Again, that is asking the wrong question; all that matters is why El Salvador detained them. Fundamentally, nothing changed from the district court's previous decision to justify its second-guessing and speculating about a foreign nation's intentions. That is not a proper judicial inquiry. *See Kiobel v. Royal Dutch Petrol. Co.*, 569 U.S. 108, 116 (2013) (warning of "the danger of unwarranted judicial interference in the conduct of foreign policy").

29

The district court relied on *Braden v. 30th Judicial Circuit Court of Kentucky*, 410 U.S. 484 (1973), to suggest that El Salvador does not have to be completely indifferent, as multiple sovereigns can have an interest and a role in detaining Petitioners. JA338, 343. That just ignores the indifference factor: El Salvador was not indifferent, so the factor cuts against constructive custody. *Braden* was about challenging a separate restraint imposed by another state. Here, there was no separate restraint imposed by the United States. If El Salvador had released Petitioners instead of detaining them in CECOT, the United States would not and could not have rearrested them in El Salvador. Indeed, post-release, the class members remain free (to Defendants' knowledge) in their home country or third countries.

**c.** *Third*, Petitioners could not (iv) be released on mere request by the United States. This factor favors Defendants for the same reasons the control inquiry does. *See supra* I.A.1.b. Again, the district court originally agreed. *See J.G.G.*, 786 F. Supp. 3d at 57. Yet despite acknowledging that El Salvador "can choose to release them," *id.*, the district court suddenly decided that the release of Abrego Garcia and the

transfer of class members to Venezuela proved that the United States had control the whole time. JA341–42. Those events cut *against* control.

After a district court ordered the United States to facilitate the return of Abrego Garcia from El Salvador (a MS-13 members who was removed against an immigration judge order), the United States spent months trying to secure his return with no success until an indictment was issued (as President Bukele said publicly). JA182–83 ¶¶9–11; JA472 ¶11; JA315–18 ¶¶2–5. Efforts to return another detainee never bore fruit. JA311–12 ¶7. Those efforts would have been immediately successfully if the United States truly had constructive custody.

As to the transfer of the class members, this was an arrangement spearheaded by El Salvador as early as April 2025, when President Bukele publicly proposed an exchange with the Maduro regime. JA311 ¶5; JA182 ¶9. President Bukele lamented Maduro's rejection of this offer on April 22. JA182 ¶9. On July 18, the parties reached an agreement, mediated by the United States, to transfer Petitioners to the Maduro regime in exchange for release of 10 American prisoners and 80 Venezuelan political prisoners. JA312–13 ¶¶8–9; CIDH Video. President Bukele publicly took credit for this arrangement as a significant victory.

CIDH Video. While the United States helped facilitate that arrangement given the acrimony between Bukele and Maduro, the United States did not have the ability to procure the transfer on its own.

The district court ignored this timeline, instead assuming the United States orchestrated the exchange based on speculation that El Salvador got nothing out of the deal. JA341–42. That was wholly improper. As the court previously recognized, second-guessing foreign sovereigns' motives and diplomatic exchanges is far outside the competence of federal courts. S*ee J.G.G.*, 786 F. Supp. 3d at 57. Anyway, President Bukele secured a significant diplomatic deal that he took credit for as a humanitarian success. The deal also resulted in the release of 80 political prisoners that Maduro, President Bukele's foe, considered his political enemies or otherwise politically problematic. The district court ignored that key fact and never explained how that part of the arrangement only benefited the United States. The district court's attempt to psychoanalyze sensitive foreign negotiations and officials underscores the impropriety of its analysis. *See Munaf*, 553 U.S. at 702; *Kiyemba*, 561 F.3d at 515.

32

The bottom line is that El Salvador maintained control the entire time, chose to transfer the class members for its own purposes, and the United States never could have secured their release without complicated negotiations. The district court's contrary conclusion is belied by the evidence and threatens the President's control over foreign affairs.

**d.**    *Finally*, the United States was not trying to (iii) dodge the court's jurisdiction—the court lacked jurisdiction to begin with. *J.G.G.*, 604 U.S. at 672. The district court relied on the quick removal and the leaked "report" by a disgruntled former Government attorney to argue that Defendants intended to evade review. JA340. Yet even the district court recognized that the question was whether the detention itself was designed to evade review, which it did not find obvious. *Id.* For good reason. The "report" was not made under oath, is inaccurate, and has nothing to do with whether Petitioners were in United States custody in CECOT. Petitioners' own evidence also shows that the United States removed Petitioners quickly because it believed it legally could. JA221; JA234–40; JA273–74. Indeed, even after reviewing this evidence, this Court *twice* granted mandamus to stop the district court's unlawful contempt inquiry, with three judges finding no violation of the district

33

court's order. *J.G.G.*, 147 F.4th at 1046 (Katsas, J., concurring); *In re Trump*, No. 25-5452, 2026 WL 1042105, at *1 (D.C. Cir. Apr. 14, 2026). That is hardly evasion.

