**ORAL ARGUMENT NOT YET SCHEDULED**

No. 26-5074

In the United States Court of Appeals
for the District of Columbia Circuit

**J.G.G.** et al.,

*Plaintiffs–Appellees,*

v.

**DONALD J. TRUMP**, in his official capacity
as President of the United States, et al.,

*Defendants–Appellants.*

On Appeal from a Judgment
of the United States District Court
for the District of Columbia

**PUBLIC APPENDIX—SEALED MATERIAL
IN SEPARATE SUPPLEMENT**

**Brett A. Shumate**
Assistant Attorney General

**Yaakov M. Roth**
Principal Deputy Assistant
 Attorney General

**Drew C. Ensign**
Deputy Assistant Attorney
 General

**Tiberius Davis**
Counsel to the Assistant Attorney
 General
Civil Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington DC 20530-0001
(202) 514-2000

**Anthony Nicastro**
Acting Director
Office of Immigration Litigation

# TABLE OF CONTENTS

District Court Docket ................................................................ JA1

Excerpt of Complaint (ECF 1)............................................. JA40

Excerpt of Transcript of Hearing of March 15, 2025 (ECF 20) ......... JA43

Declaration of Selwyn Smith (ECF 72-1) ......................... JA46

Declaration of Marcos D. Charles (ECF 72-2)................... JA55

Order of Apr. 16, 2025 (ECF 80) ....................................... JA60

Amended Complaint (ECF 101) ........................................ JA61

Excerpt of Declaration of Oscar Sarabia Roman (ECF 102-14) ...... JA101

Proposed Order Granting Motion for Preliminary Injunction (ECF 102-15) ................................................................................. JA172

Proposed Order Granting Motion for Class Certification (ECF 103-3) ..... .............................................................................. JA175

Redacted Declaration of Michael G. Kozak (ECF 129) .................... JA179

Order of June 4, 2025 (ECF 147) .................................... JA184

Excerpt of UN Report on Enforced or Involuntary Disappearances (ECF 160-1).................................................................................. JA186

Notice of Changed Circumstances (ECF 168) ................. JA203

Declaration of Mellissa B. Harper (ECF 168-1) ............. JA205

Supplemental Declaration of Andres Antillano (ECF 177-3).......... JA208

Redacted Declaration (ECF 177-4) ................................. JA211

Redacted Declaration (ECF 177-5) ................................. JA213

Redacted Declaration (ECF 177-6) ................................. JA216

Redacted Declaration (ECF 177-7) ................................. JA218

Leaked DOJ Email (ECF 177-8) ...................................................... JA221

Letter Grant to El Salvador (ECF 177-10) ...................................... JA222

Diplomatic Notes with El Salvador (ECF 177-11) .......................... JA226

Declaration of Noelle Smith (ECF 177-12) .................................... JA231

Declaration of Deputy Secretary of State Christopher Landau (ECF 182-1) .................................................................................................. JA309

Supplemental Declaration of Secretary of State Marco Rubio (ECF 182-2) .................................................................................................... JA315

Order of Dec. 22, 2025 (ECF 214) ................................................. JA320

Memorandum Opinion of Dec. 22, 2025 (ECF 215) ........................ JA322

Defendants' Response to Order of Dec. 22, 2025 (ECF 229)............ JA365

Supplemental Declaration of Secretary of State Marco Rubio (ECF 229-1) .................................................................................................... JA369

Plaintiffs' Response to Defendants' Remedial Proposal (ECF 234) ........... ........................................................................................................... JA371

Third Supplemental Declaration of Oscar Sarabia Roman (ECF 234-1)... ........................................................................................................... JA381

Defendants' Reply Regarding Remedial Proposal (ECF 239) ......... JA395

Transcript of Hearing of Feb. 9, 2026 (ECF 244)............................ JA402

Memorandum Opinion and Order of Feb. 12, 2026 (ECF 247) ....... JA442

Plaintiffs' Notice in Response to Order of Feb. 12, 2026 (ECF 252) .......... ........................................................................................................... JA449

Defendants' Notice of Appeal (ECF 254) ....................................... JA451

Declaration of Liana J. Castano (ECF 256-1) ................................ JA453

Plaintiffs' Notice in Response to Order of Feb. 12, 2026 (ECF 257) ..........
.................................................................................................. JA458

Plaintiffs' Response to Defendants' Motion for Stay Pending Appeal
(ECF 259) ................................................................................... JA461

APPEAL,E-FILE,<span style="color:red">ENJOINED</span>,PSEUDO-GR,STAYED,TYPE-D

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:25-cv-00766-JEB

J.G.G. et al v. TRUMP et al
Assigned to: Chief Judge James E. Boasberg
Related Cases: 1:25-cv-01774-JEB
           1:26-cv-01008-JEB
Case in other court: USCA, 25-05068
                   USCA, 25-05068
                   USCA, 25-05124
                   USCA, 25-05217
                   USCA, 25-05452
                   USCA, 26-05040
                   USCA, 26-05074
Cause: 28:1331 Federal Question: Other Civil Rights

Date Filed: 03/15/2025
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: U.S. Government Defendant

| Date Filed | # | Docket Text |
|---|---|---|
| 03/15/2025 | 1 | COMPLAINT against All Defendants ( Filing fee $ 405 receipt number ADCDC-11544662) filed by J.G.O., G.F.F., J.G.G., W.G.H., J.A.V.. (Attachments: # 1 Civil Cover Sheet, # 2 Summons Donald J. Trump, # 3 Summons Pamela Bondi, # 4 Summons Kristi Noem, # 5 Summons DHS, # 6 Summons Madison Sheahan, # 7 Summons ICE, # 8 Summons Marco Rubio, # 9 Summons DOS, # 10 Summons USAO)(Gelernt, Lee) (Entered: 03/15/2025) |
| 03/15/2025 | 2 | SEALED MOTION to Proceed Under Pseudonym filed by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V. (Attachments: # 1 Declaration of J.G.G., # 2 Declaration of W.G.H., # 3 Declaration of Molly Lauterback, # 4 Declaration of J.A.V., # 5 Declaration of Grace Carney, # 6 Text of Proposed Order)(Gelernt, Lee) (Entered: 03/15/2025) |
| 03/15/2025 | 3 | MOTION for Temporary Restraining Order by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V.. (Attachments: # 1 Certificate of Counsel, # 2 Memorandum in Support, # 3 Declaration of J.G.G., # 4 Declaration of Grace Carney, # 5 Declaration of J.G.O., # 6 Declaration of W.G.H., # 7 Declaration of Molly Laterback, # 8 Declaration of J.A.V., # 9 Text of Proposed Order)(Gelernt, Lee) (Entered: 03/15/2025) |
| 03/15/2025 | 4 | MOTION to Certify Class by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V.. (Attachments: # 1 Declaration of Daniel Galindo, # 2 Text of Proposed Order)(Gelernt, Lee) (Entered: 03/15/2025) |
| 03/15/2025 | 5 | NOTICE of Appearance by Daniel Antonio Galindo on behalf of All Plaintiffs (Galindo, Daniel) (Entered: 03/15/2025) |
| 03/15/2025 | | MINUTE ORDER granting 2 SEALED MOTION to Proceed Under Pseudonym. The Court has reviewed Plaintiffs' 2 Motion to Proceed Pseudonymously. Given the expedited nature of this matter, it determines that a full Opinion is not practical at this time. Believing that Plaintiffs have made the required showing on the relevant factors, the Court ORDERS that: 1) Their 2 Motion is GRANTED; and 2) They shall be permitted to proceed pseudonymously unless and until the assigned judge determines otherwise. |

<span style="color:red">JA1</span>

| | | |
|---|---|---|
| | | Signed by Chief Judge James E. Boasberg on 3/15/2025. (zjd) Modified on 3/15/2025 (zjd). (Entered: 03/15/2025) |
| 03/15/2025 | | Case Assigned to Chief Judge James E. Boasberg. (zjd) (Entered: 03/15/2025) |
| 03/15/2025 | 6 | SUMMONS (9) Issued Electronically as to All Defendants, U.S. Attorney, and U.S. Attorney General. (Attachments: # 1 Notice and Consent) (zjd) (Entered: 03/15/2025) |
| 03/15/2025 | 7 | NOTICE of Appearance by Bradley Girard on behalf of All Plaintiffs (Girard, Bradley) (Entered: 03/15/2025) |
| 03/15/2025 | | MINUTE ORDER: The Court has reviewed Plaintiffs' Complaint and Motion for Temporary Restraining Order. Given the exigent circumstances that it has been made aware of this morning, it has determined that an immediate Order is warranted to maintain the status quo until a hearing can be set. As Plaintiffs have satisfied the four factors governing the issuance of preliminary relief, the Court accordingly ORDERS that: 1) Plaintiffs' 3 Motion for TRO is GRANTED; 2) Defendants shall not remove any of the individual Plaintiffs from the United States for 14 days absent further Order of the Court; and 3) The parties shall appear for a Zoom hearing on March 17, 2025, at 4:00 p.m. The hearing will proceed by videoconference for the parties and by telephone for members of the public. Toll free number: 833-990-9400. Meeting ID: 049550816. So ORDERED by Chief Judge James E. Boasberg on 3/15/2025. (lcjeb1) Modified to add public access line on 3/15/2025 (znbn). (Entered: 03/15/2025) |
| 03/15/2025 | 8 | NOTICE of Appearance by Skye Perryman on behalf of All Plaintiffs (Perryman, Skye) (Entered: 03/15/2025) |
| 03/15/2025 | 9 | NOTICE of Appearance by Somil Trivedi on behalf of All Plaintiffs (Trivedi, Somil) (Entered: 03/15/2025) |
| 03/15/2025 | | MINUTE ORDER: The Court ORDERS that the parties shall appear for Zoom hearing on Plaintiffs' 4 Motion for Class Certification on March 15, 2025, at 5:00 p.m. The hearing will proceed by videoconference for the parties and by telephone for members of the public. Toll free number: 833-990-9400. Meeting ID: 049550816. So ORDERED by Chief Judge James E. Boasberg on 3/15/2025. (lcjeb1) (Entered: 03/15/2025) |
| 03/15/2025 | 10 | NOTICE of Appearance by Scott Michelman on behalf of All Plaintiffs (Michelman, Scott) (Entered: 03/15/2025) |
| 03/15/2025 | | Set/Reset Hearings: Hearing set for 3/17/2025 at 04:00 PM via Zoom (Audio Line Available) before Chief Judge James E. Boasberg. (znbn) Modified to correct hearing location on 3/15/2025 (znbn). (Entered: 03/15/2025) |
| 03/15/2025 | 11 | NOTICE of Appearance by Christina Greer on behalf of All Defendants (Greer, Christina) (Entered: 03/15/2025) |
| 03/15/2025 | 12 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to Order on Motion for TRO,,, by MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. STATE DEPARTMENT, DONALD J. TRUMP, PAMELA BONDI, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY. Fee Status: No Fee Paid. Parties have been notified. (Greer, Christina) (Entered: 03/15/2025) |
| 03/15/2025 | 13 | NOTICE of Appearance by Arthur B. Spitzer on behalf of All Plaintiffs (Spitzer, Arthur) (Entered: 03/15/2025) |
| 03/15/2025 | 14 | Transmission of the Notice of Appeal, Minute Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 12 Notice of Appeal to DC Circuit Court. (zjd) (Entered: 03/15/2025) |

**JA2**

| 03/15/2025 | 15 | ENTERED IN ERROR.....NOTICE of Appearance by Christina Greer on behalf of All Defendants (Greer, Christina) Modified on 3/17/2025; refiled as docket entry 16 (znmw). (Entered: 03/15/2025) |
|---|---|---|
| 03/15/2025 | 16 | NOTICE of Appearance by Drew C Ensign on behalf of All Defendants (Ensign, Drew) (Entered: 03/15/2025) |
| 03/15/2025 | | Minute Entry for proceedings held before Chief Judge James E. Boasberg: Motion Hearing held via Zoom (with public access line) on 3/15/2025 re 4 MOTION to Certify Class filed by J.G.O., W.G.H., J.G.G., G.F.F., J.A.V.. Oral arguments heard. Order forthcoming. (Court Reporter Tammy Nestor) (znbn) (Entered: 03/15/2025) |
| 03/15/2025 | | MINUTE ORDER: As discussed in today's hearing, the Court ORDERS that: 1) Plaintiffs' 4 Motion for Class Certification is GRANTED insofar as a class consisting of "All noncitizens in U.S. custody who are subject to the March 15, 2025, Presidential Proclamation entitled 'Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua' and its implementation" is provisionally certified; 2) The Government is ENJOINED from removing members of such class (not otherwise subject to removal) pursuant to the Proclamation for 14 days or until further Order of the Court; 3) The Government shall file any Motion to Vacate this TRO by March 17, 2025, with Plaintiffs' Opposition due by March 19, 2025; and 4) The hearing set for March 17, 2025, is VACATED and RESET for March 21, 2025, at 2:30 p.m. via Zoom. So ORDERED by Chief Judge James E. Boasberg on 3/15/2025. (lcjeb1) (Entered: 03/15/2025) |
| 03/15/2025 | 17 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to Order on Motion to Certify Class,,,, Set/Reset Deadlines,,, by MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. STATE DEPARTMENT, DONALD J. TRUMP, PAMELA BONDI, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY. Fee Status: No Fee Paid. Parties have been notified. (Greer, Christina) (Entered: 03/15/2025) |
| 03/15/2025 | 18 | Transmission of the Notice of Appeal, Minute Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 17 Notice of Appeal to DC Circuit Court. (zjd) (Entered: 03/15/2025) |
| 03/15/2025 | | USCA Case Number 25-5067 for 12 Notice of Appeal to DC Circuit Court, filed by DONALD J. TRUMP, MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM, U.S. STATE DEPARTMENT, PAMELA BONDI. (zjm) Modified on 3/17/2025 to correct case number (zjm). (Entered: 03/17/2025) |
| 03/15/2025 | | USCA Case Number 25-5068 for 17 Notice of Appeal to DC Circuit Court, filed by DONALD J. TRUMP, MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM, U.S. STATE DEPARTMENT, PAMELA BONDI. (zjm) (Entered: 03/17/2025) |
| 03/16/2025 | 19 | NOTICE by MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. STATE DEPARTMENT, DONALD J. TRUMP, PAMELA BONDI, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY (Ensign, Drew) (Entered: 03/16/2025) |
| 03/16/2025 | 20 | TRANSCRIPT OF PROCEEDINGS before Chief Judge James E. Boasberg held on 3/15/25; Page Numbers: 1-47. Court Reporter/Transcriber Tammy Nestor, |

**JA3**

tammy_nestor@dcd.uscourts.gov, Transcripts may be ordered by submitting the
Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 4/6/2025. Redacted Transcript Deadline set for 4/16/2025. Release of Transcript Restriction set for 6/14/2025.(Nestor, Tammy) (Entered: 03/16/2025)

| | | |
|---|---|---|
| 03/17/2025 | 21 | RESPONSE re 19 Notice (Other) filed by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V.. (Gelernt, Lee) (Entered: 03/17/2025) |
| 03/17/2025 | | MINUTE ORDER: The Court ORDERS that the parties shall appear in person (or by Zoom if necessary) for a hearing at 4:00 p.m. today regarding the 19 Notice and 21 Response. The Government shall be prepared to provide answers to the questions raised by Plaintiffs on page 6 of their Response. So ORDERED by Chief Judge James E. Boasberg on 3/17/2025. (lcjeb1) (Entered: 03/17/2025) |
| 03/17/2025 | | MINUTE ORDER: The Court ORDERS that, in order to accommodate the parties' schedules, the hearing set for today at 4:00 p.m. is VACATED and RESET for 5:00 p.m. The hearing will proceed in-person for the parties and by telephone for members of the public. Toll free number: 833-990-9400. Meeting ID: 049550816. Any use of the public-access telephone line requires adherence to the general prohibition against photographing, recording, livestreaming, and rebroadcasting of court proceedings (including those held by telephone or videoconference), as set out in Standing Order No. 24-31 (JEB). Violation of these prohibitions may result in sanctions, including removal of court-issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court. So ORDERED by Chief Judge James E. Boasberg on 3/17/2025. (lcjeb1) (Entered: 03/17/2025) |
| 03/17/2025 | 22 | NOTICE of Appearance by August Edward Flentje on behalf of All Defendants (Flentje, August) (Entered: 03/17/2025) |
| 03/17/2025 | | Set/Reset Hearings: Miscellaneous Hearing set for 3/17/2025 at 05:00 PM in Courtroom 22A- In Person (Audio Line Available) before Chief Judge James E. Boasberg. Motion Hearing set for 3/21/2025 at 02:30 PM via Zoom (Audio Line Available) before Chief Judge James E. Boasberg. (znbn) (Entered: 03/17/2025) |
| 03/17/2025 | 23 | NOTICE of Appearance by Abhishek Kambli on behalf of All Defendants (Kambli, Abhishek) (Entered: 03/17/2025) |
| 03/17/2025 | 24 | MOTION to Vacate *Response and Motion to Vacate Hearing* re 19 Notice (Other), Order,,,, Set Hearings,,, Set/Reset Hearings, 21 Response to Document by MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. STATE DEPARTMENT, DONALD J. TRUMP, PAMELA BONDI, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY. (Ensign, Drew) Modified event on 3/17/2025 (znmw). (Entered: 03/17/2025) |

**JA4**

| 03/17/2025 | | MINUTE ORDER: The Court ORDERS that Defendants' 24 Motion to Vacate is DENIED. The hearing will proceed as scheduled. So ORDERED by Chief Judge James E. Boasberg on 3/17/2025. (lcjeb1) (Entered: 03/17/2025) |
|---|---|---|
| 03/17/2025 | | Minute Entry for proceedings held before Chief Judge James E. Boasberg: Hearing held on 3/17/2025. Oral arguments heard. Order forthcoming. (Court Reporter Tammy Nestor) (znbn) (Entered: 03/17/2025) |
| 03/17/2025 | | MINUTE ORDER: As discussed in today's hearing, the Court ORDERS that by 12:00 p.m. on March 18, 2025, the Government shall file a Notice, which may, if necessary, be sealed in part, setting forth: 1) A sworn declaration that no one on any flight departing the United States after 7:25 p.m. on March 15, 2025, was removed solely on the basis of the Proclamation at issue; 2) A sworn declaration setting forth when the Proclamation at issue was signed, when it was made public, and when it went into effect; 3) The Government's best estimate of the number of individuals subject to the Proclamation currently remaining in the United States and how many are currently in U.S. custody; and 4) The Government's position on whether, and in what form, it will provide answers to the Court's questions regarding the particulars of the flights. Such form could include *in camera* review or in a classified setting. If the Government takes the position that it will not provide that information to the Court under any circumstances, it must support such position, including with classified authorities if necessary. So ORDERED by Chief Judge James E. Boasberg on 3/17/2025. (lcjeb1) (Entered: 03/17/2025) |
| 03/17/2025 | 25 | TRANSCRIPT OF PROCEEDINGS before Chief Judge James E. Boasberg held on 3/17/25; Page Numbers: 1-31. Court Reporter/Transcriber Tammy Nestor, tammy_nestor@dcd.uscourts.gov, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/7/2025. Redacted Transcript Deadline set for 4/17/2025. Release of Transcript Restriction set for 6/15/2025.(Nestor, Tammy) (Entered: 03/17/2025) |
| 03/17/2025 | 26 | MOTION to Vacate re 3/15/2025 Minute Orders on Temporary Restraining Order and Certification of Class by MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. STATE DEPARTMENT, DONALD J. TRUMP, PAMELA BONDI, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY. (Attachments: # 1 Declaration Declaration of Robert L. Cerna, # 2 Declaration Declaration of Michael G. Kozak)(Flentje, August) Modified event and docket text on 3/18/2025 (znmw). (Entered: 03/17/2025) |
| 03/18/2025 | 27 | NOTICE of Appearance by Hina Shamsi on behalf of All Plaintiffs (Shamsi, Hina) (Entered: 03/18/2025) |

**JA5**

| 03/18/2025 | 28 | NOTICE *in Response to March 17 Minute Order* by MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. STATE DEPARTMENT, DONALD J. TRUMP, PAMELA BONDI, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY (Attachments: # 1 Affidavit Cerna Declaration)(Ensign, Drew) (Entered: 03/18/2025) |
|---|---|---|
| 03/18/2025 | | MINUTE ORDER: The Court ORDERS that the Zoom hearing set for March 21, 2025, at 2:30 p.m. shall now take place in Courtroom 22A. Members of the public may attend in person or by telephone. Toll free number: 833-990-9400. Meeting ID: 049550816. Any use of the public-access telephone line requires adherence to the general prohibition against photographing, recording, livestreaming, and rebroadcasting of court proceedings (including those held by telephone or videoconference), as set out in Standing Order No. 24-31 (JEB). Violation of these prohibitions may result in sanctions, including removal of court-issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court. So ORDERED by Chief Judge James E. Boasberg on 3/18/2025. (lcjeb1) (Entered: 03/18/2025) |
| 03/18/2025 | 29 | NOTICE of Appearance- Pro Bono by Noelle Smith on behalf of All Plaintiffs (Smith, Noelle) (Entered: 03/18/2025) |
| 03/18/2025 | 30 | NOTICE of Appearance- Pro Bono by Omar C. Jadwat on behalf of All Plaintiffs (Jadwat, Omar) (Entered: 03/18/2025) |
| 03/18/2025 | | MINUTE ORDER: In response to Defendants' 28 Notice at page 2, the Court ORDERS that by 12:00 p.m. on March 19, 2025, Defendants shall file *ex parte* and under seal (or submit to the Court) a declaration providing the following details regarding each of the two flights leaving U.S. airspace before 7:25 p.m. on March 15, 2025: 1) What time did the plane take off from U.S. soil and from where? 2) What time did it leave U.S. airspace? 3) What time did it land in which foreign country (including if it made more than one stop)? 4) What time were individuals subject solely to the Proclamation transferred out of U.S. custody? and 5) How many people were aboard solely on the basis of the Proclamation? So ORDERED by Chief Judge James E. Boasberg on 3/18/2025. (lcjeb1) (Entered: 03/18/2025) |
| 03/18/2025 | 31 | NOTICE of Appearance- Pro Bono by Sidra Mahfooz on behalf of All Plaintiffs (Mahfooz, Sidra) (Entered: 03/18/2025) |
| 03/18/2025 | 32 | NOTICE of Appearance- Pro Bono by Oscar Sarabia Roman on behalf of All Plaintiffs (Sarabia Roman, Oscar) (Entered: 03/18/2025) |
| 03/18/2025 | 33 | NOTICE of Appearance- Pro Bono by Ashley Gorski on behalf of All Plaintiffs (Gorski, Ashley) (Entered: 03/18/2025) |
| 03/18/2025 | 34 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Sarah M. Rich, Filing fee $ 100, receipt number ADCDC-11550426. Fee Status: Fee Paid. by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V.. (Attachments: # 1 Declaration, # 2 Certificate of Good Standing)(Girard, Bradley) (Entered: 03/18/2025) |
| 03/18/2025 | 35 | NOTICE of Appearance- Pro Bono by Patrick Toomey on behalf of All Plaintiffs (Toomey, Patrick) (Entered: 03/18/2025) |
| 03/18/2025 | | MINUTE ORDER: The Court ORDERS that the 34 Motion for Leave to Appear Pro Hac Vice of Sarah Marion Rich is GRANTED. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)**. Click for instructions. So ORDERED by Chief Judge James E. Boasberg on 3/18/2025. (lcjeb1) (Entered: 03/18/2025) |

**JA6**

| 03/18/2025 | 36 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Audrey Wiggins, Filing fee $ 100, receipt number ADCDC-11551084. Fee Status: Fee Paid. by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V.. (Attachments: # 1 Declaration, # 2 Certificate of Good Standing)(Girard, Bradley) (Entered: 03/18/2025) |
|---|---|---|
| 03/18/2025 |  | MINUTE ORDER: The Court ORDERS that the 36 Motion for Leave to Appear Pro Hac Vice of Audrey J. Wiggins is GRANTED. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)**. Click for instructions. So ORDERED by Chief Judge James E. Boasberg on 3/18/2025. (lcjeb1) (Entered: 03/18/2025) |
| 03/19/2025 | 37 | Emergency MOTION to Stay re Order,,,, Set Deadlines,,, by MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. STATE DEPARTMENT, DONALD J. TRUMP, PAMELA BONDI, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY. (Ensign, Drew) (Entered: 03/19/2025) |
| 03/19/2025 | 38 | ORDER: The Court ORDERS that: 1) Defendants' 37 Motion is GRANTED IN PART and DENIED IN PART; and 2) Defendants shall have until March 20, 2025, at 12:00 p.m. to provide the information discussed in the Minute Order of March 18, 2025, or to invoke the state-secrets doctrine and explain the basis for such invocation. Signed by Chief Judge James E. Boasberg on March 19, 2025. (lcjeb3) (Entered: 03/19/2025) |
| 03/19/2025 | 39 | NOTICE of Appearance by Sarah Rich on behalf of J.G.G., G.F.F., J.G.O., W.G.H., J.A.V. (Rich, Sarah) (Entered: 03/19/2025) |
| 03/19/2025 | 40 | NOTICE of Appearance by Audrey Jordan Wiggins on behalf of J.G.G., G.F.F., J.G.O., W.G.H., J.A.V. (Wiggins, Audrey) (Entered: 03/19/2025) |
| 03/19/2025 | 41 | NOTICE of Appearance by Cody H. Wofsy on behalf of All Plaintiffs (Wofsy, Cody) (Entered: 03/19/2025) |
| 03/19/2025 | 42 | NOTICE OF WITHDRAWAL OF APPEARANCE as to MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. STATE DEPARTMENT, DONALD J. TRUMP, PAMELA BONDI, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY. Attorney Christina Greer terminated. (Greer, Christina) (Entered: 03/19/2025) |
| 03/19/2025 | 43 | NOTICE of Appearance- Pro Bono by My Khanh Ngo on behalf of All Plaintiffs (Ngo, My Khanh) (Entered: 03/19/2025) |
| 03/19/2025 | 44 | RESPONSE re 26 MOTION to Vacate *TRO* filed by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V.. (Attachments: # 1 Index of Exhibits, # 2 Declaration of Deborah Fleishaker, # 3 Declaration of Juanita Goebertus, # 4 Declaration of Sarah Bishop, # 5 Declaration of Linette Tobin, # 6 Declaration of Austin Thierry, # 7 Declaration of Osvaldo E. Caro-Cruz, # 8 Declaration of Katherine Kim, # 9 Declaration of Karyn Ann Shealy, # 10 Declaration of Stephanie Quintero, # 11 Declaration of Grace Carney, # 12 Declaration of Melissa Smyth, # 13 Declaration of Solanyer Michell Sarabia Gonzalez, # 14 Declaration of Jennifer Venghaus, # 15 Declaration of Oscar Sarabia Roman)(Gelernt, Lee) (Entered: 03/19/2025) |
| 03/20/2025 | 45 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Christine L. Coogle, Filing fee $ 100, receipt number ADCDC-11556213. Fee Status: Fee Paid. by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V.. (Attachments: # 1 Declaration, # 2 Certificate of Good Standing) (Girard, Bradley) (Entered: 03/20/2025) |
| 03/20/2025 | 46 | NOTICE of Appearance by Michael Lawrence Waldman on behalf of J.G.G., G.F.F., J.G.O., W.G.H., J.A.V. (Waldman, Michael) (Entered: 03/20/2025) |

**JA7**

| 03/20/2025 | 47 | ORDER: The Court ORDERS that: 1) By March 21, 2025, at 10:00 a.m., Defendants shall submit a sworn declaration by a person with direct involvement in the Cabinet-level discussions regarding invocation of the state-secrets privilege; 2) By March 25, 2025, Defendants shall submit a declaration indicating whether or not the Government is invoking the privilege; 3) By March 25, 2025, Defendants shall file a brief showing cause why they did not violate the Court's Temporary Restraining Orders by failing to return class members removed from the United States on the two earliest planes that departed on March 15, 2025; and 4) Plaintiffs may file any response to such brief by March 31, 2025. Signed by Chief Judge James E. Boasberg on 3/20/2025. (lcjeb1) (Entered: 03/20/2025) |
|---|---|---|
| 03/20/2025 | 48 | MOTION for Leave to File *Amicus Curiae Brief* by BRANDON GILL. (Attachments: # 1 Exhibit Proposed Brief, # 2 Text of Proposed Order)(Block, Andrew) (Entered: 03/20/2025) |
| 03/20/2025 | 49 | NOTICE by MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. STATE DEPARTMENT, DONALD J. TRUMP, PAMELA BONDI, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY (Attachments: # 1 Declaration Declaration of Robert L. Cerna)(Flentje, August) (Entered: 03/20/2025) |
| 03/20/2025 |  | MINUTE ORDER: The Court ORDERS that the 45 Motion for Leave to Appear Pro Hac Vice of Christine L. Coogle is GRANTED. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Chief Judge James E. Boasberg on 3/20/2025. (lcjeb1) (Entered: 03/20/2025) |
| 03/21/2025 | 50 | RESPONSE TO ORDER OF THE COURT re 47 Order by MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. STATE DEPARTMENT, DONALD J. TRUMP, PAMELA BONDI, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY (Attachments: # 1 Declaration)(Flentje, August) Modified event title on 3/21/2025 (znmw). (Entered: 03/21/2025) |
| 03/21/2025 |  | Minute Entry for proceedings held before Chief Judge James E. Boasberg: Motion Hearing held on 3/21/2025. Oral arguments heard. Order forthcoming. (Court Reporter Sonja Reeves) (znbn) (Entered: 03/21/2025) |
| 03/21/2025 |  | MINUTE ORDER: The Court ORDERS that Amicus's 48 Motion for Leave to File is DENIED as untimely. Filing the night before the hearing does not permit the Court sufficient time to consider the arguments asserted. So ORDERED by Chief Judge James E. Boasberg on 3/21/2025. (lcjeb1) (Entered: 03/21/2025) |
| 03/21/2025 | 51 | TRANSCRIPT OF MOTION HEARING before Chief Judge James E. Boasberg held on March 21, 2025; Page Numbers: 1-65. Date of Issuance:March 21, 2025. Court Reporter/Transcriber Sonja L. Reeves, RDR, CRR, Sonja_Reeves@dcd.uscourts.gov, Transcripts may be ordered by submitting the Transcript Order Form  For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.  **NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. |

**JA8**

| | | |
|---|---|---|
| | | Redaction Request due 4/11/2025. Redacted Transcript Deadline set for 4/21/2025. Release of Transcript Restriction set for 6/19/2025.(Reeves, Sonja) (Entered: 03/21/2025) |
| 03/24/2025 | 52 | ORDER: For the reasons set forth in the accompanying Memorandum Opinion, the Court ORDERS that: 1) Defendants' 26 Motion to Vacate is DENIED; and 2) If Plaintiffs wish to convert the Temporary Restraining Order into a preliminary injunction, they shall so inform the Court by March 26, 2025. Signed by Chief Judge James E. Boasberg on 3/24/2025. (lcjeb1) (Entered: 03/24/2025) |
| 03/24/2025 | 53 | MEMORANDUM OPINION re 52 Order on Motion to Vacate. Signed by Chief Judge James E. Boasberg on 3/24/2025. (lcjeb1) (Entered: 03/24/2025) |
| 03/24/2025 | 54 | NOTICE of Appearance by Christine L. Coogle on behalf of J.G.G., G.F.F., J.G.O., W.G.H., J.A.V. (Coogle, Christine) (Entered: 03/24/2025) |
| 03/24/2025 | 55 | NOTICE *in Response to March 19 Minute Order* by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V. re 47 Order,,,, Set Deadlines,,, (Attachments: # 1 Exhibit A: Declaration of S.Z.F.R., # 2 Exhibit B: Declaration of E.E.P.B.)(Gelernt, Lee) (Entered: 03/24/2025) |
| 03/24/2025 | 56 | NOTICE *Invoking State Secrets Privilege* by MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. STATE DEPARTMENT, DONALD J. TRUMP, PAMELA BONDI, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY re 47 Order,,,, Set Deadlines,,, (Attachments: # 1 Affidavit Attorney General Bondi Declaration, # 2 Affidavit Secretary Rubio Declaration, # 3 Affidavit Secretary Noem Declaration)(Ensign, Drew) (Entered: 03/24/2025) |
| 03/25/2025 | | MINUTE ORDER: Given the Government's 56 Notice Invoking State Secrets Privilege, the Court ORDERS that if Plaintiffs wish to respond, they shall file any Response by March 31, 2025. So ORDERED by Chief Judge James E. Boasberg on 3/25/2025. (lcjeb1) (Entered: 03/25/2025) |
| 03/25/2025 | 57 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Pooja A. Boisture, Filing fee $ 100, receipt number ADCDC-11566919. Fee Status: Fee Paid. by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V.. (Attachments: # 1 Declaration, # 2 Certificate of Good Standing)(Girard, Bradley) (Entered: 03/25/2025) |
| 03/25/2025 | 58 | RESPONSE TO ORDER TO SHOW CAUSE re 47 Order by MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. STATE DEPARTMENT, DONALD J. TRUMP, PAMELA BONDI, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY. (Ensign, Drew) Modified event title on 3/26/2025 (znmw). (Entered: 03/25/2025) |
| 03/25/2025 | 59 | LEAVE TO FILE DENIED- Janice Wolk Grenadier - Motion. This document is unavailable as the Court denied its filing. Pro Se party has been notified by first class mail. "Leave to file DENIED." Signed by Chief Judge James E. Boasberg on 3/25/2025. (zjm) (Entered: 03/26/2025) |
| 03/25/2025 | 63 | MOTION to Intervene by JANICE WOLK GRENADIER. "Leave to file GRANTED." signed by Chief Judge James E. Boasberg on 3/25/2025 (Attachment: # 1 Exhibits)(zjm) Modified on 3/27/2025 to correct docket text (zjm). (Entered: 03/27/2025) |
| 03/26/2025 | | MINUTE ORDER: The Court ORDERS that the 57 Motion for Leave to Appear Pro Hac Vice of Pooja Ashok Boisture is GRANTED. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Chief Judge James E. Boasberg on 3/26/2025. (lcjeb1) (Entered: 03/26/2025) |

**JA9**

| 03/26/2025 | 60 | Unopposed MOTION for Leave to File Amicus Brief by MARK J. ROZELL, HEIDI KITROSSER, MITCHEL A. SOLLENBERGER. (Attachments: # 1 Text of Proposed Order)(McClanahan, Kelly) (Entered: 03/26/2025) |
|---|---|---|
| 03/26/2025 | | MINUTE ORDER: The Court ORDERS that: 1) The consent 60 Motion for Leave to File Amicus Brief is GRANTED; and 2) Movants shall file any such brief by April 1, 2025. So ORDERED by Chief Judge James E. Boasberg on 3/26/2025. (lcjeb1) (Entered: 03/26/2025) |
| 03/26/2025 | 61 | NOTICE re 52 Order *Regarding Plaintiffs' Motion for a Preliminary Injunction* by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V. (Gelernt, Lee) Modified to add link on 3/27/2025 (znmw). (Entered: 03/26/2025) |
| 03/26/2025 | | MINUTE ORDER: Given Plaintiffs' 61 Notice, the Court ORDERS that: 1) Plaintiffs shall file a Motion to Extend the TRO by 5:00 p.m. on March 27, 2025, and Defendants shall file any Opposition by 12:00 p.m. on March 28, 2025; 2) Plaintiffs shall file their PI Motion by March 28, 2025; Defendants' Opposition shall be due by April 1, 2025; and Plaintiffs' Reply shall be due by April 4, 2025; and 3) The parties shall appear for a hearing on the Motion on April 8, 2025, at 3:00 p.m. So ORDERED by Chief Judge James E. Boasberg on 3/26/2025. (lcjeb1) (Entered: 03/26/2025) |
| 03/27/2025 | 62 | NOTICE of Appearance by Pooja Boisture on behalf of J.G.G., G.F.F., J.G.O., W.G.H., J.A.V. (Boisture, Pooja) (Entered: 03/27/2025) |
| 03/27/2025 | 64 | MOTION for Temporary Restraining Order *, Motion to Extend Temporary Restraining Order* by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V.. (Attachments: # 1 Text of Proposed Order)(Gelernt, Lee) (Entered: 03/27/2025) |
| 03/27/2025 | | MINUTE ORDER: The Court ORDERS that the 63 Motion to Intervene is DENIED. So ORDERED by Chief Judge James E. Boasberg on 3/27/2025. (lcjeb1) (Entered: 03/27/2025) |
| 03/28/2025 | 65 | RESPONSE re 64 MOTION for Temporary Restraining Order *, Motion to Extend Temporary Restraining Order* filed by MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. STATE DEPARTMENT, DONALD J. TRUMP, PAMELA BONDI, U.S. DEPARTMENT OF HOMELAND SECURITY. (Ensign, Drew) (Entered: 03/28/2025) |
| 03/28/2025 | 66 | ORDER: The Court ORDERS that the TROs entered on March 15, 2025, are extended and shall remain in effect until April 12, 2025, or until further order of the Court. Signed by Chief Judge James E. Boasberg on 3/28/2025. (lcjeb1) (Entered: 03/28/2025) |
| 03/28/2025 | 67 | MOTION for Preliminary Injunction by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V.. (Attachments: # 1 Memorandum in Support, # 2 Index of Exhibits, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit, # 18 Exhibit, # 19 Exhibit, # 20 Exhibit, # 21 Exhibit, # 22 Text of Proposed Order)(Gelernt, Lee) (Entered: 03/29/2025) |
| 03/31/2025 | | MINUTE ORDER: The Court ORDERS that the parties shall appear on April 3, 2025, at 3:00 p.m. for a hearing on the Court's 47 Order to Defendants to show cause why they did not violate the Court's Temporary Restraining Orders. Members of the public may attend in person or by telephone. Toll free number: 833-990-9400. Meeting ID: 049550816. Any use of the public-access telephone line requires adherence to the general prohibition against photographing, recording, livestreaming, and rebroadcasting of court proceedings (including those held by telephone or videoconference), as set out in Standing Order No. 24-31 (JEB). Violation of these prohibitions may result in sanctions, including removal of court-issued media credentials, restricted entry to future hearings, denial of entry to future |

**JA10**

| | | hearings, or other sanctions deemed necessary by the Court. So ORDERED by Chief Judge James E. Boasberg on March 31, 2025. (lcjeb2) (Entered: 03/31/2025) |
|---|---|---|
| 03/31/2025 | 68 | NOTICE of Appearance by Cecilia D. Wang on behalf of All Plaintiffs (Wang, Cecilia) (Entered: 03/31/2025) |
| 03/31/2025 | 69 | RESPONSE re 56 Notice (Other), *Re: Invocation of State Secrets Privilege* filed by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V.. (Gelernt, Lee) (Entered: 03/31/2025) |
| 03/31/2025 | 70 | REPLY re 58 Memorandum, *Re: Order to Show Cause* filed by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V.. (Gelernt, Lee) (Entered: 03/31/2025) |
| 03/31/2025 | 74 | LEAVE TO FILE DENIED- DANA ALBRECHT - Motion. This document is unavailable as the Court denied its filing. Pro Se party has been notified by first class mail. "Leave to file DENIED. Improper to file such motion in this case." Signed by Chief Judge James E. Boasberg on 3/31/25. (zjm) (Entered: 04/02/2025) |
| 04/01/2025 | 71 | NOTICE of Appearance- Pro Bono by Evelyn Danforth-Scott on behalf of All Plaintiffs (Danforth-Scott, Evelyn) (Entered: 04/01/2025) |
| 04/01/2025 | 72 | Memorandum in opposition to re 67 Motion for Preliminary Injunction, filed by MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO A. RUBIO, U.S. STATE DEPARTMENT, DONALD J. TRUMP, PAMELA J. BONDI, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY. (Attachments: # 1 Declaration Declaration of Selwyn Smith, # 2 Declaration Declaration of Marcos Charles)(Flentje, August) (Entered: 04/01/2025) |
| 04/01/2025 | 75 | LEAVE TO FILE DENIED- DANA ALBRECHT - Motion for CM/ECF.. This document is unavailable as the Court denied its filing. Pro Se party has been notified by first class mail. "Leave to fine DENIED." Signed by Chief Judge James E. Boasberg on 4/1/2025. (zjm) (Entered: 04/03/2025) |
| 04/02/2025 | 73 | AMICUS BRIEF re 56 Notice (Other), *(Amici Curiae)* filed by MARK J. ROZELL, HEIDI KITROSSER, MITCHEL A. SOLLENBERGER. (McClanahan, Kelly) Modified event title on 4/2/2025 (znmw). (Entered: 04/02/2025) |
| 04/03/2025 | | Minute Entry for Show Cause Hearing held before Chief Judge James E. Boasberg on 4/3/2025. Matter taken under advisement; forthcoming Order. (Court Reporter: Tammy Nestor) (lsj) (Entered: 04/03/2025) |
| 04/04/2025 | 76 | TRANSCRIPT OF PROCEEDINGS before Chief Judge James E. Boasberg held on 4/3/25; Page Numbers: 1-31. Court Reporter/Transcriber Tammy Nestor, tammy_nestor@dcd.uscourts.gov, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. |

**JA11**

| | | |
|---|---|---|
| | | Redaction Request due 4/25/2025. Redacted Transcript Deadline set for 5/5/2025. Release of Transcript Restriction set for 7/3/2025.(Nestor, Tammy) (Entered: 04/04/2025) |
| 04/04/2025 | 77 | REPLY to opposition to motion re 67 Motion for Preliminary Injunction, filed by G.F.F., J.A.V., J.G.G., J.G.O., W.G.H.. (Gelernt, Lee) (Entered: 04/04/2025) |
| 04/07/2025 | | MINUTE ORDER: The Court ORDERS that the hearing set for April 8, 2025, at 3:00 p.m. shall take place in Courtroom 22A. Members of the public may attend in person or by telephone. Toll free number: 833-990-9400. Meeting ID: 049550816. Any use of the public-access telephone line requires adherence to the general prohibition against photographing, recording, livestreaming, and rebroadcasting of court proceedings (including those held by telephone or videoconference), as set out in Standing Order No. 24-31 (JEB). Violation of these prohibitions may result in sanctions, including removal of court-issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court. So ORDERED by Chief Judge James E. Boasberg on 4/7/2025. (lcjeb3) (Entered: 04/07/2025) |
| 04/07/2025 | 78 | NOTICE *Regarding Supreme Court Decision* by PAMELA J. BONDI, KRISTI NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT (Attachments: # 1 Exhibit JGG Supreme Court Decision)(Ensign, Drew) (Entered: 04/07/2025) |
| 04/08/2025 | | MINUTE ORDER: In yesterday's ruling vacating this Court's TROs, the Supreme Court held that Plaintiffs cannot be deported under the Alien Enemies Act without an opportunity to challenge their removal in federal court. It also determined that the appropriate venue for such proceedings is the Southern District of Texas or wherever Plaintiffs are currently held. This Court accordingly ORDERS that: 1) Today's preliminary-injunction hearing is VACATED; and 2) Plaintiffs shall file a Notice by April 16, 2025, indicating whether they believe that they still have a basis to proceed on their Motion for Preliminary Injunction in this Court and, if so, proposing a briefing schedule. So ORDERED by Chief Judge James E. Boasberg on 4/8/2025. (lcjeb1) (Entered: 04/08/2025) |
| 04/11/2025 | 79 | REQUEST FOR LEAVE TO FILE REVIEW. The attached document requires leave to file: LAMAR C. CHAPMAN, III - MOTION. Reason(s): Filer is not a party to the case. (Attachments: # 1 Motion, # 2 Motion) (zjm) (Entered: 04/11/2025) |
| 04/14/2025 | 82 | REQUEST FOR LEAVE TO FILE REVIEW. The attached document requires leave to file: MIKE YELLEN's Motion. Reason(s): Filer is not a party to the case. (znmw) (Entered: 04/16/2025) |
| 04/15/2025 | | MINUTE ORDER re 79 Request for Leave to File Review. Leave to file is denied. So ORDERED by Chief Judge James E. Boasberg on 4/15/2025. (lcjeb1) Modified filed date on 4/16/2025 (znmw). (Entered: 04/15/2025) |
| 04/16/2025 | 80 | ORDER: Given the finding of probable cause for contempt set forth in the accompanying Memorandum Opinion, the Court ORDERS that: (1) If Defendants opt to purge their contempt, they shall file by April 23, 2025, a declaration explaining the steps they have taken and will take to do so; and (2) If Defendants opt not to purge their contempt, they shall instead file by April 23, 2025, declaration(s) identifying the individual(s) who, with knowledge of the Court's classwide Temporary Restraining Order, made the decision not to halt the transfer of class members out of U.S. custody on March 15 and 16, 2025. Signed by Chief Judge James E. Boasberg on April 16, 2025. (lcjeb2) (Entered: 04/16/2025) |

<span style="color:red">**JA12**</span>

| 04/16/2025 | 81 | MEMORANDUM OPINION re: 80 Probable Cause Order. Signed by Chief Judge James E. Boasberg on April 16, 2025. (lcjeb2) (Entered: 04/16/2025) |
|---|---|---|
| 04/16/2025 | 83 | NOTICE of Appearance by Ernesto Horacio Molina, Jr on behalf of All Defendants (Molina, Ernesto) (Entered: 04/16/2025) |
| 04/16/2025 | 84 | NOTICE OF APPEAL TO DC CIRCUIT COURT by U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, PAMELA J. BONDI, U.S. STATE DEPARTMENT, DONALD J. TRUMP, U.S. DEPARTMENT OF HOMELAND SECURITY, MARCO A. RUBIO, KRISTI NOEM, MADISON SHEAHAN. Fee Status: No Fee Paid. Parties have been notified. (Molina, Ernesto) (Entered: 04/16/2025) |
| 04/16/2025 | 85 | MOTION for Temporary Restraining Order *and Notice in Response to the Court's April 8, 2025 Order* by G.F.F., J.A.V., J.G.G., J.G.O., W.G.H.. (Attachments: # 1 Text of Proposed Order)(Gelernt, Lee) (Entered: 04/16/2025) |
| 04/16/2025 | | MINUTE ORDER: The Court ORDERS that the 82 Request for Leave to File is DENIED. So ORDERED by Chief Judge James E. Boasberg on 4/16/2025. (lcjeb1) (Entered: 04/16/2025) |
| 04/16/2025 | 86 | RESPONSE TO ORDER OF THE COURT re 4/8/2025 Minute Order filed by G.F.F., J.A.V., J.G.G., J.G.O., W.G.H.. (See Docket Entry 85 to view document). (znmw) (Entered: 04/17/2025) |
| 04/17/2025 | 87 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 84 Notice of Appeal to DC Circuit Court. (znmw) (Entered: 04/17/2025) |
| 04/17/2025 | | MINUTE ORDER: The Court ORDERS that: 1) The Government shall file any Opposition to Plaintiffs' 85 Motion for TRO by April 19, 2025, at 9:00 a.m.; Plaintiffs shall file any Reply by April 21, 2025, at 9:00 a.m.; and the parties shall appear for a hearing on April 21, 2025, at 5:00 p.m.; and 2) Plaintiffs shall amend their Complaint and file any new motion for preliminary relief by April 24, 2025; Defendants shall file their Opposition by May 1, 2025; Plaintiffs shall file their Reply by May 5, 2025; and the parties shall appear for a hearing on the motion on May 7, 2025, at 5:00 p.m. Signed by Chief Judge James E. Boasberg on 4/17/2025. (lcjeb1) (Entered: 04/17/2025) |
| 04/17/2025 | | Set/Reset Hearings: Motion Hearing set for 4/21/2025 at 05:00 PM in Courtroom 22A- In Person before Chief Judge James E. Boasberg. Motion Hearing set for 5/7/2025 at 05:00 PM in Courtroom 22A- In Person before Chief Judge James E. Boasberg. (znbn) (Entered: 04/17/2025) |
| 04/17/2025 | | USCA Case Number 25-5124 for 84 Notice of Appeal to DC Circuit Court, filed by DONALD J. TRUMP, MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. DEPARTMENT OF HOMELAND SECURITY, MARCO A. RUBIO, KRISTI NOEM, PAMELA J. BONDI, U.S. STATE DEPARTMENT. (zdp) (Entered: 04/17/2025) |
| 04/17/2025 | 96 | REQUEST FOR LEAVE TO FILE REVIEW. The attached documents require leave to file: MEGHAN KELLY - Motion to File Amicus Brief, Motion to Proceed In Forma Pauperis, Motion for Exception to Pro Hac Vice Rules. Reason(s): Filer is not a party to the case. (Attachments: # 1 Amicus Motion - Exhibit A, # 2 Amicus Motion - Exhibit B, # 3 Amicus Motion - Exhibit C, # 4 Amicus Motion - Propose Order, # 5 Motion to Proceed IFP, # 6 IFP Motion - Exhibit 1, # 7 IFP Motion - Exhibit 2, # 8 IFP Motion - Proposed Order, # 9 Motion for Exception to PHV, # 10 PHV Motion - Appendix A, # 11 PHV Motion - Appendix B, # 12 PHV Motion - Appendix C, # 13 PHV Motion - Appendix D, # 14 PHV Motion - Appendix E, # 15 PHV Motion - Appendix F, # 16 PHV Motion - |

**JA13**

| | | |
|---|---|---|
| | | Appendix J-K, # 17 PHV Motion - Appendix L, # 18 PHV Motion - Proposed Order, # 19 Certificate of Service) (znmw) (Entered: 04/22/2025) |
| 04/18/2025 | 88 | Emergency MOTION to Stay re 81 Memorandum & Opinion, 80 Order,,, Set Deadlines,, *Pending Appeal* by PAMELA J. BONDI, KRISTI NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT. (Attachments: # 1 Exhibit)(Molina, Ernesto) (Entered: 04/18/2025) |
| 04/18/2025 | 89 | ERRATA by PAMELA J. BONDI, KRISTI NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT re 88 Motion to Stay,. (Attachments: # 1 Corrected Emergency Motion For A Stay Pending Appeal)(Molina, Ernesto) (Entered: 04/18/2025) |
| 04/18/2025 | 90 | Emergency MOTION to Expedite *TRO in Light of AEA Removals* by G.F.F., J.A.V., J.G.G., J.G.O., W.G.H.. (Attachments: # 1 Declaration - Brown, # 2 Declaration - Brane) (Gelernt, Lee) (Entered: 04/18/2025) |
| 04/18/2025 | 91 | ORDER: The Court ORDERS that Defendants' 88 Emergency Motion to Stay is DENIED. Signed by Chief Judge James E. Boasberg on April 18, 2025. (lcjeb2) (Entered: 04/18/2025) |
| 04/18/2025 | | MINUTE ORDER: Having reviewed Plaintiffs' 85 Motion for Temporary Restraining Order and 90 Emergency Motion to Expedite, the Court ORDERS that the parties shall appear for a Zoom hearing on April 18, 2025, at 6:15 p.m. The hearing will proceed by videoconference for the parties and by telephone for members of the public. Toll free number: 833-990-9400. Meeting ID: 049550816. So ORDERED by Chief Judge James E. Boasberg on April 18, 2025. (lcjeb2) (Entered: 04/18/2025) |
| 04/18/2025 | 92 | NOTICE by G.F.F., J.A.V., J.G.G., J.G.O., W.G.H. re 90 Motion to Expedite (Attachments: # 1 Exhibit)(Gelernt, Lee) (Entered: 04/18/2025) |
| 04/18/2025 | | MINUTE ORDER: For the reasons discussed in today's hearing, the Court ORDERS that: 1) Plaintiff's 90 Emergency Motion to Expedite the Temporary Restraining Order is DENIED; and 2) The briefing schedule for the TRO and the hearing set for Monday, April 21, 2025, at 5 p.m. are VACATED. So ORDERED by Chief Judge James E. Boasberg on 4/18/2025. (lcjeb4) (Entered: 04/18/2025) |
| 04/18/2025 | | Minute Entry for proceedings held before Chief Judge James E. Boasberg: Motion Hearing held on 4/18/2025 re 90 Emergency MOTION to Expedite *TRO in Light of AEA Removals* filed by J.G.O., W.G.H., J.G.G., G.F.F., J.A.V.. Oral argument heard. (Court Reporter Tammy Nestor) (znbn) (Entered: 04/18/2025) |
| 04/18/2025 | 93 | TRANSCRIPT OF PROCEEDINGS before Chief Judge James E. Boasberg held on 4/18/25; Page Numbers: 1-34. Court Reporter/Transcriber Tammy Nestor, Telephone number tammy_nestor@dcd.uscourts.gov, Transcripts may be ordered by submitting the [Transcript Order Form](#) <br><br> For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter. <br><br> **NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five |

**JA14**

| | | |
|---|---|---|
| | | personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 5/9/2025. Redacted Transcript Deadline set for 5/19/2025. Release of Transcript Restriction set for 7/17/2025.(Nestor, Tammy) (Entered: 04/18/2025) |
| 04/18/2025 | 94 | Unopposed MOTION for Leave to File Amicus Brief*of John W. Keker, Robert A. Van Nest, Elliot R. Peters and Laurie Carr Mims* by JOHN W KEKER, ROBERT A. VAN NEST, ELLIOT R. PETERS, LAURIE CARR MIMS. (Attachments: # 1 Exhibit Proposed Amici Curiae Brief, # 2 Text of Proposed Order)(Hirsch, Steven) (Entered: 04/18/2025) |
| 04/19/2025 | | MINUTE ORDER: The Court ORDERS that the Unopposed 94 Motion for Leave to File Amicus Brief is GRANTED. So ORDERED by Chief Judge James E. Boasberg on 4/19/2025. (lcjeb1) (Entered: 04/19/2025) |
| 04/19/2025 | 95 | MOTION for Leave to File Amicus Brief by COOLIDGE REAGAN FOUNDATION. (Attachments: # 1 Brief of Putative Amicus Curiae, # 2 Text of Proposed Order)(Backer, Dan) (Entered: 04/19/2025) |
| 04/21/2025 | | RESOLVED.....NOTICE of Provisional/Government Not Certified Status re 95 MOTION for Leave to File Amicus Brief by COOLIDGE REAGAN FOUNDATION. (Attachments: # 1 Brief of Putative Amicus Curiae, # 2 Text of Proposed Order)(Backer, Dan).<br><br>Your attorney renewal/government certification has not been received. As a result, your membership with the U.S. District & Bankruptcy Courts for the District of Columbia is not in good standing, and you are not permitted to file. Pursuant to Local Civil Rule 83.9, you must immediately correct your membership status by following the appropriate instructions on this page of our website: https://www.dcd.uscourts.gov/attorney-renewal.<br><br>Please be advised that the presiding judge in this case has been notified that you are currently not in good standing to file in this court. Renewal Due by 4/28/2025. (zapb) 4/21/2025 (zapb). (Entered: 04/21/2025) |
| 04/21/2025 | 97 | REQUEST FOR LEAVE TO FILE REVIEW. The attached document requires leave to file: MEGHAN KELLY - Motion to Serve by Email and E-File. Reason(s): Filer is not a party to the case. (Attachments: # 1 E-File - Exhibit 1, # 2 E-File - Exhibit 2, # 3 E-File - Proposed Order, # 4 Certificate of Service) (znmw) (Entered: 04/22/2025) |
| 04/22/2025 | 98 | REQUEST FOR LEAVE TO FILE REVIEW. The attached document requires leave to file: MEGHAN KELLY - Proposed Amicus Brief. Reason(s): Filer is not a party to the case. (Attachments: # 1 Amicus Brief - Exhibits, # 2 Certificate of Service) (znmw) (Entered: 04/22/2025) |
| 04/22/2025 | | MINUTE ORDER: The Court ORDERS that the 95 Motion for Leave to File Amicus Brief is GRANTED. So ORDERED by Chief Judge James E. Boasberg on 4/22/2025. (lcjeb1) (Entered: 04/22/2025) |
| 04/22/2025 | | MINUTE ORDER re 97 Request for Leave to File Review. The Court ORDERS that leave to file is granted. So ORDERED by Chief Judge James E. Boasberg on 4/22/2025. (lcjeb1) (Entered: 04/22/2025) |
| 04/22/2025 | 104 | MOTION for CM/ECF Password by MEGHAN KELLY. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(zjm) (Entered: 04/25/2025) |

**JA15**

| 04/23/2025 | 105 | REQUEST FOR LEAVE TO FILE REVIEW. The attached document requires leave to file: MEGHAN KELLY - Corrected Proposed Amicus Brief. Reason(s): Filer is not a party to the case. (Attachments: # 1 Corrected Amicus Brief, # 2 Exhibit 1-12, # 3 Exhibit 13, # 4 Exhibit 14, # 5 Exhibit 15, # 6 Certificate of Service) (zjm) (Entered: 04/28/2025) |
| --- | --- | --- |
| 04/24/2025 | 99 | NOTICE of Appearance by Brian D. Netter on behalf of G.F.F., J.A.V., J.G.G., J.G.O., W.G.H. (Netter, Brian) (Entered: 04/24/2025) |
| 04/24/2025 | 100 | REDACTED DOCUMENT- Redacted Public Version of ECF No. 2 *Unsealed Motion to Proceed Under Pseudonyms* by G.F.F., J.A.V., J.G.G., J.G.O., W.G.H.. (Galindo, Daniel) (Entered: 04/24/2025) |
| 04/24/2025 | 101 | AMENDED COMPLAINT against All Defendants filed by G.F.F., J.G.G., J.G.O., W.G.H., J.A.V., M.Z.V.V., M.Y.O.R., M.M.A.A., D.A.R.H., EYLAN SCHILMAN, LIYANARA SANCHEZ, DORYS MENDOZA.(Gelernt, Lee) (Entered: 04/24/2025) |
| 04/25/2025 | 102 | MOTION for Preliminary Injunction by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. (Attachments: # 1 Memorandum in Support, # 2 Exhibit Declaration of Rebecca Hanson, # 3 Exhibit Declaration of Andres Antillano, # 4 Exhibit Declaration of Steven Dudley, # 5 Exhibit Declaration of Sarah Bishop, # 6 Exhibit Declaration of Juanita Goebertus, # 7 Exhibit Declaration of Liyanara Sanchez, # 8 Exhibit Declaration of DARH, # 9 Exhibit Declaration of MZVV, # 10 Exhibit Declaration of MYOR, # 11 Exhibit Declaration of MMAA, # 12 Exhibit Declaration of Dorys Mendoza, # 13 Exhibit Declaration of Elyan Schulman, # 14 Exhibit Declaration of Oscar Sarabia Roman, # 15 Text of Proposed Order)(Gelernt, Lee) (Entered: 04/25/2025) |
| 04/25/2025 | 103 | MOTION to Certify Class by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. (Attachments: # 1 Memorandum in Support, # 2 Declaration, # 3 Text of Proposed Order)(Gelernt, Lee) (Entered: 04/25/2025) |
| 04/29/2025 | 106 | REQUEST FOR SUMMONS TO ISSUE filed by LIYANARA SANCHEZ, M.Z.V.V., G.F.F., J.G.G., M.Y.O.R., EYLAN SCHILMAN, M.M.A.A., J.G.O., DORYS MENDOZA, D.A.R.H., W.G.H., J.A.V.. (Attachments: # 1 Summons)(Gelernt, Lee) (Entered: 04/29/2025) |
| 04/30/2025 | 107 | SUMMONS (2) Issued Electronically as to PETE HEGSETH, U.S. DEPARTMENT OF DEFENSE. (znmw) (Entered: 04/30/2025) |
| 05/01/2025 | 108 | Memorandum in opposition to re 102 MOTION for Preliminary Injunction filed by DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT. (Attachments: # 1 Exhibit A: Landau Declaration, # 2 Exhibit B:, # 3 Text of Proposed Order)(Ensign, Drew) (Entered: 05/01/2025) |
| 05/02/2025 | 109 | NOTICE of Appearance by Tiberius T Davis on behalf of All Defendants (Davis, Tiberius) (Entered: 05/02/2025) |
| 05/05/2025 | 110 | NOTICE of Appearance by Aditi Shah on behalf of All Plaintiffs (Shah, Aditi) (Main Document 110 replaced on 5/6/2025) (znmw). (Entered: 05/05/2025) |
| 05/05/2025 | 111 | REPLY to opposition to motion re 102 Motion for Preliminary Injunction,,, filed by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. (Gelernt, Lee) (Entered: 05/05/2025) |

**JA16**

| 05/06/2025 | | MINUTE ORDER: The Court ORDERS that Proposed Amicus's [104](#) Motion, which it construes as a Motion for CM/ECF Password, is GRANTED, provided that she comply with any requirements imposed by the Clerk's Office. So ORDERED by Chief Judge James E. Boasberg on 5/6/2025. (lcjeb1) (Entered: 05/06/2025) |
| --- | --- | --- |
| 05/06/2025 | | MINUTE ORDER: The Court ORDERS that Proposed Amicus's [98, 105] Requests for Leave to File are DENIED. She must file a motion for leave to file an amicus brief before simply filing one. So ORDERED by Chief Judge James E. Boasberg on 5/6/2025. (lcjeb1) (Entered: 05/06/2025) |
| 05/06/2025 | [112](#) | NOTICE OF SUPPLEMENTAL AUTHORITY by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H. (Attachments: # [1](#) Supplement Memorandum Opinion from G.F.F. v. Trump, # [2](#) Supplement Memorandum Opinion from D.B.U. v. Trump) (Gelernt, Lee) (Entered: 05/06/2025) |
| 05/06/2025 | [113](#) | MOTION for Order to Proceed under Pseudonyms - Supplemental Motion for Leave to Proceed Under Pseudonyms by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. (Attachments: # [1](#) Text of Proposed Order)(Gelernt, Lee) Modified on 5/8/2025 to correct event (zjm). (Entered: 05/06/2025) |
| 05/07/2025 | | MINUTE ORDER: The Court ORDERS that the hearing set for today at 5:00 p.m. shall take place in Courtroom 22A. Members of the public may attend in person or by telephone. Toll free number: 833-990-9400. Meeting ID: 049550816. Any use of the public-access telephone line requires adherence to the general prohibition against photographing, recording, livestreaming, and rebroadcasting of court proceedings (including those held by telephone or videoconference), as set out in Standing Order No. 24-31 (JEB). Violation of these prohibitions may result in sanctions, including removal of court-issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court. So ORDERED by Chief Judge James E. Boasberg on 5/7/2025. (lcjeb1) (Entered: 05/07/2025) |
| 05/07/2025 | [114](#) | Memorandum in opposition to re [103](#) MOTION to Certify Class filed by PAMELA J. BONDI, PETE HEGSETH, KRISTI NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT. (Davis, Tiberius) (Entered: 05/07/2025) |
| 05/07/2025 | [115](#) | NOTICE of Proposed Order re [114](#) Memorandum in opposition to re [103](#) MOTION to Certify Class *(Proposed Order)* filed by PAMELA J. BONDI, PETE HEGSETH, KRISTI NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT. (Davis, Tiberius) Modified event title on 5/9/2025 (znmw). (Entered: 05/07/2025) |
| 05/07/2025 | | Minute Entry for proceedings held before Chief Judge James E. Boasberg: Motion Hearing held on 5/7/2025 re [85](#) MOTION for Temporary Restraining Order *and Notice in Response to the Court's April 8, 2025 Order* filed by J.G.O., W.G.H., J.G.G., G.F.F., J.A.V.. Oral argument heard, order forthcoming. (Court Reporter Janice Dickman) (znbn) (Entered: 05/07/2025) |
| 05/08/2025 | [116](#) | ORDER: As explained at the conclusion of yesterday's hearing, the Court ORDERS that: 1) By May 9, 2025, Respondents shall submit any declarations they wish to provide regarding whether the United States has constructive custody over the proposed CECOT class; 2) By May 12, 2025, Petitioners shall submit to the Court a notice regarding |

| | | |
|---|---|---|
| | | whether they wish to seek jurisdictional discovery, and, if so, the specific discovery they propose to propound; and 3) By May 14, 2025, Respondents shall submit any response to Petitioners' discovery proposal. Signed by Chief Judge James E. Boasberg on 5/8/2025. (lcjeb4) (Entered: 05/08/2025) |
| 05/08/2025 | 117 | ORDER: The Court ORDERS that: 1) Petitioners' 113 Motion for Leave to File Under Pseudonym is GRANTED; 2) All parties shall use the pseudonyms listed in the Amended Complaint in all documents filed in this action; and 3) Within fourteen days of this Order, Petitioners and their next friends must file a sealed declaration containing their real names and residential addresses. Signed by Chief Judge James E. Boasberg on 5/8/2025. (lcjeb1) (Entered: 05/08/2025) |
| 05/09/2025 | 118 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by PAMELA J. BONDI, PETE HEGSETH, KRISTI NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit Sealed Declaration, # 2 Exhibit Sealed Redacted Declaration, # 3 Exhibit Sealed Document 1, # 4 Exhibit Sealed Document 2, # 5 Exhibit Sealed Document 3, # 6 Exhibit Sealed Document 4, # 7 Text of Proposed Order Sealed Proposed Order)(Davis, Tiberius) (Entered: 05/09/2025) |
| 05/10/2025 | 119 | CERTIFICATE OF SERVICE re 118 by PAMELA J. BONDI, PETE HEGSETH, KRISTI NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT *of Sealed Filing*. (Davis, Tiberius) Modified to add link on 5/12/2025 (znmw). (Entered: 05/10/2025) |
| 05/10/2025 | 120 | NOTICE *(Filing Statement)* by PAMELA J. BONDI, PETE HEGSETH, KRISTI NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT re 116 Order,,, Set Deadlines,, (Davis, Tiberius) (Entered: 05/10/2025) |
| 05/11/2025 | 121 | MOTION for Leave to File Excess Pages by MEGHAN KELLY. (Attachments: # 1 proposed order for leave to exceed page limits in Meghan Kelly's amicus brief)(KELLY, MEGHAN) (Entered: 05/11/2025) |
| 05/11/2025 | 122 | MOTION for Leave to File Amicus Brief by MEGHAN KELLY. (Attachments: # 1 4 exhibit A Affidavit Texas venue prejudicial against Plaintiffs to Motion to file Amicus Brief, # 2 5 Exhibit B Meg proposed 5 art of impeachment including protecting kids and folks at the border sent to all 541 congress people to Motion to File Amicus, # 3 6 Exhibit C Texas Governor Abbott's Border_Statement to Motion to file Amicus, # 4 7 Exhibit D Ice court case detained college kid in one state moved her in night across state lines Appellate Court said unlawful government change venue to manipulate forums to motion to file amicus, # 5 8 Exhibit E Leaked Memo to search without a warrant to Motion to file amicus, # 6 Certificate of Service to Motion to exceed page limits, Motion for Leave to file amicus and exhibits thereto, and proffered Amicus Brief and Exhibits thereto) (KELLY, MEGHAN) (Entered: 05/11/2025) |
| 05/11/2025 | 123 | SUPPLEMENT (Proposed Amicus Brief) re 122 MOTION for Leave to File Amicus Brief by MEGHAN KELLY. (Attachments: # 1 Exhibits 1-12 to proposed amicus brief above, # 2 Exhibit 13 USSC order Texas evaded by declaring insurrection Jan 24 2024 to proposed amicus brief, # 3 Exhibit 14 annexing Canada, Greenland, Panama Canal to proposed amicus brief above, # 4 Exhibit 15 Trump's potentially conflicting corporate interests to proposed amicus brief above, # 5 Proposed order on Meghan Kelly's Motion |

**JA18**

| | | |
|---|---|---|
| | | for Leave to file amicus brief)(KELLY, MEGHAN) Modified event title on 5/12/2025 (znmw). (Entered: 05/11/2025) |
| 05/12/2025 | | MINUTE ORDER: The Court ORDERS that Defendants' 118 Motion for Leave to File Document Under Seal is GRANTED. In the event that the Court, after review, believes that a redacted version of the filing should be placed on the public record, it will so order. So ORDERED by Chief Judge James E. Boasberg on 5/12/2025. (lcjeb1) (Entered: 05/12/2025) |
| 05/12/2025 | | MINUTE ORDER: The Court ORDERS that the 121 Motion for Leave to File Excess Pages is DENIED. So ORDERED by Chief Judge James E. Boasberg on 5/12/2025. (lcjeb1) (Entered: 05/12/2025) |
| 05/12/2025 | 124 | TRANSCRIPT OF PROCEEDINGS before Chief Judge James E. Boasberg held on May 7, 2025; Page Numbers: 1-42. Date of Issuance: May 12, 2025. Court Reporter: Janice Dickman, Telephone number: 202-354-3267, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 6/2/2025. Redacted Transcript Deadline set for 6/12/2025. Release of Transcript Restriction set for 8/10/2025.(Dickman, Janice) (Entered: 05/12/2025) |
| 05/12/2025 | 125 | NOTICE *Regarding Jurisdictional Discovery* by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H. (Attachments: # 1 Exhibit A Proposed Discovery Requests)(Gelernt, Lee) (Entered: 05/12/2025) |
| 05/13/2025 | | MINUTE ORDER: The Court ORDERS that Amicus's 122 Motion for Leave is DENIED WITHOUT PREJUDICE. She must attach her proposed brief to any motion for leave to file. So ORDERED by Chief Judge James E. Boasberg on 5/13/2025. (lcjeb1) (Entered: 05/13/2025) |
| 05/14/2025 | 126 | RESPONSE re 125 Notice (Other), *in Opposition to Petitioners-Plaintiffs' Request for Further Discovery,* filed by PAMELA J. BONDI, PETE HEGSETH, KRISTI NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT. (Davis, Tiberius) (Entered: 05/14/2025) |
| 05/14/2025 | 127 | REPLY to opposition to motion re 103 Motion to Certify Class, filed by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. (Gelernt, Lee) (Entered: 05/14/2025) |

**JA19**

| 05/15/2025 | 131 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Motion to Intervene. Joshua Hall & Eric Heilner. Reason(s): Filer is not a party to the case. (zjm) (Entered: 05/21/2025) |
|---|---|---|
| 05/16/2025 | 128 | ORDER: The Court ORDERS that: 1) By May 19, 2025, Petitioners shall serve the requests listed in this Order upon Respondents in the finalized form contemplated by the Federal Rules of Civil Procedure; 2) By May 23, 2025, Respondents shall provide responses to the requests listed in this Order, assert any applicable privileges, and explain why such privilege applies; and 3) By May 26, 2025, Petitioners shall file any response to Respondents' submissions. Signed by Chief Judge James E. Boasberg on 5/16/2025. (lcjeb1) (Entered: 05/16/2025) |
| 05/16/2025 | | MINUTE ORDER: Per the Court's Minute Order of May 12, 2025, granting Defendants' 118 Motion for Leave to File Under Seal, and because they have now informed the Court that they do not oppose filing the redacted exhibit comprising ECF No. 118-2 on the public docket, the Court ORDERS that they shall do so by May 19, 2025. So ORDERED by Chief Judge James E. Boasberg on May 16, 2025. (lcjeb2) (Entered: 05/16/2025) |
| 05/16/2025 | 129 | REDACTED DOCUMENT- Declaration to Order, *filed in response to minute order of May 16, 2025,* by PAMELA J. BONDI, PETE HEGSETH, KRISTI NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT. (Davis, Tiberius) (Entered: 05/16/2025) |
| 05/21/2025 | 130 | MOTION for Leave to File Amicus Brief by MEGHAN KELLY. (Attachments: # 1 declaration to Motion for leave to file an amicus brief by Meghan Kelly, # 2 Exhibit 1 Redacted admission Fraud in AEA by Defendants, # 3 Exhibit 2 proof of secretly concealing evidence in my favor to affect outcome of case on appeal Kelly v Trump Due Process violations and in future planned discipline to discredit me in cover ups and demean relig belief in Jesus, # 4 Exhibits 3 & 4 kelly v trump docs secretly sealed to hide evidence in my favor, # 5 Exhibit 5 and 6 exemption form bar dues in DE, # 6 Exhibit 7 Lexis published Motion to Reign in arms from gov force to compel Meghan forgo or interfere case kelly v trump, # 7 Exhibit 8 Danger against Meg and solicitor generalfuneral US Supreme Court accepted only one full copy the original and the original and 10 copies of the IFP with the required exhibit and 10 copies of Pet for rehearing without exhibits, # 8 9 Yahoo Mail - Number 23-7360_ Fw_ Thank you Lisa Nesbitt Kelly v Swartz_Meg asserts right to live_religious objections to healthcare, science and mental healthcare by..., # 9 Exhibit 10 Exhibit 43 to Appendix F kelly v trump, # 10 Exhibit 11 USSC fired court staff Lisa nesbitt same as state court to cover up mistakes that may be cured not concealed Meg wants to protect and correct not destroy, # 11 Exhibit 12 Proposed amicus brief by Meghan Kelly, # 12 Declaration proposed Amicus Brief, # 13 Certificate of Service og Meghan Kelly's May 21 Motion for leave to file amicus)(KELLY, MEGHAN) (Entered: 05/21/2025) |
| 05/21/2025 | 132 | SEALED DOCUMENT filed by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H. re 117 Order on Motion for Order,, Set/Reset Deadlines, (This document is SEALED and only available to authorized persons.)(Galindo, Daniel) (Entered: 05/21/2025) |
| 05/22/2025 | | MINUTE ORDER **re 131 Request for Leave to File Review.** Leave to file is granted. The Clerk is directed to file the attached document on the public docket. So ORDERED by Chief Judge James E. Boasberg on 5/22/2025. (lcjeb1) (Entered: 05/22/2025) |

**JA20**

| | | |
|---|---|---|
| 05/22/2025 | | MINUTE ORDER: The Court ORDERS that Amicus's 130 Motion is GRANTED and her [130-11] Brief is deemed FILED. So ORDERED by Chief Judge James E. Boasberg on 5/22/2025. (lcjeb1) (Entered: 05/22/2025) |
| 05/22/2025 | | MINUTE ORDER: The Court ORDERS that Petitioners-Plaintiffs' Reply to the Government's discovery submissions shall now be due by May 27, 2025. So ORDERED by Chief Judge James E. Boasberg on 5/22/2025. (lcjeb1) (Entered: 05/22/2025) |
| 05/22/2025 | 133 | MOTION to Intervene by JOSHUA HALL. (znmw) (Entered: 05/23/2025) |
| 05/22/2025 | 143 | AMICUS BRIEF by MEGHAN KELLY. (zjm) (Entered: 05/28/2025) |
| 05/23/2025 | 134 | NOTICE OF WITHDRAWAL OF APPEARANCE as to D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. Attorney Pooja Boisture terminated. (Boisture, Pooja) (Entered: 05/23/2025) |
| 05/23/2025 | 135 | NOTICE OF WITHDRAWAL OF APPEARANCE as to D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. Attorney Skye Perryman terminated. (Perryman, Skye) (Entered: 05/23/2025) |
| 05/23/2025 | 136 | NOTICE OF WITHDRAWAL OF APPEARANCE as to D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. Attorney Somil Trivedi terminated. (Trivedi, Somil) (Entered: 05/23/2025) |
| 05/23/2025 | 137 | NOTICE OF WITHDRAWAL OF APPEARANCE as to D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. Attorney Michael Lawrence Waldman terminated. (Waldman, Michael) (Entered: 05/23/2025) |
| 05/23/2025 | 138 | NOTICE OF WITHDRAWAL OF APPEARANCE as to D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. Attorney Audrey Jordan Wiggins terminated. (Wiggins, Audrey) (Entered: 05/23/2025) |
| 05/23/2025 | 139 | STIPULATION *of Agreed Confidentiality Order* by PAMELA J. BONDI, PETER B. HEGSETH, KRISTI NOEM, MARCO RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT. (Davis, Tiberius) Modified on 5/27/2025 (znmw). (Entered: 05/23/2025) |
| 05/27/2025 | | ENTERED IN ERROR.....NOTICE OF ERROR regarding 139 Stipulation,. The following error(s) need correction: Missing signatures - Please refile. (znmw) Modified on 5/27/2025; per request from chambers (znmw). (Entered: 05/27/2025) |
| 05/27/2025 | 140 | ORDER: The Court ORDERS that the 139 Stipulated Confidentiality Order is ADOPTED. Signed by Chief Judge James E. Boasberg on 5/27/2025. (lcjeb4) (Entered: 05/27/2025) |
| 05/27/2025 | 141 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H. (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit Sealed Document 1, # 2 Exhibit Sealed Document 2, # 3 Exhibit Sealed Document 3)(Gelernt, Lee) (Entered: 05/27/2025) |

**JA21**

| | | |
|---|---|---|
| 05/27/2025 | 142 | CERTIFICATE OF SERVICE by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H. re 141 SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H. (This document is SEALED and only available to authorized person . (Gelernt, Lee) (Entered: 05/27/2025) |
| 05/28/2025 | 144 | NOTICE OF WITHDRAWAL OF APPEARANCE as to D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. Attorney Sarah Rich terminated. (Rich, Sarah) (Entered: 05/28/2025) |
| 05/28/2025 | | MINUTE ORDER: The Court ORDERS that the 141 Sealed Motion for Leave to File Document Under Seal is GRANTED. So ORDERED by Chief Judge James E. Boasberg on 5/28/2025. (lcjeb1) (Entered: 05/28/2025) |
| 05/28/2025 | 145 | SEALED Response filed by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit)(zjm) (Entered: 05/29/2025) |
| 06/04/2025 | 146 | NOTICE of Appearance by Michael King Thomas Tan on behalf of All Plaintiffs (Tan, Michael) (Entered: 06/04/2025) |
| 06/04/2025 | 147 | ORDER: For the reasons set forth in the accompanying Memorandum Opinion, the Court ORDERS that: 1) Plaintiffs' 102 Motion for Preliminary Injunction is GRANTED IN PART and DENIED IN PART; 2) Plaintiffs' 103 Motion for Class Certification is DENIED WITHOUT PREJUDICE as to the Criminal Custody Class and GRANTED as to the CECOT Class with modifications. The latter Class shall be defined as follows: <br><br> All noncitizens removed from U.S. custody and transferred to the Terrorism Confinement Center (CECOT) in El Salvador on March 15 and 16, 2025, pursuant solely to the Presidential Proclamation entitled, "Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua"; and <br><br> 3) By June 11, 2025, Defendants shall submit a Notice to the Court advising how they intend to facilitate the ability of the CECOT Class to seek habeas relief. SIGNED by Chief Judge James E. Boasberg on 6/4/2025. (lcjeb3) (Entered: 06/04/2025) |
| 06/04/2025 | 148 | MEMORANDUM OPINION re 147 Order on Preliminary Injunction and Class Certification Motions. SIGNED by Chief Judge James E. Boasberg on 6/4/2025. (lcjeb3) (Entered: 06/04/2025) |
| 06/04/2025 | | MINUTE ORDER: Given the Court's ruling today on Plaintiffs' PI Motion, it ORDERS that Plaintiffs' 85 Motion for TRO is DENIED as moot. Similarly, Plaintiffs' 67 prior PI Motion is DENIED as moot. Finally, proposed Intervenor's 133 Motion to Intervene is DENIED as not satisfying Fed. R. Civ. P. 24. So ORDERED by Chief Judge James E. Boasberg on 6/4/2025. (lcjeb1) (Entered: 06/04/2025) |
| 06/04/2025 | | MINUTE ORDER: As set forth in the Court's 148 Memorandum Opinion, the Court ORDERS that Plaintiffs shall by June 6, 2025, post a $1.00 bond in accordance with Fed. R. Civ. P. 65(c). So ORDERED by Chief Judge James E. Boasberg on 6/4/2025. (lcjeb1) (Entered: 06/04/2025) |

**JA22**

| 06/05/2025 | | DEPOSIT of Funds for Bond in the amount of $ 1.00, Receipt Number 209726, pursuant to 06/04/2025 Minute Order. (zjm) (Entered: 06/06/2025) |
|---|---|---|
| 06/10/2025 | 149 | ENTERED IN ERROR.....NOTICE OF APPEAL TO DC CIRCUIT COURT as to 147 Order on Motion for Preliminary Injunction,,,, Order on Motion to Certify Class,,,, Set/Reset Deadlines,,, by PAMELA J. BONDI, MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT, DONALD J. TRUMP, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF DEFENSE, MARCO RUBIO, KRISTI NOEM, PETER B. HEGSETH. Fee Status: No Fee Paid. Parties have been notified. (Davis, Tiberius) Modified on 6/10/2025 (znmw). (Entered: 06/10/2025) |
| 06/10/2025 | | NOTICE OF ERROR regarding 149 Notice of Appeal to DC Circuit Court,. The following error(s) need correction: Incorrect case number. Please refile. (znmw) (Entered: 06/10/2025) |
| 06/10/2025 | 150 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 147 Order on Motion for Preliminary Injunction,,,, Order on Motion to Certify Class,,,, Set/Reset Deadlines,,, by PAMELA J. BONDI, MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT, DONALD J. TRUMP, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF DEFENSE, MARCO RUBIO, KRISTI NOEM, PETER B. HEGSETH. Fee Status: No Fee Paid. Parties have been notified. (Davis, Tiberius) (Entered: 06/10/2025) |
| 06/10/2025 | 151 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 150 Notice of Appeal to DC Circuit Court. (znmw) (Entered: 06/10/2025) |
| 06/10/2025 | 152 | Emergency MOTION to Stay *Order Pending Appeal* by PAMELA J. BONDI, PETER B. HEGSETH, KRISTI NOEM, MARCO RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT. (Attachments: # 1 Proposed Order)(Davis, Tiberius) (Entered: 06/10/2025) |
| 06/10/2025 | | USCA Case Number 25-5217 for 150 Notice of Appeal to DC Circuit Court, filed by U.S. DEPARTMENT OF DEFENSE, PETER B. HEGSETH, DONALD J. TRUMP, MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM, PAMELA J. BONDI, U.S. STATE DEPARTMENT. (zjm) (Entered: 06/17/2025) |
| 06/12/2025 | 153 | ORDER: The Court ORDERS that Defendants' 152 Motion to Stay Pending Appeal is DENIED WITHOUT PREJUDICE. Signed by Chief Judge James E. Boasberg on June 12, 2025. (lcjeb2) (Entered: 06/12/2025) |
| 06/12/2025 | 154 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Motion to Intervene - Paul M. Dorsey. Reason(s): Filer is not a party to the case. (Attachments: # 1 List, # 2 Exhibits, # 3 Text of Proposed Order) (zjm) (Entered: 06/17/2025) |
| 06/17/2025 | | MINUTE ORDER **re 154 Request for Leave to File Review.** Leave to file is granted. The Clerk is directed to file the attached document on the public docket. So ORDERED by Chief Judge James E. Boasberg on 6/17/2025. (lcjeb1) (Entered: 06/17/2025) |
| 06/17/2025 | 155 | Unopposed MOTION to Clarify , Unopposed MOTION to Stay by PAMELA J. BONDI, PETER B. HEGSETH, KRISTI NOEM, MARCO RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF |

**JA23**

| | | |
|---|---|---|
| | | HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT. (Attachments: # 1 Text of Proposed Order)(Davis, Tiberius) (Entered: 06/17/2025) |
| 06/17/2025 | 156 | MOTION to Intervene by PAUL M. DORSEY. (Attachments: # 1 List, # 2 Exhibits, # 3 Text of Proposed Order)(znmw) (Entered: 06/25/2025) |
| 06/20/2025 | | MINUTE ORDER: The Court ORDERS that Defendants' Unopposed 155 Motion to Clarify is GRANTED insofar as the Government need not take any action or file any pleadings until the D.C. Circuit sends down its mandate in the appeal of this Court's 147 Order. So ORDERED by Chief Judge James E. Boasberg on 6/20/2025. (lcjeb1) (Entered: 06/20/2025) |
| 06/24/2025 | 157 | MANDATE of USCA as to 12 Notice of Appeal to DC Circuit Court, filed by DONALD J. TRUMP, MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM, PAMELA J. BONDI, U.S. STATE DEPARTMENT ; USCA Case Number 25-5067. (Attachments: # 1 USCA Order June 24, 2025)(zjm) (Entered: 06/25/2025) |
| 06/26/2025 | 158 | NOTICE of Filing by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H. (Attachments: # 1 Exhibit A: 28(j) - 25-5124, # 2 Exhibit B: 28(j) - 25-5217)(Gelernt, Lee) (Entered: 06/26/2025) |
| 07/03/2025 | 159 | NOTICE of Filing by PAMELA J. BONDI, PETER B. HEGSETH, KRISTI NOEM, MARCO RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT (Attachments: # 1 Exhibit 28(j) Response - CADC No. 25-5124, # 2 Exhibit 28(j) Response - CADC No. 25-5217)(Davis, Tiberius) (Entered: 07/03/2025) |
| 07/07/2025 | | MINUTE ORDER: The Court ORDERS that Intervenor's 156 Motion to Intervene is DENIED as he does not satisfy the test set forth in Fed. R. Civ. P. 24. So ORDERED by Chief Judge James E. Boasberg on 7/7/2025. (lcjeb1) (Entered: 07/07/2025) |
| 07/07/2025 | 160 | NOTICE of United Nations Document by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H. (Attachments: # 1 Exhibit UN Report on Enforced or Involuntary Disappearances, # 2 Exhibit Petitioners' Requests for Production of Documents)(Gelernt, Lee) (Entered: 07/07/2025) |
| 07/11/2025 | 161 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by PAMELA J. BONDI, PETER B. HEGSETH, KRISTI NOEM, MARCO RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Notice to Counsel/Party SEALED RESPONSE, # 2 Notice to Counsel/Party SEALED REDACTED RESPONSE, # 3 Text of Proposed Order SEALED PROPOSED ORDER)(Davis, Tiberius) (Entered: 07/11/2025) |
| 07/12/2025 | 162 | CERTIFICATE OF SERVICE by PAMELA J. BONDI, PETER B. HEGSETH, KRISTI NOEM, MARCO RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT re 161 SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by PAMELA J. BONDI, PETER B. HEGSETH, KRISTI NOEM, MARCO RUBIO, |

JA24

| | | |
|---|---|---|
| | | MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS EN *FORCEMENT, U.S. STATE DEPARTMENT*. (Davis, Tiberius) (Entered: 07/12/2025) |
| 07/14/2025 | | MINUTE ORDER: The Court ORDERS that Defendants' 161 Sealed Motion for Leave to File Document Under Seal is GRANTED. In the event that the Court, after review, believes that a redacted version of the filing should be placed on the public record, it will so order. So ORDERED by Chief Judge James E. Boasberg on 07/14/2025. (lcjeb1) (Entered: 07/14/2025) |
| 07/14/2025 | 163 | MOTION to Intervene by GLORIA BROWNING. (zjm) (Entered: 07/14/2025) |
| 07/14/2025 | 167 | SEALED Response filed by PAMELA J. BONDI, PETER B. HEGSETH, KRISTI NOEM, MARCO RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT. re 160 Notice (Other),. (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Notice to Counsel/Party SEALED REDACTED RESPONSE)(zjm) (Entered: 07/17/2025) |
| 07/15/2025 | 164 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 3/24/2025. Answer due for ALL FEDERAL DEFENDANTS by 5/23/2025. (Gelernt, Lee) (Entered: 07/15/2025) |
| 07/15/2025 | 165 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 3/31/2025. (Gelernt, Lee) (Entered: 07/15/2025) |
| 07/15/2025 | 166 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. PETER B. HEGSETH served on 5/6/2025; KRISTI NOEM served on 3/31/2025; MARCO RUBIO served on 3/31/2025; MADISON SHEAHAN served on 3/31/2025; DONALD J. TRUMP served on 3/31/2025; U.S. DEPARTMENT OF DEFENSE served on 5/6/2025; U.S. DEPARTMENT OF HOMELAND SECURITY served on 3/31/2025; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT served on 3/31/2025; U.S. STATE DEPARTMENT served on 3/28/2025 (Gelernt, Lee) (Entered: 07/15/2025) |
| 07/17/2025 | | MINUTE ORDER: The Court ORDERS that Intervenor's 163 Motion to Intervene is DENIED. She does not satisfy the requirements of Fed. R. Civ. P. 24. So ORDERED by Chief Judge James E. Boasberg on 7/17/2025. (lcjeb1) (Entered: 07/17/2025) |
| 07/18/2025 | 168 | NOTICE *of Changed Circumstances* by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H. (Attachments: # 1 Exhibit A Declaration of Mellissa Harper)(Gelernt, Lee) (Entered: 07/18/2025) |

**JA25**

| 07/21/2025 | | MINUTE ORDER: The Court ORDERS that the parties shall appear for a status hearing on July 24, 2025, at 11:00 a.m. The hearing will proceed in-person for the parties and by telephone for members of the public. Toll free number: 833-990-9400. Meeting ID: 049550816. Any use of the public-access telephone line requires adherence to the general prohibition against photographing, recording, livestreaming, and rebroadcasting of court proceedings (including those held by telephone or videoconference), as set out in Standing Order No. 24-31 (JEB). Violation of these prohibitions may result in sanctions, including removal of court-issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court. So ORDERED by Chief Judge James E. Boasberg on 7/21/2025. (lcjeb4) Modified to add public line on 7/21/2025 (znbn). (Entered: 07/21/2025) |
|---|---|---|
| 07/24/2025 | | Minute Entry for proceedings held before Chief Judge James E. Boasberg: Status Conference held on 7/24/2025. Minute Order forthcoming. (Court Reporter Tammy Nestor) (znbn) (Entered: 07/24/2025) |
| 07/24/2025 | | MINUTE ORDER: As discussed at today's status hearing, the Court ORDERS that the parties shall submit a Joint Status Report by August 7, 2025, and every two weeks thereafter until further Order of the Court. So ORDERED by Chief Judge James E. Boasberg on July 24, 2025. (lcjeb3) (Entered: 07/24/2025) |
| 07/24/2025 | 169 | TRANSCRIPT OF PROCEEDINGS before Chief Judge James E. Boasberg held on 7/24/25; Page Numbers: 1-21. Court Reporter/Transcriber Tammy Nestor, tammy_nestor@dcd.uscourts.gov, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 8/14/2025. Redacted Transcript Deadline set for 8/24/2025. Release of Transcript Restriction set for 10/22/2025.(Nestor, Tammy) (Entered: 07/24/2025) |
| 08/07/2025 | 170 | Joint STATUS REPORT by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. (Gelernt, Lee) (Entered: 08/07/2025) |
| 08/08/2025 | | MINUTE ORDER: Having reviewed the parties' 170 Joint Status Report, the Court ORDERS that they shall now file such reports on the first business day of each month. So ORDERED by Chief Judge James E. Boasberg on 08/08/2025. (lcjeb1) (Entered: 08/08/2025) |
| 08/19/2025 | 171 | MANDATE of USCA as to 150 Notice of Appeal to DC Circuit Court, filed by U.S. DEPARTMENT OF DEFENSE, PETER B. HEGSETH, DONALD J. TRUMP, MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. DEPARTMENT OF HOMELAND SECURITY, MARCO A. RUBIO, KRISTI |

**JA26**

| | | |
|---|---|---|
| | | NOEM, PAMELA J. BONDI, U.S. STATE DEPARTMENT ; USCA Case Number 25-5217. (Attachments: # 1 USCA Order August 8, 2025)(zjm) (Entered: 08/21/2025) |
| 09/02/2025 | 172 | Joint STATUS REPORT by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. (Gelernt, Lee) (Entered: 09/02/2025) |
| 09/03/2025 | | MINUTE ORDER: Having reviewed the parties' 172 Joint Status Report, the Court ORDERS that once Plaintiffs file a new Motion for Preliminary Injunction, they need not file any further JSRs. So ORDERED by Chief Judge James E. Boasberg on 09/03/2025. (lcjeb1) (Entered: 09/03/2025) |
| 10/01/2025 | 173 | Joint STATUS REPORT by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. (Gelernt, Lee) (Entered: 10/01/2025) |
| 10/14/2025 | 174 | NOTICE of Appearance- Pro Bono by Sean Ming-Jun Lau on behalf of All Plaintiffs (Attachments: # 1 Certificate Pursuant to Local Civil Rules 83.2(f) and 83.2(g))(Lau, Sean) (Entered: 10/14/2025) |
| 10/14/2025 | 175 | NOTICE of Appearance- Pro Bono by Kathryn Huddleston on behalf of All Plaintiffs (Huddleston, Kathryn) (Entered: 10/14/2025) |
| 10/15/2025 | 176 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H. (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Text of Proposed Order)(Gelernt, Lee) (Entered: 10/15/2025) |
| 10/15/2025 | 177 | MOTION for Preliminary Injunction by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. (Attachments: # 1 Memorandum in Support, # 2 Exhibit Index, # 3 Exhibit A Declaration of Andres Antillano, # 4 Exhibit B Redacted Declaration, # 5 Exhibit C Redacted Declaration, # 6 Exhibit D Redacted Declaration, # 7 Exhibit E Redacted Declaration, # 8 Exhibit F, # 9 Exhibit G, # 10 Exhibit H, # 11 Exhibit I, # 12 Declaration J Declaration of Noelle Smith, # 13 Text of Proposed Order)(Gelernt, Lee) (Entered: 10/15/2025) |
| 10/15/2025 | 178 | MOTION to Certify Class by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Gelernt, Lee) (Entered: 10/15/2025) |
| 10/15/2025 | | MINUTE ORDER: The Court ORDERS that: 1) Plaintiffs' 176 Motion for Leave to File Under Seal is GRANTED; and 2) Plaintiffs' [176-1], [176-2], [176-3], [176-4] unredacted Declarations are deemed filed under seal. So ORDERED by Chief Judge James E. Boasberg on October 15, 2025. (lcjeb1) (Entered: 10/15/2025) |
| 10/15/2025 | 181 | SEALED Exhibits filed by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. re 177 Motion for Preliminary Injunction,,. (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit)(zjm) (Entered: 10/20/2025) |
| 10/16/2025 | 179 | MOTION to Stay *Proceedings Pending Lapse in Appropriations* by PAMELA J. BONDI, PETER B. HEGSETH, KRISTI NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF |

**JA27**

| | | |
|---|---|---|
| | | HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT. (Attachments: # 1 Text of Proposed Order)(Davis, Tiberius) (Entered: 10/16/2025) |
| 10/17/2025 | | MINUTE ORDER: Given that this Court's Standing Order's default rule for extensions does not apply to PI Motions and given the importance of a timely resolution of this matter, the Government's 179 Motion to Stay is DENIED. So ORDERED by Chief Judge James E. Boasberg on October 17, 2025. (lcjeb1) (Entered: 10/17/2025) |
| 10/17/2025 | 180 | PROPOSED BRIEFING SCHEDULE *(Joint Submission)* by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. (Gelernt, Lee) (Entered: 10/17/2025) |
| 10/17/2025 | | MINUTE ORDER: The Court ADOPTS the parties' 180 Joint Proposed Briefing Schedule and ORDERS that: (1) Defendants shall file their Response to Plaintiffs' Motion for Preliminary Injunction and Motion for Class Certification by October 31, 2025; and (2) Plaintiffs shall file their Replies by November 10, 2025. So ORDERED by Chief Judge James E. Boasberg on October 17, 2025. (lcjeb1) (Entered: 10/17/2025) |
| 10/29/2025 | | MINUTE ORDER: The Court ORDERS that the parties shall appear for a hearing on Plaintiffs' 177 178 Motions on November 19, 2025, at 2:00 p.m. So ORDERED by Chief Judge James E. Boasberg on October 29, 2025. (lcjeb1) (Entered: 10/29/2025) |
| 10/31/2025 | 182 | Memorandum in opposition to re 177 MOTION for Preliminary Injunction filed by PAMELA BONDI, PETER B. HEGSETH, KRISTI NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT. (Attachments: # 1 Exhibit A - Declaration of Deputy Secretary of State Christopher Landau, # 2 Exhibit B - Declaration of Secretary of State Marco Rubio)(Davis, Tiberius) (Entered: 10/31/2025) |
| 10/31/2025 | 183 | Memorandum in opposition to re 178 MOTION to Certify Class filed by PAMELA BONDI, PETER B. HEGSETH, KRISTI NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT. (Attachments: # 1 Exhibit A - Joint Status Report in J.O.P. v. DHS)(Davis, Tiberius) (Entered: 10/31/2025) |
| 10/31/2025 | 184 | NOTICE of Proposed Order by PAMELA BONDI, PETER B. HEGSETH, KRISTI NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT re 183 Memorandum in Opposition, 182 Memorandum in Opposition,, (Davis, Tiberius) (Entered: 10/31/2025) |
| 11/10/2025 | 185 | STRICKEN PURSUANT TO THE MINUTE ORDER FILED ON 11/12/2025.....REPLY to opposition to motion re 177 Motion for Preliminary Injunction,, filed by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. (Gelernt, Lee) Modified on 11/12/2025 (znbn). (Entered: 11/10/2025) |
| 11/10/2025 | 186 | REPLY to opposition to motion re 178 Motion to Certify Class, filed by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. (Gelernt, Lee) (Entered: 11/10/2025) |
| 11/12/2025 | | MINUTE ORDER: The Court ORDERS that Plaintiffs' 185 Reply is STRICKEN for violating the Court's Local Rule on excessive footnotes. Given that the Reply is limited to |

**JA28**

| | | |
|---|---|---|
| | | 25 pages, Plaintiffs shall file a compliant brief with no more than 5 footnotes containing no more than 25 aggregate lines of text by November 13, 2025. So ORDERED by Chief Judge James E. Boasberg on November 12, 2025. (lcjeb1) (Entered: 11/12/2025) |
| 11/12/2025 | 187 | REPLY to opposition to motion re 177 Motion for Preliminary Injunction,, filed by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. (Gelernt, Lee) (Entered: 11/12/2025) |
| 11/14/2025 | | NOTICE of Hearing: Motion Hearing set for November 19, 2025, at 02:00 PM in Courtroom 22A- In Person (Audio Line Available) before Chief Judge James E. Boasberg. The hearing will proceed in-person for the parties. Members of the public may attend in person or by telephone. Toll free number: 833-990-9400. Meeting ID: 049550816. Any use of the public-access telephone line requires adherence to the general prohibition against photographing, recording, livestreaming, and rebroadcasting of court proceedings (including those held by telephone or videoconference), as set out in Standing Order No. 24-31 (JEB). Violation of these prohibitions may result in sanctions, including removal of court-issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court. (znbn) (Entered: 11/14/2025) |
| 11/17/2025 | | MINUTE ORDER: Given the ruling on November 14, 2025, by the Court of Appeals, the Court ORDERS that at the PI hearing on November 19, 2025, the parties shall be prepared to discuss next steps in this Court's contempt inquiry. So ORDERED by Chief Judge James E. Boasberg on November 17, 2025. (lcjeb1) (Entered: 11/17/2025) |
| 11/18/2025 | 188 | NOTICE OF WITHDRAWAL OF APPEARANCE as to G.F.F., J.A.V., J.G.G., J.G.O., W.G.H.. Attorney Brian D. Netter terminated. (Netter, Brian) (Entered: 11/18/2025) |
| 11/18/2025 | 189 | NOTICE OF WITHDRAWAL OF APPEARANCE as to G.F.F., J.A.V., J.G.G., J.G.O., W.G.H.. Attorney Christine L. Coogle terminated. (Coogle, Christine) (Entered: 11/18/2025) |
| 11/18/2025 | 190 | NOTICE OF WITHDRAWAL OF APPEARANCE as to G.F.F., J.A.V., J.G.G., J.G.O., W.G.H.. Attorney Bradley Girard terminated. (Coogle, Christine) (Entered: 11/18/2025) |
| 11/19/2025 | 191 | NOTICE of Appearance by John Bailey on behalf of All Defendants (Bailey, John) (Entered: 11/19/2025) |
| 11/19/2025 | | Minute Entry for proceedings held before Chief Judge James E. Boasberg: Motion Hearing held on 11/19/2025 re 177 MOTION for Preliminary Injunction filed by LIYANARA SANCHEZ, J.G.O., D.A.R.H., M.Y.O.R., W.G.H., M.Z.V.V., G.F.F., M.M.A.A., DORYS MENDOZA, J.G.G., EYLAN SCHILMAN, J.A.V., 178 MOTION to Certify Class filed by LIYANARA SANCHEZ, J.G.O., D.A.R.H., M.Y.O.R., W.G.H., M.Z.V.V., G.F.F., M.M.A.A., DORYS MENDOZA, J.G.G., EYLAN SCHILMAN, J.A.V.. Oral argument heard; motion taken under advisement. (Court Reporter Sara Wick) (znbn) (Entered: 11/19/2025) |
| 11/20/2025 | | NOTICE: As discussed at yesterday's hearing, the Court will issue an Order implementing its proposed next steps in the contempt inquiry once the mandate from the Court of Appeals issues. (lcjeb1) (Entered: 11/20/2025) |
| 11/24/2025 | | MINUTE ORDER: Now that the Mandate from the Court of Appeals has issued, the Court ORDERS that each side shall file by November 25, 2025, its proposals on how the Court's inquiry regarding a potential contempt referral should proceed, including names of possible witnesses and dates for hearings. So ORDERED by Chief Judge James E. Boasberg on November 24, 2025. (lcjeb4) (Entered: 11/24/2025) |

**JA29**

| 11/24/2025 | 192 | MANDATE of USCA as to 84 Notice of Appeal to DC Circuit Court, filed by DONALD J. TRUMP, MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. DEPARTMENT OF HOMELAND SECURITY, MARCO A. RUBIO, KRISTI NOEM, PAMELA J. BONDI, U.S. STATE DEPARTMENT ; USCA Case Number 25-5124. (Attachments: # 1 USCA Order 8/8/2025)(znmw) (Entered: 11/24/2025) |
|---|---|---|
| 11/24/2025 | | MINUTE ORDER: The Court ORDERS that Defendants shall file a Notice by November 25, 2025, regarding their position on converting Plaintiffs' Motion for Preliminary Injunction into a Motion for Summary Judgment. So ORDERED by Chief Judge James E. Boasberg on November 24, 2025. (lcjeb1) (Entered: 11/24/2025) |
| 11/25/2025 | 193 | RESPONSE TO ORDER OF THE COURT *Response To The Court's November 24, 2025 Order* by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H. (Gelernt, Lee) Modified event on 12/1/2025 (znmw). (Entered: 11/25/2025) |
| 11/25/2025 | 194 | NOTICE *Regarding Consolidation* by PAMELA J. BONDI, PETER B. HEGSETH, KRISTI NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT (Davis, Tiberius) (Entered: 11/25/2025) |
| 11/25/2025 | 195 | RESPONSE TO ORDER OF THE COURT *Regarding Proceedings* by PAMELA J. BONDI, PETER B. HEGSETH, KRISTI NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT (Davis, Tiberius) Modified event on 12/1/2025 (znmw). (Entered: 11/25/2025) |
| 11/28/2025 | 196 | ORDER: The Court ORDERS that the Government shall submit declarations from all individuals involved in the decision not to halt the transfer of class members out of U.S. physical custody on March 15 and 16, 2025, by December 5, 2025. Signed by Chief Judge James E. Boasberg on November 28, 2025. (lcjeb3) (Entered: 11/28/2025) |
| 12/01/2025 | 197 | TRANSCRIPT OF PROCEEDINGS before Chief Judge James E. Boasberg held on 11/19/2025. Page Numbers: 1-37. Date of Issuance: 12/01/2025. Court Reporter: Sara Wick, telephone number 202-354-3284. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 12/22/2025. Redacted Transcript Deadline set for 1/1/2026. Release of Transcript Restriction set for 3/1/2026.(Wick, Sara) (Entered: 12/01/2025) |
| 12/05/2025 | 198 | NOTICE *of Filing of Declarations in Response to Court's December 1 Order* by PAMELA J. BONDI, PETER B. HEGSETH, KRISTI NOEM, MARCO A. RUBIO, |

**JA30**

| | | |
|---|---|---|
| | | MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT (Attachments: # 1 Declaration of Secretary Noem, # 2 Declaration of Acting General Counsel of DHS Mazzara, # 3 Declaration of Deputy Attorney General Blanche)(Davis, Tiberius) (Entered: 12/05/2025) |
| 12/08/2025 | 199 | DECLARATION by non-party Honorable Emil Bove, Circuit Judge re 196 Order. "Leave to file GRANTED," signed by Chief Judge James E. Boasberg on 12/8/2025. (znmw) (Entered: 12/08/2025) |
| 12/08/2025 | 200 | ORDER: The Court ORDERS that: 1) Plaintiffs shall attempt to secure the presence of Erez Reuveni for testimony on December 15, 2025, at 9:30 a.m.; 2) The Government shall produce Drew Ensign for testimony on December 16, 2025, at 2:00 p.m.; and 3) Both sides shall appear in person at such hearings and will have the opportunity to question witnesses. Signed by Chief Judge James E. Boasberg on December 8, 2025. (lcjeb1) (Entered: 12/08/2025) |
| 12/08/2025 | | Set/Reset Hearings: Contempt Hearing set for 12/15/2025 09:30 AM in Courtroom 22A- In Person before Chief Judge James E. Boasberg. Contempt Hearing set for 12/16/2025 02:00 PM in Courtroom 22A- In Person before Chief Judge James E. Boasberg. (znbn) (Entered: 12/08/2025) |
| 12/10/2025 | 201 | MOTION for Reconsideration *of the Court's December 8 Order (ECF 200)*, MOTION for Protective Order by PAMELA J. BONDI, PETER B. HEGSETH, KRISTI NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT. (Attachments: # 1 Declaration of Deputy Assistant Attorney General Drew Ensign)(Davis, Tiberius) (Entered: 12/10/2025) |
| 12/10/2025 | 202 | MOTION for Leave to File Amicus Brief by MEGHAN KELLY. (Attachments: # 1 Exhibit Exhibits 1 through 12B to Motion emails to opposing counsel and exhibits thereto including Complaint against Democrats and proof gov attacks against Meg delaying amicus Too long to expend time now in light of urgent issues, # 2 Exhibit Final Proposed Amicus Brief By Meghan Kelly, # 3 Exhibit 3 Declaration to Proposed Amicus Brief By Meghan Kelly, # 4 Text of Proposed Order 4 proposed order on amicus brief, # 5 Certificate of Service)(KELLY, MEGHAN) (Entered: 12/10/2025) |
| 12/11/2025 | 203 | NOTICE *OF INTENT TO FILE A RESPONSE* by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H. re 201 Motion for Reconsideration,, Motion for Protective Order, (Gelernt, Lee) (Entered: 12/11/2025) |
| 12/11/2025 | 204 | NOTICE *OF WITNESS APPEARANCE* by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H. re 200 Order, (Gelernt, Lee) (Entered: 12/11/2025) |
| 12/11/2025 | | MINUTE ORDER: The Court ORDERS that the response deadline proposed in Plaintiffs' 203 Notice is approved. So ORDERED by Chief Judge James E. Boasberg on December 11, 2025. (lcjeb1) (Entered: 12/11/2025) |
| 12/11/2025 | 205 | RESPONSE re 201 MOTION for Reconsideration *of the Court's December 8 Order (ECF 200)* MOTION for Protective Order filed by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. (Attachments: # 1 Declaration of Daniel Galindo) (Gelernt, Lee) (Entered: 12/11/2025) |

**JA31**

| 12/12/2025 | 206 | NOTICE *(Service of Mandamus Petition)* by PAMELA J. BONDI, PETER B. HEGSETH, KRISTI L. NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT (Attachments: # 1 Appendix Addendum to Mandamus Petition)(Davis, Tiberius) (Entered: 12/12/2025) |
|---|---|---|
| 12/12/2025 | 207 | MOTION to Stay *Pending Mandamus* by PAMELA J. BONDI, PETER B. HEGSETH, KRISTI L. NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT. (Davis, Tiberius) (Entered: 12/12/2025) |
| 12/12/2025 | 208 | ORDER: The Court ORDERS that Defendants' 201 Motion to Reconsider is DENIED. Signed by Chief Judge James E. Boasberg on December 12, 2025. (lcjeb1) (Entered: 12/12/2025) |
| 12/12/2025 | | MINUTE ORDER: For the reasons set forth in the Court's 208 Order denying the Government's Motion for Reconsideration, the Court ORDERS that the Government's 207 Motion to Stay is DENIED. So ORDERED by Chief Judge James E. Boasberg on December 12, 2025. (lcjeb1) (Entered: 12/12/2025) |
| 12/12/2025 | 209 | NOTICE of Letter to the Court filed by non-party Michael Bromwich, Counsel to Erez Reuveni. "Leave to File is GRANTED," signed by Chief Judge James E. Boasberg on 12/12/2025. (znmw) (Entered: 12/12/2025) |
| 12/12/2025 | 210 | NOTICE *of Administrative Stay* by PAMELA J. BONDI, PETER B. HEGSETH, KRISTI L. NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT re 200 Order, (Attachments: # 1 USCA Order Granting Administrative Stay)(Davis, Tiberius) (Entered: 12/12/2025) |
| 12/12/2025 | 211 | ORDER of USCA; USCA Case Number 25-5452. (zjm) (Entered: 12/17/2025) |
| 12/15/2025 | | MINUTE ORDER: Given the administrative stay issued by the Court of Appeals, the Court ORDERS that the hearings set for this week are VACATED. So ORDERED by Chief Judge James E. Boasberg on December 15, 2025. (lcjeb1) (Entered: 12/15/2025) |
| 12/16/2025 | 212 | Emergency MOTION to Intervene, MOTION to Consolidate by BOREALIS S. HEDLING. (Attachments: # 1 Exhibit List, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 17)(zjm) (Additional attachment(s) added on 12/19/2025: # 18 Pro Se Consent to receive Notices of Electronic Filing) (zjm). (Entered: 12/18/2025) |
| 12/16/2025 | 213 | ENTERED IN ERROR.....NEW Pro Se Consent To Receive Notices of Electronic Filing by BOREALIS S. HEDLING (zjm) Modified on 12/19/2025 (zjm). (Entered: 12/18/2025) |
| 12/22/2025 | 214 | ORDER: For the reasons stated in the accompanying Memorandum Opinion, the Court ORDERS that: 1) Plaintiffs' 177 Motion for Summary Judgment is GRANTED; 2) Plaintiffs' 178 Motion for Class Certification is GRANTED; 3) Defendants' 182 Motion for Summary Judgment is DENIED; and 4) The Government shall submit its proposal either to facilitate the return of Plaintiffs to the United States or to otherwise provide them with hearings that satisfy the requirements of due process by January 5, 2026. Signed by Chief Judge James E. Boasberg on December 22, 2025. (lcjeb1) (Entered: 12/22/2025) |

<span style="color:red">**JA32**</span>

| | | |
|---|---|---|
| 12/22/2025 | 215 | MEMORANDUM OPINION re 214 Order on Summary Judgment and Class Certification Motions. Signed by Chief Judge James E. Boasberg on December 22, 2025. (lcjeb1) (Entered: 12/22/2025) |
| 12/23/2025 | 216 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Motion for Temporary Restraining Order - BOREALIS S. HEDLING. Reason(s): Filer is not a party to the case. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 10.1) (zjm) (Entered: 12/31/2025) |
| 12/23/2025 | 217 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Errata to Emergency Motion - BOREALIS S. HEDLING. Reason(s): Filer is not a party to the case. (Attachments: # 1 Exhibit, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 10.1, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 7, # 8 Exhibit 6) (zjm) (Entered: 12/31/2025) |
| 12/23/2025 | 218 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Motion to Clarify - BOREALIS S. HEDLING. Reason(s): Filer is not a party to the case. (Attachments: # 1 Exhibit 18) (zjm) (Entered: 12/31/2025) |
| 12/25/2025 | 219 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Notice - BOREALIS S. HEDLING. Reason(s): Filer is not a party to the case. (Attachments: # 1 Exhibit 19, # 2 Exhibit 20) (zjm) (Entered: 12/31/2025) |
| 12/30/2025 | 220 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Motion for Declaratory - BOREALIS S. HEDLING. Reason(s): Filer is not a party to the case. (zjm) (Entered: 12/31/2025) |
| 01/02/2026 | | MINUTE ORDER: As the relief sought has nothing to do with this case, the Court ORDERS that proposed Intervenor's 217 Motion is DENIED. So ORDERED by Chief Judge James E. Boasberg on January 2, 2026. (lcjeb4) (Entered: 01/02/2026) |
| 01/02/2026 | | MINUTE ORDER: The Court ORDERS that the 218 , 219 , and 220 Requests for Leave to File are DENIED. So ORDERED by Chief Judge James E. Boasberg on January 2, 2026. (lcjeb4) (Entered: 01/02/2026) |
| 01/02/2026 | 225 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Notice of Appeal - BOREALIS S. HEDLING. Reason(s): Filer is not a party to the case. (Attachments: # 1 IFP, # 2 Certificate of Service, # 3 Supplement Main, # 4 Supplement 1, # 5 Supplement 2, # 6 Supplement 3) (zjm) (Entered: 01/07/2026) |
| 01/03/2026 | 226 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Motion to Recuse - BOREALIS S. HEDLING. Reason(s): Filer is not a party to the case. (Attachments: # 1 Exhibit) (zjm) (Additional attachment(s) added on 1/7/2026: # 2 Exhibit) (zjm). (Entered: 01/07/2026) |
| 01/04/2026 | 221 | NOTICE of Appearance by Ryan Giannetti on behalf of BRANDON GILL (Giannetti, Ryan) (Entered: 01/04/2026) |
| 01/04/2026 | 222 | NOTICE OF WITHDRAWAL OF APPEARANCE as to BRANDON GILL. Attorney Andrew Block terminated. (Block, Andrew) (Entered: 01/04/2026) |
| 01/04/2026 | 223 | MOTION for Extension of Time to *Respond to Court's Order* by PAMELA J. BONDI, PETER B. HEGSETH, KRISTI L. NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT. (Davis, Tiberius) (Entered: 01/04/2026) |
| 01/04/2026 | 227 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Motion for TRO - BOREALIS S. HEDLING. Reason(s): Filer is not a party to the |

**JA33**

| | | |
|---|---|---|
| | | case. (zjm) (Additional attachment(s) added on 1/7/2026: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3) (zjm). (Entered: 01/07/2026) |
| 01/05/2026 | | MINUTE ORDER: As the Government's 223 Motion fails to comply with LCvR 7(m), the Court ORDERS that it shall file a Rule 7(m) Notice by 5:00 p.m. today. So ORDERED by Chief Judge James E. Boasberg on January 5, 2026. (lcjeb4) (Entered: 01/05/2026) |
| 01/05/2026 | 224 | NOTICE *of Compliance with Local Rule 7(m)* by PAMELA J. BONDI, PETER B. HEGSETH, KRISTI L. NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT (Davis, Tiberius) (Entered: 01/05/2026) |
| 01/05/2026 | | MINUTE ORDER: The Court ORDERS that: 1) The 223 Motion for Extension of Time is GRANTED; and 2) The Government shall submit its proposal either to facilitate the return of Plaintiffs to the United States or to otherwise provide them with hearings that satisfy the requirements of due process by January 12, 2026. So ORDERED by Chief Judge James E. Boasberg on January 5, 2026. (lcjeb4) (Entered: 01/05/2026) |
| 01/06/2026 | 228 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Motion to Withdraw - BOREALIS S. HEDLING. Reason(s): Filer is not a party to the case. (zjm) (Entered: 01/07/2026) |
| 01/12/2026 | 229 | RSPONSE TO ORDER OF THE COURT re 214 *Response to Court Order* by PAMELA J. BONDI, PETER B. HEGSETH, KRISTI L. NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT (Attachments: # 1 Declaration of Secretary of State Rubio)(Davis, Tiberius) Modified event title on 1/13/2026 (znmw). (Entered: 01/12/2026) |
| 01/13/2026 | 230 | MOTION for Leave to File Amicus Brief*Amicus Motion without a brief to preserve facts nd issues for the courts nd paarties to address or not by free choice, not government extinguished choice* by MEGHAN KELLY. (Attachments: # 1 Declaration, # 2 Exhibit 1 email regarding stance on survelience issue and affidavits showing Meg is in danger and may not be able to file in future due to government threats, # 3 Exhibit 2 Newsweek Supreme Court Rulings May Be Based on Threats to JusticesCourt Papers - Newsweek, # 4 Exhibit 3 Donald Trump threatens Cuba, Mexico, Colombia, more post-Venezuela operation, # 5 Exhibit 4 email stance on Trump's invsion of another country to evade and simantle the rule of law while contributing to conditions for overthrow, # 6 Exhibit 5 Yahoo Mail - Meg follow up_ Fw_ Activity in Case 1_25-cv-00766- Order on Motion for Extension of Time to, # 7 Exhibit 6 DUE DATE IS TODAY_I want to draft about protecting pay and pension not this_PLEASE preserve your rights to allow court to save you when clients misbehave_, # 8 Exhibit 7 Senate Judiciary clashes over judicial impeachments, rising threats against judges _ Courthouse News Service, # 9 Exhibit 8 proposed order on amicus motion, # 10 Certificate of Service)(KELLY, MEGHAN) (Entered: 01/13/2026) |
| 01/13/2026 | 232 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Motion to Disqualify - BOREALIS S. HEDLING. Reason(s): Filer is not a party to the case. (Attachments: # 1 Exhibit) (zjm) (Entered: 01/18/2026) |
| 01/14/2026 | | MINUTE ORDER: The Court ORDERS that Plaintiffs shall respond to Defendants' 229 filing by January 16, 2026. So ORDERED by Chief Judge James E. Boasberg on January 14, 2026. (lcjeb1) (Entered: 01/14/2026) |

**JA34**

| | | |
|---|---|---|
| 01/15/2026 | 231 | Unopposed MOTION for Extension of Time to File Response/Reply by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. (Gelernt, Lee) (Entered: 01/15/2026) |
| 01/15/2026 | | MINUTE ORDER: The Court ORDERS that Plaintiffs' 231 Motion for Extension is GRANTED, and they shall file their Response by January 26, 2026. So ORDERED by Chief Judge James E. Boasberg on January 15, 2026. (lcjeb1) (Entered: 01/15/2026) |
| 01/16/2026 | | MINUTE ORDER: The Court ORDERS that: 1) The 202 , 230 Motions for Leave to File Amicus Brief are DENIED, as the Court does not believe such brief would assist its resolution of the matter; and 2) The 212 Motion to Intervene is DENIED, as the proposed intervenor's claims are not related to this matter. So ORDERED by Chief Judge James E. Boasberg on January 16, 2026. (lcjeb1) (Entered: 01/16/2026) |
| 01/16/2026 | 233 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Notice of Appeal - BOREALIS S. HEDLING. Reason(s): Filer is not a party to the case. (Attachments: # 1 IFP, # 2 Affidavit in support, # 3 Supplement Main, # 4 Supplement) (zjm) (Entered: 01/21/2026) |
| 01/20/2026 | | MINUTE ORDER: The Court ORDERS that the 232 Request for Leave to File is DENIED. So ORDERED by Chief Judge James E. Boasberg on January 20, 2026. (lcjeb1) (Entered: 01/20/2026) |
| 01/21/2026 | | MINUTE ORDER re **233 Request for Leave to File Review.** Leave to file is granted. The Clerk is directed to file the attached document on the public docket. So ORDERED by Chief Judge James E. Boasberg on January 21, 2026. (lcjeb1) (Entered: 01/21/2026) |
| 01/21/2026 | 235 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 01/16/2026 Minute Order on Motion to Intervene,, Order on Motion to Consolidate Cases,, Order on Motion for Leave to File Amicus Brief,,, by BOREALIS S. HEDLING. Fee Status: No Fee Paid. (Attachments: # 1 Supplement)(zjm) Modified on 1/30/2026 to add docket text (zjm). (Entered: 01/30/2026) |
| 01/21/2026 | 236 | MOTION for Leave to Appeal in forma pauperis by BOREALIS S. HEDLING. (Attachments: # 1 Affidavit, # 2 Supplement)(zjm) (Entered: 01/30/2026) |
| 01/21/2026 | 240 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Motion to Clarify - BOREALIS S. HEDLING. Reason(s): Filer is not a party to the case. (zjm) (Entered: 02/03/2026) |
| 01/27/2026 | 234 | RESPONSE TO ORDER OF THE COURT re Order, Set Deadlines filed by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. (Attachments: # 1 Declaration of Oscar Sarabia Roman)(Gelernt, Lee) (Entered: 01/27/2026) |
| 01/28/2026 | | MINUTE ORDER: The Court ORDERS that: 1) Defendants shall file a Reply to Plaintiffs' 234 Response by February 2, 2026; and 2) The parties shall appear for a hearing on February 9, 2026, at 10:00 a.m. in Courtroom 22A. In their Reply, Defendants shall respond to, *inter alia*, Plaintiffs' proposal regarding remote proceedings in third countries, their request for the immediate return of passports and identity documents, whether Defendants will parole class members who arrive at a U.S. port of entry, and whether they will issue boarding letters for air travel to the U.S. for Plaintiffs in Venezuela or third countries. The hearing will proceed in-person for the parties. Members of the public may attend in person or by telephone. Toll free number: 833-990-9400. Meeting ID: 049550816. Any use of the public-access telephone line requires adherence to the general prohibition against photographing, recording, livestreaming, and rebroadcasting of court proceedings (including those held by telephone or |

**JA35**

| | | |
|---|---|---|
| | | videoconference), as set out in Standing Order No. 24-31 (JEB). Violation of these prohibitions may result in sanctions, including removal of court-issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court. So ORDERED by Chief Judge James E. Boasberg on January 28, 2026. (lcjeb1) (Entered: 01/28/2026) |
| 01/30/2026 | 237 | Transmission of the Notice of Appeal, Minute Order Appealed, and Docket Sheet to US Court of Appeals. The fee remains to be paid and another notice will be transmitted when the fee has been paid in the District Court or motion to proceed In Forma Pauperis has been decided re 235 Notice of Appeal to DC Circuit Court,. (zjm) (Entered: 01/30/2026) |
| 01/30/2026 | 241 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Motion to Intervene, Consolidate, and Recuse - BOREALIS S. HEDLING. Reason(s): Filer is not a party to the case. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (zjm) (Entered: 02/03/2026) |
| 02/02/2026 | | MINUTE ORDER: The Court ORDERS that the 236 Motion for Leave to Appeal in forma pauperis is GRANTED. So ORDERED by Chief Judge James E. Boasberg on February 2, 2026. (lcjeb1) (Entered: 02/02/2026) |
| 02/02/2026 | | USCA Case Number 26-5040 for 235 Notice of Appeal to DC Circuit Court, filed by BOREALIS S. HEDLING. (zjm) (Entered: 02/02/2026) |
| 02/02/2026 | 238 | Supplemental Record on Appeal transmitted to US Court of Appeals re 02/02/2026 Minute Order on Motion for Leave to Appeal in forma pauperis ;USCA Case Number 26-5040. (zjm) (Entered: 02/02/2026) |
| 02/02/2026 | 239 | RESPONSE TO ORDER OF THE COURT re Order,,,,,, Set Deadlines/Hearings,,,,, *Response on Proposal* filed by PAMELA J. BONDI, PETER B. HEGSETH, KRISTI L. NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT. (Davis, Tiberius) (Entered: 02/02/2026) |
| 02/02/2026 | 248 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Motion for TRO - BOREALIS S. HEDLING. Reason(s): Filer is not a party to the case. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4) (zjm) (Entered: 02/17/2026) |
| 02/03/2026 | | MINUTE ORDER re **240 Request for Leave to File Review.** Leave to file is granted. The Clerk is directed to file the attached document on the public docket. So ORDERED by Chief Judge James E. Boasberg on February 3, 2026. (lcjeb1) (Entered: 02/03/2026) |
| 02/03/2026 | | MINUTE ORDER re **241 Request for Leave to File Review.** Leave to file is granted. The Clerk is directed to file the attached document on the public docket. So ORDERED by Chief Judge James E. Boasberg on February 3, 2026. (lcjeb1) (Entered: 02/03/2026) |
| 02/03/2026 | 242 | MOTION to Clarify by BOREALIS S. HEDLING. (zjm) (Entered: 02/05/2026) |
| 02/03/2026 | 243 | MOTION to Intervene, MOTION to Consolidate, MOTION for Recusal by BOREALIS S. HEDLING. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(zjm) (Entered: 02/05/2026) |
| 02/03/2026 | 245 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Motion to Expedite - BOREALIS S. HEDLING. Reason(s): Filer is not a party to the case. (zjm) (Entered: 02/10/2026) |
| 02/08/2026 | 246 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Emergency Notice - BOREALIS S. HEDLING. Reason(s): Filer is not a party to the case. (zjm) (Entered: 02/10/2026) |

**JA36**

| 02/09/2026 |  | Minute Entry for Hearing held before Chief Judge James E. Boasberg on 2/9/2026: Discussions heard in re 234 Response to Order of the Court re Order. (Court Reporter Tammy Nestor) (znbn) (Entered: 02/09/2026) |
| --- | --- | --- |
| 02/10/2026 | 244 | TRANSCRIPT OF PROCEEDINGS before Chief Judge James E. Boasberg held on 2/9/26; Page Numbers: 1-42. Court Reporter/Transcriber Tammy Nestor, tammy_nestor@dcd.uscourts.gov, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 3/3/2026. Redacted Transcript Deadline set for 3/13/2026. Release of Transcript Restriction set for 5/11/2026.(Nestor, Tammy) (Entered: 02/10/2026) |
| 02/11/2026 | 249 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Notice - BOREALIS S. HEDLING. Reason(s): Filer is not a party to the case. (zjm) (Entered: 02/17/2026) |
| 02/12/2026 | 247 | MEMORANDUM OPINION AND ORDER: The Court ORDERS that 1) Plaintiffs shall file Notices on February 20, 2026; February 27, 2026; and March 9, 2026, as described in the attached Memorandum Opinion and Order; 2) Defendants shall promptly return to Plaintiffs upon written request by their current counsel all passports and identification documents that any agency currently retains, and make good-faith efforts to obtain any such documents that were transferred to El Salvador; and 3) Defendants shall file a Status Report by March 13, 2026, with the information described in the attached Memorandum Opinion and Order. Signed by Chief Judge James E. Boasberg on February 12, 2026. (lcjeb3) (Entered: 02/12/2026) |
| 02/12/2026 |  | Set/Reset Deadlines: Status Report due by 3/13/2026. (znbn) (Entered: 02/18/2026) |
| 02/15/2026 | 250 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Motion to Renew, Expedite, and Appoint Counsel; Motion to Modify - BOREALIS S. HEDLING. Reason(s): Filer is not a party to the case. (Attachments: # 1 Motion to Modify, # 2 Motion to Modify) (zjm) (Entered: 02/17/2026) |
| 02/18/2026 |  | MINUTE ORDER: The Court ORDERS that proposed Intervenor's 242 , 243 Motions are DENIED. As he continues to file frivolous and unrelated pleadings that clutter the docket, the Court will accept no more filings from him. His 245 , 246 , 249 , and 250 Requests for Leave to File are thus DENIED. So ORDERED by Chief Judge James E. Boasberg on February 18, 2026. (lcjeb1) (Entered: 02/18/2026) |
| 02/20/2026 | 251 | SEALED DOCUMENT filed by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H. re 247 Order,,, Memorandum & Opinion,, (This document is SEALED and only available to authorized persons.)(Gelernt, Lee) (Entered: 02/20/2026) |

**JA37**

| | | |
|---|---|---|
| 02/27/2026 | 252 | NOTICE by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H. re 247 Order,,, Memorandum & Opinion,, (Gelernt, Lee) (Entered: 02/27/2026) |
| 02/27/2026 | 253 | SEALED DOCUMENT filed by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H. re 247 Order,,, Memorandum & Opinion,, (This document is SEALED and only available to authorized persons.)(Gelernt, Lee) (Entered: 02/27/2026) |
| 03/04/2026 | 254 | NOTICE OF APPEAL TO DC CIRCUIT COURT by PAMELA J. BONDI, MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT, DONALD J. TRUMP, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF DEFENSE, MARCO A. RUBIO, KRISTI L. NOEM, PETER B. HEGSETH. Fee Status: No Fee Paid. (Davis, Tiberius) (Entered: 03/04/2026) |
| 03/05/2026 | 255 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 254 Notice of Appeal to DC Circuit Court. (znmw) (Entered: 03/05/2026) |
| 03/05/2026 | | USCA Case Number 26-5074 for 254 Notice of Appeal to DC Circuit Court, filed by U.S. DEPARTMENT OF DEFENSE, PETER B. HEGSETH, DONALD J. TRUMP, MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. DEPARTMENT OF HOMELAND SECURITY, MARCO A. RUBIO, PAMELA J. BONDI, KRISTI L. NOEM, U.S. STATE DEPARTMENT. (zjm) (Entered: 03/06/2026) |
| 03/09/2026 | 256 | MOTION to Stay *the Court's February 12, 2026 Order Pending Appeal* by PAMELA J. BONDI, PETER B. HEGSETH, KRISTI L. NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT. (Attachments: # 1 Declaration Exhibit A Castano Declaration, # 2 Text of Proposed Order)(Davis, Tiberius) (Entered: 03/09/2026) |
| 03/09/2026 | 257 | NOTICE by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H. re 247 Order,,, Memorandum & Opinion,, (Gelernt, Lee) (Entered: 03/09/2026) |
| 03/09/2026 | 258 | SEALED DOCUMENT filed by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H. re 247 Order,,, Memorandum & Opinion,, (This document is SEALED and only available to authorized persons.)(Gelernt, Lee) (Entered: 03/09/2026) |
| 03/10/2026 | | MINUTE ORDER: The Court ORDERS that Plaintiffs shall respond to Defendants' 256 Motion to Stay by March 12, 2026. So ORDERED by Chief Judge James E. Boasberg on March 10, 2026. (lcjeb3) (Entered: 03/10/2026) |
| 03/12/2026 | 259 | RESPONSE re 256 MOTION to Stay *the Court's February 12, 2026 Order Pending Appeal* filed by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, W.G.H.. (Gelernt, Lee) (Entered: 03/12/2026) |
| 03/13/2026 | | MINUTE ORDER: Given that Plaintiffs do not oppose a stay pending appeal, the Court ORDERS that: 1) Defendants' 256 Motion for Stay is GRANTED; 2) The case is STAYED pending further Order of the Court; and 3) To the extent that Plaintiffs' 259 Response seeks clarification regarding jurisdiction, the Court believes that its Memorandum Opinion speaks for itself and that additional revision or supplementation is |

**JA38**

| | | not warranted at this juncture. So ORDERED by Chief Judge James E. Boasberg on March 13, 2026. (lcjeb2) (Entered: 03/13/2026) |
|---|---|---|
| 03/27/2026 | 260 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Emergency Motion to Reconsider Denial - BOREALIS S. HEDLING. Reason(s): Filer is not a party to the case. (zjm) (Entered: 04/03/2026) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 05/06/2026 22:42:45 | | | |
| **PACER Login:** | | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:25-cv-00766-JEB |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

**JA39**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

J.G.G.,*
El Valle Detention Facility
1800 Industrial Drive
Raymondville, TX 78580;

G.F.F.,*
Orange County Jail
110 Wells Farm Road
Goshen, NY 10924;

J.G.O.,*
El Valle Detention Facility
1800 Industrial Drive
Raymondville, TX 78580;

W.G.H.,*
El Valle Detention Facility
1800 Industrial Drive
Raymondville, TX 78580;

J.A.V.,*
El Valle Detention Facility
1800 Industrial Drive
Raymondville, TX 78580;

*Plaintiffs–Petitioners*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, The White House,
1600 Pennsylvania Avenue, NW, Washington,
D.C. 20500;

PAMELA BONDI, Attorney General of the United
States, in her official capacity, 950 Pennsylvania
Ave., NW, Washington, DC, 20530;

KRISTI NOEM, Secretary of the U.S. Department
of Homeland Security, in her official capacity, 245
Murray Lane SW, Washington, DC 20528;

Case No. _____

**CLASS ACTION COMPLAINT**
**AND PETITION FOR WRIT**
**OF HABEAS CORPUS**

**JA40**

U.S. DEPARTMENT OF HOMELAND
SECURITY, 245 Murray Lane SW, Washington,
DC 20528;

MADISON SHEAHAN, Acting Director and
Senior Official Performing the Duties of the
Director of U.S. Immigration and Customs
Enforcement, in her official capacity, 500 12th
Street, SW, Washington, DC 20536;

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, 500 12th St. SW, Washington,
DC 20536;

MARCO RUBIO, Secretary of State, in his official
capacity, 2201 C Street, NW, Washington, DC
20520;

U.S. STATE DEPARTMENT, 2201 C Street, NW,
Washington, DC 20520;

*Defendants–Respondents*.

\* Motion for these Plaintiffs to proceed under pseudonym has been concurrently filed with this
complaint.

## JURISDICTION AND VENUE

5.     This case arises under the Alien Enemies Act ("AEA"), 50 U.S.C. §§ 21-24; the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.*; the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, *et seq.* and its implementing regulations; the Convention Against Torture ("CAT"), *see* Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231); the All Writs Act, 28 U.S.C. § 1651, and the Fifth Amendment to the U.S. Constitution.

6.     This Court has subject matter jurisdiction under 28 U.S.C. § 2241 et seq. (habeas corpus), art. I, § 9, cl. 2 of the U.S. Constitution (Suspension Clause), 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (United States as defendant), 28 U.S.C. § 1361 (mandamus), and 28 U.S.C. § 1651 (All Writs Act). Defendants have waived sovereign immunity for purposes of this suit. 5 U.S.C. §§ 702, 706.

7.     The Court may grant relief pursuant to 28 U.S.C. § 2241; 28 U.S.C. § 2243; the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq.; 28 U.S.C. § 1331; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable powers.

8.     Venue is proper in this District under 28 § 1391(e)(1) because Defendants are agencies of the United States or officers of the United States acting in their official capacity, Defendants reside in this District, and a substantial part of the events or omissions giving rise to the claim occurred in this district.

2

JA42

                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA

J.G.G., et al.,
                                        Civil Case
                    Plaintiff(s),       No. 25-00766 JEB
            v.
                                        Washington, D.C.
DONALD J. TRUMP, et al.,
                                        March 15, 2025
                    Defendant(s).

-----------------------------------------------------------

                    MOTION HEARING HELD VIA ZOOM
            BEFORE THE HONORABLE JAMES E. BOASBERG
                UNITED STATES DISTRICT CHIEF JUDGE

APPEARANCES:

FOR THE PLAINTIFF(S):   Lee Gelernt, Esquire
                        Daniel A. Galindo, Esquire
                        American Civil Liberties Union
                        125 Broad Street
                        18th Floor
                        New York, New York 10004

                        Skye Perryman, Esquire
                        Somil Trivedi, Esquire
                        Sarah Rich, Esquire
                        Democracy Forward Foundation
                        P.O. Box 34533
                        Washington, D.C. 20043


FOR THE DEFENDANT(S):   Drew C. Ensign, Esquire
                        United States Department of Justice
                        950 Pennsylvania Avenue Northwest
                        Washington, D.C. 20530


REPORTED BY:            Tammy Nestor, RMR, CRR
                        Official Court Reporter
                        333 Constitution Avenue Northwest
                        Washington, D.C. 20001
                        tammy_nestor@dcd.uscourts.gov


**JA43**

MR. ENSIGN:  Absolutely, Your Honor.  In the Vetre case, there were non-core habeas claims including conditions.  And in that case, this court recognized, this was in a somewhat odd posture, that within DDC, that because prison condition cases could be brought in habeas, they had to be.  And so similarly, because these claims can be brought in habeas, they have to be.

THE COURT:  The prison condition cases, again, relate to the nature of confinement and duration of your confinement.  And here, they are not arguing that they can't be confined.  They are just saying they can't be removed, right?

MR. ENSIGN:  Your Honor, we are using it to address whether this is core or non-core.  In Vetre, a non-core habeas claim was transferred under the venue rule.  So whether this is core habeas, as we have argued, and clearly where the venue rule would apply or even if this were non-core habeas, then nonetheless the venue rule still applies to it as this court has recognized.

MR. GELERNT:  Your Honor, I would just say that that case involved, I think you were getting at this, but the length of someone's confinement.

THE COURT:  Again, I have not gone back and reviewed that case because your citation earlier, Mr. Ensign, led me to believe it was not my case.  I know IRLR is.

I guess your -- do you want to dismiss your habeas claim, Mr. Gelernt?  I don't know.  It's certainly not your primary claim.  You may have other reasons for including it.

MR. GELERNT:  Your Honor, I think if the Court felt like it needed us to dismiss the habeas in order to issue a class-wide TRO, then we are prepared to do that.  We certainly don't feel like we need it.

On the other hand, I think the Court could just hold it in abeyance.  I mean, I think that it's very clear that if you don't need to bring it in habeas, you don't have to and you can bring it -- in other words, I think Your Honor could not have been clearer in IRLR.  There are a number of cases that say that.  Otherwise, virtually every case would be brought in habeas.

THE COURT:  Again, I think this is a reasonably close question, but I've got to rule on it with essentially 40 minutes' notice given that this was first raised by the government in our hearing.  And I'm not blaming the government at all because they haven't had an opportunity to brief it.

And so as brief as my research has been at this period of time, I don't think that venue bars certification.  I will, for clarity, I will grant the plaintiffs' -- first grant the plaintiffs' motion to dismiss their habeas count.  So that count is dismissed without prejudice at this point.

**JA45**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| J.G.G.*, et al.*, | |
| Petitioner, | |
| v. | No. 1:25-cv-766 (JEB) |
| DONALD J. TRUMP, *et al.*, | |
| | <u>Declaration Of Deputy Assistant Director</u> <u>Selwyn Smith</u> |
| Respondents. | |

**DECLARATION OF SELWYN SMITH**

I, Selwyn Smith, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.      I am a Deputy Assistant Director ("DAD") for Homeland Security Investigations ("HSI") at U.S. Immigration and Customs Enforcement ("ICE") within the U.S. Department of Homeland Security ("DHS").

2.      As the DAD of Countering Transnational Organized Crime, Public Safety and Border Security division ("PSBS"), I oversee a wide variety of investigative and special operations programs targeting Transnational Criminal Organizations involved in human smuggling, narcotics trafficking, racketeering and violent gang activity as well as other crimes enforced by HSI. These programmatic areas support the targeting of cross border criminal organizations that exploit America's legitimate trade, travel, and financial systems for illicit purposes.

**JA46**

3.    I am aware that the instant lawsuit has been filed regarding the removal of Venezuelan members of Tren de Aragua ("TdA") pursuant to the Alien Enemies Act ("AEA").

4.    I provide this declaration based on my personal knowledge, reasonable inquiry, and information obtained from various records, systems, databases, other DHS employees, and information portals maintained and relied upon by DHS in the regular course of business.

5.    On March 15, 2025, President Trump announced the Proclamation *Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua* stating that, "Evidence irrefutably demonstrates that TdA has invaded the United States and continues to invade, attempt to invade, and threaten to invade the country; perpetrated irregular warfare within the country; and used drug trafficking as a weapon against our citizens" (the Proclamation) (https://www.whitehouse.gov/presidential-actions/2025/03/invocation-of-the-alien-enemies-act-regarding-the-invasion-of-the-united-states-by-tren-de-aragua/). In the same Proclamation, President Trump announced that, pursuant to 50 U.S.C. § 21, "all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies."

6.    Members of TdA pose an extraordinary threat to the American public. TdA members are involved in illicit activity to invoke fear and supremacy in neighborhoods and with the general population. This has been evident from investigations throughout the nation where TdA members coalesce to conduct their criminal acts. For example, TdA's takeover of Denver apartment buildings stoked fear in the tenants when TdA committed burglaries, narcotics, and weapons violations. Other inquiries into the actions of member of TdA have resulted in criminal investigations and prosecution of cases of human trafficking, to include trafficking of women

**JA47**

from Venezuela; bank fraud; federal narcotics violations; extortion of human smuggling victims; and homicide, to name a few. This, along with the myriad state violations and investigations of groups of TdA members committing crimes throughout the nation are evidence of their criminal enterprise.

7.     TdA is a violent transnational criminal organization (TCO) which originated in the mid-to-late 2000's as a prison gang founded by inmates of the Tocorón prison in the Venezuelan state of Aragua. TdA has since evolved from Venezuela's most powerful homegrown prison gang into a TCO which by 2018, had expanded throughout South America and grew to have an estimated 3,000 to 5,000 members. As TdA continues its expansion throughout South America it is currently proliferating into North America.

8.     Much like MS-13, as TdA's influence and power expanded to other prisons throughout Venezuela and then across the southern hemisphere, the global leadership of the organization exploited the prison system to develop a base of operations for the gang to coordinate logistics, revenue streams, and recruitment. TdA was also able to grow its numbers from the steady prison population and build its criminal enterprise through the extortion of inmates. The founding members, senior leaders, and a vast number of TdA members escaped the Tocorón prison in September 2023. The subsequent destruction of the prison resulted in the displacement of the senior leaders and the decentralization of the global command-and-control structure for the organization.

9.     Over the course of the past three years, TdA has expanded throughout North America and are now known to be present and committing criminal activity in at least 40 states in the continental United States and Canada. TdA has proven to leverage many of the same expansion tactics and strategies in the United States that they previously employed throughout

**JA48**

South America. Due to the migration patterns of the Venezuelan diaspora and the vast expansion of the organization throughout the United States, TdA has become a loosely affiliated collection of independent cells committing disorganized and opportunistic crimes of violence against the Venezuelan population and rival gangs, terrorizing local communities. Detention of TdA leaders and members would potentially result in the unintended consequence of consolidating and centralizing their command-and-control structure and thereby providing an opportunity for TdA to organize and prolong the violent activities of their criminal enterprise within the United States.

10.    Historically, TdA has been found to be either, or both, strategic and opportunistic in their evolution and expansion. Within the Venezuelan penitentiary system, TdA methodically pursued geographic expansion by taking control of selected prisons in Aragua and surrounding states. Throughout the gang's expansion across international borders, the establishment and disbursement became more random and responsive to the environment and driven by profitability. As TdA continues its geographical expansion it has shown to operate as a loosely organized criminal syndicate serving as an umbrella organization for franchise networks under the TdA banner.

11.    TdA establishes their presence in a three-phase expansion methodology through force and dominance in an urban population within a geographical region. This pattern of behavior has been documented in TdA's expansion throughout South America, including into Colombia, Perú, and Chile. The three known phases of expansion are the Exploration, Penetration, and Consolidation phase.

12.    <u>Exploration</u> - In this step, TdA has been known to infiltrate and control groups of Venezuelan refugees traveling along migratory routes. By mixing with these migrants TdA

**JA49**

members can keep a low profile and pass into new regions. They have been known to exploit these migrants for the gang's profit through extortion and sexual exploitation.

13.    Penetration - In this step, TdA members begin to establish themselves within their new territory. This is often accompanied by a corresponding increase in crime and violence as they begin to set up their criminal activities and confront existing gangs previously established in the area. In general, TdA has historically targeted opportunistic areas with a relatively low volume of rival organizations present and with elevated profitability. During this phase TdA will typically engage in extortion, low-level drug distribution, human trafficking and sexual exploitation, kidnapping, and other violent crimes of intimidation.

14.    Consolidation - Once TdA members have firmly established themselves within an area and overcome and/or absorbed competing gangs through domination they move to consolidate their power and position within the territory into an enterprise.

15.    Reporting reveals TdA is attempting to expand its presence and criminal activity throughout the Western Hemisphere by exploiting the record mass migration resulting from Venezuela's recent political, economic, and humanitarian crises. According to key assessments, if left unchecked, TdA is likely to establish increasingly sophisticated human smuggling and sex trafficking networks into the United States leading to an increase in criminal activity and likely adding further strain to law enforcement resources as seen in Chicago, New York, Denver, and along our southern border.

16.    As of September 2024, ICE HSI reporting indicates that TdA members have been identified in at least 40 states across the United States. ICE HSI has opened approximately 472 investigations targeting members and/or TdA criminal networks across domestic and international offices. The violations in these investigations include, but are not limited to,

**JA50**

murder, robbery, human smuggling, human trafficking, sex trafficking, hostage taking, narcotics trafficking, and firearms violations.

17. In January 2024, the New York Police Department ("NYPD") recorded a surge in moped robberies that are attributed by police as likely orchestrated by TdA recruits. NYPD CompStat reporting indicates that moped-based armed robbery patterns during this period were 158% higher than the same period the previous year. NYPD attributes this surge to be a result of TdA recruitment of Venezuelans in New York City migrant centers. Accused leaders have admitted to a complex network connected to Florida and Texas with profits shipped back to South America. Associated crews of this TdA network are allegedly involved in extortion and ransom schemes connected to human smuggling and human trafficking networks.

18. In June 2024, multiple suspected TdA members participated in a nationally publicized series of robberies including the armed robbery of $2 million in merchandise from a high-end jewelry store in Denver, Colorado. In total, 13 subjects were apprehended by ICE HSI in a multi-agency, coordinated enforcement operation as the group attempted to flee to Venezuela.

19. In January 2025, as a result of a joint ICE HSI investigation, nine TdA members were criminally charged in Colorado state court for their participation in the December 17, 2024, armed home invasion, kidnapping, and torture of two Venezuelan nationals at the Edge of Lowry Apartments in Aurora, Colorado. In total, 12 subjects were charged, with three Venezuelan nationals remaining at large. The court granted the City of Aurora an emergency order to temporarily close the Edge of Lowery Complex due to "an imminent threat to public safety and welfare."

20.    In February 2025, a joint multi-jurisdictional ICE HSI investigation with the Federal Bureau of Investigation and Tennessee Bureau of Investigation, dismantled a transnational commercial sex trafficking enterprise charging eight subjects with ties to TdA. The defendants operated an illegal commercial sex and sex trafficking enterprise out of Nashville motels from July 2022 through March 2024. The defendants facilitated the victims' arrival into the United States and used online commercial sex websites to post advertisements and internet or cellular communications to conduct illicit criminal activities.

21.    It is critical to use all available law enforcement tools to disrupt TdA activities quickly. These individuals are designated as foreign terrorists. Within Venezuela, TdA was able to grow its numbers from the steady prison population and build its criminal enterprise through the extortion of inmates. Keeping them in ICE custody where they could potentially continue to recruit new TdA members poses a grave risk to ICE personnel; other, nonviolent detainees; and the United States as a whole.

22.    Though many TdA members subject to the AEA do not have criminal records in the United States, due to their origin as a prison gang, it is safe to assume these subjects have criminal histories in their home countries, which U.S, law enforcement cannot verify due to the lack of diplomatic relations that currently exist with the country of Venezuela. The lack of a criminal record in the United States does not indicate they pose a limited threat. In fact, based upon their association with TdA, the lack of specific information about each individual actually highlights the risk they pose. It demonstrates that they are potential terrorists for whom we lack a complete profile.

23.    However, even though many of these TdA members have been in the United States only a short time, some have still managed to commit extremely serious crimes. A review

**JA52**

of ICE databases reveals that numerous individuals subject to the AEA have arrests and convictions in the United States for dangerous offenses.

24.    Additionally, a review of ICE databases reveals that numerous individuals removed have arrests, pending charges, and convictions outside of the United States, including an individual who is under investigation by Venezuelan authorities for the crimes of aggravated homicide, qualified kidnapping, and illegal carrying of weapons of war and short arms with ammunition for organized gang in concealment and trafficking; an individual who is the subject of an active INTERPOL Blue Notice issued on or about January 2, 2025, and a Red Notice issued February 5, 2025, for the crime of kidnapping and rape in Chile; an individual who is the subject of an INTERPOL Red Notice issued by Chile for kidnapping for ransom and criminal conspiracy involving TdA; an individual who admitted he sold marijuana and crystal methamphetamine for the Colombian gang Las Paisas, assaulted someone with a knife for a cellphone while living in Venezuela, and has twice robbed people for money while living in Colombia; an individual who is the subject of an INTERPOL Red Notice for child abduction; an individual identified as a "high-ranking" member of the TdA by the Mobile Tactical Interdiction Unit in Guatemala City, Guatemala; an individual who is the subject of an INTERPOL Red Notice based on obstruction of justice, criminal conspiracy, and aggravated corruption based on the individual's role as a police officer in modifying evidence to cover up a murder; an individual who, according to Peruvian Newspapers, is associated with high-ranking TdA members and who fled Peru while under investigation for illegal possession of firearm and distributing narcotics; and an individual who is the subject of an INTERPOL Blue Notice stating that he is under investigation in Venezuela for murder with aggravating circumstances against a victim whose corpse was found inside a suitcase on a dirt road.

**JA53**

25.     According to a review of ICE databases, numerous individuals removed were arrested together as part of federal gang operations, including two individuals who were in a vehicle during a Federal Bureau of Investigations gun bust with known TdA members; four individuals who were arrested during the execution of an HSI New York City operation; and four individuals who were encountered during the execution of an arrest warrant targeting a TdA gang member, all of whom were in a residence with a firearm and attempted to flee out the back of the residence.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of April 2025.

SELWYN J SMITH
Digitally signed by SELWYN J SMITH
Date: 2025.04.01 21:51:03 -04'00'

Selwyn Smith
Deputy Assistant Director
Homeland Security Investigations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

J.G.G.*, et al.*,

Petitioner,

v.

DONALD J. TRUMP, *et al.*,

Respondents.

No. 1:25-cv-766 (JEB)

Declaration Of Acting Assistant Director
Marcos D. Charles

**DECLARATION OF MARCOS D. CHARLES**

I, Marcos D. Charles, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.      I am an Acting Assistant Director for Field Operations at Enforcement and Removal Operations ("ERO") at U.S. Immigration and Customs Enforcement ("ICE") within the U.S. Department of Homeland Security ("DHS").

2.      As the (A) Assistant Director, I am responsible for providing guidance and counsel to the twenty-five ERO Field Office Directors, ensuring all field operations are working to efficiently execute the agency mission.  I began my career with the U.S. Government as a border patrol agent for the former Immigration and Naturalization Service in Hebbronville, TX. Over time I was promoted to Senior Border Patrol Agent, Supervisory Border Patrol Agent, and Field Operations Supervisor. I joined ICE in 2008 as the Assistant Officer in Charge. Overtime I was promoted to Supervisory Detention and Deportation Officer, Assistant Field Office Director,

**JA55**

Chief of Staff, Deputy Field Office Director, and Field Office Director before becoming the Acting Assistant Director.

3. I am aware that the instant lawsuit has been filed regarding the removal of Venezuelan members of Tren de Aragua ("TdA") pursuant to the Alien Enemies Act ("AEA").

4. I provide this declaration based on my personal knowledge, reasonable inquiry, and information obtained from various records, systems, databases, other DHS employees, and information portals maintained and relied upon by DHS in the regular course of business.

5. On March 15, 2025, President Trump announced the Proclamation *Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua* stating that, "Evidence irrefutably demonstrates that TdA has invaded the United States and continues to invade, attempt to invade, and threaten to invade the country; perpetrated irregular warfare within the country; and used drug trafficking as a weapon against our citizens" (the Proclamation) (https://www.whitehouse.gov/presidential-actions/2025/03/invocation-of-the-alien-enemies-act-regarding-the-invasion-of-the-united-states-by-tren-de-aragua/). In the same Proclamation, President Trump announced that, pursuant to 50 U.S.C. § 21, "all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies."

6. Gangs remain one of the more formidable issues that corrections officials face in the management of prisons and civil detention facilities. Gangs are responsible for a disproportionate amount of prison misconduct and violence. Their continued presence challenges ongoing efforts to maintain control, order, and safety in the facilities. While all gangs disrupt the

**JA56**

orderly administration of detention facilities, TdA represents a heightened challenge beyond what prisons in the United States face, given TdA's formation and history in penal institutions.

7.      TdA is not just a normal gang. Open-source information documents the gang's history and growth over the last decade. As reported in National Public Radio's article titled, *Tren de Aragua, a criminal organization with roots in Venezuela, has roots in Venezuela, has rapidly expanded across Latin America*, TdA was founded in 2014 in the Tocorón prison, in the central Venezuelan state of Aragua, led by Héctor Rusthenford Guerrero Flores, alias "Niño Guerrero." The gang largely controlled the Tocorón prison and eventually branched out overseas. The gang's leaders fled the prison in 2023 when it was taken over by security forces. While leadership splintered after fleeing the prison, TdA recruited new gang members from among the eight million Venezuelans who had fled the country's economic crisis. Initially, it established criminal cells in neighboring Colombia, Peru, and Chile, where it smuggled drugs and people and operated extortion rackets and prostitution rings. TdA's most notorious alleged crime was the 2024 killing of Ronald Ojeda, a former Venezuelan army officer who conspired against Nicolás Maduro, the country's authoritarian leader, then fled to Chile. Suspected gang members dressed as Chilean police officers abducted Ojeda from his apartment. Days later, his body was found stuffed in a suitcase and buried in cement. The history reflects over a decade of savage criminal activity, vicious disregard for authority, and violent crimes which threaten the stability of order. TdA poses the same terrorizations in the United States as the origin countries from which they started – Venezuela, and now also to include Colombia, Peru and Chile.

8.      While in confinement in Venezuela, TdA was able to grow its numbers exponentially. Multiple examples of their savagery can be found in open-source news articles highlighting the numerous abhorrent activities they have conducted while in the United States

including but not limited to murder, rape, kidnapping, sex trafficking, drug trafficking, robbery, and assault. Further, TdA has been designated a Foreign Terrorist Organization. Their continued presence in ICE custody poses significant risks such as the ability to recruit new TdA members. Detention of hundreds of members of a designated Foreign Terrorist Organization, among other populations of aliens is an unnecessary danger to other detainees and facility staff.

9.      The designation of TdA as a terrorist organization has introduced new budgetary challenges for ICE/ERO. This classification necessitates a shift in resource allocation, directing limited funds and human capital towards the identification, arrest, detention, and removal of individuals within this newly prioritized organization. ICE is bound by statutory requirements to not release certain aliens from immigration detention based on criminal or threat designations. This shift in priorities hampers ICE's ability to properly detain those aliens who are not statutorily eligible for release or for whom an ICE officer determines is a public safety or flight risk during the custody determination process. Detaining this dangerous population of aliens detracts from our already limited bedspace capacities and diminishes our resources and obstructs ICE's ability to detain other criminal aliens, and make difficult decisions on which aliens are the most egregious, dangerous and/or removable all while also being bound by statutory requirements in the Immigration and Nationality Act (INA), which imposes limitations on release, such as aliens subject to expedited removal, or for whom there is a prohibition of release under the mandatory detention provision of INA § 236(c). ICE currently has roughly 41,500 beds available for detention. These beds cost the American public roughly $152 a bed daily. Because members of TdA pose a significant threat of danger at ICE detention facilities, their swift removal from the United States after entering ICE custody ensures the preservation of security and order for both detainees and facility personnel.

**JA58**

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of April, 2025.



MARCOS D CHARLES
Digitally signed by MARCOS D CHARLES
Date: 2025.04.01 22:48:40 -04'00'

Marcos D. Charles
Acting Assistant Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| J.G.G., *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 25-766 (JEB)** |
| DONALD J. TRUMP, *et al.*, | |
| **Defendants.** | |

## ORDER

Given the finding of probable cause for contempt set forth in the accompanying Memorandum Opinion, the Court ORDERS that:

1. If Defendants opt to purge their contempt, they shall file by April 23, 2025, a declaration explaining the steps they have taken and will take to do so; and

2. If Defendants opt not to purge their contempt, they shall instead file by April 23, 2025, declaration(s) identifying the individual(s) who, with knowledge of the Court's classwide Temporary Restraining Order, made the decision not to halt the transfer of class members out of U.S. custody on March 15 and 16, 2025.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date: April 16, 2025

1
**JA60**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

LIYANARA SANCHEZ, as next friend on behalf
of FRENGEL REYES MOTA,
c/o American Civil Liberties Union,
125 Broad Street, 18th Floor
New York, NY 10004;

D.A.R.H.,* as next friend on behalf of ANDRY
JOSE HERNANDEZ ROMERO,
c/o American Civil Liberties Union,
125 Broad Street, 18th Floor
New York, NY 10004;

M.Z.V.V., as next friend on behalf of J.A.B.V.,*
El Valle Detention Facility
c/o American Civil Liberties Union,
125 Broad Street, 18th Floor
New York, NY 10004;

M.Y.O.R., as next friend on behalf of M.A.O.R.,*
c/o American Civil Liberties Union,
125 Broad Street, 18th Floor
New York, NY 10004;

M.M.A.A., as next friend on behalf of G.A.A.A.,*
c/o American Civil Liberties Union,
125 Broad Street, 18th Floor
New York, NY 10004;

DORYS MENDOZA, as next friend on behalf of
M.R.M.,*
c/o American Civil Liberties Union,
125 Broad Street, 18th Floor
New York, NY 10004;

EYLAN SCHILMAN, as next friend on behalf of
T.C.I.,*
c/o American Civil Liberties Union,

Case No. 1:25-cv-00766-JEB

**AMENDED CLASS ACTION PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT**

JA61

125 Broad Street, 18th Floor
New York, NY 10004;

*Petitioners–Plaintiffs,*

J.G.G.,*
c/o American Civil Liberties Union,
125 Broad Street, 18th Floor
New York, NY 10004;

G.F.F.,*
c/o American Civil Liberties Union,
125 Broad Street, 18th Floor
New York, NY 10004;

J.G.O.,*
c/o American Civil Liberties Union,
125 Broad Street, 18th Floor
New York, NY 10004;

W.G.H.,*
c/o American Civil Liberties Union,
125 Broad Street, 18th Floor
New York, NY 10004;

J.A.V.,*
c/o American Civil Liberties Union,
125 Broad Street, 18th Floor
New York, NY 10004;

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, The White House,
1600 Pennsylvania Avenue, NW, Washington,
D.C. 20500;

PAMELA BONDI, Attorney General of the United States, in her official capacity, 950 Pennsylvania Ave., NW, Washington, DC, 20530;

KRISTI NOEM, Secretary of the U.S. Department of Homeland Security, in her official capacity, 245 Murray Lane SW, Washington, DC 20528;

U.S. DEPARTMENT OF HOMELAND SECURITY, 245 Murray Lane SW, Washington, DC 20528;

MADISON SHEAHAN, Acting Director and Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement, in her official capacity, 500 12th Street, SW, Washington, DC 20536;

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, 500 12th St. SW, Washington, DC 20536;

MARCO RUBIO, Secretary of State, in his official capacity, 2201 C Street, NW, Washington, DC 20520;

U.S. STATE DEPARTMENT, 2201 C Street, NW, Washington, DC 20520;

PETE HEGSETH, Secretary of Defense, in his official capacity, 100 Defense Pentagon, Washington, DC 20301; and,

U.S. DEPARTMENT OF DEFENSE, 100 Defense Pentagon, Washington, DC 20301;

*Respondents–Defendants*.

**INTRODUCTION**

1.      Petitioners–Plaintiffs ("Petitioners") and Plaintiffs[1] are Venezuelan men threatened with imminent removal or who have already suffered removal under the President's Proclamation invoking the Alien Enemies Act ("AEA"), a wartime measure that has been used only three times before in our Nation's history: the War of 1812, World War 1, and World War II.

2.      The Proclamation authorizes "immediate" removal of noncitizens that the Proclamation deems to be alien enemies, without any opportunity for judicial review. It also contorts the plain language of the AEA: arrivals of noncitizens from Venezuela are deemed an "invasion" or "predatory incursion" by a "foreign nation or government," where Tren de Aragua, a Venezuelan gang, is deemed to be sufficiently akin to a foreign nation or government.

3.      But the AEA has only ever been a power invoked in time of war, and plainly only applies to warlike actions: it cannot be used here against nationals of a country—Venezuela—with whom the United States is not at war, which is not invading the United States, and which has not launched a predatory incursion into the United States.

4.      Multiple judges—including this Court—have already held that there is likely no authority for the government's actions. *See, e.g.*, *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *5–10 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring) (AEA predicates of

---

[1] Plaintiffs are the original Plaintiffs in *J.G.G. v. Trump*. Because Plaintiffs have filed habeas actions in their districts of confinement and do not seek relief in this Court through the writ of habeas corpus, they continue to be designated as "Plaintiffs," not "Petitioners." Petitioners-Plaintiffs ("Petitioners") refer to the newly amended individuals who are designated under the Proclamation and detained in El Salvador or criminal custody in the United States. Petitioners are pursuing their claims through habeas in addition to APA and equity.

1

"invasion" or "predatory incursion" not met); *id*. at \*13 (Millett, J., concurring) ("The Constitution's demand of due process cannot be so easily thrown aside."); *D.B.U v. Trump*, No. 1:25-cv-01163, 2025 WL 1163530, at \*9–12 (D. Colo. Apr. 22, 2025); *J.G.G. v. Trump*, No. CV 25-766 (JEB), 2025 WL 890401, at \*2 (D.D.C. Mar. 24, 2025) (Boasberg, J.) ("before [petitioners] may be deported, they are entitled to individualized hearings to determine whether the Act applies to them at all").

5.      Nevertheless, the government has twice attempted (once successfully) to remove individuals under the AEA without any meaningful process. First, on March 15, the government secretly loaded people onto planes, published the Proclamation, and removed at least 137 people within hours to a brutal prison in El Salvador. Those removed received no notice of their designation nor any opportunity to contest it. Second, on April 17, the government provided individuals with an English-only notice form that did not inform them of their right to seek judicial review. Hours after distributing the notices, the government loaded people onto buses and drove them towards the airport, only turning around after counsel filed an emergency appeal in the Supreme Court.

6.      These repeated attempts to use the Proclamation to remove noncitizens without any review of the determination that they are alien enemies violate the AEA, the APA, and the Constitution. For that reason, Petitioners, Plaintiffs, and the putative class that they represent seek this Court's intervention to restrain these summary removals, and to determine that this use of the AEA is unlawful and must be halted.

7.      Petitioners also bring this challenge to remedy the unlawful detention of a subclass held in the notorious Terrorism Confinement Center ("CECOT") prison in El Salvador. The 137 people wrongly deported on March 15 remain incommunicado and have not spoken to

2

their families or attorneys in over a month now. Their families are deeply concerned for their safety, especially given reports of widespread physical and psychological abuse in Salvadoran prisons. The continuing detention of the CECOT Subclass in El Salvador violates the AEA, Fifth Amendment, Sixth Amendment, and Eighth Amendment.

## JURISDICTION AND VENUE

8.      This case arises under the Alien Enemies Act ("AEA"), 50 U.S.C. §§ 21–24; the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.*; the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, *et seq.* and its implementing regulations; the Convention Against Torture ("CAT"), *see* Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231); and the Fifth, Sixth, and Eighth Amendments to the U.S. Constitution.

9.      This Court has subject matter jurisdiction under 28 U.S.C. § 2241 et seq. (habeas corpus), art. I, § 9, cl. 2 of the U.S. Constitution (Suspension Clause), 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (United States as defendant), 28 U.S.C. § 1361 (mandamus), and 28 U.S.C. § 1651 (All Writs Act). Respondents-Defendants ("Respondents") have waived sovereign immunity for purposes of this suit. 5 U.S.C. §§ 702, 706.

10.     The Court may grant relief pursuant to 28 U.S.C. § 2241; 28 U.S.C. § 2243; the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq.; 28 U.S.C. § 1331; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable powers.

11.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because Respondents are agencies of the United States or officers of the United States acting in their official capacity, Respondents reside in this District, and a substantial part of the events or omissions giving rise to the claim occurred in this District.

JA66

**PARTIES**

**Petitioners and Plaintiffs**

12.     Petitioner Frengel Reyes Mota is a Venezuelan national who has been transferred by the government from an immigration detention facility in Texas to CECOT. Mr. Reyes Mota fled Venezuela and sought asylum in the United States after violence from paramilitary groups. As his "next friend," his wife Liyana Sanchez, brings this action on his behalf. Mr. Reyes Mota's wife saw his name on a public list of Venezuelans deported to El Salvador and became alarmed that the U.S. government had removed and detained him at CECOT. Ms. Sanchez has not been able to speak with her husband since his removal. She desires that her husband be able to challenge his designation as an "alien enemy" and to defend himself against the false allegations of his membership in a gang.

13.     Petitioner Andry Jose Hernandez Romero is a Venezuelan national who has been transferred by the government from an immigration detention facility in Texas to CECOT. Mr. Hernandez Romero sought asylum in the United States after he was targeted for his sexual orientation as well as his refusal to promote government propaganda while working for a government-affiliated television station. Before he fled Venezuela, armed men connected to the government had been following and threatening him. Mr. Hernandez Romero entered using the CBP One app and passed his credible fear interview. As his "next friend," his mother D.A.R.H., brings this action on his behalf. Mr. Hernandez Romero's mother discovered that her son had been deported when his name appeared in a news article listing Venezuelans deported to El Salvador. She later heard from a journalist who told her that Andry was at CECOT, was being mistreated by guards, and was begging for his release. D.A.R.H. has done everything possible to support her son since his deportation, including speaking with his lawyer and trying to find any

4

information about where he is. But D.A.R.H. has been unable to contact her son since he was sent to El Salvador. She desires that her son be able to challenge his designation as an "alien enemy" and to defend himself against the false allegations of gang membership.

14.    Petitioner J.A.B.V. is a Venezuelan national who has been transferred by the government from an immigration detention facility in Texas to CECOT. He fled Venezuela and sought asylum in the United States after he was violently targeted after the campaigned for the opposition leader. J.A.B.V. was abducted by masked men, beaten, and told he would be killed if he campaigned again. He was then held for several days at a police center, where he was tortured. J.A.B.V. passed his credible fear interview. As his "next friend," his mother, M.Z.V.V., brings this action on his behalf. M.Z.V.V. saw J.A.B.V.'s name on a public list of Venezuelans deported to El Salvador and became alarmed that the U.S. government had removed and detained him at CECOT. M.Z.V.V. has not been able to speak with her son since his removal. She desires that her son be able to challenge his designation as an "alien enemy" and to defend himself against the false allegations of his membership in a gang.

15.    Petitioner M.A.O.R. is a Venezuelan national who has been transferred by the government from an immigration detention facility in Texas to CECOT. He was in the process of seeking protection in the United States. As his "next friend," his sister, M.Y.O.R., brings this action on his behalf. M.Y.O.R. saw M.A.O.R.'s name on a public list of Venezuelans deported to El Salvador and became alarmed that the U.S. government had removed and detained him at CECOT. M.Y.O.R. has not been able to speak with her brother since his removal. She desires that her brother be able to challenge his designation as an "alien enemy" and to defend himself against the false allegations of his membership in a gang.

5

16.     Petitioner G.A.A.A. is a Venezuelan national who has been transferred by the government from an immigration detention facility in Texas to CECOT. He fled Venezuela and sought asylum in the United States due to the violence in his town at the hand of a paramilitary group. As his "next friend," his mother, M.M.A.A., brings this action on his behalf. M.A.A.A. saw J.A.B.V.'s name on a public list of Venezuelans deported to El Salvador and became alarmed that the U.S. government had removed and detained him at CECOT. M.M.A.A. has not been able to speak with her son since his removal. She desires that her son be able to challenge his designation as an "alien enemy" and to defend himself against the false allegations of his membership in a gang.

17.     Petitioner M.R.M. is a Venezuelan national who is currently has been transferred by the government from an immigration detention facility in Texas to CECOT. As his "next friend," his mother Dorys Mendoza, brings this action on his behalf. Ms. Mendoza saw M.R.M.'s name on a public list of Venezuelans deported to El Salvador and became alarmed that the U.S. government had removed and detained him at CECOT. Ms. Mednoza has not been able to speak with her son since his removal. She desires that her son be able to challenge his designation as an "alien enemy" and to defend himself against the false allegations of his membership in a gang.

18.     Petitioner T.C.I. is a Venezuelan national who is currently in criminal custody and detained in New Jersey. After leaving Venezuela, he turned himself into immigration authorities and was granted humanitarian parole. As his "next friend," his criminal defense attorney Eylan Schilman, brings this action on his behalf. T.C.I. informed Mr. Schilman that officials approached him to sign a form in English that he was a member of Tren de Aragua and subject to removal. T.C.I. refused to sign because he denies membership in Tren de Aragua or any other

6

gang. Mr. Schilman desires that his client be able to challenge his designation as an "alien enemy" and to defend himself against the false allegations of his membership in a gang.

19.    Plaintiff J.G.G. is a Venezuelan national who is detained at El Valle Detention Center in Texas. J.G.G. is seeking asylum, withholding of removal, and CAT protection because he fears being killed, arbitrarily imprisoned, beaten, or tortured by Venezuelan state police, since they have previously done so to him. J.G.G. was nearly removed on March 15 pursuant to the Proclamation. He was pulled off the plane at the last minute due to this Court's TRO. Despite the fact that J.G.G. is not involved whatsoever with Tren de Aragua, he fears that the government will continue trying to deport him because he has tattoos and because they have previously attempted to deport him under the Proclamation.

20.    Plaintiff J.A.V. is a Venezuelan national who is detained at El Valle Detention Center in Texas. J.A.V. is seeking asylum because of his political views and fear of harm and mistreatment by multiple criminal groups, including TdA. J.A.V. is not and has never been a member of TdA—he was in fact victimized by that group and it is the reason why he cannot return to Venezuela. J.A.V. was nearly removed on March 15 pursuant to the Proclamation. However, he was spared from immediate deportation due to this Court's TRO. J.A.V. fears that the government will continue trying to deport him because he has previously been designated an alien enemy.

21.    Plaintiff G.F.F. is a 21-year-old Venezuelan national who is detained at Orange County Jail in New York. G.F.F. and his family fled Venezuela in part due to threats from TdA based on his sexual orientation and gender non-conformity. He also fears persecution from Venezuelan state actors, including police and paramilitary groups. G.F.F. entered the United States in May 2024 and was released on his own recognizance after passing a credible fear

JA70

interview. G.F.F. was nearly deported pursuant to the Proclamation on March 15; he was taken off the plane after this Court issued its initial TRO. G.F.F. strongly denies any association with TdA. G.F.F. fears that the government will continue trying to deport him because it has filed an I-213 identifying him as an "associate/affiliate of Tren de Aragua" and because the government previously attempted to deport him under the Proclamation.

22.     Plaintiff W.G.H. is a 29-year-old Venezuelan national who is detained at El Valle Detention Center in Texas. W.G.H. is seeking asylum because he was extorted and threatened by multiple criminal groups in Venezuela, including TdA. W.G.H. is extremely afraid of returning to Venezuela or being sent to El Salvador. W.G.H. was almost deported on March 15, despite the fact that he has repeatedly denied any connection to TdA whatsoever. He was removed from the plane after this Court's TRO. W.G.H. W.G.H. fears that the government will continue trying to deport him because it has filed an I-213 stating that W.G.H. "has been identified as a Tren de Aragua gang associate" and because he was previously designated under the Proclamation.

23.     Plaintiff J.G.O. is a 32-year-old Venezuelan national who is detained at Orange County Jail in New York. J.G.O. is seeking asylum in the United States because he actively protested against the Maduro regime in Venezuela and fears torture, imprisonment, or death on account of his political activism if he returns. J.G.O. was nearly deported on March 15, but was removed from the plane after this Court's TRO. J.G.O. fears that the government will continue trying to deport him pursuant to the AEA because he has been questioned about gang affiliation and because he has already been designated under the Proclamation. J.G.O. vehemently denies any affiliation with a gang.

JA71

**Respondents-Defendants**

24.     Respondent Donald Trump is the President of the United States. He is sued in his official capacity. In that capacity, he issued the Proclamation under the Alien Enemies Act.

25.     Respondent Pamela J. Bondi is the U.S. Attorney General at the U.S. Department of Justice, which is a cabinet-level department of the United States government. She is sued in her official capacity.

26.     Respondent Kristi Noem is the Secretary of the U.S. Department of Homeland Security, which is a cabinet-level department of the United States government. She is sued in her official capacity. In that capacity, Respondent Noem is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103.

27.     Respondent U.S. Department of Homeland Security ("DHS") is a cabinet-level department of the United States federal government. Its components include Immigration and Customs Enforcement ("ICE"). Respondent DHS is a legal custodian of Petitioners.

28.     Respondent Todd Lyons is the Acting Director of ICE. Respondent Lyons is responsible for ICE's policies, practices, and procedures, including those relating to the detention of immigrants during their removal procedures. Respondent Lyons is a legal custodian of Petitioners. Respondent Lyons is sued in his official capacity.

29.     Respondent ICE is the subagency of DHS that is responsible for carrying out removal orders and overseeing immigration detention. Respondent ICE is a legal custodian of Petitioners.

30.     Respondent Marco Rubio is the Secretary of State, which is a cabinet-level department of the United States government. He is sued in his official capacity. In that capacity, Respondent Rubio negotiates and enters into contracts or agreements with El Salvador for the

9

removal and detention of Petitioners and others, and would be responsible for facilitating the return of Petitioners sent to El Salvador or any other country.

31.    Respondent U.S. Department of State ("DOS") is a cabinet-level department of the United States federal government.

32.    Respondent Pete Hegseth is the Secretary of Defense, which is a cabinet-level department of the United States government. He is sued in his official capacity. In that capacity, Respondent Hegseth oversees the Department of Defense and acts as the principal defense policy maker and advisor.

33.    Respondent U.S. Department of Defense ("DOD") is a cabinet-level department of the Unite States federal government.

## BACKGROUND

**The Alien Enemies Act**

34.    The AEA is a wartime authority enacted in 1798 that grants the President specific powers with respect to the regulation, detention, and deportation of enemy aliens.

35.    The AEA, as codified today, provides that "[w]henever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government, and the President makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being of the age of fourteen years and upward, who shall be within the United States and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed as alien enemies." 50 U.S.C. § 21.

JA73

36.    The AEA can thus be triggered in only two situations. The first is when a formal declared war exists with a foreign nation or government. The second is when a foreign nation or government perpetrates, attempts, or threatens an invasion or predatory incursion against the territory of the United States.

37.    To trigger the AEA, the President must make a public proclamation of the declared war, or of the attempted or threatened invasion or predatory incursion. *Id.*

38.    Section 21 of the AEA also provides that noncitizens must be afforded a right of voluntary departure. Only noncitizens who "refuse or neglect to depart" are subject to removal. *Id.* § 21.

39.    Section 22 of the AEA specifies the terms of departure for aliens designated as enemies. It grants noncitizens the full time to depart as stipulated by any treaty between the United States and the enemy nation, unless the noncitizen has engaged in "actual hostility" against the United States. If no such treaty exists, the President may declare a "reasonable time" for departure, "according to the dictates of humanity and national hospitality." *Id.* § 22.

40.    The Act has been used only three times in American history, all during actual or imminent wartime.

41.    The AEA was first invoked several months into the War of 1812, but President Madison did not use the AEA to remove anyone from the United States during the war.

42.    The AEA was invoked a second time during World War I by President Wilson. Upon information and belief, there were no removals effectuated pursuant to the AEA during World War I.

43.    The AEA was used again during World War II, though it was never used as a widespread method of removal.

11

JA74

44.    On December 7, 1941, after the Japanese invaded Hawaii in the attack on Pearl Harbor, President Roosevelt proclaimed that Japan had perpetrated an invasion upon the territory of the United States. The President issued regulations applicable to Japanese nationals living in the United States. The next day Congress declared war on Japan.

45.    On the same day, President Roosevelt issued two separate proclamations stating that an invasion or predatory incursion was threatened upon the territory of the United States by Germany and Italy. The President incorporated the same regulations that were already in effect as to Japanese people for German and Italian people. Three days later Congress voted unanimously to declare war against Germany and Italy.

46.    Congress declared war against Hungary, Romania, and Bulgaria on June 5, 1942. Just over a month later, President Roosevelt issued a proclamation recognizing that declaration of war and invoking the AEA against citizens of those countries.

47.    Under these proclamations, the United States infamously interned noncitizens from Japan, Germany, Italy, Hungary Romania, and Bulgaria (with U.S. citizens of Japanese descent subject to a separate order that did not rely on the AEA).

48.    It was not until the end of hostilities that the President provided for the removal of alien enemies from the United States under the AEA. On July 14, 1945, President Truman issued a proclamation providing that alien enemies detained as a danger to public peace and safety "shall be subject upon the order of the Attorney General to removal from the United States." The Department of Justice subsequently issued regulations laying out the removal process. *See* 10 Fed. Reg. 12189 (Sept. 28, 1945). It was never used as a widespread method of removal.

12

**JA75**

**Systemic Overhaul of Immigration Law in 1952**

49.    Following the end of World War II, Congress consolidated U.S. immigration laws into a single text under the Immigration and Nationality Act of 1952 ("INA").

50.    The INA, and its subsequent amendments, provide for a comprehensive system of procedures that the government must follow before removing a noncitizen from the United States. The INA provides the exclusive procedure by which the government may determine whether to remove an individual. 8 U.S.C. § 1229a(a)(3).

51.    In addition to laying out the process by which the government determines whether to remove an individual, the INA also enshrines particular forms of humanitarian protection.

52.    First, the INA provides that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . . ), irrespective of such alien's status," may apply for asylum. 8 U.S.C. § 1158(a)(1). To qualify for asylum, a noncitizen must show a "well-founded fear of persecution" on account of a protected ground, such as race, nationality, political opinion, or religion. 8 U.S.C. § 1101(a)(42)(A).

53.    Second, Congress has barred the removal of an individual to a country where it is more likely than not that he would face persecution on one of these protected grounds. 8 U.S.C. § 1231(b)(3). That protection implements this country's obligations under the 1951 Refugee Convention and the 1967 Protocol relating to the Status of Refugees. The relevant form of relief, known as "withholding of removal," requires the applicant to meet a higher standard with respect to the likelihood of harm than asylum; granting that relief is mandatory if the standard is met absent limited exceptions.

54.    Third, the Convention Against Torture ("CAT") prohibits the government from returning a noncitizen to a country where it is more likely than not that he would face torture. *See*

13

JA76

8 U.S.C. § 1231 note. That protection implements the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242. As with withholding of removal, CAT relief also requires the applicant to meet a higher standard with respect to the likelihood of harm than asylum and relief is mandatory if that standard is met. There is no exception to CAT relief.

**President Trump's Proclamation Invoking the AEA**

55.    On March 14, the President signed the AEA Proclamation at issue here. It provides that "all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies." *See* Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua (Mar. 15, 2025).[2]

56.    Although the AEA calls for a "public proclamation," 50 U.S.C. § 21, the administration did not make the invocation public until around 3:53 p.m. EDT on March 15.

57.    The Proclamation alleges that Tren de Aragua is perpetrating, attempting, and threatening predatory incursions, hostile actions, and irregular warfare.

58.    The Proclamation thus states that all Venezuelan citizens ages fourteen or older alleged to be members of Tren de Aragua—and who are not U.S. citizens or lawful permanent residents—are alien enemies.

59.    The Proclamation provides no means or process for individuals to contest that they are members of the TdA and do not therefore fall within the terms of the Proclamation. Nor

---

[2] *Available at* https://www.whitehouse.gov/presidential-actions/2025/03/invocation-of-the-alien-enemies-act-regarding-the-invasion-of-the-united-states-by-tren-de-aragua.

14

**JA77**

does it provide individuals with an opportunity for voluntary departure, as required by Section 21. Nor does it provide the grace period required under Section 22, during which individuals can arrange their affairs. The Proclamation instead invokes Section 22's exception by claiming that all individuals subject to the Proclamation are "chargeable with actual hostility," and pose "a public safety risk."

60.     As multiple judges have already found, the Proclamation is likely unlawful.

61.     First, the Proclamation does not satisfy the statutory requirements for proper invocation of the Alien Enemies Act. Tren de Aragua, a criminal organization, is not a nation or foreign government and is not part of the Venezuelan government. The United States is not in a declared war with Venezuela. The United States cannot declare war against Tren de Aragua because it is not a nation. And neither Venezuela nor Tren de Aragua have invaded or threatened to invade the United States, nor has either engaged in a "predatory incursion" within the meaning of the AEA.

62.     Moreover, there is no meaningful notice or meaningful opportunity for individuals to challenge their designation as alien enemies. There is thus a significant risk that even individuals who do not fall under the terms of the Proclamation will be subject to it.

63.     The Proclamation also violates the process and protections that Congress has prescribed elsewhere in the country's immigration laws for the removal of noncitizens.

64.     As a result, countless Venezuelans are at imminent risk of removal pursuant to the Proclamation without any hearing or meaningful review, regardless of the absence of any ties to TdA or the availability of claims for relief from and defenses to removal. And for some people, it is too late. As described in more detail below, over 130 individuals were removed on March 15

15

to a prison in El Salvador known for dire conditions, torture, and other forms of physical abuse—possibly for life. They have lost all contact with their attorneys, family, and the world.

**Implementation of the Proclamation and Subsequent Litigation**

65.     Upon information and belief, prior to the public issuance of the Proclamation, Respondents developed a memorandum for federal law enforcement officers with guidance on implementation of the Proclamation.

66.     Prior to the public issuance of the Proclamation, ICE had moved Venezuelan detainees into position such that, when the Proclamation was made public, the detainees were already being transported to the airport and loaded onto planes.

67.     Those flights took off quickly and, despite this Court's order to return individuals on the flights who were being removed pursuant to the AEA, the planes continued to El Salvador where the individuals were promptly detained in that country's notorious Terrorism Confinement Center ("CECOT").

68.     The government also sent eight Venezuelan women to CECOT, presumably pursuant to the Proclamation. However, upon landing, Salvadoran officials informed U.S. officials that CECOT does not imprison women. The government returned the eight Venezuelan women to the United States, along with a Nicaraguan man whom they also attempted to send to CECOT.

69.     Petitioners received no advance notice of the basis for their removal. Neither Petitioners nor their attorneys were told that they had been designated "alien enemies." They were not told that they could challenge that designation. Nor were they given an opportunity to do so. They were not even told where the plane was going when they boarded.

16

70.     It later emerged that Respondents had a notice form asserting that an individual is an "alien enemy" and stating that they are "not entitled to a hearing, appeal, or judicial review of this notice and warrant of apprehension and removal." But the CECOT Subclass received no such notice. Nor did their lawyers.

71.     It also emerged that Respondents used a checklist to identify alleged TdA members. The checklist gave points for certain characteristics. Eight points meant the individual was "verified" as TdA. The checklist included characteristics such as "subject has tattoos denoting membership/loyalty to TDA" and "subject possesses written rules, constitution, membership certificates, bylaws, etc. indicating . . . membership of or allegiance to TDA."

72.     Whether most (or perhaps all) of the class members lack ties to TdA remains to be seen, because the government secretly rushed the men out of the country and has provided Petitioners with no information about the class. But evidence since the flights on March 15 increasingly shows that many members of the CECOT Subclass removed to El Salvador are not "members" of TdA as is required to fall within the Proclamation; many have no ties to TdA at all.

73.     Respondents' errors are unsurprising because the methods they employ in the checklist are flawed. For example, the checklist relies on indicators like tattoos or other iconography, despite the fact that TdA does not have common tattoos or symbols. It also relies on possessing an official "indicia" of the organization, like membership certificate or written rules—but the government's own declarants have conceded that TdA is "decentralized" and "loosely organized."

74.     These mistakes are devastating. Individuals who are wrongly designated are deported to El Salvador's notorious CECOT prison, as has already occurred to a number of class

17

JA80

members. Respondents have repeatedly taken the position that they cannot or will not take any meaningful steps to facilitate the return of individuals from CECOT.

75.    Since March 15, Respondent DOD has operated at least one flight transporting individuals from the United States to CECOT in El Salvador. Several of those individuals were alleged to be affiliated with TdA.

76.    Respondents have custody or constructive custody over the individuals designated under the AEA, including those detained at CECOT. Respondents are responsible for the restraints on the liberty of these individuals.

77.    Individuals detained at CECOT are detained at the behest of Respondents, and Respondents are paying El Salvador millions of dollars to detain them, as Respondent Secretary Rubio has publicly explained.

78.    Respondents are outsourcing part of the United States' prison system to El Salvador. Respondent Secretary Noem has publicly described the transfer of U.S. residents to CECOT as "one of the tools" in the United States' "toolkit" "that we will use if you commit crimes against the American people."

79.    Upon information and belief, Respondents are aware that the Salvadoran government mistreats and tortures individuals detained in CECOT.

80.    Respondents are attempting to deliberately prevent individuals designated under the AEA, including individuals detained at CECOT, from seeking judicial review.

81.    Respondents have also taken the position that noncitizens subject to the Proclamation are not be afforded credible fear interviews, nor will claims for protection under the Convention Against Torture ("CAT") be recognized.

18

JA81

82.    Petitioners obtained a TRO against Respondents' unlawful action from this Court on March 15. Respondents sought a stay of the TRO in the D.C. Circuit. The D.C. Circuit denied the motions for stay in a per curiam opinion. *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682 (D.C. Cir. Mar. 26, 2025). Judge Henderson, concurring, found that the orders were appealable but that Respondents had failed to establish a likelihood of success on the merits because, in her preliminary view, that the AEA's statutory predicates of "invasion" and "predatory incursion" were not met. *Id.* at *1–13 (Henderson, J., concurring). Judge Millett, also concurring, wrote that the order was not appealable and that if the court were to reach the merits, Respondents were unlikely to prevail on their jurisdictional arguments and that the balance of equities weighed against Respondents. *Id.* at *13–31 (Millett, J., concurring). Judge Walker dissented, acknowledging that Petitioners had a right to contest their designation as enemy aliens under the Proclamation but contending that those claims must be brought in habeas in the district of confinement. *Id.* at *31–40 (Walker, J., concurring).

83.    Respondents then sought a stay in the Supreme Court. The Court held that "AEA detainees must receive notice after the date of this order that they are subject to removal under the Act . . . within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue before such removal occurs." *Trump v. J.G.G.*, No. 24A931, 2025 WL 1024097, at *2 (U.S. Apr. 7, 2025).

84.    Despite the Supreme Court's clear instructions, Respondents again attempted to remove individuals under the AEA with inadequate process. On April 16, within hours of a district court in the Northern District of Texas denying a TRO and deferring decision on class certification, the government gave detainees a Bluebonnet Detention Center in Texas an English-only form, not provided to any attorney, which nowhere mentioned the right to contest the

**JA82**

designation or removal, much less explained how detainees could do so. ICE officers told detainees that they would be removed within 24 hours.

85.     Petitioners' counsel sought relief at the Fifth Circuit and the Supreme Court. Petitioners' counsel also sought relief in this court, in the form of a request to expedite their TRO regarding notice. This Court held a hearing in which Respondents stated that they would not remove anyone that same day, but Respondents reserved the right to remove people under the AEA the following day.

86.     At 12:51 a.m. EDT on Saturday, April 19., the Supreme Court directed the government not to remove any member of the putative class of detainees from the United States until further order of the Court.

87.     On April 23, 2025, Respondents submitted a declaration in the Southern District of Texas, under seal, with information about the notice process that the government had for individuals designated for removal under the AEA. *See* Cisneros Decl., *J.A.V. v. Trump*, No. 1:25-cv-072 (S.D. Tex. filed Apr. 23, 2025), ECF No. 45, Exhibit D. That declaration and its accompanying exhibit were unsealed the next day. Oral Order, *J.A.V. v. Trump*, No. 1:25-cv-072 (S.D. Tex. Apr. 24, 2025). The declaration states that individuals are given 12 hours' notice ahead of scheduled removal and that if they express an intent to file a habeas petition, they are given 24 hours to actually file that petition. Cisneros Decl. ¶ 11. The notice process is patently inadequate as a matter of due process.

## CLASS ALLEGATIONS

88.     Petitioners and Plaintiffs bring this action under Federal Rules of Civil Procedure 23(a) and 23(b)(2) on behalf of themselves and a class of all other persons similarly situated.

89.     This Court has already certified a class of "All noncitizens in U.S. custody who are subject to the March 15, 2025, Presidential Proclamation entitled 'Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua' and its implementation."

90.     Petitioners and Plaintiffs seek to amend the class definition to: "All noncitizens who have been, are or will be subject to the March 2025 Presidential Proclamation entitled 'Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua' and/or its implementation."

91.     Petitioners further seek to certify the following subclasses under Federal Rules of Civil Procedure 23(a) and 23(b)(2):

a.  "CECOT Subclass": All noncitizens in custody at the Terrorism Confinement Center ("CECOT") in El Salvador who were, are, or will be subject to the March 2025 Presidential Proclamation entitled "Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren De Aragua" and/or its implementation.

b.  "Criminal Custody Subclass": All noncitizens in criminal custody who were, are, or will be subject to the March 2025 Presidential Proclamation entitled "Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren De Aragua" and/or its implementation.

92.     Petitioners and Plaintiffs, together, seek to represent the class, and seek injunctive and declaratory relief for Claims I–VIII, as specified below.

93.     Petitioners Frengel Reyes Mota, Andry Jose Hernandez Romero, J.A.B.V., M.A.O.R., G.A.A.A., and M.R.M. are currently detained in CECOT and also seek to represent

21

<span style="color:red">JA84</span>

the CECOT Subclass. They seek habeas, injunctive, and declaratory relief for Claims I–XIII, as specified below.

94.     Petitioner T.C.I. is currently detained in criminal custody and also seeks to represent the Criminal Custody Subclass. He seeks habeas, injunctive, and declaratory relief for Claims I–IX, as specified below, in addition to Claims X–XIII, as specified below, insofar as the Criminal Custody Subclass face an imminent risk of removal and detention at CECOT or a facility with equivalent conditions.

95.     Plaintiffs are the original Plaintiffs in *J.G.G. v. Trump*: J.G.G., G.F.F., J.G.O, W.G.H., and J.A.V. Because Plaintiffs have filed habeas actions in their districts of confinement and do not seek relief in this Court through the writ of habeas corpus, they continue to be designated as "Plaintiffs," not "Petitioners." Among other things, Plaintiffs continue to seek—as a matter of due process—meaningful notice of the government's intent to remove them. *See J.G.G. v. Trump*, No. 24A931, 2025 WL 1024097, at *2 (U.S. Apr. 7, 2025) (per curiam) (due process requires government to provide detainees notice that they are subject to removal "within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue"). Because this claim is a precondition to the effective exercise of habeas rights, it lies outside of habeas. In addition, Plaintiffs continue to advance their original claims in equity and under the Administrative Procedure Act. *See* Claims, *infra*.

96.     The proposed class and subclasses satisfy the requirements of Rule 23(a) and Rule 23(b)(2).

97.     The proposed class and both subclasses satisfy the requirements of Rule 23(a)(1) because they are so numerous that joinder of all members is impracticable. Besides the five originally named petitioners who were nearly removed on March 15, 2025, there are at least 137

22

individuals were actually removed to the CECOT prison on March 15 pursuant to the AEA. After those removals, on March 18, 2025, the government identified 54 members of TdA in detention, 32 in criminal custody and 172 on its nondetained docket. That means there were roughly nearly 400 people in the entire class as of mid-March 2025, of whom at least 137 were in the CECOT subclass and 32 in Criminal Custody subclass. The government also confirmed that it continues to monitor and identify more TdA members. On April 18, 2025, the government attempted to remove dozens more Venezuelan men pursuant to the AEA.

98.     Joinder is also impracticable because class members are largely detained and unrepresented, in addition to being geographically spread out. Joinder is also impracticable because many in the proposed class and subclasses are pro se, indigent, have limited English proficiency, and/or have a limited understanding of the U.S. judicial system. Despite over 130 subclass members at CECOT, Respondents have not provided information about the individuals detained there and are holding them incommunicado, without any access to the outside world, let alone the ability to communicate with any existing or potential counsel. Due to their imprisonment and isolation from the world, the CECOT subclass members cannot practically bring their own challenges. Similarly, Respondents will not provide information about any of the class members in the United States, even to their immigration counsel. Because of the swift timeline for notice and removals, class and subclass members are not able to effectively seek judicial review on an individual basis.

99.     The proposed class and both subclasses satisfy the commonality requirements of Rule 23(a)(2). The members of the proposed class and subclasses are subject to a common practice: designation under the Proclamation and either the threat or actual summary removal pursuant to the AEA. The suit raises at least one question of law common to the entire class:

JA86

what notice and process is due for those who are designated under the Proclamation. The suit also raises other questions of law common to members of the proposed class and both subclasses, including whether the Proclamation and its implementation violate the AEA, the INA, and the statutory protections for asylum seekers. Moreover, the subclasses share common questions of law and fact regarding the conditions of confinement at CECOT, and whether their current or imminent imprisonment there violates the Fifth, Sixth, and Eighth Amendments.

100.    The proposed class and both subclasses satisfy the typicality requirements of Rule 23(a)(3), because the claims of the representative Plaintiffs and Petitioners are typical of the claims of the class. Each proposed class member, including the Plaintiffs, has experienced the same principal injury (inability to challenge their designation), based on the same government practices (the implementation of the Proclamation without meaningful notice), which is unlawful as to the entire class. Each proposed CECOT subclass member, including the proposed CECOT subclass representatives, Frengel Reyes Mota, Andry Jose Hernandez Romero, J.A.B.V., M.A.O.R., G.A.A.A., and M.R.M., has experienced or faces the same principal injury (unlawful removal to CECOT), based on the same government practice (the Proclamation and its implementation), which is unlawful as to the entire subclass because it violates the AEA, the INA, the APA, and various provisions of the Constitution. Similarly, each proposed Criminal Custody subclass member, including the proposed Criminal Custody subclass representative, T.C.I., also faces the same principal injury (imminent removal to CECOT), based on the same government practice (the Proclamation and its implementation), which is unlawful as to the entire subclass because it violates the AEA, the INA, the APA, and various provisions of the Constitution.

24

101.    The proposed class and both subclasses satisfy the adequacy requirements of Rule 23(a)(4). The representative Plaintiffs and Petitioners seek the same relief as the other members of the class, including a meaningful procedure for notice and opportunity to be heard that comports with due process. The representative Petitioners seek the same relief as the other members of both subclasses—among other things, an order declaring the Proclamation unlawful and an injunction preventing enforcement of the Proclamation and to facilitate their return to the United States. In defending their rights, Plaintiffs and Petitioners will defend the rights of all proposed class members and subclass members fairly and adequately.

102.    Both the class and subclasses are represented by experienced attorneys from the American Civil Liberties Union and the Democracy Forward Foundation. Proposed Class Counsel have extensive experience litigating class action lawsuits and other complex systemic cases in federal court on behalf of noncitizens.

103.    The class and subclasses also satisfy Rule 23(b)(2). Respondents have acted (or will act) on grounds generally applicable to the class and subclasses by subjecting them to summary removal under the Proclamation rather than affording them the protection of immigration laws. Injunctive and declaratory relief is therefore appropriate with respect to the class as a whole. Habeas, injunctive and declaratory relief is also appropriate with respect to both subclasses as a whole.

### HARM TO PLAINTIFFS AND PETITIONERS

104.    Countless Venezuelans fear imminent removal under the Proclamation based on flimsy allegations that they will have no change to rebut. And named Plaintiffs J.G.G., J.A.V., G.F.F., W.G.H. and J.G.O. all fear removal under the Proclamation because the government has previously attempted to remove them as alien enemies. While the named Plaintiffs as of today

JA88

have obtained temporary relief in other proceedings, that relief is temporary and in the absence of it, they are at imminent risk of unlawful removal.

105. For the Plaintiffs, Petitioners, and putative class members who have not yet been removed to El Salvador, they face serious harm if they are removed to El Salvador, where they will be subject to egregious conditions at CECOT. Many Plaintiffs and Petitioners also fear return to Venezuela, where they have a well-founded fear of persecution.

106. Petitioner T.C.I. also fears removal under the Proclamation because the government has previously pressured him to sign a paper stating that he was a member of Tren de Aragua and subject to removal. He has not obtained any temporary relief and is at imminent risk of unlawful removal.

107. Petitioner T.C.I. also fears removal to Venezuela, where he will be targeted by gang members, as with many putative subclass members.

108. Petitioners Frengel Reyes Mota, Andry Jose Hernandez Romero, J.A.B.V., M.A.O.R., G.A.A.A., and M.R.M. are already facing serious harm after being removed to El Salvador, where they are currently subject to egregious conditions at CECOT.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

**Ultra Vires, Violation of 50 U.S.C. § 21**
**(Class and Subclasses against All Respondents)**

109. All of the foregoing allegations are repeated and realleged as if fully set forth herein.

110. The AEA does not authorize the removal of noncitizens from the United States absent a "declared war" or a "perpetrated, attempted, or threatened" "invasion or predatory incursion" into the United States by a "foreign nation or government." *See* 50 U.S.C. § 21. The

26

Proclamation mandates Petitioners' and Plaintiffs' removal under the AEA where those preconditions have not been met, and Petitioners imprisoned at CECOT have already been removed under the AEA where those preconditions were not met.

111.    The AEA also does not authorize the removal of noncitizens from the United States unless they "refuse or neglect to depart" from the United States. *See* 50 U.S.C. § 21. The Proclamation mandates Petitioners' and Plaintiffs' removal under the AEA where those preconditions have not been met, and Petitioners have been removed under the AEA where those preconditions were not met.

112.    The AEA Process, which was purportedly established pursuant to the authority of 50 U.S.C. § 21, was not authorized by that law.

113.    The application of the AEA Process to Petitioners and Plaintiffs is therefore ultra vires.

114.    The application of the AEA Process to Petitioners and Plaintiffs is contrary to law. *See* 5 U.S.C. § 706(2)(A).

## SECOND CLAIM FOR RELIEF

**Violation of 8 U.S.C. § 1101, *et seq.***
**(Class and Subclasses against All Respondents)**

115.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

116.    The INA, 8 U.S.C. § 1101, *et seq.*, sets out the sole mechanisms established by Congress for the removal of noncitizens.

117.    The INA provides that a removal proceeding before an immigration judge under 8 U.S.C. § 1229a is "the sole and exclusive procedure" by which the government may determine

27

JA90

whether to remove an individual, "[u]nless otherwise specified" in the INA. 8 U.S.C. § 1229a(a)(3).

118. The AEA Process creates an alternative removal mechanism outside of the immigration laws set forth by Congress in Title 8.

119. The INA's "exclusive procedure" and statutory protections apply to any removal of a noncitizen from the United States, including removals authorized by the AEA. Because the AEA Process provides for the removal of Petitioners and Plaintiffs without the procedures specified in the INA, it violates 8 U.S.C. § 1229a and the INA.

120. As a result, the application of the AEA to Petitioners and Plaintiffs, which will result or has resulted in their removal from the United States, is contrary to law. See 5 U.S.C. § 706(2)(A).

121. In addition, by refusing to grant Petitioners and Plaintiffs access to the procedures specified in the INA, Respondents have withheld and unreasonably delayed actions mandated by the statute. 5 U.S.C. § 706(1).

## THIRD CLAIM FOR RELIEF

### Violation of 8 U.S.C. § 1158, Asylum
### (Class and Subclasses against All Respondents)

122. All of the foregoing allegations are repeated and realleged as if fully set forth herein.

123. The INA provides, with certain exceptions, that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply

28

for asylum in accordance with this section or, where applicable, section 1225(b) of this title." 8 U.S.C. § 1158(a)(1).

124.    Respondents' application of the AEA Process to Petitioners and Plaintiffs prevents them from applying for asylum in accordance with 8 U.S.C. § 1158(a)(1), and is therefore contrary to law. *See* 5 U.S.C. § 706(2)(A).

## FOURTH CLAIM FOR RELIEF

### Violation of 8 U.S.C. § 1231(b)(3), Withholding of Removal
### (Class and Subclasses against All Respondents)

125.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

126.    The "withholding of removal" statute, INA § 241(b)(3), *codified at* 8 U.S.C. § 1231(b)(3), bars the removal of noncitizens to a country where it is more likely than not that they would face persecution.

127.    Respondents' AEA Process and regulations violate the withholding of removal statute because they do not provide adequate safeguards to ensure that Petitioners and Plaintiffs are not returned to a country where it is more likely than not that they would face persecution. As a result, Respondents' actions against Petitioners and Plaintiffs are contrary to law. *See* 5 U.S.C. § 706(2)(A).

128.    In addition, by refusing to grant Petitioners and Plaintiffs the procedural protections to which they are entitled, Respondents have withheld and unreasonably delayed actions mandated by the statute. 5 U.S.C. § 706(1).

## FIFTH CLAIM FOR RELIEF

### Violation of the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"),
### codified at 8 U.S.C. § 1231 note
### (Class and Subclasses against All Respondents)

29

JA92

JA93

129.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

130.    FARRA prohibits the government from returning a noncitizen to a country where it is more likely than not that he would face torture.

131.    Respondents' AEA Process and regulations violate FARRA because they do not provide adequate safeguards to ensure that Petitioners and Plaintiffs are not returned to a country where it is more likely than not that they would face torture. As a result, Respondents' actions against Petitioners and Plaintiffs are contrary to law. *See* 5 U.S.C. § 706(2)(A).

132.    In addition, by refusing to grant Petitioners and Plaintiffs the procedural protections to which they are entitled, Respondents have withheld and unreasonably delayed actions mandated by the statute. 5 U.S.C. § 706(1).

## SIXTH CLAIM FOR RELIEF

### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
### (Class and Subclasses against All Respondents except Respondent Trump)

133.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

134.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion." 5 U.S.C. § 706(2)(A).

135.    Respondents' actions are arbitrary and capricious. Respondents have failed to consider relevant factors in applying the AEA Process, including the risk of torture and other inhumane treatment at CECOT, and Venezuelans' fear of persecution and torture in their home country. Respondents also relied on factors Congress did not intend to be considered, and offered no sufficient explanation for their decision to remove them from this country.

JA93

136.    The subjection of Petitioners and Plaintiffs to the AEA Process is arbitrary and capricious because it also departs from existing agency policies prohibiting the return of individuals who fear persecution or torture, without providing a reasoned explanation for departing from these policies.

**SEVENTH CLAIM FOR RELIEF**

*Ultra Vires*, **Violation of 50 U.S.C. § 22**
**(Class and Subclasses against All Respondents)**

137.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

138.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

139.    The AEA requires that noncitizens whose removal is authorized by the AEA, unless "chargeable with actual hostility, or other crime against the public safety," be allowed the full time stipulated by treaty to depart or a reasonable time in which to settle their affairs before departing. *See* 50 U.S.C. § 22. The Proclamation denies Petitioners and Plaintiffs any time under Section 22 to settle their affairs, because it declares everyone subject to the Proclamation to be "chargeable with actual hostility" and to be a "danger to public safety," without any kind of individualized determination.

140.    The AEA Process thus contravenes 50 U.S.C. § 22 and is *ultra vires*.

141.    The application of the AEA Process to Petitioners and Plaintiffs is contrary to law. *See* 5 U.S.C. § 706(2)(A).

31

<span style="color:red">**JA94**</span>

## EIGHTH CLAIM FOR RELIEF

### Violation of Due Process Under the Fifth Amendment
### (Class and Subclasses against All Respondents)

142.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

143.    The Due Process Clause of the Fifth Amendment provides in relevant part that: "No person shall be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

144.    In denying Petitioners and Plaintiffs adequate notice and meaningful procedural protections to challenge their removal, the Proclamation violates due process.

145.    The Proclamation also denies Petitioners and Plaintiffs the opportunity to voluntarily depart and any time to settle their affairs before departing and thus violates the due process.

## NINTH CLAIM FOR RELIEF

### Violation of Habeas Corpus
### (Subclasses against All Respondents)

146.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

147.    Detainees have the right to file petitions for habeas corpus to challenge the legality of their detention and raise other claims related to their detention or to the basis for their removal.

148.    The ongoing or imminent detention of Petitioners under the Alien Enemies Act has violated, continues to violate, and will violate their right to habeas corpus. *See* U.S. Const. art. I, § 9, cl. 2 (Suspension Clause); 28 U.S.C. § 2241.

32

JA95

## TENTH CLAIM FOR RELIEF

### Ultra Vires, Post-Removal Imprisonment in Violation of 50 U.S.C. § 21
### (Subclasses against All Respondents)

149.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

150.    When the AEA's conditions have been met, the AEA authorizes a series of actions the executive branch may take with respect to alien enemies residing in the United States: in particular, alien enemies are liable to be "apprehended, restrained, secured, and removed." 50 U.S.C. § 21. But the AEA does not authorize the detention of alien enemies *after* they have been removed from the United States.

151.    The ongoing or imminent imprisonment of Petitioners in El Salvador, following their removal, contravenes the AEA and is *ultra vires*.

152.    The ongoing or imminent imprisonment of Petitioners in El Salvador, following their removal, is contrary to law. *See* 5 U.S.C. § 706(2)(A).

## ELEVENTH CLAIM FOR RELIEF

### Punitive Civil Detention in Violation of the Fifth Amendment
### (Subclasses against All Respondents)

153.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

154.    Detention under the auspices of the AEA, like other forms of immigration detention, is civil detention. Civil detention is subject to due process constraints and must therefore be justified by a regulatory, nonpunitive purpose. *See Bell v. Wolfish*, 441 U.S. 520, 535, 538-39 (1979). Those held in such detention have a due process right not to be subjected to any condition, practice, or policy that constitutes punishment.

33

**JA96**

155.    Respondents are detaining or will imminently detain Petitioners at CECOT for the purpose of punishment and with the expressed intent to punish.

156.    Respondents have identified no legitimate reason for transferring and holding detainees at the notorious CECOT prison in El Salvador, other than to deter future migration to the United States, induce self-deportation, and coerce people into giving up claims and accepting deportation. These are impermissible justifications for civil immigration detention.

157.    Respondents' ongoing or imminent detention of Petitioners at CECOT also subjects them to punitive conditions that violate their due process rights as civil detainees. *See Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982).

158.    Respondents' ongoing or imminent detention of Petitioners at CECOT subjects them to harsher detention conditions than they would face in U.S. prisons and immigration detention facilities—hallmarks of punitive detention.

159.    For these reasons, detention at CECOT constitutes unlawful punishment, in violation of the Fifth Amendment of the U.S. Constitution.

## TWELFTH CLAIM FOR RELIEF

### Criminal Punishment in Violation of the Fifth and Sixth Amendments
### (Subclasses against All Respondents)

160.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

161.    Imprisonment at CECOT, based on unproven accusations of criminal conduct, constitutes criminal punishment in violation of the Fifth and Sixth Amendments. Respondents' intent to criminally punish Petitioners is plain from the circumstances of their confinement at CECOT and from Respondents' own statements. Hallmarks of criminal punishment include a

34

JA97

finding that a person committed acts in violation of a criminal law, the stigma inherent in such a determination, and a resulting deprivation of liberty.

162.    Respondents have made or will imminently make summary determinations that Petitioners are "terrorists" and members of a "criminal organization," with no due process.

163.    Senior U.S. government officials, including President Trump, have made statements reiterating these accusations and conclusory findings that Petitioners are "criminals," making their intent to punish clear and amplifying the resulting stigma.

164.    Respondents have deprived or will imminently deprive Petitioners of their liberty, subjecting them to criminal detention at CECOT in some of the most punitive conditions imaginable.

165.    The Fifth and Sixth Amendments guarantee fundamental protections in connection with criminal punishment, including the right to notice of the government's allegations, the right to counsel, the right to trial by a jury, the right to proof beyond a reasonable doubt, and the protection against double jeopardy.

166.    Respondents have not afforded Petitioners any of these protections, despite subjecting them to ongoing or imminent criminal punishment.

167.    By the actions described above, Respondents have denied or will imminently deny Petitioners the process they are due with regard to their ongoing seizure and detention, in violation of the Due Process Clause of the Fifth Amendment.

168.    By the actions described above, Respondents have denied or will imminently deny Petitioners the fundamental protections of the Sixth Amendment.

169.    For these reasons, the ongoing or imminent imprisonment of Petitioners at CECOT constitutes criminal punishment that violates the Fifth and Sixth Amendments.

JA98

JA99

**THIRTEENTH CLAIM FOR RELIEF**

**Conditions of Confinement in Violation of the Eighth Amendment**
**(Subclasses against All Respondents)**

170.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

171.    The Eighth Amendment prohibits cruel and unusual punishment.

172.    Under the Eighth Amendment, Respondents must provide for Petitioners' basic human needs, including food, shelter, medical care, and reasonable safety. *DeShaney v. Winnebago County Dept. of Social Svcs.*, 489 U.S. 189, 199-200 (1989). Respondents must also avoid the use of excessive physical force.

173.    In subjecting Petitioners to ill treatment, unsafe conditions, inadequate subsistence, inadequate medical care, and excessive physical force at CECOT, Respondents are violating or will imminently violate Petitioners' Eighth Amendment rights to decent and humane treatment in criminal confinement.

**PRAYER FOR RELIEF**

WHEREFORE, Petitioners and Plaintiffs respectfully pray this Court to:

a.  Certify this action as a class action on behalf of the proposed class and subclasses, appoint the Petitioners and Plaintiffs as class representatives; Petitioners as subclass representatives; and undersigned counsel as class counsel;

b.  Order Respondents to provide notice of AEA designation to Plaintiffs, Petitioners, and class counsel, and an opportunity to challenge such designation at least 30 days prior to the removal date;

36

c.  Grant a writ of habeas corpus that (1) enjoins Respondents from removing Petitioners pursuant to the Proclamation or, in the event they have already been removed to CECOT, that orders Respondents to facilitate their return to the United States; and (2) enjoins Respondents from detaining Petitioners or otherwise regulating them pursuant to the Proclamation;

d.  Enjoin Respondents from removing Petitioners and Plaintiffs from the United States pursuant to the Proclamation;

e.  Enjoin Respondents from detaining or otherwise regulating Petitioners and Plaintiffs pursuant to the Proclamation;

f.  Declare unlawful the Proclamation and the AEA Process, including detention of Petitioners at CECOT;

g.  Order Respondents to facilitate the return of the CECOT Subclass to the United States;

h.  Award Plaintiffs' counsel reasonable attorneys' fees under the Equal Access to Justice Act, and any other applicable statute or regulation; and

i.  Grant such further relief as the Court deems just, equitable, and appropriate.

Dated: April 24, 2025                                  Respectfully submitted,

                                                      /s/ *Lee Gelernt*

Noelle Smith                                          Lee Gelernt (D.D.C. Bar No. NY0408)
Oscar Sarabia Roman                                   Daniel Galindo (D.D.C. Bar No. NY035)
My Khanh Ngo                                          Ashley Gorski
Cody Wofsy                                            Patrick Toomey
AMERICAN CIVIL LIBERTIES UNION                        Sidra Mahfooz
FOUNDATION                                            Omar Jadwat
425 California Street, Suite 700                       Hina Shamsi (D.D.C. Bar No. MI0071)
San Francisco, CA 94104                               AMERICAN CIVIL LIBERTIES UNION
(415) 343-0770                                        FOUNDATION
nsmith@aclu.org                                       125 Broad Street, 18th Floor
osarabia@aclu.org                                     New York, NY 10004

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

LIYANARA SANCHEZ, as next friend on behalf of
FRENGEL REYES MOTA, *et al.*,

*Petitioners–Plaintiffs*,

J.G.G., *et al.*,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, *et al.*,

*Respondents–Defendants*.

Case No: 1:25-cv-00766-JEB

---

**<u>DECLARATION OF OSCAR SARABIA ROMAN</u>**

I, Oscar Sarabia Roman, declare as follows:

1. I am over eighteen years of age and am competent to make this declaration.

2. I am a lawyer at the American Civil Liberties Union Immigrants' Rights Project. I
   represent the Petitioners and Plaintiffs in this case.

3. Attached hereto as exhibits are true and correct copies of the following:

| Exhibit | Document |
|---------|----------|
| 1. | "Alien Enemy Validation Guide," "Verification of Removal," and first "Notice and Warrant of Apprehension and Removal Under the Alien Enemies Act" Transcription. |
| 2. | Second "Notice and Warrant of Apprehension and Removal Under the Aline Enemies Act." |

1

3.     Dep't of Homeland Sec., Homeland Sec. Investigations, Assessment Report of Analysis (HSI-CHI-24-455).

4.     Dep't of Homeland Sec., U.S. Border Patrol, Situational Awareness: TDA Gang Recognition Indicators (Oct. 2, 2023).

5.     Matthew Lee & Regina Garcia Cano, *US Prepares to Deport about 300 Alleged Gang Members to El Salvador*, AP News (Mar. 15, 2025), *available at* https://apnews.com/article/trump-deportations-salvador-tren-aragua-64e72142a171ea57c869c3b35eeecce7.

6.     Antonio Pequeno, *Sen. Van Hollen Says Trump Administration Made $15 Million Deal with El Salvador to Imprison Deportees Including Abrego Garcia*, Forbes (Apr. 18, 2025), *available at* https://www.forbes.com/sites/antoniopequenoiv/2025/04/18/sen-van-hollen-says-trump-administration-made-15-million-deal-with-el-salvador-to-imprison-deportees-including-abrego-garcia/.

7.     Louis Casiano, *US Paid El Salvador to Take Venezuelan Tren de Aragua Members: 'Pennies on the Dollar,' White House Says*, Fox News (Mar. 17, 2025), *available at* https://www.foxnews.com/politics/us-paid-el-salvador-take-venezuelan-tren-de-aragua-members-pennies-dollar-white-house-says.

8.     Marco Rubio (@SecRubio), X (Mar. 16, 2025, 7:59 AM), https://x.com/SecRubio/status/1901241933302825470.

9.     Nayib Bukele (@nayibbukele), X (Apr. 4, 2025, 10:23 AM), https://x.com/nayibbukele/status/1901245427216978290

10.    U.S. Dep't of Homeland Sec., How It's Going, DHS, https://www.dhs.gov/medialibrary/assets/video/59108 (last visited Apr. 23, 2025).

11.    Nayib Bukele (@nayibbukele), X (Feb. 3, 2025, 6:44 PM), https://x.com/nayibbukele/status/1886606794614587573.

12.    Marco Rubio (@SecRubio), X (Mar. 19, 2025, 12:31 PM), https://x.com/SecRubio6/status/1902442726525739445.

13.    Mary Beth Sheridan and Maria Sacchetti, *Noem Threatens to Send More Immigrants to El Salvador Prison*, Wash. Post (Mar. 26, 2025), *available at* https://www.washingtonpost.com/world/2025/03/26/el-salvador-noem-cecot-venezuelans/.

14.    Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 31, 2025, 11:09 AM), https://truthsocial.com/@realDonaldTrump/posts/114258384664012595.

2

JA102

15.     Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 16, 2025, 12:54 PM), https://truthsocial.com/@realDonaldTrump/posts/114173862724361939.

16.     Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 18, 2025, 6:05 AM), https://truthsocial.com/@realDonaldTrump/posts/114183576937425149.

17.     *President Trump Delivers Justice to Terrorists, Security for Americans*, White House (Mar. 17, 2025), *available at* https://www.whitehouse.gov/articles/2025/03/president-trump-delivers-justice-for-terrorists-security-for-americans/.

18.     Charlie Savage & Julian E. Barnes, *Intelligence Assessment Said to Contradict Trump on Venezuelan Gang,* The New York Times (Mar. 22, 2025), *available at* https://www.nytimes.com/2025/03/20/us/politics/intelligence-trump-venezuelan-gang-alien-enemies.html.

19.     Kristi Noem, (@Sec_Noem), X (Mar. 26, 2025, 4:08 PM), *available at* https://x.com/Sec_Noem/status/1905034256826408982.

20.     Nayib Bukele, X.com, (Mar. 16, 2025, 5:13AM ET), *available at* https://x.com/nayibbukele/status/1901245427216978290.

21.     "Border Czar" Tom Homan on President Trump Invoking Alien Enemies Act, C-SPAN (Mar. 17, 2025), *available at* https://www.c-span.org/program/white-house-event/border-czar-tom-homan-on-president-trump-invoking-alien-enemies-act/657338.

I hereby declare under penalty of perjury of the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Executed on 24th of April, 2025, in San Francisco, California.

_____
Oscar Sarabia Roman

3

**JA103**

# EXHIBIT 1

JA104

**ALIEN ENEMIES ACT:**
**ALIEN ENEMY VALIDATION GUIDE**

In the case of: _____ A-File No:_____

1.  The person named above is fourteen years or older: ☐
2.  The person named above is not a citizen or lawful permanent resident of the United States: ☐
3.  The person named above is a citizen of Venezuela: ☐

   *If any of these three requirements are not satisfied, the person named above shall not be ordered removed under the Alien Enemies Act (AEA). In such a case, you should consult your supervisor and the Office of the Principal Legal Advisor (OPLA), U.S. Immigration and Customs Enforcement, and, where applicable, initiate removal proceedings under the Immigration and Nationality Act (INA).*

4.  The person named above is validated as a member of Tren de Aragua (TDA), as determined by reference to the following evaluation form:

   ***Instructions:*** *Complete the following validation evaluation form for each suspected alien targeted for removal under the AEA, or, following apprehension, for each alien potentially subject to an AEA removal.*

   *After accounting for the two comments below, aliens scoring 8 points and higher are validated as members of TDA; you should proceed with issuing Form AEA-21B, titled, "Notice and Warrant of Apprehension and Removal under the Alien Enemies Act." Aliens scoring 6 or 7 points <u>may</u> be validated as members of TDA; you should consult with a supervisor and OPLA, reviewing the totality of the facts, before making that determination; if you determine an alien should not be validated at this time as a member of TDA, when available, you should initiate removal proceedings under the INA. Alien scoring 5 points or less should not be validated at this time as member of TDA; when available, you should initiate removal proceedings under the INA.[1]*

   *Comment 1: Even if 8 points or higher, if all tallied points for an alien are from the Symbolism and/or Association categories (with <u>no points</u> scoring in any other category), consult your supervisor and OPLA before determining whether to validate the alien as a member of TDA (and proceed with an AEA removal) or initiate INA removal proceedings.*

---

[1] A tally of 5 points or less, or any decision to initiate INA removal proceedings, is not a finding that an alien is *not* an Alien Enemy. Relatedly, at any time, additional information may come to light that gives reason to revisit a prior decision to forego an AEA removal.

*Comment 2*: *For purposes of validating an alien as a member of TDA, at least one scoring category must involve conduct occurring, or information received, within the past five years.*

| Valuation Explanation | | | |
|---|---|---|---|
| **Category** | **Definition Explanation** | **Points** | |
| **Judicial Outcomes and Official Documents** | a.  Subject has been convicted of violating Title 18, United States Code, Section 521 or any other federal or state law criminalizing or imposing civil penalties for activity related to TDA | 10 | |
| | b.  Court records (e.g., indictments, criminal complaints, sentencing memorandums) identifying the subject as a member of TDA, describing specific activity of TDA | 5 | |
| **Self-Admission** | a.  Subject self-identifies as a member or associate of TDA verbally or in writing to law enforcement officer, even if that self identification to a law enforcement officer is unwitting, e.g., through lawful interception of communications. | 10 | |
| **Criminal Conduct and Information** | a.  Subject participates in criminal activity (e.g., narcotics trafficking, human smuggling, etc.) with other members of TDA, including preparatory meetings and significant incidents directly attributed to TDA | 6 | |
| | b.  Law enforcement or intelligence reporting identifying subject as a member of TDA, to include Bureau of Prisons validations and reliable foreign partner information. | 4 | |
| | c.  Credible testimonies/statements from victims, community members, or informants that affirm the subject's membership in or allegiance to TDA. | 3 | |
| | d.  Detailed open-source media (e.g., newspapers, investigative journalism reports) that describe arrest, prosecution, or operations of a subject as a member of TDA | 2 | |
| | e.  Subject conducts and/or facilitates business with TDA (e.g., money laundering, mule, service provider) | 2 | |
| **Documents and Communications** | a.  Written or electronic communications (e.g., e-mails, letters, texts, secure messages) that discuss business with, and/or are communicating with, known members of TDA; cell phone data contains multiple group, organizational, or organization leaders' or members' information. | 6 | |
| | b.  Subject conducts phone calls about the business of TDA with known members of TDA | 10 | |
| | c.  Financial transactions indicating criminal activity for TDA or with known members of TDA | 3 | |
| | d.  Subject possesses written rules, constitution, membership certificates, bylaws, etc., indicating, together with other conduct, membership of or allegiance to TDA | 6 | |
| **Symbolism** | a.  Subject has tattoos denoting membership/loyalty to TDA | 4 | |
| | b.  Social media posts by the subject displaying symbols of TDA or depicting activity with other known members of TDA | 2 | |
| | c.  Subject observed tagging or graffitiing to mark the territory of, and the subject's allegiance to, TDA | 2 | |
| | d.  Subject observed displaying hand signs used by TDA | 2 | |
| | e.  Subject displays insignia, logos, notations, drawings, or dress known to indicate allegiance to TDA, as observed by law enforcement in person or via virtual mediums | 4 | |

**JA106**

| | | | | |
|---|---|---|---|---|
| **Association** | a. | Surveillance documentation that a subject is frequently observed closely associating with known leaders and members of TDA | 2 | |
| | b. | Subject part of group photos with two or more known members of TDA | 2 | |
| | c. | Subject presently resides with known members of TDA | 2 | |
| | | | **Total Points** | |
| | | | | |

## VALIDATION DETERMINATION

*Note: If any of the four requirements are <u>not</u> satisfied, do not complete this validation determination.*

Based on the validation guide and instructions above, including Comments 1 and 2, I find

that the person named above, _____ :

1. Is fourteen years or older;
2. Is not a citizen or lawful permanent resident of the United States;
3. Is a citizen of Venezuela; and
4. Is a member of Tren de Aragua.

Accordingly, the above-named person is validated as an Alien Enemy.

| | | |
|---|---|---|
| _____ | _____ | _____ |
| *Name of Agent/officer completing the form* | *Signature of agent/officer completing the form* | *Date* |

| | | |
|---|---|---|
| _____ | _____ | _____ |
| *Name of Supervisor* | *Signature of Supervisor* | *Date* |

**JA107**

## VERIFICATION OF REMOVAL

A-number_____ Date: _____

Alien Enemy's name: _____

| Departure Date | Port of Departure | Manner of Departure |
|---|---|---|
| Signature of Verifying Officer | | Title of Officer |

<br>

**Photograph of alien removed**                     **Right index fingerprint of alien removed**

_____            _____
(Signature of alien whose fingerprint and       (Signature of official taking fingerprint)
Photograph appear above)

**JA108**

## NOTICE AND WARRANT OF APPREHENSION AND REMOVAL
## UNDER THE ALIEN ENEMIES ACT

A-File No._____    Date: _____

In the Matter of: _____

Date of Birth: _____                Sex:    Male        Female

**Warrant of Apprehension and Removal**

To any authorized law enforcement officer:

The President has found that Tren de Aragua is perpetrating, attempting, or threatening an invasion or predatory incursion against the territory of the United States, and that Tren de Aragua members are thus Alien Enemies removable under Title 50, United States Code, Section 21.

_____has been determined to be: (1) at least fourteen years of
          (Full Name of Alien Enemy)
age; (2) not a citizen or lawful permanent resident of the United States; (3) a citizen of Venezuela; and (4) a member of Tren de Aragua. Accordingly, he or she has been determined to be an Alien Enemy and, under Title 50, United States Code, Section 21, he or she shall immediately be apprehended, restrained, and removed from the United States pursuant to this Warrant of Apprehension and Removal.

     **Signature of Supervisory Officer:** _____

     **Title of Officer:** _____        **Date:** _____

**Notice to Alien Enemy**

I am a law enforcement officer authorized to apprehend, restrain, and remove Alien Enemies. You have been determined to be at least fourteen years of age; not a citizen or lawful permanent resident of the United States; a citizen of Venezuela; and a member of Tren de Aragua. Accordingly, you have been determined to be an Alien Enemy subject to apprehension, restraint, and removal from the United States. You are not entitled to a hearing, appeal, or judicial review of this notice and warrant of apprehension and removal. Until you are removed from the United States, you will remain detained under Title 40, Unite States Code, Section 21. Any statements you make now or while you are in custody may be used against you in any administrative or criminal proceeding. This is not a removal under the Immigration and Nationality Act.

After being removed from the United States, you must request and obtain permission from the Secretary of Homeland Security to enter or attempt to enter the United States at any time. Should you enter or attempt to enter the United States without receiving such permission, you will be subject to immediate removal and may be subject to criminal prosecution and imprisonment.

Signature of alien: _____    Date:_____

| CERTIFICATE OF SERVICE |
| --- |
|  |

**JA109**

# EXHIBIT 2

JA110

## NOTICE AND WARRANT OF APPREHENSION AND REMOVAL
### UNDER THE ALIEN ENEMIES ACT

A-File No:_____ Date:_____

In the Matter of: _____

Date of Birth: _____        Sex:      Male        Female

**Warrant of Apprehension and Removal**

**To any authorized law enforcement officer:**

The President has found that Tren de Aragua is perpetrating, attempting, or threatening an invasion or predatory incursion against the territory of the United States, and that Tren de Aragua members are thus Alien Enemies removable under Title 50, United States Code, Section 21.

_____ has been determined to be: (1) at least fourteen years of
      (Full Name of Alien Enemy)
age; (2) not a citizen or lawful permanent resident of the United States; (3) a citizen of Venezuela; and (4) a member of Tren de Aragua. Accordingly, he or she has been determined to be an Alien Enemy and, under Title 50, United States Code, Section 21, he or she shall be apprehended, restrained, and removed from the United States pursuant to this Warrant of Apprehension and Removal.

**Signature of Supervisory Officer:** _____

**Title of Officer:** _____    **Date:** _____

**Notice to Alien Enemy**

I am a law enforcement officer authorized to apprehend, restrain, and remove Alien Enemies. You have been determined to be at least fourteen years of age; not a citizen or lawful permanent resident of the United States; a citizen of Venezuela; and a member of Tren de Aragua. Accordingly, under the Alien Enemies Act, you have been determined to be an Alien Enemy subject to apprehension, restraint, and removal from the United States. Until you are removed from the United States, you will be detained under Title 50, United States Code, Section 21. Any statement you make now or while you are in custody may be used against you in any administrative or criminal proceeding. This is not a removal under the Immigration and Nationality Act. If you desire to make a phone call, you will be permitted to do so.

After being removed from the United States, you must request and obtain permission from the Secretary of Homeland Security to enter or attempt to enter the United States at any time. Should you enter or attempt to enter the United States without receiving such permission, you will be subject to immediate removal and may be subject to criminal prosecution and imprisonment.

Signature of alien: _____    Date: _____

---

### CERTIFICATE OF SERVICE

I personally served a copy of this Notice and Warrant upon the above-named person on ˙_____
and ensured it was read to this person in a language he or she understands.                (Date)

_____        _____
Name of officer/agent                          Signature of officer/agent

---

Form AEA-21B

**JA111**

# EXHIBIT 3

JA112

UNCLASSIFIED//FOR OFFICIAL USE ONLY/LAW ENFORCEMENT SENSITIVE

**U.S. DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**

**U.S. BORDER PATROL**                    **EL PASO SECTOR**

THIS INFORMATION WAS PROVIDED BY CBP AND MAY CONTAIN INFORMATION FROM ANOTHER AGENCY. ANY DISCLOSURE OF THIS INFORMATION OUTSIDE OF CBP MAY CONSTITUTE A VIOLATION OF THE THIRD AGENCY RULE. RELEASING ANY INFORMATION TO ANY ENTITY OUTSIDE OF CBP IS STRICTLY PROHIBITED.

**Situational Awareness**                                        **DATE: 10/02/2023**
**TDA Gang Recognition Indicators**

(U//FOUO/LES) The El Paso Sector (EPT) Intelligence Unit (SIU) HUMINT-Gang Unit continues to see migrants from Venezuela with confirmed and suspected links to the Tren de Aragua (TDA) gang.

(U//FOUO/LES) Intelligence collections have identified the below tattoos on subjects; indicative of possibly being a member or associate of the TDA.

**AK-47**

  

**Gas Mask/Real Hasta la Muerte**

 

UNCLASSIFIED//FOR OFFICIAL USE ONLY/LAW ENFORCEMENT SENSITIVE

JA113

UNCLASSIFIED//FOR OFFICIAL USE ONLY/LAW ENFORCEMENT SENSITIVE

**Stars on the Shoulders:**



**Trains:**



**Ismalito:**



(U//FOUO/LES) EPT HUMINT-Gang Unit collections determined that the Chicago Bulls attire, clocks, and rose tattoos are typically related to the Venezuelan culture and not a definite indictor of being a member or associate of the TDA.

(U//FOUO/LES) Agents are reminded to remain cognizant of their surroundings at all times and maintain a high level of situational awareness when dealing with subjects with TDA indicators.

This product was prepared by the El Paso Sector Intelligence and Operations Center.
Comments and/or questions may be directed to the El Paso Sector Intelligence HUMINT-GANG Unit EPT_SIU_HUMINT@cbp.dhs.gov.

UNCLASSIFIED//FOR OFFICIAL USE ONLY/LAW ENFORCEMENT SENSITIVE
**JA114**

# EXHIBIT 4

JA115



# Homeland Security Investigations

HSI-CHI-24-455

## WHAT IS TREN DE ARAGUA?

Tren de Aragua (TdA) is a transnational criminal organization that began as a labor union working in Venezuelan rail yards in the mid-to-late 2000s. TdA rapidly evolved into a gang that specializes in human trafficking, extreme violence, and extortion in the Aragua State of Venezuela. The foundation of the gang and its leadership is based in Venezuelan prisons but has expanded into Mexico, Brazil, Ecuador, Peru, Chile, Costa Rica, Panama, Colombia, Guatemala, and Bolivia. The gang is swiftly growing and ramping up recruiting measures to strengthen its presence in the United States. TdA is headed by Héctor Rusthenford Guerrero Flores aka "Nino Guerrero"—his current whereabouts are unknown.

## EXPANSION AND CRIMINAL INVOLVEMENT

TdA has continuously made efforts to expand its criminal enterprise into other countries. There are three major steps that are part of its expansion process:

1.  **Exploration Phase:** TdA members arrive to a new area via border crossings, migration routes, hotspots, or urban areas with notable Venezuelan populations. TdA members exploit migrants and maintain a low profile while conducting illicit activities.

2.  **Penetration Phase:** TdA members enter local criminal economies with low barriers to entry.

3.  **Consolidation Phase:** TdA establishes roots in criminal economies, sets up a financial base, and builds criminal structures needed to maintain their illicit activities. This phase usually involves money laundering.

As depicted by a July 2023 InSight crime report (see map to the right), TdA has been involved in a variety of crimes while operating in South America.

More recently, the organization has shifted its focus to establish a presence in the United States. Open source information indicates that TdA members are present in California, Illinois, Florida, New York, Nevada, and Texas and that suspected TdA members may be involved in a variety of crimes to include kidnapping, human trafficking, sex trafficking, organized retail crime, robberies, and document fraud.



Tren de Aragua's Regional Presence and Criminal Economies (2023)



**ASSESSMENT REPORT OF ANALYSIS**

JA116



# Homeland Security Investigations

HSI-CHI-24-455

## DETECTING AND IDENTIFYING

Open source material has depicted TdA members with a combination of the below tattoos:

**ASSESSMENT REPORT OF ANALYSIS**

**"Jump Man" Symbol**



**AK-47s**



**Trains**



**Crowns**



**"Hijos de Dios" Quote**



"HJ" or "Hijos de Dios" translation: "Sons of God"

**"Real Hasta La Muerte" Quote**



"Real Hasta La Muerte" translation: "Till Death"

**Stars**



**Clocks**



**Skull with Gas Mask**



## ADDITIONAL IDENTIFIERS

Homeland Security Investigations, Chicago Field Office, has obtained additional information to help identify TdA members:

- Typically males in the age range of 18-25 years old;

- Dressed in high-end urban street wear;

- Favor the Chicago Bulls[USPER] basketball jersey, specifically Michael Jordan[USPER] jerseys with the number "23", and Jordan "Jump Man" footwear/sneakers; and / or

- Often wear sports attire from U.S. professional sports teams with Venezuelan nationals on them.

*This product contains U.S. person information that has been deemed necessary for the intended recipient to understand, assess, or act on the information provided. It has been highlighted in this document with the label [USPER] and should be handled in accordance with the recipient's intelligence oversight/information handling procedures. U.S. person information should be protected in accordance with constitutional requirements and all federal and state privacy and civil liberties laws.*

**This is a Homeland Security Investigations (HSI), Chicago Field Division document. For any questions related to this report or to provide additional information, please contact HSI Chicago at (630) 458-7400 or** HSIChicagoIntake@hsi.dhs.gov.

**JA117**

# EXHIBIT 5

JA118

US prepares to send about 300 alleged gang members to El Salvador | AP News

**LIVE:**
Trump administration

**LIVE:**
Karen Read trial

Stock market today

Student loan collections

Earth Day

**LIVE:**
Trump administration

**LIVE:**
Karen Read trial

Stock market today

Student loan collections

Earth Day

POLITICS

# US prepares to deport about 300 alleged gang members to El Salvador



U.S. Secretary of State Marco Rubio, left, meets with President Nayib Bukele at his residence at Lake Coatepeque, El Salvador, Feb. 3, 2025. (AP Photo/Mark Schiefelbein, File)

Read More

BY MATTHEW LEE AND REGINA GARCIA CANO

Updated 8:39 PM PDT, March 15, 2025

WASHINGTON (AP) — President Donald Trump's administration will pay El Salvador $6 million to imprison for one year about 300 alleged members of the Venezuelan Tren de Aragua gang, in one of the first instances of the Central American country taking migrants from the United States.

**JA119**

The agreement follows discussions between El Salvador's President, Nayib Bukele, and Secretary of State Marco Rubio about housing migrants in El Salvador's notorious prison. Bukele's government has arrested more than 84,000 people, sometimes without due process, since 2022 as part of his crackdown on gang violence in the small country.

It came as the American Civil Liberties Union and Democracy Forward preemptively sued Trump late Friday in federal court in Washington, D.C., saying five Venezuelan men being held at an immigration detention center in Raymondville, Texas, were at "imminent risk of removal" under the Alien Enemies Act.

The agreement may have been put on hold, however.

U.S. District Judge James E. Boasberg on Saturday blocked anyone from being deported under Trump's proclamation for two weeks and scheduled a Friday hearing to consider arguments. ACLU attorney Lee Gelernt said two flights Saturday may have carried people deported under Trump's proclamation, one to El Salvador and one possibly to Honduras. Boasberg said any such flights would have to be returned midair to the United States.

---

**RELATED STORIES**

JA120



**Trump administration deports 17 more 'violent criminals' to El Salvador**

JA121



**Venezuela-hired lawyers file petition in El Salvador aimed at freeing Venezuelans deported by US**

JA122



## The frenzied 24 hours when Venezuelan migrants in the US were shipped to an El Salvador prison

Memos detailing the transfer did not disclose how the Trump administration identified the roughly 300 people as members of Tren de Aragua, a gang Trump repeatedly highlighted in the campaign and declared to be a terrorist organization.

"The Republic of El Salvador confirms it will house these individuals for one (1) year, pending the United States' decision on their long term disposition," wrote El Salvador's ministry of foreign affairs in a memo obtained by The Associated Press.

The Central American nation and Trump administration last month struck a deal to house migrants detained in the United States. The Trump administration contended that El Salvador could even house American citizens, though the U.S. cannot deport citizens to another country.

Rubio and Bukele discussed the specifics of the new transfer, which include a cost of about $20,000 to house each prisoner for the year. A State Department document also suggests that it may set aside $15 million to send to El Salvador to house additional members of the gang.

JA123

The Salvadoran memo also confirmed the country would take two men it said were members of the MS-13 gang, an organization that was initially comprised of Salvadoran migrants to the U.S. and had gained an increasing foothold in El Salvador prior to Bukele's crackdown.

One man, Cesar Eliseo Sorto Amaya, was convicted of double homicide in El Salvador before he was caught illegally entering the United States, according to the U.S. Justice Department. The other was charged under President Joe Biden's administration with being a high-ranking leader of the MS-13 gang.

Bukele's government did not immediately respond to a request for comment from The Associated Press.

The Tren de Aragua gang originated in a prison in the South American country and accompanied an exodus of millions of Venezuelans, the overwhelming majority of whom were seeking better living conditions after their nation's economy came undone last decade.

Trump and his allies have turned the gang into the face of the alleged threat posed by immigrants living in the U.S. illegally and formally designated it a "foreign terrorist organization" last month.

Authorities in several countries have reported arrests of Tren de Aragua members, even as Venezuela's government claims to have eliminated the criminal organization.

The government of President Nicolás Maduro has not taken back immigrants deported from the U.S., except on a few occasions. Over the past few weeks, about 350 people were deported to Venezuela, including some 180 who spent up to 16 days at the U.S. naval base in Guantanamo Bay, Cuba.

Trump's government has alleged Venezuelans sent to the naval base are Tren de Aragua members, but it has offered little evidence to back that up.

On Saturday, the government's centralized press office in Caracas did not immediately respond to a request for comment on the agreement between the U.S. and Salvadoran governments.

——

Garcia Cano reported from Caracas, Venezuela. Associated Press writer Nicholas Riccardi in Denver contributed to this report.

JA124

## MOST READ



| 1 | **Pope Francis, first Latin American pontiff, ministered with a charming, humble style** |

| 2 | **Live updates: Pope Francis died after cerebral stroke, Vatican says** |

| 3 | **Vance meets Pope Francis on Easter Sunday after tangle over migration, gets chocolate eggs for kids** |

| 4 | **Student loans in default to be referred to debt collection, Education Department says** |

| 5 | **Which cardinals are seen as contenders to be the next pope?** |

JA125

# EXHIBIT 6

JA126

FORBES > BUSINESS

#### BREAKING

# Sen. Van Hollen Says Trump Administration Made $15 Million Deal With El Salvador To Imprison Deportees Including Abrego Garcia

**Antonio Pequeño IV** Forbes Staff

*Pequeño is a breaking news reporter who covers tech and more.*

Follow

   1

Apr 18, 2025, 06:30pm EDT

**TOPLINE** Sen. Chris Van Hollen, D-Md., said in a press conference Friday the Trump administration has promised to pay El Salvador $15 million to detain deportees including Kilmar Abrego Garcia, the Maryland resident erroneously deported last month by the Trump administration.

JA127

4/22/25, 1:14 PM
Sen. Van Hollen Says Trump Administration Paying El Salvador $15 Million To Detain Abregg Garcia And Other Deportees

Case 1:25-cv-00766-JEB    Document 102-14    Filed 04/25/25    Page 29 of 104



Van Hollen spoke to reporters Friday. (AP Photo/Jose Luis Magana)

ASSOCIATED PRESS

### KEY FACTS

- Van Hollen, who took a high-profile trip to El Salvador Thursday to see Abrego Garcia in person, said the Trump administration has paid El Salvador $4 million of the $15 million as of Friday, adding he was "aware that there was some document that memorialized the payments."

- The senator emphasized that he has not directly seen the agreement between the White House and El Salvador, adding he was not sure what the details of the agreement were.

- The Associated Press reported last month, around the same time as multiple deportation flights were made from the U.S. to El Salvador, that the government would pay El Salvador $6 million to imprison for a year around 300 alleged members of the Tren de Aragua gang, noting a State Department document that suggested the Trump administration could put aside a total of $15 million to house more deportees.

**JA128**

4/22/25, 1:14 PM
Sen. Van Hollen Says Trump Administration Paying El Salvador $15 Million To Detain Abregg Garcia And Other Deportees

Case 1:25-cv-00766-JEB    Document 102-14    Filed 04/25/25    Page 39 of 104

- Van Hollen also gave updates on Abrego Garcia after meeting with him Thursday, revealing he has been moved from CECOT maximum security prison to a new prison with better conditions, though he said Abrego Garcia still has no means of communicating with the outside world.

- The senator criticized the Trump administration's resistance to court orders asking it to facilitate Abrego Garcia's return, saying its actions threaten constitutional rights at large and are "an issue for every American."

*Get Forbes Breaking News Text Alerts: We're launching text message alerts so you'll always know the biggest stories shaping the day's headlines. Text "Alerts" to (201) 335-0739 or sign up here.*

### TANGENT

Van Hollen also accused El Salvador's government of trying to stage a photo during his meeting with Abrego Garcia. El Salvador President Nayib Bukele claimed on social media Thursday the two men were drinking margaritas during the meeting, an assertion Van Hollen denied. The senator said El Salvador government members put two drinks down during the meeting that he and Abrego did not drink from, claiming photos of the meeting show the salt rims of the drinks were untouched. Van Hollen also noted the drink put in front of Abrego Garcia came with less liquid than the other.

### KEY BACKGROUND

White House Press Secretary Karoline Leavitt has said Abrego Garcia was deported over a "clerical error," confirming a sworn statement from Immigration and Customs Enforcement Field Office Director Robert Cerna, who said the deportation was "an error" and "an oversight." Abrego was living in the U.S. under withholding of removal, a deportation protection allowing him to temporarily live and work in the country.District Court Judge Paula Xinis ordered the government to facilitate Abrego Garcia's

**JA129**

return earlier this month, a ruling that was supported by the Supreme Court. Justice Sonia Sotomayor said Xinis' order "properly requires" the Trump administration to facilitate Abrego Garcia's release from custody "and to ensure that his case is handled as it would have been had he not been improperly sent to El Salvador." The Trump administration has argued it does not have the authority to bring Abrego Garcia back from the "domestic custody of a foreign sovereign nation." President Donald Trump and other top government officials have said Abrego Garcia will not return to the U.S., repeatedly alleging he is an MS-13 gang member. Xinis has said the Trump administration relied on a "vague, uncorroborated allegation" to accuse Abrego Garcia of gang membership, while the 4th U.S. Circuit Court of Appeals said the government should present the allegation in a court of law if it is confident in it.

## FURTHER READING

Sen. Van Hollen Meets Kilmar Abrego Garcia In El Salvador (Forbes)

Trump Administration Says It Will Simply Re-Deport Kilmar Abrego Garcia If He Is Brought Back To U.S. (Forbes)

*Follow me on Twitter or LinkedIn. Send me a secure tip.*

 **Antonio Pequeño IV**    Follow

Antonio Pequeño IV is a reporter who covers breaking news, with a focus on technology and online culture. He joined Forbes in 2023 and works in Los Angeles. He's... **Read More**

Editorial Standards                                      Forbes Accolades

One Community. Many Voices. Create a free account to share your thoughts. Read our community guidelines here.

🔔  Log in

What do you think?

Sort by **Best** ˅

**JA130**

4/22/25, 1:14 PM
Sen. Van Hollen Says Trump Administration Paying El Salvador $15 Million To Detain Abrego Garcia And Other Deportees

Case 1:25-cv-00766-JEB    Document 102-14    Filed 04/25/25    Page 32 of 104



**MyForbes User**

19 April, 2025

Thank you Antonio for taking up for Kilmar!
I don't care if he beat his wife a few years
ago, the only thing that matters is teaching
President Trump (and the American people)
a lesson. Please keep the anger coming!
Also, Forbes should give you a raise. Great
job!

Reply · 👍 · Share



Terms | Privacy | Feedback

## More From Forbes



### 10 Million Student Loan Borrowers...

By **Adam S. Minsky**,
Contributor



### Meet The Largest Snake Ever ...

By **Scott Travers**,
Contributor



### White House Says It Will Seize Wage...

By **Alison Durkee**,
Forbes Staff



### Trump Issues Huge Fed Challenge—...

By **Billy Bambrough**,
Contributor



## Joe Rogan Won't Work UFC 315: 'I'd Rather Go To Russia'

By Trent Reinsmith, Contributor



## The World's Best Single Malt Scotch Whisky, According To The London...

By Joseph V Micallef, Contributor



## Northern Lights Forecast: Aurora Borealis Expected In These 10 States...

By Ty Roush, Forbes Staff



## The World's Best Bourbon, According To The London Spirits Competition

By Joseph V Micallef, Contributor



### Is Joel Really Dead In 'The Last Of Us'?...

By Monica Mercuri, Contributor



### The U.S. Trade Deficit Math In Fou...

By Trefis Team, Contributor





JA132

### Hegseth Doesn't Deny Second...

By **Sara Dorn**, Forbes Staff

### Immigration Service Targets H-1...

By **Stuart Anderson**, Contributor



### What Net Worth Puts You In The Top 1%, 5%, And 10% Of Americans?

By **Jack Kelly**, Contributor



### The American Whiskey Industry Is Getting A Much-Needed Boost

By **Hudson Lindenberger**, Contributor



### Tesla Stock Dives 6% Ahead Of Possible 'Code Red' Earnings For Elon Musk's...

By **Derek Saul**, Forbes Staff



### Why Is Peter Krause Leaving '9-1-1'? The Reason Behind His Shocking Exit As...

By **Monica Mercuri**, Contributor

**JA133**

# EXHIBIT 7

JA134





Print    Close

# US paid El Salvador to take Venezuelan Tren de Aragua members: 'pennies on the dollar,' White House says

By Louis Casiano

Published March 17, 2025

Fox News

The United States paid El Salvador $6 million to take in Venezuelan illegal immigrants slated to be deported to their home countries, the White House said Monday.

The Trump administration sent at least 238 members of the Venezuelan Tren de Aragua gang living illegally in the U.S. to El Salvador around the same time a federal judge moved to block deportations of illegal immigrants under a wartime law involved by President Donald Trump.

On Monday, White House Press Secretary Karoline Leavitt detailed the cost to U.S. taxpayers.

**EL SALVADOR PRESIDENT RIPS FBI TRUMP RAID, QUESTIONS WHAT US GOV'T WOULD SAY IF HIS POLICE TARGETED CANDIDATES**



In this photo provided by El Salvador's presidential press office, prison guards transfer deportees from the U.S., alleged to be Venezuelan gang members, to the Terrorism Confinement Center in Tecoluca, El Salvador on Sunday.  (El Salvador presidential press office via AP)

"It was approximately $6 million, to El Salvador, for the detention of these foreign terrorists," she told reporters. "And I would point out that is pennies on the dollar in comparison to the cost of life, and the cost it would impose on the American taxpayer to house these terrorists in maximum security prisons here in the United States of America."

In a social media post over the weekend, El Salvadorian President Nayib Bukele said the U.S. "will pay a very low fee" for his country to house the migrants, "but a high one for us."

**RUBIO HEADS TO PANAMA, LATIN AMERICA TO PURSUE TRUMP'S 'GOLDEN AGE' AGENDA**



President of El Salvador Nayib Bukele casts his vote in a ballot box during the Municipal and Parliament (PARLACEN) elections on March 3, 2024 in San Salvador, El Salvador. (Photo by APHOTOGRAFIA/Getty Images)

"Over time, these actions, combined with the production already being generated by more than 40,000 inmates engaged in various workshops and labor under the Zero Idleness program, will help make our prison system self-sustainable. As of today, it costs $200

**JA135**

million per year," Bukele wrote on X.

Secretary of State Marco Rubio celebrated the Salvadoran president as "the strongest security leader in our region" and "a great friend of the U.S." for accepting criminal illegal aliens.

The deportations of the gang members came as U.S. District Judge James Boasberg ordered the Trump administration to halt its deportations of illegal immigrants under the Alien Enemies Act of 1798 that Trump invoked on Friday to target Tren de Aragua members in the U.S.



A mega-prison known as Detention Center Against Terrorism (CECOT) stands in Tecoluca, El Salvador, March 5, 2023.  (AP Photo/Salvador Melendez)

**CLICK HERE TO GET THE FOX NEWS APP**

Boasberg ordered flights that were "actively departing" to return.

The wartime powers act allows the deportation of natives and citizens of an enemy nation without a hearing. It has been invoked three times before, including, during the War of 1812, World War I and World War II.

*Fox News Digital's Emma Colton contributed to this report.*

*Louis Casiano is a reporter for Fox News Digital. Story tips can be sent to louis.casiano@fox.com.*

Print     Close

**URL**

https://www.foxnews.com/politics/us-paid-el-salvador-take-venezuelan-tren-de-aragua-members-pennies-dollar-white-house-says

Home | Video | Politics | U.S. | Opinion | Entertainment | Tech | Science | Health | Travel | Lifestyle | World | Sports | Weather

Privacy | Terms

This material may not be published, broadcast, rewritten, or redistributed. © FOX News Network, LLC. All rights reserved. Quotes displayed in real-time or delayed by at least 15 minutes. Market data provided by Factset. Powered and implemented by FactSet Digital Solutions. Legal Statement. Mutual Fund and ETF data provided by Refinitiv Lipper.Do Not Sell my Personal Information - New Terms of Use - FAQ

JA136

# EXHIBIT 8

4/22/25, 2:42 PM    Secretary Marco Rubio on X: "We have sent 2 dangerous top MS-13 leaders plus 21 of its most wanted back to face justice in El S…

Case 1:25-cv-00766-JEB   Document 102-14   Filed 04/25/25   Page 40 of 104

X

Home

Explore

Notifications

Messages

Grok

Bookmarks

Communities

Premium

Verified Orgs

Profile

More

**Post**

← **Post**

**Secretary Marco Rubio** ✓ ☐                              ⊘  …
@SecRubio

We have sent 2 dangerous top MS-13 leaders plus 21 of its most wanted back to face justice in El Salvador. Also, as promised by @POTUS, we sent over 250 alien enemy members of Tren de Aragua which El Salvador has agreed to hold in their very good jails at a fair price that will also save our taxpayer dollars. President @nayibbukele is not only the strongest security leader in our region, he's also a great friend of the U.S. Thank you!

4:59 AM · Mar 16, 2025 · **5.1M** Views

💬 3.6K          ⟲ 16K          ♡ 98K          🔖 1.3K                    ⬆

**Post your reply**                                              Reply

**Eric Daugherty** ✓  @EricLDaugh · Mar 16                    ⊘  …
Wow. El Salvador is proof that there is no excuse for these nations to refuse to take their own people back. Have competent policies and you should be able to deal with your own criminals.

💬 44          ⟲ 167          ♡ 4.1K          📊 116K          🔖  ⬆

**Trump World** ✓  @Louaye1980 · Mar 16                       ⊘  …
Send them to the homes of the judges that want them here

💬 37          ⟲ 34          ♡ 2.4K          📊 48K          🔖  ⬆

**SovereignStack** ✓  @sovereignstack_ · Mar 16              ⊘  …
"This is exactly how leadership should work! Protecting American citizens by removing violent criminals and ensuring they face justice where they belong. Hats off to President Bukele for stepping up, and to @POTUS for keeping his promise! And El Salvador proves that there's no
Show more

▶

💬 29          ⟲ 247          ♡ 1.3K          📊 33K          🔖  ⬆

**Gunther Eagleman™** ✓  @GuntherEagleman · Mar 16          ⊘  …
Thank you Sec. Rubio

**Noelle Smith**                …
@NoelleSmit3575

Post

🔍 Search

**Relevant peo**

**Secretary M**
@SecRubio
72nd Secret
the leadersh

**What's happe**

**From**
**Pomp**
LIVE

Politics · Trending
**Susan Rice**
16K posts

Politics · Trending
**#PahalgamTerrori**
Trending with  Kashmi
235K posts

Politics · Trending
**Gulf of Mexico**
8,487 posts

Sports · Trending
**Shay Shay**
6,781 posts

Show more

Terms of Service  |  Priva
Accessibility  |  Ads info

⊘

**JA138**

# EXHIBIT 9

JA139

| | Search | **𝕏** |
|---|---|---|

🏠 **Home**

🔍 **Explore**

🔔 **Notifications**

✉️ **Messages**

✺ **Grok**

🔖 **Bookmarks**

👥 **Communities**

𝕏 **Premium**

⚡ **Verified Orgs**

👤 **Profile**

⋯ **More**

**Post**

**Relevant peo**

## Post

**Nayib Bukele** ✔️ ☐
@nayibbukele

Today, the first 238 members of the Venezuelan criminal organization, Tren de Aragua, arrived in our country. They were immediately transferred to CECOT, the Terrorism Confinement Center, for a period of one year (renewable).

The United States will pay a very low fee for them, but a high one for us.

Over time, these actions, combined with the production already being generated by more than 40,000 inmates engaged in various workshops and labor under the Zero Idleness program, will help make our prison system self-sustainable. As of today, it costs $200 million per year.

On this occasion, the U.S. has also sent us 23 MS-13 members wanted by Salvadoran justice, including two ringleaders. One of them is a member of the criminal organization's highest structure.

This will help us finalize intelligence gathering and go after the last remnants of MS-13, including its former and new members, money, weapons, drugs, hideouts, collaborators, and sponsors.

As always, we continue advancing in the fight against organized crime. But this time, we are also helping our allies, making our prison system self-sustainable, and obtaining vital intelligence to make our country an even safer place. All in a single action.

May God bless El Salvador, and may God bless the United States.

🇸🇻 🤝 🇺🇸

▶️

5:13 AM · Mar 16, 2025 · **23.6M** Views

**Relevant peo**

**Nayib Buke**
@nayibbuke
Philosopher

**What's happe**

**From
Pomp**
LIVE

Politics · Trending
**Gulf of Mexico**
8,527 posts

Sports · Trending
**Shay Shay**
6,781 posts

Sports · Trending
**Yamal**
36.8K posts

Politics · Trending
**Susan Rice**
16K posts

**Show more**

Terms of Service | Priva
Accessibility | Ads info

**Noelle Smith**
@NoelleSmit3575   ⋯

JA140

# EXHIBIT 10

JA141





U.S. Department of Homeland Security

# How It's Going

JA142

How It's Going | Homeland Security



Do not come.

**JA143**

| 0:10 / 0:44 | Speed: 1x | *Playing* |

Embed Code (#embed-code)    Download Links (#download-links)    Video Usage Guidelines (/photo-video-audio-use-guidelines)

How it's going, comparison of administrations (DHS Video by DHS/Released)

## In Collections:

- Making America Safe Again (https://www.dhs.gov/medialibrary/collections/58863)
- First 100 Days (https://www.dhs.gov/medialibrary/collections/60087)

## Related Media





(/medialibrary/assets/video/59439)



(/medialibrary/assets/video/59166)

(/medialibrary/assets/video/59704)



(/medialibrary/assets/video/59155)



(/medialibrary/assets/video/59127)





(/medialibrary/assets/video/59114)



(/medialibrary/assets/video/59113)

**JA144**



(/medialibrary/assets/video/59112)

(/medialibrary/assets/video/59111)



(/medialibrary/assets/video/59110)



(/medialibrary/assets/video/59109)



(/medialibrary/assets/video/59088)



(/medialibrary/assets/video/59063)



(/medialibrary/assets/video/59062)



(/medialibrary/assets/video/59061)

**JA145**



(/medialibrary/assets/video/59060)



(/medialibrary/assets/video/59054)



(/medialibrary/assets/video/59025)



(/medialibrary/assets/video/59022)



(/medialibrary/assets/video/59004)



(/medialibrary/assets/video/59002)

1(/ajax/assets/related_media?asset=59108&per_page=21&page=0)   2(/ajax/assets/related_media?asset=59108&per_page=21&page=1)

**JA146**

JA147

# EXHIBIT 11

Case 1:25-cv-00766-JEB   Document 102-14   Filed 04/25/25   Page 50 of 104



JA148

# EXHIBIT 12

**JA149**

Search

← **Post**

Home

Explore

Notifications

Messages

Grok

Bookmarks

Communities

Premium

Verified Orgs

Profile

More

Post

**Secretary Marco Rubio** ✓ ☐
@SecRubio

The Trump Administration is committed to making America SAFER.

Tren de Aragua is a Foreign Terrorist Organization and one of the most dangerous gangs operating inside the United States. We're thankful for @nayibbukele's support and collaboration.



0:36

12:31 PM · Mar 19, 2025 · **190.3K** Views

💬 719          🔁 2.7K          ❤️ 12K          🔖 163          ↥

**Post your reply**                                    Reply

**DOGEai** ✓  @dogeai_gov · Mar 19
🤖 Automated
Designating Tren de Aragua as a Foreign Terrorist Organization is a critical step—weak borders invite chaos, and this gang's presence proves the cost of failed policies. Collaboration with El Salvador highlights what happens when leaders prioritize security over political
Show more

💬 6          🔁 3          ❤️ 24          📊 823          🔖 ↥

**Olga Lautman** 🇺🇸🇺🇦 ✓  @OlgaNYC1211 · Mar 19
Go to hell! Reprehensible you are covering up Russia's genocide and the kidnapping of over 20,000 Ukrainian children

**Relevant peo**

**Secretary M**
@SecRubio
72nd Secret
the leadersh

**What's happe**

**Senat**
LIVE

Politics · Trending
**Susan Rice**
23.9K posts

Sports · Trending
**#FearTheDeer** 🦌
24K posts

Politics · Trending
**#PahalgamTerrori**
Trending with Kashmi
259K posts

Entertainment · Trend
**Tim Pool**
43K posts

**Show more**

Terms of Service  |  Priva
Accessibility  |  Ads info

**Noelle Smith**
@NoelleSmit3575  ···

**JA150**



Case 1:25-cv-00766-JEB    Document 102-14    Filed 04/25/25    Page 53 of 104

| | X | |
|---|---|---|

🔍 |

⌂  **Home**

🔍  **Explore**

🔔  **Notifications**

✉️  **Messages**

⬦  **Grok**

🔖  **Bookmarks**

👥  **Communities**

✖  **Premium**

⚡  **Verified Orgs**

👤  **Profile**

⋯  **More**

**Post**

**Noelle Smith**
@NoelleSmit3575    ⋯

💬 2    🔁 2    ♡ 18    📊 246    🔖  📤

**Cash Loren** ✓  @CashLorenShow · Mar 19    ⬦  ⋯
Thell those activist judges to go pound sand
💬    🔁 1    ♡ 18    📊 319    🔖  📤

**The Scoop** ✓  @TheScoopUS · Mar 19    ⬦  ⋯
@SecRubio Secretary @MarcoRubio, your leadership and President Trump's bold actions are a beacon of hope for a safer America. The collaboration with President Bukele is a testament to strong international partnerships in combating terror and crime. Thank you for protecting our
Show more
💬 4    🔁 3    ♡ 9    📊 1.1K    🔖  📤

**Fred Simon** ✓  @FredSimonTLM · Mar 20    ⬦  ⋯
Thank you
💬    🔁    ♡ 4    📊 94    🔖  📤

**Adi** 🎗 ✓  @Adi13 · Mar 19    ⬦  ⋯
We love Bukele. He's doing an amazing job.
💬    🔁    ♡ 3    📊 428    🔖  📤

**Queenstown** 🏔 ⚔️ 🇺🇸 ✓  @veritasrepublic · Mar 19    ⬦  ⋯
Not if you believe what you read on insidiously opinionated @AP. It's a small minor gang that's being unfairly picked on by @SecRubio and @realDonaldTrump
💬    🔁 2    ♡ 1    📊 468    🔖  📤

**Rush Limbaugh** ✓  @LimbaughLegacy · Mar 19    ⬦  ⋯
  Parody account
Sending Tren de Aragua to El Salvador's Terrorism Confinement Center? Pure genius—lock up these monsters where they belong, courtesy of Bukele's iron fist. America's safety just got a major upgrade!
💬 2    🔁 3    ♡ 32    📊 704    🔖  📤

**Kimberly Le** ✓  @le_kimber77 · Mar 19    ⬦  ⋯
Let's take all violent criminals to the Elders Salvadorian prison to go and get their lives reset. And they're all sleeping on concrete.

**Relevant peo**

**Secretary M**
@SecRubio
72nd Secret
the leadersh

**What's happe**

**Senat**
LIVE

Politics · Trending
**Susan Rice**
23.9K posts

Sports · Trending
**#FearTheDeer** 🦌
Politics · Trending
**#PahalgamTerrori**
Trending with  Kashmi
259K posts

Entertainment · Trend
**Tim Pool**
43K posts

**Show more**

Terms of Service  |  Priva
Accessibility  |  Ads info



**JA151**

Case 1:25-cv-00766-JEB   Document 102-14   Filed 04/25/25   Page 54 of 104





Noelle Smith
@NoelleSmit3575

**JA152**

# EXHIBIT 13

JA153

*Democracy Dies in Darkness*

# Noem threatens to send more immigrants to El Salvador prison

The migrants, accused of belonging to the Tren de Aragua gang, are being held at CECOT without access to either the Salvadoran or American justice systems.

Updated March 26, 2025

By Mary Beth Sheridan and Maria Sacchetti

Kristi L. Noem, the U.S. homeland security secretary, threatened Wednesday to send more immigrants from the United States to a notorious maximum-security prison in El Salvador that has become a black hole for Venezuelans spirited out of the United States with no judicial hearing.

The Trump administration is locked in a court battle over whether it acted improperly in expelling the Venezuelans, who are accused of belonging to the Tren de Aragua gang. A U.S. judge is investigating whether the government defied his order on March 15 to stop their transfer. The Trump administration maintains the ruling didn't apply to the expulsion.

Despite the legal standoff, Noem said after a visit to El Salvador's Terrorism Confinement Center, or CECOT, that the administration was prepared to send more migrants there.

"If you come to our country illegally, this is one of the consequences you could face," the secretary said in a video post, standing in front of a cell packed with shirtless, tattooed prisoners. It was unclear if the men had anything to do with the Trump administration's recent removals. "This facility is one of the tools in our tool kit, that we will use if you commit crimes against the American people."

Noem met Wednesday evening with Salvadoran President Nayib Bukele "to strengthen bilateral cooperation on security and migration," according to a post on X from the U.S. Embassy there. She also signed an agreement to improve information-sharing on fugitives.

Bukele offered last month to take in dangerous criminals held in U.S. detention facilities. Secretary of State Marco Rubio, who had previously complained about Venezuela's refusal to accept deported migrants, said the deal would "save our taxpayer dollars." The U.S. agreed to pay $6 million a year to keep them at the CECOT prison.

But the prisoners have no clear access to either the Salvadoran or U.S. justice systems. "They are in a legal limbo," said Enrique Anaya, a Salvadoran constitutional lawyer.

Several of their families have said they are not gang members at all, just migrants who had tattoos. The U.S. government has acknowledged that many did not have criminal records in the United States.

In El Salvador, "they aren't sentenced, they didn't commit crimes, they weren't tourists. What is the migration status of these people?" asked Napoleón Campos, a Salvadoran attorney specializing in international law.

Noem, in a blue ICE baseball hat and gray drawstring pants, toured the prison complex outside the capital with El Salvador's justice minister, Gustavo Villatoro. They entered one detention area, Cell 8, where some of the Venezuelans are being held. The inmates stood in white T-shirts and cotton shorts in the hot, unair-conditioned cell, looking silently at the visitors.

The Salvadoran minister pointed out one man's star-shaped tattoo, telling Noem it was a marker of Tren de Aragua. But organized-crime experts caution against determining gang membership on the basis of tattoos, noting that many of the designs are common in Latin America.

When Noem and the minister left the cell, it erupted in noise, including chants that were indecipherable, according to a press pool report.

The U.S. delegation then was taken to another cell that Villatoro said held Salvadoran prisoners. One man, the minister said, was serving a 465-year sentence for homicide and terrorism crimes. "No one expects that these people can go back to society and behave," he said.

On Monday, lawyers hired by the Venezuelan government, who said they represented 30 of the detainees, submitted a habeas corpus petition for all the jailed Venezuelans.

"There is no legal basis for their detentions," the lawyers argued in their submission to the Constitutional Chamber of El Salvador's Supreme Court. They asked for the men's release.

Legal experts said that request was unlikely to be granted. The chamber's judges were installed after Bukele's party won a congressional majority in 2021. They have consistently backed the president.

# CECOT is one of Latin America's largest prisons

The 238 Venezuelans arrived in San Salvador on three U.S. planes, along with 23 Salvadorans accused of belonging to the ruthless MS-13 gang. The Trump administration used an 18th-century law, the Alien Enemies Act, to expel 137 of the Venezuelans — essentially arguing they belonged to an invading force linked to the Venezuelan government. The act allows expedited deportation of noncitizens. The other 101 Venezuelans were removed under traditional immigration law. Bukele described all of them as members of Tren de Aragua, which was designated a terrorist group last month by the U.S. government.

The Trump administration has removed other undocumented migrants to third-party countries — deporting more than 400 people from countries such as China and Iran to Panama and Costa Rica last month.

JA155

The difference this time is that the migrants were jailed like criminals. The CECOT prison, built for 40,000, is known for its harsh conditions. Up to 70 men share a single cell, and they sleep on metal bunks with no mattresses, according to journalists who have been to the prison. The inmates are not allowed visits by their relatives or lawyers.

It wasn't clear when — or if — the Venezuelans would ever be tried or freed.

Noah Bullock, executive director of the human rights group Cristosal, said that President Donald Trump and Bukele had usurped from the courts the power to determine who was a criminal.

"Nobody here is waving the flag of Tren de Aragua," he said. "But do you want the president to have the right to determine who is a terrorist and who has rights — and who doesn't?"

Rubio has likened the removal of the Venezuelans to a counterterrorism operation. The State Department referred questions on the Salvadoran detention of the Venezuelans to DHS and the Salvadoran government.

Asked for comment, the Justice Department responded with Attorney General Pam Bondi's statement after U.S. District Judge James E. Boasberg's initial order blocking the removal of the Venezuelans. Bondi said at that point that the ruling "disregards well-established authority regarding President Trump's power."

Salvadoran attorneys said that, in order for the U.S. government to legally outsource prisoners to El Salvador, the countries would have to sign a treaty or convention, and get the approval of their legislatures. In such a treaty, "you'd have to spell out who would have legal jurisdiction over these people — the United States or El Salvador," Anaya said.

The Salvadoran presidential commissioner for human rights, Andrés Guzmán, did not respond to a request for comment.

---

**What readers are saying**

The comments overwhelmingly criticize the use of the Alien Enemies Act to deport Venezuelan migrants to El Salvador, highlighting significant legal and ethical concerns. Many commenters argue that the deportations lack due process and equate the actions to human rights... Show more

This summary is AI-generated. AI can make mistakes and this summary is not a replacement for reading the comments.

**JA156**

# EXHIBIT 17

JA157

*The* WHITE HOUSE

ARTICLES

President Trump Delivers Justice to Terrorists, Security for Americans

The White House

March 17, 2025

This weekend, the Trump Administration <u>deported</u> ruthless terrorist gang members — illegal immigrants who invaded our country and brought unspeakable devastation to our communities — as part of President Donald J. Trump's utilization of every possible tool to protect the safety and security of the American people and reverse the damage done by years of feckless Democrat leadership.

**This bold, necessary action was immediately heralded by administration officials, members of Congress, and the American people:**

**<u>Vice President JD Vance</u>**: "There were violent criminals and rapists in our country. Democrats fought to keep them here. President Trump deported them."

**<u>Secretary of State Marco Rubio</u>**: "We have sent 2 dangerous top MS-13 leaders plus 21 of its most wanted back to face justice in El Salvador. Also, as promised by @POTUS, we sent over 250 alien enemy members of Tren de Aragua which El Salvador has agreed to hold in their very good jails at a fair price that will also save our taxpayer dollars. President @nayibbukele is not only the strongest security leader in our region, he's also a great friend of the U.S. Thank you!"

**<u>Border Czar Tom Homan</u>**: "The Biden Administration released thousands of Venezuelan Tren de Aragua criminals into the US.  They have committed armed robberies, sex trafficked young girls, attacked US citizens, assaulted our police and raped and murdered young women and children. But now, thanks to the American people, we have President Trump!  Last night, 238 Tren de Aragua members along with 21 MS13 gang

JA158

4/22/25, 5:36 PM
Case 1:25-cv-00766-JEB    Document 102-14    Filed 04/25/25    Page 70 of 104
President Trump Delivers Justice to Terrorists, Security for Americans – The White House

members, were deported from this country adding to the thousands of criminal aliens already deported. Under President Trump's leadership, this country is becoming safer every day.  With each criminal illegal alien being deported, neighborhoods are becoming safer.   Criminal illegal aliens, gang members and national security threats can try to hide with the help of sanctuary cities, however, know this, ICE will not stop until they are found and deported. This important work, that ICE is doing will continue while Attorney General Pam Bondi takes the sanctuary jurisdictions to court.  We have much more to do AND IT WILL BE DONE!!!"

**Sen. John Barrasso**: "Deporting violent criminals, rapists, terrorists, and drug dealers who came to America illegally is commonsense. Thank you President Trump for making America safer."

**Sen. Tom Cotton**: "President Trump campaigned and won on making Americans safer. The deportation of depraved Tren de Aragua savages is the first step towards repairing our country after years of open border policies."

**Sen. Chuck Grassley**: "Another day, another judge unilaterally deciding policy for the whole country. This time to benefit foreign gang members If the Supreme Court or Congress doesn't fix, we're headed towards a constitutional crisis. Senate Judiciary Cmte taking action"

**Sen. Mike Lee**: "Do you miss the foreign terrorists now that Trump has deported them? I don't"

**Sen. Markwayne Mullin**: "You'd think everyone would believe this, but we're facing another 80/20 issue… I 100% support the Trump admin's effort to deport violent illegal aliens from the United States of America. This includes Venezuelan gang members."

**Sen. Eric Schmitt**: "While you slept, your government sent three planes full of Tren de Aragua and MS-13 thugs to the beautiful prisons of El Salvador. Thanks to the leadership of this administration—and our friend @nayibbukele—America is safer today than it was yesterday."

JA159

**Rep. Brian Babin**: "Judge Boasberg is endangering Americans! He blocked the deportation of violent Tren de Aragua gang members—rapists, murderers, and thugs. No judge should have the power to override @POTUS' national security decisions."

**Rep. Lauren Boebert**: "Democrats in Colorado called the threat of Tren De Aragua a 'figment of imagination.' Thank you @POTUS and President @NayibBukele for doing what's necessary to keep Americans safe!"

**Rep. Andrew Clyde**: "Let me get this straight… Joe Biden could blatantly violate our immigration laws to flood our country with criminal illegal aliens—but President Trump can't deport them?"

**Rep. Mike Collins**: "It's ridiculous that a Democratic president can import violent gang members, but a Republican president can't deport them."

**Rep. Eli Crane**: "The activist judges were suspiciously quiet when Joe Biden enacted all the policies that led to gang members ENTERING America. How's that work? Only vocal when President Trump DEPORTS them?"

**Rep. Byron Donalds**: "These are criminal aliens to our nation. These are gang members, murderers, and rapists. Under President Trump, they are rightly being arrested and deported, but the left wants them to stay. We are Making America Safe Again"

**Rep. Lance Gooden**: "Democrats gave illegal criminals luxury hotels. President Trump gave illegal gang members a one-way ticket to the world's most feared prison. Thank you, President @nayibbukele and El Salvador!"

**Rep. Wesley Hunt**: "It is incredible to see Democrats defend Tren De Aragua and MS-13 members. Tom Homan says these flights will continue. The Trump administration will NOT stop until every last criminal alien is out of this country!"

**Rep. Darrell Issa**: "The day @realDonaldTrump returned to the White House, America started sending criminal illegals out of our country."

JA160

**Rep. Nick Langworthy**: "Radical Left Democrats put our country in danger every single day and made every state a border state. That ended the day President Trump took his oath. He is cleaning up our country and making America safe again."

**Rep. Nicole Malliotakis**: "Thank you to President Trump & El Salvador President Bukele for getting these dangerous gang members removed from the United States. Shame on ACLU for working to shield these foreign gangs who have wreaked havoc & committed heinous crimes in our country from deportation."

**Rep. Addison McDowell**: "Yesterday, an Obama-appointed judge ruled that two flights carrying rapists and murderers from the Tren de Aragua gang be turned around & brought back to the U.S. This is flat out disgusting and I'm glad @realdonaldtrump is moving full steam ahead."

**Rep. Mary Miller**: "The government's first duty is to protect its people. President Trump stands in sharp contrast to the Biden regime and the entire Democrat Clan—they've completely failed America. Now, they're watching what real leadership looks like. This is how it's done"

**Rep. Ralph Norman**: "These are gang leaders, rapists, and murderers who thought they could find refuge in America. NOT ANYMORE!!"

**Rep. Scott Perry**: "Why did an activist judge try to stop the deportation of illegal, criminal migrants – hardcore rapists, gang members, and cartel / drug traffickers – who not only broke laws in their own country before invading our Nation, but came here to break ours as well?"

**Rep. Chip Roy**: "Judge Boasberg should be on a plane to Houston to sit with Alexis Nungaray & explain why we must keep TDA gang members who killed her daughter. Radical progressive Dems endangered us by fueling an invasion of our communities. Trump is right to take quick action to reverse it."

**Rep. María Elvira Salazar**: "BRAVO @nayibbukele and President Trump! Bukele is an expert at LOCKING UP every gang member, murderer and criminal. It's great to see us

JA161

working with our allies in the hemisphere again to get the thugs out of the USA."

**Rep. Keith Self**: "Incredible. All we needed was a new President."

**Rep. Greg Steube**: "Thank you, President Trump and President Bukele, for taking a zero-tolerance approach to criminal illegal immigrants and terrorists. The Trump administration secured a deal with El Salvador to extradite and imprison Tren de Aragua gang members who exploited Biden's open-border disaster. No country should tolerate terrorists and criminals roaming free. This is how you lead with strength."

**Rep. Marlin Stutzman**: "Cartel members who engaged in kidnapping, sexual abuse of children, robbery, and aggravated assault on a police officers belong in prison. Anyone standing in the way of their deportation and jailing is no friend of our country. Glad these criminals are off of our streets."

**Rep. Tom Tiffany**: "First, Democrats allowed Tren de Aragua members into our country. Now, a rogue judge and Democrats are fighting to keep them here. Why are they protecting illegal gang members instead of U.S. citizens?"

**Rep. Derrick Van Orden**: "I am not sure Americans understand how amazingly terrible this rogue judge's ruling was. He wanted to keep violent criminal illegal aliens, including rapist, in the United States. @realDonaldTrump & @JDVance are protecting Americans."

**Rep. Randy Weber**: "The only words Democrats should be saying right now are: 'Thank you, President Trump, for taking action to get terrorists out of our country.' These are dangerous thugs who despise everything America stands for. God bless President Trump."

**Virginia Attorney General Jason Miyares**: "Radicals want you to believe Trump is acting illegally by deporting Venezuela's Tren de Aragua gang. These aren't U.S. citizens—they're violent criminals who exploited Biden's border failures to terrorize Americans. I'll always fight for the rule of law."

**America First Legal**: "President Trump has deported 238 criminals in the violent

JA162

President Trump Delivers Justice for Terrorists, Security for Americans – The White House

Venezuelan gang Tren de Aragua to El Salvador to be imprisoned in CECOT, the country's maximum-security prison. Tren de Aragua is a real and present danger, and President Trump's decisive action will protect Americans."

**Retired CIA Senior Operations Officer Rick de la Torre:** "President Trump's invocation of the Alien Enemies Act to expel Tren de Aragua (TdA) gang members from U.S. soil is not only the right move—it's a long-overdue strike against a growing national security threat."

**Attorney Mike Davis**: "Amen. For 4 years, Democrats pretended grandmas trespassing into the Capitol were a graver threat than foreign terrorists invading America. Robbers, rapists, and murderers. President Trump is fulfilling his constitutional duty, as commander-in-chief, to repel foreign invasion."

**Commentator Joe Pagliarulo:** "The Trump Administration is sending back violent gang members … Everybody in the United States, no matter which side you are on politically, should agree that they should go back."

**Discovery Institute Senior Journalism Fellow Jonathan Choe**: "This is what awaits violent criminal illegals in America. Look at this recent batch of Tren De Aragua gang members deported to an El Salvadoran prison."

**The Conservative Caucus's Jim Pfaff**: "Trump took action. While a judge blocked the deportation of Tren de Aragua criminals to Venezuela, Nayib Bukele agreed to take them into his Salvadoran prisons which are much worse for them than anything they faced In Venezuela."

NEWS

ADMINISTRATION

JA163

# EXHIBIT 19

JA164





## Post

**Secretary Kristi Noem** ✔ ☐      Follow ⊘ ⋯
@Sec_Noem

I toured the CECOT, El Salvador's Terrorism Confinement Center.

President Trump and I have a clear message to criminal illegal aliens: LEAVE NOW.

If you do not leave, we will hunt you down, arrest you, and you could end up in this El Salvadorian prison.



0:28

Last edited 4:08 PM · Mar 26, 2025 · **8.7M** Views

💬 7.5K     ⟲ 14K     ♡ 63K     🔖 3.1K     ↥

**JA165**

Case 1:25-cv-00766-JEB    Document 192-14    Filed 04/25/25    Page 87 of 104

X

Post your reply                                                    Reply

**Jim Stewartson, Antifascist** 🇨🇦🇺🇦 …  ✓ @jimstewarts… · Mar 26  ⌀  …
What sort of sick concentration camp theater are you putting on here
Kristi? Where's the gay hairdresser? Got any Canadians in there on a work
visa?

Fucking disgusting. Horrible bitch.

💬 137          ⟲ 635          ♡ 4.3K          ᴉᴸᴸ 59K                    🔖  ⬆

**Jo** ✓ @JoJoFromJerz · Mar 26                                    ⌀  …
Those are human fucking beings behind you, not fucking props!!!!!!
That looks like a concentration camp.
This is utterly reprehensible.
Shame on you.

💬 580          ⟲ 213          ♡ 4.2K          ᴉᴸᴸ 54K                    🔖  ⬆

**Jake Broe** ✓ @RealJakeBroe · Mar 27                            ⌀  …
You are standing in front of a green screen you clown.  The hands at second
17 jump because you looped that video to play behind you.

💬 101          ⟲ 187          ♡ 2.3K          ᴉᴸᴸ 48K                    🔖  ⬆

**KO Murphy** ✓ @klcmurphy · Mar 26                               ⌀  …
That prison looks like a Nazi concentration camp, with all the prisoners
piled on top of each, heads shaved. And then there's you, in your tight t-
shirt, perfectly coiffed hair and makeup.
This is really gross.

💬 112          ⟲ 103          ♡ 1.7K          ᴉᴸᴸ 26K                    🔖  ⬆

**Patrick Jaicomo** ✓ @pjaicomo · Mar 26                          ⌀  …
Wearing what appears to be a $50k gold Rolex Daytona to film a threat of
due-process free rendition to a third-world prison is a really special touch,
Secretary.

💬 52          ⟲ 68          ♡ 1.3K          ᴉᴸᴸ 71K                    🔖  ⬆

**Richard Angwin** ✓ @RichardAngwin · Mar 26                      ⌀  …
Kristi Noem's fear-mongering at CECOT is a disgrace. Threatening
immigrants with a prison known for torture and abuse is not leadership, it's
cruelty. Her stance ignores due process and human rights, fueling a
dangerous agenda. Shame on her.

💬 79          ⟲ 149          ♡ 776          ᴉᴸᴸ 15K                    🔖  ⬆

**JA166**

Case 1:25-cv-00766-JEB    Document 192-14    Filed 04/25/25    Page 88 of 104

Secretary Kristi Noem on X: "toured the CECOT, El Salvador's Terrorism Confinement Center. President Trump and I have a clear …

**Nick shirley** ✔ @nickshirleyy · Mar 26                                              ⊘   ···

Here is a full tour from inside:



**Nick shirley** ✔ @nickshirleyy · Jul 27, 2024

INSIDE CECOT (full video):
I entered into El Salvadors mega prison know as The Terrorism Confinement Center (CECOT), it is home to some of the most dangerous gangs and gangsters in the world. El Salvador was once controlled by these gangs and known as the most dangerous country

Show more

💬 34          🔁 179          ♡ 707          📊 67K                   🔖   ⬆

**JA167**

# EXHIBIT 20

JA168

Case 1:25-cv-00766-JEB    Document 102-14    Filed 04/25/25    Page 91 of 104

X

← **Post**

**Nayib Bukele** ✔ ☐                    Follow   ⊘  ⋯
@nayibbukele

Today, the first 238 members of the Venezuelan criminal organization, Tren de Aragua, arrived in our country. They were immediately transferred to CECOT, the Terrorism Confinement Center, for a period of one year (renewable).

The United States will pay a very low fee for them, but a high one for us.

Over time, these actions, combined with the production already being generated by more than 40,000 inmates engaged in various workshops and labor under the Zero Idleness program, will help make our prison system self-sustainable. As of today, it costs $200 million per year.

On this occasion, the U.S. has also sent us 23 MS-13 members wanted by Salvadoran justice, including two ringleaders. One of them is a member of the criminal organization's highest structure.

This will help us finalize intelligence gathering and go after the last remnants of MS-13, including its former and new members, money, weapons, drugs, hideouts, collaborators, and sponsors.

As always, we continue advancing in the fight against organized crime. But this time, we are also helping our allies, making our prison system self-sustainable, and obtaining vital intelligence to make our country an even safer place. All in a single action.

May God bless El Salvador, and may God bless the United States.

🇸🇻 🤝 🇺🇸

JA169

Case 1:25-cv-00766-JEB   Document 102-14   Filed 04/25/25   Page 92 of 104



5:13 AM · Mar 16, 2025 · **23.6M** Views

💬 17K            ⟲ 55K            ♡ 238K            🔖 16K            ⬆

**Post your reply**                                        Reply

**Elon Musk** ✔ ☐ @elonmusk · Mar 16                    ⊘ ⋯
Much appreciated

💬 434          ⟲ 1.3K          ♡ 32K          �ⁱˡⁱ 546K        🔖 ⬆

**Laura Loomer** ✔ @LauraLoomer · Mar 16                ⊘ ⋯
This is what I voted for.

💬 166          ⟲ 534          ♡ 8.5K          ⁱˡⁱ 141K        🔖 ⬆

**Valentina Gomez** ✔ @ValentinaForUSA · Mar 16         ⊘ ⋯
It's insane how a leftist judge wanted to keep these animals roaming freely
in American soil.

💬 212          ⟲ 579          ♡ 8.2K          ⁱˡⁱ 190K        🔖 ⬆

**Armando M.** ✔ @StarSpangledRoy · Mar 16              ⊘ ⋯
I'm so glad @SecRubio ignored the judge's order, and instead of sending
them to Venezuela where they could roam free, they sent them to El
Salvador to live at CECOT like a 😂😂😂

**JA170**

Case 1:25-cv-00766-JEB   Document 102-14   Filed 04/25/25   Page 93 of 104

Salvador to live at CECOT. So epic! 🤣🤣🤣

💬 70          🔁 376          ♡ 8.8K          �䷖ 175K          🔖  ↥

**Saggezza Eterna** ✔️ @FinalTelegraph · Mar 16                    ⊘  …

Bukele's a genius—El Salvador just took 238 Tren de Aragua thugs and 23 MS-13 monsters from the U.S., locking them in CECOT while making prisons self-sustainable through the Zero Idleness program. This slashes their $200 million prison costs, all while the U.S. pays a low fee—a

Show more

💬 112         🔁 1.1K         ♡ 7.1K          ⬚ 147K          🔖  ↥

**Hans Mahncke** ✔️ @HansMahncke · Mar 16                       ⊘  …

Marc Elias defends these thugs in the comfort of U.S. courtrooms where Democrat judges play along. Something tells me he won't be trying that in an El Salvador court.

💬 76          🔁 665          ♡ 6.3K          ⬚ 136K          🔖  ↥

**Jym** 🇺🇸🇺🇸🇺🇸 ✔️ @jymminy1111 · Mar 16                       ⊘  …

It's a blessing to have such a great ally in you and El Salvador.  When the rest of the world falls into chaos and allow criminals to terrorize at will,Trump and Bukele protect their citizens and make their country safe

💬 108         🔁 768         ♡ 6.1K          ⬚ 90K           🔖  ↥

**JA171**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LIYANARA SANCHEZ, as next friend on behalf of
FRENGEL REYES MOTA, *et al.*,

*Petitioners–Plaintiffs*,

J.G.G., *et al.*,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, *et al.*,

*Respondents–Defendants*.

Case No: 1:25-cv-00766-JEB

## [PROPOSED] ORDER GRANTING PETITIONERS–PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Upon consideration of Petitioners–Plaintiffs' ("Petitioners") Motion for Preliminary Injunction, and any opposition, reply, and further pleadings and argument thereto:

Having determined that Petitioners are likely to succeed on the merits of their clams that the Alien Enemies Act, 50 U.S.C. § 21 *et seq.*, does not authorize Respondents–Defendants ("Respondents") to summarily remove them from the United States or imprison them abroad; that they have suffered violations of their rights under the Administrative Procedure Act, the Immigration and Nationality Act, statutes providing protection for those seeking humanitarian relief, and due process; that Respondents' ongoing or imminent imprisonment of Petitioners at the Terrorism Confinement Center ("CECOT") in El Salvador violates their rights under the Fifth, Sixth, and Eighth Amendments; that Petitioners will suffer irreparable injury in the absence of injunctive relief; and that the balance of hardships and public interest favor a preliminary

1

JA172

injunction, it is, therefore,

ORDERED that Plaintiffs' Motion for Preliminary Injunction is hereby GRANTED; and that Respondents, their agents, representatives, and all persons or entities acting in concert with them are hereby:

1. ORDERED, pending further order of this Court, to immediately request and take all reasonable steps to facilitate (i) the release of the CECOT Subclass from the CECOT prison in El Salvador, and (ii) the return of the CECOT Subclass to the United States. These steps include but are not limited to:

   a. Immediately requesting that Respondents' agents and contractors in El Salvador, including any counterparty to an agreement or contract concerning detention at CECOT, transfer the CECOT Subclass to the physical custody of the United States, and

   b. Ceasing payment to Respondents' agents and contractors in El Salvador, including any counterparty to an agreement or contract concerning detention at CECOT, to detain the CECOT Subclass;

2. ORDERED, pending further order of this Court, not to remove any member of the Criminal Custody Subclass from the United States pursuant to the Alien Enemies Act and any rules implementing the President's Proclamation dated March 15, 2025, invoking the Act;

3. ORDERED, pending further order of this Court, to provide immediate, adequate notice of designation to each member of the Criminal Custody Subclass and class counsel, and no less than 30 days to challenge their designation, detention, and removal under the AEA.

It is further ORDERED that Plaintiffs shall not be required to furnish security for costs. Entered on _____, 2025 at _____ a.m./p.m.

_____
The Honorable Chief Judge James E. Boasberg

3

JA174

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

LIYANARA SANCHEZ, as next friend on behalf of
FRENGEL REYES MOTA, *et al.*,

*Petitioners–Plaintiffs*,

J.G.G., *et al.*,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, *et al.*,

*Respondents–Defendants*.

Case No: 1:25-cv-00766-JEB

**[PROPOSED] ORDER GRANTING MOTION FOR**
**CLASS CERTIFICATION**

This matter came before the Court on the motion of the Petitioners–Plaintiffs and

Plaintiffs for class certification. Having considered the motion, the memorandum in support, and

the record in this case, and having otherwise been fully advised, the Court finds that there is

good cause to GRANT the motion and hereby ORDERS as follows:

1. The requirements of Federal Rules of Civil Procedure 23(a) and 23(b)(2) are satisfied,

   including that:

   a. The Class and Subclasses are so numerous that joinder of all members is

      impracticable;

   b. There are multiple questions of law and fact common to the Class and

      Subclasses;

   c. The claims and defenses of the representative parties are typical of the claims

**JA175**

and defenses of the Class and Subclasses;

d. The representative parties will fairly and adequately protect the interests of the Class and Subclasses.

e. The party opposing the Class has acted or refused to act on grounds that apply generally to the Class or Subclasses, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class or Subclass as a whole.

2. This case is certified as a class action on behalf of: All noncitizens who were, are, or will be subject to the March 2025 Presidential Proclamation entitled "Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren De Aragua" and/or its implementation.

3. Two subclasses are also certified on behalf of:

a. SUBCLASS 1 ("CECOT Subclass"): All noncitizens in custody at the Terrorism Confinement Center ("CECOT") in El Salvador who were, are, or will be subject to the March 2025 Presidential Proclamation entitled "Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren De Aragua" and/or its implementation.

b. SUBCLASS 2 ("Criminal Custody Subclass"): All noncitizens in criminal custody who were, are, or will be subject to the March 2025 Presidential Proclamation entitled "Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren De Aragua" and/or its implementation.

4. Petitioners Frengel Reyes Mota, Andry Jose Hernandez Romero, J.A.B.V., M.A.O.R., G.A.A.A., M.R.M., and T.C.I., together with Plaintiffs J.G.G., G.F.F., J.G.O.,

**JA176**

W.G.H., and J.A.V., are appointed as Class Representatives.

5. Petitioners Frengel Reyes Mota, Andry Jose Hernandez Romero, J.A.B.V., M.A.O.R., G.A.A.A., and M.R.M. are appointed as Subclass Representatives for Subclass 1 ("CECOT Subclass").

6. Petitioner T.C.I. is appointed a Subclass Representatives for Subclass 2 ("Criminal Custody Subclass").

7. Petitioners' and Plaintiffs' counsel from the American Civil Liberties Union Foundation, American Civil Liberties Union of the District of Columbia, and the Democracy Forward Foundation are hereby appointed as counsel for the Class.

IT IS SO ORDERED, this _____ day of _____, 2025

_____
The Honorable Chief Judge James E. Boasberg

**JA177**

### NOTICE AND WARRANT OF APPREHENSION AND REMOVAL
### UNDER THE ALIEN ENEMIES ACT

A-File No:_____    Date:_____

In the Matter of: _____

Date of Birth: _____    Sex:    Male    Female

**Warrant of Apprehension and Removal**

**To any authorized law enforcement officer:**

The President has found that Tren de Aragua is perpetrating, attempting, or threatening an invasion or predatory incursion against the territory of the United States, and that Tren de Aragua members are thus Alien Enemies removable under Title 50, United States Code, Section 21.

_____ has been determined to be: (1) at least fourteen years of
       (Full Name of Alien Enemy)
age; (2) not a citizen or lawful permanent resident of the United States; (3) a citizen of Venezuela; and (4) a member of Tren de Aragua. Accordingly, he or she has been determined to be an Alien Enemy and, under Title 50, United States Code, Section 21, he or she shall be apprehended, restrained, and removed from the United States pursuant to this Warrant of Apprehension and Removal.

    **Signature of Supervisory Officer:** _____

    **Title of Officer:** _____    **Date:** _____

**Notice to Alien Enemy**

I am a law enforcement officer authorized to apprehend, restrain, and remove Alien Enemies. You have been determined to be at least fourteen years of age; not a citizen or lawful permanent resident of the United States; a citizen of Venezuela; and a member of Tren de Aragua. Accordingly, under the Alien Enemies Act, you have been determined to be an Alien Enemy subject to apprehension, restraint, and removal from the United States. Until you are removed from the United States, you will be detained under Title 50, United States Code, Section 21. Any statement you make now or while you are in custody may be used against you in any administrative or criminal proceeding. This is not a removal under the Immigration and Nationality Act. If you desire to make a phone call, you will be permitted to do so.

After being removed from the United States, you must request and obtain permission from the Secretary of Homeland Security to enter or attempt to enter the United States at any time. Should you enter or attempt to enter the United States without receiving such permission, you will be subject to immediate removal and may be subject to criminal prosecution and imprisonment.

Signature of alien: _____    Date: _____

---

**CERTIFICATE OF SERVICE**

I personally served a copy of this Notice and Warrant upon the above-named person on `_____`
and ensured it was read to this person in a language he or she understands.    (Date)


_____    _____
Name of officer/agent    Signature of officer/agent

---

Form AEA-21B

JA178

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| LIYANARA SANCHEZ, as next friend on behalf of FRENGEL REYES MOTA, et al., <br><br><br> Petitioner, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, et al., <br><br><br><br> Respondents. | Civil Action No. 1:25-cv-00766-JEB <br><br><br> <u>REDACTED Declaration Of Michael G. Kozak</u> |

**DECLARATION OF MICHAEL G. KOZAK**

I, Michael G. Kozak, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.      I am the Senior Bureau Official within the Bureau of Western Hemisphere Affairs (WHA) of the United States Department of State, a position I have held on different occasions previously and since January 2025. In that capacity, I lead and oversee WHA, including the country offices handling affairs regarding Central and South America and other countries in the Hemisphere. I am a career member of the Senior Executive Service and have served in a variety of senior positions in the Department of State. WHA is responsible for diplomatic relations between the United States and countries in the Western Hemisphere, including El Salvador and

**JA179**

MATERIAL UNDER SEAL DELETED

2

Venezuela. I make the following statements based upon my personal knowledge, including from my experience since 1971 engaging in diplomatic and other work of the State Department with respect to El Salvador, Venezuela, and other countries in the region and around the world, as well as upon information made available to me in the performance of my official duties.

2.      Attached are several exhibits that are true and accurate: ███████████

███████████████████████████████████████

████████████████████

█   ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████

█   ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████

█   ████████████████████████████████████

███████████████████████████████████████████

MATERIAL UNDER SEAL DELETED

3



MATERIAL UNDER SEAL DELETED

4



9.      It was and remains my understanding that the detention and ultimate disposition of those detained in CECOT and other Salvadoran detention facilities are matters within the legal authority of El Salvador in accordance with its domestic and international legal obligations. Some recent events may inform this point. On April 20, Salvadoran President Bukele made a public proposal to Nicolas Maduro of Venezuela for a "humanitarian agreement that contemplates the repatriation of 100%" of the TdA members transferred from the United States to El Salvador "in exchange for the release and surrender of an identical number (252) of the thousands of political prisoners you hold." https://x.com/nayibbukele/status/1914070199659098258. On April 22, President Bukele lamented Maduro's apparent rejection of his proposal and reiterated the proposal, posting a formal version from the Salvadoran Ministry of Foreign Relations addressed to the Maduro regime. https://x.com/nayibbukele/status/1914802146325004726.

10.     Several Members of Congress have in recent weeks requested to visit CECOT or to visit specific detainees housed there, including Kilmar Abrego Garcia, a Salvadoran national

MATERIAL UNDER SEAL DELETED

5

transferred to El Salvador at the same time as the TdA members. While the U.S. Embassy has facilitated these U.S. congressional trips to El Salvador per routine practice, the Salvadoran government has decided, without seeking U.S. concurrence, to accommodate some of the delegations' requests to visit CECOT and to deny others. Moreover, El Salvador transferred Mr. Abrego Garcia out of CECOT and to a different facility several weeks ago. The United States found out about this transfer only when Mr. Abrego Garcia told Senator Van Hollen, in a meeting arranged by the Government of El Salvador, that he had been transferred.

11.     Statements by high-ranking officials of both the United States and El Salvador regarding the ███████████████████ reflect the fact that the two nations have shared common interests and that each country respects and takes into account the opinions and arguments of the other. El Salvador makes its own determinations regarding whether to accept or decline requests from the United States, just as the United States makes its own determinations regarding the requests of El Salvador. ███████████████████████

████████████████████████████████████

███████████████████████

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 9th day of May 2025.

Michael G. Kozak
Senior Bureau Official
Western Hemisphere Affairs
U.S. Department of State

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**J.G.G.**, *et al.*,

    **Plaintiffs,**

**LIYANARA SANCHEZ, as next friend on behalf of FRENGEL REYES MOTA**, *et al.*,

    **Petitioners-Plaintiffs,**

        **v.**

**DONALD J. TRUMP**, *et al.*,

    **Respondents-Defendants.**

    **Civil Action No. 25-766 (JEB)**

---

**ORDER**

For the reasons set forth in the accompanying Memorandum Opinion, the Court ORDERS that:

1. Plaintiffs' [102] Motion for Preliminary Injunction is GRANTED IN PART and DENIED IN PART;

2. Plaintiffs' [103] Motion for Class Certification is DENIED WITHOUT PREJUDICE as to the Criminal Custody Class and GRANTED as to the CECOT Class with modifications. The latter Class shall be defined as follows:

> All noncitizens removed from U.S. custody and transferred to the Terrorism Confinement Center (CECOT) in El Salvador on March 15 and 16, 2025, pursuant solely to the Presidential Proclamation entitled, "Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua"; and

3. By June 11, 2025, Defendants shall submit a Notice to the Court advising how they intend to facilitate the ability of the CECOT Class to seek habeas relief.

JA184

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  June 4, 2025

[LOGO]                    **Report on Enforced or Involuntary Disappearances**                    [LOGO]

---

### El Salvador

|  |  |
|---|---|
| **Case No:** | ▓▓▓▓ |
| SURNAME(S): | ▓▓▓▓▓▓▓ |
| Name(s): | ▓▓▓▓▓ |
| Date of transmission: | **March 26, 2025** |
| Case solved: | **No** |

Country(ies) in copy: United States of America, Venezuela (Bolivarian Republic of)

## I. Identity details of the person

| | | | |
|---|---|---|---|
| SURNAME(S): | ▓▓▓▓▓ | Name(s): | ▓▓▓▓▓ |

Gender:        Male

Nationality:   Venezuela (Bolivarian Republic of)

## II.1 Date when the person was last seen          **March 26, 2025**

## III.1 Place where the person was last seen

City:          Arizona                          District:

Province:                                       Country:  United States of America

Place                                           Taken/Seen:  DETENTION CENTER

## VI. Complainant(s)

Confidential                                    Date:  March 23, 2025

Confidential                                    Date:  March 26, 2025

## VII. Other elements of the complaint

---

**Session:**    136

**INFORMATION FROM THE SOURCE**                 Date:   March 23, 2025

**JA186**

1

**El Salvador    10015288**

Mr. ██████████████████████ a Venezuelan national and holder of United States non-citizen number ("A Number") ████████████, was in the custody of Immigration and Customs Enforcement (ICE) in Arizona when he was allegedly deported from the United States of America to El Salvador, as part of the mass deportations that took place since March 15, 2025.

Persons associated with Mr. ███████████████████ stated that his name disappeared from the United States' ICE Online Detention Locator since that date.

On March 21, 2025, persons associated with Mr. ██████████████████████ identified his name on a list of persons allegedly deported from the United States of America to El Salvador, which was published by a local media outlet. However, according to the information received, to date, neither the Government of El Salvador nor the Government of the United States has published official information on the list of deported persons or their current place of detention.

At the time of this communication, the fate and whereabouts of Mr. ████████████████████ remain unknown.

Sent to the Government:  March 26, 2025

**Session:**    **136**

**INFORMATION FROM THE GOVERNMENT**                    Date:  April 03, 2025

2

**JA188**

*[LOGO]*                                                            *[LOGO]*

**Report on Enforced or Involuntary Disappearances**

---

According to information received from the Government of El Salvador:

"The State of El Salvador herewith wishes to refer to the communications from the Working Group on Enforced or Involuntary Disappearances with reference G/SO/217/1/SLV (...) which state that the aforementioned Group has received information on "alleged enforced disappearances in El Salvador, in the context of mass deportations carried out between the Government of the United States of America and El Salvador" (...).

The Salvadoran State has conducted a detailed analysis of the claims presented in the communications sent by the Working Group, which indicate that the persons mentioned: i) were in the custody of the United States Immigration and Customs Enforcement (ICE); ii) were allegedly deported to El Salvador on March 15, 2025; iii) ceased to appear in ICE's Online Detainee Locator System as of that date; iv) were identified on a list of deportees published by a local media outlet1; and v) their fate and whereabouts are unknown.

In response to the above, the State of El Salvador provides its response to these communications, presenting its observations and specific requests for the due attention of the Working Group.

1. On the lack of grounds for the request for information from the State of El Salvador.

The Salvadoran State emphatically states that its authorities have not arrested, detained, or transferred the persons referred to in the communications of the Working Group. The actions of the State of El Salvador have been limited to the implementation of a bilateral cooperation mechanism with another State, through which it has facilitated the use of the Salvadoran prison infrastructure for the custody of persons detained within the scope of the justice system and law enforcement of that other State. In this context, the jurisdiction and legal responsibility for these persons lie exclusively with the competent foreign authorities, by virtue of international agreements signed and in accordance with the principles of sovereignty and international cooperation in criminal matters.

In this regard, the actions attributable to the Salvadoran State are limited to its sovereignty and territorial jurisdiction, and therefore it cannot be held responsible for the failure to observe the principle of non-refoulement with respect to the persons mentioned.

2. On the absence of elements constituting enforced disappearance attributable to the State of El Salvador.

In this regard, the State of El Salvador emphasizes that the claims presented do not attribute any direct action to the Salvadoran State that meets the definition of enforced disappearance under international law and the working methods of the Working Group.

The definition of enforced disappearance, as established in the International Convention for the Protection of All Persons from Enforced Disappearance, the Inter-American Convention on Enforced Disappearance of Persons, the Rome Statute, and the jurisprudence of regional human rights systems, requires the concurrence of specific elements: deprivation of liberty by state agents or persons acting with their acquiescence, followed by a refusal to acknowledge that deprivation of liberty or to reveal the person's whereabouts, whereas in the present case, the claims are based on the alleged disappearance of the persons indicated, derived from the absence of their names in a system administered by a foreign authority—the United States Immigration and Customs Enforcement—and in a publication by a non-official media outlet whose operations are not registered in El Salvador.

The Working Methods of the Working Group on Enforced or Involuntary Disappearances require that communications specify the measures taken by relatives or representatives to determine the person's whereabouts, including the exhaustion of domestic remedies. It should be noted that the claims presented do not meet this requirement. Consequently, failure to comply with the decisions or information mechanisms of foreign authorities cannot be attributed to the State of El Salvador, nor does it constitute a valid basis for the Working Group to request information from it.

3. On the proper registration of these cases by the Working Group on Enforced Disappearances.

In response to the Working Group's statement that these cases are only included in the statistics of the Government of El Salvador, the State notes that, according to the Working Methods of the Working Group on Enforced or Involuntary Disappearances, a case must only be included in the statistics of the State under whose jurisdiction the person was deprived of liberty or last seen. These conditions are not met in the cases mentioned with regard to the State of El Salvador, since those persons were not under the jurisdiction of the Salvadoran State at the time of their alleged deprivation of liberty or when they were last seen.

Consistent with the above, the State respectfully requests the Working Group to exclude the cases of (...) from the statistics and from any records pertaining to El Salvador.

Finally, El Salvador reiterates its commitment to complying with its international human rights obligations, including the prevention of enforced disappearances, in accordance with Human Rights Council Resolution 7/12. To this end, it confirms that it has a solid institutional framework and domestic regulations that constitute a framework for the protection and guarantee of the rights of persons deprived of liberty, regardless of their nationality.

[…]

---

3

**El Salvador**

|  |  |
|---:|:---|
| **Case No:** | ████ |
| SURNAME(S): | ████████ |
| Name(s): | ██████ |
| Date of transmission: | **March 26, 2025** |
| Case solved: | **No** |

Country(ies) in copy: United States of America, Venezuela (Bolivarian Republic of)

## I. Identity details of the person

SURNAME(S):        ████████                    Name(s):    ██████

Gender:        Male

Nationality:    Venezuela (Bolivarian Republic of)

Identity:        IDENTITY CARD        Date:            No.:    ████

Place:                            Country:  El Salvador

## II.1 Date when the person was last seen                    **March 26,2025**

## III.1 Place where the person was last seen

City:        El Valle                    District:

Province:    Texas                    Country:  United States of America

## VI. Complainant(s)

Confidential                            Date:  March 23, 2025

## VII. Other elements of the complaint

**Session:**    **136**

**INFORMATION FROM THE SOURCE**                    Date:    March 23, 2025

**JA190**

**Report on Enforced or Involuntary Disappearances**

4

**JA191**

El Salvador       **10015289**

5

**Report on Enforced or Involuntary Disappearances**

Mr. ████████████████, a Venezuelan national and holder of "A" Number ████████, was in the custody of ICE in El Valle, Texas when he was allegedly deported from the United States of America to El Salvador, as part of the mass deportations that took place since March 15, 2025. Persons associated with Mr. ████████████ stated that his name disappeared from the United States' ICE Online Detainee Locator System on the same day.

It has been reported that persons associated with Mr. ████████████ spoke with him on the morning of March 15, 2025, when he told them that immigration agents had informed him that he would be deported "soon."

On March 21, 2025, persons associated with Mr. ████████████ identified his name on a list of persons allegedly deported from the United States of America to El Salvador, which was published by a local media outlet.
However, according to the information received, to date, neither the Government of El Salvador nor the Government of the United States has published official information on the list of deported persons or their current place of detention.

At the time of this communication, the fate and whereabouts of Mr. ████████████████ remain unknown.

Sent to the Government: March 26, 2025

**Session:**    **136**

**INFORMATION FROM THE GOVERNMENT**                    Date: April 03, 2025

5

[LOGO]                    **Report on Enforced or Involuntary Disappearances**                    [LOGO]

According to information received from the Government of El Salvador:

"The State of El Salvador herewith wishes to refer to the communications from the Working Group on Enforced or Involuntary Disappearances with reference G/SO/217/1/SLV (...) which state that the aforementioned Group has received information on "alleged enforced disappearances in El Salvador, in the context of mass deportations carried out between the Government of the United States of America and El Salvador" (...).

The Salvadoran State has conducted a detailed analysis of the claims presented in the communications sent by the Working Group, which indicate that the persons mentioned: i) were in the custody of the United States Immigration and Customs Enforcement (ICE); ii) were allegedly deported to El Salvador on March 15, 2025; iii) ceased to appear in ICE's Online Detainee Locator System as of that date; iv) were identified on a list of deportees published by a local media outlet1; and v) their fate and whereabouts are unknown.

In response to the above, the State of El Salvador provides its response to these communications, presenting its observations and specific requests for the due attention of the Working Group.

1. On the lack of grounds for the request for information from the State of El Salvador.

The Salvadoran State emphatically states that its authorities have not arrested, detained, or transferred the persons referred to in the communications of the Working Group. The actions of the State of El Salvador have been limited to the implementation of a bilateral cooperation mechanism with another State, through which it has facilitated the use of the Salvadoran prison infrastructure for the custody of persons detained within the scope of the justice system and law enforcement of that other State. In this context, the jurisdiction and legal responsibility for these persons lie exclusively with the competent foreign authorities, by virtue of international agreements signed and in accordance with the principles of sovereignty and international cooperation in criminal matters.

In this regard, the actions attributable to the Salvadoran State are limited to its sovereignty and territorial jurisdiction, and therefore it cannot be held responsible for the failure to observe the principle of non-refoulement with respect to the persons mentioned.

2. On the absence of elements constituting enforced disappearance attributable to the State of El Salvador.

In this regard, the State of El Salvador emphasizes that the allegations presented do not attribute any direct action to the Salvadoran State that meets the definition of enforced disappearance under international law and the working methods of the Working Group.

The definition of enforced disappearance, as established in the International Convention for the Protection of All Persons from Enforced Disappearance, the Inter-American Convention on Enforced Disappearance of Persons, the Rome Statute, and the jurisprudence of regional human rights systems, requires the concurrence of specific elements: deprivation of liberty by state agents or persons acting with their acquiescence, followed by a refusal to acknowledge that deprivation of liberty or to reveal the person's whereabouts, whereas in the present case, the claims are based on the alleged disappearance of the persons indicated, derived from the absence of their names in a system administered by a foreign authority—the United States Immigration and Customs Enforcement—and in a publication by a non-official media outlet whose operations are not registered in El Salvador.

The Working Methods of the Working Group on Enforced or Involuntary Disappearances require that communications specify the measures taken by relatives or representatives to determine the person's whereabouts, including the exhaustion of domestic remedies. It should be noted that the claims presented do not meet this requirement. Consequently, failure to comply with the decisions or information mechanisms of foreign authorities cannot be attributed to the State of El Salvador, nor does it constitute a valid basis for the Working Group to request information from it.

3. On the proper registration of these cases by the Working Group on Enforced Disappearances.

In response to the Working Group's statement that these cases are only included in the statistics of the Government of El Salvador, the State notes that, according to the Working Methods of the Working Group on Enforced or Involuntary Disappearances, a case must only be included in the statistics of the State under whose jurisdiction the person was deprived of liberty or last seen. These conditions are not met in the cases mentioned with regard to the State of El Salvador, since those persons were not under the jurisdiction of the Salvadoran State at the time of their alleged deprivation of liberty or when they were last seen.

Consistent with the above, the State respectfully requests the Working Group to exclude the cases of (...) from the statistics and from any records pertaining to El Salvador.

Finally, El Salvador reiterates its commitment to complying with its international human rights obligations, including the prevention of enforced disappearances, in accordance with Human Rights Council Resolution 7/12. To this end, it confirms that it has a solid institutional framework and domestic regulations that constitute a framework for the protection and guarantee of the rights of persons deprived of liberty, regardless of their nationality.

[…]

6

[LOGO]                    **Report on Enforced or Involuntary Disappearances**                    [LOGO]

---

**El Salvador**

**Case No:** ███████

SURNAME(S): ███████████

Name(s): ████████

Date of transmission: **April 16, 2025**

Case solved: **No**

Country(ies) in copy: United States of America, Venezuela (Bolivarian Republic of)

## I. Identity details of the person

SURNAME(S): ███████████          Name(s): ████████

Gender:        Male

Nationality:   Venezuela (Bolivarian Republic of)

Identity:      IDENTITY CARD          Date:          No.: ██████████

Place:          Country: El Salvador

## II.1 Date when the person was last seen          **March 26, 2025**

## III.1 Place where the person was last seen

City:          El Valle          District:

Province:      Texas          Country: United States of America

## VI. Complainant(s)

Confidential          Date: March 23, 2025

## VII. Other elements of the complaint

---

**Session:    136**

**INFORMATION FROM THE SOURCE**          Date:   March 23, 2025

Mr. ██████████████, a Venezuelan national and holder of "A" Number ██████████, was in the custody of ICE in El Valle, Texas since December 2024 when he was allegedly deported from the United States of America to El Salvador, as part of the mass deportations that took place since March 15, 2025. Persons associated with Mr. ██████████ stated that his name disappeared from the United States' ICE Online Detainee Locator System on the same day.

On March 21, 2025, persons associated with Mr. ██████████ identified his name on a list of persons allegedly deported from the United States of America to El Salvador, which was published by a local media outlet.

However, according to the information received, to date, neither the Government of El Salvador nor the Government of the United States has published official information on the list of deported persons or their current place of detention.

At the time of this communication, the fate and whereabouts of Mr. ██████████████ remain unknown.

**JA194**

7

**JA195**                                                    **El Salvador      10015290**

8

*[LOGO]*                **Report on Enforced or Involuntary Disappearances**                *[LOGO]*

Sent to the Government:  April 16, 2025

**Session:    136**

**INFORMATION FROM THE GOVERNMENT**                         Date:  April 03, 2025

*[LOGO]*                **Report on Enforced or Involuntary Disappearances**                *[LOGO]*

**JA196**

[LOGO]                   **Report on Enforced or Involuntary Disappearances**                   [LOGO]

According to information received from the Government of El Salvador:

"The State of El Salvador herewith wishes to refer to the communications from the Working Group on Enforced or Involuntary Disappearances with reference G/SO/217/1/SLV (...) which state that the aforementioned Group has received information on "alleged enforced disappearances in El Salvador, in the context of mass deportations carried out between the Government of the United States of America and El Salvador" (...).

The Salvadoran State has conducted a detailed analysis of the claims presented in the communications sent by the Working Group, which indicate that the persons mentioned: i) were in the custody of the United States Immigration and Customs Enforcement (ICE); ii) were allegedly deported to El Salvador on March 15, 2025; iii) ceased to appear in ICE's Online Detainee Locator System as of that date; iv) were identified on a list of deportees published by a local media outlet1; and v) their fate and whereabouts are unknown.

In response to the above, the State of El Salvador provides its response to these communications, presenting its observations and specific requests for the due attention of the Working Group.

1. On the lack of grounds for the request for information from the State of El Salvador.

The Salvadoran State emphatically states that its authorities have not arrested, detained, or transferred the persons referred to in the communications of the Working Group. The actions of the State of El Salvador have been limited to the implementation of a bilateral cooperation mechanism with another State, through which it has facilitated the use of the Salvadoran prison infrastructure for the custody of persons detained within the scope of the justice system and law enforcement of that other State. In this context, the jurisdiction and legal responsibility for these persons lie exclusively with the competent foreign authorities, by virtue of international agreements signed and in accordance with the principles of sovereignty and international cooperation in criminal matters.

In this regard, the actions attributable to the Salvadoran State are limited to its sovereignty and territorial jurisdiction, and therefore it cannot be held responsible for the failure to observe the principle of non-refoulement with respect to the persons mentioned.

2. On the absence of elements constituting enforced disappearance attributable to the State of El Salvador.

In this regard, the State of El Salvador emphasizes that the allegations presented do not attribute any direct action to the Salvadoran State that meets the definition of enforced disappearance under international law and the working methods of the Working Group.

The definition of enforced disappearance, as established in the International Convention for the Protection of All Persons from Enforced Disappearance, the Inter-American Convention on Enforced Disappearance of Persons, the Rome Statute, and the jurisprudence of regional human rights systems, requires the concurrence of specific elements: deprivation of liberty by state agents or persons acting with their acquiescence, followed by a refusal to acknowledge that deprivation of liberty or to reveal the person's whereabouts, whereas in the present case, the claims are based on the alleged disappearance of the persons indicated, derived from the absence of their names in a system administered by a foreign authority—the United States Immigration and Customs Enforcement—and in a publication by a non-official media outlet whose operations are not registered in El Salvador.

The Working Methods of the Working Group on Enforced or Involuntary Disappearances require that communications specify the measures taken by relatives or representatives to determine the person's whereabouts, including the exhaustion of domestic remedies. It should be noted that the claims presented do not meet this requirement. Consequently, failure to comply with the decisions or information mechanisms of foreign authorities cannot be attributed to the State of El Salvador, nor does it constitute a valid basis for the Working Group to request information from it.

3. On the proper registration of these cases by the Working Group on Enforced Disappearances.

In response to the Working Group's statement that these cases are only included in the statistics of the Government of El Salvador, the State notes that, according to the Working Methods of the Working Group on Enforced or Involuntary Disappearances, a case must only be included in the statistics of the State under whose jurisdiction the person was deprived of liberty or last seen. These conditions are not met in the cases mentioned with regard to the State of El Salvador, since those persons were not under the jurisdiction of the Salvadoran State at the time of their alleged deprivation of liberty or when they were last seen.

Consistent with the above, the State respectfully requests the Working Group to exclude the cases of (...) from the statistics and from any records pertaining to El Salvador.

Finally, El Salvador reiterates its commitment to complying with its international human rights obligations, including the prevention of enforced disappearances, in accordance with Human Rights Council Resolution 7/12. To this end, it confirms that it has a solid institutional framework and domestic regulations that constitute a framework for the protection and guarantee of the rights of persons deprived of liberty, regardless of their nationality.

[…]

JA197

[LOGO]                    **Report on Enforced or Involuntary Disappearances**                    [LOGO]

**El Salvador**

**Case No:** ▮▮▮▮▮

SURNAME(S): ▮▮▮▮▮▮▮▮▮

Name(s): ▮▮▮▮▮▮

Date of transmission: **April 16, 2025**

Case solved: **No**

Country(ies) in copy: United States of America, Venezuela (Bolivarian Republic of)

## I. Identity details of the person

SURNAME(S): ▮▮▮▮▮▮                                    Name(s): ▮▮▮▮▮▮

Gender: Male

Age:                                                      Date of birth: ▮▮▮▮▮

Parents: ▮▮▮▮▮▮▮▮▮▮▮

Nationality: Venezuela (Bolivarian Republic of)

Civil status: ▮▮▮▮

Residence: ▮▮▮▮▮▮▮▮▮▮▮

Identity: IDENTITY CARD          Date:                No.: ▮▮▮▮▮

          Place:                          Country: El Salvador

## II.1  Date that the person was detained                    **March 2024**

## III.1  Place where the person was detained

Province:                                          Country: United States of America

## II.2  Date when the person was last seen                   **March 15, 2025**

## III.2  Place where the person was last seen

Place: Webb County Detention Center

City: Laredo                                        District:

Province: Texas                                     Country: United States of America

## V. Procedures carried out

INVESTIGATIONS IN          Date: ▮▮▮

                          Place: ▮▮▮▮▮▮▮▮

**JA198**

*[LOGO]* **Report on Enforced or Involuntary Disappearances** *[LOGO]*

Report

Date: ███████████

Place: ████████████████████████████

**JA199**

10

**El Salvador    10015365**

*[LOGO]* **Report on Enforced or Involuntary Disappearances** *[LOGO]*

Report

Date: ███████████

Place: ████████████████████████████

11

**JA199**

*[LOGO]*                    **Report on Enforced or Involuntary Disappearances**                    *[LOGO]*

## VI. Complainant(s)

Confidential                                                      Date:    April 08, 2025

**JA200**

## VII.  Other elements of the report

**Session:**     **136**

**INFORMATION FROM THE GOVERNMENT**                    Date:  April 03, 2025

11

**JA200**

[LOGO]                **Report on Enforced or Involuntary Disappearances**                [LOGO]

According to information received from the Government of El Salvador:

"The State of El Salvador herewith wishes to refer to the communications from the Working Group on Enforced or Involuntary Disappearances with reference G/SO/217/1/SLV (...) which state that the aforementioned Group has received information on "alleged enforced disappearances in El Salvador, in the context of mass deportations carried out between the Government of the United States of America and El Salvador" (...).

The Salvadoran State has conducted a detailed analysis of the claims presented in the communications sent by the Working Group, which indicate that the persons mentioned: i) were in the custody of the United States Immigration and Customs Enforcement (ICE); ii) were allegedly deported to El Salvador on March 15, 2025; iii) ceased to appear in ICE's Online Detainee Locator System as of that date; iv) were identified on a list of deportees published by a local media outlet1; and v) their fate and whereabouts are unknown.

In response to the above, the State of El Salvador states that it has responded to previous communications from the Working Group on alleged disappearances of persons of Venezuelan nationality, in particular through Note B1592025, dated April 3 of this year, which pointed out the lack of grounds for requesting information from the State of El Salvador, as well as the lack of elements that would constitute an enforced disappearance attributable to the State of El Salvador. It therefore requested that the cases be excluded from El Salvador's statistics, in accordance with the working methods of the Working Group on Enforced or Involuntary Disappearances, since those persons were not under the jurisdiction of the Salvadoran State at the time of their alleged deprivation of liberty or when they were last seen.

In response to the above, the State of El Salvador states that it has responded to previous communications from the Working Group on alleged disappearances of persons of Venezuelan nationality, in particular through Note B1592025, dated April 3 of this year, which pointed out the lack of grounds for requesting information from the State of El Salvador, as well as the lack of elements that would constitute an enforced disappearance attributable to the State of El Salvador. It therefore requested that the cases be excluded from El Salvador's statistics, in accordance with the working methods of the Working Group on Enforced or Involuntary Disappearances, since those persons were not under the jurisdiction of the Salvadoran State at the time of their alleged deprivation of liberty or when they were last seen.

The State reiterates each of the terms of its previous communication, in particular that:

i its authorities have not arrested, detained, or transferred the persons referred to in the Working Group's communications.

ii the actions of the State of El Salvador have been limited to the implementation of a bilateral cooperation mechanism on prison matters with another State,

iii it has only facilitated the use of Salvadoran prison infrastructure for the reception and custody of persons detained within the scope of the justice system and law enforcement of another State,

iv the jurisdiction and legal responsibility for these persons lie exclusively with the competent foreign authorities, by virtue of international agreements signed and in accordance with the principles of sovereignty and international cooperation in criminal matters,

v the actions attributable to the Salvadoran State are limited to its sovereignty and territorial jurisdiction,

vi the claims presented do not attribute any direct action to the Salvadoran State that meets the definition of enforced disappearance under international law and the working methods of the Working Group, vii) there are no valid grounds for the Working Group to request information from El Salvador, and

vii El Salvador is committed to complying with its international human rights obligations, including the prevention of enforced disappearances, in accordance with Human Rights Council Resolution 7/12. To this end, it confirms that it has a solid institutional framework and domestic regulations that constitute a framework for the protection and guarantee of the rights of persons deprived of liberty, regardless of their nationality.

Consequently, it REQUESTS the Working Group on Enforced Disappearances to:

1. Consider the response of the State of El Salvador to communication G/SO/217/1/SLV dated April 16, 2025, as having been submitted.
2. Exclude from the statistics and any records pertaining to El Salvador the cases referred to in the communication, as their registration does not comply with the provisions of the Working Methods of the Working Group on Enforced or Involuntary Disappearances, which state that a case must only be included in the statistics of the State under whose jurisdiction the person was deprived of liberty or last seen, conditions that are not met in the cases mentioned with regard to the Salvadoran State at the time of their alleged deprivation of liberty or when they were last seen."

---

**Session:    136**

**INFORMATION FROM THE SOURCE**                          Date:  April 08, 2025

---

12

[LOGO]                                                                    [LOGO]

**Report on Enforced or Involuntary Disappearances**

Mr. ▮▮▮▮▮▮ (identified as Mr. ▮▮▮▮▮▮ in U.S. immigration records), a Venezuelan national and holder of identity card number ▮▮▮▮▮, was in custody at the Webb County Detention Center (Laredo, Texas) when he was allegedly deported from the United States of America to El Salvador as part of the mass deportations that have taken place since March 15, 2025.

Mr. ▮▮▮▮▮ had been in custody at the Moshannon Valley Processing Center (Philipsburg, Pennsylvania) since May 2024. A judge ordered his removal on December 2, 2024. He was subsequently transferred to a detention center in El Paso, Texas, and on March 10, 2025, he was transferred to the Webb County Detention Center.

On March 14, 2025, Immigration and Customs Enforcement (ICE) officials reportedly informed Mr. ▮▮▮▮▮ that he would be removed from the center. Persons associated with Mr. ▮▮▮▮▮ claim that after this date, they were unable to find his information on the ICE Online Detainee Locator System, implying that Mr. ▮▮▮▮ had been released or deported.

On March 15, 2024, it was reported that the bus transporting Mr. ▮▮▮▮▮ broke down and he was returned to the Webb County Detention Center. Mr. ▮▮▮ informed persons associated with him that his departure had been rescheduled for around 3 p.m. Central Time.

Since this call, persons associated with Mr. ▮▮▮▮▮ have been unable to contact him. Furthermore, persons associated with him have requested assistance from his congressional representative's office. According to the information received, the congressional office has requested information from the U.S. Department of Homeland Security and is awaiting a response.

In addition, persons associated with him have ▮▮▮▮▮▮▮▮▮.

At the time of this communication, the fate and whereabouts of Mr. ▮▮▮▮▮ remain unknown.

Sent to the Government:  April 16, 2025

JA202

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

LIYANARA SANCHEZ, as next friend on behalf of
FRENGEL REYES MOTA, *et al.*,

*Petitioners–Plaintiffs*,

J.G.G., *et al.*,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, *et al.*,

*Respondents–Defendants*.

Case No: 1:25-cv-00766-JEB

**NOTICE OF CHANGED CIRCUMSTANCES**

Petitioners-Plaintiffs ("Plaintiffs") provide notice to the Court of significant new developments bearing on this litigation. According to a declaration filed by the government in *J.O.P. v. United States Dep't of Homeland Sec.*, No. 8:19-cv-01944 (D. Md.), 252 Venezuelan nationals in El Salvador are being flown to Venezuela. *J.O.P.*, ECF No. 352, Ex. A ¶ 7 (Declaration of Mellissa B. Harper, U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations, Acting Assistant Director, filed July 18, 2025) (attached as Ex. A). The declaration states that this is the result of "diplomatic efforts" that included the United States. *Id.* ¶ 8. It further states:

> As part of these negotiations, the United States obtained assurances from the Maduro regime that (1) if and when U.S. legal proceedings reach a stage where the appearance of one of the 252 Venezuelan nationals formerly housed at CECOT may be called for in legal proceedings or required by a court; (2) if the U.S. government is prepared to facilitate the person's travel to the United States for that purpose; and

1

**JA203**

(3) if the individual is willing to travel to the United States for that purpose, the Maduro regime will not impose obstacles to the individual's travel.

*Id.* ¶ 9.

These individuals appear to include all members of the certified class in this litigation, based on the government's representations in *J.O.P.*, *id.* ¶ 8, a social media post from El Salvador's president,[1] and public reporting.[2] In light of these developments, Plaintiffs respectfully request that this Court request an immediate status update from the government as to whether it is prepared to bring the members of the class back to the United States for habeas proceedings.

//

---

[1] Nayib Bukele, X (Jul. 18, 2025), https://x.com/nayibbukele/status/1946296384035918284.
[2] *Prisoner Swap Frees Americans in Venezuela for Migrants in El Salvador*, N.Y. Times, Jul. 18, 2025, https://www.nytimes.com/2025/07/18/world/americas/venezuela-us-prisoner-swap-migrants-el-salvador.html.

JA204

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Southern Division)

| | |
|---|---|
| J.O.P., *et al.*,<br><br>        *Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF<br>HOMELAND SECURITY, *et al.*,<br><br>        *Defendants*. | 8:19-CV-01944-SAG<br>Declaration of<br>Acting Assistant Director<br>Mellissa B. Harper |

## DECLARATION OF MELLISSA B. HARPER

I, Mellissa B. Harper, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.      I am currently employed by the U.S. Department of Homeland Security (DHS),

U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations

(ERO) as the Acting Assistant Director (A)AD. I have held this position since July, 2025.

2.      As (A)AD, I oversee the mission of ERO's eight headquarters divisions:

Enforcement, Removal, Non-Detained Management, Custody Management, Field Operations,

ICE Health Service Corps, Law Enforcement Systems and Analysis, and Operations Support.

3.      I am aware of the court's order in *J.O.P. v. Department of Homeland*

*Security*, ECF No. 254, which orders the Defendants to facilitate the return of an alien with

the pseudonym Cristian. I am also aware of ECF No. 293, which orders the Defendants to

file weekly status reports in the form of a declaration.

4.      U.S. Department of State (DOS) is the agency of the United States

Government responsible for high-level diplomatic discussions.

5.      DHS has informed the DOS of the Court's order and requested DOS

assistance in complying with the Court's order, including by entering into negotiations to

facilitate Cristian's return. DOS has acknowledged the request.

6.  Given the nature of the diplomatic discussions necessitated by the court's order to facilitate Cristian's return to the United States, which would involve engagement with the highest levels of the Salvadoran government, and as conveyed to you previously, DOS including in country Embassy officials has assumed responsibility on behalf of the U.S. Government for these diplomatic discussions with El Salvador.

7.  DOS informed me today, on July 18, 2025, that the Salvadoran government in the sole exercise of its sovereign authority, released Cristian from CECOT, along with 251 other Venezuelan nationals, to be flown to their home country of Venezuela, as part of an arrangement between El Salvador and the Maduro regime. Maduro, in turn, released ten wrongful detainees and 80 Venezuelan political prisoners.

8.  While the United States engaged in diplomatic efforts help make this arrangement possible, the decision to release the Venezuelan nationals from CECOT, and to repatriate them to Venezuela, was made solely by the Government of El Salvador in the exercise of its sovereign authority.

9.  As part of these negotiations, the United States obtained assurances from the Maduro regime that (1) if and when U.S. legal proceedings reach a stage where the appearance of one of the 252 Venezuelan nationals formerly housed at CECOT may be called for in legal proceedings or required by a court; (2) if the U.S. government is prepared to facilitate the person's travel to the United States for that purpose; and (3) if the individual is willing to travel to the United States for that purpose, the Maduro regime will not impose obstacles to the individual's travel.

I declare, under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief, as of the time of signature.

JA207

Executed this 18th day of July 2025.

**MELLISSA B HARPER**

Digitally signed by MELLISSA B HARPER
DN: cn=MELLISSA B HARPER, o=U.S. Government, ou=People, email=Mellissa.B.Harper@ice.dhs.gov, c=US
Date: 2025-07-18T15:06:58-0500

Mellissa B. Harper
Acting Assistant Director
Removal Division
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

## SUPPLEMENTAL DECLARATION OF ANDRÉS ANTILLANO

I, Andrés Antillano, declare the following pursuant to 28 U.S.C. § 1746, and declare under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

1.      For a summary of my professional qualifications, please refer to my previous declaration, filed as ECF No. 102-3. Based on my experience, I have been asked to describe the situation in Venezuela for the men sent by the United States to CECOT in March 2025 and then sent to Venezuela in July.

2.      The CECOT detainees were quickly politicized by both the Maduro regime and the opposition in Venezuela.

3.      The Maduro regime has used these men as propaganda tools to demonstrate the shortcomings of the United States and the benevolence of the Venezuelan state. Therefore, it has prominently featured them in its propaganda, including disclosing personal details about them and their time at CECOT.

4.      This extreme attention puts men in danger for several reasons.

5.      First, CECOT detainees who refuse to participate in government propaganda or speak out against the regime will face threats (or worse) from the Maduro regime. In the past, the Maduro regime has not hesitated to arrest and detain returning asylum seekers who demonstrate against the Venezuelan government in order to send a message. This is especially true when prominent figures speak out, and by the very nature of its propaganda campaign, the Venezuelan government has given many CECOT detainees a prominent position.

6.      Second, CECOT detainees face political violence from both sides. Venezuela continues to experience persistent political violence. The regime collaborates with paramilitary groups that regularly threaten, intimidate, and attack individuals perceived as opposition

1

JA208

sympathizers. If the Maduro regime perceives any of the detainees as members or sympathizers of the opposition because they express opposition to the regime (or simply refuse to participate in propaganda), they are likely to be subjected to physical violence by pro-regime paramilitary groups.

7.      Just as pro-regime paramilitary groups attack opposition supporters, pro-opposition groups sometimes physically attack supporters of the Maduro regime. Because these men feature heavily in government propaganda and therefore have public ties to the regime, they are likely targets of opposition groups' violence. Consequently, they face a dangerous situation: either participate in propaganda and face violence from opposition groups, or refuse to participate in propaganda and face violence from pro-government groups.

8.      Unlike the Maduro regime, right-wing opposition leaders in Venezuela have insisted that the men are dangerous criminals and members of the Tren de Aragua. The opposition maintains that the Trump administration made no mistake in designating them as members of the TdA.

9.      Being prominently labeled as TdA members by high-profile political leaders in both the United States and Venezuela carries serious consequences, despite the falsity of the accusations in the vast majority of cases. Rival gangs that mistakenly believe public statements that these men are TdA members may threaten or attack them as they would any other rival gang member. TdA, or other TdA-related gangs, may subject CECOT detainees to retaliation, as they perceive the men to have pretended to belong to TdA. These simultaneous threats can make daily life for these men very dangerous.

10.      In short, CECOT detainees face a complex web of threats in Venezuela. Given that both the Maduro regime and the opposition have aggressively sought to use them for their political ends, threats are often unavoidable.

2

JA210

Date: 10 08 2025_____

Andres Antillano

3

JA210

MATERIAL UNDER SEAL DELETED

███████████████

1. I am one of the men who was removed to CECOT under the Alien Enemies Act on March 15. ████████████████████████████. I was sent from CECOT to Venezuela on July 18, 2025.

2. When we landed in El Salvador, we asked the American officials on the plane if we could speak to the Venezuelan consulate. They denied our requests and physically forced us out of the planes after we refused to get out.

3. The first night at CECOT, the Director of CECOT spoke to us. I later learned that his name is Belarmino Garcia. He told us that we were detained at CECOT because we were terrorists and members of Tren de Aragua. He also told us that the United States had directed El Salvador to lock us up in this place in order to "do justice."

4. About one and a half or two months after we arrived at CECOT, the Director said to us, "if it were up to me, I would let you go. But the order comes from above. It comes from Donald Trump."

5. We asked the guards why we were being detained in CECOT since we had never broken any laws in El Salvador. They told us that there was an agreement between the United States and El Salvador to keep us in CECOT and that the orders to keep us in CECOT came from the United States. They told us that the United States thought it was more economical to keep us in CECOT than in the United States.

6. The guards told us that the only way that we would be released was if the United States ordered it. They said that the United States needed to reach an agreement with Venezuela for that to happen.

7. While I was detained at CECOT, officials from the United States visited on two occasions. One time, a woman came with photographers. I recognized her as Secretary Noem from watching the news when I was detained in the United States. Another time, a few Americans came together. Some were wearing suits and others wore military gear. I knew they were American because they were speaking English and the military uniforms had American flags on the sleeves.

8. I also knew that they were Americans because the Salvadoran guards told us so. They said that the fact that Americans were visiting was a good sign because it meant that our case would continue to move along. They told us that the officials coming meant that an agreement between the United States and Venezuela was in progress, and that we would likely soon be transferred to Venezuela.

9. Around the beginning of July, our conditions began to improve. We were given better food and haircuts, and the beatings stopped. Prison officials told us these changes were under orders from the United States. The guards also told us that our detention had to do with our immigration cases and status in the United States. They said that because Venezuela had come to an agreement with the United States, the Venezuelan government would be coming to pick us up soon.

MATERIAL UNDER SEAL DELETED

10. On July 18, we were transferred to a Venezuelan plane and flown to Caracas. I am now ███████████████████

11. I would like to return to the United States legally to live. I was in the middle of my asylum case when I was deported to CECOT. I want to continue pursuing my asylum claim.

12. If I were granted asylum, I would remain in the United States for the long term and live with █████████████.

13. I am afraid to leave Venezuela because I have heard that the United States has labeled me as a gang member and an "international criminal." This could lead to difficulties if I try to go to another country, including the United States. In my view, the United States is giving me no choice but to remain in Venezuela.

14. I would like to be able to leave Venezuela and travel freely. ███████████████████████████████████████████████

Sworn on this 9th day of October 2025

**MATERIAL UNDER SEAL DELETED**

████████████████

1. ████████████████████████████████

2. I originally came to the United States from Venezuela to seek asylum ████████████
████████████████ ████████████████████████████
████████

3. I was first taken into ICE custody on ████████████. ICE took my money, my phone, and my documents. I haven't seen any of my stuff since then. I assume that ICE confiscated it and doesn't plan to return it, since I'm in Venezuela now.

4. I applied for asylum, but I was never able to defend my case because I was removed to CECOT on March 15, 2025, under the Alien Enemies Act.

5. My removal began when I was put on a plane in El Valle, Texas. The officials on the plane had "ICE" written on their uniforms but they did not have name tags. Some wore hoods over their faces. I had seen similar uniforms on ICE officials in detention in the United States, but all of the prior times I interacted with ICE officials, the uniforms had always included name tags. It seemed to me like they were intentionally trying to hide their identities.

6. When the plane landed in El Salvador, the ICE officials tried to force us to sign a form. One Venezuelan man who spoke English translated the form. It accused us of being members of Tren de Aragua. They told us that we had to sign the paper in order to proceed with our cases. We didn't understand what this meant but we refused to sign it because we are not members of Tren de Aragua. We all refused to sign it.

7. We could see from our windows that the men getting off of the first plane were being beaten by Salvadoran officials. We were scared to get off the plane and refused to do so. The ICE officials told us that, if we did not get off the plane, they would force us off. Then they started to beat us and punch us to make us get out. They even choked one of the women on the plane who was crying out for them to stop hitting us.

8. After we were taken off the plane, we were transported to CECOT. I was confused why I was in prison in El Salvador because I have never committed a crime in El Salvador (or anywhere).

9. Once we arrived at CECOT, there was no doubt in my mind that the United States was in charge of our detention. A man announced to us that he was the Director of CECOT. He told us that he was waiting on U.S. orders about what to do with us. Our Salvadoran guards told us the same thing. They said that the United States was responsible for our detention and that we couldn't leave until the United States gave the word.

10. On multiple occasions throughout our detention, we would ask the guards what was going on with our situation. The guards consistently told us that they did not know and that it was up to the United States what happened to us.

11. While I was at CECOT, I met a Salvadoran detainee who was employed by the prison as a janitor. He told me that he was doing extra cleaning because Americans were coming to

1

MATERIAL UNDER SEAL DELETED

visit. Soon after, there were men in suits speaking English who walked through the prison.

12. Around early July, I learned from the guards that our release from CECOT was being negotiated between Venezuela and the United States. A week or two prior to our release, they stopped beating us. They also gave us creams to heal our bruises and other medications. They allowed us to eat a little more food.

13. On July 18, 2025, we were sent from CECOT to Venezuela.

14. I don't feel safe in Venezuela. When I first got back to Venezuela, the government forced me to give them my address and all my personal details. I didn't have a choice. Someone from the government took me to my house and dropped me off so they know exactly where I lived. They told me that they would be paying attention to me and visiting me.

15. This scared me because the government in Venezuela is very strong. The government official who dropped me off at my home threatened me that I would have to pay money if I was stopped by the government outside of my home. I know that people associated with the government (either government officials or members of colectivos associated with the government) have similarly approached my friends who have returned from the United States to force them to pay this kind of "extortion fee" as a punishment for living in the United States. My friends knew they were associated with the government because the people knew personal details that only the government had access to. The government officials call these "fees" a "vaccine" because they protect us from retribution by the government. I'm scared about what would happen if I refused to pay the fee, but I also don't have many resources available to pay.

16. They made other threats, too. For example, the government threatened to initiate a case against me for being a traitor to Venezuela—solely because I left to go to the United States. I think the government feels like it can extort money from me because this threat of legal action makes me easy to exploit. I know this threat is real because I know innocent people in Venezuela who have been imprisoned for years for being "traitors" for speaking out against the government.

17. █████████████████████████████████████████████████████████ I try not to go out as much as possible because I'm afraid that someone associated with the government will recognize me and the threats will start again. I don't travel to other towns or cities. I don't think I can ever return to my normal life here now that I've been so publicly portrayed as a gang member.

18. I'm also afraid to travel outside of Venezuela because of the U.S. government's false accusations. I'm afraid that, because the United States has called me a "terrorist," I will be arrested if I try to go to another country.

19. ████████████████████████████████████████████████████

2

**MATERIAL UNDER SEAL DELETED**



20. It is very important to me to clear my name. I'm not guilty of what the United States accused me of. I have never been involved in any gang or criminal activity and I don't even have any tattoos. I would like the opportunity to prove that to a judge in the United States.

21. I would also like to return to the United States to continue my asylum claim. I don't feel safe in Venezuela, and

Sworn on this 9th day of October 2025

3

MATERIAL UNDER SEAL DELETED

████████████████████

1. I was removed to CECOT under the Alien Enemies Act on March 15. ███████████ ██████████████████

2. ███████████████████████████████████████████████████████████████████████ ██████████████████████████

3. I never had the chance to present evidence in support of my asylum case nor defend my case in front of an immigration judge because I was taken to the CECOT prison in El Salvador before my individual hearing date.

4. I was flown to El Salvador in a plane with officials wearing ICE uniforms. We were all shackled. When we landed and realized that we were in El Salvador, everyone on my flight was confused and scared. We had heard that there had been negotiations between Trump and El Salvador about detaining immigrants at CECOT. We also knew that CECOT was a maximum-security prison.

5. An ICE officer presented a form for us to sign. The form was in English. One of the other detainees on the flight who could read English translated it for us. It said we were members of TdA and we would be in CECOT for up to a year. I refused to sign the form because I am not a member of TdA.

6. We were terrified of being detained at CECOT so we refused to get off the plane. The ICE officials on the plane beat us and forced us off the plane.

7. When we arrived at CECOT, the director at CECOT spoke to us. He said that the United States had an agreement with El Salvador to detain us because we were members of TdA.

8. While we were detained at CECOT, we asked the guards why we were in detention in El Salvador. We did not understand because we had committed no crimes there. The guards told us that the U.S. government put us there because we were members of TdA. The guards told us that we could only be released if the U.S. said so.

9. At one point, some Americans came to CECOT to inspect the prison. We could tell that they were American because they spoke English with an American accent. They had photographers with them.

10. On July 18, we were transferred from CECOT to Venezuela. We were initially taken to Caracas, where we were interviewed by Venezuelan government officials. They made us take a lie detector test while we answered their questions. After processing in Caracas, government officials drove me to my house. When they dropped me off, they told me that I had to behave. I understood this to be a threat that if I spoke out against the government, they would do something bad to me.

11. I am afraid about remaining in Venezuela for several reasons. All of the men from CECOT have received a lot of publicity in Venezuela. People recognize me and know that I was at CECOT. I do not feel safe being so high profile here. It has made me particularly visible to and a target of the Venezuelan government. I am afraid that they could threaten me or worse for anything I say.

12. ████████████████████████████ I avoid going anywhere else because government stops are common in Venezuela. I am afraid that the government officials who stop me

**MATERIAL UNDER SEAL DELETED**

will try to extort me based on the allegations that I'm a terrorist or involved in TdA. This happened to one of the people I was in CECOT with—he had to move because of the extortion he was experiencing from government officials.

13. Being labeled as TdA makes life difficult here. ██████████████████ ████████████████████████████████████████ ██████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████ I am in touch with other men who were detained at CECOT, and many of them have been unable to find a job because people think they are gang members.

14. I feel stuck in Venezuela. I have heard that I cannot travel to other countries that have agreements with the United States because I am now designated as a member of TdA and a terrorist.

15. It is important to me to have an opportunity to clear my name. I am a hard worker. I am not a member of TdA. I have never been in a gang or involved in any crime or terrorism. I want people to know that about me. I do not want the label of "Tren de Aragua" attached to me for the rest of my life.

16. I would like to have the opportunity to live legally in the United States.

Sworn on this 14th day of October 2025



_____

**JA217**

MATERIAL UNDER SEAL DELETED

██████████████

1. ████████████████████████████████████████████████████

2. On Friday, July 18, 2025, I was finally released from the CECOT prison in El Salvador where the U.S. government sent me on March 15, 2025. I spent 125 grueling days in the prison where I endured significant and severe physical, mental and emotional torture.

3. Due to the abuse I suffered while I was at CECOT, it is hard for me to talk about my time there. I remember when we first arrived to CECOT, the director of the prison met with us and said he was waiting for orders from the U.S. about what to do with us. Throughout our time at CECOT the Salvadoran guards made comments about us being criminals and said that President Trump sent us to CECOT because we were criminals. The guards often said things like, "you're going to spend the rest of your life here" and "neither Venezuela or the US will ever come get you." I remember the guards telling us that we would stay at CECOT as long as the U.S. said we had to stay there.

4. When I returned to Venezuela on July 18, the government kept us at a hotel for a few days for medical exams and interviews with government officials. Officers from Servicio Bolivariano de Inteligencia Nacional (SEBIN), which is the Venezuela intelligence agency, interviewed me in my hotel room. During the interview they connected me to a polygraph machine. They asked me questions about which political party I belonged to and what I thought about the government rescuing us from CECOT. I felt pressured to answer everything positively towards the government because I feared I would not be able to leave freely if I did not say what they wanted me to say.

5. At some point during the interviews, SEBIN officials said to me, "we know you were asking for asylum in the US but for now we aren't going to act on it since we don't have any evidence of your application, but if we ever get evidence you're going to be in danger for being a traitor to the country."

6. While we were still at the hotel, Venezuelan government officials told me that all of us who had been at CECOT had been designated as terrorists. I was told that if I left Venezuela, I would be subject to arrest and imprisonment of 10 years because of the designation. I believe that by telling me this they were trying to make me too scared to travel outside of Venezuela again.

<span style="color:red">**MATERIAL UNDER SEAL DELETED**</span>



7. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8. Since I have been in Venezuela, there have been several situations that have frightened me and made me feel unsafe. Throughout the months of August and September 2025, I was stopped multiple times by people who made remarks to me about how I should be careful and that they knew about me. I assume they mean that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮, people from the government or 'colectivos' connected to the government were watching me. I feel unsafe because of these remarks, so I now only go out in public if it is absolutely necessary.

9. There have been several instances of negative encounters with people ▮▮▮▮▮▮ ▮▮. People have told me things like "you are part of Tren de Aragua" and ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. These accusations weigh on me because I am not and have never been part of Tren de Aragua or any gang, nor have I otherwise been associated with Tren de Aragua.

10. Because the U.S. government said that I was part of Tren de Aragua, some people now think this is true. It has affected me because ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and no one wants to hire me. I think it's because I have the stigma of being accused of being part of Tren de Aragua. It feels like I am being shunned by my community because of all the accusations that were made against me.

11. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**MATERIAL UNDER SEAL DELETED**

12.

13. I have had severe long term mental impact from being sent by the United States to CECOT. I have problems falling asleep and most nights I stay awake until 2 or 3 in the morning, which was not something that regularly happened to me before all this happened. I feel exhausted and depressed and keep reliving the nightmare I experienced in El Salvador. Thinking about what happened and the abuse I suffered is what keeps me up at night.

14. My physical health has also been impacted. ██████████████████ ████████████, and I believe I am feeling weak and sick from the stress I have experienced as a result of my time at CECOT and the threats I now face in Venezuela. I didn't have adequate medical care for four months, and the stressful and dangerous situation I am in now makes it extremely difficult to recover from that.

15. I want people to know that I am not a gang member and the U.S. government falsely accused me of being in Tren de Aragua. ████████████████. I have never been involved in any criminal activities. ████████ I want to be able to speak to a judge in the U.S. and prove to everyone that what they said is not true. I want to clear my name.

16. I would also like to return to the United States to continue my asylum claim. I was in the middle of the asylum process and never had a chance to have my day in court. I don't feel safe in Venezuela, especially given everything that has happened since I was returned here from El Salvador. If I won asylum, my plan would be to stay in the United States for the long term and rebuild my life. ████████████████

Sincerely,



_____
October 14, 2025
Date



| From: | Flentje, August (CIV) |
| To: | Reuveni, Erez R. (CIV); ███████ (CIV); ███████ (CIV) |
| Subject: | Fwd: Advice to DHS |
| Date: | Sunday, March 16, 2025 2:28:42 PM |

Hi. Does this get us comfortable with the notice as drafted earlier with the addition of the removed from US airspace line? Drew will be the slash s and make the ECF filing even

Begin forwarded message:

> **From:** "Roth, Yaakov M (CIV)" <Yaakov.M.Roth@usdoj.gov>
> **Date:** March 16, 2025 at 2:26:48 PM EDT
> **To:** "Flentje, August (CIV)" <August.Flentje@usdoj.gov>
> **Cc:** "Reuveni, Erez R. (CIV)" <Erez.R.Reuveni@usdoj.gov>, "Ensign, Drew C (CIV)" <Drew.C.Ensign@usdoj.gov>
> **Subject: Advice to DHS**
>
>
> I have been told by ODAG that the principal associate deputy attorney general advised DHS last night that the deplaning of the flights that had departed US airspace prior the court's minute order was permissible under the law and the court's order.
>
>
> Sent from my iPhone

**JA221**

March 22, 2025

Ministry of Foreign Relations of El Salvador
Blvd. Cancillería , Calle El Pedregal, Antiguo Cuscatlan
La Libertad, El Salvador C.A

On behalf of the United States, I am pleased to inform you that, under the authority contained in the Foreign Assistance Act of 1961 (FAA), including sections 481 and 635 of that Act, the Government of the United States of America, through the Bureau of International Narcotics and Law Enforcement Affairs (INL), of the U.S. Department of State, hereby provides a sum of $4,760,000 through this grant agreement for El Salvador's law enforcement and anticrime needs, which may include costs associated with the detention of members of the Foreign Terrorist Organization Tren de Aragua (TdA), whom El Salvador accepted from the United States. Your countersignature of this letter and the accompanying DS-1909 Federal Assistance Award coversheet acknowledges acceptance of these funds and your agreement to comply with the terms and conditions set forth in this letter.

On March 14, 2025, the Government of El Salvador (GOES) communicated its willingness to accept and house approximately 300 members of TdA removed for up to one year or until another decision is made on their disposition. The purpose of this grant is to provide funds to be used by Salvadoran law enforcement and corrections agencies for its law enforcement needs, which include costs associated with detaining the 238 TdA members recently deported to El Salvador.

The GOES shall not transfer any part of the funds provided under this grant to a third party or use funds for any purpose other than costs described above, subject to the terms and conditions identified in this grant agreement. Funds provided under this grant will be deposited into the GOES bank account using the following banking data:

U.S. Intermediate Bank: JP Morgan Chase Bank
BIC: CHASU33
ABA: ███████

Beneficiary Bank: Central Reserve Bank of El Salvador
BIC: CENRSVSS
Account Number: ███████

Final Bank: General Directorate of the Treasury
Account Number: ██████

**JA222**

RFK Human Rights_0004

Account:  R DE H-DGT-ATENCIÓN A OTROS SERVICIOS

Additional terms and conditions of this grant are outlined in the attached Annex, which is incorporated into this letter by reference.  The GOES further agrees to exercise due diligence to ensure compliance with section 620M of the FAA and Department of State policy, and to cooperate with the Department of State in the implementation of this requirement.  At least 30 days prior to using these funds to provide assistance to any security force unit, the GOES agrees to identify such unit to the Department of State.  The GOES agrees not to provide this assistance to any unit identified by the Department of State as prohibited under section 620M of the FAA.

The GOES agrees that no part of the funds provided by this grant will: a) be used in transactions with, or to provide resources or support to, individuals and organizations designated pursuant to Executive Order 13818 for being foreign persons who are current or former government officials, or persons acting for or on behalf of such an official, who are responsible for or complicit in, or have directly or indirectly engaged in corruption, including the misappropriation of state assets, the expropriation of private assets for personal gain, corruption related to government contracts or the extraction of natural resources, or bribery; or b) be used in transactions with, or to provide resources or support to, individuals and organizations associated with terrorism,  including any individual or entity designated under United States Executive Order 13224 (a list of these names can be found on the following website http://www.treasury.gov/ofac/downloads.sdnlist.pdf), except as authorized under U.S. law or to support the detention of such individuals, including  TdA members removed from the United States.

Further, GOES agrees that no part of the funds provided by this grant will be used in transactions with, or to provide resources or support to or through, a known drug trafficker in accordance with section 487 of the Foreign Assistance Act of 1961 (FAA).

The GOES will provide, within six months following the end of each calendar year, a comprehensive report of financial activity related to the funding provided through this agreement.  The GOES will provide, upon request, additional reports of financial transaction-level activity related to the funding provided through this agreement as requested by the United States.

This agreement may be amended in writing if agreed to by both the Government of the United States and the Government of El Salvador.

The above agreement as memorialized in this letter is not an international agreement and any rights or obligations arising from it do not arise under international law.  Any issue or dispute related to the agreement, including the legal obligations of the parties are to be

RFK Human Rights_0005

resolved solely through consultations between the Ministry of Foreign Relations of El Salvador and the Department of State. The Department of State does not assume liability for any third-party claims for damages arising out of this award.

Please counter-sign, as indicated below, and return this letter as soon as possible. Our receipt of this letter with your countersignature, indicating your acceptance of the terms and conditions of this letter, will serve as the official U.S. obligation of funds. The funds provided herein will be transferred to the GOES as soon as practicable following my receipt of your acceptance. The purpose of this grant, which is to support costs related to detention of members of TdA, will be met upon disbursement.

Sincerely,

Countersignature

Title

Date

Attachment: Annex – Additional Terms and Conditions

RFK Human Rights_0006

Annex – Additional Terms and Conditions

1.      GOES agrees that none of the funds awarded under this agreement may be made available to encourage, mobilize, publicize, or manage mass-migration caravans towards the United States southwest border.  Funds may not be made available for legal counseling on the United States asylum process, or for referrals to legal representation in the United States.

2.      GOES agrees that funds may not be made available for legal counseling on the United States asylum process; and/or for referrals to legal representation in the United States.

3.      GOES agrees that none of the funds awarded under this agreement may be made available for subawards, direct financial support, or otherwise used to provide any payment or transfer to United Nations Relief and Works Agency (UNRWA).

4.      GOES agrees that none of the funds provided under this agreement may be used to lobby for or against abortion. The GOES agrees that none of the funds provided under this agreement may be used to pay for the performance of abortion as a method of family planning or to motivate or coerce any person to practice abortions.

5.      GOES agrees that none of the funds awarded under this agreement may be used for any initiatives or programs, or any activities that do not comply with Executive Order 14173 titled Ending Illegal Discrimination and Restoring Merit-Based Opportunity.  By signing the letter, the Recipient certifies the following: 1) Its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code and; 2) It does not operate any programs promoting Diversity, Equity, and Inclusion that violate any applicable Federal anti-discrimination laws.

**JA225**                                                          RFK Human Rights_0007



~~CONFIDENTIAL//FGI//MOD~~

The Embassy of the United States of America presents its compliments

to the Ministry of Foreign Affairs of the Republic of El Salvador and has the

honor to request that El Salvador accept, by March 14, 2025, César Antonio

Lopez Larios, Mara Salvatrucha (MS-13) gang leader requested by President

Bukele, César Eliseo Sorto Amaya, MS-13 gang leader convicted of murder in

El Salvador, and up to 500 Venezuelan Tren de Aragua (TdA) members.

The United States understands that El Salvador will take these actions

in accordance with its authorities under Salvadoran domestic law, and in a

manner that is consistent with El Salvador's international legal obligations

regarding human rights and treatment of prisoners, including the

Convention Against Torture.  Further, with regard to the TdA members, the

United States understands El Salvador intends to accommodate them for a

duration of one year unless or until a determination concerning their long-

term disposition is made.

~~[CONFIDENTIAL//FGI//MOD]~~
**DIPLOMATIC NOTE**

**JA226**

~~CONFIDENTIAL//FGI//MOD~~

-2-

In recognition of El Salvador's assistance on this matter, and in order to advance the shared objective of advancing the anti-crime and anti-drug objectives of our countries, the United States intends, consistent with U.S. domestic legal requirements to provide in-kind and financial support to the Government of El Salvador.

This note serves as 24-hour notice of the arrival of the Lopez Larios, Amaya, and up to 500 Venezuelan TdA members.

The United States requests the Ministry of Foreign Affairs of the Republic of El Salvador confirm receipt of this diplomatic note and provide a response to the Embassy of the United States of America confirming that it shares the understandings set forth in this note.

The Embassy avails itself of this opportunity to express to the Ministry of Foreign Affairs the renewed assurances of its highest consideration.

Embassy of the United States of America,

San Salvador, March 13. 2025.

Classified By: Michael G. Kozak, WHA Senior Bureau Official

Reasons: 1.4(b) & (d), E.O. 13526

Declassify On: Exempt from auto declass sec. 3.3(b)(6), foreign government information, consult with El Salvador prior to declassification.



Declassified by Michael G. Kozak
Senior Bureau Official
Western Hemisphere Affairs
Declassified on: 20250509

**JA227**

CONFIDENTIAL//FOREIGN GOVERNMENT INFORMATION/MODIFIED HANDLING AUTHORIZED



**THE MINISTRY OF FOREIGN AFFAIRS
OF THE REPUBLIC OF EL SALVADOR**

Antiguo Cuscatlán, March 14, 2025.

To the Honorable Embassy of the United States of America:

In response to your Diplomatic Note No. 2025-068, regarding the transfer of two individuals identified as members of the terrorist organization MS-13 (Cesar Antonio Lopez Larios and Cesar Eliseo Sorto Amaya), as well as individuals designated by the United States as members of the foreign terrorist organization "Tren de Aragua," we wish to communicate the following:

The Ministry of Foreign Affairs of the Republic of El Salvador reaffirms its commitment to assist the United States in combating terrorism and promoting peace and freedom across our nations, while upholding human rights. In this context, we respectfully:

Agree to the transfer of the two individuals mentioned above, who are members of MS-13.

Express our readiness to accommodate approximately 300 members of the foreign terrorist organization "Tren de Aragua," currently detained by the United States. The Republic of El Salvador confirms it will house these individuals for one (1) year, pending further decisions on their long-term disposition.

Furthermore, we assure you that the reception of these individuals will be conducted in accordance with Salvadoran law and international obligations, including adherence to the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, of which we have been a signatory since May 19, 1994.

We also wish to express our appreciation for the United States offer of in-kind and financial support to El Salvador in recognition of this cooperation.

In closing, we take this opportunity to reiterate our highest esteem and consideration for the Honorable Embassy of the United States of America.

Minister of Foreign Affairs
Republic of El Salvador

Declassified by Michael G. Kozak
Senior Bureau Official
Western Hemisphere Affairs
Declassified on: 20250509

Classified By: Michael G. Kozak, WHA Senior Bureau Official

Reasons: 1.4(b) & (d), E.O. 13526

Declassify On: Exempt from auto declass sec. 3.3(b)(6), foreign government information, consult with El Salvador prior to declassification.

CONFIDENTIAL//FOREIGN GOVERNMENT INFORMATION/MODIFIED HANDLING AUTHORIZED

CONFIDENTIAL//FOREIGN GOVERNMENT INFORMATION/MODIFIED HANDLING AUTHORIZED

No. 2025-93

The Embassy of the United States of America presents its compliments to the Ministry of Foreign Affairs of the Republic of El Salvador and wishes to express its appreciation for the Government of El Salvador's support in combatting the crisis of illegal immigration and its acceptance of Foreign Terrorist Organization members.

This note acknowledges one flight which arrived in El Salvador March 30, 2025, carrying 16 passengers as per the attached manifest. All seven non-Salvadoran passengers are identified as Venezuelan members of the Foreign Terrorist Organization Tren de Aragua (TdA). All nine Salvadoran passengers are identified as members of the Foreign Terrorist Organization MS-13. The United States highlights the importance of the Government of El Salvador's previous assurance that El Salvador's reception and treatment of TdA and MS-13 individuals will be in accordance with Salvadoran law and international obligations, including adherence to the Convention Against Torture.

CONFIDENTIAL//FOREIGN GOVERNMENT INFORMATION/MODIFIED HANDLING AUTHORIZED

CONFIDENTIAL//FOREIGN GOVERNMENT INFORMATION/MODIFIED HANDLING AUTHORIZED

JA230

The Embassy of the United States avails itself of this opportunity to

express to the Ministry of Foreign Affairs the renewed assurances of its

highest consideration.

Embassy of the United States of America

San Salvador, March 31, 2025.



Classified By: Michael G. Kozak, WHA Senior Bureau Official

Reasons: 1.4(b) & (d), E.O. 13526

Declassify On: Exempt from auto declass sec. 3.3(b)(6), foreign government information, consult with El Salvador prior to declassification.



Declassified by Michael G. Kozak
Senior Bureau Official
Western Hemisphere Affairs
Declassified on: 20250509

CONFIDENTIAL//FOREIGN GOVERNMENT INFORMATION/MODIFIED HANDLING AUTHORIZED

**JA230**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LIYANARA SANCHEZ, as next friend on behalf of FRENGEL REYES MOTA, *et al.*, <br><br> *Petitioners–Plaintiffs*, <br><br> J.G.G., *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br> *Respondents–Defendants*. | Case No: 1:25-cv-00766-JEB |

**DECLARATION OF NOELLE SMITH**

I, Noelle Smith, declare as follows:

1. I am over eighteen years of age and am competent to make this declaration.

2. I am a lawyer at the American Civil Liberties Union Immigrants' Rights Project. I represent the Petitioners and Plaintiffs in this case.

3. Attached hereto as exhibits are true and correct copies of the following:

**Exhibit**

1. Attorney General, Memorandum for Law Enforcement Officers re: Guidance for Implementing the Alien Enemies Act (Mar. 14, 2025).

2. Dep't of Homeland Sec., Louisiana Lockup: A New Partnership with DHS and the State of Louisiana to Expand Detention Space (Sept. 3, 2025), https://perma.cc/6T73-3CEG.

3. Video posted by Secretary Noem (@sec_noem) and DHS (@dhsgov), Instagram (Sept. 4, 2025), https://perma.cc/5C2A-7RRX.

**JA231**

4.    Dep't of Homeland Sec, *DHS Releases Names of Worst of the Worst Convicted Criminal Illegal Aliens Detained at Guantanamo Bay* (July 8, 2025), https://perma.cc/58GH-85W7.

5.    The Charlie Kirk Show: *Left-Wing Judges: The Gangsters in Black with Ken Paxton and Stephen Miller* (Sept. 27, 2023), *interview available at* https://thecharliekirkshow.com/podcasts/the-charlie-kirk-show/left-wing-judges-the-gangsters-in-black-with-ken-p (approximate transcript, available at https://app.podscribe.com/episode/88595585?transcriptVersionReqId=d55a7c39-4466-44dd-8326-26a17cb2ef66, attached here for the court's convenience).

6.    Frances Robles et al., *U.S. Botched a Deal to Swap Venezuelans Held in El Salvador for Americans*, N.Y. Times (July 8, 2025), https://perma.cc/5YBW-CDUL.

7.    Caitlin Yilek et al., *10 Americans Freed in Prisoner Swap Between U.S., El Salvador and Venezuela*, CBS News (July 18, 2025), https://perma.cc/EQ6P-B4TL.

8.    Jennifer Hansler & Priscilla Alvarez, *Trump Admin Proposed Sending Up to 500 Alleged Venezuelan Gang Members During Negotiations to Use El Salvador's Mega-Prison*, CNN (Apr. 28, 2025), https://perma.cc/29VZ-PP4Y.

9.    Marco Rubio, Dep't of State, *Welcoming the Release of U.S. Nationals and Political Prisoners Held in Venezuela*, U.S. Dep't of State (July 18, 2025), https://perma.cc/636K-A92J.

10.   Hamed Aleaziz et al., *'Can We Extradite Him?' How U.S. Officials Grappled with the Release of a Triple Murderer*, N.Y. Times (Aug. 1, 2025), https://perma.cc/2EQE-ZXLK.

11.   Karen DeYoung & Samantha Schmidt, *U.S.-Venezuela Prisoner Swap Frees Americans for Migrants in El Salvador*, Wash. Post (July 18, 2025), https://perma.cc/5R85-296Y.

I hereby declare under penalty of perjury of the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Executed on the 14th of October, 2025, in San Francisco, California.

Noelle Smith

# EXHIBIT 1

JA233



# Office of the Attorney General
## Washington, D. C. 20530

March 14, 2025

MEMORANDUM FOR LAW ENFORCEMENT OFFICERS

FROM:              THE ATTORNEY GENERAL

SUBJECT:           GUIDANCE FOR IMPLEMENTING THE ALIEN ENEMIES ACT

The President's Proclamation under 50 U.S.C. § 21 et seq., titled, "Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua" ("the Proclamation"), directs the Attorney General and Secretary of Homeland Security to apprehend, restrain, secure, and remove every Alien Enemy subject to the Proclamation. The Proclamation further grants authority to the Attorney General to issue any guidance necessary to effectuate the prompt apprehension, detention, and removal of Alien Enemies. This memorandum provides guidance on implementing the President's invocation of the Alien Enemies Act ("AEA"). This guidance shall take effect when the Proclamation is made public by the President.

*****

### (1) Definitions

For purposes of this guidance memorandum, an "Alien Enemy" under the Proclamation and 50 U.S.C. § 21 is a person who is: (1) fourteen years of age or older; (2) not a citizen or lawful permanent resident of the United States; (3) a citizen of Venezuela; and (4) a member of the hostile enemy Tren de Aragua, as determined by reference to Form AEA-21A, titled, "Alien Enemies Act: Alien Enemy Validation Guide," attached to this memorandum.

### (2) Removal of Alien Enemies

All aliens who are determined to be Alien Enemies under the Proclamation and 50 U.S.C. § 21 shall be issued a Notice and Warrant of Apprehension and Removal under the AEA and removed from the United States, except as provided in section (8) of this memorandum. In effectuating the removal of Alien Enemies, law enforcement officers and agents ("officers") must follow the procedures below.

### A. Apprehension and Removal Procedures in Proactive Matters

#### i. Step 1: Validation of Alien Enemy Status and Execution of Form AEA-21A

At Step 1 of the proactive AEA apprehension and removal procedures, a line officer, or any other available officer ("line officer"), is responsible for determining whether an individual qualifies as an Alien Enemy. As outlined above, that requires determining that an individual is: (1) at least fourteen years of age; (2) not a citizen or lawful permanent resident of the United States; (3) a citizen of Venezuela; and (4) a member of Tren de Aragua.

**LAW ENFORCEMENT SENSITIVE/LIMITED OFFICIAL USE**

JA234

Form AEA-21A guides the analysis of these four requirements. Accordingly, at Step 1, a line officer must complete Form AEA-21A for each suspected Alien Enemy. As outlined in that form, there may be instances where removal proceedings under the Immigration and Nationality Act ("INA") would be more appropriate based upon a review of the facts of the case than removal under the AEA. Line officers should adhere to the instructions in Form AEA-21A, including consulting with their supervisor(s) and the Office of the Principal Legal Advisor, U.S. Immigration and Customs Enforcement, in making such a determination.

At the conclusion of Step 1, if all four requirements stated above are satisfied, the line officer must validate the subject individual as an Alien Enemy by signing the Validation Determination section of Form AEA-21A. Thereafter, a supervisor must review the line officer's determination and approve the reviewing officer's determination by signing in the space allotted in Form AEA-21A. In this supervisory review, the supervisor may consider all relevant facts, including but not limited to, supporting documentation, identity verification documentation, and statements made by the alien regarding his or her alienage and connection to Tren de Aragua. The supervisor may request additional information from any source and may require an interview of the alien.

### ii.    Step 2: Issuance of Warrant of Apprehension and Removal

If, at the conclusion of Step 1, a supervisor approves the line officer's validation determination, a supervisor must then issue a Warrant of Apprehension and Removal for the subject Alien Enemy by signing the top portion of Form AEA-21B, titled "Notice and Warrant of Apprehension and Removal Under the Alien Enemies Act."

### iii.    Step 3: Deconfliction

To the extent possible, before apprehending an Alien Enemy, officers should conduct standard conflict checks (e.g., DICE, DARTS) to ensure apprehending and removing the Alien Enemy is consistent with the interests of justice.

### iv.    Step 4: Apprehension of Alien Enemies in Proactive Matters

After a supervisor issues a Warrant of Apprehension and Removal and deconfliction is complete, officers shall use all available tools to immediately apprehend validated Alien Enemies wherever they are found in the United States, including, but not limited to, inside Alien Enemies' residences and workplaces. Prior to entering an Alien Enemy's residence to apprehend an Alien Enemy, officers must have reason to believe the validated Alien Enemy is present inside the residence.

To be clear, as outlined below in the section titled, "Apprehension and Removal Procedures in Reactive Matters," it is not necessary to complete Forms AEA-21A and AEA-21B prior to apprehending an Alien Enemy, where an officer has a reasonable belief that all four requirements to be validated as an Alien Enemy are met. In such circumstances, officers are authorized to apprehend the Alien Enemy and thereafter complete Forms AEA-21A and AEA-21B.

While a judicial or administrative arrest warrant is not necessary to apprehend a validated Alien Enemy, to perfect apprehension operation plans, officers should consider consulting federal prosecutors in the relevant district to obtain criminal search warrants and/or criminal arrest warrants based on violations of, for example, 8 U.S.C. § 1304(e) (failure to carry immigration documents), 8 U.S.C. § 1306 (failure to register and failure to comply with address obligations), 8 U.S.C. § 1324 (smuggling and harboring aliens), 8 U.S.C. §§ 1325–1326 (illegal entry and re-entry); and 18 U.S.C. § 922(g)(5) (possession of firearm by alien). Beyond these common crimes, because Tren de Aragua has been designated as a Foreign Terrorist Organization and a Specially Designated Global Terrorist, crimes including 18 U.S.C. § 2339B (providing material support or resources to designated Foreign Terrorist Organizations) and 50 U.S.C. § 1705 (violating orders issued under the International Emergency Economic Powers Act) may also be relevant to address in any consultation. While the ultimate goal is immediate identification and removal of Alien Enemies, coordination with federal prosecutors—who are required to support these operations at every step—may enhance officers' ability to conduct apprehensions safely and efficiently, and may assist in the collection of evidence identifying additional Tren de Aragua members in the vicinity of the Alien Enemy to be apprehended.

### v.    Step 5: Service of Notice and Warrant of Apprehension and Removal

Upon apprehension, an officer must serve the Alien Enemy with Form AEA-21B. This Notice and Warrant of Apprehension and Removal must include a statement by the officer that notifies the Alien Enemy that:

a) The officer has been authorized to apprehend, restrain, and remove Alien Enemies;
b) The alien has been determined to be an Alien Enemy;
c) The alien has been determined to be at least fourteen years of age;
d) The alien has been determined to not be a citizen or lawful permanent resident of the United States;
e) The alien has been determined to be a citizen of Venezuela;
f) The alien has been determined to be a member of Tren de Aragua;
g) The alien is not entitled to a hearing, appeal, or judicial review of the apprehension and removal warrant;
h) The Alien Enemy shall be detained pending removal from the United States; and
i) After being removed from the United States, the Alien Enemy may not enter or attempt to enter the United States without the permission of the Secretary of Homeland Security.

After serving Form AEA-21B upon the validated Alien Enemy, the serving officer must obtain the signature of the Alien Enemy and execute the certificate of service on Form AEA-21B. If the Alien Enemy refuses to sign, the officer should so indicate on the signature line.

LAW ENFORCEMENT SENSITIVE/LIMITED OFFICIAL USE

     **vi.**    **Step 6: Detention**

All apprehended Alien Enemies must be detained under 50 U.S.C. § 21 until removal is effectuated because all Alien Enemies subject to the Proclamation are chargeable with actual hostility or other crime against the public safety. Such detention may occur in any location deemed suitable by officers in the Department of Justice or the Department of Homeland Security, and may include facilities maintained by the federal government, state or local governments, or contracted private entities.

     **vii.**    **Step 7: Removal**

Immediately upon apprehension, officers should commence arrangements to promptly remove the Alien Enemy out of the territory of the United States. At the time of removal, officers must verify removal of the Alien Enemy on Form AEA-21C, titled, "Verification of Removal," and fully execute such form.

**B. Apprehension and Removal Procedures in Reactive Matters**

As much as practicable, officers should follow the proactive procedures above—and have an executed Warrant of Apprehension and Removal—before contacting an Alien Enemy. However, that will not always be realistic or effective in swiftly identifying and removing Alien Enemies. For example, consistent with the law, officers may need to contact a suspected Alien Enemy to develop further facts or otherwise confirm any of the four requirements for validation as an Alien Enemy. Or an officer may encounter a suspected Alien Enemy in the natural course of the officer's enforcement activity, such as when apprehending other validated members of Tren de Aragua. Given the dynamic nature of enforcement operations, officers in the field are authorized to apprehend aliens upon a reasonable belief that the alien meets all four requirements to be validated as an Alien Enemy. This authority includes entering an Alien Enemy's residence to make an AEA apprehension where circumstances render it impracticable to first obtain a signed Notice and Warrant of Apprehension and Removal (Form AEA-21B).

Whenever officers make a reactive apprehension under the AEA, officers must thereafter complete each relevant step of the Proactive Removal Procedures outlined above. And prior to removal of an Alien Enemy, officers must complete all forms described above, namely, Forms AEA-21A, AEA-21B, and AEA-21C.

**(3) Independent Arrest Authority**

Many Alien Enemies and suspected Alien Enemies are already subject to immediate arrest under traditional criminal and immigration arrest authority. Those arrests should already be occurring. And in such cases, adhering to traditional arrest requirements, there is no reason to wait for validation of Alien Enemy status before making an arrest. Following such arrests officers have discretion to initiate an AEA removal if all requirements set forth herein are satisfied.

#### (4) Recordkeeping

All records associated with the apprehension and removal of an Alien Enemy, including all forms identified above and all supporting documentation, must be maintained by the Department of Homeland Security.

#### (5) Limitations on Relief From Removal

##### a. No entitlement to hearings, appeals, or judicial review of removal order

An alien determined to be an Alien Enemy and ordered removed under the Proclamation and 50 U.S.C. § 21 is not entitled to a hearing before an immigration judge, to an appeal of the removal order to the Board of Immigration Appeals, or to judicial review of the removal order in any court of the United States.

##### b. Ineligibility for relief or protection from removal

An alien determined to be an Alien Enemy under the Proclamation and 50 U.S.C. § 21 shall be ineligible for any relief or protection from removal.

#### (6) Reporting of Apprehension and Removal Warrants

All issued Forms AEA-21B under this guidance memorandum must be reported to the Secretary of Homeland Security.

#### (7) Apprehension and Removal Authority

All Department of Justice and Department of Homeland Security officers and agents are hereby authorized to perform the actions described herein, including but not limited to, determining Alien Enemy status, issuing notices and warrants of apprehension and removal, and effectuating removals of Alien Enemies from the United States. At the direction of the Attorney General or the Secretary of Homeland Security, subject to applicable law, any other law enforcement officer or agent may also perform the actions described herein.

#### (8) Exemptions from Removal

An alien determined to be an Alien Enemy under the Proclamation and 50 U.S.C. § 21 may be exempted from the immediate removal requirement of section (2) of this memorandum in the following circumstances:

> a. First, immediate removal is not mandated when an Assistant United States Attorney or other Department of Justice attorney determines that the Alien Enemy may have engaged in criminal misconduct in violation of federal laws and investigation and/or prosecution of that criminal misconduct would best serve the interests of justice. In such a case, the Alien Enemy shall be detained under 50 U.S.C. § 21

(irrespective of any conditions of release set under 18 U.S.C. § 3142),[1] until the conclusion of any investigation, prosecution, and custodial sentence, or until an Assistant United States Attorney or other Department of Justice attorney determines that continued investigation or criminal prosecution no longer best serves the interests of justice. At such time, the Alien Enemy shall be removed from the United States under the AEA.

    **b.** Second, immediate apprehension and removal of an Alien Enemy is not mandated when the investigating agency determines that such actions would substantially compromise a significant law enforcement investigation or prosecution, and the participating U.S. Attorney's Office concurs in writing with the agency's determination.[2]  These determinations should be made with all relevant circumstances in mind, including the safety of the public and the desire to swiftly remove Alien Enemies from the United States. Delay in apprehension and removal of an Alien Enemy under this subsection is permitted only for such time as is reasonably necessary to complete the investigation or prosecution. Further, in the event it would not impair an investigation or prosecution to hold an Alien Enemy in custody during the pendency of the investigation or prosecution, the Alien Enemy shall be detained under 50 U.S.C. § 21.

All exemptions under this section shall be disclosed as Urgent Reports pursuant to Justice Manual § 1-13.130; such reports shall specify the anticipated charges, the anticipated timeframe for bringing charges, and, where applicable, the significance of an Alien Enemy's role in an ongoing investigation or prosecution.

## (9) Prosecution Referrals

Consistent with the exemptions outlined in section (8), throughout the removal process described herein, officers should be alert to cases where a referral to the U.S. Attorney's Office for criminal prosecution, rather than immediate removal as an Alien Enemy, may better serve the interests of justice.

## (10)    Attachments

    a. Form AEA-21A ("Alien Enemies Act: Validation Guide")

---

[1] In the event a court orders an Alien Enemy detained pending trial under 18 U.S.C. § 3142, officers should be prepared to resume custody of the Alien Enemy under 50 U.S.C. § 21 when the Alien Enemy's custodial status changes (e.g., when conditions of release are later set by the court or the criminal case terminates).

[2] There may be instances where a federal agency is partnered with a state or local prosecutor on an active investigation or prosecution. The presumption in such cases is that any associated Alien Enemy will be subject to immediate apprehension and removal under the AEA. This presumption may be overcome only upon approval from the Office of the Deputy Attorney General following a written request from the subject agency and prosecutor's office.

  b. Form AEA-21B ("Notice and Warrant of Apprehension and Removal Under the Alien Enemies Act")

  c. Form AEA-21C ("Verification of Removal")

# ALIEN ENEMIES ACT:
# ALIEN ENEMY VALIDATION GUIDE

In the case of: _____    A-File No.: _____

1.  The person named above is fourteen years or older: ☐
2.  The person named above is not a citizen or lawful permanent resident of the United States: ☐
3.  The person named above is a citizen of Venezuela: ☐

*If any of these three requirements are not satisfied, the person named above shall not be ordered removed under the Alien Enemies Act (AEA). In such a case, you should consult your supervisor and the Office of the Principal Legal Advisor (OPLA), U.S. Immigration and Customs Enforcement, and, where applicable, initiate removal proceedings under the Immigration and Nationality Act (INA).*

4.  The person named above is validated as a member of Tren de Aragua (TDA), as determined by reference to the following evaluation form:

**Instructions**: *Complete the following validation evaluation form for each suspected alien targeted for removal under the AEA, or, following apprehension, for each alien potentially subject to an AEA removal.*

*After accounting for the two comments below, aliens scoring 8 points and higher are validated as members of TDA; you should proceed with issuing Form AEA-21B, titled, "Notice and Warrant of Apprehension and Removal under the Alien Enemies Act." Aliens scoring 6 or 7 points may be validated as members of TDA; you should consult with a supervisor and OPLA, reviewing the totality of the facts, before making that determination; if you determine an alien should not be validated at this time as a member of TDA, when available, you should initiate removal proceedings under the INA. Aliens scoring 5 points or less should not be validated at this time as members of TDA; when available, you should initiate removal proceedings under the INA.[1]*

*Comment 1: Even if 8 points or higher, if all tallied points for an alien are from the Symbolism and/or Association categories (with no points scoring in any other category), consult your supervisor and OPLA before determining whether to validate the alien as a member of TDA (and proceed with an AEA removal) or initiate INA removal proceedings.*

---

[1] A tally of 5 points or less, or any decision to initiate INA removal proceedings, is not a finding that an alien is *not* an Alien Enemy. Relatedly, at any time, additional information may come to light that gives reason to revisit a prior decision to forego an AEA removal.

1

Form AEA-21A

JA241

*Comment 2: For purposes of validating an alien as a member of TDA, at least one scoring category must involve conduct occurring, or information received, within the past five years.*

| Validation Evaluation | | | |
|---|---|---|---|
| **Category** | **Definition/Explanation** | **Points** | **✓** |
| **Judicial Outcomes and Official Documents** | a.  Subject has been convicted of violating Title 18, United States Code, Section 521 or any other federal or state law criminalizing or imposing civil penalties for activity related to TDA | 10 | |
| | b.  Court records (e.g., indictments, criminal complaints, sentencing memorandums) identifying the subject as a member of TDA, describing specific activity of TDA | 5 | |
| **Self-Admission** | a.  Subject self-identifies as a member or associate of TDA verbally or in writing to law enforcement officer, even if that self-identification to a law enforcement officer is unwitting, e.g., through lawful interception of communications | 10 | |
| **Criminal Conduct and Information** | a.  Subject participates in criminal activity (e.g., narcotics trafficking, human smuggling, etc.) with other members of TDA, including preparatory meetings and significant incidents directly attributed to TDA | 6 | |
| | b.  Law enforcement or intelligence reporting identifying subject as a member of TDA, to include Bureau of Prisons validations and reliable foreign partner information | 4 | |
| | c.  Credible testimonies/statements from victims, community members, or informants that affirm the subject's membership in or allegiance to TDA | 3 | |
| | d.  Detailed open-source media (e.g., newspapers, investigative journalism reports) that describe arrest, prosecution, or operations of a subject as a member of TDA | 2 | |
| | e.  Subject conducts and/or facilitates business with TDA (e.g., money laundering, mule, service provider) | 2 | |
| **Documents and Communications** | a.  Written or electronic communications (e.g., e-mails, letters, texts, secure messages) that discuss business with, and/or are communicating with, known members of TDA; cell phone data contains multiple group, organizational, or organization leaders' or members' information | 6 | |
| | b.  Subject conducts phone calls about the business of TDA with known members of TDA | 10 | |
| | c.  Financial transactions indicating criminal activity for TDA or with known members of TDA | 3 | |
| | d.  Subject possesses written rules, constitution, membership certificates, bylaws, etc., indicating, together with other conduct, membership of or allegiance to TDA | 6 | |
| **Symbolism** | a.  Subject has tattoos denoting membership/loyalty to TDA | 4 | |
| | b.  Social media posts by the subject displaying symbols of TDA or depicting activity with other known members of TDA | 2 | |
| | c.  Subject observed tagging or graffitiing to mark the territory of, and the subject's allegiance to, TDA | 2 | |
| | d.  Subject observed displaying hand signs used by TDA | 2 | |
| | e.  Subject displays insignia, logos, notations, drawings, or dress known to indicate allegiance to TDA, as observed by law enforcement in person or via virtual mediums | 4 | |

2

Form AEA-21A

**JA242**

| Association | a. | Surveillance documentation that a subject is frequently observed closely associating with known leaders and members of TDA | 2 | |
| | b. | Subject part of group photos with two or more known members of TDA | 2 | |
| | c. | Subject presently resides with known members of TDA | 2 | |
| | | | **Total Points** | |
| | | | | |

## VALIDATION DETERMINATION

*Note: If any of the four requirements are <u>not</u> satisfied, do not complete this validation determination.*

Based on the validation guide and instructions above, including Comments 1 and 2, I find

that the person named above, _____:

1. Is fourteen years or older;
2. Is not a citizen or lawful permanent resident of the United States;
3. Is a citizen of Venezuela; and
4. Is a member of Tren de Aragua.

Accordingly, the above-named person is validated as an Alien Enemy.

_____          _____          _____
*Name of agent/officer*          *Signature of agent/officer*          *Date*
*completing the form*             *completing the form*

_____          _____          _____
*Name of supervisor*             *Signature of supervisor*             *Date*

3

Form AEA-21A

JA243

## NOTICE AND WARRANT OF APPREHENSION AND REMOVAL
## UNDER THE ALIEN ENEMIES ACT

A-File No:_____    Date:_____

In the Matter of: _____

Date of Birth: _____        Sex:      Male          Female

### Warrant of Apprehension and Removal

**To any authorized law enforcement officer:**

The President has found that Tren de Aragua is perpetrating, attempting, or threatening an invasion or predatory incursion against the territory of the United States, and that Tren de Aragua members are thus Alien Enemies removable under Title 50, United States Code, Section 21.

_____ has been determined to be: (1) at least fourteen years of
        (Full Name of Alien Enemy)
age; (2) not a citizen or lawful permanent resident of the United States; (3) a citizen of Venezuela; and (4) a member of Tren de Aragua. Accordingly, he or she has been determined to be an Alien Enemy and, under Title 50, United States Code, Section 21, he or she shall immediately be apprehended, restrained, and removed from the United States pursuant to this Warrant of Apprehension and Removal.

**Signature of Supervisory Officer:** _____

**Title of Officer:** _____    **Date:** _____

### Notice to Alien Enemy

I am a law enforcement officer authorized to apprehend, restrain, and remove Alien Enemies. You have been determined to be at least fourteen years of age; not a citizen or lawful permanent resident of the United States; a citizen of Venezuela; and a member of Tren de Aragua. Accordingly, you have been determined to be an Alien Enemy subject to apprehension, restraint, and removal from the United States. You are not entitled to a hearing, appeal, or judicial review of this notice and warrant of apprehension and removal. Until you are removed from the United States, you will remain detained under Title 50, United States Code, Section 21. Any statement you make now or while you are in custody may be used against you in any administrative or criminal proceeding. This is not a removal under the Immigration and Nationality Act.

After being removed from the United States, you must request and obtain permission from the Secretary of Homeland Security to enter or attempt to enter the United States at any time. Should you enter or attempt to enter the United States without receiving such permission, you will be subject to immediate removal and may be subject to criminal prosecution and imprisonment.

Signature of alien: _____    Date: _____

| CERTIFICATE OF SERVICE |
|---|
| I personally served the original of this Notice and Warrant upon the above-named person on _____.<br>(Date) |
| _____        _____<br>Name of officer/agent                Signature of officer/agent |

Form AEA-21B

**JA244**

**JA245**

## VERIFICATION OF REMOVAL

A-File No:_____ Date:_____

Alien Enemy's name:_____

| Departure Date | Port of Departure | Manner of Departure |
|---|---|---|
| Signature of Verifying Officer | | Title of Officer |

**Photograph of alien removed**

**Right index fingerprint of alien removed**

_____
(Signature of alien whose fingerprint and photograph appear above)

_____
(Signature of official taking fingerprint)

Form AEA-21C

**JA245**

# EXHIBIT 2

JA246



| NOTICE | Due to the lapse in federal funding, this website will not be actively managed. Click here for more information. |

 Homeland
Security

U.S. Department of Homeland Security

# Louisiana Lockup: A New Partnership with DHS and the State of Louisiana to Expand Detention Space

**Release Date:** September 3, 2025

*Louisiana Lockup, Cornhusker Clink, and Speedway Slammer give ICE the ability to lock up some of the worst of the worst criminal illegal aliens including murderers, rapists, pedophiles, drug traffickers, and gang members*

**WASHINGTON** – Today, the Department of Homeland Security (DHS) announced a new partnership with the state of Louisiana to expand ICE detention space by up to 416 beds. These beds will be available at the Louisiana State Penitentiary also known as, Angola Prison. This facility dubbed "Louisiana Lockup" will house some of the worst of the worst criminal illegal aliens arrested by ICE.

This agreement was made possible by the One Big Beautiful Bill which provided funding to secure 80,000 new beds for ICE to utilize when detaining and deporting the worst of the worst.

*"COMING SOON: Louisiana Lockup. Today, we're announcing a new partnership with the state of Louisiana to expand detention space,"* said **Secretary Noem**. *"Thank you to Governor Landry for his partnership to help remove the worst of the worst out of our country. If you are in America illegally, you could find yourself in CECOT, Cornhusker Clink, Speedway Slammer, or Louisiana Lockup. Avoid arrest and self deport now using the CBP Home App."*

*"Criminal illegal aliens beware: Louisiana Lockup is where your time in America ends,"* **said Gov. Landry.** *"Louisiana Lockup will give ICE the space it needs to lock up some of the worst criminal illegal aliens—murderers, rapists, pedophiles, drug traffickers, and gang members—so they can no longer threaten our families and communities. This facility fulfills President Trump's Make America Safe Again promise. I want to thank President Trump, Secretary Kristi Noem, Attorney General Pam Bondi, and ICE Deputy Director Madison Sheahan for their leadership and partnership. Together, we're making Louisiana and America safer."*

Below are some of the dangerous criminal illegal aliens arrested by ICE New Orleans. These are the types of violent criminal illegal aliens who could end up being detained at Louisiana Lockup:



ICE New Orleans removed Omar Martinez-Garcia, a 39-year-old criminal illegal alien from Mexico. His criminal history includes a conviction for **homicide-murder 2nd degree.**



ICE New Orleans removed Colon Pibaque, a 51-year-old criminal illegal alien from Ecuador. His criminal history includes a conviction for **cocaine-smuggling**.

**JA247**

Case 1:25-cv-00766-JEB    Document 177-12    Filed 10/15/25    Page 19 of 84



ICE New Orleans removed Rafael Ojeda-Acosta, a 70-year-old criminal illegal alien from Cuba. His criminal history includes a conviction for **rape with a weapon and forcible sodomy**.



ICE New Orleans removed Jelber Gomez-Lopez, a 32-year-old criminal illegal alien from Guatemala. His criminal history includes a conviction for **DWI and possession of controlled substance**. Gomez is wanted by in Guatemala for **murder, conspiracy and criminal association.**



ICE New Orleans arrested Aris Manuel Santana, a 45-year-old criminal illegal alien from the Dominican Republic. His criminal history includes a conviction for **conspiracy to possess with intent to distribute 5 kilograms or more of cocaine**.

ICE New Orleans arrested Julio Lara-Avila, a 30-year-old criminal illegal alien from Mexico. His criminal history includes a conviction for **battery-family violence, cruelty to children 3rd degree.**



ICE New Orleans arrested Humberto Vargas-Lopez, a 55-year-old criminal illegal alien from Cuba. His criminal history which includes convictions for **aggravated rape, aggravated burglary, possession of controlled substance- cocaine, possession of marijuana, obstruction of public officer,**

<span style="color:red">JA248</span>

**and battery with a deadly weapon with serious bodily harm**.



ICE New Orleans arrested Clairvorn Seanclair Kelly, a 28-year-old criminal illegal alien from St. Kitts-Nevis. His convictions include **possession for firearm with altered serial number, unlawful transfer of firearms out-of-state, illegally dealing in firearms, and conspiracy**.



ICE New Orleans arrested Juan Carlos Abreu-Sanchez, a 48-year-old criminal illegal alien from the Dominican Republic. His criminal history includes **Operating a Vessel Used to Smuggle 1,600 Kilograms of Cocaine** into Puerto Rico.



ICE New Orleans arrested Olvin Rodriguez-Inestroza, a 22-year-old criminal illegal alien from Honduras. He had outstanding warrants for **394 counts of pornography involving juveniles and 2 counts of sexual abuse of an animal.**



ICE New Orleans arrested Edgardo Amador-Rodriguez, a 28-year-old criminal illegal alien from Honduras. This **MS-13 gang member's** criminal history includes convictions for **domestic violence, possession of a firearm, negligent carrying of a concealed firearm, and misrepresentation during booking.**

JA249



ICE New Orleans arrested Anwar Jehad Abdelmajid, a 37-year-old criminal illegal alien from Venezuela. His criminal history includes convictions for **conspiracy to commit fraud, conspiracy to commit drug trafficking, and aggravated assault.**

###

## Topics

SECRETARY OF HOMELAND SECURITY (/TOPICS/SECRETARY-HOMELAND-SECURITY)

CITIZENSHIP AND IMMIGRATION SERVICES (/TOPICS/CITIZENSHIP-AND-IMMIGRATION-SERVICES)    LAW ENFORCEMENT (/TOPICS/LAW-ENFORCEMENT)

## Keywords

IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE) (/KEYWORDS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT-ICE)    ALIEN (/KEYWORDS/ALIEN)    CRIME (/KEYWORDS/CRIME)

DEPORTATION (/KEYWORDS/DEPORTATION)    FUNDING (/KEYWORDS/FUNDING)    ILLEGAL (/KEYWORDS/ILLEGAL)

IMMIGRATION ENFORCEMENT (/KEYWORDS/IMMIGRATION-ENFORCEMENT)    LAW ENFORCEMENT (/KEYWORDS/LAW-ENFORCEMENT)

LAW ENFORCEMENT PARTNERSHIP (/KEYWORDS/LAW-ENFORCEMENT-PARTNERSHIP)    MAKING AMERICA SAFE AGAIN (/KEYWORDS/MAKING-AMERICA-SAFE-AGAIN)

PARTNERSHIP (/KEYWORDS/PARTNERSHIP)    PRESIDENT TRUMP (/KEYWORDS/PRESIDENT-TRUMP)    SECRETARY KRISTI NOEM (/KEYWORDS/SECRETARY-KRISTI-NOEM)

Last Updated: 09/04/2025

**JA250**

# EXHIBIT 3

JA251

# Instagram

Log In    **Sign Up**



 **sec_noem** and **dhsgov**    ...
Original audio

 **sec_noem** ✔ 5w
We are announcing a new partnership with the state of Louisiana to expand detention space. Thank you to Governor Jeff Landry for his partnership to help remove the WORST of the WORST from our country.

If you are in America illegally, you could find yourself in CECOT, Cornhusker Clink, Speedway Slammer, or Louisiana Lockup. Avoid arrest and self deport NOW using the CBP Home App.

      

**3,335 likes**
September 4

Log in to like or comment.

**More posts from sec_noem**

**JA252**

# Instagram













**JA253**

# EXHIBIT 4

JA254

| NOTICE | Due to the lapse in federal funding, this website will not be actively managed. Click here for more information. |
|---|---|

  **Homeland Security**

U.S. Department of Homeland Security

# DHS Releases Names of Worst of the Worst Convicted Criminal Illegal Aliens Detained at Guantanamo Bay

**Release Date:** July 8, 2025

*Pedophiles, murderers, kidnappers, and other violent criminals are being held at the military facility*

WASHINGTON – The Department of Homeland Security (DHS) today released the names of some of the dangerous, criminal illegal aliens detained at the Guantanamo Bay.

*"We're arresting criminal illegal aliens and getting them off America's streets. Guantanamo Bay is holding the worst of the worst including child predators, rapists and murderers,"* **said Assistant Secretary Tricia McLaughlin**. *"Whether it is CECOT, Alligator Alcatraz, Guantanamo Bay or another detention facility, these dangerous criminals will not be allowed to terrorize U.S. citizens. President Trump and Secretary Noem are using every tool available to get criminal illegal aliens off our streets and out of our country. Our message is clear: Criminals are not welcome in the United States."*

Below are examples of **nearly 30 high-threat**, **violent criminal illegal aliens** that have committed **heinous crimes** and are detained at Guantanamo Bay. These dangerous illegal aliens are **convicted criminals** with **final orders of removal from an immigration judge.**

- Olma Juarez-Mendez, an illegal alien from Guatemala, has been **convicted of domestic abuse**.
- Hung Vo, an illegal alien from Vietnam, has been **convicted** of **robbery with a weapon.**
- Quan Phung, an illegal alien from Vietnam, has been **convicted** of **aggravated assault with a weapon**.
- Andis Noe Cortes Zepeda, an illegal alien from Honduras, has been **convicted** of **sexual assault**.
- Antonio Erazo-Ramos, an illegal alien from Honduras, has been **convicted** of **assault**.
- Xiang Liu, an illegal alien from China, has been **convicted** of **robbery**.
- Jin Feng Lu, an illegal alien from China, has been **convicted** of **homicide**.
- Hieu Tran, an illegal alien from Vietnam, has been **convicted** of **robbery**.
- Shubham Singh, an illegal alien from India, has been **convicted** of **child pornography**.
- Franklin Almendarez-Alvarez, an illegal alien from Honduras, has been **convicted** of **lewd acts with a minor.**
- Ramiro Villanueva, an illegal alien from Colombia, has been **convicted** of **smuggling cocaine**.
- Tien Minh Cao, an illegal alien from Vietnam, has been **convicted** of **kidnapping**.
- Khang Huy Trang, an illegal alien from Vietnam, has been **convicted** of **kidnapping for ransom**.
- Carlos Olivo Orellana, an illegal alien from El Salvador, has been convicted of **lewd acts with a minor.**
- Wen Lin, an illegal alien from China, has been **convicted** of **robbery**.
- Guillermo Gonzales-Tiul, an illegal alien from Guatemala, has been **convicted** of **assault**.
- Yong Liang, an illegal alien from China, has been **convicted** of **kidnapping**.
- Luis Fernando Ospina Tabarez, an illegal alien from Colombia, has been **convicted** of **smuggling heroin**.
- Ilie Bogde, an illegal alien from Romania, has been **convicted** of **robbery**.
- Jose Diego Pereira Valdez, and illegal alien from El Salvador, has been **convicted** of **aggravated assault with a gun**.
- Larry Medina, an illegal alien from Venezuela, has been **convicted** of **sexual assault**.
- Brayan Vasquez-Montero, an illegal alien from Colombia, has been **convicted** of **aggravated assault with a weapon**.
- Nathaniel Akeen, an illegal alien from Liberia, has been **convicted** of **robbery.**
- Eric Gresford Miller, an illegal alien from Jamaica, has been **convicted** of **aggravated assault with a gun**.
- Nigel Tomlinson, an illegal alien from the United Kingdom, has been **convicted** of **child sexual abuse**.
- Victor Bonilla-Alvarez, an illegal alien from El Salvador, has been **convicted** of **trafficking weapons.**

On January 29, 2025, President Donald J. Trump signed an [executive order (https://www.whitehouse.gov/presidential-actions/2025/01/expanding-migrant-operations-center-at-naval-station-guantanamo-bay-to-full-capacity/)](https://www.whitehouse.gov/presidential-actions/2025/01/expanding-migrant-operations-center-at-naval-station-guantanamo-bay-to-full-capacity/), Expanding Migrant Operations Center at Naval Station Guantanamo Bay to Full Capacity, directing Secretary Noem to expand the Migrant Operations Center at Naval Station Guantanamo Bay to provide additional detention space for high-priority criminal aliens illegally present in the United States.

###

JA255

# EXHIBIT 5

JA256

# The Gangsters in Black with Ken Paxton and Stephen Miller" episode transcripts, sponsors, audience info, episodes, content rating

 app.podscribe.com/episode/88595585

0

00:00:00

We get it. You're busy. You don't have time to waste on the mainstream media. That's why Salem News Channel is here. We have hosts worth watching, actually discussing the topics that matter. Andrew Wilco, the next Isa, Brandon Tatum. And more open debate and free speech you won't find anywhere else. We are not like the other guys. We are Salem News Channel. Watch anytime on any screen for free. 24 7 at SNC tv and on local now Channel 5 25

1

00:00:30

Hey everybody, Tan The Charlie Kirk Show Ken Paxton recently acquitted in Texas is telling us about what he plans to do to get to work. Then Stephen Miller as we have a very in-depth, extremely detailed and important conversation about immigration. Email us as always, freedom at Charlie Kirk dot com. That is freedom at Charlie Kirk dot com. Subscribe to our podcast. Open up your podcast application and type in Charlie Kirk Show and get involved with Turning Point U s a at tp USA dot com. That is tp USA dot com. Buckle up everybody. Here we go. Charlie,

2

00:01:07

What you've done is incredible here. Maybe

3

00:01:08

Charlie Kirk is on the college Campus

0

00:01:10

I want

2

**JA257**

00:01:10

You to

00:01:11

Know we are lucky to have Charlie Kirk

00:01:13

Charlie, Kirk's running the White House folks.

00:01:17

I want to thank Charlie. He's an incredible guy. His spirit, his love of this country. He's done an amazing job building, one of the most powerful youth organizations ever created. Turning Point U. s a

00:01:27

We will not Embrace the ideas that have destroyed countries, destroyed lives. and we are gonna fight for freedom on Campuses across the country. That's why we're here.

00:01:39

Brought to you by the loan experts. I trust Andrew and Todd at Sierra Pacific mortgage at Andrew and Todd dot com. He's back to work and he's more motivated than ever. Joining us now is the Attorney General of Texas Ken Paxton Ken. Welcome to the program. Been a couple months since we have chatted. We tried to do our part. I'm glad that you got through that clown show and that nonsense. First of all, how are you doing?

00:02:08

You know what? It's just really great to be back. I appreciate your help and we have a lot to do and believe me, you're right. I'm very motivated.

00:02:16

JA258

Well, good. And and we're gonna go through some of the specifics because what happened is that you were put on the sidelines for what, three, four months. You weren't even allowed to do your job because you had to fight all this crap. I I wanna go through some of the specifics though, for our national audience. Texas is being invaded. Texas is seeing a crime wave in certain parts of the area. We have major issues. We have these, you know, illegal cities that you're gonna go after. But why is it that the insiders in Austin felt the need to go out of their way to try to derail you? What, what was really driving this? It's perplexing as a non Texan to witness.

7

00:02:51

It doesn't look like it makes any sense, but it really makes a lot of sense. If you understand how the Texas House works, then you understand why this happened. We have 150 members of the house, 65 are Democrat. The 65 Democrats block vote for speaker, and it takes 76 votes to become speaker. And speaker controls everything. All the legislation getting through committee assignments. What happens is completely controlled by that one person. And so what happens is the Democrats will pick the Republican that gives them the most for their money and they pick Dave Phelan and Dave Phelan cut a deal with the Democrats and the Democrats. House Democrats, I believe did this for Joe Biden and the Washington Democrats to take me out because we filed 48 lawsuits against him.

7

00:03:36

And so it looks like the Republicans did it, but the reality is the Democrats motivated it and Dave Felan is controlled by the Democrats.

1

00:03:44

Yeah. And so, I mean, I was, I was in Texas a couple weeks ago while this whole thing was unfolding and someone came up to me, they said, Hey Charlie, you know this speaker of the house is like a really, he's a drunk. I was like, oh, come on. Like that's, but then there's this piece of tape I saw that I just, I have to play play Cut 1 24. You guys be the judge. Is is Dade Felan a fun, a low functioning alcoholic play Cut 1 24

8

00:04:05

Speaker. I'll move that. Mr. Campbell send amendment is settle of the author. Is there objection to the opposition amendment? The chair has members adopted.

9

00:04:18

Mr. Chair recognizes Mr. Johnson of Harris to speak in

00:04:21

Opposition. The chair recognizes Mr. Mr. Johnson of Harris, Mr. Johnson of Harris to speak in opposition to the bill.

00:04:34

So, so, so Ken. I I have to play that because that's the guy who made you go through hell. That's the guy who impeached you. I mean, so, so just to go, you could comment on that if you want, but I, I have to do that 'cause it's just hilarious. So this guy's obviously either on pills drunk or having a stroke, which I don't think he was. But then he, he sided with Democrats. Why is the, the great state of Texas, the Red state of Texas, having Democrats choose a speaker of the House who designed that system.

00:04:57

So it's, it's, we're getting outsmarted in the house. The Republicans should block vote themselves and decide which Republican they want. But that's not the way it works. The Democrats get together, they, they align all of their votes. And if you think about it, you need 76 votes. The speaker's gonna vote for himself. He only needs 10 Republican votes with the Democrats. And so it's pretty easy once you have 66 votes to get there, because then he tells 10 Republicans, Hey, I'll make you chair of this, I'll make you chair of this. And it's a done deal. So it's control, it's, it's stupid. But we've let the Democrats do this for over a decade where they control. And you can see the difference between the Texas Senate and Texas House with Dan Patrick in charge.

00:05:37

The Texas Senate is very conservative, does really good things for Texas. The Texas House on the other hand, has democratic chairs. They, they don't get a lot of good things done for the state of Texas. They block a lot of good legislation both by Governor Abbott who's trying to get school choice done. And they've been blocking many things done by the Senate that Governor Patrick's tried to get done.

00:05:56

JA260

So, so Ken just one final thought on this then I wanna get to the work that you're doing. That's the most important thing. Can you just add more, you, you said this with Tucker Carlson, but it's worth repeating how this was really a Bush family driven operation and how the people spoke and they were able to push back against it. Add a little bit more to that, more context please.

7

00:06:13

So we, in this process, we were getting information. We, they finally had to disclose emails and there was, there were definitely connections between Carl Rove, George P. Bush, obviously pushed by Carl Rove in, in the last election against me and a group called Texans for Lawsuit Reform, which is supposedly a Republican group, but they've, they've aligned in the Bush camp. And that's two guys named Dick Victor Bolse and Dick Weekly who have spent millions of dollars to take people like me out. Carl Rose participated in this and George p was supposed to be their guy. And it's interesting because he went to get his license, literally the day that these guys turned me over for supposedly violating the law to the F B I who I was investigating, by the way, for breaking the law.

7

00:06:56

And there's no doubt that there's a connection between the ex-employees who also got emails and text messages from Carl Roe, Carl Roe, Texans for lawsuit reform, the Bushes, they're all aligned.

1

00:07:07

So, so Ken, let's now get to the work that you're doing. What are the top priorities? What are the lawsuits you're filing and the things that you wanna bring to completion?

7

00:07:15

Well, everybody can see what's going on in the border. It's not gotten any better since I left. Unfortunately, you know, with the four months out, we were, we're stopped in our progress. But we are looking at many things along the border to try to fight back the Biden administration's un you know, unlawful activity. We're also going down to look at Liberty County, which is where this village or city has been set up that's been growing like crazy. And there's all kinds of crime there. There's all kinds of difficulties there. We're gonna try to figure out how we can stop that. Obviously I've only been back for a week, so we've, we've, I've got a lot of catching up, but I can promise you this. Whatever we can do in those situations, we

**JA261**

are going to do and we're gonna continue our investigation of big pharma. We had an investigation of some of the, the vaccine manufacturers potentially lying to Texas consumers and to the world about the efficacy of their, of their vaccines.

7

00:08:03

So we've got a lot to do a along with finishing our lawsuits against big tech.

1

00:08:08

And look, this is Ken. Can you just remind our audience the size of your office? It is the largest ags office in the country, isn't it?

7

00:08:16

It is the largest Republican office. I think New York and New Jersey, Manhattan and California may have larger democratic offices. It is the largest Republican office. We have about 4,200 employees. We have close to 800 lawyers. Our budget's about 1.8 billion for the biennium. And so we do a lot of things that a lot of people don't know about and we're very active in really trying to defend Texas and defend the Constitution.

1

00:08:38

Yeah, and with with, with that sort of enormity, you can now defend the rule of law and like talk about this though. This is what I'm a little confused about. There's this local DA AG office tension where you can't bring criminal cases. Can you just talk about that a little bit? 'cause it's confusing to some people in our audience.

7

00:08:56

Well, and I'm glad you brought that up because this is the riskiest thing going on for Texas for since 1951. The, the Attorney General's office, I, I'm not that old so I wasn't around then. But we've been authorized or directed by the legislature to prosecute voter fraud. We have a dual court system. We have the Court of Criminal Appeals, that is the final say on criminal matters. and we have the Texas Supreme Court. That is the final say on civil matters. The Court of Criminal Appeals is Republican, but largely unknown. And I'm very suspicious of them now. And I think we need to change that court because they struck down the only statute that allowed me to prosecute any type of criminal activity, which was voter fraud, which we were doing.

**JA262**

7

00:09:37

We had over 900 cases of real voter fraud that we were investigating or prosecuting. Now all of that is stopped and it's up to the local das who, again, are largely Soros funded in the bigger cities. And so voter fraud now is not being prosecuted. That is a huge risk to my state in the future. and we will lose the state if we don't stop voter fraud.

1

00:09:57

Are you then able to do the investigation and hand it off to a local sheriff or DA because you, are you able to do the legwork and say, Hey, you know, we, we believe there's a crime here and then work in harmony. 'cause that's what that, that's similar to what a lot of the Democrat states are doing. New York being one of them.

7

00:10:15

We're trying, but there a lot of these das won't prosecute it. So we used to have the authority both to investigate and to, and to prosecute. And by the way, they struck down the law saying that because I was in the executive branch, the Attorney general is an executive, that I didn't have the authority to go to court. 'cause that is a judicial function now that is insane. And if that's true, then every, every State attorney general is doing something illegal under their constitution as well as the US Attorney General.

1

00:10:42

I hope everyone understands that. They, they basically turn the ags office into a civil lawsuit organization. You could still sue civilly, you can protect the people of Texas, but to actually investigate crime, they've neutered you. I want to explore that more. 'cause it's very unusual and it actually puts you at a disadvantage versus other ags in other states that have that kind of criminal investigative authorities. Strong Cell is amazing. I gotta tell you, the combination of N A D H coq 10 and collagen is really something, you know, people ask me, they say, Charlie, how do you keep your energy up? How do you just keep on pushing? Look, part of it is diet nutrition.

1

00:11:22

But I'll be honest, I take supplements really seriously. Fact, check me on this. You can say, oh, Charlie, I'm gonna fact check you. Type this into your search engine N A D H. Just type it in. What does it tell you? It might tell you that it is the secret to living long anti-aging

**JA263**

properties, more energy. Well, all of that is being proven in more and more clinical trials. N A D H is a precursor so that your mitochondria can remain healthy and vibrant. The elites, a lot of billionaires people, lot of money, they spend a ton of money on N A D. It's a fact. N a D just might be your secret weapon for more energy. I take N A D every single day. I could tell you that. N A D H compared with coq 10.

00:12:02

The trials show very, very good things. I know, don't take my word for it. I mean, honestly, my word should be good for something. But fact, check me, look at it. And if you do it over 30 days, you'll see an increase in energy. I wake up better than ever before. N a D can help you potentially, again, fact, check me on this with depression, anxiety, other issues that you might be dealing with. It is nature's gift to you so that you might have extra energy and mental clarity. You guys can use promo code Charlie for 20% off. It's Strong Cell dot com slash Charlie. N a d might be nature's secret weapon for you. I love it. I take it every single day. Try to try it for at least 30 days to see the maximum benefit.

00:12:43

And let me know, has N AD helped your life? Strong Cell dot com slash Charlie, check it out. Strong Cell dot com slash Charlie. Let's just play cut 1 26 just to show this illegal invasion of Texas play cut 1 26 in

10
00:12:59

Eagle Pass, Texas, where just moments ago, customs and border protection cut a hole through the constantina wire that has been stretched by Texas d p s along the border there to allow migrants to come through. It was initially a group of about 60 to 70 people. It swelled to some 300 very, very quickly.

00:13:19

Okay, so Ken, let's just get into some detail here. You have the largest Republican ags office. It it's complicated because you don't have all the investigative powers of other states. But just to kind of go back through this, what specifically are you now going to do with the authority granted to stop the invasion of the great state of Texas?

7
00:13:39

**JA264**

So I just, that clip I is shocking to me that the federal government would clip our, our wire to allow people to come in illegally. In other words, not, not only are they doing their own thing, but they're actually stopping us from protecting our border and our lands in Texas, we're looking at every available angle. We've got about two or three lawsuits that we're looking at, and specifically one related to them damaging our property and prohibiting us from keeping illegals from coming into the country. So I can guarantee you we've got more lawsuits coming as it relates to immigration, and we're gonna do everything we can to stop this.

00:14:16

Yeah. And so let's, this is, I I I'm able to, I'm a talk show guy and you're, you're a lawyer, so you have to be more focused or very careful. And he says, I think this is treason. I mean, the federal government is actively co-sponsoring the entrance of non-citizens into the country and it's not getting any better. And so Ken, is there any precedent where the federal government willingly doesn't do its job and it damages a sovereign state? And if so, what? How can you deal with that? 'cause your duty is to Texas. They are just saying, we don't care about Texas. We don't care about all the damage that's being done.

00:14:50

I've never seen like this, I've never seen the federal government, our country affirmatively help. Basically the cartels. 'cause that's the business model, right? It's the cartels bring people to the federal government. The federal government transports them and they also aid and vet their drug trafficking, fentanyl, trafficking. I've never seen them actually damage our property to allow illegals to come in. And so this is a new thing for us that we're looking at trying to figure out how do we stop the federal government from one aiding and abetting, but also actually damaging our property to help the illegals get in. It's, it's insane.

00:15:27

Yeah. And so th this is what is frustrating us in Arizona and others. I is that where w why, why is the state government not doing more? And and that's where we're confused. And the federal government, they're actually, they're going through and cutting the wire Ken. That's what's insane is they're actually cutting the wire to allow the foreigners come in. Talk about how you are taking aim at this illegal city that's been created in Houston. It's a bizarre story, but this seems to be a primary focus of yours.

00:16:01

**JA265**

Yes. Let me go back to real quickly this case, Arizona v us that you know about is, is fundamental to changing this because part of the reason we're in such a difficult spot is, you know, 10 years ago when Arizona tried to protect themselves with state law because the federal government wouldn't, Obama sued the state of Arizona and they came in and said basically the, the Supreme Court under Justice Kennedy, right? In the opinion with Justice Roberts joining the liberals said that the state could not pass their own laws. If the federal government had laws that were similar, that cannot be right. It cannot be right. The federal government can pass a law then ignore their own laws and say, well, you can't enforce your laws because we have laws that we're not enforcing.

7
00:16:42

None of it makes any sense. I want another shot at that. So I've encouraged the legislature or the governor to do something that would violate that. And let us take another crack at it. Now that the court has changed. Back to your other question, we are definitely looking at that Liberty County issue. It's insane. It's been growing for years. It, it is a hodgepodge of people from all over the world and it's also creating all kinds of crime issues. And it's creating an incentive for people to move into this county who are illegal. And we're gonna figure out some way to stop it. It was a state creation, this sort of mud district, this development. And we're looking into how it got created and what we can do to, and we may have suggestions for the legislature 'cause they're gonna go back into special session.

7
00:17:25

Well,

1
00:17:25

They, I I know I'm, I'm glad. Finally, special session. I mean, your state's being invaded. I'm pleased. Hey, how about if you didn't spend 90 days impeaching, Ken Paxton, you wouldn't have to go to special session. But Ken, let me just end with this though, which is that I want to empower you and tell you the audience is with you. You are one of the few fighters we have on the entire country. Please be as aggressive as you can be while fi fo following and enforcing the law. We need you. And so we're here for you, Ken. Thank you. Glad you got through that. And now it's time to uphold the law and protect Texas. Thank you Ken so much.

7
00:18:01

And thank you. I'm inspired and I'm ready to go. So thank you. Thank

1

**JA266**

00:18:04

You, Ken. Listen, listen, as students begin heading back to school, do you think they'll be learning about the founding principles that made America the freest most prosperous nation in history? Will they learn that our unalienable rights are God given and not granted by government? Will they be given a full and honest account of our nation's history? The answer to all these questions is yes for students at Hillsdale College and these days, in addition to teaching college students, Hillsdale has extended its teaching to K through 12 students and lifelong learners like you and me. If you're not doing so already, one of the best ways to start learning from my friends at Hillsdale is through in Prius, Hillsdale's Free Digest of Liberty. My listeners can sign up for free at this special website, which is available for a limited time.

00:18:47

It's at Charlie for hillsdale.com. I look forward to in Primus each month. And you can too. It's interesting, useful, and free. The best and smartest in conservative constitutionalist thought. Find out more about Hillsdale and in Primus at Charlie for hillsdale.com. They're an excellent college, America's greatest college, Charlie four hillsdale.com. Joining us now is Stephen Miller. Stephen, thank you for taking the time. You know, Stephen, we're seeing an invasion of our country. Let's start there. That's not a controversial statement. How and why can this legally be described as an invasion? And why does that categorization matter?

00:19:26

Well, the, the invasion clause primarily matters in two contexts. The first would be in Article four, section four, and the ability of states to, in the invocation of that clause, to demand Relief from the federal government. And then the constitutional principle would flow from that, that if the government declined, it's actually called the guarantee clause, that if the government declined to fulfill its guarantee under the US Constitution, that the state would then be authorized to unilaterally defend its territory and to stop the immunization. It also matters in another context, which is the 14th amendment section three.

00:20:10

And that would be that Joe Biden is actually ineligible to run for president because Huey disqualified for aiding and embedding an insurrection against the United States. So it has significant legal meaning for both of those reasons.

00:20:23

<span style="color:red">**JA267**</span>

Yeah. And so Greg Abbott declared a invasion in November of 2022, just about a year ago. But Steven, he's done really nothing to stop it except some razor wire and some things in the river. Talk about how and why the states need to step up and take this into their own hands and tell the federal government to get outta the way.

11
00:20:41

Yeah, so I'll, I'll be blunt in saying that the, if Texas were to act unilaterally to, to repel the invasion, it would be the, the action that would be required would be of a scope and scale beyond what I think many people realize or appreciate. Because what you'd really be talking about having to do is switching from a blocking strategy, which is what they're doing Right now. So, you know, put up some razor wire here, put a show of force over there, put cars in trucks where applicable, make it, make trespassing arrests and so forth.

11
00:21:22

Two, a detain and remove strategy. But because of the logistical challenges involved in removing you would need to build, which of course I would support doing, you would need to build an extremely large holding area for illegal immigrants that at any given point of time, you know, could hold upwards of, you know, 50, 60, 70,000 illegal aliens while you are waiting to send them someplace, somewhere that would be willing to accept 'em. Because even if you push 'em across the border, they have to, they're gonna run back across. So you have to have some place to, to detain them. So that, I presume on the third or fourth attempt of illegal immigrant to cross, who's then pushed back, who ends up in a detention center, they would stop trying.

11
00:22:06

But that, that is the kind of infrastructure that they would have to build. The other issue is that they would then have to make sure to protect their own law enforcement officers from arrest and prosecution. Because my presumption is, is that D O J would begin prosecuting state officials for deprivation of civil rights and the other kinds of exotic federal charges that you've seen garland's d o j bring up to go after conservatives that could even imagine them charging state troopers with kidnapping and things of that nature. So obviously in the event where you invoke the guarantee clause and the federal government disregards that invocation, and then you take action unilaterally as a state, you have to be prepared to do the full sweep of, of activity that I've described and be aware of the fact again that the Department of Justice, presumably that has been unwilling to use any kind of force to stop the border invasion, would indeed use force to try to arrest and incarcerate your state law enforcement officers.

JA268

00:23:10

Yeah. And so is there anything, so first of all, that's really well said. And you're right, and the Department of Justice, Merrick Garland Joe Biden, they wouldn't arrest the drug traffickers, the child sex traffickers, the fentanyl traffickers, the gun traffickers. They would arrest the Texas sheriffs that are enforcing the law. Texas was once its own sovereign country with its own constitution. Does that play into this argument? Because they'll say, oh, it's supremacy clause, but Stephen, just from a moral standpoint, putting the legal thing, legal issue aside, when your own state is being invaded and the federal government is co-sponsoring the invasion, don't you have a moral right to act and figure it out?

00:23:43

Well, I think as, as others have said before, there's no such requirement in the Constitution for a state to commit suicide. And so while it's true that there is federal supremacy, and that's of course a bedrock principle of the US constitution, again, in an environment in which a state is being invaded and the federal government declines, not only declines to stop that invasion, but in fact as the opposite marshals as resources to perpetuate that invasion, then, then the state at that point has the legal and yes, the moral right. So,

00:24:21

Yeah. Lemme interrupt though. Stephen Stephen, while this is on my mind, I'm sorry to interrupt. I just wanna keep the pace going here. When you were in the Trump White House then, what was the argument that San Francisco and Chicago used to not allow federal agents into their city for sanctuary cities? Isn't that a challenge for the supremacy clause? Why was San Francisco not for example, or LA saying Feds are ice not allowed, but Texas can't say we're gonna secure our own border? What, what am I missing here?

00:24:46

Well, yes, I mean, that is indeed we, when we went to court against sanctuary jurisdictions, most notably California, if my memory serves me correct, one of the arguments we made is that, is that their refusal to turn illegal aliens in custody over to the federal government violated the supremacy clause. 'cause again, we weren't talking about asking the state to go out and make arrests. We were asking states to engage in what are known as custody transfers where they arrest an illegal alien in the context of committing a local crime. And then we find out that they're here illegally. And so that we asked them to be turned over. And so they were actively harboring illegal aliens. In fact, they would go to great lengths to make sure that those illegal aliens could be released without us ever knowing when and where.

JA269

00:25:28

And so they were concealing these criminal aliens from the federal government, and we argued that violated the supremacy clause. But the, the judiciary, such as it existed at the time, again, if memory serves me correct, did not favor those arguments. Now if you remember, well, as you remember, of course you remember by the end of 2020 the Supreme Court of course went from a, from a four conservative minority to a five conservative majority. So one would hope that if these questions were raised again in 2025, they would have a very,

00:26:04

Yeah. So I mean Stephen, but just to think a little creatively here, wouldn't Texas be able to say, well, we're a sanctuary state for the Constitution. I mean, this is just use their own standard that has been set by these left Wing Gangsters in black dresses. I I Why, why would that be, you know, flimsy, if at all? Because, and by the way, it's not just that, it's also on the marijuana issue. States defy federal guidance and federal law on the marijuana issue. They did this on gay marriage against doma, the Defensive Marriage Act. So it's not the first example where the left finds wrinkles and state dissension against federal law or federal practice. Why don't we start to Embrace some of that spirit when it comes to, I don't know, enforcing our border from an invasion?

00:26:50

Well, I think that you, you, you could and should the, the, the sad reality is that Judges really don't care about consistency, a very large percentage of the care about outcomes. And so the Ninth Circuit Judges ruling on questions related to California, of course are completely outcome determined. And then the Fifth Circuit Judges, who would rule on issues relating to Texas, would bend over backwards to try to appear neutral or to try to appear objective. And so, as you know, better than most oftentimes trying to appear neutral means in fact issuing the wrong ruling, just to make a point.

00:27:32

So I don't think that the judiciary is going to save us at this particular moment. I think that, that, again, Texas has sovereign rights that it can exercise. They should go into that of course. And I don't think they're going to, so it's, it's a hypothetical. I don't think they're going to, but they should go into that if they do clearheaded understanding about the nature of the challenge they're gonna have with the federal government. And then if there is a, if there is a,

JA270

a president in 2025 who is not of the left, then they would need to of course be issuing a number of pardons to a lot of people who may get caught up in various D o J prosecutions in such a circumstance.

00:28:17

Yeah, it's just basically what you're saying is that Judges will make up whatever they want to get the outcome they want, but then they're going to rely on process to not stop the invasion. So Stephen, what you're talking about is that the Texas house, the Texas governor, the entire Texas leadership Republican need to come together and say we're doing this. And that might require a standoff with the federal government. This is where the US house could actually come in and apply equal pressure. Right? The United States House could have a top-down, bottom up, almost a pincer movement where you have the Texas standing up to the federal government and the US House of Representatives standing up for Texas, cutting off funding, cutting off the special projects of Joe Biden, but Stephen that would require a serious Republican party.

00:28:59

We don't have such Stephen summarize it all.

00:29:02

Yeah, I mean, the bottom line, as you said, is that conservatives rely on process to protect themselves from criticism, thereby often arriving at the wrong result and the left ignores process and is solely focused on arriving at the correct result. When those two forces need each other over time, it ends predictably, which is that the right will lose almost all major legal disputes with sufficient passage of time. And so it is gonna be incumbent upon the elected representatives of the state of Texas to assert their fundamental sovereign rights as a state. And to understand that the constitutional crisis is not the implication of those rights.

00:29:42

The constitutional crisis is what's happening Right now, which is the absence of invoking those rights.

00:29:47

JA271

Stephen stay right there. We are not a serious country. 10 million people will waltz into America. Were worried about legal process. It is how you lose America. Hey, everybody. Charlie Kirk here. When the government used emergency edicts during Covid to restrict the gathering and worship of churches, three pastors facing the risk of imprisonment, unlimited fines and their own churches being ripped apart, took a courageous stand and reopen their doors in the face of a world that chose to comply. The Essential Church is a feature length documentary that explores the struggle between the church and government throughout history. The story uncovers those who have sacrificed their lives throughout history for what they believe in rediscover why the church is essential, and how we prove this stand remains true from a scientific, legal, and most importantly, a theological and biblical perspective.

1

00:30:35

This is not your typical movie, it will change your life. You need to see this movie with your family and friends. The essential church is streaming today exclusively at Salem now.com. That's essential church movie streaming at Salem now.com. That is Salem now.com. Check out the essential church movie. It's terrific. So go to Salem now.com Right. now, One of the things that has infected center right vichy French Republicans, is that deportation is radical. It's not radical. Israel deports people all the time. I want a immigration system that Israel has. Why does Israel get a wall get borders? Why do they get to deport foreigners that commit crimes?

1

00:31:18

Well, we don't because we are not a serious country and we are a suicidal country. Stephen. When I see the people come across the border, it demoralizes me. It's like this daily slit of my wrists. Every day somebody is like slitting my wrist, this slow bleed of the republic Stephen. When Trump is president again as the 47th president of the United States, how do we deport 30 million people?

11

00:31:38

Well, your first priority for deportation needs to be, to send a message to the world and for many other reasons, needs to be all of the illegal aliens who entered the country under Joe Biden. So that you immediately send the message to the whole, the planet that, 'cause someday there of course will be another far left president and that far left president will open the border. And you need to send a message to the world that even if you come here, even if you get in, you're still gonna be deported from the country. and we don't know how large that number is going to be. Of course, you'll pick up an enormous number of what they call

collaterals when you're making those arrests. So you'd have to imagine, you know, if you, if you went to say you rated like a agricultural plant that had, say a meat packing center that had one Biden illegal, you'd probably pick up 10 other legals at the same time.

11
00:32:30

So you'll get an enormous number of collaterals. But that number, and it's unknowably large because it's of course your releases your God aways, and then all of the people who are overstaying their visas, which nobody even talks about. But, but since ice has been disabled from deporting visa overstays, there's millions more illegals than no one is even aware of or thinking about or even having a conversation about. In order to to, to carry out a deportation operation of that scale, you would need to involve the US military, which is why President Trump often talks about the Eisenhower model, where the last time the US military was involved in a large scale deportation operation.

11
00:33:11

So also the reason why President Trump has talked about invoking the Alien Enemies Act, which is a law that was passed in the late 18th century during the Adams presidency, that allows you to instantaneously remove any non-citizen foreigner from an invading country age 14 or older. So it doesn't apply to the entire, all the demographics of illegal alien groups, but it applies to those 14 and older. And so it would be particularly useful in context where you have large amounts of gang members and drug dealers and other criminal offenders who are overwhelmingly gonna be over that age threshold.

11
00:33:59

And so that allows you to suspend the due process that normally applies to a removal city. Most people don't realize who haven't worked in immigration enforcement, how bureaucratic that process is, or the fact that all illegal aliens have the ability under current practice and procedure, not only to appeal their deportations, but if they get the right kind of lawyer and they get the right kind of judge, they can even get their deportation appealed into federal Article three appellate courts. In other words, outta the immigration courts, which are under D O J and into regular federal court.

11
00:34:40

And so you can have a single deportation for a single alien get all the way to the United States Supreme Court. That's how bureaucratic system has become. And so you need to then invoke extraordinary powers to overcome that. And then you need to mobilize the US military state, federal, and local law enforcement to then carry out large scale deportations

**JA273**

across the whole country. And then you would need to build very large staging facilities to carry out the removals. 'cause you know, logistically what a lot of people don't think about or realize is that if a, if a deportation team goes to a particular house and arrests any illegal alien family, so say mother or father and four children, there's not like there's a plane on a tarmac that's just like 10 minutes away ready to take them.

11
00:35:28

And even if there was, it wouldn't be a very efficient use of resources, right, to have an entire chartered aircraft for a single family unit. So you need to then build massive staging facilities so that you can efficiently remove people plain, full at a time or where applicable busload if it, if it's gonna go back to Mexico at a time. And so it would be a, an undertaking. Yep. It would be greater than any national infrastructure project that we've done date. But that's what we have to do. But,

1
00:35:56

But look, we live in a modern era. We have a lot of people that want to go to work, round them up, kick 'em out, go home, go make Honduras great again since you're such a blessing to America. Stephen, thank you so much. Wonderful work we'll have you on. Again, thanks so much for listening. Everybody Email us as always, freedom at Charlie Kirk dot com. Thank you so much for listening and God bless.

12
00:36:19

For more on many of these stories and news you can trust, go to Charlie Kirk dot com.

13
00:36:24

When I grow up, I wanna work for a woke company like super woke. When I grow up, when I grow up, I wanna be hired based on what I look like rather than my skills. I wanna be judged by my political beliefs. I wanna get promoted based on my chromosomes. When I grow up, I want to be offended by my coworkers and walk around the office on eggshells and have my words policed by hr. Words like grandfather peanut gallery. Long time, no see no can do. When I grow up, I wanna be obsessed with emotional safety and do workplace sensitivity training all day long. When I grow up, I wanna climb the corporate ladder just by following the crowd.

13
00:37:04

JA274

I wanna be a conformist. I wanna weaponize my pronouns. What are pronouns?

14

00:37:11

It's time to grow up and get back to work. Introducing the number one woke free job board in America. Red balloon work.

JA275

# EXHIBIT 6

JA276

# U.S. Botched a Deal to Swap Venezuelans Held in El Salvador for Americans

Secretary of State Marco Rubio and the U.S. envoy to Venezuela were both working on different deals and ended up at cross purposes.

 **Listen to this article · 8:57 min**  Learn more

**By Frances Robles, Julie Turkewitz and Zolan Kanno-Youngs**

Frances Robles reported from Florida, Julie Turkewitz from Bogotá, Colombia, and Zolan Kanno-Youngs from Washington.

July 8, 2025

The Trump administration's top diplomat, Secretary of State Marco Rubio, was overseeing a deal to free several Americans and dozens of political prisoners held in Venezuela in exchange for sending home about 250 Venezuelan migrants the United States had deported to El Salvador.

But the deal never happened.

Part of the reason: President Trump's envoy to Venezuela was working on his own deal, one with terms that Venezuela deemed more attractive. In exchange for American prisoners, he was offering to allow Chevron to continue its oil operations in Venezuela, a vital source of revenue for its authoritarian government.

The discussions, which included the release of about 80 Venezuelan political prisoners, and the two different deals were described by two U.S. officials and two other people who are familiar with the talks and sought anonymity because of the sensitive nature of the issue.

The State Department never sealed the deal. The top U.S. officials did not appear to be communicating with each other and ended up at cross purposes. The approximately 250 people expelled from the United States are still being held in a

JA277

maximum-security prison in El Salvador. And it became clear that while Mr. Trump's White House once said that it had no control over the detainees in El Salvador, it was willing to use them as bargaining chips.

Both U.S. tracks — one managed by Mr. Rubio and the other led by the envoy, Richard Grenell — involved speaking with the same Venezuelan representative, Jorge Rodríguez, the president of Venezuela's National Assembly, one U.S. official and the two other people said.

The conflicting diplomatic efforts signaled a monthslong divide over how to approach Venezuela and resembled the chaos that permeated Mr. Trump's first term, when competing officials vied for influence with the president. But the lack of coordination left Venezuelan officials unclear about who spoke for Mr. Trump and, ultimately, left both American and Venezuelan detainees imprisoned.

The offer to swap Venezuelan migrants in El Salvador for prisoners remains on the table, one of the U.S. officials said. The White House is not willing, for now, to extend Chevron's license in Venezuela.

Mr. Grenell declined an interview request, but in an email used a profanity to denounce The Times's account of the separate deals as false.

A person close to Mr. Grenell who is familiar with the talks with Venezuela said Mr. Grenell did not believe that a swap involving the Venezuelan migrants was going to happen because he believed that Mr. Trump would never have authorized the release of accused gang members. The person spoke on the condition of anonymity to protect the sensitive nature of the ongoing negotiations.

Mr. Trump's aides said that there was no tension between any of the diplomats.

"There is no fraction or division," Karoline Leavitt, the White House press secretary, said in a statement. "The president has one team, and everyone knows he is the ultimate decision maker."

JA278



CECOT is a sprawling compound with eight hulking cell blocks — each can hold around 3,000 prisoners.  Fred Ramos for The New York Times

The United States is paying the Salvadoran government millions of dollars to detain migrants who the Trump administration claims are all members of a Venezuelan gang, Tren de Aragua, and who it said had come to the United States to commit crimes.

But the Trump administration has provided little proof that the men are gang members, and their lawyers argue that their detentions are illegal and took place without due process.

**Want to stay updated on what's happening in El Salvador and Venezuela?** Sign up for Your Places: Global Update, and we'll send our latest coverage to your inbox.

JA279

The negotiations over the swap, which were led by the State Department and John McNamara, the chargé d'affaires of the U.S. Embassy in Bogotá, Colombia, who also oversees Venezuelan affairs, had advanced to the point where in May Venezuela was set to send a state plane to El Salvador to retrieve the men, one of the two people said.

At the same time, the United States planned to send a plane normally used for deportations to Caracas, the Venezuelan capital, to pick up the political prisoners and the Americans. Mr. McNamara planned to fly to Caracas to oversee the handover.

The Venezuelan political prisoners, many of whom were arrested while protesting fraudulent elections held last year, would have been given the choice of staying in Venezuela or going to live in El Salvador, according to one of the people close to the talks.

The swap would have included a range of people who protested the 2024 election results in Venezuela, including a man jailed for criticizing President Nicolás Maduro of Venezuela on TikTok and a former mayor arrested in August.

The deal would have freed 11 U.S. citizens and legal permanent residents, including Lucas Hunter, who was arrested in January, and Jonathan Pagan Gonzalez, who was arrested last year.

El Salvador's president, Nayib Bukele, first hinted at such a deal in late April. He suggested on social media that a "humanitarian agreement" would exchange all the Venezuelan migrants for Americans in Venezuelan custody and some Venezuelans. At the time, Venezuelan officials publicly dismissed the proposal and demanded that their "kidnapped" countrymen be returned.

While Mr. Rubio and Mr. McNamara focused on the prisoner swap, Mr. Grenell worked on a deal of his own. Before pitching it to the Venezuelans, Mr. Grenell called the president to tell him about the offer and believed he had the president's support. But Mr. Grenell had not actually received the president's final approval, according to one of the U.S. officials.

JA280

The White House had already heard from a group of Florida Republicans, Cuban Americans, who threatened not to support Mr. Trump's tax and domestic policy bill if the administration eased oil sanctions against Venezuela. Mr. Trump's aides believed that allowing Chevron to export oil from Venezuela would jeopardize Mr. Trump's domestic policy agenda. Now that the bill has passed, it is unclear if administration officials will change their minds on the Chevron license.

The exchange arranged by the State Department was set to take place in late May. That same month, Mr. Grenell went to Venezuela on a separate mission in which he won the release of Joseph St. Clair, an Air Force veteran held in Venezuela.



Richard Grenell, President Trump's special envoy to Venezuela, posted this photo on social media of himself with Joseph St. Clair as they returned from Venezuela. Richard Grenell

JA281

Case 1:25-cv-00766-JEB Document 177-12 Filed 10/15/25 Page 56 of 84

Senior Trump administration officials still view Mr. Grenell as a valuable player in the administration, even though some say they believe that he moved too fast — and without the necessary buy-in — in the episode.



Chevron's oil operations in Venezuela had been an important source of revenue for the Venezuelan government.   Marco Bello/Reuters

Mr. Grenell, the person close to him said, was surprised to learn about the swap, and is the only authorized negotiator on any deals with Venezuela. But since the episode, Mr. Rubio has taken the lead in talking to the Venezuelans, one of the U.S. officials said.

The Venezuelan and Salvadoran governments did not provide comment for this article.

JA282

Case 1:25-cv-00766-JEB    Document 177-12    Filed 10/15/25    Page 57 of 84

The relatives of some Americans detained in Venezuela expressed frustration over the failure of the efforts to win their freedom.

"The sense that we parents had was that you had various people talking, but they weren't working together — one negotiator would say one thing, and another would say something else," said Petra Castañeda, whose son, Wilbert Castañeda, 37, a Navy SEAL, was arrested last year in Venezuela. "You would think they would be duly coordinated."



Petra Castañeda's son, Wilbert Castañeda, a Navy SEAL, has been detained in Venezuela since last year. Ariana Drehsler for The New York Times

In Mr. Trump's first term, American officials tried to oust Mr. Maduro through sanctions, diplomatic isolation and the support of an alternative president, a young legislator. Mr. Rubio and other Cuban American Republicans continue to support sanctions and an isolationist approach.

JA283

10/14/25, 2:07 PM
Case 1:25-cv-00766-JEB   Document 177-12   Filed 10/15/25   Page 58 of 84
U.S. Botched a Deal to Swap Venezuelans in El Salvador for American Prisoners - The New York Times

But in the second term, Mr. Grenell has expressed a willingness to work with the Venezuelan government. He made his first trip to Caracas in January, and got several Americans released.

The Maduro government has spent the past year or so rounding up foreigners in its territory and imprisoning them to use in negotiations with foreign governments, according to security analysts and human rights groups.



President Nicolás Maduro of Venezuela during a news conference last year.  Alejandro Cegarra for The New York Times

The Venezuelan watchdog group Foro Penal says there are now 85 people with foreign citizenship wrongfully detained in Venezuela, the largest number the group has ever counted.

JA284

10/14/25, 2:07 PM
Case 1:25-cv-00766-JEB    Document 177-12    Filed 10/15/25    Page 59 of 84
U.S. Botched a Deal to Swap Venezuelans in El Salvador for American Prisoners - The New York Times

While Mr. Grenell was able to secure the release of six Americans in January, and then Mr. St. Clair in May, many more U.S. citizens and permanent residents remained in Venezuelan custody or were recently captured.

The State Department deal that had been in the works with Venezuela included stern warnings that suggested severe consequences if more prisoners were taken after the swap, one of the people said.

Jetzy Arteaga, whose son, Carlos Cañizales Arteaga, has been held in El Salvador since March after migrating to North Carolina, said she was eager to see the deal revived.

"At first, when we heard that our sons were being used as bargaining chips, this offended us a lot," Ms. Arteaga said. "Our sons are not bargaining chips. But now we realize there is no other option."

Annie Correal contributed reporting.

**Frances Robles** is a Times reporter covering Latin America and the Caribbean. She has reported on the region for more than 25 years.

**Julie Turkewitz** is the Andes Bureau Chief for The Times, based in Bogotá, Colombia, covering Colombia, Venezuela, Bolivia, Ecuador and Peru.

**Zolan Kanno-Youngs** is a White House correspondent for The Times, covering President Trump and his administration.

---

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: White House Botches Swap Of Detainees

JA285

# EXHIBIT 7

JA286

# 10 Americans freed in prisoner swap between U.S., El Salvador and Venezuela

cbsnews.com/news/prisoner-swap-us-venezuela-el-salvador

Caitlin Yilek, Sara Cook, Margaret Brennan                                       July 18, 2025

[Politics](#)

By

Sara Cook,

Jose Diaz
Updated on: July 18, 2025 / 6:09 PM EDT / CBS News

*Washington* — Ten Americans are en route to the U.S. after a prisoner swap involving the U.S., El Salvador and Venezuela, Secretary of State Marco Rubio said Friday.

The Americans were freed from Venezuela in exchange for El Salvador returning 252 Venezuelans who were deported from the U.S. to a notorious Salvadoran prison earlier this year, senior administration officials said, alleging the released Venezuelans were members of the gang Tren de Aragua.

A former Navy SEAL, [Wilbert Joseph Castaneda](#), is among the Americans released, three sources told CBS News. Castaneda was detained in Venezuela last year while on personal travel.

"We have prayed for this day for almost a year. My brother is an innocent man who was used as a political pawn by the Maduro regime," Castaneda's family said in a statement. The family said he had suffered several traumatic brain injuries during his 18 years in the Navy that "impaired his judgment and risk mitigation" and "led him to make a bad decision to travel to Venezuela."

The U.S. has warned Americans against traveling to Venezuela or near its borders, citing the risks of wrongful detention.

"Until today, more Americans were wrongfully held in Venezuela than any other country in the world," Rubio said in a statement that credited "President Trump's leadership and commitment to the American people."

"Every wrongfully detained American in Venezuela is now free and back in our homeland," Rubio added.

The U.S. Embassy in Venezuela posted a [photo](#) of the freed Americans with U.S. diplomat John McNamara.

**JA287**

1/4



Ten Americans who were freed from Venezuela in a prisoner swap on Friday, July 18, 2025. U.S. Embassy in Venezuela

As part of the deal, the Venezuelan government also released dozens of people who were described as Venezuelan political prisoners and detainees, a senior administration official said.

Salvadoran President Nayib Bukele wrote on X that his country "handed over all the Venezuelan nationals detained in our country, accused of being part of the criminal organization Tren de Aragua," in exchange for "a considerable number of Venezuelan political prisoners … as well as all the American citizens it was holding as hostages."

The Trump administration deported more than 200 male Venezuelan citizens to El Salvador in March, accusing them of being part of the transnational gang Tren De Aragua. Mr. Trump invoked an 18th-century wartime law, the Alien Enemies Act, to order officials to quickly deport many of the Venezuelan migrants, deeming them a threat to the U.S. The Salvadoran government has held many of the detainees in a supermax prison called the Terrorism Confinement Center, or CECOT.

In May, the Supreme Court extended a pause on deportations of Venezuelan migrants detained in northern Texas while they challenge their removals under the wartime law.

**JA288**

Some of the families of the Venezuelan deportees have denied that they have gang connections, and a "60 Minutes" investigation in April found that most of the detainees did not have criminal convictions.

The Venezuelan government confirmed Friday's swap, saying in a statement it "has achieved the release of the 252 Venezuelan citizens who remained kidnapped and subjected to forced disappearance in a concentration camp, known as CECOT, in the Republic of El Salvador."

## Officials describe "down-to-the-wire" deal

A senior administration official said the deal with El Salvador and Venezuela was "essentially down to the wire." The flight carrying the detainees took off from Venezuela at around 3:40 p.m. ET and left Venezuelan airspace at around 3:55 p.m. The official alleged the Venezuelan government took "one last stand" by briefly delaying Friday's swap as a "power flex."

The prisoner swap was arranged as Venezuela faces intense U.S. sanctions that limit the country's once-lucrative oil industry, and came one day after the Trump administration imposed sanctions on six leaders and affiliates of Tren de Aragua. A senior administration official said Friday's deal was "humanitarian in nature" and there was "not a discussion of sanctions whatsoever."

Rubio credited Bukele — who has cast himself as a key ally in Mr. Trump's deportation push — for the swap. Bukele posted on X that his government initially proposed the swap to Venezuela's government in April.

> Ten Americans are are their way home from detention in Venezuela! Thanks to @POTUS, @SecRubio, @usembassyve, @aboehler and many others for your support bringing Americans home pic.twitter.com/0lnxkBEZ9S
>
> — Special Presidential Envoy for Hostage Affairs (@StateSPEHA) July 18, 2025

James LaPorta, Charlie D'Agata, S. Dev, Camilla Schick, Eleanor Watson, Olivia Gazis and Camilo Montoya-Galvez contributed to this report.

## More from CBS News

- **Sacramento-area voices are hopeful after Middle East ceasefire, releases**



JA289

# EXHIBIT 8

JA290

# Trump admin proposed sending up to 500 alleged Venezuelan gang members during negotiations to use El Salvador's mega-prison

**CNN** cnn.com/2025/04/28/politics/trump-el-savador-prison-negotiations

By Jennifer Hansler and Priscilla Alvarez , CNN                    April 28, 2025



This handout photo from Press Secretary of the President of El Salvador show US military personnel escorting an alleged gang member to El Salvador's Cecot prison at the El Salvador International Airport in San Luis Talpa, El Salvador, on April 12.

Press Secretary of the President of El Salvador/Reuters
*CNN  —*

The United States proposed sending up to 500 Venezuelan migrants with alleged ties to the Tren de Aragua gang to El Salvador as the two governments sought to reach an agreement on the use of the Central American nation's notorious mega-prison, according to emails seen by CNN.

The details of the arrangement, which have not been previously reported, reveal the Trump administration's deal-making with El Salvador to take the unprecedented step of sending migrants to the country to be detained in CECOT, officially known as the Terrorism Confinement Center.

**JA291**

El Salvador eventually agreed to accept up to 300 people in mid-March, according to an internal document. A US official described 500 as a "notional" figure, adding that the arrangement between the two countries is a "cooperation agreement but in a friendly non-binding fashion," and still stands.

President Donald Trump has lavished praise on El Salvador's Trump-friendly President Nayib Bukele, telling reporters earlier this month "he's doing a fantastic job." "He's been amazing," Trump said. "They have some very bad people in that prison," he added referring to CECOT.

Trump officials have long touted El Salvador as a key ally to the administration's immigration agenda — but deportation flights carrying 238 Venezuelan migrants to the country last month sparked a fraught legal battle and fierce criticism from Democrats and immigrant advocates.

Prior to those flights, though, the United States had been setting up a costly arrangement with El Salvador to detain migrants with alleged ties to Tren de Aragua, a Venezuelan gang that the administration labeled a foreign terrorist organization.

The US has approved $15 million in foreign affairs funding to be sent to El Salvador. But, as of late April, just under $5 million has been sent in the form of a grant to El Salvador's government, according to two sources familiar. According to the US official, the Trump administration is providing compensation per individual imprisoned in the country which is why another tranche of money hasn't been sent yet.

The proposed arrangement included the US providing transportation and related costs and paying a one-time maintenance fee of $10 million, about $20,000 per person sent to the facility, according to emails sent between Bukele's brother Ibrajim and Michael Needham, the counselor and chief of staff to Secretary of State Marco Rubio days before the deportation flights departed.

"Upon all nine being returned, (El Salvador) will provide (US government) a 50% discount for Year 2, if necessary, of the original TdAs," one email reads, referring to a request by the El Salvadoran government of certain MS-13 members.

The US official told CNN that deportations of MS-13 gang members, particularly of its leaders, was a priority for Bukele, and the Trump administration agreed.

Prior to the correspondence between Bukele's brother and Needham, Rubio and the Salvadoran president discussed detaining US deportees during Rubio's visit in February.

**JA292**

## 'Reasonable' terms

Ibrajim Bukele described the terms as seeming "reasonable" and requested requirements for the inmates who would be deported there. Needham told him that the "baseline requirements do not differ from El Salvador's for the treatment of prisoners, as both are in accordance with international legal norms."

While he asked for the agreement to be limited to 500 members of Tren de Aragua, Needham added the US "would like to keep the door open for a separate discussion on how the USG can help El Salvador with a new facility in the future."

A day before the March 15 flights, El Salvador's government agreed to accept up to 300 alleged Tren de Aragua members for up to one year, as well as two alleged MS-13 members, according to the internal document seen by CNN.

Rubio and President Bukele also spoke again prior to the flights.

"The United States has provided funding for El Salvador's law enforcement and anticrime needs in connection with the Government of El Salvador's offer to receive Venezuelan Tren de Aragua gang members removed from the United States," a State Department spokesperson told CNN.

"The United States is fully engaging with our regional partners, including El Salvador, to put an end to the exploitation and deaths that stem from illegal immigration, which can also involve human trafficking and alien smuggling," they said.

"As countries continue to work with us in securing our borders and addressing illegal immigration, we will provide assistance as necessary in support of these collaborative efforts," the spokesperson said. "Our goal is to ensure that our partners are well-equipped to handle the challenges they face, ultimately contributing to a more stable and secure region."

During a meeting between Trump and Bukele in the Oval Office, Trump urged the Salvadoran president to build more mega-prisons, like CECOT, and signaled that deportees could also include US citizens who are violence criminals.

A formal notice of the $4.76 million grant to El Salvador, dated March 22, notes the purpose of the grant "to provide funds to be used by Salvadoran law enforcement and corrections agencies for its law enforcement needs, which include costs of detaining the 238 TdA members recently deported to El Salvador," according to the internal document seen by CNN.

Migrants sent to CECOT are considered to be in Salvadoran custody, according to US officials, and therefore no longer in the control of the US despite payments from the United States.

**JA293**

CNN previously reported that the Trump administration was preparing to send more immigrants to CECOT on the heels of a Supreme Court decision allowing the use of the centuries-old Alien Enemies Act, which effectively wipes away due process and allows for the swift removal of migrants.

"It's one of the reasons I went to El Salvador last week was a visit with the president. Asked him to continue to take terrorists from the United States of America that no longer belong here," Homeland Security Secretary Kristi Noem said following a trip to El Salvador.

But across the country, cases have cropped up contesting the removal of migrants under the wartime authority for fear that they may be sent to El Salvador and never returned. Since the flights in March, multiple attorneys have shared stories of clients who were deported to El Salvador with no ties to Tren de Aragua.

A federal judge in New York blasted the Trump administration last week for its use of the notorious prison in El Salvador for ICE detainees.

The comments came during a hearing in a case with a pending habeas petition filed by the ACLU on behalf of a class of Venezuelan immigrants facing removal under Trump's invocation of the Alien Enemies Act.

"These people are being thrown out of the country because of tattoos," Judge Alvin Hellerstein said in court last Tuesday. "There is nothing in this statute or proclamation that authorizes the United States of America to hire a jail in a foreign country for people could be subjected to cruel and unusual punishment not allowable in the United States jails."

JA294

# EXHIBIT 9

JA295

Case 1:25-cv-00766-JEB　Document 177-12　Filed 10/15/25　Page 71 of 84

An official website of the United States Government Here's how you know

Home　>　...　> Welcoming the Release of U.S. Nationals and Politi...

# Welcoming the Release of U.S. Nationals and Political Prisoners Held in Venezuela

**PRESS STATEMENT**

**MARCO RUBIO, SECRETARY OF STATE**

JULY 18, 2025

Today, thanks to President Trump's leadership and commitment to the American people, the United States welcomes home ten Americans who were detained in Venezuela. Until today, more Americans were wrongfully held in Venezuela than any other country in the world. It is unacceptable that Venezuelan regime representatives arrested and jailed U.S. nationals under highly questionable circumstances and without proper due process. Every wrongfully detained American in Venezuela is now free and back in our homeland.

I want to thank my team at the State Department, as well as our interagency partners, and especially El Salvador's President Nayib Bukele, for their work to secure these long-awaited releases and their efforts to ensure the safety of U.S. nationals both at home and abroad. Our commitment to the American people is clear: we will safeguard the well-being of U.S. nationals both at home and abroad and not rest until all Americans being held hostage or unjustly detained around the world are brought home.

We also welcome the release of Venezuelan political prisoners and detainees that were also released from Venezuelan prisons. The Trump Administration continues to support the restoration of democracy in Venezuela. The regime's use of unjust detention as a tool of political

Cookie Settings

JA296

repression must end. We reiterate our call for the unconditional release of remaining unjustly and arbitrarily detained political prisoners and foreign nationals.

TAGS

Bureau of Western Hemisphere Affairs    El Salvador    Office of the Spokesperson

The Secretary of State    Venezuela

White House

USA.gov

Office of the Inspector General

Archives

Contact Us

America 250



JA297

# EXHIBIT 10

JA298

# 'Can We Extradite Him?' How U.S. Officials Grappled With the Release of a Triple Murderer

The decision to free an American convicted of murder in a prisoner swap with Venezuela threatened to undercut President Trump's claims of keeping the worst of the worst out of the United States.

 ▶   **Listen to this article · 4:35 min**   <u>Learn more</u>

**By Hamed Aleaziz, Julie Turkewitz and José Bautista**

Hamed Aleaziz reported from Washington, Julie Turkewitz from Bogotá, Colombia, and Jose Bautista from Madrid.

Aug. 1, 2025

By the time the United States was extracting a group of Americans and legal U.S. residents from a prison in Venezuela last month, some State Department officials had come to an uncomfortable realization.

One of the prisoners had been convicted of murdering three people in Spain in 2016. And soon he would be on his way home, having his photo taken alongside those deemed by the United States to have been wrongfully imprisoned in Venezuela.

How were they going to explain that to the American people?

On July 18, the day of the prisoner release, U.S. officials tried to figure out whether and how to acknowledge that Washington was bringing home Dahud Hanid Ortiz, whose case seemed to undercut President Trump's claims of keeping the worst of the worst out of the United States.

In an internal email exchange that was obtained by The New York Times, State Department officials debated whether to include Mr. Hanid Ortiz in a public statement to be published that afternoon about the people being released, 10

**JA299**

including him.

"We had understood that we don't want to refer to him as a hostage or wrongfully detained, which is why we said nine," a press official wrote.

Michael Kozak, the career official who oversees diplomacy in the Western Hemisphere, replied: "Well then we probably should not have asked for him. Can we now extradite him to Spain? We did get the S.O.B. released."

Finally, Mr. Kozak made the decision to include him: "Well I would stick with 10 as we did ask for and receive 10." He added that the fact that at least one "is a bum does not change that fact."

That afternoon, Secretary of State Marco Rubio released a statement saying that Mr. Trump's leadership had led to the release of the "10 Americans."

"Every wrongfully detained American in Venezuela is now free and back in our homeland," Mr. Rubio said in the statement.

At some point, however, U.S. officials started referring to "nine" people instead of 10.

In a statement, an official from the State Department said: "We do not comment on allegedly 'leaked' emails. We are very pleased that nine innocent, wrongfully detained Americans have been freed from Venezuela. The Trump administration is committed to law and order; violators will be held accountable for their crimes."

Mr. Rubio was not included in the email conversation about how to identify Mr. Hanid Ortiz.

**JA300**

Case 1:25-cv-00766-JEB Document 177-12 Filed 10/15/25 Page 77 of 84



Mr. Hanid Ortiz, in the back row on the right, in a blue cap with flag in hand, standing with the other U.S. citizens and permanent residents released from Venezuela. John McNamara, a State Department official, stands in the middle. Special Presidential Envoy for Hostage Affairs

The State Department has not responded to questions about why the administration decided to include Mr. Hanid Ortiz among those freed from Venezuelan detention, whether it was an oversight or purposeful, and when exactly they learned about his record.

Mr. Hanid Ortiz, 54, a citizen of the United States and Venezuela, is now living as a free man in the United States, according to two people with knowledge of the case.

A 19-year U.S. Army veteran who served for a year in Iraq, Mr. Hanid Ortiz was expelled from the military after pleading guilty to fraud and larceny.

In 2016, according to Venezuelan court documents, he sought to kill a lawyer in Madrid who he believed had a relationship with his wife. When he arrived at the lawyer's office he killed two women there, as well as a man he mistakenly believed

was the lawyer.

The deaths were violent, according to an extradition request by the Spanish government that was included in the Venezuelan records. One woman was killed with a large knife or machete. Another was likely killed with an iron bar. Afterward, Mr. Hanid Ortiz fled to Germany and eventually to Venezuela.

The Venezuelan Constitution does not allow the extradition of its citizens, so he was tried in Venezuela, found guilty and sentenced to three decades in prison in 2023.

Now that Mr. Hanid Ortiz is in the United States, Manuel Ollé Sesé, a professor of International Criminal Law at the Complutense University of Madrid, said that he believed Spain had the legal ability to extradite him.

"The murderer is convicted in Venezuela, but has not served his sentence," he said, "so Spain could prosecute him since it would be an exception to the principle of 'ne bis in idem,' that is, double jeopardy."

A person at the Spanish attorney general's office who was not authorized to speak publicly said that the office's criminal cooperation unit was studying the case.

**Hamed Aleaziz** covers the Department of Homeland Security and immigration policy for The Times.

**Julie Turkewitz** is the Andes Bureau Chief for The Times, based in Bogotá, Colombia, covering Colombia, Venezuela, Bolivia, Ecuador and Peru.

---

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: U.S. Officials Struggle to Justify Release of a Triple Murderer

JA302

# EXHIBIT 11

JA303

*Democracy Dies in Darkness*

# U.S.-Venezuela prisoner swap frees Americans for migrants in El Salvador

The Venezuelans, labeled terrorists and violent criminals by Trump, had been deported to the notorious CECOT prison, setting off a tense legal battle over executive power.

Updated July 18, 2025

By Karen DeYoung and Samantha Schmidt

More than 250 Venezuelans deported in March by the Trump administration and flown to a high-security prison in El Salvador were sent home Friday in exchange for 10 American citizens and permanent U.S. residents imprisoned in Venezuela by the government of President Nicolás Maduro.

The swap at least partially ended one of the most controversial episodes of President Donald Trump's second term — the secret removal under a 1798 wartime law and indefinite incarceration without charge of Venezuelan migrants he said were members of a "terrorist" gang. Legal challenges to those actions continue.

In a carefully coordinated series of events following months of negotiations among Washington, Caracas and San Salvador, the 252 Venezuelans were bused from El Salvador's Terrorism Confinement Center (CECOT) to be picked up by two aircraft sent from Venezuela. Simultaneously, a U.S.-chartered Gulfstream plane departed a small Georgia airport carrying U.S. diplomatic officials and medical personnel en route to Caracas.

Salvadoran President Nayib Bukele later said in a social media post that the releases meant his government had now handed over "all the Venezuelan nationals detained in our country." He said Maduro had also released a number of domestic political prisoners as part of the deal.

In a statement issued after the departing U.S. plane cleared Venezuelan airspace with the Americans aboard about 4 p.m., Secretary of State Marco Rubio said that more Americans had been wrongfully jailed "under highly questionable circumstances without proper due process" in Venezuela than in any other country. He said that "every wrongfully detained American" in Venezuela was now free.

**Trump presidency**

JA304

We're tracking Trump's progress on campaign promises and legal challenges to his executive orders and actions.

Maduro has often accused the CIA and American mercenaries of infiltrating Venezuela in plots to overthrow his government. Successive U.S. administrations have accused him of electoral fraud and human rights abuses and imposed economic sanctions.

The State Department has long warned against travel to Venezuela, where Maduro has used arrests of Americans as bargaining tools. Ten Americans were freed in late 2023 in exchange for the Biden administration's release of a U.S.-imprisoned close Maduro ally. Seven were freed earlier this year in previous deals negotiated by the Trump administration.

The names of those released by Caracas on Friday were not provided. Although Rubio and senior administration officials who briefed reporters on the exchange described them all as "Americans," another official called that a "colloquial" expression and said five are U.S. citizens and five are permanent U.S. residents, or green-card holders. The officials spoke on the condition of anonymity under rules set by the White House.

Advisers to relatives of two of the released citizens provided statements. Lucas Hunter's family has said he was on a windsurfing trip in Colombia near the Venezuelan border in January when he was "kidnapped" and arrested by Venezuelan border guards. "We are grateful that President Trump has made this issue a priority for his team," Hunter's sister, Sophie Hunter, said Friday.

Venezuela had alleged that Wilbert Castañeda Gomez, a decorated former Navy SEAL, was part of a plot to assassinate Maduro when he was arrested while on vacation in August. "My brother is an innocent man who was used as a political pawn by the Maduro regime," Christian Castañeda said.

A statement released by the Venezuelan government said that all of the Americans had been "under judicial orders for their proven participation in serious crimes against the country, the independence and the security of the nation." The statement also said, in an apparent reference to the release of political prisoners, that "alternative measures" — usually referring to home detention and regular check-in — had been granted to "a group of Venezuelan citizens who remain detained ... for their participation in the commission of common crimes and crimes against the constitutional order." Later official statements said 80 had been released, although no names were given.

JA305

Earlier Friday, a plane arrived in Caracas carrying seven young children who Interior Minister Diosdado Cabello said had been "kidnapped" by the United States when U.S. agents separated them from their deported parents. The return of the children was part of the new exchange agreement, according to a person informed of the deal who spoke on the condition of anonymity because they were not authorized to discuss it. They were brought to Venezuela aboard a regular U.S. deportation flight from Houston. It was unclear who had custody of them in the United States, where Cabello said the return of 25 more was being negotiated with the Trump administration.

Friday's swap was a remarkable development after Trump, in a high-stakes early bid to claim executive power and prove he was serious about ridding the country of illegal migrants, did not follow a court order, which was issued as the deportation planes to El Salvador were midflight or preparing for takeoff March 15, to halt or reverse the removals. The administration never provided a complete list of the Venezuelans' identities and subsequently told courts it had no power to force or even ask El Salvador to return them.

Many of the Venezuelan prisoners were sent on the March 15 flights within days of being rounded up at their U.S. homes or workplaces. They arrived in shackles at El Salvador's CECOT prison under an unpublicized agreement between Rubio and Bukele, whose government was paid to incarcerate them.

One senior administration official said that Bukele's initial offer to accept the prisoners provided the "opportunity" to initiate negotiations for an exchange.

Trump's sudden invocation of the 1798 Alien Enemies Act to justify more than half of the removals launched a torrent of legal challenges. Federal courts have halted deportations under the act now, although they have issued differing opinions on whether Trump has the power to use it. The Supreme Court has not ruled on the question but has said that the law requires potential deportees be given an opportunity to challenge their removal.

The rest of the deported prisoners were sent to El Salvador under regular deportation procedures. The administration said, without presenting evidence, that many were violent criminals. As the Venezuelans simply disappeared, none were given an opportunity to challenge their detention or deportation, and family members were not informed. Inmates at the prison are not allowed any contact with the outside world.

Maduro had demanded the return of the Venezuelans, who he said had been "kidnapped," as a point of national honor, after Bukele offered in April to send them home if Maduro would free all U.S. citizens he was holding as well as dozens of imprisoned domestic political opponents.

But an exchange being negotiated by the State Department in May was scotched when it collided with separate negotiations being secretly conducted by presidential envoy Richard Grenell, who told Trump he had persuaded Maduro to resume suspended deportation flights to Caracas in return for the release of the Americans. The State Department eventually resumed talks leading to the final deal.

**JA306**

For the returned Venezuelans, the agreement ended four months of confinement in what both Salvadoran and U.S. human rights groups have called one of the most brutal facilities in the hemisphere, where those detained were deprived of access to lawyers or their families.

Questioned about his justification days after the deportations, Trump told reporters the Venezuelans were "bad people. … When you look at the crimes they have committed, you don't get worse than that. These are … drug dealers, drug lords, people from mental institutions."

Homeland Security Secretary Kristi L. Noem, on a visit to the prison in late March, filmed and posted a video warning potential migrants of their fate as she stood before dozens of shirtless men with shaved heads, stacked on three levels of shelves inside a cell. They should remain in the megaprison, built to house 80,000, "for the rest of their lives," she later said.

Trump claimed authority to invoke the Alien Enemies Act, which requires invasion by a foreign power, by saying most of the deportees were members of Tren de Aragua, a Venezuelan gang active in the U.S. that he had designated a terrorist group. The administration said its activities constituted an invasion under the act since the gang was under the control of the Maduro government — something U.S. intelligence later put in doubt.

In the Friday briefing, a senior administration official said "all" of the 252 deportees returned to Venezuela were "members of Tren de Aragua," a sweeping assertion for which the administration has never provided evidence.

But numerous news reports and court filings have indicated that many of the Venezuelans were not violent criminals, much less members of the gang. Some of those sent to El Salvador had been legally living in the U.S. — including Kilmar Abrego García, one of 23 Salvadorans included on the flights. When a federal judge in Maryland ordered him returned, the administration said it had no power to do so, since all of the deportees were now under the "custody of a foreign nation" and the matter was out of U.S. hands.

Abrego, a Maryland resident, was returned to the U.S. last month, only to face federal charges of migrant smuggling, which he denies. U.S. court filings last week by lawyers for more than 100 Venezuelans challenging their deportations and imprisonment in El Salvador included an acknowledgment by Bukele officials that the U.S., not El Salvador, has "the jurisdiction and legal responsibility" for them.

Lee Gelernt, an American Civil Liberties Union attorney and lead counsel for the migrants, said Friday that lawyers are still pursuing due process for them and noted that a federal judge in the District of Columbia ruled in June that the government had failed to give them a chance to contest their deportations. That decision is on appeal.

"These individuals have languished incommunicado in a notorious prison known for torture for more than four months with zero due process and now with this latest maneuver the administration appears to be trying to avoid all judicial accountability," Gelernt said in a statement.

Late Friday, the 252 released Venezuelans deplaned on live television at the international airport outside Caracas. Dressed in T-shirts and jeans, their hair grown out, they shouted "Viva," crossed themselves and bumped fists with Cabello, who waited at the bottom of the stairs.

*Justin Jouvenal and Maria Sacchetti contributed to this report.*

**JA308**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND, SOUTHERN DIVISION

|  |  |
|---|---|
| J.O.P., *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND<br>SECURITY, *et al.*,<br><br>    Defendants. | No. 8:19-cv-01944-SAG<br><br><br>Declaration of Christopher Landau |

**DECLARATION OF DEPUTY SECRETARY OF STATE CHRISTOPHER LANDAU**

I, Christopher Landau, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as

follows:

1.      I am the Deputy Secretary of State of the United States of America. In that

capacity, I am the principal deputy, adviser, and alter ego to the Secretary of State, the President's

chief foreign affairs advisor. I serve as Acting Secretary of State in the Secretary's absence, and I

assist the Secretary in the formulation and conduct of U.S. foreign policy and in giving direction

to all elements of the Department of State. I carry out the President's foreign policy through the

State Department and the Foreign Service of the United States. *See* 22 U.S.C. § 2651a. I have

served in this role since March 25, 2025, and previously served as United States Ambassador to

Mexico, among other positions.

2.      I am familiar with the facts and court orders in this case, including the Court's order

of April 23, 2025, ordering Defendants—the Department of Homeland Security (DHS),

Immigration and Customs Enforcement (ICE), U.S. Citizenship and Immigration Services

(USCIS), and certain officials of those agencies—to facilitate the return to the United States of a

1

**JA309**

class member who is proceeding under the pseudonym "Cristian." ("April 23 Order," ECF 254). I am also aware of the Court's order of May 20, 2025, requiring Defendants to provide a status report on, *inter alia*, the steps they have taken to facilitate Cristian's return to the United States ("May 20 Order," ECF 280), as well as the court's order of June 5, 2025, to provide further regular status reports ("June 5 Order," ECF 293). I have made the statements herein based on my personal knowledge, on information provided to me in my official capacity, on reasonable inquiry, and on information obtained from various records, systems, databases, State Department employees, and information portals maintained and relied upon by the United States Government in the regular course of business, and on my evaluation of that information.

3.      On March 13–14, 2025, the United States and El Salvador memorialized a non-legally binding arrangement under which El Salvador committed to accept approximately 300 Venezuelan deportees associated with the designated foreign terrorist organization Tren de Aragua, *see* https://foia.state.gov/FOIALIBRARY/QNI2.aspx, and under which El Salvador also gave its assurance that it would comply with domestic and international legal obligations with respect to these individuals. DHS had responsibility for identifying the individuals to be removed under the arrangement.

4.      For reasons the State Department has publicly explained to the Inter-American Commission     on     Human     Rights     on     July     22,     2025, https://www.youtube.com/watch?v=5zJpvgzxnwg, the United States thereafter deported to El Salvador 252 Venezuelan nationals associated with Tren de Aragua, including Cristian. From that point forward, Cristian and the others were in the custody of El Salvador, which chose to house them in the Terrorism Confinement Center (CECOT). El Salvador had sovereign discretion over their ultimate disposition.

2

**JA310**

5.     On April 20, 2025, President Bukele of El Salvador proposed to Nicolás Maduro of Venezuela a deal whereby El Salvador would repatriate the Venezuelans in its custody in exchange for Maduro releasing political prisoners in his custody. https://x.com/nayibbukele/status/1914070199659098258; *see also* https://x.com/nayibbukele/status/1914802146325004726 (posting formal version of offer). As explained in detail to the Inter-American Commission at the July 22 public hearing, the State Department resolved to use its diplomatic good offices to help the two sides reach a deal.

6.     On May 30, 2025, cognizant of the May 20 Order requiring a report on steps taken to facilitate Cristian's return, I spoke with DHS/ICE Enforcement and Removal Operations Acting Deputy Assistant Director Mellissa Harper. I related to Ms. Harper that Secretary Rubio has a personal relationship with President Bukele and senior officials in the Salvadoran government that dates back over a decade to the Secretary's service on the Senate Foreign Relations Committee. I went on to tell her that based on this deep experience with El Salvador and his familiarity with political and diplomatic sensitivities in that country, Secretary Rubio was personally handling the discussions with the government of El Salvador regarding persons subject to court orders— whether by this Court or others—detained in El Salvador. I additionally assured Ms. Harper that Secretary Rubio had read and understood this Court's order, and that Secretary Rubio wanted to assure this Court that he was committed to making prompt and diligent efforts on behalf of the United States to comply with that order. I understand that Ms. Harper then included this information in her declaration attached to Defendants' status update to the Court, dated June 2, 2025 (ECF 290).

7.     Even as the State Department was undertaking the diplomatic efforts described above, the State Department also assisted Defendants' compliance with the May 20 and June 5

3

Orders by regularly requesting location and status updates on Cristian from El Salvador. Even though the State Department made frequent requests to El Salvador for updates, those requests were not always met with a response. We conveyed to Defendants whatever information El Salvador provided us as soon as we obtained it, and it is my understanding that Defendants then reported that information to the Court. It should go without saying that El Salvador is a sovereign country, and we cannot control when, how, or if it responds to our inquiries.

8.      After weeks of sensitive diplomatic discussions, the United States helped secure a deal between El Salvador and Maduro's regime. On July 18, El Salvador decided to release the 252 Venezuelans who were in its custody, including Cristian, in exchange for the Maduro regime's release of 10 Americans along with dozens of Venezuelan political prisoners. To help ensure the greatest possible compliance with the Court's order regarding Cristian, the State Department sought and obtained assurances from the Maduro regime that the regime will not impose obstacles to any transferred Venezuelan's travel if three conditions are all met: (1) U.S. legal proceedings reach a stage where the appearance of one of the 252 Venezuelan nationals formerly housed at CECOT may be called for in legal proceedings or required by a court; (2) the U.S. government is prepared to facilitate the person's travel to the United States for that purpose; and (3) the individual is willing to travel to the United States for that purpose.

9.      The Bukele-Maduro deal came to fruition over several hours on July 18 and involved simultaneous flights taking off from Venezuela and El Salvador carrying the respective individuals who would be repatriated. Due to logistical factors beyond anyone's control, the deal was still actively being implemented at noon on July 18, when Defendants' weekly status update was due to the Court under the June 5 Order. To mitigate the risk that the deal would fall apart under public scrutiny, the State Department asked Defendants to delay filing their report until we

4

had confirmation that the respective planes had safely taken off. If Defendants had filed their report, we feared that the deal would have collapsed and 10 Americans and 80 Venezuelan political prisoners would have remained in detention. At the same time, we were determined not to mislead the Court or Plaintiffs by having Defendants file a report at noon that omitted any mention of the operation then underway. As soon as we had confirmation that the planes had safely taken off— approximately 3:45pm Eastern Daylight Time on July 18—the State Department notified Acting Deputy Assistant Director Harper so that she could include the information in her declaration accompanying the status report. It is my understanding that she did so and that the Justice Department filed the status report with the Court within minutes thereafter. We regret this brief delay in filing the status report, but the operation's success and sensitive diplomatic engagement depended on maximum discretion.

10.    Secretary Rubio publicly testified to the Senate Foreign Relations Committee on May 20, 2025, that if high-level State Department officials were compelled to share with third parties the details of their conversations with our foreign counterparts, we would break trust with those counterparts, chilling their willingness to discuss matters candidly with us and harming our ability to conduct foreign affairs. Maintaining a relationship of trust and mutual respect with foreign counterparts is the cornerstone of effective diplomacy, and achieving a diplomatic goal often involves complex negotiations that the foreign counterpart does not want divulged publicly. Diplomacy also involves careful timing—sometimes achieving a goal is contingent upon another action that can only happen at a later time. These considerations impeded us from providing further detail to Defendants for their weekly status reports on the specific steps the State Department was taking at that time to facilitate Cristian's return, and we can likewise not divulge many of those

JA313

details now. Suffice it to say that our diligent efforts put Cristian in a position to return to the United States if he ever so chooses.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 11th day of September, 2025.

Christopher Landau
Deputy Secretary of State

6

SBU - LEGAL
**JA314**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| KILMAR ARMANDO ABREGO GARCIA, *et al.*,<br><br>     Plaintiffs,<br><br>v.<br><br>KRISTI NOEM, Secretary,<br>United States Department of Homeland Security, *et al.*,<br><br>     Defendants. | No. 8:25-cv-951 (PX)<br><br><br><br>Declaration of Marco Rubio |

**SUPPLEMENTAL DECLARATION OF SECRETARY OF STATE MARCO RUBIO**

I, Marco Rubio, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.      I am the Secretary of State of the United States and head of the United States Department of State, an Executive Department of the United States. A description of my role and duties, the basis for my knowledge about facts and policies relevant to this lawsuit, and of the Court's orders in this suit, are set forth in my first state secrets declaration. ECF No. 112-5, May 5, 2025. The purpose of this Supplemental Declaration is to update the court on the extensive efforts to facilitate the return of Kilmar Abrego Garcia and to comply with discovery obligations. This Supplemental Declaration is based on personal knowledge and on information provided to me by knowledgeable State Department employees.

2.      As the U.S. government has repeatedly conveyed to Plaintiffs, before the Fourth Circuit's decision of April 17 clarifying its understanding of "facilitate," the United States took the position that the only steps needed to facilitate the return of Mr. Abrego Garcia involved removing domestic barriers. After that date, diplomatic discussions with the Salvadoran government were

1

**JA315**

necessary with a view to persuading it to release Mr. Abrego Garcia into our custody. As Judge Boasberg found with respect to the Venezuelan nationals deported, to El Salvador on March 15, the United States did not retain custody, constructive or otherwise, over the deported individuals. The same was true for Mr. Abrego Garcia, a Salvadoran national *not* subject to the March 13-14 arrangement between the United States and El Salvador, during his confinement in CECOT and Centro Industrial. This fact was evidenced, among other ways, in El Salvador's unilateral decision to move him from CECOT to Centro Industrial in mid-April, which the United States only found out about after Mr. Abrego Garcia told Senator Van Hollen this fact in a meeting with the Senator arranged by the Salvadoran government. It is also evidenced in El Salvador's unilateral decisions to grant certain members of the U.S. Congress access to Mr. Abrego Garcia and deny such access to different members of Congress. As such, the decision to release him was not up to us; it was El Salvador's decision alone to make.

3.    The United States has reiterated to Plaintiffs that diplomatic efforts were ongoing, telling them truthfully in successive iterations of interrogatory responses that the State Department continued to engage in appropriate diplomatic discussions with El Salvador, including direct communications between Salvadoran President Nayib Bukele and me. Ambassador Kozak conveyed a similar message to the court in a declaration dated April 22, where he noted we were having high-level diplomatic discussions with the Salvadoran government to determine whether it would be willing to release Mr. Abrego Garcia into U.S. custody in order for us to return him to the United States. Deputy Secretary of State Landau updated the court on these efforts in a letter dated April 29 in which he explained my decision to personally handle ongoing discussions regarding Mr. Abrego Garcia, given my personal relationship with President Bukele and senior officials in the Salvadoran government. As Deputy Secretary Landau explained, I understood the

court's order to facilitate Mr. Abrego Garcia's release, and I was committed to making prompt and diligent efforts to comply. Deputy Secretary Landau reiterated Ambassador Kozak's caution that these diplomatic efforts would require weeks—perhaps months—to bear fruit. He added that the fact that the State Department had not immediately secured Mr. Abrego Garcia's release was evidence of the difficulty of the task, not a lack of diligence. He also cautioned that it was uncertain whether President Bukele or others within the Salvadoran government would ever consent to release Mr. Abrego Garcia.

4.    In public testimony before the Senate Foreign Relations Committee on May 20 and the House Foreign Affairs Committee on May 21, I explained that I was complying with the court's order to facilitate Mr. Abrego Garcia's return, including directly communicating with President Bukele to that end.  In an addendum to my Supplemental State Secrets declaration dated May 23, I elaborated on the sensitivities surrounding these discussions, and why we could not divulge certain details to the court or the Plaintiffs. The reasons why those details cannot be divulged still stand.

5.    While I will likewise not divulge the details of discussions about Mr. Abrego Garcia's release that occurred following his May 21 indictment in the Middle District of Tennessee, I can confirm that these discussions and the presentment of a criminal warrant resulted in El Salvador's decision to release Mr. Abrego Garcia into U.S. custody on June 6. President Bukele's tweet from June 6 indicates why the changed circumstances mattered to him: "As I said in the Oval Office: 1. I would never smuggle a terrorist into the United States. 2. I would never release a gang member onto the streets of El Salvador. That said, we work with the Trump administration, and if they request the return of a gang member to face charges, of course we wouldn't refuse."[1]

---

[1] https://x.com/nayibbukele/status/1931084729840800096?s=46.

3

6.      I and my Department have worked diligently to comply with the order of this court and those of the Fourth Circuit and the United States Supreme Court. As Deputy Secretary Landau, Ambassador Kozak, and I explained for the court, diplomacy can take time and is not always successful. In this instance it did take time, but it was successful. Mr. Abrego Garcia has been returned to the United States, as the court ordered.

7.      My Department has also made extensive efforts to comply with our discovery obligations. Personnel from the Department's Bureau of Administration searched the Department's e-Records database to locate emails potentially responsive to Plaintiffs' Requests for Production. These personnel updated and repeated these searches as parameters and search terms were negotiated with Plaintiffs. This process was completed for nine total State Department custodians, identifying a total of 878 email records for review in the Relativity database of the Department of Justice. The Department also provided to Plaintiffs "non-custodial" documents as requested, including the diplomatic note arrangement with El Salvador (declassifying the arrangement for this purpose) and the letter grant of foreign assistance funds for El Salvador. The Office of the Legal Adviser worked closely with the Bureau of Administration, Executive Secretariat personnel, and custodians to identify and collect non-email documents, including Word and pdf documents from the Microsoft environment, Teams chats, chats from apps such as WhatsApp and Signal on cellular telephones, and other documents not included in the e-Records database. Seven attorneys in the Office of the Legal Adviser have spent a total of approximately 700 hours over the course of ten weeks, including nights, weekends, and the Easter holiday, reviewing and marking these emails and other documents for responsiveness and privilege, drafting privilege justifications, and discussing these designations and justifications with attorneys in the Departments of Justice and Homeland Security. Three Office of the Legal Adviser attorneys spent approximately 150 total

4

hours supporting Department principals in drafting privilege declarations and other written material for this case. In sum, these hundreds of hours of work by many people in multiple offices at the Department confirm our extensive and diligent efforts to comply with discovery obligations.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 24 day of June 2025.

_____

Marco Rubio
Secretary of State

5

JA319

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

**J.G.G.**, *et al.*,

    **Plaintiffs,**

**LIYANARA SÁNCHEZ, as next friend on
behalf of FRENGEL REYES MOTA,** *et al.*,

    **Petitioners-Plaintiffs,**

    **v.**

**DONALD J. TRUMP,** *et al.*,

    **Respondents-Defendants.**

**Civil Action No. 25-766 (JEB)**

---

**ORDER**

For the reasons stated in the accompanying Memorandum Opinion, the Court ORDERS that:

1. Plaintiffs' [177] Motion for Summary Judgment is GRANTED;

2. Plaintiffs' [178] Motion for Class Certification is GRANTED;

3. Defendants' [182] Motion for Summary Judgment is DENIED; and

4. The Government shall submit its proposal either to facilitate the return of Plaintiffs to the United States or to otherwise provide them with hearings that satisfy the requirements of due process by January 5, 2026.

1

JA320

_/s/ James E. Boasberg_
JAMES E. BOASBERG
United States District Judge


Date:  <u>December 22, 2025</u>

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

J.G.G., *et al.*,

      **Plaintiffs,**

**LIYANARA SÁNCHEZ, as next friend on behalf of FRENGEL REYES MOTA, *et al.*,**

      **Petitioners-Plaintiffs,**

      **v.**

**DONALD J. TRUMP, *et al.*,**

      **Respondents-Defendants.**

**Civil Action No. 25-766 (JEB)**

## MEMORANDUM OPINION

Nine months ago, six Venezuelan men were hustled out of a detention center in Texas, loaded onto planes, and shipped to an infamous mega-prison in El Salvador with no explanation and no opportunity to challenge the reason for their hasty removal. On behalf of themselves and a putative class of similarly situated detainees, they have turned to the courts to vindicate their constitutional right to due process. These efforts have precipitated multiple trips up and down the assorted tiers of the federal judiciary, complicated by their subsequent transfer to and release in their native Venezuela. After the D.C. Circuit vacated this Court's prior preliminary injunction, Plaintiffs have again moved for an order enjoining the Government to facilitate their return to the United States to pursue their individual habeas claims. The parties then agreed to consolidate this Motion into Cross-Motions for Summary Judgment.

The Court ultimately finds that the United States maintained constructive custody over Plaintiffs while they were imprisoned in El Salvador, thus affording the Court habeas jurisdiction

1

JA322

over this action.  In addition, it will certify a class of Plaintiffs who were removed on March 15 and seek to enforce their right to a hearing.  On the merits, the Court concludes that this class was denied their due-process rights and will thus require the Government to facilitate their ability to obtain such hearing.  Our law requires no less.

## I.    Background

The facts and winding procedural history of this case are well trodden.  The Court thus offers a reasonably brief recap.

In early March of this year, the Department of Homeland Security began interviewing Venezuelan detainees about possible gang membership and moving them to El Valle Detention Facility in Texas.  J.G.G. v. Trump, 772 F. Supp. 3d 18, 26 (D.D.C. 2025).  Sometime around March 14, the President secretly invoked the Alien Enemies Act, 50 U.S.C. § 21, to sign a Proclamation asserting that a Venezuelan gang named Tren de Aragua had committed an invasion and predatory incursion upon the United States.  See Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren De Aragua, White House (Mar. 15, 2025) (signature dated Mar. 14), https://perma.cc/D3GM-5YBM; ECF No. 28-1 (Robert L. Cerna Second Decl.), ¶ 5.  Pursuant to the AEA, the President directed immigration officials to apprehend and remove any such gang members from the United States.  See Proclamation No. 10903, 90 Fed. Reg. 13033, 13034 (Mar. 20, 2025).

In the early morning hours of March 15, Venezuelans at El Valle were taken from their cells, shackled, and loaded onto planes.  J.G.G. v. Trump, 786 F. Supp. 3d 37, 44 (D.D.C. 2025), vacated and remanded, No. 25-5217, 2025 WL 2317650 (D.C. Cir. Aug. 8, 2025); ECF Nos. 44-9 (Karyn Ann Shealy Second Decl.), ¶¶ 7–8; 44-10 (Stephanie Quintero Decl.), ¶¶ 2–3; 44-11 (Grace Carney Second Decl.), ¶¶ 11–13; 44-12 (Melissa Smyth Decl.), ¶¶ 13–14.  Unbeknownst

JA323

to them, the Government had deemed them all members of Tren de Aragua and sought to remove them immediately pursuant to the Proclamation, which had yet to be shared with the public or with them.  These men were given "no advance notice of the basis for their removal," nor were they informed that they could challenge their designation.  See ECF No. 101 (Am. Compl.), ¶ 69.  The only reason that this Court was made aware of these impending removals was because a few of the men moved to El Valle had been able to contact their lawyers the day before, who rightly surmised that such a Proclamation either had secretly issued or was about to issue and thus filed this action at 1:12 a.m. on March 15.  See ECF Nos. 3-2 (TRO Br.) at 1–2; 3-3 (J.G.G. Decl.), ¶ 6; 3-4 (Grace Carney First Decl.), ¶¶ 17–20.  The Court granted the five named Plaintiffs' request for a temporary restraining order that same morning, which enjoined their removal, and it scheduled an emergency hearing for 5:00 p.m. that day to consider the Motion to Certify a Class.  See Minute Orders 2, 3 of March 15, 2025.

Just an hour before the hearing, the Proclamation was made public.  J.G.G., 786 F. Supp. 3d at 47.  Less than two hours after the Proclamation was published, and while the emergency hearing was ongoing, the Government flew 252 Venezuelan men, including 137 putative class members, out of the United States.  J.G.G. v. Trump, 778 F. Supp. 3d 24, 32–33 (D.D.C. 2025).  Rather than heading to Venezuela, however, these planes were bound for El Salvador.  Id. at 35.  At the hearing, meanwhile, the Court certified a class of all individuals subject to removal under the Proclamation, including the individuals on the planes, and issued a TRO enjoining their removal for fourteen days.  See Minute Order of Mar. 15, 2025, 7:25 p.m.  Despite this Court's Order to not relinquish physical custody of the men, id., the Government disembarked the Venezuelans in El Salvador, where they were imprisoned in the Terrorism Confinement Center

JA324

(CECOT).  J.G.G., 778 F. Supp. 3d at 34–35.  The Government's actions are the subject of a separate contempt inquiry.  See J.G.G v. Trump, 2025 WL 3198891 (D.C. Cir. Nov. 14, 2025).

An interim ruling by the Supreme Court then reshaped the contours of this litigation. Trump v. J.G.G., 604 U.S. 670 (2025).  The Justices held that Plaintiffs' claims must be brought in habeas and thus in the location of their confinement.  Because class members were detained in various centers across the country, but not here in D.C., the Supreme Court vacated this Court's TRO for improper venue.  Id. at 673.

While detained at CECOT, a new set of named Plaintiffs, including Frengel Reyes Mota and Andry Jose Hernandez Romero, filed this Amended Complaint against the Government, alleging that Plaintiffs were improperly removed without a hearing.  See Am. Compl., ¶¶ 109–73 (filed Apr. 24, 2025).  On behalf of themselves and a putative class of detainees imprisoned in CECOT, Plaintiffs sought preliminary relief in the form of an injunction requiring the Government to facilitate their return to the United States.  See ECF No. 102-1 (Mot. PI) at 1.  A separate named Plaintiff sought to enjoin the Government from removing via the Proclamation individuals currently in criminal custody here in the United States.  Id. at 1–2, 10–11.  Plaintiffs thus moved to certify two subclasses: those already removed and imprisoned at CECOT, and those in criminal custody at risk of future removal.  See ECF No. 103 (Mot. Class Cert.) at 2.

For the CECOT class, the Court ordered limited jurisdictional discovery into whether Plaintiffs were in the constructive custody of the United States when they were imprisoned in CECOT.  See ECF Nos. 116 (Juris. Disc. Ord.); 128 (Further Juris. Disc. Ord.).  It then issued a Memorandum Opinion on June 4 that granted in part and denied in part Plaintiffs' Motions. J.G.G., 786 F. Supp. 3d at 83.  That Opinion explained that the Court viewed jurisdiction to consider Plaintiffs' habeas and due-process claims as "mutually exclusive."  Id. at 52.  While the

4

JA325

Court believed the question to be "close," it found that Plaintiffs had not shown constructive custody under the available record — in large part given the declaration of a State Department officer — thereby foreclosing habeas jurisdiction.  Id. at 57–59.  On the other hand, the Court held that it had jurisdiction over Plaintiffs' due-process claims in equity.  Id. at 59–61.  From there, it affirmed that Plaintiffs were exceedingly likely to succeed on the merits of their claim that the Government's hasty removal procedures had violated their due-process rights.  Id. at 62.  The Court also certified a class comprising individuals then detained at CECOT who had been removed solely pursuant to the AEA.  Id. at 79–80.  It found that the proposed criminal-custody class, conversely, did not meet the stringent standard for a preliminary injunction or the Rule 23 standards for class certification.  Id. at 66–75, 80.  It then ordered the Government to facilitate the CECOT detainees' ability to obtain the process they were denied and instructed it to notify the Court of its proposed plan to do so.  Id. at 82.  The Government appealed.  See ECF No. 150 (Not. Appeal).

While the appeal was pending, the facts on the ground shifted once again.  On July 18, all 252 Venezuelans in CECOT, including our 137 class members, were released back to Venezuela.  See ECF No. 168-1 (Mellissa Harper Decl.), ¶ 7.  In exchange, Venezuela released ten U.S. nationals, as well as eighty Venezuelan political prisoners.  Id.  As recently as July 24, the Government has represented to this Court that the Venezuelan government would not oppose the effort of Plaintiffs who seek to return to the United States pursuant to their lawsuit.  See ECF No. 169 (July 24 Hr'g Tr.) at 14:25–15:2; Harper Decl., ¶ 9.

The D.C. Circuit subsequently vacated the preliminary injunction "[i]n light of the[] developments" on the ground — namely, the transfer to and release of the putative class members in Venezuela.  J.G.G. v. Trump, 2025 WL 2317650, at *3 (D.C. Cir. Aug. 8, 2025).

5

Following the appellate court's vacatur, Plaintiffs now move again for a preliminary injunction, requesting that this Court, as it did in June, require the Government to restore Plaintiffs' ability "to proceed through habeas" and give effect to their due-process rights. See ECF No. 177-1 (Renewed Mot. PI) at 3. The scope of the requested injunction is limited to that procedural facilitation; Plaintiffs in their Motion do not directly challenge the validity of the President's Proclamation invoking the AEA, see Am. Compl., ¶ 110, the propriety of removing noncitizens outside the processes in the Immigration and Nationality Act, id., ¶ 50, nor their individual designations as TdA members. See, e.g., ECF Nos. 177-5 (Redacted Decl. 2), ¶ 20; 177-6 (Redacted Decl. 3), ¶ 5. Instead, they simply seek the chance to raise these arguments before a United States court and ask that this Court help facilitate such opportunity.

## II.    Legal Standard

Although Plaintiffs sought preliminary relief in their instant Motion, the parties have since consented to converting this Motion and the Government's Opposition into Cross-Motions for Summary Judgment. See ECF Nos. 197 (Nov. 19 Hr'g Tr.) at 10:16–11:11 (Plaintiffs are "somewhat agnostic" about proceeding as preliminary injunction or summary judgment); 194 (Gov. Not.) at 2 (Defendants "do not object to treating the preliminary injunction briefing as cross motions for summary judgment"). The Court will thus consolidate the preliminary injunction with the trial on the merits under Rule 65(a)(2) because "further discovery would not alter [its] analysis," and "only legal issues remain." Gov. Not. at 1.

"When faced with cross-motions for summary judgment, the Court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Family Tr. of Mass., Inc. v. United States, 892 F. Supp. 2d 149, 154 (D.D.C. 2012) (cleaned up) (quoting Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003)).

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, 477 U.S. 242, 247–48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

## III.    Analysis

The Court first addresses threshold questions of its own jurisdiction and the propriety of class certification. It then turns to the merits of Plaintiffs' claims and the appropriate remedy.

### A.    Justiciability

In looking at the justiciability of this lawsuit, the Court considers Defendants' filing as akin to a Rule 12(b)(1) motion to dismiss for lack of jurisdiction. See 5B Wright & Miller's Federal Practice & Procedure § 1350 (4th ed. 2025) ("[A] motion for summary judgment under Federal Rule of Civil Procedure 56 [is an] inappropriate method[] for challenging the district court's subject matter jurisdiction."); Lake Pilots Ass'n, Inc. v. U.S. Coast Guard, 257 F. Supp. 2d 148, 163 n.16 (D.D.C. 2003) (styling justiciability arguments during summary-judgment motion as separate motion for dismissal under 12(b)(1) grounds)); Na'im v. Rice, 577 F. Supp.

7

JA328

2d 361, 366 n.1 (D.D.C. 2008) (construing failure-to-exhaust arguments as motion to dismiss, although party had moved for summary judgment). Although 12(b)(1) motions can be decided on the complaint alone, "when necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." Na'im, 577 F. Supp. 2d at 369 (citing Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C. Cir. 1992)).

Defendants press two arguments for why this Court may not hear Plaintiffs' claims: it lacks subject-matter jurisdiction, and the claims are moot.

1.    *Subject-Matter Jurisdiction*

As with any case, the Court must first assure itself of its jurisdiction. The parties correctly note that because Plaintiffs were confined in El Salvador at the time they filed their Amended Complaint, the question of jurisdiction is more complicated than it would be otherwise. In Noem v. Abrego Garcia, 145 S. Ct. 1017 (2025), the Supreme Court encountered a similar problem. There, it considered the case of Kilmar Abrego Garcia, who had been arrested in the United States and sent to CECOT on one of the same planes as Plaintiffs despite a 2019 order expressly prohibiting his removal to El Salvador. Id. at 1018. The Court affirmed that the district court had "properly required" the Government to facilitate Abrego Garcia's return to the United States, implicitly confirming that there was jurisdiction in the district court to hear his claims even though he was detained in CECOT. Id. The Court did not clarify what theory of jurisdiction applied but nonetheless ratified the district court's order. Id. This Court likewise concludes today that it has jurisdiction to hear Plaintiffs' claims. Although this Court previously found jurisdiction available under equity, J.G.G., 786 F. Supp. 3d at 61, new information leads it to proceed under habeas jurisdiction today without revisiting the question of its equitable

authority.  Nothing in this Opinion should be read to upend the Court's prior due-process jurisdictional analysis, however, and that pathway would remain available to Plaintiffs if habeas were not.

Under 28 U.S.C. § 2241(c), a district court may hear a habeas petition only if it was filed while the petitioner was in custody "under or by color of the authority of the United States." Because "[c]ustody and jurisdiction are intertwined under the habeas statute," In re Petitioners Seeking Habeas Corpus Relief in Rel. to Prior Detentions at Guantanamo Bay, 700 F. Supp. 2d 119, 127 (D.D.C. 2010), a court must determine whether the petitioner was in U.S. custody at the time his petition was filed in order to determine "whether it has jurisdiction over the habeas petition in th[e] case."  Abu Ali v. Ashcroft, 350 F. Supp. 2d 28, 41 (D.D.C. 2004).  Here, Plaintiffs filed their Amended Complaint while detained at CECOT.  While there is thus no doubt that they were in custody at the time of filing, the key question is whether custody was "under or by color of the authority of the United States."  28 U.S.C. § 2241(c).

The Court briefly notes that Plaintiffs' subsequent release to Venezuela does not affect its statutory jurisdiction, as § 2241(c) requires only that petitioners be in custody at the time their habeas petition is filed.  See 17B Wright & Miller § 4262 ("The critical moment in determining custody is when the habeas corpus petition is filed."); Allen v. Allen, 2025 WL 1334644, at *1 (D.D.C. Apr. 1, 2025) ("To satisfy the statute's 'in custody' requirement, 'a petitioner must have been in custody at the time the habeas petition was filed.'") (quoting Banks v. Gonzales, 496 F. Supp. 2d 146, 149 (D.D.C. 2007)).  While subsequent release can, in some situations, moot a petitioner's habeas claims, the Court finds that it did not do so here, for the reasons discussed in further detail below.  See infra Section III.A.2 (Mootness).

JA330

Back now to the question of U.S. custody. Plaintiffs bear the burden of establishing the Court's statutory jurisdiction to entertain their habeas suit. See In re Petitioners, 700 F. Supp. 2d at 127. At the same time, it is settled that "the Supreme Court has 'very liberally construed the "in custody" requirement for purposes of federal habeas.'" Abu Ali, 350 F. Supp. 2d at 46 (quoting Maleng v. Cook, 490 U.S. 488, 492 (1989)). Custody need not be actual or physical to satisfy 18 U.S.C. § 2241(c); constructive custody will suffice for jurisdiction purposes. Jones v. Cunningham, 371 U.S. 236, 238–39 (1963); Justs. of Bos. Mun. Ct. v. Lydon, 466 U.S. 294, 300 (1984) (quotation marks and citation omitted) ("Our cases make clear that the use of habeas corpus has not been restricted to situations in which the applicant is in actual, physical custody.").

Here, no one disputes that the United States lacked physical custody over Plaintiffs in CECOT. Plaintiffs argue instead that their CECOT detention was so intertwined with United States control that it amounted to constructive custody. See Renewed Mot. PI at 9. In other words, they allege that El Salvador was acting as the United States's agent when it detained Plaintiffs in CECOT, and the United States thus can be held accountable under the Great Writ for producing Plaintiffs. See Steinberg v. Police Ct., 610 F.2d 449, 453 (6th Cir. 1979) (explaining that constructive custody exists when "the imprisoning sovereign is the respondent's agent").

In its June 4 Opinion, the Court concluded that the issue of custody was a "close question." J.G.G., 786 F. Supp. 3d at 57. It ultimately found, however, that Plaintiffs had failed to establish constructive custody with the information available at that time. Id. The Court instead proceeded to consider Plaintiffs' causes of action as standalone due-process claims, which the Court did have jurisdiction to hear. Id. at 59–61. As new facts have developed in the intervening months, the Court must revisit the issue. In previously considering the question of

10

constructive custody, the Court drew on the factors thoughtfully outlined by Judge John Bates in

Abu Ali to organize its assessment of the relevant evidence.  It will do so again here.

Those factors look at whether:

> (i) [Petitioners are] detained at the behest of United States officials;
> (ii) [their] ongoing detention is at the direction of the United States
> enlisting a foreign state as an agent or intermediary who is
> indifferent to the detention of the prisoner[s]; (iii) [they are] being
> detained in the foreign state to deny [them] an opportunity to assert
> [their] rights in a United States tribunal; and (iv) [they] would be
> released upon nothing more than a request by the United States.

Abu Ali, 350 F. Supp. 2d at 68 (footnotes omitted).  As explained in Abu Ali itself, these factors

are not an exhaustive or binding test of constructive custody.  Instead, they provide a framework

for organizing information relevant to the question of custody, identifying key facts that may

strongly indicate that a foreign state is acting as an agent for the United States in detaining a

petitioner.  Id.  At the end of the day, the critical question remains whether Plaintiffs' detention

in CECOT was sufficiently dictated by the United States such that it can be said that El Salvador

acted as the United States's agent in detaining them.  Cf. id. at 48; In re Petitioners, 700 F. Supp.

2d at 127.

The Court begins with a summary of the facts.  While the facts in the record are

essentially undisputed, the parties spar over their legal significance.  On March 15, Plaintiffs

were flown out of the United States without prior notice of their removal or an opportunity to file

habeas petitions.  See Am. Compl., ¶ 5.  Although none of them hailed from El Salvador,

Plaintiffs were taken there, imprisoned in CECOT, and detained in the mega-prison for the next

four months.  Around the same time, the United States transferred 4.7 million dollars to El

Salvador "to be used by Salvadoran law enforcement and corrections agencies for its law

enforcement needs, which include costs associated with detaining" Plaintiffs.  See ECF No. 177-

11

10 (U.S. Grant Letter) at ECF p. 2.  In July 2025, Plaintiffs were released from CECOT and sent to Venezuela at the same time that Venezuela released ten Americans and eighty Venezuelan political prisoners.  See ECF No. 177-12 (Noelle Smith Decl.), Exh. 11 at 1–2 (*Washington Post* report on prisoner swap).

Alongside these facts are statements from the relevant entities about what they believed their role in Plaintiffs' detention to be.  In addition to the declaration submitted last time from Michael G. Kozak, Senior Bureau Official at the United States Department of State, the Government provided two additional declarations by the Secretary of State and Deputy Secretary of State, which concern the United States's conduct in securing the return of two individuals from CECOT in two separate and unrelated cases.  See ECF Nos. 182-1 (Christopher Landau Decl.); 182-2 (Marco Rubio Decl.).

Plaintiffs counter with a report by the United Nations Office of the High Commissioner for Human Rights, Working Group on Enforced or Involuntary Disappearances, investigating the disappearance of several individuals sent to CECOT, see ECF No. 160-1 (U.N. Report), which was made available to this Court only after its last foray into constructive custody.  See ECF No. 160 (Not. of U.N. Report) (alerting Court to U.N. Report on July 7, 2025).  In a statement to the U.N. Office, El Salvador expressly disclaimed responsibility for the detainees, contending instead that "the jurisdiction and legal responsibility for these persons l[ay] exclusively with the competent foreign authorities."  U.N. Report at 3, 6, 9.  Plaintiffs also submitted a copy of a June whistleblower complaint made by former DOJ lawyer, Erez Reuveni, statements made by the Director of CECOT to prisoners, and public statements made by top United States officials.  See Reuveni Whistleblower Disclosure at 10; ECF No. 177-4 (Redacted Decl. 1), ¶¶ 3–4; Redacted Decl. 2, ¶ 9; Redacted Decl. 3, ¶¶ 7–8; Smith Decl., Exh. 2 at 1.

12

Relying on the totality of the evidence, the Court now examines the four Abu Ali factors.

a.        Behest of the United States

The Court first considers whether El Salvador detained Plaintiffs at the behest of the United States.  This factor asks which government — the United States or the host country — directed the choice to detain someone.  In other words, once Plaintiffs had been removed to El Salvador, did the United States direct that country's choice to imprison them?  Here, the facts suggest that this was the case

Before removing Plaintiffs from this country, the United States arranged for El Salvador to detain them in exchange for money.  See ECF No. 177-11 (Embassy Comms.) at ECF p. 4. In this arrangement, El Salvador agreed to "accept" and "accommodate" Plaintiffs "for a duration of one year unless or until a determination concerning their long-term disposition is made."  Id. at ECF p. 2–3.  "In recognition of El Salvador's assistance on this matter," id. at ECF p. 3, the United States transferred $4.7 million to that country "to be used by Salvadoran law enforcement and corrections agencies for its law enforcement needs, which include costs associated with detaining" Plaintiffs.  See U.S. Grant Letter at ECF p. 2.  Its Ministry of Foreign Affairs itself described the deal as follows: "The Republic of El Salvador confirms it will house [Plaintiffs] for one (1) year, pending further decisions on their long-term disposition. . . . We also wish to express our appreciation for the United States offer of in-kind and financial support to El Salvador in recognition of this cooperation."  Embassy Comms. at ECF p. 4.

The existence of such an agreement strongly indicates that the United States dictated the choice to detain Plaintiffs in CECOT.  Abu Ali, 350 F. Supp. 2d at 68 n.42 ("[T]he presence of a formal relationship between the countries that governs the detention, in the nature of a treaty or otherwise, may bear on the jurisdictional question.").  Defendants do not dispute the existence of

13

this arrangement but simply argue that it "was not enforceable."  ECF No. 182 (Gov. Opp. PI) at 8.  But the Court is not adjudicating a contract dispute.  The arrangement need not be legally enforceable to bear on the question of whether El Salvador was detaining Plaintiffs at the United States's request.

Beyond the agreement's mere existence, its structure also supports the conclusion that the United States dictated Plaintiffs' detention.  It is certainly true that we can arrange for another country to accept custody of prisoners in a way that cedes all control over them to the recipient country, such that any subsequent detention by such country would not be at the behest of the United States.  Our caselaw is rife with these kinds of international agreements.  See Kiyemba v. Obama, 561 F.3d 509, 515 (D.C. Cir. 2009); Gul v. Obama, 652 F.3d 12, 18 (D.C. Cir. 2011); In re Petitioners, 700 F. Supp. 2d at 127–29; Al Hajji v. Obama, 2009 WL 4251108, at *2 (D.D.C. Nov. 23, 2009).  This arrangement was structured differently, and its features strongly support a finding of continued United States control over Plaintiffs.

First, in describing and detailing the nature of the arrangement, Defendants' declarations on their face make no mention of the United States relinquishing control over Plaintiffs, whereas all the other arrangements where we did cede control over detainees do.  Compare, e.g., Obaydullah v. Bush, No. 08-1173, ECF No. 15-1 (Sandra L. Hodgkinson Decl.), ¶ 5 (D.D.C. Aug. 12, 2008) (stating unequivocally that once transferred, detainees are "no longer in the custody and control of the United States"), and Kiyemba, 561 F.3d at 515 (quoting declaration from Deputy Assistant Secretary of Defense for Detainee Affairs stating that after release from U.S. custody, detention by foreign sovereign was "pursuant to its own laws and not on behalf of the United States"), with ECF No. 129 (Michael G. Kozak Redacted Decl.), ¶ 9 (stating only that "the detention and ultimate disposition of those detained in CECOT and other Salvadoran

14

detention facilities are matters within the legal authority of El Salvador"). "If the United States had intended to wash its hands of responsibility for the alien detainees sent to El Salvador, it could have clearly and explicitly done so in its agreement with El Salvador," just as was done in those other arrangements. E.D.Q.C. v. Warden, Stewart Det. Ctr., 2025 WL 1829416, at *3 (M.D. Ga. July 2, 2025). But it did not.

Second, if the United States intended to relinquish control over Plaintiffs, it is hard to understand why the arrangement with El Salvador explicitly included a one-year time horizon. Per the agreement, El Salvador agreed to detain Plaintiffs for a year or "until a determination concerning their long-term disposition is made." U.S. Grant Letter at ECF p. 2. If El Salvador, upon accepting Plaintiffs, could dispose of them however it wished, there would be no need for the agreement to mention any sort of time limit or conditional provision. These undisputed features of the arrangement point strongly toward El Salvador's acting at America's behest.

Additional statements from both nations bolsters this conclusion. In a response to the United Nations Working Group, El Salvador itself indicated that it was working at the behest of the United States: it "facilitated the use of the Salvadoran prison infrastructure for the custody of persons detained within the scope of the justice system and law enforcement of that other State." U.N. Report at 3, 6, 9. If this alone were not clear enough, El Salvador next stated that "the jurisdiction and legal responsibility for these persons lie exclusively with the competent foreign authorities . . . ." Id.; compare id., with Abu Ali, 350 F. Supp. 2d at 38 (Saudi Arabian officials "acknowledged publicly that the United States has been involved throughout his detention, and have told United States officials that they would release Abu Ali at the request of the United States.").

15

The Government argues that the reliability of the U.N. Report is undercut by the anonymity of the Salvadoran official who made the statement.  See Gov. Opp. PI at 14.  The Court finds this argument unpersuasive; even if the official is not named, these are statements made to an international governing body in an official capacity.  U.S. Dep't of State v. Ray, 502 U.S. 164, 179 (1991) ("We generally accord Government records and official conduct a presumption of legitimacy.").  In any case, the same sentiment was echoed by an identifiable Salvadoran official — the Director of CECOT, who told the men that "if it were up to me, I would let you go," but that the order to continue their detention "comes from Donald Trump." Redacted Decl. 1, ¶¶ 3–4; Redacted Decl. 2, ¶ 9; Redacted Decl. 3, ¶¶ 7–8.

Officials on the other side of the arrangement appear to share the same sentiments.  In the months following the Court's June 4 Opinion, Department of Homeland Security Secretary Kristi Noem and her office have made multiple public statements casting CECOT as an extension of U.S. detention facilities.  See Smith Decl., Exh. 2 at 1 (Secretary Noem stating on September 3, 2025, "If you are in America illegally, you could find yourself in CECOT."); id., Exh. 3 at 1 (same, in joint social-media post with DHS, on September 4); id., Exh. 4 at 1 (DHS on July 8 threatening detention at CECOT as among "every tool available" to United States); see also ECF No. 102-14 (Oscar Sarabia Roman Decl.) at 56, 86 (DHS Secretary Kristi Noem threatening detention at CECOT as "one of the tools in our [i.e., the United States's] toolkit"). These statements strongly undermine the Government's contention that El Salvador retains complete discretion over what to do with individuals removed from the United States; if it did, how could a United States official ensure that an individual removed to El Salvador would be placed in CECOT?  At the very least, these statements indicate that our Government believed

that it had the power to control whether deportees sent to El Salvador were placed into CECOT after their removal.

The Government waves such statements away as immaterial in light of the sworn declarations submitted to the Court. See Gov. Opp. PI at 13. Yet it is significant that Noem — the very official who apparently made the decision to relinquish U.S. physical custody over Plaintiffs, see ECF No. 198-1 (Kristi Noem Decl.) at 1 — is the one who made them. If Noem herself conceived of CECOT as an extension of U.S. detention facilities, and publicly framed it as such, that bears on the ultimate legal question: whether El Salvador was acting at the behest of the United States when it detained Plaintiffs in CECOT. As explained later, these statements are also compatible with the sworn declarations submitted by the Government. See infra Section III.A.1.e (Government Declarations).

b.      El Salvador's Indifference

The Court next considers whether El Salvador was indifferent to Plaintiffs' detention. Abu Ali, 350 F. Supp. 2d at 68. This factor is a bit of a misnomer; total indifference is not the test. Instead, courts should ask whether the recipient country retains any independent interest in the actions it chooses to undertake, or if its interest is simply derivative of the principal nation's interest. The question in this case is thus whether El Salvador had an interest in Plaintiffs' detention that was distinct from that of the United States. The Court concludes that it did not.

Consider the chain of events: the United States selects Plaintiffs for removal with no input from El Salvador. We then fly Plaintiffs there, although not a single Plaintiff or putative class member is El Salvadoran or was wanted under El Salvador law. Indeed, there is no allegation that Plaintiffs had any connection whatsoever to that country. See ECF No. 145 (Pls. Sealed Resp.) at 8 n.4; Redacted Decl. 1, ¶¶ 5–6 ("[W]e had never broken any laws in El

17

Salvador."); Redacted Decl. 2, ¶ 8 (similar); Redacted Decl. 3, ¶ 8 (similar).  El Salvador then places Plaintiffs in CECOT, where they are detained for months, most likely via payment from the United States.  Four months later, El Salvador sends Plaintiffs to Venezuela, and Venezuela sends ten Americans back to the United States and releases several Venezuelan political prisoners.  El Salvador ultimately received nothing in this July exchange.  All this poses a single glaring question: what independent interest did El Salvador possibly have in detaining hundreds of Venezuelan nationals removed from the United States?  The Court cannot find one in this record.

The Government's only real counter is weak.  It argues that El Salvador has an interest in detaining dangerous individuals to prevent them from running amok throughout the country.  See Gov. Opp. PI at 16.  Yet that simply raises the question of why El Salvador allowed Plaintiffs into its country in the first place.  All record evidence indicates that it detained Plaintiffs not because of any independent interest in their detention, but purely because it would receive a financial benefit via its arrangement with the United States — just as any agent would in honoring an agreement with its principal.

c.    Evading Judicial Review

The Court next examines whether Plaintiffs' detention was intended to deprive them of judicial review, which fact would also support a finding of constructive custody.

To begin, Plaintiffs' hasty and secretive removal from the United States was certainly intended to deprive them of an opportunity to secure prior judicial review.  First, the President invoked the AEA but waited to publicize the Proclamation.  J.G.G., 786 F. Supp. 3d at 47–48.  Plaintiffs were then put on flights leaving the country before the Proclamation was ever announced, and they were kept in the dark as to the reason for their removal.  Id. at 47.  As the

18

**JA339**

Government has conceded, Plaintiffs had no opportunity to contest their designation as TdA members prior to removal.  See ECF No. 124 (May 7 Hr'g. Tr.) at 30:19–30:20 (conceding that CECOT Class did not even receive "the 12 hours [of notice] that we are providing at this moment").  They were then flown out of the country literally as this Court conducted an emergency hearing on the validity of their removal.  J.G.G., 786 F. Supp. 3d at 48.  For what reason?  Plaintiffs were already detained, so there was no threat that announcement of the Proclamation would somehow lead to their evading capture.  Reuveni's whistleblower statements corroborate the Court's conclusion.  According to his disclosure, the Principal Assistant Deputy Attorney General stated in a meeting that if courts attempted to stop the removals, DOJ would need to consider telling the courts, "Fuck you" and ignore any court order.  See Reuveni Whistleblower Disclosure at ECF p. 10; see also ECF No. 177-8 (Reuveni Exhibits), Exh. 1 at 2 (contemporaneous text messages between Reuveni and August Flentje, then-Acting Director of DOJ OIL, referencing this statement).

While the purpose of Plaintiffs' hasty removal is evident, it is less clear whether their subsequent detention in CECOT was also intended to serve such a purpose.  CECOT detention certainly had the effect of erecting barriers to judicial review; at the most basic level, detainees there often have no outside-world contact, including with their lawyers.  See Am. Compl., ¶ 64; ECF No. 102-7 (Liyanara Sánchez Decl.), ¶ 10.  And because it sent Plaintiffs to be detained abroad, the Government now contests this Court's ability to hear their claims and argues that it lacks jurisdiction, all while supplying no alternative forum for Plaintiffs to challenge their already-executed removals.  See Gov. Opp. PI at 6–27.  Indeed, the Court has had to devote nearly twenty pages to untangling the tricky jurisdictional questions created by a Complaint filed from El Salvador.  It is nonetheless hard to say whether the detention itself was intended to help

**JA340**

evade judicial review, or if that is simply a byproduct of the United States's other motivations for detaining Plaintiffs in CECOT, such as deterring future migrants by subjecting deportees to maximum pain and suffering.  See, e.g., Smith Decl., Exh. 3 at 1 (statement of Kristi Noem) ("If you are in America illegally, you could find yourself in CECOT . . . . Avoid arrest and self deport NOW using the CBP Home App.").  While the question is close, the Court accordingly finds that this factor is neutral as to the question of constructive custody.

    d.  Returned upon Request

In many constructive-custody cases, it is hard for a court to discern whether petitioners would be released upon a respondent's request.  Not so here.  Petitioners have indeed been released upon the United States's request.  Since this Court's June 4 Opinion, multiple developments have shown that the United States is able to request, and has successfully requested, the release of CECOT detainees.  First, after the Government was ordered to facilitate the return of Abrego Garcia from CECOT, he was brought back to the United States on June 6. See Abrego Garcia v. Noem, 2025 WL 2062203, at *2 (D. Md. July 23, 2025).  This return followed public statements made by the President of the United States agreeing that he could "call up the president of El Salvador" to secure the return of detainees like Abrego Garcia.  See ECF No. 111 (Reply ISO Second Mot. for PI) at 3.

Second, Plaintiffs in this case were indeed released upon the United States's request, in what appears to be a clear prisoner exchange between our country and Venezuela.  In July, all 252 Venezuelans removed from the United States and detained in CECOT were sent to Venezuela.  See Harper Decl., ¶ 7.  At the same time, ten U.S. nationals were released from Venezuela and sent back to the United States.  See Smith Decl., Exh. 10 at 2 (reporting email from Kozak stating that "we did ask for and receive 10" Americans).  As the Government

JA341

previously conceded to this Court, Plaintiffs served essentially as bargaining chips in a prisoner swap with Venezuela. See July 24 Hr'g Tr. at 18:3–8 (Government acknowledging that United States "had involvement in negotiating [the deal] and obviously got the return of prisoners out of it"). The Government tries to downplay its role in Plaintiffs' release and its corresponding legal significance, arguing that it was up to the discretion of the El Salvadoran government. See Gov. Opp. PI at 18–19. But that argument is at odds with the undisputed record. If that were the case, why would El Salvador not arrange an exchange where it benefited? To find that the swap was coordinated solely between Venezuela and El Salvador, but with no benefit to the latter, belies reality.

The Court thus concludes that the Government retained, and exercised, the power to control the return of CECOT detainees.

e.    Government Declarations

In rebuttal, the Government relies almost exclusively on the three declarations from Kozak, Landau, and Rubio to argue that Plaintiffs have not proven constructive custody. See Gov. Opp. PI at 10. It principally contends that none of Plaintiffs' proffered evidence can overcome sworn Government declarations to the contrary. The Supreme Court has indeed made clear that courts are "not suited to second-guess" Government representations regarding foreign affairs. Munaf v. Geren, 553 U.S. 674, 702 (2008). And just as it did in its prior Opinion, this Court fully credits the assertions made in the Government declarations. It nonetheless finds constructive custody to be consistent with those declarations.

First, as this Court previously noted, the Kozak declaration is substantially less on point than the declarations that determined analogous cases. J.G.G., 786 F. Supp. 3d at 58. Far from establishing that the United States has relinquished all custody and control over Plaintiffs,

21

Kozak's statement that "the detention and ultimate disposition of those detained in CECOT and other Salvadoran detention facilities are matters within the legal authority of El Salvador in accordance with its domestic and international legal obligations" does not preclude a finding of constructive custody. See Michael G. Kozak Redacted Decl., ¶ 9. As one other court noted, this assertion in the Kozak declaration "leaves the issue of ultimate control over the alien detainees murky." E.D.Q.C., 2025 WL 1829416, at *3–4. It does not undercut the evidence provided by Plaintiffs that the United States continued to play a role in their detention. This is because constructive custody does not require that the respondent be the sole holder of control over the petitioner; shared control over a petitioner is, after all, the very essence of an agent-principal model of constructive custody. See Braden v. 30th Jud. Cir. Ct., 410 U.S. 484, 498–99 (1973). Kozak's commentary on El Salvador's control over Plaintiffs, without noting whether that control is singular and without commenting on the extent of the United States's control over Plaintiffs, is thus consistent with a finding of constructive custody. The declarations that dispose of constructive-custody questions tend to unambiguously state that the United States has "no control over the disposition of detainees transferred there" or that decisions about the petitioners fell within "the sole discretion of the Afghanistan government under its domestic laws." In re Petitioners, 700 F. Supp. 2d at 128. None of that language is present here. The Court thus finds it can fully credit the Kozak declaration and nonetheless conclude that constructive custody exists.

The Rubio and Landau declarations, originally submitted in two other unrelated cases and repurposed by Defendants for this case, are of limited import here. Rubio's concerns then-ongoing efforts to retrieve Abrego Garcia. See Rubio Decl., ¶ 2. Landau's relates to an individual from CECOT who is covered by a separate settlement agreement and provides

22

additional information on the logistics of the July 2025 prisoner swap.  See Landau Decl., ¶ 2. The Government cites them primarily for the inference that the United States's difficulty in retrieving them from CECOT shows that it lacks constructive custody over detainees located there.  See Gov. Opp. PI at 17–18.  But, as Plaintiffs point out, those declarations do not make clear the extent to which the United States requested the return of those individuals and whether El Salvador declined to return them.  See ECF No. 187 (Pl. Rep.) at 11–12.  Without information on the United States's conduct in these negotiations, these declarations say little about the fourth Abu Ali factor.

In addition, commentary about El Salvador's sovereignty does not exclude the possibility that it acted as an agent for the United States and that constructive custody is therefore present. For instance, the Landau declaration states that "El Salvador had sovereign discretion over [the] ultimate disposition" of those detained in CECOT.  See Landau Decl., ¶ 4.  But El Salvador could very well exercise its sovereign discretion to act at the behest of the United States pursuant to an arrangement to house detainees in exchange for money.  Like the Kozak declaration, neither of the others contains any statement that the United States relinquished all control over Plaintiffs or that El Salvador was solely responsible for them.

In sum, "[n]one of the documents produced by Respondents demonstrate relinquishment of control by the United States over the final disposition of the detainees or El Salvador's unfettered right to release them from custody."  E.D.Q.C., 2025 WL 1829416, at *3.  Even when fully credited, consequently, the Government's submitted declarations do little to undermine Plaintiffs' evidence of constructive custody.

What the Government overstates as total deference to its declarations in prior cases is more accurately interpreted as a rejection of those petitioners' conclusory and speculative

JA344

allegations of custody.  See Kiyemba, 561 F.3d at 515 n.7 (relying on government declarations "in the absence of contrary evidence" and petitioner's "failure to present anything that contradicts them"); In re Petitioners, 700 F. Supp. 2d at 128 (holding that petitioners' "blanket allegations" were insufficient in light of government declarations); Al Hajji, 2009 WL 4251108, at *1–2 ("no basis on this record" for determination that petitioners were in constructive custody of United States where they provided only "rank speculation," in contrast to government declaration); Maqaleh, 738 F.3d at 323 n.5 (finding government declaration would be sufficient if detainee's evidence "fails to impugn" declaration's accuracy).

Plaintiffs here, in contrast, do provide specific evidence to support their claims of constructive custody, including ample evidence previously unavailable to the Court when it first addressed this question — statements by El Salvadoran officials, whistleblower statements by Government officials, public statements by top U.S. officials, and even clear evidence of a U.S.-Venezuelan prisoner swap.

*     *     *

All in all, the undisputed factual record indicates that the United States and El Salvador have behaved as principal and agent in the detention and subsequent release of Plaintiffs.  The Abu Ali factors help crystallize the evidence into three takeaways supporting a finding of constructive custody: El Salvador acted at the behest of the United States, it was indifferent to Plaintiffs' detention outside of honoring its arrangement with the United States, and the United States retained the ability to control their release from CECOT.

Plaintiffs' habeas claims are therefore properly before this Court under § 2241(c). Because this habeas action may proceed regarding Plaintiffs' detention abroad, this Court sitting in the District of Columbia would be the proper venue for those claims, a point the Government

24

JA345

has previously conceded.  See May 7 Hr'g. Tr. at 14:18–24; Rumsfeld v. Padilla, 542 U.S. 426, 447 n.16 (2004); Rasul v. Bush, 542 U.S. 466, 483–84 (2004).

### 2.    *Mootness*

The Government next argues that even if there was custody in April, any challenge to Plaintiffs' detention in CECOT is now moot because they have since been released back to Venezuela.  Release from custody will not moot a habeas claim, however, if the petitioner continues to suffer "collateral consequences of his prior detention."  In re Petitioners, 700 F. Supp. 2d at 129.  A collateral consequence must be a concrete injury that is redressable by a favorable decision on the petitioner's claim.  Spencer v. Kemna, 523 U.S. 1, 7 (1998).

Under the collateral-consequences doctrine, as well as a more general evaluation of fundamental mootness principles, Plaintiffs' claims remain justiciable by this Court even after their release from CECOT.  This is because Plaintiffs attack not their now-ended detention in CECOT, but their failure to receive a hearing to challenge the AEA Proclamation and designation as TdA members that sent them there.  Although their detention has now ended — likely after much suffering by Plaintiffs, see Julie Turkewitz *et al.*, 'You Are All Terrorists': Four Months in a Salvadoran Prison, N.Y. Times (Nov. 8, 2025), https://perma.cc/FB47-ZQ2U — other consequences continue.

The Proclamation itself lists a set of restrictions that applies to Plaintiffs as a result of their designation, including barring their entry into the United States, barring their residing in this country, and subjecting them to property seizure and forfeiture.  See 90 Fed. Reg. at 13034– 35.  Similarly, their designations under the Proclamation also subject them to other restrictions that apply to members of foreign terrorist organizations (FTOs), such as the freezing of their assets and an additional bar on entry into the United States.  See 18 U.S.C. § 2339B(a)(2); 8

JA346

U.S.C. § 1182(a)(3)(B)(i)(V). Plaintiffs are also prevented from applying for asylum as a result of their designation. Compare 8 U.S.C. § 1158(a) (noncitizen physically present in United States or who arrives in United States may apply for asylum), with id., § 1158(b)(2)(A)(v) (no right to apply for asylum if Attorney General determines, *inter alia*, that noncitizen is a member of terrorist organization). If Plaintiffs were to succeed in their challenge to their designation as TdA members and alien enemies, these ongoing injuries would be remedied. Plaintiffs would not then be subject to the restrictions under the AEA, nor to the additional restrictions imposed on members of FTOs, nor barred from asylum based on FTO membership. This reasoning holds even if all the Court grants Plaintiffs is the opportunity to challenge their designations because that remedy would significantly increase the odds that they may change their designation. Utah v. Evans, 536 U.S. 452, 464 (2002) (injury redressable if court decision creates "a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered"). Plaintiffs' habeas claims thereby continue to present redressable injuries for this Court to consider.

Defendants cite to Gul v. Obama, 652 F.3d 12, 18 (D.C. Cir. 2011), to argue that Plaintiffs' travel restrictions cannot amount to a collateral consequence. See Gov. Opp. PI at 22. Even if that were true, the other remaining restrictions on Plaintiffs keep this case alive. That said, the Court finds that the Government has overread Gul's travel-restrictions holding, which turned on two key facts not found in this case.

First, it was unclear whether petitioners in that case even wanted to travel back to the U.S., such that the harm of being barred from doing so was too remote to constitute an injury. See Gul, 652 F.3d at 18. Plaintiffs here, conversely, have filed sworn declarations stating a desire to return to our shores. See Redacted Decl. 1, ¶ 11; Redacted Decl. 2, ¶ 21; Redacted

Decl. 3, ¶ 16; ECF No. 177-7 (Redacted Decl. 4), ¶ 16.  Second, the travel restrictions raised as collateral consequences were not redressable in Gul.  Petitioners there were placed on the No Fly List because they had previously been detained in Guantanamo Bay, and "any individual who was a detainee held at . . . Guantanamo Bay" must be included on the No Fly List.  See 49 U.S.C. § 44903(j)(2)(C)(v).  Even if the court had found their designation as enemy combatants to be unlawful, that finding would have had no impact on the petitioners' travel restrictions: "Gul and Hamad will accordingly be barred from flights entering the United States regardless whether a court declares they were unlawfully detained."  Gul, 652 F.3d at 19.  This is markedly different from our case, where a grant of Plaintiffs' Motion could result in vitiating the restrictions they currently face.

For these reasons, the Court finds that Plaintiffs' habeas claims continue to present a case or controversy for review.  As their claims are justiciable via habeas jurisdiction, the Court need not assess its equitable due-process jurisdiction.  J.A.V. v. Trump, 781 F. Supp. 3d 535, 554 (S.D. Tex. 2025).

B.    Class Certification

Next up is the question of class certification.  The Court first considers whether it is ever permissible in habeas cases, then if the putative class should be certified in this case.

1.    *Habeas Class Actions*

The Government contends that because "habeas petitions are incompatible with class actions," this Court cannot certify Petitioners' putative class.  See ECF No. 183 (Gov. Opp. Class Cert.) at 5.  True, the Supreme Court has "never decided whether Federal Rule of Civil Procedure 23, providing for class actions, is applicable to petitions for habeas corpus relief."  Schall v. Martin, 467 U.S. 253, 261 n.10 (1984).  Even if the "precise provisions" of Rule 23 do

JA348

not govern habeas claims, <u>United States ex rel. Sero v. Preiser</u>, 506 F.2d 1115, 1125 (2d Cir. 1974), the Supreme Court has held many times over that courts overseeing habeas actions have the ability and the obligation to adopt procedures enabling them to "provide a prompt and efficacious remedy for whatever society deems to be intolerable restraints."  <u>Fay v. Noia</u>, 372 U.S. 391, 401–02 (1963); <u>see</u> <u>Harris v. Nelson</u>, 394 U.S. 286, 291 (1969) (federal courts "not only <u>may</u>" apply procedures to support habeas inquiry but "<u>must</u> do so upon an appropriate showing" of need for them) (emphasis added); <u>Hensley v. Mun. Ct., San Jose Milpitas Jud. Dist.</u>, 411 U.S. 345, 350 (1973) ("[W]e have consistently rejected interpretations of the habeas corpus statute that would suffocate the writ in stifling formalisms . . . .").  Where "habeas corpus jurisdiction and the duty to exercise it [are] present, the courts may fashion appropriate modes of procedure" to govern habeas proceedings.  <u>Harris</u>, 394 U.S. at 299 (rejecting applicability of Rule 33 to habeas action but permitting similar interrogatory procedure through All Writs Act).

The Second Circuit, relying on <u>Harris</u>, reasoned that the All Writs Act granted courts the authority to adopt features of Rule 23 to adjudicate aggregated claims in habeas proceedings. <u>Sero</u>, 506 F.2d at 1125–26.  That Act empowers federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a).  The All Writs Act does not "enlarge" a court's jurisdiction, <u>Clinton v. Goldsmith</u>, 526 U.S. 529, 535 (1999), or grant courts some freestanding authority to act "[w]here a statute specifically addresses the particular issue at hand." <u>Pa. Bureau of Corr. v. U.S. Marshals Serv.</u>, 474 U.S. 34, 43 (1985).  It does permit courts to issue orders "'in aid of' the issuing court's jurisdiction." <u>Clinton</u>, 526 U.S. at 534 (quoting 28 U.S.C. § 1651(a)), or to prevent actions that would "frustrate the implementation of a court order or the proper administration of justice." <u>United States v. N.Y. Tel. Co.</u>, 434 U.S. 159, 174 (1977).  Even if

28

"[t]here is no evidence that habeas class actions existed at the Founding," Gov. Opp. Class Cert. at 10, a court may issue orders that "fill[] the interstices of federal judicial power when those gaps threaten[] to thwart the otherwise proper exercise of federal courts' jurisdiction." Pa. Bureau, 474 U.S. at 41; see also ITT Cmty. Dev. Corp. v. Barton, 569 F.2d 1351, 1359 (5th Cir. 1978) (when its jurisdiction is threatened, court may "employ procedures necessary" for resolution of issues before it).

The Government argues that the All Writs Act does not authorize habeas class actions because a class would never be "necessary or in appropriate aid of [the courts'] respective jurisdictions" in a habeas case. See Gov. Opp. Class Cert. at 9–10 (alteration in original) (quoting 28 U.S.C. § 1651(a)). That cannot be right. Take this case, where the Government has the sole discretion to exempt named Plaintiffs from the effects of the policy they challenge, thereby selectively mooting their claims and depriving this Court of jurisdiction. Class certification can mitigate the Government's ability to unilaterally moot any claims and so be "necessary or in appropriate aid of [this Court's] jurisdiction." U.S. Parole Comm'n v. Geraghty, 445 U.S. 388, 398 (1980) ("When . . . there is no chance that the named plaintiff's expired claim will reoccur, mootness still can be avoided through certification of a class prior to expiration of the named plaintiff's personal claim."); see also Adam S. Zimmerman, The Class Appeal, 89 U. Chi. L. Rev. 1419, 1456 (2022) (habeas class actions "preserve courts' jurisdiction in situations where the executive branch effectively controls whether the case will expire before judgment"). The Court thus holds that the All Writs Act authorizes courts to order class-like aggregation of habeas claims in cases like the one before it.

Courts so agreeing are legion. "[T]he broad consensus among the circuit courts is that representative actions akin to a class action may be brought in habeas proceedings." Guerrero

Orellana v. Moniz, 2025 WL 3033769, at *7 (D. Mass. Oct. 30, 2025) (collecting cases); see also

Mead v. Parker, 464 F.2d 1108, 1112–13 (9th Cir. 1972) (while "usual habeas corpus case" is

not suitable for class-action treatment, when "the relief sought can be of immediate benefit to a

large and amorphous group," class action "may be appropriate"); Williams v. Richardson, 481

F.2d 358, 361 (8th Cir. 1973) (similar).  The D.C. Circuit signaled as much when it rejected the

argument that "there is no equivalent to class actions in habeas," noting that "courts have in fact

developed such equivalents."  LoBue v. Christopher, 82 F.3d 1081, 1085 (D.C. Cir. 1996)

(resolving case on other grounds).

The Government protests that habeas is "an individualized writ" that is not "amenable to

classwide resolution."  Gov. Opp. Class Cert. at 5.  It is indeed true that when a prisoner protests

the validity of his criminal conviction, that challenge would be fundamentally at odds with class-

wide adjudication.  See Lee Kovarsky & D. Theodore Rave, Habeas Class Actions, 139 Harv. L.

Rev. (forthcoming 2026) (manuscript at 24), https://perma.cc/FQ2B-X5U7.  But those individual

variations in conviction type, detention length, or procedural history may not matter when

petitioners challenge a universally applicable policy or procedure.  Certifying a class, then,

seems exactly the sort of procedural mechanism that allows courts to administer habeas actions

"with the initiative and flexibility necessary to insure that miscarriages of justice within its reach

are surfaced and corrected."  Harris, 394 U.S. at 291.

Other courts, moreover, have held that precisely the action petitioners bring — one

challenging the removal of noncitizens under the Alien Enemies Act without due process — is

ideal for class-wide resolution.  See D.B.U. v. Trump, 349 F.R.D. 228, 235–36 (D. Colo. 2025);

Arevalo v. Trump, 785 F. Supp. 3d 644, 668 (C.D. Cal. 2025); J.A.V. v. Trump, 349 F.R.D. 152,

155 (S.D. Tex. 2025) (citing Harris to hold that "unusual circumstances of the case presented a

30

compelling justification for allowing a multi-party proceeding similar to the class action authorized by the Rules of Civil Procedure") (quotation marks omitted); but see W.M.M. v. Trump, 782 F. Supp. 3d 370, 380 (N.D. Tex. 2025) (denying class certification for failure to satisfy Rule 23 prerequisites), vacated by A.A.R.P. v. Trump, 605 U.S. 91 (2025). "Given the nature of the case, there can be no genuine issues of fact" that differentiate the putative class members. Bijeol v. Benson, 513 F.2d 965, 968 (7th Cir. 1975). A class-like representative action is thus an appropriate and optimal way to determine "[t]he single issue of law presented." Id.; see also Richardson, 481 F.2d at 361 (discussing class-action advantages of judicial economy and benefit to similarly situated individuals in habeas proceedings).

This Court agrees that the aggregation of individual claims in a class-like procedure is permissible in habeas actions and that such aggregation could be appropriate here. It next evaluates whether the CECOT class still satisfies Rule 23, as the Court held it did in its June 4 Opinion. J.G.G., 786 F. Supp. 3d at 76–79.

### 2.    *Rule 23(a) Prerequisites*

While not required in a habeas class-action equivalent, other courts have applied Rule 23(a)'s prerequisites to evaluate an action's suitability for class-wide adjudication. See, e.g., J.A.V., 349 F.R.D. at 156 ("When determining whether a procedure analogous to a Rule 23 class action is appropriate in a particular habeas corpus proceeding, courts can consider the Rule 23 factors."); M.A.P.S. v. Garite, 349 F.R.D. 631, 636 (W.D. Tex. 2025); D.B.U., 349 F.R.D. at 235–36. This Court follows suit to ensure that the same "procedural protections built into the Rule to protect the rights of absent class members during litigation" are also in place here. Ortiz v. Fibreboard Corp., 527 U.S. 815, 847 (1999).

a.      Numerosity

The numerosity requirement reserves class certification for cases in which "the class is so numerous that joinder of all members is impracticable," Fed. R. Civ. P. 23(a)(1); otherwise, plaintiffs should simply be joined as named parties under Rule 20(a)(1).  Courts have interpreted numerosity to encompass an "inherently fact-based analysis" concerning both the quantity of plaintiffs — "'41 or more is usually sufficiently numerous'" — and "the ability of individual class members to pursue their cases through the use of joinder."  In re Modafinil Antitrust Litig., 837 F.3d 238, 249–50 (3d Cir. 2016) (quoting 5 Moore's Federal Practice § 23.22); see 1 William B. Rubenstein, Newberg and Rubenstein on Class Actions § 3:12 (6th ed. 2025); Robidoux v. Celani, 987 F.2d 931, 936 (2d Cir. 1993).  The "factors relevant to the practicability of joinder" include "judicial economy arising from the avoidance of a multiplicity of actions, geographic dispersion of class members, financial resources of class members, [and] the ability of claimants to institute individual suits."  Robidoux, 987 F.2d at 936.

Plaintiffs' putative class clears the numerosity bar with room to spare.  The CECOT class includes at least 137 detainees — well over the "general benchmark" of 40.  R.I.L.-R v. Johnson, 80 F. Supp. 3d 164, 181 (D.D.C. 2015); see J.G.G., 786 F. Supp. 3d at 77.  This Court previously found that joinder would be impracticable when the class members were imprisoned at CECOT because they "lack[ed] contact with the outside world and fac[ed] challenges in procuring legal representation."  J.G.G., 786 F. Supp. 3d at 77.  Those hurdles have only compounded following their transfer to Venezuela.  Logistical difficulties, geographical dispersion, and fear of surveillance in Venezuela thwart counsel's efforts to contact detainees and represent them in this suit, making joinder to this suit or pursuit of individual claims even more challenging than when they were confined in the same location at CECOT.  See Nov. 19 Hr'g Tr. at 13:16–24;

32

JA353

Robidoux, 987 F.3d at 936 ("geographic dispersion" over single state weighed in favor of numerosity); J.D. v. Azar, 925 F.3d 1291, 1323 (D.C. Cir. 2019) ("dispersion of class members across the country" is "non-numerical consideration[] that might make joinder impracticable"). Far from the Government's contention that the class fails numerosity because it is not "ascertainable," Gov. Opp. Class Cert. at 16, the hurdles in contacting each individual detainee bolster this action's suitability for class-wide treatment.

b.      Commonality

Commonality requires proponents of class certification to demonstrate that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This requirement captures "the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 132 (2009) (emphasis in original).

This Court has already found fundamental similarities across the class — namely, the detainees were all corralled onto a couple of airplanes and "remov[ed] to CECOT without adequate notice and an opportunity to file a habeas petition." J.G.G., 786 F. Supp. 3d at 77. The thrust of the commonality among the class remains the same: all were deported from the United States at the same time, in the same way, pursuant to the same invocation of the Alien Enemies Act. See Am. Compl., ¶¶ 64–74. They likewise seek uniform answers to the same questions: do individuals have a right to some minimum process prior to their removal under the Act? And did the Government violate the class members' due-process rights by removing them as it did? The answer to those questions is either "yes" or "no" for all class members because of the identical process (or lack thereof) they received. The removal process cannot simultaneously be lawful as to some class members' claims and violative as to others'. Where, as here, "there are genuinely

33

common issues" such that "the accuracy of the[ir] resolution . . . is unlikely to be enhanced by repeated proceedings," courts should "resolve those issues in one fell swoop." Mejdrech v. Met-Coil Sys. Corp., 319 F.3d 910, 911 (7th Cir. 2003).

The Government seeks to muddy the waters by pointing to differences in the class members' circumstances now that they have been transferred to Venezuela. See Gov. Opp. Class Cert. at 13 (noting that "little is known about the class members' current circumstances"). Those differences all arose after the CECOT class was removed under the AEA Proclamation and do not bear on the central question of whether that removal deprived Plaintiffs of due-process rights to "contest their AEA designations." Renewed Mot. PI at 2. The determination of that question "will resolve an issue that is central to the validity of each one of the [class members'] claims in one stroke." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011). Even if every Plaintiff must bring later claims separately in a different court, there would be no need to relitigate the validity of his removal procedures in the first place. McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 672 F.3d 482, 491 (7th Cir. 2012).

Nor does the fact that some class members might prefer to stay in Venezuela rather than return to the United States defeat commonality. Within any class, some members might elect not to claim a particular remedy. J.D., 925 F.3d at 1314. But the availability of a remedy to "uninterested individuals" does not threaten class certification unless it prompts a "'conflict of interest between named parties and the class they seek to represent.'" Id. (alterations omitted) (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625 (1997)). Plaintiffs here seek the opportunity to assert their various habeas claims and an injunction requiring the Government's assistance to do so. See Renewed Mot. PI at 3. Whether five, fifty, or all of the class members take advantage of such relief, the ability of other class members to obtain a remedy will not be

JA355

affected.  Cf. Amchem, 521 U.S. at 626 (conflict between interest in "generous immediate payments" for certain plaintiffs and "an ample, inflation-protected fund for the future" for others weighed against class certification).

> c.    Typicality

Typicality, which "often overlaps with commonality," J.G.G., 786 F. Supp. 3d at 78 (cleaned up), assesses whether the named Plaintiffs "possess the same interest and suffer[ed] the same injury as the class members." E. Tex. Motor Freight Sys. Inc. v. Rodriguez, 431 U.S. 395, 403 (1977) (quotation marks omitted).  Plaintiffs, as with "all members of the putative CECOT class," were removed "solely under the [AEA] Proclamation." J.G.G., 786 F. Supp. 3d at 78 (redefining class to exclude potentially atypical class members subject to final orders of removal under INA).  Indeed, any detainee so removed on the first two planes that departed from Texas on March 15 could be a class representative under this metric.  See Kovarsky & Rave, Habeas Class Actions (manuscript at 44) (referring to Petitioners' claims and noting that "[i]n advancing their own claims, they would advance the class's interest at the same time").

> d.    Adequacy of Representation

The Government does not dispute that Plaintiffs' counsel would ably represent both the class representatives and the unnamed class members' interests.  See Gov. Opp. Class Cert. at 12–17.  The Court nonetheless examines the sufficiency of the named Plaintiffs' proposed representation of absent class members given the Government's argument that only a detainee or his "next friend" can bring an action in habeas.  Id. at 7.

A non-detainee can apply for a writ of habeas corpus on behalf of a detainee under 28 U.S.C. § 2242 (contemplating that "[a]pplication for a writ of habeas corpus" may be brought "by someone acting on [detainee's] behalf").  That "next friend" must "provide an adequate

JA356

explanation . . . why the real party in interest cannot appear on his own behalf to prosecute the action" and "must be truly dedicated to the best interests of the person on whose behalf he seeks to litigate." Whitmore ex rel. Simmons v. Arkansas, 495 U.S. 149, 163 (1990). These requirements bar "intruders or uninvited meddlers" from thrusting themselves forward and prevent third parties with no stake in someone else's habeas petition from litigating their claims. Id. at 164. In this case, the named Plaintiffs functionally seek to serve as the "next friend" for all other CECOT Class members.

The "next friend" inquiry dovetails neatly with Rule 23(a)(4)'s requirement that courts must determine whether "the representative parties will fairly and adequately protect the interests of the class." The animating question in both doctrines is whether the named parties can provide sufficient "guarantees of loyalty" to "those whose rights must ultimately be adjudicated in absentia" — here, the unnamed detainees. See Samuel Issacharoff, Governance and Legitimacy in the Law of Class Actions, 1999 Sup. Ct. Rev. 337, 341 (delineating "due process approach" to class certification). Such guarantees are easier to obtain when there are no "conflicts of interest between named parties and the class they seek to represent." Amchem, 521 U.S. at 625. Here, all class members have the same interest in having their removals under the AEA declared unlawful. The Court perceives no opportunity for abuse of the "next friend" status.

Quite the opposite: the strictures of Rule 23 protect exactly the interests that "next friend" requirements do. Here, the unnamed class members "cannot appear on [their] own behalf to prosecute the action," Whitmore, 495 U.S. at 163, because they are scattered throughout Venezuela with little ability to talk freely to counsel. The named members thus gave "an adequate explanation" of why they should bring the action in place of their unavailable counterparts. Id. What is more, the typicality requirement ensures that the named plaintiffs have

36

"suffer[ed] the same injury as the [unnamed] class members," E. Tex. Motor Freight Sys., 431 U.S. at 403 (quotation marks omitted) — which in turns means they are not evading standing requirements. See Whitmore, 495 U.S. at 164 (raising this concern). A robust Rule 23(a) inquiry thus achieves the same ends as the "next friend" protection. See Kovarsky & Rave (manuscript at 44) (linking "fundamental constitutional requirement" that Rule 23(a) protects with § 2242's representative-litigation provision).

2.      *Rule 23(b)(2)*

Just as the CECOT Class can be treated as a cohesive unit under Rule 23(a)'s prerequisites, it meets Rule 23(b)(2)'s requirement that the Government "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief . . . is appropriate respecting the class as a whole." The Government retorts that Rule 23(b)(2) "does not authorize certification here" because (b)(2) classes are inappropriate "when each individual class member would be entitled to a different injunction." Gov. Opp. Class Cert. at 18 (quotation marks omitted). It once again sidesteps the relief Plaintiffs actually seek: an injunction affording them the ability to return to the United States to challenge their AEA designations via process they previously lacked. See Renewed Mot. PI at 3. Class certification to adjudicate and remedy the initial harm, common to all Plaintiffs, thus comports with Rule 23(b)(2)'s standard. J.G.G., 786 F. Supp. 3d at 79 (certification of (b)(2) class appropriate when "'single injunction' would . . . 'provide relief to each member of the class'") (quoting Wal-Mart, 564 U.S. at 360).

*        *        *

The Court, accordingly, will certify the same class as before: All noncitizens removed from U.S. custody and transferred to the Terrorism Confinement Center (CECOT) in El Salvador on March 15 and 16, 2025, pursuant solely to the Presidential Proclamation entitled, "Invocation

37

**JA358**

of the Alien Enemies Act Regarding the Invasion of The United States by Tren de Aragua."

J.G.G., 786 F. Supp. 3d at 79–80; see also ECF No. 178 (Renewed Mot. Class Cert.) at 1

(seeking "certification of the same class" Court previously certified).

      C.      Merits

Having now determined its jurisdiction and delineated the group seeking relief, the Court

may at last consider the merits of Plaintiffs' suit. Its inquiry is guided by their request that they

be permitted to "contest their AEA designations" and that the Government "ensure [Plaintiffs']

cases are handled as they would have been if the Government had not provided constitutionally

inadequate process." Renewed Mot. PI at 3 (quotation marks omitted). The instant Motion does

not, in other words, ask the Court to rule at this juncture that Proclamation 10903 exceeded the

statutory bounds of the Alien Enemies Act because, for example, the United States is not

experiencing an "invasion or predatory incursion" from a "foreign nation or government."

Plaintiffs similarly are not at this point asking for a ruling on their designation as TdA members.

Their contention in this Motion is simpler: they and every member of the CECOT class

were prevented from "contest[ing] their AEA designations" because the Government "provided

constitutionally inadequate process" before removing them under the AEA. See Renewed Mot.

PI at 3 (quotation marks omitted). They seek, as this Court ordered in June, an injunction

requiring the Government to "facilitate Plaintiffs' ability to proceed through habeas," as if they

had not been improperly removed in the first instance. Id. (quotation marks omitted). Put

differently, they could have challenged the validity of the President's Proclamation invoking the

AEA, see Am. Compl., ¶ 110, the propriety of removing noncitizens outside the processes in the

Immigration and Nationality Act, id., ¶ 50, and their individual designations as TdA members,

see, e.g., Redacted Decl. 2, ¶ 20; Redacted Decl. 3, ¶ 5, back in March had they been afforded

the opportunity to do so before their hasty removal.  They now seek the chance to raise each of those arguments, and presumably more, in United States courts upon return to this country.

The merits of Plaintiffs' due-process claim are easily resolved.  Even if the AEA was properly invoked as a general matter, it is beyond cavil that designated "alien enemies" under that act must be afforded some process to contest their designation.  A.A.R.P., 605 U.S. at 94–95.  Here, Plaintiffs received none.  They were not told of their designation or informed that they could challenge it before being loaded onto planes and shipped out of the United States mere hours after Proclamation 10903 was made public.  See Am. Compl., ¶¶ 66–67, 69; see also, e.g., ECF Nos. 102-10 (M.Y.O.R. Decl.), ¶ 10; 102-8 (D.A.R.H. Decl.), ¶ 15.  The Supreme Court has unequivocally affirmed that in circumstances like these, "notice roughly 24 hours before removal, devoid of information about how to exercise due process rights to contest that removal, surely does not pass muster."  A.A.R.P., 605 U.S. at 95.  Other courts have consistently required that detainees receive an opportunity spanning days — not hours — to file a habeas petition challenging their designation before deportation.  See Gutierrez-Contreras v. Warden, 2025 WL 1202547, at *4 (C.D. Cal. Apr. 25, 2025) (14 days); D.B.U. v. Trump, 779 F. Supp. 3d 1264, 1269 (D. Colo. 2025) (21 days); A.S.R. v. Trump, 782 F. Supp. 3d 224, 249–50 (W.D. Pa. 2025) (21 days).  By any measure, the detainees surely fell victim to constitutionally inadequate process.

At various points in this litigation, the Government itself has not even contested that the detainees who now make up the CECOT class received inadequate process prior to their removal.  See generally July 24 Hr'g Tr. (Government not contesting Court's finding on merits of due-process violation); Gov. Opp. PI (same); May 7 Hr'g Tr. at 29:24–31:21.  There can be no genuine dispute about this question now.  Because all detainees were subject to an identical

39

removal, see Am. Compl., ¶¶ 64–74, the Court holds that the entire class received constitutionally inadequate process on the weekend of March 14–16, 2025, when class members were given no meaningful notice of their AEA designations and no opportunity to challenge them.  The Court thus turns to an appropriate and feasible remedy to rectify this constitutional violation.

D.    Remedy

It is well settled that statutory habeas-corpus remedies are not confined to release. Carafas v. LaVallee, 391 U.S. 234, 239 (1968) ("[T]he statute does not limit the relief that may be granted to discharge of the applicant from physical custody.  Its mandate is broad with respect to the relief that may be granted."); 28 U.S.C. § 2243 (instructing courts to "dispose of [a petition] as law and justice require").  "[I]f, at the time the habeas corpus petition is considered, justice requires relief for the applicant, a federal court possesses power to grant any form of relief necessary to satisfy the requirement of justice."  Levy v. Dillon, 415 F.2d 1263, 1265 (10th Cir. 1969).  The flexibility of habeas remedies is "essential to insure that miscarriages of justices within its reach are surfaced and corrected."  Harris, 394 U.S. at 291; Jones, 371 U.S. at 243 (habeas is not "a static, narrow, formalistic remedy; its scope has grown to achieve its grand purpose"); Velasco Lopez v. Decker, 978 F.3d 842, 855 (2d Cir. 2020) ("Habeas corpus, as the Supreme Court has said, is an 'adaptable remedy,' the 'precise application and scope' of which changes 'depending upon the circumstances.'  The equitable and flexible nature of habeas relief also gives the reviewing court considerable latitude 'to correct errors that occurred during the [prior] proceedings.'") (alteration in original) (citation omitted) (quoting Boumediene v. Bush, 553 U.S. 723, 786 (2008)).

40

JA361

By granting the Motion, this Court is declaring that Plaintiffs should not have been removed in the manner that they were, with virtually no notice and no opportunity to contest the bases of their removal, in clear contravention of their due-process rights. The Government, furthermore, does not dispute that the Proclamation was the sole basis for their removal. See Gov. Opp. PI at 1–2.

Had Plaintiffs not been removed to El Salvador, granting their Motion would have led this Court to enjoin the Government from removing them pursuant to the Proclamation until they had received the opportunity to challenge their designations under the AEA and the validity of the Proclamation. See J.A.V., 781 F. Supp. 3d at 565 (granting permanent injunction barring government from "detaining, transferring, or removing [named plaintiffs] and the members of the certified class, under the Alien Enemies Act"); Renewed Mot. PI at 32. It obviously cannot do so here as removal has already taken place.

The remedy must thus adapt to meet the injury that has occurred. The Court finds that the only remedy that would give effect to its granting of Plaintiffs' Motion would be to order the Government to undo the effects of their unlawful removal by facilitating a meaningful opportunity to contest their designation and the Proclamation's validity. Otherwise, a finding of unlawful removal would be meaningless for Plaintiffs, who have already been sent back to Venezuela against their wishes and without due process. Expedited removal cannot be allowed to render this relief toothless. If secretly spiriting individuals to another country were enough to neuter the Great Writ, then "the Government could snatch anyone off the street, turn him over to a foreign country, and then effectively foreclose any corrective course of action." J.G.G., 786 F. Supp. 3d at 82 (citing Abrego Garcia, 145 S. Ct. at 1019 (statement of Sotomayor, J.)).

The Supreme Court has already unanimously agreed that facilitating an individual's return to the United States is a proper remedy, one that does not upset the Executive Branch's exclusive authority over foreign affairs. Abrego Garcia, 145 S. Ct. at 1018 (finding district court order "properly requires the Government to 'facilitate' Abrego Garcia's release from custody in El Salvador and to ensure that his case is handled as it would have been had he not been improperly sent to El Salvador"). Even so, the Court remains mindful of the deference due to the Executive Branch on issues of foreign affairs. Id. (instructing district court to act with "due regard for the deference owed to the Executive Branch in the conduct of foreign affairs"). For that reason, the Court will allow the Government to articulate what steps it proposes to facilitate the return of Plaintiffs.

The Court agrees with the District of Massachusetts that the fact that Plaintiffs are "not held by any foreign government" should make facilitating their return easier. D.V.D. v. U.S. Dep't of Homeland Sec., 784 F. Supp. 3d 401, 412 n.10 (D. Mass. 2025). Further, it notes that as recently as July 2025, the Venezuelan government has signaled that it would not oppose the return of removed individuals to the United States. See Harper Decl., ¶ 9 (explaining that Government has "obtained assurances from" Venezuela that "the Maduro regime will not impose obstacles" if individual previously detained at CECOT wished to return to United States). Finally, the Court proffers that ICE's policy on returning lawfully removed individuals provides some tangible starting points for the Government, including actions such as "issuing a Boarding Letter to permit commercial air travel" or "parol[ing] the alien into the United States upon his or her arrival at a U.S. port of entry." U.S. Immigr. & Customs Enf't, Policy Directive No. 11061.1, Facilitating the Return to the United States of Certain Lawfully Removed Aliens, § 3.1 (Feb. 24, 2012); see also Abrego Garcia v. Noem, 2025 WL 1135112, at *1 (4th Cir. Apr. 17,

42

2025) ("'Facilitate' is an active verb."). The Government could also theoretically offer Plaintiffs a hearing without returning them to the United States so long as such hearing satisfied the requirements of due process.

The Court will give the Government two weeks to submit its proposal.

## IV.    Conclusion

For the foregoing reasons, the Court will grant Plaintiffs' Motion for Class Certification, grant Plaintiffs' Motion for Summary Judgment, and deny the Government's Motion for Summary Judgment. A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  December 22, 2025

JA364

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LIYANARA SANCHEZ, as next friend on behalf of FRENGEL REYES MOTA, *et al.*,

*Petitioners–Plaintiffs*,

J.G.G., *et al.*,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

*Respondents–Defendants*.

Case No: 1:25-cv-00766-JEB

## RESPONSE TO COURT ORDER

This Court has ordered Defendants to present a proposal to facilitate the filing of habeas corpus petitions by class members. ECF 214. At the outset, Defendants strenuously object to the lawfulness of any such relief for multiple reasons.

First, the Court lacks jurisdiction over the claims of class members who were detained by a separate sovereign and have since been transferred to their home country. The Court correctly concluded, in an earlier order, that Defendants did not have constructive custody over a prison controlled by El Salvador. *J.G.G. v. Trump*, 786 F. Supp. 3d 37, 73, 80 (D.D.C. 2025). In its more recent order, the Court reached the opposite conclusion only by refusing to view the "evidence in the light most favorable to the non-movant and drawing all justifiable inferences in its favor," as the summary judgment standard requires, *Feld v. Fireman's Fund Ins. Co.*, 909 F.3d 1186, 1190 (D.C. Cir. 2018), instead taking every inference in favor of Plaintiffs and against Defendants, ECF 215 at 6-24. Even so, there is no basis to change the Court's previous conclusion. Defendants did

1

not have control over El Salvador and could not produce the detainees, as copious evidence made clear. *See Munaf v. Geren*, 553 U.S. 674, 686 (2008). And El Salvador chose, of its own volition, to transfer class members to Venezuela. The Court previously recognized that second-guessing the interests of a foreign leader was "outside [its] ken," yet that is exactly what the Court then did. *Compare J.G.G.*, 786 F. Supp. 3d at 57, *with* ECF 215 at 12-18.

Second, even if Defendants had constructive custody, they clearly do not now that class members are ostensibly free in their native Venezuela. The Court nonetheless exercised habeas jurisdiction by making the extraordinary determination that designation under the Alien Enemies Act (AEA) gives rise to ongoing collateral consequences. But any potential impacts on travel and return are insufficient under binding precedent. *See Gul v. Obama*, 652 F.3d 12, 18 (D.C. Cir. 2011). And the other consequences that the Court identified, like "property seizure," are wholly speculative. ECF 215 at 25. The Court's analysis was patently erroneous and thus Defendants continue to object to any relief.

All of that aside, circumstances in Venezuela have materially changed since the Court issued its order. Nicolas Maduro is now in United States custody awaiting trial; the situation on the ground in Venezuela is in flux; and the United States' relations with the regime of Maduro's successor, so-called Acting President Delcy Rodríguez, are at an extraordinarily sensitive juncture. In response to the Court's order, given the fluid situation in Venezuela, Defendants do not believe there is any feasible way to allow class members to file habeas petitions at this time. *See* Rubio Decl., ¶¶ 3-4. Indeed, the Secretary of State has determined that either path that the Court has suggested would risk material damage to U.S. foreign policy interests at this delicate juncture. *Id.*; ECF 214.

The Court has referenced the possibility of holding remote habeas hearings while the class members remain in Venezuela.  Defendants believe that approach would pose insurmountable legal and practical obstacles, and would not "satisfy the requirements of due process."  ECF 215 at 43. *First*, Defendants could not meaningfully enforce perjury laws against witnesses in Venezuela, especially given the lack of an applicable extradition treaty.  *Second*, Defendants may not be able to verify the identity of individuals that might testify in such remote proceedings.  *Third*, given the current political instability in Venezuela, there is a serious risk of intentional interference with remote proceedings.  Rubio Decl. ¶ 4.  And Petitioners are likely to complain that they will not have sufficient access to evidence or counsel given the fluid and volatile situation in Venezuela. Moreover, conducting such hearings from Venezuela may prompt diplomatic issues with the existing regime in Venezuela.  There appears to be no precedent in U.S. history for such a mass use of remote hearings.  Remote habeas proceedings conducted with numerous Petitioners in a foreign nation undergoing significant changes would substantially prejudice Defendants and prevent fair adjudication of any issues presented.

Nor is it feasible to offer habeas hearings in person, which would require returning the class members to U.S. custody.  Defendants are unable to retrieve class members from Venezuela at this time, as civilian travel into and out of Venezuela has become heavily restricted. Moreover, requiring engagement with the Rodríguez regime on this issue would disrupt ongoing negotiations. As Secretary Rubio's declaration makes clear, the situation in Venezuela is still in flux and highly sensitive, such that diplomatic engagement on this issue presents significant foreign-relations concerns.  *See* Rubio Decl., ¶¶ 3-4.  Forcing Defendants to take any action regarding class members inside of Venezuela will thus disrupt "sensitive and weighty interests of national security and

foreign affairs" with a nation that is currently in flux. *Holder v. Humanitarian L. Project*, 561 U.S. 1, 33–35 (2010).

If the Court enters such an order, Defendants note that they intend to seek a stay pending appeal of any injunction. For the reasons set forth above, any injunction would lack legal basis. As for the equities, the class members are no longer detained and face, even on this Court's telling, only hypothetical and speculative "collateral consequences" from their AEA designations. Meanwhile, an injunction would impermissibly intrude on core Article II powers, and cause serious harms to the foreign policy and national security of the United States. *See J.G.G. v. Trump*, 147 F.4th 1044, 1071 (D.C. Cir. 2025) (Rao, J., concurring). Defendants should thus be given the opportunity to seek appellate review before being forced to comply with an injunction. Defendants will file a separate motion seeking that relief after a final judgment is issued.

Dated: January 12, 2025

Respectfully submitted,

Brett A. Shumate
Assistant Attorney General
Civil Division

Drew C. Ensign
Deputy Assistant Attorney General
Office of Immigration Litigation

*/s/ Tiberius Davis*
Tiberius Davis
Counsel to the Assistant Attorney General
Civil Division
U.S. Department of Justice

Anthony Nicastro
Acting Director
Office of Immigration Litigation

*Counsel for Respondents–Defendants*

**JA368**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| J.G.G.*, et al.*,<br><br>Petitioner,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>Respondents. | No. 1:25-cv-766 (JEB)<br><br><br>Declaration Of Marco Rubio |

**SUPPLEMENTAL DECLARATION OF SECRETARY OF STATE MARCO RUBIO**

I, Marco Rubio, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.      I am the Secretary of State of the United States and head of the United States Department of State, an Executive Department of the United States.  A description of my role and duties, the basis for my knowledge about facts and policies relevant to this lawsuit, and of the Court's orders in this suit, are set forth in my Declaration of March 24, 2025. ECF No. 56-2. I am aware that the Court has held that the 137 class members in this case are entitled to pursue their due process claims through habeas corpus proceedings and has ordered Defendants to present a proposal to facilitate willing class members' filing of habeas claims.

2.      On July 18, 2025, El Salvador, in its sovereign discretion, released 252 Venezuelan nationals, including the 137 class members, and the Maduro regime transferred them to Venezuela, their home country. We understood at the time that the regime released these individuals. Given the passage of time, the U.S. government does not know—nor does it have

**JA369**

any way of knowing—the whereabouts of class members, including whether anyone has departed Venezuela or whether the regime subsequently took anyone back into custody.

3.      On January 3, 2026, the United States successfully carried out a surgical law enforcement operation against Nicolás Maduro and his wife Cilia Flores and transported them to New York to stand trial on narco-terrorism conspiracy and other charges. In the wake of this operation, the situation in Venezuela remains fluid. The United States remains involved to see changes in Venezuela that are beneficial to the United States and that it also expects will be beneficial for the people of Venezuela, who have suffered tremendously. These efforts entail ongoing, intensive, and extraordinarily delicate engagement with elements within the regime of Maduro's successor, so-called Acting President Delcy Rodríguez.

4.      In my considered judgment as the Nation's chief diplomat, I assess that introducing the matter of the disposition of the 137 class members into these discussions at this time would risk material damage to U.S. foreign policy interests in Venezuela. This assessment holds true whether the proposal is to transport class members to a U.S. jurisdiction or to arrange remote hearings from Venezuela. Remote hearings also present a serious risk of intentional interference by anti-American elements in Venezuela that would undermine the interests of justice.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 12th day of January 2026.

$\underline{\text{    /s/ Marco Rubio}\qquad\qquad\qquad}$

Marco Rubio
Secretary of State

**JA370**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LIYANARA SANCHEZ, as next friend on behalf of FRENGEL REYES MOTA, *et al.*,

*Petitioners–Plaintiffs*,

J.G.G., *et al.*,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

*Respondents–Defendants*.

Case No: 1:25-cv-00766-JEB

### PLAINTIFFS' RESPONSE TO DEFENDANTS' REMEDIAL PROPOSAL[1]

The Court directed Defendants to provide a proposal "to facilitate the return of Plaintiffs to the United States or to otherwise provide them with hearings that satisfy the requirements of due process." Order, ECF No. 214. Defendants have failed to proffer any meaningful proposal. First, Defendants ignore obvious alternatives. For class members who are no longer in Venezuela or who may be able to travel to a third country (as some have), there is no obstacle: Defendants can facilitate remote proceedings, including from U.S. embassies and consulates overseas—just as DHS's own policies contemplate—and they can also facilitate class members' transportation, return, and reentry to the United States from third countries. Second, Defendants' conclusory

---

[1] In light of the court's closure yesterday due to inclement weather, Plaintiffs understand the deadline for this response to have been extended by one day. *See* Fed. R. Civ. P. 6(a)(3).

1

JA371

explanations for why it is not feasible at this time to provide due process for those class members in Venezuela are insufficient.

## I.    DEFENDANTS HAVE FAILED TO ADDRESS ALTERNATIVES THAT CAN PROVIDE RELIEF FOR CLASS MEMBERS.

Even setting aside Defendants' contention that, at this time, they cannot ensure due process for those in Venezuela (via remote hearings or their return to the United States), the government's claim that there is *no* feasible path forward for class members to obtain relief fails to account for ways in which Defendants routinely facilitate access to immigration proceedings from outside the United States. Thus, even if the Court were to credit Defendants' claims about Venezuela at present, any such issues are plainly surmountable for class members who are able to reach a third country.

ICE guidance contemplates the possibility of remote immigration proceedings, stating that ICE may "arrang[e] for video teleconferencing or telephonic testimony, if appropriate." Third Supplemental Declaration of Oscar Sarabia Roman, Exh. 1. The guidance observes: "Most courts and many foreign embassies have the technology to support your participation in your immigration hearing by either video teleconferencing or by phone." Sarabia Roman Third Supp. Decl., Exh. 2. Indeed, "Venezuelan applicants for nonimmigrant visas can apply at any U.S. Embassy or Consulate around the world." Sarabia Roman Third Supp. Decl., Exh. 3. Many Venezuelans apply at the U.S. Embassy in Bogota where the U.S. Department of State's Venezuela Affairs Unit has been housed since 2019.

Class members could likewise travel from a third country to the United States directly and be paroled into the United States. That is consistent with ICE Directive 11061.1, which says that ICE will:

2

engage in activities which allow a lawfully removed alien to travel to the United States (such as by issuing a Boarding Letter to permit commercial air travel) and . . . parole the alien into the United States upon his or her arrival at a U.S. port of entry.

Sarabia Roman Third Supp. Decl., Exh. 4.[2]

None of Defendants' objections to remote proceedings from Venezuela have any relevance to proceedings from a third country. For example, Defendants complain that they "could not meaningfully enforce perjury laws against witnesses in Venezuela" due to the lack of an extradition treaty. Defs.' Resp. 3. The D.C. Circuit has previously rejected an almost identical argument. *See El-Hadad v. United Arab Emirates*, 496 F.3d 658, 669 (D.C. Cir. 2007) (permitting video testimony despite argument that, "with no extradition treaty between the United States and Egypt," witness "could not be prosecuted for perjury"). And in any event, Colombia and other countries to which class members may be able to travel do have extradition treaties with the United States.

Accordingly, the Court should order Defendants to provide options from third countries for class members immediately.

## II.    DEFENDANTS' EXPLANATION FOR WHY THEY CANNOT PROVIDE DUE PROCESS FOR THOSE IN VENEZUELA IS UNPERSUASIVE.

Even for those class members in Venezuela, Defendants' conclusory explanations for why it is not feasible to provide due process are unpersuasive. Some, perhaps many, cases can likely be resolved on the papers, without the need for live testimony. And Defendants' speculative and conclusory objections provide no basis to find live testimony infeasible. Finally, the Rubio

---

[2] This Directive specifically describes ICE policy for "facilitating the return to the United States" of individuals who were "lawfully removed" while their petition for review (PFR) was pending. Sarabia Roman Third Supp. Decl. Exh. 4. If their PFR is "granted by a U.S. court of appeals or the U.S. Supreme Court," the policy describes how ICE may facilitate their return. *Id.* There is no reason similar procedures cannot be followed as to individuals, like class members, *unlawfully* removed.

JA373

Declaration's explanation for why it is not possible at this time to allow class members to return from Venezuela is too conclusory to warrant deference without further elaboration.

1. As an initial matter, habeas proceedings need not proceed to an evidentiary stage: "on the facts admitted, it may appear that, as matter of law, the prisoner is entitled to the writ and to a discharge." *Walker v. Johnston*, 312 U.S. 275, 284 (1941). And, like other civil cases, habeas claims may be granted upon a motion for summary judgment. 1 Fed. Habeas Corpus Practice & Proc. § 17.3 (describing the appropriateness of petitioner-initiated summary proceedings where "no facts are in dispute"); Fed. R. Civ. P. 81(a)(4) (describing applicability of the Federal Rules of Civil Procedure to habeas corpus proceedings); *e.g.*, *Foster v. Barbour*, 613 F.2d 59, 60-61 (4th Cir. 1980) (granting writ without evidentiary hearing where such a hearing would "not have developed any further facts" to affect the court's decision).

It is likely that in many cases there will be no genuine dispute of material fact after the petitioner puts forward their petition and seeks summary judgment on the basis that the government was wrong to designate them as a member of TdA. *See, e.g.*, *Bacha v. Obama*, 2009 WL 2365846, at *1 (D.D.C. July 30, 2009) (granting habeas relief after government conceded that it "no longer treat[ed] petitioner as detainable"); *Abdah v. Obama*, 717 F. Supp. 2d 21, 36 (D.D.C. 2010) (granting habeas relief because government presented "no evidence that [petitioner] has any connection to Al Qaeda").

To begin, the evidentiary record and independent reporting show that there is no indication that the overwhelming majority of class members have any connection to TdA whatsoever, and that the government's criteria for designation were arbitrary and irrational—such that mass erroneous designations were entirely predictable. Scores of individuals appear to have been designated as TdA based largely on innocuous tattoos. But experts who study TdA explain that

4

TdA "has never had . . . identity marks such as tattoos that identify its members." Antillano Decl. ¶ 14 (ECF No. 67-4); Hanson Decl. ¶¶ 22, 24 (ECF No. 67-3) ("Tattoos are not a reliable way to identify members of the group."); Dudley Decl. ¶ 25 (ECF No. 67-12) (tattoos are not a "reliable means" of identifying TdA); *see also* Sarabia Roman Decl., Exh. 20 (ECF No. 67-21) ("Venezuelan gangs are not identified by tattoos."). Rather, tattoos are commonplace within Venezuelan culture, particularly among young people, irrespective of gang affiliation. *See* Hanson Decl. ¶¶ 22, 24; Antillano Decl.¶ 14; *see also* Sarabia Roman Decl., Exh. 20 (ECF No. 67-21) ("gang members also sport tattoos considered culturally popular at the moment and popular among the general public").

The government's own documents reveal the patent absurdity of using tattoos and attire as indicators of TdA membership, as they have done for many class members. For instance, the Chicago Homeland Security Investigations office identified wearing a Chicago Bulls jersey, particularly one bearing Michael Jordan's name, as a TdA marker. *See* Sarabia Roman Decl., Exh. 2. Experts characterize this theory as "close to laughable," given the Bulls' status as Chicago's home team and Jordan's universal popularity. Sarabia Roman Decl., Exh. 20 ("The idea that a Jordan tattoo or jersey would be used to link someone with Tren de Aragua is close to laughable."); Hanson Decl. ¶ 24 (same). Even the government's own intelligence contradicts the practice. *See, e.g.*, Sarabia Roman Decl. Exh. 3 ("EPT HUMINT-Gang Unit collections determined that the Chicago Bulls attire, clocks, and rose tattoos are typically related to the Venezuelan culture and not a definite indicator of being a member or associate of the TDA.").

Nor has the government's reliance on hand gestures, symbols, logos, graffiti, or manner of dress fared any better. Experts agree that TdA lacks consistent iconography, unifying symbols, or a distinctive style of clothing. Hanson Decl. ¶¶ 23-24 (TdA does not have "iconography or unifying

5

cultural motifs, such as symbols, insignias, logos, notations, graffiti tags, music, or drawings" nor "a typical manner of dress . . ." "associated with them"); Antillano Decl. ¶ 14 (no "symbol" or "identity mark" to identify TdA members). And there is no evidence whatsoever that TdA maintains a constitution or issues membership documentation—yet these too were treated as purported indicators of affiliation. *See* Antillano Decl. ¶ 14.

Moreover, approximately 75 percent of individuals sent to El Salvador had no criminal record in the United States or abroad, and many entered the United States lawfully, including several who arrived as highly vetted refugees. *See* Cecilia Vega, *U.S. Sent 238 Migrants to Salvadoran Mega-prison; Documents Indicate Most Have No Apparent Criminal Records*, CBS News (Apr. 6, 2025), https://perma.cc/DE3L-BLKN; Mica Rosenberg et al., *Trump Administration Knew Vast Majority of Venezuelans Sent to Salvadoran Prison Had Not Been Convicted of U.S. Crimes*, ProPublica (May 30, 2025), https://perma.cc/KF7N-KY9K; Bloomberg News, *About 90% of Migrants Sent to El Salvador Lacked U.S. Criminal Record*, Los Angeles Times (Apr. 10, 2025), https://perma.cc/Q5LW-8JZC; Veronica Egui Brito, *Despite Refugee Status in the U.S., Young Venzuelan Was Deported to Salvadoran Prison*, Miami Herald (Mar. 21, 2025), https://perma.cc/D6UJ-TLE3; David J. Bier, *50+ Venezuelans Imprisoned in El Salvador Came to US Legally, Never Violated Immigration Law*, Cato Institute (May 19, 2025), https://perma.cc/M68R-2KJS; *Agelviz-Sanguino v. Noem*, No. 25-cv-2116, ECF No. 1 ¶ 1 (S.D. Tex. May 9, 2025) (Venezuelan noncitizen "was previously approved for refugee resettlement," yet the government "unlawfully removed him to El Salvador"). Even the government's own declarant in this litigation has conceded "that many of the TdA members removed under the AEA do not have criminal records in the United States." Cerna Decl. ¶ 9 (ECF No. 26-1).

JA376

In short, even if remote hearings were not feasible, *but see infra*, many—and perhaps most—cases could be resolved on a paper record given that the government will likely have little or no evidence to connect class members to TdA.

2. Defendants' objections to remote hearings from Venezuela are conclusory and speculative, at best. Defendants claim, for instance, that they "may not be able to verify the identity of individuals" testifying in such proceedings. Defs.' Resp. 3. But class members were in Defendants' custody prior to being sent to torture in El Salvador, and Defendants typically collect personal information, including photographs that would allow them to identify an individual in remote video proceedings. Indeed, it is incredible to imagine that Defendants did *not* collect such information for individuals that they designated under the AEA. Defendants' additional assertions regarding hurdles to remote proceedings in Venezuela—claims about lack of access to counsel, "a serious risk of intentional interference," and that such proceedings "may prompt diplomatic issues," *id.* at 3—are speculative and unsubstantiated. Secretary Rubio's conclusory statements do not provide a meaningful basis for the Court to determine why this remedial process is in fact infeasible. And concerns based on access to evidence due to "the fluid and volatile situation in Venezuela," *id.* at 3, describe the kind of hurdles that individuals coming from countries in turmoil regularly face in the immigration context. Moreover, if any individual class member believes that he lacks access to the needed evidence, he can always choose not to go forward at this time.

3. Secretary Rubio's declaration states that the situation is too delicate at this time to facilitate the return of class members. But as to these men, the declaration conspicuously fails to explain why there is any reason to believe the current head of Venezuela—Maduro's former Vice President—would not honor the specific agreement made by the Maduro regime to "not impose

obstacles to [their] travel" to the United States as appropriate for legal proceedings. Harper Decl. ¶ 9 (ECF No. 168-1).

Defendants additionally argue—but not in a sworn affidavit—that they "are unable to retrieve class members from Venezuela at this time, as civilian travel into and out of Venezuela has become heavily restricted." Defs.' Resp. 3. But as of January 10, "[s]ome commercial airlines have resumed operations from Venezuela"—according to the State Department itself. U.S. Embassy Caracas, *Do Not Travel to Venezuela; Depart Immediately* (Jan. 10, 2026), https://perma.cc/B96Y-R7Q9. Moreover, Defendant DHS has expanded deportation flights to Venezuela since the ouster of Maduro, sending three flights in the past week and expecting to regularly send three flights per week. In a statement, DHS attributed the increased flights to the President's "actions bringing stability to Venezuela"—contrary to Defendants' argument that Venezuela's *in*stability prevents class members from receiving meaningful relief. Annie Correal et al., *Facing U.S. Pressure, Venezuela Agrees to Take More Deportees*, N.Y. Times (Jan. 23, 2026), https://perma.cc/N43J-FRM5.

Given that Defendants have been able to negotiate and implement expanded deportation flights from the United States following Maduro's ouster, Defendants provide no meaningful basis for concluding that facilitating the return of class members from Venezuela via U.S. transport would be infeasible. *See* Supp. Decl. of Sec'y of State Marco Rubio (ECF No. 229-1) ¶ 4 (providing no reasoned explanation for assertion that a "proposal . . . to transport class members to a U.S. jurisdiction" would harm "U.S. foreign policy interests in Venezuela").

It is not unusual for a court to order the executive branch to take specific steps to facilitate an individual's return where, as here, the removal was patently unlawful. These steps may include: purchasing airline tickets; working with relevant airlines to pre-clear an individual's flight;

working with third-country immigration authorities to facilitate transit through those countries; and providing documentation necessary for re-entry into the United States. *See, e.g.*, *Yaide v. Wolf*, No. 19-cv-7874, 2019 WL 6896148, at \*4 (N.D. Cal. Dec. 18, 2019); *Rantesalu v. Cangemi*, No. 04-cv-1375, 2004 WL 898584, at \*7 n.8 (D. Minn. Apr. 23, 2004); *see also, e.g.*, *Walters v. Reno*, 145 F.3d 1032, 1050–51 (9th Cir. 1998) (requiring parole into country or other arrangement for hearing attendance for class of noncitizens); *Dennis v. INS*, No. 01-cv-279, 2002 WL 295100, at \*3 (D. Conn. Feb. 19, 2002) (noting that cost of plane ticket was "not great in any sense"); *Abrego Garcia v. Noem*, 348 F.R.D. 589, 592 n.1 (D. Md. 2025) (detailing government's efforts in other cases to facilitate return). Defendants make the blanket objection that they "are unable to retrieve class members from Venezuela at this time," Defs.' Resp. at 3, but they offer no explanation as to why they cannot take each of these steps.

Additionally, Defendants should retrieve and immediately return class members' passports and identity documents that were confiscated by U.S. authorities and never returned. Possession of such papers will assist class members in traveling to the United States or to third countries where their habeas petitions can be adjudicated.

## PROPOSED RELIEF

This Court should require that:

- Defendants expeditiously submit a new proposal providing for remote proceedings in third countries and travel by class members to the United States from third countries.

- For class members who are currently unable to travel to a third country, the Court should allow individual habeas actions to proceed on written submissions.

- For class members who are currently unable to travel to a third country, the Court should also require Defendants to more fully explain why Plaintiffs cannot return or have remote

hearings from Venezuela. If, however, the Court concludes that Defendants need not facilitate Plaintiffs' return from Venezuela or provide remote hearings from Venezuela, the Court should require Defendants to provide regular status reports as the situation in Venezuela evolves, so that the Court may assess the availability of relief for class members who remain in Venezuela.

- Defendants should immediately return class members' passports and identity documents.

Dated: January 27, 2025                                  Respectfully submitted,

                                                         /s/ *Lee Gelernt*

Noelle Smith                                             Lee Gelernt (D.D.C. Bar No. NY0408)
Oscar Sarabia Roman                                      Daniel Galindo (D.D.C. Bar No. NY035)
My Khanh Ngo                                             Ashley Gorski
Cody Wofsy                                               Patrick Toomey
Spencer Amdur                                            Sidra Mahfooz
Michael K.T. Tan                                         Omar Jadwat
AMERICAN CIVIL LIBERTIES UNION                           Hina Shamsi (D.D.C. Bar No. MI0071)
FOUNDATION
425 California Street, Suite 700                          Sean M. Lau
San Francisco, CA 94104                                  AMERICAN CIVIL LIBERTIES UNION
(415) 343-0770                                           FOUNDATION
nsmith@aclu.org                                          125 Broad Street, 18th Floor
osarabia@aclu.org                                        New York, NY 10004
mngo@aclu.org                                            (212) 549-2660
cwofsy@aclu.org                                          lgelernt@aclu.org
samdur@aclu.org                                          dgalindo@aclu.org
m.tan@aclu.org                                           agorski@aclu.org
                                                         ptoomey@aclu.org
Arthur B. Spitzer (D.C. Bar No. 235960) Scott            smahfooz@aclu.org
Michelman (D.C. Bar No. 1006945)                         ojadwat@aclu.org
Aditi Shah (D.C. Bar No. 90033136)                       hshamsi@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF                            slau@aclu.org
COLUMBIA
529 14th Street, NW, Suite 722                           *Counsel for Petitioners–Plaintiffs*
Washington, D.C. 20045
(202) 457-0800

10

JA380

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LIYANARA SANCHEZ, as next friend on behalf of
FRENGEL REYES MOTA, *et al.*,

*Petitioners–Plaintiffs*,

J.G.G., *et al.*,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, *et al.*,

*Respondents–Defendants*.

Case No: 1:25-cv-00766-JEB

## THIRD SUPPLEMENTAL DECLARATION OF OSCAR SARABIA ROMAN

I, Oscar Sarabia Roman, declare as follows:

1. I am over eighteen years of age and am competent to make this declaration.

2. I am a lawyer at the American Civil Liberties Union Immigrants' Rights Project. I represent the Petitioners in this case.

3. Attached hereto as exhibits are true and correct copies of the following:

### Exhibit Documents

Ex. 1.     FAQs: Facilitating Return for Lawfully Removed Aliens: What happens if I win my case and the court of appeals grants my petition for review after I have been removed? *Available at* https://perma.cc/5MU6-9DMF (visited Jan. 26, 2026).

Ex. 2.     FAQs: Facilitating Return for Lawfully Removed Aliens: What if I believe I need to be present in the United States for my case after I have been removed? *Available at* https://perma.cc/5MU6-9DMF (visited Jan. 26, 2026).

Ex. 3.     U.S. Visa Services: Additional Information---Venezuelan Applicants, *available at* https://perma.cc/BU2Y-SY4E (visited Jan. 26, 2026).

1

2

JA382

Ex. 4.     ICE Policy 11061.1 (Feb. 24, 2012), *available at* https://perma.cc/TMA7-XMTS (visited Jan. 26, 2026).

I hereby declare under penalty of perjury of the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Executed on 27th of January, 2026, in San Francisco, California.

*/s/ Oscar Sarabia Roman*
Oscar Sarabia Roman

2

# EXHIBIT 1

JA383

An official website of the United States government Here's how you know ⌄    🌐 En Español | 🔒 Contact Us    🔗 Quick Links

## U.S. Immigration and Customs Enforcement

Search 🔍

Call **1-866-DHS-2-ICE** to report suspicious activity    **Report Crime**

| About Us | Enforcement and Removal Operations | Homeland Security Investigations | Newsroom |

ICE › REMOVE                                                                ⤳ ⌄

## FAQs: Facilitating Return for Lawfully Removed Aliens

⊕ I was ordered removed and am scheduled to be removed soon, but have a petition for review pending...

⊖ What happens if I win my case and the court of appeals grants my petition for review after I have been removed?

That will depend on the nature of the court order and the posture of your proceedings.

If you were a lawful permanent resident (LPR) prior to entry of the final removal order in your case, and the court's decision voids your removal order, U.S. Immigration and Customs Enforcement (ICE) will consider your LPR status to be reinstated. LPRs are permitted to enter and reside in the United States. Absent extraordinary circumstances, ICE will facilitate your return to the United States.

If you were not an LPR before being removed, absent extraordinary circumstances ICE will facilitate your return to the United States if your presence is necessary for continued adjudication of your case. This may be because the court of appeals specifically ordered your presence, or because the nature of the court's order requires you to return for further testimony. ICE may explore other options in lieu of facilitating your return, such as arranging for video teleconferencing or telephonic testimony, if appropriate.

ICE will also facilitate your return to the United States, absent extraordinary circumstances, if, at the conclusion of proceedings for which your presence was not necessary, the Board of Immigration Appeals or Immigration Court enters a final and unreviewable decision that permits you to be physically present in the United States.

⊕ What constitutes "extraordinary circumstances"?

⊕ What if I believe I need to be present in the United States for my case after I have been removed?

⊕ Is it my responsibility to request assistance from DHS once I learn that a court of appeals has granted my petition for review?

⊕ How do I request assistance from DHS in facilitating my return to the United States after a court of appeals has granted my petition for review?

⊕ Can my lawyer, legal representative, family member, or other advocate contact the Custody Programs Division on my behalf?

⊕ Will the Custody Programs Division let me know if ICE has agreed to facilitate my return to the United States?

⊕ What does the Custody Programs Division do when I request ICE's assistance to return to the United States after a court grants my petition for review?

⊕ Will I be provided a point of contact in ICE throughout the return process?

⊕ Do I need to fill out any forms to start the process?

⊕ If the ICE point of contact tells me that ICE will facilitate my return to the United States, what happens?

⊕ What do I need to return to the United States?

⊕ What is a transportation/boarding letter?    **JA384**

⊕ What if my country will not issue me a passport?



⊕  Am I responsible for making my own travel arrangements to return to the United States?

⊕  Who is responsible for paying for my return trip?

⊕  I provided the U.S. Embassy or Consulate with my passport and received a transportation/boarding letter. I just bought an airline ticket...

⊕  I am in Mexico or Canada and would enter the United States by land at the border crossing. Will I need a transportation/boarding letter?

⊕  How long will it take from the time I request ICE to facilitate my return until my arrival in the United States?

⊕  If ICE facilitates my return to the United States after my petition for review has been granted, what will my immigration status be, if any?

⊕  When ICE facilitates my return to the United States, after my petition for review has been granted, will I be detained upon my return?



⊕  Do I need to pay a fee for ICE to consider whether to facilitate my return to the United States?

⊕  Who do I contact for status regarding my request to return to the United States?

Updated: 02/02/2024



## CONTACT

⊞ ERO contact form

▢ ERO Contact Center of Operations (ECCO): (844) 319-6691

## RELATED INFORMATION

Enforcement and Removal Operations

📄 Printable PDF (98 KB)

📄 ICE Policy Directive Number 11061.1: Facilitating the Return to the United States of Certain Lawfully Removed Aliens

📄 Form G-28: Notice of Entry of Appearance as Attorney or Accredited Representative

📄 Form 60-001: Privacy Waiver Authorizing Disclosure to a Third Party

About Us    Enforcement and Removal Operations    Homeland Security Investigations    Newsroom



**U.S. Immigration and Customs Enforcement**



**ICE Contact Center**

Report suspicious activity: 1-866-DHS-2-ICE



ICE.gov
**An official website of the U.S. Department of Homeland Security**

About ICE

Accessibility

FOIA Requests

Privacy Policy

DHS.gov

Archive

No FEAR Act Data

Site Links

Performance Reports

Inspector General

The White House

DHS Components

USA.gov



National Terrorism Advisory System

**NTAS** NATIONAL TERRORISM ADVISORY SYSTEM

**NO CURRENT ADVISORIES**

*Put this widget on your web page*

JA385

# EXHIBIT 2

🇺🇸 An official website of the United States government   Here's how you know ∨                         ⊕ En Español    ☐ Contact Us    ⊘ Quick Links

**U.S. Immigration and Customs Enforcement**

Search 🔍

Call **1-866-DHS-2-ICE** to report suspicious activity    **Report Crime**

| About Us | Enforcement and Removal Operations | Homeland Security Investigations | Newsroom |

ICE › REMOVE    ≼ ∨

## FAQs: Facilitating Return for Lawfully Removed Aliens

⊕ I was ordered removed and am scheduled to be removed soon, but have a petition for review pending...

⊕ What happens if I win my case and the court of appeals grants my petition for review after I have been removed?

⊕ What constitutes "extraordinary circumstances"?

⊖ What if I believe I need to be present in the United States for my case after I have been removed?

Most courts and many foreign embassies have the technology to support your participation in your immigration hearing by either video teleconferencing or by phone. However, if these alternatives are not available to you in the country to which you were removed, and your presence is required by court order or is otherwise necessary to continue your case, you may request that the Department of Homeland Security (DHS) facilitate your return to the United States. You will need to contact ICE to request return to the United States.

⊕ Is it my responsibility to request assistance from DHS once I learn that a court of appeals has granted my petition for review?

⊕ How do I request assistance from DHS in facilitating my return to the United States after a court of appeals has granted my petition for review?

⊕ Can my lawyer, legal representative, family member, or other advocate contact the Custody Programs Division on my behalf?

⊕ Will the Custody Programs Division let me know if ICE has agreed to facilitate my return to the United States?

⊕ What does the Custody Programs Division do when I request ICE's assistance to return to the United States after a court grants my petition for review?

⊕ Will I be provided a point of contact in ICE throughout the return process?

⊕ Do I need to fill out any forms to start the process?

⊕ If the ICE point of contact tells me that ICE will facilitate my return to the United States, what happens?

⊕ What do I need to return to the United States?

⊕ What is a transportation/boarding letter?

⊕ What if my country will not issue me a passport?

⊕ Am I responsible for making my own travel arrangements to return to the United States?

⊕ Who is responsible for paying for my return trip?

⊕ I provided the U.S. Embassy or Consulate with my passport and received a transportation/boarding letter. I just bought an airline ticket...

⊕ I am in Mexico or Canada and would enter the United States by land at the border crossing. Will I need a transportation/boarding



**JA387**

I am in Mexico or Canada and would enter the United States by land at the border crossing. Will I need a transportation/boarding letter?

⊕ How long will it take from the time I request ICE to facilitate my return until my arrival in the United States?

⊕ If ICE facilitates my return to the United States after my petition for review has been granted, what will my immigration status be, if any?

⊕ When ICE facilitates my return to the United States, after my petition for review has been granted, will I be detained upon my return?

⊕ Do I need to pay a fee for ICE to consider whether to facilitate my return to the United States?

⊕ Who do I contact for status regarding my request to return to the United States?



Updated: 02/02/2024

**CONTACT**

📋 ERO contact form

📱 ERO Contact Center of Operations (ECCO): (844) 319-6691

**RELATED INFORMATION**

Enforcement and Removal Operations

📄 Printable PDF (98 KB)

📄 ICE Policy Directive Number 11061.1: Facilitating the Return to the United States of Certain Lawfully Removed Aliens

📄 Form G-28: Notice of Entry of Appearance as Attorney or Accredited Representative

📄 Form 60-001: Privacy Waiver Authorizing Disclosure to a Third Party

**About Us**    **Enforcement and Removal Operations**    **Homeland Security Investigations**    **Newsroom**



U.S. Immigration and Customs Enforcement

f 𝕏 ▶ flickr 📷 in ✉ 🔊

**ICE Contact Center**

Report suspicious activity: 1-866-DHS-2-ICE

ICE.gov
An official website of the U.S. Department of Homeland Security

| | | |
|---|---|---|
| About ICE | Archive | The White House |
| Accessibility | No FEAR Act Data | DHS Components |
| FOIA Requests | Site Links | USA.gov |
| Privacy Policy | Performance Reports | |
| DHS.gov | Inspector General | |

National Terrorism Advisory System

⬥ NTAS
NATIONAL TERRORISM ADVISORY SYSTEM

**NO CURRENT ADVISORIES**

*Put this widget on your web page*

<span style="color:red">**JA388**</span>

# EXHIBIT 3

JA389



## — ADDITIONAL INFORMATION

Bogota Nonimmigrant Visa Wait Times

Rights and Protections for Temporary Workers

Rights and Protections for Immigrant Visa Applicants

Report Fraud

**Venezuelan Applicants**

Instructions for Voluntary Departures

### Venezuelan Applicants

Venezuelan applicants for nonimmigrant visas can apply at any U.S. Embassy or Consulate around the world. If you choose to apply at the U.S. Embassy in Bogotá, all applicants who do not reside in Colombia must attend the visa interview in-person – this includes minor children and the elderly. We do not expedite cases for travel back to Venezuela after the interview. You may be asked to provide bank documents during the interview; we recommend bringing bank statements for all active accounts.

## — APPLYING FOR A VISA

### What type of visa do you need?

If you are unsure what type of visa you need, please use the Visa Wizard below to learn more.

The type of visa you must obtain is defined by U.S. immigration law and relates to the purpose of your travel. You can use this wizard to find out what visa type may be most appropriate for your purpose of travel. If applying from some countries, you will be redirected to a third-party site to help you determine what visa type is best for you. Please answer all questions as the applicant.



# EXHIBIT 4

**U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT**

### 11061.1: Facilitating the Return to the United States of Certain Lawfully Removed Aliens

|  |  |
|---|---|
| **Issue Date:** | February 24, 2012 |
| **Effective Date:** | February 24, 2012 |
| **Superseded:** | N/A |

**Federal Enterprise Architecture Number:** 306-112-002b

1. **Purpose/Background.** Under the Immigration and Nationality Act (INA), as amended, aliens who petition the circuit courts of appeals for review of their administrative removal orders may continue to litigate their petitions after their removal from the United States. Absent a court-ordered stay of removal, U.S. Immigration and Customs Enforcement (ICE) may lawfully remove such aliens while their petitions for review (PFRs) are pending. This Directive describes existing ICE policy for facilitating the return to the United States of certain lawfully removed aliens whose PFRs are granted by a U.S. court of appeals or the U.S. Supreme Court. This Directive applies only to supervisors in Enforcement and Removal Operations (ERO), Homeland Security Investigations (HSI), and the Office of the Principal Legal Advisor (OPLA). This Directive does not apply to bargaining unit employees.

2. **Policy.** Absent extraordinary circumstances, if an alien who prevails before the U.S. Supreme Court or a U.S. court of appeals was removed while his or her PFR was pending, ICE will facilitate the alien's return to the United States if either the court's decision restores the alien to lawful permanent resident (LPR) status, or the alien's presence is necessary for continued administrative removal proceedings. ICE will regard the returned alien as having reverted to the immigration status he or she held, if any, prior to the entry of the removal order and may detain the alien upon his or her return to the United States. If the presence of an alien who prevails on his or her PFR is not necessary to resolve the administrative proceedings, ICE will not facilitate the alien's return. However, if, following remand by the court to the Executive Office for Immigration Review (EOIR), an alien whose PFR was granted and who was not returned to the United States is granted relief by EOIR or the Department of Homeland Security (DHS) allowing him or her to reside in the United States lawfully, ICE will facilitate the alien's return to the United States.

3. **Definitions.** The following definitions apply for purposes of this Directive only:

3.1. **Facilitate an Alien's Return.** To engage in activities which allow a lawfully removed alien to travel to the United States (such as by issuing a Boarding Letter to permit commercial air travel) and, if warranted, parole the alien into the United States upon his or her arrival at a U.S. port of entry. Facilitating an alien's return does not necessarily

---

Facilitating the Return to the United States of Certain Lawfully Removed Aliens

2

include funding the alien's travel via commercial carrier to the United States or making flight arrangements for the alien.

**3.2.**    **Petition for Review (PFR).**  A request for a U.S. court of appeals to review a removal order entered by ICE or EOIR under 8 U.S.C. § 1252, INA § 242.  The U.S. courts of appeals' PFR decisions are subject to review by the U.S. Supreme Court through a petition for writ of certiorari.

**3.3.**    **Restore an alien to lawful permanent resident (LPR) status.**  To enter a judicial decision which renders non-final an administrative removal order against an LPR.  *See Matter of Lok*, 18 I&N Dec. 101 (BIA 1981) (holding that an LPR retains such status until the entry of a final administrative order of removal), *aff'd*, 681 F.2d 107 (2d Cir. 1982).  Practically speaking this means that, when a PFR is granted that returns a former LPR to the posture of a pre-order alien, the alien will once again, in contemplation of law, be an LPR even though removal proceedings may still be pending before EOIR on remand from the circuit court.

**3.4.**    **Stay of Removal.**  An order issued by EOIR or a federal court which prevents ICE from executing a removal order.

**4.**    **Responsibilities.**

**4.1.**    ERO, HSI, and OPLA supervisors must fully coordinate at the local, international, and Headquarters levels to effectuate this policy.

**5.**    **Procedures/Requirements.**  None

**6.**    **Authorities/References.**

**6.1.**    INA § 101(a)(20), 8 U.S.C. § 1101(a)(20).

**6.2.**    INA § 212(d)(5), 8 U.S.C. § 1182(d)(5).

**6.3.**    INA § 242, 8 U.S.C. § 1252.

**6.4.**    8 Code of Federal Regulations (CFR) § 212.5.

**6.5.**    DHS Delegation Number 7030.2, "Delegation of Authority to the Assistant Secretary for the Bureau of Immigration and Customs Enforcement" (November 13, 2004).

**6.6.**    Memorandum of Agreement (MOA) between United States Citizenship and Immigration Services (USCIS), ICE, and Customs and Border Protection (CBP), "Coordinating the Concurrent Exercise by USCIS, ICE, and CBP, of the Secretary's Parole Authority Under INA § 212(d)(5)(A) with Respect to Certain Aliens Located Outside of the United States" (September 29, 2008).

---

3

6.7.    MOA between ICE and CBP, "Significant Public Benefit Parole Protocol for U.S. Customs and Border Protection and U.S. Immigration and Customs Enforcement for Law Enforcement Purposes" (September 22, 2005).

6.8.    *Matter of Lok*, 18 I&N Dec. 101 (BIA 1981), *aff'd*, 681 F.2d 107 (2d Cir. 1982).

7.      **Attachments.** None

8.      **No Private Right.** This Directive is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

John Morton
Director
**U.S. Immigration and Customs Enforcement**

---

Facilitating the Return to the United States of Certain Lawfully Removed Aliens

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LIYANARA SANCHEZ, as next friend on behalf
of FRENGEL REYES MOTA, *et al.*,

*Petitioners–Plaintiffs*,

J.G.G., *et al.*,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, *et al.*,

*Respondents–Defendants*.

Case No: 1:25-cv-00766-JEB

**REPLY REGARDING REMEDIAL PROPOSAL**

This Court's January 28 Minute Order directed Defendants to submit a reply addressing (1) Petitioners' proposal (ECF 234) regarding remote proceedings in third countries, (2) their request for the immediate return of passports and identity documents, and (3) whether Defendants will parole class members who arrive at a U.S. port of entry, and relatedly whether they will issue boarding letters for air travel to the United States for Plaintiffs in Venezuela or third countries. Reserving all objections regarding this Court's jurisdiction and prior orders, Defendants respond to each point and elaborate on the significant practical and legal obstacles to Petitioners' proposals.

**1. Remote Hearings Are Both Legally and Practically Impossible.**

Petitioners propose (ECF 234 at 1-2) offering all overseas class members remote hearings on their yet-to-be-filed habeas petitions. Remote habeas hearings on the validity of Petitioners' AEA designations would present insuperable legal bars and substantial practical problems that together render this an untenable and unacceptable proposal.

1

JA395

To start, if Petitioners seek to file habeas petitions while remaining overseas and beyond the custody and control of the United States, there would be no jurisdiction over these as-yet-unfiled petitions. As the Supreme Court made clear in this case, individuals must file their own habeas petitions to challenge their factual and legal designation under the Proclamation. *Trump v. J.G.G.*, 604 U.S. 670, 672 (2025). As a jurisdictional matter, habeas requires custody. *See Maleng v. Cook*, 490 U.S. 488, 494 (1989); *Alexander v. Maass*, 82 F.3d 422 (9th Cir. 1996). Custody cannot be waived, consented to, or ordered as a legal fiction. *See Laffey v. Nw. Airlines, Inc.*, 567 F.2d 429, 474 (D.C. Cir. 1976). Yet, as everyone agrees, Petitioners are not currently in the custody of the United States. Remote hearings from Venezuela or a third country would not put Petitioners back into Defendants' custody, and therefore would not generate habeas jurisdiction.

To be clear, this defect exists independent of the Court's incorrect ruling that Defendants had constructive custody over Petitioners when they filed the instant claims. The Court's remedy proposal contemplates that Petitioners will file new habeas petitions; those petitions will not be jurisdictionally proper unless Petitioners return to custody before filing them, since any "petitioner must demonstrate that he was in custody *at the time he filed the petition*." *Qassim v. Bush*, 466 F.3d 1073, 1078 (D.C. Cir. 2006) (emphasis added). Nor does this Court's holding that this case is not moot due to "collateral consequences" supply jurisdiction over future habeas petitions. Collateral consequences may prevent a habeas case from becoming moot *after* a detainee's release. *See United States v. Rydle*, 58 F.4th 14, 17 (1st Cir. 2023). But "the collateral consequences … are not themselves sufficient to render an individual 'in custody' for the purposes of a habeas attack" in the first instance. *Maleng*, 490 U.S. at 491–92; *see also Stanbridge v. Scott*, 791 F.3d 715, 718–19 (7th Cir. 2015) (sex offender status may have been a collateral consequence, but it did not count as custody). There is no legal basis for holding remote habeas hearings without *custody*.

Remote hearings also present severe practical difficulties, as described in Defendants' last submission.  ECF 229 at 3.  In addition to current sensitivities in Venezuela given the "fluid" situation described by Secretary Rubio, ECF 229-1 at ¶ 3, the United States cannot enforce perjury or other procedural rules in Venezuela, or even verify the identity of witnesses.  Moreover, these habeas proceedings by their nature are likely to implicate sensitive or classified information; developing procedures to protect that information when the proceedings are occurring over potentially unsecure lines in foreign settings is a non-starter.  Further, the conduct of a habeas proceeding overseas by the United States—even at a U.S. Embassy or Consulate—would be an infringement on the sovereignty of a foreign state absent that state's consent.  This Court has made clear that any habeas hearings must "satisfy the requirements of due process," but there would be no way to do so if the hearings occur remotely with Petitioners in Venezuela or neighboring foreign countries.  ECF 215 at 4.

Petitioners respond (ECF 234 at 2) that remote hearings occur in immigration proceedings. But those remote telephonic or video proceedings generally occur *within the United States*, not in foreign countries.  In any event, immigration hearings are administrative matters that lack the procedures and formalities of Article III courts; they are thus not a suitable model for federal habeas proceedings.  *See Miranda v. Garland*, 34 F.4th 338, 359-61 (4th Cir. 2022) (collecting cases holding that due process protections are reduced in immigration proceedings); *cf. Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 138–39 (2020) (discussing due process in the immigration context).

Finally, Petitioners speculate (ECF 234 at 3-7) that many petitions could be resolved on the papers alone.  That is both premature and dubious.  Petitioners have the burden to demonstrate that they are not members of TdA.  *See Ex parte Gilroy*, 257 F. 110, 114 (S.D.N.Y. 1919) ("the burden

is on Alexander to show that he is not an enemy alien, and not upon the United States to show that he is”); *Waite v. Jacobs*, 475 F.2d 392, 394 (D.C. Cir. 1973) (“long-standing rule that the burden of proof is on the petitioner in habeas corpus”).  The habeas cases Petitioners cite that resolved on the papers either presented no dispute or raised pure legal issues.  Much of Petitioners’ evidence contesting their TdA membership, however, has been in the form of declarations; evaluating that evidence will thus necessarily turn on their credibility.  The government thus has a right to examine Petitioners, precluding proceedings on the papers.

For all of these reasons, remote hearings are not possible here, either legally or practically.  Rather, the only jurisdictionally proper means of permitting new habeas proceedings would be for aliens to return to United States custody, which itself presents grave national security and foreign policy impediments, as discussed further below.

**2.  Defendants Do Not Generally Maintain Petitioners’ Passports or Identity Documents.**

Apparently for the first time in this litigation, Petitioners belatedly request that Defendants “retrieve and immediately return class members’ passports and identity documents that were confiscated by U.S. authorities and never returned.”  ECF 234 at 9.  They do not identify any particular passports or other identity documents or particular class members to whom they belong; nor do they explain how this relief relates to this litigation or is necessary for any of the proposals that the Court is considering.

In all events, Defendants understand from the Department of Homeland Security that Petitioners’ property, including any identity documents, was transferred to El Salvador along with Petitioners in March 2025.  To the extent that any passports or identity documents may remain in a petitioner’s file with DHS, Defendants are prepared to turn those over upon an individual request from a counsel who represents that individual petitioner.

4

**JA398**

**3.  Facilitating Travel and Granting Parole to Petitioners Would Be Untenable.**

Petitioners also propose (ECF 234 at 2-3) that the United States provide them with boarding letters to facilitate their travel to the United States, and then parole them into the country, where they would presumably be detained pending removal.  This option is not tenable either, while the United States can in theory lower domestic barriers to entry, *see* ECF 234 at 2-3, the facts of this case make that option a legal and factual nonstarter.

For one thing, this approach would not avoid the foreign-policy harms vis-à-vis Venezuela that Secretary Rubio set forth in his previous declaration.  ECF 229 at ¶ 4.  Whether done directly or indirectly, retrieving Petitioners to take them into custody would require diplomacy with top leaders in the Delcy Rodriguez interim regime or foreign sovereigns in third countries and thus raise separation of powers issues.  *See J.G.G. v. Trump*, 147 F.4th 1044, 1059-60 (D.C. Cir. 2025) (Katsas, J., concurring); *id.* at 1069 (Rao, J., concurring) (granting mandamus in part based on forcing the Executive to engage in diplomacy).  Moreover, with the myriad of other high-priority matters that the United States is pursuing in Venezuela to stabilize the security and economic situation in the country, it is untenable to expect the United States to add to the negotiations with the Rodriguez regime the matter of sending designated TdA members back to the United States for renewed detention.  ECF 229 at ¶¶ 3-4; ECF 234 at 7-9.  Secretary Rubio discussed in detail the tenuous situation in Venezuela and the State Department's priority engagements with the regime in testimony before the Senate Foreign Relations Committee on January 28.  *See, e.g.*, Secretary of State Marco Rubio, Testimony Before the Senate Foreign Relations Committee, Jan. 28, 2026, https://www.foreign.senate.gov/download/012826_rubio_testimonypdf, at 2 (describing the United States' intention to "closely monitor the performance of the [Rodriguez] interim authorities as they cooperate with our stage-based plan to restore stability to Venezuela."); Hearing

5

<span style="color:red">**JA399**</span>

Video, https://www.foreign.senate.gov/hearings/us-policy-towards-venezuela, at 45:40 (Secretary Rubio describing "hard asks" the United States is making of the Rodriguez regime and emphasizing "there's a lot of work to be done here" to move Venezuela from the stabilization phase to the transition phase); *id.* at 2:04:04 (Secretary Rubio explaining "we're not even four weeks into this thing … and if … six months, nine months, a year from now … progress isn't being made, we'll have very different feelings about it," and "this is not the end state that we want").

Diplomacy will be required again *after* any habeas case, because even if a petitioner is successful in challenging his AEA designation, he will remain removable under the INA.  Given the high-profile nature of this case, including Petitioners' affiliation with an organization notorious for terrorizing the Venezuelan people, the United States will have to negotiate with the Rodriguez regime or whatever entity succeeds it to accept these individuals back, injecting an extremely complicated issue into what is already a delicate situation, potentially negatively affecting U.S. efforts toward stabilization and transition that aim to benefit tens of millions of Venezuelans. Petitioners' proposal thus poses an unacceptable risk of bringing about the material damage to U.S. foreign policy interests in Venezuela that Secretary Rubio warned about in his declaration. ECF 229-1 at ¶ 4.

More generally, Petitioners have been determined to be members of a foreign terrorist organization (FTO).  That determination is separate and independent from their AEA status and itself precludes admission to the United States and many forms of discretionary relief.  *See* 8 U.S.C. §§ 1182 (a)(3)(B)(i)(IV)-(V); 1227 (a)(1)(A); 1158(b)(2)(A)(v).  So "any order to bring suspected members of a foreign terrorist organization into the United States would … face[] an objection that the judiciary cannot override the statutory prohibition on the admission of such aliens." *J.G.G.*, 147 F.4th at 1055 (Katsas, J., concurring). At minimum, Defendants are not prepared (absent a

court order) to issue letters enabling members of an FTO to board commercial flights to the United States, and certainly would never release them within the United States.

*    *    *

If, over Defendants' vehement legal and practical objections, the Court issues an injunction, Defendants intend to immediately appeal, and will seek a stay pending appeal from this Court (and, if necessary, from the D.C. Circuit).

Dated: February 2, 2025                    Respectfully submitted,

Brett A. Shumate
Assistant Attorney General
Civil Division

Drew C. Ensign
Deputy Assistant Attorney General
Office of Immigration Litigation

*/s/ Tiberius Davis*
Tiberius Davis
Counsel to the Assistant Attorney General
Civil Division
U.S. Department of Justice

Anthony Nicastro
Acting Director
Office of Immigration Litigation

*Counsel for Respondents–Defendants*

**JA401**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

J.G.G., et al.,

                                  Civil Case
          Plaintiff(s),     No. 25-00766 JEB

     v.

                                    Washington, D.C.
DONALD J. TRUMP, et al.,

                                    February 9, 2026
          Defendant(s).

------------------------------------------------------------

MISCELLANEOUS HEARING
BEFORE THE HONORABLE JAMES E. BOASBERG
UNITED STATES DISTRICT CHIEF JUDGE

APPEARANCES:

FOR THE PLAINTIFF(S):   Lee Gelernt, Esquire
                           Daniel A. Galindo, Esquire
                           Sean Ming-Jun Lau, Esquire
                           American Civil Liberties Union
                           125 Broad Street
                           18th Floor
                           New York, New York 10004

                           Aditi Shah, Esquire
                           American Civil Liberties Union
                           529 Fourth Street Northwest
                           Suite 722
                           Washington, D.C. 20043

The following proceedings began at 10:01 a.m.:

THE COURT:  Okay.  Good morning, everyone.

THE COURTROOM DEPUTY:  Good morning, Judge.

Good morning, everyone.  We are here on Civil Matter 25-cv-766, J.G.G., et al. versus President Donald Trump, et al.

Beginning with counsel for the plaintiff, if you would please approach the lectern and identify yourself for the record.

MR. GELERNT:  Good morning, Your Honor.  Lee Gelernt for plaintiffs.

THE COURT:  Good morning.

MR. DAVIS:  Good morning, Your Honor.  Tiberius Davis for defendants.  And with me is John Bailey at counsel's table.

THE COURT:  Good morning to you.

All right.  We are here today for hearing regarding the remedy in this matter.  And I have gotten submissions from both sides.  So, Mr. Gelernt, if you would like to start.

MR. GELERNT:  Thank you, Your Honor.  I want to start by sort of saying where we are, where we think we are, and make a proposal that I think is eminently fair.

We think for people who are or will make it to a third country, they should have the immediate right to

either return, do a remote hearing, or start with a paper filing to see if there actually are any disputed facts.

As to people who are in Venezuela and will not be able to get out, I think we have a compromise proposal that we do think is eminently fair, is that if they want to start with a paper filing, they should be able to do so. That should not present any diplomatic issues.

As to bringing them back from Venezuela, remote hearings, we are -- we would accept the government filing in two to three weeks, whatever Your Honor thinks makes sense, a status report.

And the reason I say that is because things are moving in Venezuela. When we originally filed our papers, the government said, well, there's not really commercial flights. Now we find out that there are deportation flights and things are moving. We have also recently learned that there is a temporary embassy that's gone up and there's work being done there. So we assume that progress is going to be made. And we can't see this being an indefinite situation.

So two to three weeks from now, I think the government ought to let you know what the latest status is, but at a minimum, people file habeases from Venezuela.

And certainly as to the third countries, it just seems like the government is throwing stuff against the wall. But I can't see any reason why someone who's made it

out of Venezuela -- you know, I don't need to belabor this point with Your Honor, but it's now been 331 days as of today that these individuals have been stuck.

It seems as if no matter what we propose, ultimately the government is not going to accept it.  And obviously I don't need to tell you, but I have been practicing a long time.  I don't think I have ever seen a justice department submission end the way this did with sort of a veiled threat that if you do a single thing, we will appeal immediately rather than a respectful we would seek a stay.

THE COURT:  I have been used to that tone in this case unfortunately.

MR. GELERNT:  Right.  So that would be where we would start.  And I am happy if you want to turn to the government and then address any reasons why they think that proposal would not work, but that's where we would be.

THE COURT:  And I agree that I'm happy to give the government a little more time for people who are in Venezuela, that again, I have attempted throughout this proceeding to be deferential and respectful to the government's diplomatic and foreign affairs prerogatives and powers, and so I do think there's -- we are in a different situation with people who either are in a third country or make it to a U.S. port of entry versus people who are currently in Venezuela.

MR. GELERNT:  Right.  And I would just emphasize that I do think, Your Honor, even with that amount of deference, there should be no reason why people can't start a paper filing from Venezuela if they are inclined to do it.

THE COURT:  Right.  And so let's -- let's see if we can get a little more information about facts on the ground regarding the plaintiffs.  Again, I know, Mr. Gelernt, there's difficulty reaching everybody, particularly now given what's been happening in Venezuela, it makes it more difficult, both communications and willingness of your clients to be in touch, but do you have a sense of how many are already in third countries --

MR. GELERNT:  Yeah.

THE COURT:  -- to start?

MR. GELERNT:  With Your Honor's permission, I would rather not name the countries for the moment just for safety reasons if that's okay.

THE COURT:  Okay.

MR. GELERNT:  But I would say that they are obviously near as Venezuela.

We have reached, through either individual lawyers or directly with them, a handful of people who have made it out thus far.  But I think it would -- I do not want to represent that we know all the people because a lot of them are in hiding.  We will reach them through a variety of

means.  Thus far, we have sort of nailed down a handful of people who have made it out.

What we are being told is that people could make it out if this becomes an option, and I suspect there are many more people who have actually already made it out.

But the number is definitely not zero.  So if Your Honor were to order that, this would not be an academic exercise by any means.  And the people we have spoken to who have made it to a third country are very interested in clearing their name because this designation is traveling with them and makes it very difficult for them to do anything.  So it would not by any means be just sort of a null set.

THE COURT:  And do you expect that any will actually attempt to make it to a U.S. port of entry?

MR. GELERNT:  Without the government's permission and a court order?  I don't know whether anybody would take that risk.  I'd say if --

THE COURT:  Let's say with a court order.

MR. GELERNT:  Okay.

THE COURT:  If the court order said, government, you have to parole people into the country if they make it to a port of entry, although, they, again, would be detained, there's no argument that they should be in this country at liberty, right --

**JA407**

MR. GELERNT:  We are not certainly making that argument.

THE COURT:  -- at this point?

MR. GELERNT:  Right.  We know people who would come back.  I think if the option to do a remote hearing were available, they might take that first because they are fearful of what happens.  I think it's less fear of detention than it is of ending up somewhere remote, I mean, either back at CECOT or somewhere, you know, South Sudan, as you pointed out last hearing, Your Honor.

But there are definitely people who are ready to come back if that's the only choice.  You know, but obviously the government is not giving them that choice.  The government's giving them -- I don't see anything the government has agreed to.  But yes, there are people who very much want to come back and flee and seek asylum.  But I think they are nervous about coming back before they had a remote hearing.  But if it ends up that the only way to do this is by coming back, then they are going to take that option.

THE COURT:  So if they get a remote hearing --

MR. GELERNT:  Right.

THE COURT:  -- and either they could submit papers or they actually get a hearing --

MR. GELERNT:  Right.

THE COURT:  -- and they prevail, then isn't the

remedy that they would be brought back and placed in custody, in other words, they would be placed in the same position they were before deportation?

MR. GELERNT:  Right, Your Honor.  So that's a fair question.  The reason they wouldn't be in the exact same position is now if they come back and they're still designated AEA and the government says we are going to send you as an alien enemy to any one of a number of countries, they are in trouble.

But if they prevail in their hearing and they are no longer consider TdA and, therefore, no longer AEA or FTO, then they would come back and be placed back in immigration hearings where their asylum claims would go forward.

Now, they would be probably be in detention.  I suspect that's what the government would do.  But that's almost the least of their problems.  I mean, if they prevail for asylum, then they will get to stay.  If they don't, you're right, then they could be removed again.

But right now, if they come back and they are designated as AEA and the government decides, well, you are an alien enemy and you haven't prevailed yet, we are going to try and remove you to any one of a number of countries, besides the political theater of it, the whole practical reason they wanted to use the AEA is to take people out of immigration proceedings and not let them apply for asylum.

**JA409**

So if they did prevail --

(There was an interruption by the court reporter.)

MR. GELERNT:  I apologize.

If they were to prevail in the remote hearing and show that they were not TdA members and, therefore, didn't fall under the AEA or the foreign terrorist organization label, then they would come back and be in regular immigration proceedings and they would have the opportunity to show that they are eligible for asylum and deserve asylum just like they were trying initially before the proclamation.

THE COURT:  But then practically, and we are not at that stage, but if they prevailed from a third country or from Venezuela on the papers, then is the relief you would be seeking for the government to actively retrieve them to bring them back and place them in --

MR. GELERNT:  Yeah, I think you're right, we're not there.  Whether it's a government plane or whether it's just the government says if you get to a port of entry, I think given the situation, we would hope the government would facilitate it.  But then it would be like any other unlawful removal where the courts routinely say the government needs to facilitate the return just in a regular immigration proceeding if they violated an immigration order, a stay of removal, the government has to facilitate the return.

**JA410**

You know, the exact mechanics of it, I think, we are a ways away from, but yes, we would say then they would be able to return and apply for asylum just like they were originally trying to do.

THE COURT:  Okay.  So on the challenges, so let's say they are in a third country and they file, similarly, if they are in Venezuela and they file, your point throughout your papers anyway are we would like to be able -- we want to be able to show and we believe we can show that many of these folks are not TdA.

But you don't mention -- and it was something that I did talk about in my opinion.  And you don't talk about it, and the government doesn't talk about it, so maybe I am missing something.  But I am surprised.  Why isn't the first argument you are making on the papers for all of these people that the proclamation is invalid whether they are TdA or not?

MR. GELERNT:  That's a very fair question, Your Honor.  I think it is true that would be the first argument.

THE COURT:  Because then -- because if the issue is -- the government's raised a lot of issues about the logistics of remote hearings and perjury questions and reliability questions and technical questions.  But if the AEA was invalidly invoked by the proclamation, you don't need to have any of that.  It's just done, right?

MR. GELERNT:  You are absolutely right, Your Honor. Let me just be sort of candid about how we are seeing this. Right now, you may be aware of this, but the Fifth Circuit just heard en banc --

THE COURT:  Sure.

MR. GELERNT:  Right, and so the Supreme Court has sort of made that the test case, and all the other cases have been held in abeyance.

THE COURT:  Yes.

MR. GELERNT:  So I think the question is I think we are more than happy for you, and I think you're right that that would be the logical first step, to rule on that as well.  The only thing I would say in talking to individuals is we have had to be honest with them and say it's unlikely that any lower court that rules that the proclamation is inconsistent with the AEA is going to end the matter until SCOTUS gets it.

And so it's a little bit of a timing thing because there are some people who feel like they have absolutely zero connection to TdA and there's nothing the government can put in that will remotely create a genuine issue of fact.  And if they can get out from under it individually sooner than the Supreme Court, now it looks like its next term, deciding that, and so that's the only question, but I think you're right that whatever you do, you ought to

**JA412**

probably decide that as well because it doesn't sort of logically make sense to skip over it.  And I think that's our fault for not making that clear.

But I do think ultimately --

THE COURT:  I mean, I agree the Supreme Court is ultimately going to decide this.  But if you win, unless it's stayed pending Supreme Court review, then they could be returned at that point.  And certainly there's a lot of briefing, I know.  The only judge in our circuit to have looked at this, Judge Henderson found the proclamation was invalid.

MR. GELERNT:  Right.  So, Your Honor, I think that's right.  I don't know how it's going to play out.  I think the government is probably going to seek a stay and say that all the other circuits are holding it in abeyance pending the Fifth.

So I don't want to die on this hill by any means because I think you are right, as a logical matter, you probably ought to decide it.

Now, if the Circuit or Supreme Court doesn't stay it, so be it, then people should be allowed back.  I just don't know how this is going to play out, whether, you know, the government's going to say, look, if all the other cases are being stayed and the Fifth Circuit is the test case, but I do think you are right about that, so I don't know.

**JA413**

I guess I would say you probably ought to try and do both.

THE COURT:  Because, you know, when you say this could be done on the papers, you know, it would be quite something.  It wouldn't surprise -- nothing surprises me in this case, unfortunately, but my first reaction would be it would certainly be surprising if none of the 137 people is a TdA member.  That would be quite something.

But if the arguments are on the papers this person is not a TdA member, here are declarations and photographs of tattoos and declarations of family members, aren't those going to raise quintessential factual questions where the government says no, no, no, that tattoo is -- we have somebody who says that tattoo is TdA or we have somebody who says based on X or --

MR. GELERNT:  Yeah, I don't disagree --

(There was an interruption by the court reporter.)

MR. GELERNT:  I'm sorry.

THE COURT:  My point is, isn't it going to be hard to do TdA determinations purely on the papers?

MR. GELERNT:  So yeah.  I mean, let me start from where I think you are coming from is that it's clear you can do the paper ruling whether the proclamation satisfies the AEA.  And it sounds like, I think, that's what you think you should do.  And we are not disagreeing with that.

What we think is, though, that the people who will immediately seek hearings probably are so far removed from TdA that the government is not going to be able to put in anything.  I mean, what's happened in the two cases we are aware of that were just sort of quirky cases, the government basically folded because there was nothing they could say.  They put in the same tattoos.  There was just overwhelming evidence that a Chicago Bulls tattoo does not make you a TdA member.  In fact, TdA doesn't actually use tattoos to identify themselves.

But if there are some cases like that, I think then we would have to decide whether there's remote hearings.  We are simply saying that for people who it's so clear are not TdA, they should have the right to start.  But you're right, if a genuine issue of fact arises and the government is unwilling to bring them back or do remote hearings and Your Honor doesn't want to order that, then I think you're right, that then it would be difficult to get too far along.

But we do think there are going to be people who the government will literally not be able to say anything about.  So that's why we think we ought to start -- if someone is actually a TdA member, then I suspect -- I don't know that they are immediately going to jump at the chance to file --

THE COURT:  And I have a sense, maybe you have a better sense than I, I'm sure you do, that whether what's

happened in Venezuela is beneficial for your clients or detrimental or neither, in other words, if their fear was government targeting, maybe that's changed.  If their fear was targeting by gangs, maybe that hasn't.  I don't know if you even want to respond to that.

MR. GELERNT:  Yeah, I would be speculating a little. But based on, I think, what we are hearing, people are still very worried about the government.  I don't know that there is that big a gap between the vice president taking over. And so I think what we are hearing is that things are not great for people, and they are still in hiding and they are being surveilled.

Now, will things change?  You know, I don't know. But I think people are definitely worried about it.

And, Your Honor, I think -- I mean, you are putting your finger on exactly all the difficult questions.  And I guess from where we are sitting, it's, you know, both to decide whether the proclamation is consistent with the AEA, fine, obviously that's the logical first step.

In terms of just moving it along for individuals who feel like there's nothing the government can connect me to, I think the process ought to start.  But I think the government is going to stand up and say, even if you were to move the hearing to this afternoon, they are going to appeal.

**JA416**

And so I'm not sure that we need to figure out -- I mean, you obviously want to have a blueprint going forward.

THE COURT:  And I'm not going to rule today.  They might appeal anyway today because that seems to be the MO in this case.

MR. GELERNT:  I think as soon as you order anything, they're going to appeal.  So I think we probably -- I mean, I realize you would have liked to have a sort of map of where we are going to go.  But ultimately, I think questions about if they put in enough to create a genuine issue of fact or the Circuit stays your ruling about the proclamation not being consistent with the AEA is probably down the line because I think they are going to stand up here and say, no matter what you order, no matter how reasonable, they are going to appeal.  And so that's where we are going to be, unfortunately.

THE COURT:  So a couple of other issues, Mr. Gelernt, before I talk to Mr. Davis.

So one point the government makes is, on the jurisdictional question, which is, well, if you're filing new habeas actions, then if that's the triggering date, clearly you are not in custody now.  And so, I mean, is your answer that the habeas has already been filed and these are supplemental filings that relate to the large class action habeas that you have already filed, or is there another

response?

MR. GELERNT:  No, I think there is another response, but you're right, that is the first response.  I just want to -- sort of the overriding point I want to make, and then I want to get to the very specifics of it, is the government is sort of doing a catch 22.  Your Honor originally said, you know, they need to return to U.S. custody.  And the government said, well, we won't bring them back and you can't do anything from abroad because you are not in custody.  So it's a little bit of a catch 22.

But as to the specifics, I think there's two ways you can deal with it.  The first is exactly what you said, is the original complaint encompasses people getting hearings, and obviously those hearings assume that that's what would happen in the hearings, people could raise any defenses they had to the AEA designation.  So I don't think that we would be needing to file new habeas petitions.

But the other thing I wanted to say is Your Honor, I think, was very clear in your latest opinion that the constructive custody habeas was an alternative holding and that you said on page 9 of the slip opinion nothing upends my original decision that there's an equitable due process.

At the end of the day, even if Your Honor didn't want to -- or you could do alternative holdings again, even if Your Honor --

(There was an interruption by the court reporter.)

MR. GELERNT:  I'm sorry.  I know I'm talking fast.

Even if Your Honor wanted to have an additional ground to rule, it could say, the Court could say, these claims are encompassed within the original habeas petition so there doesn't need to be new habeas petitions.

But in addition, an alternative way to do it is just equitable due process complaints which don't require custody because that just goes back to the catch 22.  The government can't say you have to do habeas.  We are going to remove you without the chance to file habeases.  And then once you're out of the country, you're stuck.

So I think either way is fine probably.  Given that the government is going to appeal, it makes sense to do both.  But we certainly don't think a new habeas petition would have to be filed.  It will certainly be encompassed within the original habeas petition.  And Your Honor has obviously found constructive custody at the time of that filing.

THE COURT:  Okay.  One last issue was on the passports and identity documents.  Has there been progress on that given what the -- the government says that some of them were transferred to El Salvador in March 2025.  To the extent that any remain, defendants are prepared to turn those over upon an individual request from a counsel who

represents that individual petitioner.

I don't quite follow that since you are the lawyer who represents them all.

MR. GELERNT:  Right.

THE COURT:  But have you made the request, and have you heard anything?

MR. GELERNT:  So we have not, only because we wanted to first clear with you that we could be the counsel.  I don't understand why -- most of them don't have individual counsel.  They are out of the country.  I don't see why we couldn't be the counsel.

THE COURT:  No.  I think you represent them.

MR. GELERNT:  Right.

THE COURT:  And to the extent that you are waiting for that, you can make that request.

MR. GELERNT:  And we will.  And just to be clear, what we are hearing from individuals is some of them know that their passports got to El Salvador but then didn't travel with them to Venezuela.  So we would request that the government ask El Salvador, do you have these passports.

Some of them don't think their passports even made it to El Salvador, which would suggest that they are in DHS hands.  But we will make the request for each individual we believe has lost their passports in the transit, and hopefully the government will diligently look for it and

**JA420**

will report back to you about that.

THE COURT:  All right.  Thank you very much.

MR. GELERNT:  Thank you, Your Honor.

THE COURT:  All right.  Mr. Davis.

All right.  Why don't we just start with this last issue.  So if Mr. Gelernt makes a request for the documents and names each of the people they are requesting, if you have them, any problem with returning them?

MR. DAVIS:  Not if they are in our possession.  We will definitely look for them.  I mean, I think reaching out to El Salvador to negotiate with them is a separate sort of problem if they have them, which our understanding was at least the vast majority were transferred to El Salvador.

THE COURT:  We can discuss whether you will be required to ask El Salvador for those or make some efforts with El Salvador.

Okay.  So what's your response to Mr. Gelernt's proposal?  Again, most of your briefing talks about how there are difficulties on the ground in Venezuela, and of course, things are certainly in flux there and have changed since December when I first acted, and I want to be respectful of that.  So Mr. Gelernt is saying let's hold on for that and you can update us.

But for people who make it to a third country, what's the objection to having remote hearings or letting them file

papers?

MR. DAVIS:  I think the fundamental objection, which you touched on at the very end, and obviously noticeable that petitioners didn't answer that question until you pried it out of them and didn't address it, is the fact that they wouldn't have any jurisdiction because they are no longer in custody, and these would be separate individualized habeas filings that would require them to be in custody.

Now, I believe what my opposing counsel said was, well, this is sort of encompassed within the original habeas petition.  That's not been their position this entire time.  Our sort of understanding has always been we are facilitating their ability to file individual habeas, so those would be separate.  We don't think that those are encompassed within the original petition.

So I think that that would be a real problem in that the nature of those individualized petitions would be separate by themselves even if they were filed in this case.  And they would all end up in front of you if that was the case.  But we don't think that there's jurisdiction to necessarily just rope them all into this case.

THE COURT:  Okay.  So let's say I disagree with you either because I find it is part of the underlying petition or because I believe they have a standalone due process claim.  So if I find there's not a jurisdictional issue,

then what's the government's objection to letting them do that?

MR. DAVIS:  So can I just start with the due process point?  Your Honor recognized before that that was mutually exclusive from the constructive custody, so I don't see how that could work as a standalone.

Also, the remedy there was to facilitate them filing habeas, so I think that's sort of a step removed, and then we are back to the same problem.  And again, I think the individualized nature of these habeas petitions, and this has happened across the country, are filed individually.  Sometimes they'll file class one such as in the Fifth Circuit --

(There was an interruption by the court reporter.)

MR. DAVIS:  Yeah.

-- about the validity of the proclamation but not necessarily whether they, themselves, are members of TdA.

And then as far as if we got to that point, you know, obviously appeal and everything, I think our biggest concern would be, one, there's the due process.  You sort of raised due process concerns.

I remember in the May 7 hearing, I think this was on pages 37 and 38, opposing counsel said that they had due process concerns if we did this in Gitmo, which was Your Honor's suggestion, because they might have problems with

accessing evidence and accessing counsel.

Well, that's doubly true for any third country. We don't have any control over what happens in the third countries necessarily.

THE COURT: Right, but hold on. They're saying they were worried about their due process, that they wouldn't be able to access counsel. But here they want to go forward. So they're not saying it's going to be a problem. So if they are happy to go forward and they believe there is sufficient process, what is your problem with it?

MR. DAVIS: Well, I don't think they have conceded that there would be sufficient process. And I think in a vacuum, it's hard to know what these hearings would look like and if --

THE COURT: But if they believe it's sufficient, then my question is, what's your problem with it?

MR. DAVIS: I mean, if they are willing to concede that for all of the hearings, I would be kind of shocked if they would, I still think there are practical problems. If they are in third countries, we might have to reach out to that country in order to do it. We would have trouble providing sensitive information across unsecured lines.

For example, it's unclear whether it's within the diplomatic scope of embassies to take evidence. That's not really within the Vienna Convention for diplomatic missions.

It might have to go through the Hague Convention.  We might have to reach out to third countries.  And opposing counsel won't even say what third countries they are in, so, like, there could be various difficulties depending on the third country.  It's kind of hard to speculate in a vacuum.

THE COURT:  Right, but how about the paper filings?  That doesn't raise any of those problems.  What's the concern with permitting them to make -- to at least file and say we either aren't members of TdA or the proclamation is invalid?

MR. DAVIS:  I think a couple responses, Your Honor.  There's obviously the jurisdictional problem that I laid out, but put that aside.  I think the other issues are if it's just about the proclamation, as opposing counsel said, we think that that's before the Fifth Circuit, very likely to go up to the Supreme Court.  This would be in abeyance anyways.

I think the second problem is I'm not sure what remedy that would necessarily provide them.  So let's say that you find that the proclamation is illegal.  Well, they're still designated FTO members, and so they wouldn't necessarily come back.  And even if they did come back --

THE COURT:  Well, wait.  But didn't the Supreme Court already address that in Abrego Garcia?

MR. DAVIS:  How so, Your Honor?

**JA425**

THE COURT:  So in other words, doesn't -- the Supreme Court said, the United States alleges, however, that Abrego Garcia has been found to be a member of the gang MS-13, a designated foreign terrorist designation, and that his return to the United States would pose a threat to the public?

That's the point you are making, right?

But they said, nonetheless, quote, the district court's order properly requires the government to facilitate Abrego Garcia's release from custody in El Salvador and to ensure that his case is handled as it would have been had he not been improperly sent to El Salvador.  And, in fact, he was brought back, right?

MR. DAVIS:  Yes.  We can --

THE COURT:  So then why don't you have to do at least what the Supreme Court ordered the government to do in Abrego Garcia?

MR. DAVIS:  Well, I think part of Abrego is contesting that designation, where here, if it were just talking about the proclamation, that's not going to undo the FTO designation.

THE COURT:  Well, but here the government argued there was an FTO designation for Abrego.  And if they are not a TdA member, then you don't get an FTO designation anyway, right?

**JA426**

MR. DAVIS:  Two responses.  One, I am talking about if you just deal with the proclamation and you say the proclamation is invalid, that doesn't fix the FTO member problem.

THE COURT:  But my point was the FTO wasn't an impediment in Abrego.

MR. DAVIS:  Right.  As an individualized case, because he was contesting it, we brought him back under court order.  Obviously, if we are ordered to, we can do that.  But we see that as a separate barrier to entry.  I mean, it even takes away discretionary relief like asylum.  And so we can't just on our own bring him back for that reason.

And usually the cases where we do these sort of things are individualized.  It's kind of hard in a vacuum to know what these individuals, if they have other designations, if they have other barriers to entry, what that would look like.

THE COURT:  Right.  But you agree that given what the Supreme Court said in Abrego, if these people were illegally removed either because the proclamation wasn't valid or their due process rights were violated, then the remedy has to be the same as in Abrego, which is to bring them back and permit them to have the hearing -- to put them in the same place they were before they were illegally deported, right?

MR. DAVIS:  Again, Your Honor, we think there's a difference between doing that individually versus on a class basis.  It would sort of depend on each individual. Obviously if the Court ordered that, we could do that.

But I also don't know that that provides, if we are just talking about the proclamation, that much of a remedy to them to do that on the papers because then the remedy, if they succeed, is to bring them back and they are in detention and they are FTO members and they are sort of back in the same situation.

THE COURT:  It's an interesting issue that we have talked about and that I have raised with Mr. Gelernt at multiple hearings, which is, are you sure this is what you want.  In other words, we all agree, plaintiffs entirely concede that they are not brought back and released into the United States, that they would be brought back and they would be detained and put in the same position they were when they were improperly deported.

And so but if that's what they want, and it seems like some of them want that, isn't that appropriate to do?

MR. DAVIS:  I don't think so for all the reasons we have laid out.  I think we obviously have problems with all the remedies, but the one that is probably the least problematic would be allowing them to parole back in.  And we can do that sort of on an individualized basis or at a

**JA428**

port of entry. Then they are in custody. If they are in our custody, they surely can file habeas petitions and then that can be determined. But again, they will be in detention still. They could still be subject to Title 8 removal and --

THE COURT: Sure. And I think the point, which I made at the very first hearing in this case, is I have never said and the plaintiffs have never said that they are not deportable. The only question in this whole case is are they deportable pursuant to the AEA and the proclamation and were they given due process before they were removed. And I found they were not given due process before they were removed. I have not yet ruled on the validity of the AEA.

But all they are asking in this whole case is let us come back and proceed in immigration proceedings the same way we were before this mass deportation occurred in the middle of the night.

MR. DAVIS: My point is just I don't see what the remedy for just doing a remote hearing is when the end point is the same, especially when we have these jurisdictional problems. Even if you say the proclamation is invalid, they would just come back, end up in detention, and face all the same situations plus the fact they would still be FTO members if it's just on the proclamation.

So I don't really see how that's a particular remedy

to redress their injuries.

THE COURT:  Well, if that's what they want, if they would prefer to be back in the United States in custody going through immigration and other proceedings, that's their choice, right?

MR. DAVIS:  Sure.  But I think the way to do that if we have to take some of the options on the table, and obviously we object to all of them, would be to lower domestic barriers, parole them, not to do remote hearings, and then have to parole them later if they win anyways.

THE COURT:  If you are agreeing -- we can see what plaintiff says, but if you are agreeing that -- I guess there are two issues.  If you are agreeing that if they arrive at a U.S. port of entry, that you will parole them in and you would rather do that than remote hearings and so they can proceed with their hearings once they are here if they want to do that, that sounds fine.  So that's what you're saying?

MR. DAVIS:  We will obviously require a court order to parole people in.

THE COURT:  Sure.

MR. DAVIS:  We're not just going to do it on our own. We will obviously comply with the court order.  But yes, we think as far as the options on the table, remote hearings for legal, jurisdictional, practical problems are the worst.

**JA430**

We think letting them back in paroled through a port of entry is the easiest because that is something we have done in other circumstances.

Now, again, those other circumstances tend to be individualized.  And we don't necessarily know all the different barriers individual class members have, but --

THE COURT:  But we don't know -- but, again, you know, here we are talking about 137 people.  But, you know, as Mr. Gelernt said earlier when I asked him where we are, I mean, the term he used was a handful of people.  So I don't -- I understand your sort of concern about being overwhelmed, but practically, that doesn't sound like where we are.

MR. DAVIS:  That very well may be true, but we have never really gotten an answer from opposing counsel on who wants to come back and under what circumstances they want to come back.  So it's kind of hard, again, in sort of a vacuum without that factual basis to know what it would look like to bring these people back and then what sort of the barriers would be.

THE COURT:  But maybe just for economic and logistical reasons, they would think it's going to be much easier to get to a third country and have a hearing than it is to get to a U.S. port of entry, unless you are also willing to give them, like -- let me ask it this way.

**JA431**

Would you prefer to give them boarding letters, which again, this is one of the remedies in the immigration playbook at 11061.1, which is entitled facilitating the return to the United States of certain lawfully removed aliens.  And here we've got unlawfully removed aliens.  But to facilitate an alien's return, at 3.1, it states, to engage in activities which allow a lawfully removed alien to travel to the United States such as by issuing a boarding letter to permit commercial air trial, and if warranted, parole the alien into the United States upon his or her arrival at a U.S. port of entry.

So I guess my question is, would you prefer a boarding letter to a third country remote hearing?

MR. DAVIS:  So I understand boarding letters to be sort of a right to return, almost like a passport, not necessarily that the government pays for a ticket in particular.  That's something that has been done before as well.  But yes, we would prefer that over a remote hearing, that they come back.  We think both jurisdictionally, practically it's much more common to do that in the immigration space than it is to have remote hearings which are quite rare and typically in immigration proceedings which have a lot less formality, a lot less sort of due process protections than an Article III habeas hearing.

THE COURT:  And when we talked about the

**JA432**

proclamation, so if I rule that the proclamation invalidly invoked the AEA, I certainly think that the Supreme Court is going to hear the issue and very likely based on the Fifth Circuit's decision once that comes out.

But if such a ruling by me hypothetically issued, if that were not stayed pending Supreme Court review, then don't you agree that there would be a requirement to bring people back if they have been assuming your other objections are dealt with?

MR. DAVIS: I mean, I think putting aside the jurisdictional objections, we are kind of just back in the same situation of, like, okay, now what does the remedy look like. Do you bring them back and they're in detention for Title 8 purposes, or do we do remote hearings for immigration? Like, I think we're kind of back in the same position at that point.

THE COURT: All right. But I'm just clear that your preferred mode of operating is arrival at port of entry or boarding letter to remote hearings in third countries?

MR. DAVIS: Yes. From the options we have heard, we think that that's the one that most often happens in immigration situations. That's the one that likely requires the least outreach to foreign countries and also doesn't have the jurisdictional and due process concerns that we have with remote hearings.

Obviously we have our concerns with that as well, but out of the options, we think that that's the least problematic.

THE COURT:  Okay.  Anything else you want to respond to, Mr. Davis?

MR. DAVIS:  This isn't a particularly major point, Your Honor, but my opposing counsel sort of talked about, you know, people are concerned about whether they would be removed.  But if they are in Title 8 and have asylum claims, that sort of ameliorates that.  Even if they are in Title 8 removals, they can be sent to a third country.  So I don't think that that necessarily fixes that concern for them.

I do think with regard to CECOT, I can't rule out any options, but nobody has been sent there since March.  And the arrangement lapses quite soon, so that seems very unlikely.  Obviously there are now removal flights back to Venezuela, so that seems like the more likely outcome.

THE COURT:  Because it's a one-year arrangement, so it lapses when?

MR. DAVIS:  March, I believe, or -- yeah, early March.  And nobody else has been sent there since, I believe -- at least not TdA members.  Maybe El Salvador MS-13 people have, but not under the arrangement.

THE COURT:  All right.  And again, I agree with you if there -- I don't know the particulars of how Title 8

would proceed, but there's nothing that I can do related to this case if their determination is made at Title 8.  I agree with that.

Thank you very much.

Mr. Gelernt, let's go back to a couple of things.

Given what the government has said in terms of their preferences, I mean, maybe it's an economic issue, maybe there are other issues, but it would also seem then to avoid the jurisdictional issue if they arrive at a port of entry or issue a boarding letter, so why wouldn't those be preferred options for you as well?

MR. GELERNT:  I mean, this is obviously the first we are hearing of this.  And I don't know that the government is not going to appeal immediately even if that's what you order.  I don't hear them saying one way or the other.  But I suspect they are going to appeal that either way.

The only thing I would say is, one is, if they are going to come back, that should be at government expense. And I would just look at potentially Judge Sabraw's decision in the family separation case, Ms. L.  He issued a decision, I think, Friday where people were illegally removed, and he said -- and the government said, well, they should find their way back and pay for it themselves.  And he said, no, if you illegally remove them, you have to facilitate it and do it at government expense.

So I think we would say that that has to be in there. There has to be some ability to get them back because people are stranded in third countries. They are not going to be able to get back.

So at a minimum, if that's going to be the solution, the government needs to have what you, you know, what you suggested as boarding letters, and it would be at government expense because there's planes going back and forth all the time.

But in addition, I think given the predicament that the government has put these people in, to suggest that's the only way around it and that there can't be remote hearings, to me seems untenable. I don't really understand all the government's issues about the Hague Convention. Remote hearings are done all the time. We cited the El-Hadad case from the D.C. Circuit. There's also an Eleventh Circuit case. Remote hearings, remote testimony are done all the time whether there's an extradition treaty or not. And they certainly, as Your Honor suggested, started out on the papers.

Now, if the government actually puts in a genuine dispute of fact, maybe then you will have to decide should I do a remote hearing or should I say come back. But I do think it's unfair given the predicament the government has put these individuals in.

**JA436**

You know, in part we are being asked to put a square peg in a round hole because the government started this whole thing.  And every time we try to find a solution, the government is coming up with something, and certainly as to the due process.  I mean, this, I don't need to dwell on you.  You hit it already.  But it's a little bit rich of the government to worry about our due process rights all of a sudden.

So I would say if you want to start with the third countries --

THE COURT:  But, I mean, in trying to do this in measured steps, which has been my intent all along here, why not, starting with the filing of papers and hearings can be -- that can be sort of the next issue because, as the government says, you would certainly have to identify what the third country is.  You would also have to identify the third country -- if you want a boarding letter, you've got to tell them where they are, right?

MR. GELERNT:  Yeah, no, Your Honor.  I apologize for not being clear.  We will certainly identify the third country to the government and even to you.  I would prefer right this moment not to say it in open court if that's okay.

THE COURT:  Sure.

MR. GELERNT:  But if it has to be, you know, I will

**JA437**

do it.

THE COURT:  I understand.  Well, then why don't you -- if you can file something under seal that's available to the government and --

MR. GELERNT:  For sure.

THE COURT:  -- and me regarding the --

MR. GELERNT:  And I suspect --

THE COURT:  -- if you can tell us even number of people and particular countries, that would be helpful.

MR. GELERNT:  Yeah, no, for sure, Your Honor.  And I just -- you know, I mean, we can go through all the objections, but I have just never heard of the government not being able to hold testimony or hearings from a third country where we have full diplomatic relations.  There's the El-Hadad case from this circuit where it was Egypt.  There's -- we didn't cite it, but there's the Eleventh Circuit decision in U.S. v. Approximately $299,000, I can give you the cite, where -- that was also a situation where Judge Pryor said on the Eleventh Circuit, you know, if you don't want to bring them back, let -- the plaintiffs had forfeited the right to do remote hearings essentially, and remote hearings would have been fine.

So I don't see any of these issues really with -- starting obviously with paper filings, but even remote hearings.  But I do think at the end of the day there should

**JA438**

be the option of whether they come back or not.  And if they do come back, the government should facilitate it at their expense.

But, you know, again, I don't know whether the government is planning on, no matter what you rule, appealing, so we could be a little far down the road.

THE COURT:  We could, and it wouldn't surprise me. But again, I've got to formulate an order that is explicit and clear.  So I guess the question is you would have to then have your clients make an election, it would seem to me, which would be we would prefer to file our papers from this third country or third countries, or we would prefer a boarding letter.  And it would seem that --

MR. GELERNT:  We would be put to that.  And let me just be clear about why it's hard for me at this stage right now, but you are absolutely right, at some point, they will have to make a decision.  Because when we talk to them, they say, well -- the first thing they ask is has the court said these are options.  Because for them to get their minds around it given the trauma they have suffered is very difficult in the abstract.

And so what we have continuously said is it's a little bit of chicken and egg because the court really wants to know what you want to do, and they keep asking us what options will the court give.

**JA439**

But at some point, I think that's exactly the order we would like is let's start with third countries, give the government time on Venezuela.  Although, I think still people could file papers from Venezuela.  But put aside, the remote hearings are coming back, Venezuela, third countries, all the options, start with filing papers or coming back, and then people will have to make a choice.  And I think not everyone will make the same choice depending on their situation.

But once there's an order, we will say to our clients this is now what the judge has said are the options, and now it's time to make this election.

THE COURT:  And I will likely give you a deadline for such election, and if you want to seek an extension of that, I'm sure the government is --

MR. GELERNT:  Right.  And the only other thing I was going to mention to you, Your Honor, about deciding the threshold question of whether the AEA -- whether the proclamation is consistent with the AEA, I think what the government is going to do is say even if that shouldn't be stayed, they are going to say this is different from the Fifth Circuit because there's a threshold jurisdictional question --

(There was an interruption by the court reporter.)

MR. GELERNT:  What I was saying, sorry, a little

slower, is I think that unlike the other cases around the country where the individuals are in the country, I think that the government is going to seek a stay not only of whether the proclamation is consistent with the AEA, but unlike in the other circuits, a question about whether there's jurisdiction.

And we think it's clear that you were right on both the equitable due process and the constructive custody.  But I suspect that's how it will get framed going up.  But that's not a reason for you not to decide it by any means.  And that's our fault for not making it clear that that was the logical prior question.

THE COURT:  All right.  Thank you, both sides, very much.  I appreciate it.  I will try to get something out certainly by next week on this.  Thanks, everyone.

MR. GELERNT:  Thank you, Your Honor.

(The hearing concluded at 10:51 a.m.)

- - -

JA441

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **J.G.G.**, *et al.*,<br><br>     **Plaintiffs,**<br><br>**LIYANARA SÁNCHEZ, as next friend on behalf of FRENGEL REYES MOTA,** *et al.*,<br><br>     **Petitioners-Plaintiffs,**<br><br>     **v.**<br><br>**DONALD J. TRUMP,** *et al.*,<br><br>     **Respondents-Defendants.** | **Civil Action No. 25-766 (JEB)** |

**<u>MEMORANDUM OPINION AND ORDER</u>**

On December 22, 2025, this Court issued a Memorandum Opinion finding that the Government had denied due process to a class of Venezuelans it deported to El Salvador last March in defiance of this Court's Order.  See <u>J.G.G. v. Trump</u>, 2025 WL 3706685, at \*19 (D.D.C. Dec. 22, 2025).  The Court offered the Government the opportunity to propose steps that would facilitate hearings for the class members on their *habeas corpus* claims so that they could "challenge their designations under the [Alien Enemies Act] and the validity of the [President's] Proclamation."  <u>Id.</u>  Apparently not interested in participating in this process, the Government's responses essentially told the Court to pound sand.  See ECF Nos. 229 (Gov. Resp.), 239 (Gov. Reply).  Believing that other courses would be both more productive and in line with the Supreme Court's requirements outlined in <u>Noem v. Abrego Garcia</u>, 145 S. Ct. 1017 (2025), the Court will now order the Government to facilitate the return from third countries of those

1

<span style="color:red">**JA442**</span>

Plaintiffs who so desire.  It will also permit other Plaintiffs to file their habeas supplements from abroad.

## I.    Background

Given that the background of this case has featured in numerous prior Opinions, see, e.g., J.G.G. v. Trump, 772 F. Supp. 3d 18 (D.D.C. 2025), the Court will not retread old ground.  It notes simply that some of the 137 Venezuelans who were deported to the Center for Terrorism Confinement (CECOT) in El Salvador and subsequently released into Venezuela as part of a prisoner swap seek to further press their habeas claims.  At this week's hearing on remedies, even Plaintiffs' counsel could not represent how many of the 137 are still in Venezuela and how many wish to proceed with habeas.  Counsel nonetheless did inform the Court that at least a handful desire to go forward at this point.

Understanding that the situation in Venezuela remains in flux — given the United States's recent "law-enforcement action" there — and crediting the Government's assertion that these matters implicate foreign affairs, see, e.g., Gov. Resp. at 2 ("[T]he Secretary of State has determined that either path that the Court has suggested would risk material damage to U.S. foreign policy interests at this delicate juncture."), Plaintiffs have commendably sought measured steps from the Court.  See ECF No. 234 (Pl. Resp.) at 1.

As explained at the hearing, they are asking only that they be permitted to file supplemental habeas pleadings on behalf of certain of the 137 deported individuals, that those individuals in third countries — i.e., not Venezuela or the United States — could proceed with potential remote hearings if necessary, and that the Government provide at its expense returns to the U.S. from third countries for those so desiring.  Plaintiffs acknowledge, as they must, that anyone who is flown back or paroled into the United States after arriving at a port of entry will

2

JA443

be taken into U.S. custody during the pendency of further proceedings and would also potentially be subject to redeportation at the conclusion of their legal challenges.

Plaintiffs' prudent approach has not been replicated by their Government counterparts. Although the Supreme Court in Abrego Garcia upheld Judge Paula Xinis's order directing the Government "to facilitate and effectuate the return of" that deportee, see 145 S. Ct. at 1018, Defendants at every turn have objected to Plaintiffs' legitimate proposals without offering a single option for remedying the injury that they inflicted upon the deportees or fulfilling their duty as articulated by the Supreme Court. See Gov. Resp. at 2 ("Defendants do not believe there is any feasible way to allow class members to file habeas petitions at this time."). After extended questioning at the hearing, the Government finally represented that it prefers the return of the deportees (not, however, on its dime) to remote hearings, given its concerns with logistics and other evidentiary issues at such hearings.

## II.    Analysis

Our starting point is the Court's prior finding that the deportees were denied due process, J.G.G., 2025 WL 3706685, at *18 ("By any measure, the detainees surely fell victim to constitutionally inadequate process."), a conclusion that it has reached more than once and one consonant with the Supreme Court's earlier analysis of the issue. See A.A.R.P. v. Trump, 605 U.S. 91, 94–95 (2025). In such an instance, again according to the Supreme Court in the analogous case of Abrego Garcia, the Government must "ensure that [their] case is handled as it would have been had [they] not been improperly sent to El Salvador." 145 S. Ct. at 1018. In other words, it is up to the Government to remedy the wrong that it perpetrated here and to provide a means for doing so. Were it otherwise, the Government could simply remove people from the United States without providing any process and then, once they were in a foreign

3

country, deny them any right to return for a hearing or opportunity to present their case from abroad.

As Justice Sotomayor's separate Statement pointed out: "[T]he proper remedy is to provide Abrego Garcia with all the process to which he would have been entitled had he not been unlawfully removed to El Salvador. That means that the Government must comply with its obligation to provide Abrego Garcia with 'due process of law,' including notice and an opportunity to be heard, in any future proceedings." Id. at 1019 (statement of Sotomayor, J.) (citing Reno v. Flores, 507 U.S. 292, 306 (1993)). Indeed, she noted that "it has been the Government's own well-established policy to 'facilitate [an] alien's return to the United States if . . . the alien's presence is necessary for continued administrative removal proceedings' in cases where a noncitizen has been removed pending immigration proceedings." Id. (quoting U.S. Immigration and Customs Enforcement, Directive 11061.1, Facilitating the Return to the United States of Certain Lawfully Removed Aliens, § 2 (Feb. 24, 2012)).

Against this backdrop, and mindful of the flagrancy of the Government's violations of the deportees' due-process rights that landed Plaintiffs in this situation, the Court refuses to let them languish in the solution-less mire Defendants propose. The Court will thus order Defendants to take several discrete actions that will begin the remedial process for at least some Plaintiffs, as the Supreme Court has required in similar circumstances. It does so while treading lightly, as it must, in the area of foreign affairs. See Abrego Garcia, 145 S. Ct. at 1018 (recognizing "deference owed to the Executive Branch in the conduct of foreign affairs").

Respecting the Government's preference, as indicated at the most recent hearing, the Court will require it to parole into United States custody any Plaintiff who appears at a U.S. port of entry. This number, at least according to Plaintiffs, would likely be very small if not zero. In

4

addition, the Government shall offer a boarding letter to any Plaintiff in a third country who requests commercial air travel to the United States. See Directive 11061.1, ¶ 3.1 (defining "Facilitate an Alien's Return" as "[t]o engage in activities which allow a lawfully removed alien to travel to the United States (such as by issuing a Boarding Letter to permit commercial air travel) and, if warranted, parole the alien into the United States upon his or her arrival at a U.S. port of entry"); see also Application to Vacate Injunction at 17, Noem v. Abrego Garcia, No. 24A949 (S. Ct. Apr. 7, 2025) (acknowledging such actions are "entirely within the United States' control"). Once again, at this point, we are not talking about a substantial number of people — particularly because the Court, mindful of the previously mentioned foreign affairs concern, does not extend this requirement to deportees remaining in Venezuela — and such individuals would be detained upon arrival.

Plaintiffs also request that such boarding letter include Government payment of the cost of the air travel. Given that the Court has already found that their removal was unlawful — as opposed to the situation contemplated by the cited Directive, which notes that "[f]acilitating an alien's return does not necessarily include funding the alien's travel," Directive 11061.1, ¶ 3.1 (emphasis added) — the Court deems that a reasonable request. It is unclear why Plaintiffs should bear the financial cost of their return in such an instance. See Ms. L. v. U.S. Immig. & Customs Enf't ("ICE"), 2026 WL 313340, at *4 (S.D. Cal. Feb. 5, 2026) (requiring Government to "bear the expense of returning these family units to the United States" given that "[e]ach of the removals was unlawful, and absent the removals, these families would still be in the United States"). It is worth emphasizing that this situation would never have arisen had the Government simply afforded Plaintiffs their constitutional rights before initially deporting them.

5

Plaintiffs in third countries or in Venezuela may also file supplemental habeas pleadings seeking to show that the Proclamation under which they were deported unlawfully invoked the Alien Enemies Act and/or that they are not members of Tren del Aragua and thus not subject to the Proclamation. Whether hearings will be required and the logistics of such hearings may be determined at a future date. In addition, to the extent that the Government contends that such pleadings are independent habeas petitions for which the Court has no jurisdiction given Plaintiffs' current lack of custody, it may offer such arguments in opposition to any forthcoming filing by a Plaintiff. The Court, however, need not address this question today.

### III. Conclusion

The Court, accordingly, ORDERS that:

1. Plaintiffs shall file under seal (but not *ex parte*) by February 20, 2026, a Notice indicating which Plaintiffs are currently in which third countries;

2. Plaintiffs shall by February 27, 2026, file a Notice noting the number of Plaintiffs who wish to travel independently to a U.S. port of entry or who wish to be flown from a third country to the United States for their court proceedings, understanding that in both scenarios they will be detained upon arrival. Plaintiffs shall simultaneously file a separate Notice under seal listing the names of such individuals;

3. Plaintiffs shall by March 9, 2026, file a Notice giving the number of Plaintiffs (in Venezuela or third countries) who wish to file supplements to their habeas class petition, including challenges to the Proclamation or their identification as TdA members. Plaintiffs shall likewise file a simultaneous Notice under seal listing those individuals' names;

4. The Government shall promptly return to Plaintiffs upon written request by their

6

JA447

current counsel all passports and identification documents that any agency currently retains, and it shall make good-faith efforts to obtain any of Plaintiffs' passports or identification documents that were transferred to El Salvador; and

5. The Government shall file a Status Report by March 13, 2026, explaining how and when it will transport any Plaintiff seeking return to the United States from a third country. In that Status Report, the Government shall also inform the Court as to the feasibility of returning Plaintiffs still in Venezuela who wish to return for their proceedings. It shall also describe the steps taken to obtain any passports or identification documents from El Salvador.

/s/ James E. Boasberg
JAMES E. BOASBERG
Chief Judge

Date:  February 12, 2026

7

JA448

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

LIYANARA SANCHEZ, as next friend on behalf of
FRENGEL REYES MOTA, *et al.*,

*Petitioners–Plaintiffs*,

J.G.G., *et al.*,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, *et al.*,

*Respondents–Defendants*.

Case No: 1:25-cv-00766-JEB

**PLAINTIFFS' FEBRUARY 27 NOTICE IN RESPONSE TO ECF NO. 247**

**JA449**

JA450

Plaintiffs continue their outreach and report here on "the number of Plaintiffs who wish to travel independently to a U.S. port of entry or who wish to be flown from a third country to the United States for their court proceedings, understanding that in both scenarios they will be detained upon arrival." ECF No. 247 at 7.

There are nineteen (19) such Plaintiffs as of the date of this filing. Further details are submitted separately under seal, as ordered by the Court.

//

JA450

**In the United States District Court
for the District of Columbia**

|  |  |
|---|---|
| J.G.G. et al., | Case No. 1:25-cv-00766-JEB |
| *Plaintiffs*; | |
| LIYANARA SANCHEZ, as next friend on behalf of FRENGEL REYES MOTA, et al., | |
| *Petitioners–Plaintiffs,* | |
| v. | **NOTICE OF APPEAL** |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., | |
| *Respondents–Defendants.* | |

PLEASE TAKE NOTICE that all Respondents–Defendants appeal to the United States Court of Appeals for the District of Columbia Circuit from the following judgments of this Court and all orders merging therewith:

- Memorandum Opinion and Order of February 12, 2026 (ECF 247).

Respectfully submitted,

**Brett A. Shumate**
Assistant Attorney General

**Yaakov M. Roth**
Principal Deputy Assistant Attorney General

**Drew C. Ensign**
Deputy Assistant Attorney General

**August Flentje**
Special Counsel for Immigration

1

<span style="color:red">**JA451**</span>

s/Tiberius T. Davis
**Tiberius T. Davis**
Counsel to the Assistant Attorney General
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044-0878
(202) 514-2000
tiberius.davis@usdoj.gov

**Anthony Nicastro**
Acting Director
Office of Immigration Litigation

Dated: March 4, 2026                     *Counsel for Respondents–Defendants*

2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| J.G.G.*, et al.*, <br><br> Petitioner, <br><br> v. <br><br> DONALD J. TRUMP, *et al.*, <br><br><br> Respondents. | No. 1:25-cv-766 (JEB) <br><br><br> Declaration Of Assistant Director <br> Liana J. Castano |

**DECLARATION OF LIANA J. CASTANO**

I, Liana J. Castano, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.      I am the Assistant Director (AD) for Field Operations, within the U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO). I have held this position on a temporary basis since July 14, 2025, and since November 2, 2025, on a permanent basis. I began my employment with ICE in 2006 and have held several leadership positions within ERO, including Interim Assistant Director for the Removal Division, Assistant Director for the Law Enforcement Systems and Analysis Division, and Field Office Director for the Washington Field Office. As the AD for Field Operations, I manage ERO's 25 field offices as well as programs and initiatives to identify, arrest, prosecute, and remove removable aliens nationwide.

2.      This declaration is based upon my professional knowledge and experience, information obtained from other individuals employed by ICE, and information obtained from ICE official records.

Castano Declaration, Page 1 of 5

<span style="color:red">**JA453**</span>

3.      I am aware that the instant lawsuit has been filed regarding the removal of Venezuelan members of Tren de Aragua (TdA) pursuant to the Alien Enemies Act (AEA).

4.      I provide this declaration based on my personal knowledge, reasonable inquiry, and information obtained from various records, systems, databases, other DHS employees, and information portals maintained and relied upon by DHS in the regular course of business.

5.      On March 15, 2025, President Trump announced the Proclamation *Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua* stating that, "Evidence irrefutably demonstrates that TdA has invaded the United States and continues to invade, attempt to invade, and threaten to invade the country; perpetrated irregular warfare within the country; and used drug trafficking as a weapon against our citizens" (the Proclamation) (https://www.whitehouse.gov/presidential-actions/2025/03/invocation-of-the-alien-enemies-act-regarding-the-invasion-of-the-united-states-by-tren-de-aragua/). In the same Proclamation, President Trump announced that "all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies."

6.      Gangs remain one of the more formidable issues that corrections officials face in the management of prisons. Gangs are responsible for a disproportionate amount of prison misconduct and violence. Their continued presence challenges ongoing efforts to maintain control, order, and safety in the facilities. While all gangs disrupt the orderly administration of detention facilities, TdA represents a heightened challenge beyond what prisons in the U.S. otherwise face, given TdA's formation and history in penal institutions.

7.      TdA is not an ordinary gang. Open-source information documents the gang's history and growth over the last decade. As reported in National Public Radio's article titled, *Tren de Aragua, a criminal organization with roots in Venezuela, has roots in Venezuela, has rapidly expanded across Latin America*, TdA was founded in 2014 in the Tocorón prison, in the central Venezuelan state of Aragua, led by Héctor Rusthenford Guerrero Flores, alias "Niño Guerrero." The gang largely controlled the Tocorón prison and eventually branched out overseas. The gang's leaders fled the prison in 2023 when it was taken over by security forces. It recruited new gang members from among the 8 million Venezuelans who had fled the country's economic crisis. Initially, it established criminal cells in neighboring Colombia, Peru, and Chile, where it smuggled drugs and people and operated extortion rackets and prostitution rings. TdA's most notorious alleged crime was the 2024 killing of Ronald Ojeda, a former Venezuelan army officer who conspired against Nicolás Maduro, the country's authoritarian leader, then fled to Chile. Suspected gang members dressed as Chilean police officers abducted Ojeda from his apartment. Days later, his body was found stuffed in a suitcase and buried in cement. This history reflects more than a decade of savage criminal activity, vicious disregard for authority, and violent crimes that threaten the stability of order. TdA poses the same terrorizations in the United States as the origin countries from which they started – Venezuela, and now also to include Colombia, Peru and Chile.

8.      While in confinement in Venezuela, TdA was able to grow its numbers exponentially. Over time, they expanded operations to the United States. Multiple examples of their savagery can be found in open-source news articles highlighting the numerous abhorrent activities they have conducted while in the United States including but not limited to murder, rape, kidnapping, sex trafficking, drug trafficking, robbery, and assault. Their continued presence

Castano Declaration, Page 3 of 5

in ICE custody poses significant risks, such as the ability to recruit new TdA members. Detention of hundreds of members of a designated Foreign Terrorist Organization among other populations of aliens is an unnecessary danger to other detainees and facility staff. As a result, TdA was designated as a foreign terrorist organization and members of TdA were designated as foreign terrorists.

9. ICE maintains active partnerships with federal, state, and local law enforcement agencies, alongside international authorities, to track the expansion of TdA and share real-time intelligence.

10. ICE utilizes multi-layered vetting processes during encounters and detention stages to detect indicators of transnational criminal affiliation. Field agents are trained to identify specific physical identifiers, including distinctive tattoos, other imagery, and non-verbal signs associated with the TdA organization to confirm membership,

11. ICE conducts in-depth investigations that include reviewing criminal records, conducting interviews with suspected TdA members, identifying known TdA associates, reviewing electronic and written communications with suspected or known TdA associates, as well as documenting social media posts.

12. At least four of the 18 identified TdA members who wish to return to the United States have been the subjects of various criminal investigations. One has been investigated by Venezuelan authorities for multiple crimes including homicide, kidnapping, and firearms charges related to organized gang activity. Another TdA member, the subject of an arrest warrant, was encountered during a targeted law enforcement operation. He was able to flee his residence, from which firearms were recovered. One was arrested for smuggling illegal aliens and driving while intoxicated (DWI). And another has outstanding charges for a DWI.

Castano Declaration, Page 4 of 5

**JA456**

13.     At least eight of the subjects were identified based on their affiliation with known TdA members, either socializing or living with them. Additionally, these individuals had tattoos commonly associated with and displayed by members of TdA. Several subjects were identified following law enforcement monitoring of social media postings; the individuals posted pictures and videos depicting the subjects displaying various firearms, displaying TdA colors, and making hand signs commonly used to represent the TdA criminal organization. At least one other self-identified as a TdA member.

14.     Nor is immigration relief necessarily available. All aliens described here are subject to mandatory detention under INA § 235.  Six of the 18 are amenable to removal pursuant to the expedited removal scheme under INA § 235. One already has a final order of removal under Title 8 that remains valid. The remaining 11 aliens were placed in INA § 240 removal proceedings.

15.     Using the tools above, ICE identified each of the Venezuelan subjects of this litigation as a member of TdA. Each of these identified TdA members presented a significant threat to national security and public safety.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 9th day of March, 2026.

Digitally signed by LIANA J CASTANO
Date: 2026.03.09 21:14:28 -04'00'

Liana J. Castano
Assistant Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

LIYANARA SANCHEZ, as next friend on behalf of
FRENGEL REYES MOTA, *et al.*,

*Petitioners–Plaintiffs*,

J.G.G., *et al.*,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, *et al.*,

*Respondents–Defendants*.

Case No: 1:25-cv-00766-JEB

**PLAINTIFFS' MARCH 9 NOTICE IN RESPONSE TO ECF NO. 247**

1

JA458

Plaintiffs continue their outreach and report here on "the number of Plaintiffs (in Venezuela or third countries) who wish to file supplements to their habeas class petition, including challenges to the Proclamation or their identification as TdA members." ECF No. 247 at 6. Such supplemental filings would be done from abroad. *See id*.

Counsel has thus far been able to obtain the preferences for ninety-one (91) Plaintiffs. Since the last report to the Court on February 27, Plaintiffs' counsel received a class list of 137 class members from the Government and reached about 15 more Plaintiffs. Plaintiffs have some reason to believe the 137 is not exhaustive. Specifically, counsel notes that there are two individuals reached and their wishes reported who are not on the Government's class list. The parties are conferring about whether they are in fact class members. Counsel will continue their efforts to reach the remaining individuals; some individuals appear to still be detained in Venezuela, making it difficult to secure their preferences.

Of the 91 who have told counsel their preference, one individual has indicated he does not wish to challenge his designation by any means.

Sixty eight (68) wish to file supplements to their habeas class petition.

Additionally, Plaintiffs' counsel reported on February 27 on a separate group: nineteen (19) Plaintiffs who "wish to be flown from a third country to the United States for their court proceedings, understanding that . . . they will be detained upon arrival." ECF No. 247 at 6. Counsel reported that all nineteen are currently in Venezuela. Since that filing, counsel have contacted and obtained the preferences of three more Plaintiffs who wish to pursue return, bringing the total in

2

this group to twenty-two (22). Two of those recently reached Plaintiffs are in Venezuela and one is located in a third country. Those three individuals' names are disclosed in the sealed filing.

Finally, Plaintiffs' counsel anticipates filing a further update as we continue to try to reach the approximately fifty(50) Plaintiffs for whom we have not yet been able to obtained their preference.

//

JA460

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

LIYANARA SANCHEZ, as next friend on behalf of
FRENGEL REYES MOTA, *et al.*,

*Petitioners–Plaintiffs*,

J.G.G., *et al.*,

*Plaintiffs*,                                          Case No: 1:25-cv-00766-JEB

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, *et al.*,

*Respondents–Defendants*.

**PETITIONERS-PLAINTIFFS' RESPONSE TO RESPONDENTS-DEFENDANTS'
RENEWED MOTION TO STAY ORDER PENDING APPEAL**

JA461

Petitioners-Plaintiffs ("Plaintiffs") have informed the government that they consent to a stay if the parties agree to jointly move to expedite the appeal in the D.C. Circuit. The government has informed Plaintiffs that it accepts the proposal and will confer on a schedule.

Plaintiffs address one other matter. Plaintiffs note that the government's stay motion, ECF 256, appears to suggest that this Court's December 22 grant of summary judgment rested solely on habeas jurisdiction. Plaintiffs' understanding, however, is that the Court's December 22 ruling alternatively rested on equity due process jurisdiction, and that the Court did so precisely to avoid piecemeal jurisdictional appeals. *See* ECF 215 at 8-9 (incorporating by reference the equity jurisdictional analysis in its prior opinion and stating that the equity "pathway would remain available to Plaintiffs if habeas were not"). Accordingly, Plaintiffs respectfully request that the Court's stay ruling again make explicit that its December 22 grant of summary judgment rested on habeas and, in the alternative, on equity.

//