**e.** After this Court vacated its due-process injunction, the district court reversed its prior ruling on constructive custody, ostensibly because of "new facts." JA331. The only "new information" the district court considered was (i) a report by a U.N. subsidiary working group recounting a low-level Salvadoran official allegedly saying that "jurisdiction and legal responsibility" for the detainees lay "exclusively with the competent foreign authorities," JA189; and (ii) self-serving declarations recounting hearsay, mostly by CECOT guards, claiming Petitioners "could only be released if the U.S. said so." JA336–37; JA211 ¶¶3–4; JA219 ¶9; JA481 ¶9; JA216, ¶¶7–8. Neither piece of evidence moves the needle.

As to the "report," its assertions were made by an unknown Salvadoran official and edited by the unaccountable working group. JA189; *see* JA463–67 (cautioning against low-level officials making false statements like this). Moreover, the report's statement on its face is not clearly relevant; in context, it appears to be referring only to the removals

34

of the individuals from the United States, not their subsequent detention in and by El Salvador. JA189 (arguing that El Salvador cannot be held "responsible for a failure to observe the principle of non-refoulement"). The district court said that it was appropriate to rely on material drafted by an anonymous low-level official because courts can presume that government statements to foreign bodies are accurate. JA337. Yet at the same time, the court simultaneously ignored the U.S. State Department's testimony to a different, more prominent international body in which the State Department made clear the United States never had custody. CIDH Video at 35:10.

As to the self-serving hearsay from the prison guards, "sheer hearsay … counts for nothing on summary judgment." *Klayman v. Jud. Watch, Inc.*, 6 F.4th 1301, 1315 (D.C. Cir. 2021). All the more so given that there was no basis for a guard (or even director) at CECOT to know whether the United States had control of Petitioners. Fed. R. Evid. 602. At most, this "evidence" reflects a misunderstanding at the time or an attempt by low-level Salvadoran officials to avoid responsibility. *See* JA463–67; JA469–70 ¶¶4–5; JA183 ¶11; JA472 ¶11. The district court ignored this contrary evidence and instead fully credited an anonymous

edited document and several layers of hearsay over the sworn declarations of U.S. officials. That was obvious error.

### 3. The district court failed to apply the summary judgment standard.

At minimum, the district court erred by viewing the facts relative to constructive custody in the light most favorable to Petitioners. JA328. That gets the summary-judgment standard backwards; the court should have viewed the evidence in the light most favorable to the nonmovant. *Talvera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011). If there was a dispute of material fact, the district court should have denied Petitioners' motion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The district court began by accurately recounting the summary judgment standard. JA327. But then it concluded that the analysis for jurisdiction is "akin to a Rule 12(b)(1) motion to dismiss" and thus it could consider "undisputed facts plus the court's resolution of disputed facts." JA328–29 (quoting *Na'im v. Rice*, 577 F. Supp. 2d 361, 366 n.1 (D.D.C. 2008)). The district court cited no binding authority for this novel approach. To the contrary, at summary judgment, the movant "must 'set forth' by affidavit or other evidence 'specific facts'" establishing jurisdiction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *see also*

36

*Frank v. Autovest, LLC*, 961 F.3d 1185, 1187 (D.C. Cir. 2020) (plaintiff failed to carry burden of establishing standing at summary judgment stage). The Second Circuit reversed a court for the same mistake: using the Rule 12 standard for summary judgment on jurisdictional matters. *See Lugo v. City of Troy*, 114 F.4th 80, 90 (2d Cir. 2024). This Court should do the same.

The district court's improper fact-finding was not harmless; it infected the entire analysis. For example, the district court reinterpreted the diplomatic notes against Defendants, cabined the declarations of ambassadors, speculated that El Salvador's release of Petitioners for their transfer to Venezuela was orchestrated by the United States, construed the UN document in Petitioners' favor despite contrary evidence in the record, and credited their hearsay-laden declarations. JA334–45. As demonstrated, there is contrary evidence and interpretations for each. *Supra* I.A.2. There is at least a material dispute—even the district court previously found there had been no constructive custody at CECOT when it could (and did) make factual findings on the preliminary-injunction motion. *See J.G.G.*, 786 F. Supp. 3d at 57. Indeed, the district court found that El Salvador had its own

reasons to detain Petitioners and credited Defendants' declarations. *Id.* So at a minimum there is a dispute of material fact, and the district court erred by nevertheless granting summary judgment to Petitioners.

### B.    In all events, the habeas claims became moot when El Salvador released Petitioners.

Even if Petitioners had been in the constructive custody of the United States while in El Salvador, that would not support the continued exercise of habeas jurisdiction after their release. That release rendered any habeas claims moot. The district court ruled that it retained jurisdiction by virtue of supposed "collateral consequences" flowing from Petitioners' AEA and FTO designations. JA346. That was mistaken too.

"The Supreme Court has cautioned against extension of the presumption of collateral consequences." *Gul*, 652 F.3d at 16. Even the risk of parole revocation is typically not enough. *Spencer v. Kemna*, 523 U.S. 1, 14 (1998). Petitioners bore the burden to show both (1) a concrete continuing injury caused by their AEA designations, and (2) that a favorable decision would likely redress that injury. *Gul*, 652 F.3d at 14, 17–21. Petitioners made neither showing.

1.    The district court ruled that the AEA designations continue to harm Petitioners by "barring their entry into the United States,

barring their residing in this country, and subjecting them to property seizure and forfeiture." JA346. None of these rise to the level of a concrete, continuing injury. Indeed, this Court previously held that a designation as an "enemy combatant" did not result in collateral consequences, even though it restricted the ability to travel or return to the United States, could result in detention, and created consequences in third countries. *Gul*, 652 F.3d at 14, 17–21; *see also Guantanamo Bay*, 700 F. Supp. 2d at 127–37 (rejecting as collateral consequences (1) conditions imposed by foreign governments; (2) stigma; (3) a prohibition of travel to United States; and (4) inability to bring a damages action).

Here, the district court's remedy is simply a hearing to contest their AEA designations. That is not likely to redress the alleged consequences, even assuming they prevail in those hearings. To start, Petitioners have no right—regardless of their designations—to remain in the United States, and they acknowledge they would be removed again if they return. JA407–08. Indeed, the 22 who wish to return are otherwise removable, some under expedited removal, and one who already has a final order of removal under Title 8. JA456 ¶12. This means their

39

inability to return to or reside in the United States is insufficient to create jurisdiction. *See Gul*, 652 F.3d at 19–20 (explaining that "granting a detainee's habeas petition" would not remedy his injuries, because other statutes would still bar travel and entry).

In addition, there are many restrictions that apply to aliens trying to enter or reside in the United States that could apply to many of the class members irrespective of their AEA designations or membership in an FTO. For example, §1182(a)(3) has a long list of admissibility bars that may apply, including a "reasonable ground to believe" someone is likely to engage in terrorist activity, someone who "incidentally" engages in conduct that "could endanger the welfare, safety, or security of the United States," "incidentally" engages in "any other unlawful activity," or might be a public charge. *See generally* 8 U.S.C. §1182(a)(3)–(4). Even if they are allowed entry, there is a long list of grounds for deportability, such as committing various crimes. 8 U.S.C. §1227(a)(2)–(5). If any of these bars apply to a class member absent their AEA designation, they would lack collateral consequences and thus jurisdiction. *See Perez v. Greiner*, 296 F.3d 123, 126 (2d Cir. 2002) ("[B]ecause [petitioner] is permanently inadmissible to the United States due to his prior drug

40

conviction, collateral consequences cannot arise from the challenged robbery conviction, and the petition is moot."); *Abreu v. Superintendent Smithfield SCI*, 971 F.3d 403, 407 (3d Cir. 2020) (similar).

The court also worried that Petitioners could be subject to property seizure and asset forfeiture by virtue of their designations. But that risk is entirely unsubstantiated. *See Gul*, 652 F.3d at 20 (acknowledging that petitioners could be recaptured, but rejecting this as "speculative" because they had "no basis whatsoever for believing" it would occur). No evidence was presented that any class member had property seized, was likely to have property seized, or even had property that could be seized.

**2.**    The court also ruled that Petitioners' AEA designations, since they rested on membership in TdA, subjected them to restrictions that apply to FTO members—entry bans, asset forfeiture, and asylum bars. JA346–47.

Most fundamentally, however, granting habeas as to Petitioners' AEA designations would not remedy the asserted collateral consequences from the FTO designations. The two are separate and independent. *See Gul*, 652 F.3d at 20 (determination that petitioner was "member of a terrorist organization" "involves a separate legal standard" than "enemy

41

combatant). Indeed, if Petitioners successfully challenged the AEA Proclamation on legal grounds regarding the statutory predicates for invoking the Proclamation (as the district court suggested, JA411), that would not affect their identification as members of a designated FTO in any way. Membership in a designated FTO separately precludes admission to the United States and many forms of discretionary relief. *See* 8 U.S.C. §§1182(a)(3)(B)(i)(IV)-(V); 1227(a)(1)(A); 1158(b)(2)(A)(v); *J.G.G.*, 147 F.4th at 1055 (Katsas, J., concurring).

Even setting that aside, Petitioners have no right to enter the United States regardless, many class members may be subject to independent entry bars, and any threatened forfeiture of assets is speculative. Indeed, Venezuelan immigrants are currently subject to a travel ban, which would preclude entry for most class members. 8 U.S.C. §1182(f); 90 Fed. Reg. 24,497 (June 10, 2025), *as amended by* 90 Fed. Reg. 59,717 (Dec. 19, 2025).

As for asylum, it is a discretionary benefit, *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 730–31 (D.C. Cir. 2022), and ineligibility for a discretionary benefit does not qualify as a collateral consequence even if the designations erect a categorical bar to it, *see Bacilio-Sabastian v.*

42

*Barr*, 980 F.3d 480, 483 (5th Cir. 2020) (discretionary benefits do not create collateral consequences). Moreover, some class members may have independent bars to seeking asylum such as the one-year statute of limitations, 8 U.S.C. §1158(a)(2)(B), possibility of terrorist activity, certain criminal convictions, and possibility of criminal conduct, *id.* §1158(b)(2).

*     *     *

Putting it all together, the district court's speculative theory appears to be that the United States paid El Salvador to detain Petitioners in CECOT for up to a year as punishment or to evade review, but then quickly began negotiations with Maduro to send Petitioners to Venezuela after just four months with no refund for the eight remaining months of that year that Petitioners were no longer in CECOT. That makes no sense. The truth is more sensible. The United States needed somewhere to send identified TdA members in the face of Maduro's refusal to accept return of Venezuela's own nationals. CIDH Video at 35:10. El Salvador was willing to accept them in exchange for "requested" high-level MS-13 members. *Id.*; JA226. El Salvador chose to detain them all. JA182–83 ¶¶9–10; JA310 ¶4. When the Maduro regime was willing

43

to accept them in exchange for releasing political prisoners, El Salvador released the detainees for transfer back to their home country. JA312–13 ¶¶8–9. So once the United States transferred the class members to El Salvador, it lost custody and never regained it. That is certainly true now that they are ostensibly free in another country. The district court lacked jurisdiction, requiring reversal and judgment for Defendants.[12]

## II.    The Certification of a Habeas Class Was Improper.

If the Court disagrees on jurisdiction, it should still reverse the district court's use of the All Writs Act to certify a habeas class of TdA members residing abroad. The district court improperly certified "the same class as before: All noncitizens removed from U.S. custody and

---

[12] Petitioners have indicated that they believe the district court's previous due-process ruling is an alternative ground for affirmance. JA462. The district court did not analyze that claim given the new facts, certify a class on that basis, or tailor a remedy to redress it. JA330. Nevertheless, such a claim would fail for the reasons previously briefed to this Court *See J.G.G. v. Trump*, No. 25-5217 (D.C. Cir.), Doc. 2120092. First, as the Supreme Court already held, that claim challenges the validity of removal and thus also sounds in habeas. See *J.G.G.*, 604 U.S. at 672; *Early v. Blankenship*, 221 F.3d 1342 (8th Cir. 2000). It thus fails for the same reasons. Second, facilitating habeas makes no sense as a remedy, as it would require Defendants to regain custody over free individuals. Third, Petitioners have never articulated what protected interest they seek to protect through due process, and returning someone to custody cannot possibly protect a liberty interest.

transferred to the Terrorism Confinement Center (CECOT) in El Salvador on March 15 and 16, 2025, pursuant solely to the Presidential Proclamation...." JA358–59. Reversal is warranted for a simple reason: a habeas class is an oxymoron. Even if a habeas class could exist, however, something significant changed between the previous class certification and this one: El Salvador released the class members for their transfer to Venezuela, requiring the district court to rely on collateral consequences to maintain jurisdiction. The district court did not properly analyze that issue, and could not have found that *all* members of the class continued to suffer collateral consequences. That requires reversal.

### A.    Habeas is unsuitable for class adjudication.

Due to the individualized nature of the writ of habeas corpus, the class action model is an incompatible vehicle for effective and efficient relief. Class actions are intended to "create an efficient mechanism for trying claims that share common questions of law or fact when other methods of consolidation are impracticable." *Dellums v. Powell*, 566 F.2d 216, 230 (D.C. Cir. 1977). By contrast, habeas, from its inception, has been an individualized writ. Indeed, the federal habeas statute is designed for an individual petitioner; it requires that an "[a]pplication for

45

a writ of habeas corpus shall be in writing signed and verified *by the person for whose relief it is intended or by someone acting in his behalf*" and "shall allege the facts concerning *the applicant's commitment or detention, the name of the person who has custody over him and by virtue of what claim or authority*, if known." 28 U.S.C. §2242 (emphasis added). The issuance of the writ is then "directed *to the person having custody of the person detained*" and may require the custodian to "produce at the hearing *the body of the person detained.*" *Id.* §2243 (emphasis added). That is an individualized process and inquiry, not one amenable to classwide resolution.

This reflects the historical origins of habeas. "'Habeas corpus' is Latin for 'you have the body.'" *I.M.*, 67 F.4th at 440 (quoting *Webster's New International Dictionary* 1121 (2d ed. 1945)). Blackstone commented that habeas was "directed to the person detaining another, and commanding him to produce the body of the prisoner with the day and cause of his caption and detention." 3 William Blackstone, *Commentaries on the Laws of England* 131–32 (1768). That is, by definition, individualized. How can a court order the production of a prisoner's body

46

if the prisoner is an unknown class member in the control of an unknown custodian?

In its analysis of the adequacy of representation under Rule 23(a)(4), the district court analogized the inquiry to the "next friend" doctrine for habeas. JA356–57. If anything, that doctrine proves that habeas is an individual writ that is ill-suited for class adjudication. The doctrine of "next friend" allows someone close to the detainee to apply for habeas on their behalf. *Whitmore v. Arkansas*, 495 U.S. 149, 163 (1990). But not just anyone may petition on behalf of any detainee, lest it be abused "by intruders or uninvited meddlers, styling themselves next friends." *Id.* (quoting *United States ex rel. Bryant v. Houston*, 273 F. 915, 916 (2d Cir. 1921) (dismissing writ because though wife was close enough to be next friend, there was no explanation why detainee could not petition for himself)). So a "next friend" must (1) "provide an adequate explanation—such as inaccessibility, mental incompetence, or other disability—why the real party in interest cannot appear on his own behalf to prosecute the action," (2) "be truly dedicated to the best interests of the person on whose behalf he seeks to litigate," and (3) "have some significant relationship with the real party in interest." *Id.* at 163–

47

64. This analysis, once again, is highly individualized, focusing on the disability preventing the detainee from applying himself, the interests of the next friend, and the friend's relationships to the detainee. *Id.*

The district court did not engage in such an individualized inquiry. Instead, it simply concluded that class members were scattered across foreign countries and thus habeas would be inaccessible and that the class representatives shared a common legal interest so there was no conflict of interest. JA357–58. That is insufficient. To start, just because the class members are scattered does not mean habeas is inaccessible to each of them. *See Wilson v. Dixon*, 256 F.2d 536, 537–38 (9th Cir. 1958) (rejecting next friend petition because there was no explanation "why the detained person does not sign and verify the complaint and who 'the next friend' is"). Indeed, one class member has since filed a tort claim. *Rengel v. United States*, No. 26-cv-01008 (D.D.C. Mar. 24, 2026). In addition, the fact that the members share a common legal interest is not the same as being "truly dedicated to the best interests" of each class member. *Whitmore*, 495 U.S. at 163. If that was the case, anyone could petition on behalf of anyone else raising the same legal question.

Tellingly, the district court ignored the final factor: "some significant relationship with the real party in interest." *Id.* at 163–64. That is because such "next friends" are typically family members or have a significant "preexisting relationship" with the detainee. *Hamdi v. Rumsfeld*, 294 F.3d 598, 604 (4th Cir. 2002) (public defender lacked necessary preexisting relationship); *compare Coal. of Clergy, Laws. & Professors v. Bush*, 310 F.3d 1153, 1162 (9th Cir. 2002) (concerned coalition lacked relationship), *with Vargas v. Lambert*, 159 F.3d 1161, 1166 (9th Cir. 1998) (mother met requirements). There is zero evidence that any of the class representatives has a significant preexisting relationship with any other class member, much less all of them. In fact, even the class representatives are represented by close relatives. JA67–69 ¶¶12–17. It makes no sense that their close relatives can then act as next friends for a large class of people they do not know. If any prisoner can file a class action on behalf of all arguably similarly situated prisoners whom he knows nothing about, the historical exception of "next friend" would be usurped. This doctrine further highlights the individualized nature of the writ and why class certification is improper.

49

## B.    The All Writs Act does not allow for habeas classes.

The district court relied on the All Writs Act to certify a habeas class, asserting that doing so was necessary to preserve jurisdiction. JA349. That was wrong.

First, the All Writs Act is limited to "all writs necessary or appropriate in aid of their respective jurisdictions." 28 U.S.C. §1651(a). It can neither create jurisdiction in the first place nor grant a court the power to extend its jurisdiction to putative class members. *See Syngenta Crop Prot., Inc. v. Henson*, 537 U.S. 28, 32–33 (2002). The district court ruled that a class was "necessary or in appropriate aid of [this Court's] jurisdiction" because Defendants could otherwise unilaterally moot individual claims by exempting members from the Proclamation. JA350 (quoting *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 398 (1980)). That has not happened in any case challenging the AEA and is completely speculative. Moreover, mootness based on release (as here) is common in habeas. *See, e.g.*, *Qassim v. Bush*, 466 F.3d 1073, 1078 (D.C. Cir. 2006) (habeas petition was moot after release and there were no collateral consequences). That does not grant courts *carte blanche* to create novel procedures to manufacture jurisdiction, especially since habeas is an

50

individual writ. *See id.* (holding that Fed. R. App. P. 23(a) is designed to prevent transferring of habeas petitioners to preserve jurisdiction, but it cannot prevent a case from becoming moot due to release).

Second, equity and the All Writs Act are limited to the relief that was "traditionally accorded by courts of equity" at "the time of the adoption of the Constitution and the enactment of the original Judiciary Act, 1789." *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318–19, 326 n.8 (1999). Looking to history, equitable remedies were limited to the parties before a court. *See Trump v. CASA, Inc.*, 606 U.S. 831, 841–42 (2025). There is no evidence that habeas class actions existed at the Founding, much less that habeas relief was afforded to multiple parties at once. *See* Note, *Multiparty Federal Habeas Corpus*, 81 Harv. L. Rev. 1482, 1493–94 (1968) ("no case has been found in which anything resembling a class action was used in habeas corpus").

The district court did not dispute the history. Instead, it claimed that habeas is flexible and allows for procedures to "provide a prompt and efficacious remedy for whatever society deems to be intolerable restraints." JA349 (quoting *Fay v. Noia*, 372 U.S. 391, 401–02 (1963) and citing *Harris v. Nelson*, 394 U.S. 286, 291 (1969)). Neither case sweeps so

51

broadly. Indeed, *Harris* did not allow interrogatories because they were not analogous to historical habeas fact finding and were "ill-suited" for such proceedings. 394 U.S. at 296. The Court did hold that judges sometimes must "summarily hear and determine the facts" for habeas and thus has flexibility to develop procedures to "perform [its] duty," *id.* at 299–300, but that was the "only issue before the Court" and by contrast questions of "joinder and class actions has engendered considerable debate," *id.* at 294 n.5. In *Fay*, the Court held that forfeiting a direct appeal in state court did not foreclose habeas relief if that forfeiture was not knowing and intentional. 372 U.S. at 438–39. That case has since been largely overturned, *see Wainwright v. Sykes*, 433 U.S. 72, 87–88 (1977), and regardless does not remotely suggest that courts may invent habeas class actions.

It is no wonder, therefore, that the Supreme Court has never held that classwide relief may be sought in a habeas proceeding. *A.A.R.P. v. Trump*, 605 U.S. 91, 107 (2025) (Alito, J., dissenting). In every prior case before the Supreme Court, the Government did not raise the issue, and the Court denied relief on other grounds without resolving whether

habeas classes were proper.[13] The district court pointed to lower court cases, claiming they were "legion." JA350. Not so. Most of the cases did not actually rule that a habeas class was proper, but instead passingly approved of the concept in dicta.[14] The other cases are simply wrong for the reasons explained. *See United States ex rel. Sero v. Preiser*, 506 F.2d 1115, 1125–26 (2d Cir. 1974). And *LoBue v. Christopher*, if anything, cuts against the district court's position because it vacated a declaratory judgment for lack of jurisdiction since it was more properly brought as a habeas claim in a different district. 82 F.3d 1081, 1082 (D.C. Cir. 1996).

---

[13] *See Schall v. Martin*, 467 U.S. 253, 261 n.10 (1984) ("We have never decided whether Federal Rule of Civil Procedure 23, providing for class actions, is applicable to petitions for habeas corpus relief."); *Jennings v. Rodriguez*, 583 U.S. 281, 324 n.7 (2018) (remanding on other grounds) (Thomas, J., concurring in part) ("This Court has never addressed whether habeas relief can be pursued in a class action"); *Nielsen v. Preap*, 586 U.S. 392, 420 (2019) (reversing and remanding on other grounds); *Johnson v. Guzman Chavez*, 594 U.S. 523, 533 n.3 (2021) (noting the Court still has not decided the issue).

[14] *See Mead v. Parker*, 464 F.2d 1108, 1112–13 (9th Cir. 1972) (ruling that a case should not be dismissed just because it cannot be a class action without deciding if a class was proper); *Williams v. Richardson*, 481 F.2d 358, 361 (8th Cir. 1973) (similar); *Napier v. Gertrude*, 542 F.2d 825, 828 (10th Cir. 1976) (habeas was moot before class certification decided); *Hamama v. Adducci*, 912 F.3d 869, 878 (6th Cir. 2018) (holding that immigration statute precluded class habeas injunctions because it used word "individual," and merely noting that there may be habeas classes in other situations).

In so ruling, the court noted that even if a habeas class might be theoretically possible, such a class cannot assert the rights of class members not yet in custody. *Id.* So the court did not bless a habeas class action, instead ordering the case dismissed for a similar reason that the district court lacks jurisdiction here.

In short, there is no historical or logical reason that habeas corpus would be amenable to class actions. That is reason enough to reverse the district court's certification and sweeping relief.

### C.    In all events, Petitioners have not established standing for each class member.

Even assuming that habeas corpus could be sought through a class action, "[e]very class member must have Article III standing," because "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). Applying the Rule 23 requirements, however, the district court erroneously certified "the same class as before" based on the common legal issue of due process. JA354–59. In doing so, the district court ignored the fact that El Salvador had since released Petitioners for their transfer to Venezuela, where they are ostensibly free. Indeed, the district court's only response to this point was that the "Government

54

seeks to muddy the waters" and that these changes occurred after removal. JA355.

That is a non-sequitur. Standing must be demonstrated "with the manner and degree of evidence required at the successive stages of the litigation," here summary judgment. *TransUnion*, 594 U.S. at 431 (quoting *Lujan*, 504 U.S. at 561). To avoid mootness, the district court relied on the existence of collateral consequences. *See Qassim*, 466 F.3d at 1077. In order to have jurisdiction over the class, therefore, the district court had to find that every class member had some collateral consequence. Petitioners provided no such evidence. At a minimum, the district court's refusal to even analyze this issue is reversible error.

As discussed above, the district court found collateral consequences based on the class members' designations as alien enemies and FTO members, which it said bar their entrance to the United States, ability to reside in the country, and asylum claims, and subject them to property seizure or freezes. JA346–47. As explained earlier, however, a favorable ruling would have to redress any collateral. Even if those consequences are cognizable and sufficient to avoid mootness, however, many of the class members likely do not face these alleged collateral consequences at

55

all, or would not have them redressed by a favorable decision. Indeed, class members may not be able to enter or reside in the United States due to various independent bars, such as travel bans, convictions, and other grounds for inadmissibility or deportability. *See supra* I.B; JA376 (approximately a quarter of Petitioners had criminal investigations). As a result, even if those class members prove they are not TdA members, they cannot return to or reside in the United States. The same is true for possible asylum claims, as it is dubious that many much less *all* class members would have asylum claims. As to the speculative possibility of property seizures, there is no evidence that any class member has been subjected to such seizures, much less all of them. *See Gul*, 652 F.3d at 20 (rejecting "speculative" collateral consequences).

A petitioner also cannot be a class representative if he does not share the same collateral consequences as the class members. *See Arnold v. Panora*, 593 F.2d 161, 164 n.9 (1st Cir. 1979) (plaintiff was not representative of class because his revocation period did not qualify as a collateral consequence compared to others). Again, Petitioners did not demonstrate that the class representatives suffered from the alleged collateral consequences or that a favorable decision would likely redress

56

those consequences. Nor did Petitioners show the named class members were representative of the rest of the class in that regard.

Similarly, Rule 23(b)(2) requires Petitioners to show that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011). The district court attempted to sidestep this issue by claiming that the relief Petitioners seek is simply an ability to challenge their AEA designations, which a single injunction could accomplish. JA358. But this once again ignores that simply providing hearings is not likely to redress the collateral consequences of every class member, which is required for jurisdiction. *See Vallario v. Vandehey*, 554 F.3d 1259, 1268 (10th Cir. 2009) ("Under Rule 23(b)(2), the injuries sustained by the class must be 'sufficiently similar that they can be addressed' in a 'single injunction that need not differentiate between class members.'"). Any classwide injunction is thus unlikely to redress the injuries in a way required for jurisdiction.

*     *     *

57

At bottom, Petitioners failed to satisfy their burden at the summary judgment stage that class certification was proper. And the district court simply glossed over the varied collateral consequences that it acknowledged were required for jurisdiction. That is fatal to class certification. *See TransUnion*, 594 U.S. at 431.

## III.  The District Court's Sweeping Injunction Was Improper.

The district court's sweeping and burdensome injunction was also improper under the traditional equitable factors. Even a permanent injunction requires Petitioners to demonstrate (1) an irreparable injury; (2) that remedies at law are inadequate; (3) that the balance of hardships between the parties warrants equitable relief; and (4) that the injunction is not against the public interest. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010). Moreover, the injunction must be tailored to the parties before the court. *CASA*, 606 U.S. at 841–42. Yet the district court's injunction was legally impermissible, impractical, and outright dangerous. So even if this Court determines that the district court had jurisdiction and properly certified a class, the injunction should still be vacated.

The district court's injunction included several requirements, two of which raise serious practical and legal issues. First, the district court ordered Defendants to "transport any Plaintiff seeking return to the United States from a third country" so that those aliens can be paroled into the United States, be detained (again) by the United States, and then pursue a habeas petition. JA446, 448. Second, the district court allowed class members to file new habeas claims and pursue hearings remotely. JA447–48. Both forms of novel relief suffer from fatal flaws.

**1.** To start, the court's remedies are contrary to habeas, as everyone agrees that the immediate or ultimate remedy ordered below is for the currently *free* class members to return to the United States, be *detained*, and likely removed again. JA447. While not the exclusive remedy, release from custody is core to habeas and habeas cannot be used simply to regain entry. *See DHS v. Thuraissigiam*, 591 U.S. 103, 137 (2020). Defendants are unaware of any case where the habeas remedy is to return to custody. *See Rodriguez*, 411 U.S. at 486 n.7. Indeed, the Supreme Court has previously rejected a habeas claim where (as here) "the last thing petitioners want is simple release." *Munaf*, 553 U.S. at 693–94.

**2.** As to the requirement that Defendants facilitate the return of FTO members from another country, that will likely require diplomacy bearing on "sensitive and weighty interests of national security and foreign affairs." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 33–35 (2010). This is especially true because almost all of the 22 class members who wish to return are in Venezuela. JA486, 489. While the district court indicated it will not currently require Defendants to facilitate the return of people from Venezuela given the developing political situation there, it has requested updates "as to the feasibility" of their direct return. JA448. Even revealing those details can imperil fluid and sensitive negotiations bearing on national security, especially if the court eventually decides to order their return. JA370; *see J.G.G.*, 147 F.4th at 1059–60 (Katsas, J., concurring); *id.* at 1069 (Rao, J., concurring) (granting mandamus in part based on forcing the executive to engage in diplomacy).

Regardless, "any order to bring suspected members of a foreign terrorist organization into the United States would have faced an objection that the judiciary cannot override the statutory prohibition on the admission of such aliens." *Id.* at 1055 (Katsas, J., concurring). For

good reason: Such an order threatens public safety and security because, even while detained, TdA members have recruited other members and threatened the safety of staff and other detainees. JA50–54 ¶¶15–25; JA58 ¶9; JA454–56 ¶¶6–8. Of the 22 class members who currently wish to return, at least four have criminal investigations, including for serious offenses such as homicide, kidnapping, and firearms charges. JA456 ¶12. And even those who do not were determined by DHS to be members of an incredibly dangerous transnational organization. JA457 ¶¶13–15. An order requiring Defendants to return these individuals to the United States would frustrate the "public interest in effective measures to prevent the entry of illegal aliens." *United States v. Cortez*, 449 U.S. 411, 421 n.4 (1981).

3.    The provision for remote hearings is no less fraught and even more legally problematic. For a class member to file a new individual habeas petition challenging their designation, the "petitioner must demonstrate that he was in custody at the time he filed the petition." *Qassim*, 466 F.3d at 1078. None of the class members are in Defendants' custody now, however, which is required for subject matter jurisdiction. *See Maleng v. Cook*, 490 U.S. 488, 494 (1989). And "the collateral

consequences … are not themselves sufficient to render an individual 'in custody' for the purposes of a habeas attack" in the first instance. *Id.* at 491–92. So there can be no jurisdiction over *new* remote habeas petitions.

Moreover, having to conduct up to 137 mini trials remotely irreparably harms Defendants and the public interest. JA447; JA395–98. The United States cannot enforce perjury or other procedural rules in Venezuela or another third country, or even verify the identity of witnesses. Moreover, these habeas proceedings by their nature are likely to implicate sensitive or classified information; developing procedures to protect that information when the proceedings are occurring over potentially unsecure lines in foreign settings is a non-starter. "[The district court] made clear that any habeas hearings must 'satisfy the requirements of due process,' but there would be no way to do so if the hearings occur remotely." JA397 (quoting JA325). Further, the conduct of a habeas proceeding overseas by the United States—even at a U.S. Embassy or Consulate—would be an infringement on the sovereignty of a foreign state absent that state's consent. So this remedy too may necessitate diplomacy and thus irreparably harm Defendants. *See Kiobel*, 569 U.S. at 116. The district court acknowledged these potential

problems but just said they would be dealt with in the potentially hundred plus individual cases. JA447. That blindfolded approach cannot salvage this unlawful order.

4.     Meanwhile, Petitioners' harm is minimal at best. The district court previously relied on the class's detention in CECOT for irreparable harm, but they are currently ostensibly free either in their own country or third countries they chose to travel to. And as everyone admits, the ultimate remedy for even remote habeas (assuming they prevail) is to return to the United States, be detained, and likely be removed again. None of the class members have a right to remain in the United States. The equities thus decidedly tip in favor of vacating the district court's astonishing fourth attempt to achieve its desired ends.

## CONCLUSION

This Court should reverse the district court's orders and remand with directions to enter judgment for Defendants.

Respectfully submitted,

**Brett A. Shumate**
Assistant Attorney General

s/Tiberius Davis

**Tiberius Davis**
Counsel to the Assistant Attorney
 General

**Yaakov M. Roth**
Principal Deputy Assistant
 Attorney General

Civil Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington DC 20530-0001
(202) 514-2000
tiberius.davis@usdoj.gov

**Drew C. Ensign**
Deputy Assistant Attorney
 General

**Anthony Nicastro**
Acting Director
Office of Immigration Litigation

Dated: May 7, 2026

*Counsel for Defendants–Appellants*

64

## Certificate of Compliance for Briefs

1.  This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,771 words.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word for Microsoft 365 MSO (Version 2604 Build 16.0.19929.20086) 64-bit.

Dated: May 7, 2026                 s/Tiberius Davis
                                   **Tiberius Davis**