Public Copy—Sealed Material Deleted

[ORAL ARGUMENT NOT SCHEDULED]

**No. 26-5074**

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

J.G.G., *et al.*,

*Petitioners–Appellees*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, *et al.*,

*Respondents–Appellants*.

_____

On Appeal from the United States District Court for the District of Columbia
No. 1:25-cv-00766
Hon. James E. Boasberg

**BRIEF FOR PETITIONERS–APPELLEES**

Noelle Smith
Oscar Sarabia Roman
My Khanh Ngo
Spencer Amdur
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770

Lee Gelernt
    *Counsel of Record*
Daniel Galindo
Ashley Gorski
Patrick Toomey
Sidra Mahfooz
Sean M. Lau
Omar Jadwat
Hina Shamsi
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION

Arthur B. Spitzer
Scott Michelman
Aditi Shah
AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION OF
   THE DISTRICT OF COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800

125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org

Kathryn Huddleston*
AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION
915 15th Street, NW, 7th Floor
Washington, D.C. 20005
(212) 549-2500

*Barred in Texas and Arizona only;
supervised by a member of the D.C. Bar

*Counsel for Petitioners–Appellees*

**CERTIFICATE OF PARTIES, RULINGS & RELATED CASES**

**I.      PARTIES AND AMICI**

All parties, intervenors, and amici appearing before the district court and in this court are listed in the Respondents-Appellants' Opening Brief.

**II.      RULINGS UNDER REVIEW**

References to the rulings at issue appear in the Respondents-Appellants' Opening Brief.

**III.      RELATED CASES**

Prior or pending review of this case:

- *J.G.G. v. Trump*, Nos. 25-5067 & 25-5068 (D.C. Cir.)

- *J.G.G. v. Trump*, No. 25-5124 (D.C. Cir.)

- *J.G.G. v. Trump*, No. 25-5217 (D.C. Cir.)

- *In re Trump*, No. 25-5452 (D.C. Cir.)

- *J.G.G. v. Trump*, No. 26-5040 (D.C. Cir.)

- *Trump v. J.G.G.*, No. 24A931 (U.S.)

Related cases currently pending in U.S. Courts of Appeals or courts within the District of Columbia:

- *G.F.F. v. Trump*, No. 25-1671 (2d Cir.)

- *A.S.R. v. President of the United States*, No. 25-2311 (3d Cir.)

- *W.J.C.C. v. President of the United States*, No. 25-2332 (3d Cir.)

- *W.M.M. v. Trump*, No. 25-10534 (5th Cir.)

- *M.A.P.S. v. Garite*, No. 25-50580 (5th Cir.)

- *J.A.V. v. Trump*, No. 25-40400 (5th Cir.)

- *Arevalo Milan v. Trump*, No. 25-4866 (9th Cir.)

- *D.B.U. v. Trump*, No. 25-1164 (10th Cir.)

- *A.A.R.P. v. Trump*, Nos. 24A1007 & 24-1177 (U.S.)

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................ vii

INTRODUCTION .........................................................................................1

STATEMENT ...............................................................................................2

   A. AEA Removals and the Supreme Court's Rulings ...........................2

   B. The CECOT Petitioners.....................................................................6

   C. The District Court's Due Process Ruling...........................................8

STANDARD OF REVIEW .........................................................................9

SUMMARY OF ARGUMENT ...................................................................9

ARGUMENT ...............................................................................................12

   I. THE DISTRICT COURT HAD HABEAS JURISDICTION. ..........12

      A. "Custody" Turns on Multiple Factors. ..................................12

      B. Petitioners Were in Constructive Custody............................17

         1. Petitioners were detained at the United States' behest by an indifferent intermediary.......................................17

         2. The government removed and detained Petitioners to deny them access to U.S. courts........................................27

         3. Petitioners were released on the United States' request. ...........29

      C. The District Court Applied the Correct Legal Standards to Resolve Jurisdiction. ..................................................32

      D. Petitioners Continue to Suffer Collateral Consequences. ...................34

II.   ALTERNATIVELY, THE DISTRICT COURT MAY PROCEED IN EQUITY .................................................................................39

III.  THE CLASS IS PROPERLY CERTIFIED, AND PETITIONERS HAVE STANDING .......................................................................45

      A. Class Habeas Is Available. .................................................45

      B. Petitioners Have Standing and Satisfy Requirements for Class Certification. ....................................................................49

IV.   THE DISTRICT COURT'S REMEDIAL ORDERS WERE NOT AN ABUSE OF DISCRETION. .......................................................53

CONCLUSION .........................................................................................58

CERTIFICATE OF COMPLIANCE ....................................................................59

CERTIFICATE OF SERVICE .........................................................................60

# TABLE OF AUTHORITIES

**Cases**                                                           **Pages**

*A.A.R.P. v. Trump*,
  145 S. Ct. 1034 (2025)...................................................................................41

*A.A.R.P. v. Trump*,
  605 U.S. 91 (2025)....................................... 1, 6, 8, 9, 41, 42, 57

*Abdah v. Obama*,
  717 F. Supp. 2d 21 (D.D.C. 2010)...............................................................55

*Abrego Garcia v. Noem*,
  No. 25-1345, 2025 WL 1021113 (4th Cir. Apr. 7, 2025)........................2, 43, 54

*Abreu v. Superintendent Smithfield SCI*,
  971 F.3d 403 (3d Cir. 2020) ........................................................................38

*Abu Ali v. Ashcroft*,
  350 F. Supp. 2d 28 (D.D.C. 2004)........................................................12, 14, 22

*ACLU v. CIA*,
  710 F.3d 422 (D.C. Cir. 2013).....................................................................20

*Al Maqaleh v. Hagel*,
  738 F.3d 312 (D.C. Cir. 2013)..........................................................14, 15, 21, 27

*Armstrong v. Exceptional Child Center, Inc.*,
  575 U.S. 320 (2015)...............................................................................39, 44

*Betschart v. Oregon*,
  103 F.4th 607 (9th Cir. 2024) .....................................................................46

*Bijeol v. Benson*,
  513 F.2d 965 (7th Cir. 1975) ......................................................................46

*Blandino-Medina v. Holder*,
  712 F.3d 1338 (9th Cir. 2013) ....................................................................39

*Bonner v. Circuit Court*,
  526 F.2d 1331 (8th Cir. 1975) ....................................................................46

*Boumediene v. Bush*,
553 U.S. 723 (2008)......................................................................................16

*Braden v. 30th Judicial Circuit Court of Kentucky*,
410 U.S. 484 (1973)................................................................................13, 14

*Califano v. Yamasaki*,
442 U.S. 682 (1979)......................................................................................47

*Carafas v. LaVallee*,
391 U.S. 234 (1968)......................................................................................34

*Chong v. District Director*,
264 F.3d 378 (3d Cir. 2001) ....................................................................34, 38

*Del Cid Marroquin v. Lynch*,
823 F.3d 933 (9th Cir. 2016) ........................................................................37

*Demjanjuk v. Meese*,
784 F.2d 1114 (D.C. Cir. 1986).....................................................................44

*Dickerson v. Louisiana*,
816 F.2d 220 (5th Cir. 1987) ........................................................................15

*District No. 1 v. Liberty Maritime Corp.*,
815 F.3d 834 (D.C. Cir. 2016)......................................................................33

*DL v. District of Columbia*,
860 F.3d 713 (D.C. Cir. 2017) ...........…………………………………...51, 52

*D.S. ex rel. Ford v. Wilson*,
60 F.4th 770 (4th Cir. 2023) .........................................................................50

*El-Hadad v. United Arab Emirates*,
496 F.3d 658 (D.C. Cir. 2007)......................................................................56

*Fiswick v. United States*,
329 U.S. 211 (1946)......................................................................................34

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*,
527 U.S. 308 (1999)......................................................................................47

*Gul v. Obama*,
652 F.3d 12 (D.C. Cir. 2011)........................................................25, 26, 27, 36

*Harris v. Nelson*,
394 U.S. 286 (1969).....................................................................46, 47, 57

*Hensley v. Municipal Court*,
411 U.S. 345 (1973)...........................................................................16

*Hirota v. MacArthur*,
338 U.S. 197 (1948)......................................................................15, 16

*Hourani v. Mirtchev*,
796 F.3d 1 (D.C. Cir. 2015).................................................................24

*Hulley Enterprises Ltd. v. Russian Federation*,
149 F.4th 682 (D.C. Cir. 2025)..............................................................9

*INS v. St. Cyr*,
533 U.S. 289 (2001)...........................................................................16

*J.D. v. Azar*,
925 F.3d 1291 (D.C. Cir. 2019)..............................................................51

*J.G.G. v. Trump*,
147 F.4th 1044 (D.C. Cir. 2025)..............................................................4

*J.G.G. v. Trump*,
No. 25-5217 (D.C. Cir. Aug. 8, 2025).....................................................8, 40

*J.O.P. v. DHS*,
No. 19-cv-1944, 2025 WL 3240078 (D. Md. Nov. 20, 2025)..........................31

*Jones v. Cunningham*,
371 U.S. 236 (1963)...........................................................................16

*Kamagate v. Ashcroft*,
385 F.3d 144 (2d Cir. 2004) ...........................................................35, 37, 38

*Kirkham v. Société Air France*,
429 F.3d 288 (D.C. Cir. 2005)...............................................................33

*Kiyemba v. Obama,*
561 F.3d 509 (D.C. Cir. 2009) .............................................................24, 27, 29

*League of Women Voters v. Newby,*
838 F.3d 1 (D.C. Cir. 2016).................................................................................57

*Leitao v. Reno,*
311 F.3d 453 (1st Cir. 2002).........................................................................34, 38

*LoBue v. Christopher,*
82 F.3d 1081 (D.C. Cir. 1996)......................................................................45, 46

*Maleng v. Cook,*
490 U.S. 488 (1989).............................................................................................32

*Massachusetts v. EPA,*
549 U.S. 497 (2007).............................................................................................51

*McKenna v. Weinberger,*
729 F.2d 783 (D.C. Cir. 1984)............................................................................23

*Munaf v. Geren,*
553 U.S. 674 (2008)..................................................................................15, 16, 24

*Napier v. Gertrude,*
542 F.2d 825 (10th Cir. 1976) ............................................................................46

*Nken v. Holder,*
556 U.S. 418 (2009)..............................................................................................57

*Noem v. Abrego Garcia,*
145 S. Ct. 1018 (2025)...................................................................................53, 54

*Perez v. Greiner,*
296 F.3d 123 (2d Cir. 2002) ...............................................................................38

*Price v. Johnston,*
334 U.S. 266 (1948) .............................................................................................46

*Price v. Socialist People's Libyan Arab Jamahiriya,*
389 F.3d 192 (D.C. Cir. 2004)..............................................................................9

*Refugee & Immigrant Center for Education & Legal Services v. Mullin*, 174 F.4th 81 (D.C. Cir. 2026) .........................................11, 35, 38, 49, 50

*Respublica v. Betsey*,
1 U.S. (1 Dall.) 469 (Pa. 1789) ...................................................47

*Schick v. Reed*,
419 U.S. 256 (1974) ...................................................................29

*Schlup v. Delo*,
513 U.S. 298 (1995) ...................................................................57

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Insurance Co.*,
559 U.S. 393 (2010) ...................................................................47

*Smith v. Ashcroft*,
295 F.3d 425 (4th Cir. 2002) ......................................................37

*Spencer v. Kemna*,
523 U.S. 1 (1998) .......................................................................42

*Steinberg v. Police Court*,
610 F.2d 449 (6th Cir. 1979) ......................................................15

*Swaby v. Ashcroft*,
357 F.3d 156 (2d Cir. 2004) .............................................34, 37, 38

*Tavarez v. United States Attorney General*,
668 F.2d 805 (5th Cir. 1982) ......................................................15

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .............................................................49, 50

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ...................................................................47

*Trump v. Hawaii*,
585 U.S. 667 (2018) ...................................................................20

*Trump v. J.G.G.*,
604 U.S. 670 (2025) ...........................................5, 41, 42, 43, 44, 51

*Twelve John Does v. District of Columbia*,
117 F.3d 571 (D.C. Cir. 1997) ...........................................................52

*Umanzor v. Lambert*,
782 F.2d 1299 (5th Cir. 1986) ...............................................34, 35, 39

*United States v. Jung Ah Lung*,
124 U.S. 621 (1888)...........................................................................32

*United States v. Regenerative Sciences, LLC*,
741 F.3d 1314 (D.C. Cir. 2014) ...........................................................9

*United States v. Zubaydah*,
595 U.S. 195 (2022)...........................................................................32

*United States ex rel. Keefe v. Dulles*,
222 F.2d 390 (D.C. Cir. 1954)...........................................................16

*United States ex rel. Sero v. Preiser*,
506 F.2d 1115 (2d Cir. 1974) ...............................................46, 47, 48

*Utah v. Evans*,
536 U.S. 452 (2002)...........................................................................51

*Wilkinson v. Dotson*,
544 U.S. 74 (2005)............................................................................42

*Wye Oak Technology, Inc. v. Republic of Iraq*,
24 F.4th 686 (D.C. Cir. 2022)...........................................................23

*Zegarra-Gomez v. INS*,
314 F.3d 1124 (9th Cir. 2003) ...............................................34, 35, 38

**Statutes**

5 U.S.C § 704 ........................................................................................39

18 U.S.C. § 2339B(a)(2) ........................................................................35

28 U.S.C. § 1331 ...................................................................................39

28 U.S.C. § 2241(c)(1)...........................................................................12

28 U.S.C. § 2241(c)(3)...........................................................................12

## Rules and Regulations

90 Fed. Reg. 13033-35 ...............................................................4, 34, 35, 36, 45

Fed. R. Civ. P. 23(a)(1)-(4) ........................................................................48

Fed. R. Civ. P. 23(b) ...............................................................11, 49, 50, 51, 52

Fed. R. Evid. 803(3) ....................................................................................23

## Other Authorities

@realDonaldTrump, Truth Social (Apr. 21, 2025),
    https://perma.cc/EC4X-RKWD ...............................................................28

6 Newberg & Rubenstein on Class Actions § 18:17 (6th ed. 2025)........................52

Comisión Interamericana de Derechos Humanos ("CIDH Video"),
    https://www.youtube.com/watch?v=5zJpvgzxnwg.....................................19, 30

Decl. of Matthew Waxman, *Kiyemba v. Obama*, No. 05-cv-1509
    (D.D.C. Apr. 19, 2007), ECF 95, Exh. F .................................................25

Decl. of Paul Lewis, *Hamidullah v. Obama*, No. 12-5410 (D.C. Cir.
    Nov. 27, 2013), Doc. No. 1468218....................................................24

Decl. of Sandra L. Hodgkinson, *Gul v. Bush*, No. 05-cv-888 (D.D.C.
    Feb. 23, 2009), ECF 87-1 ...................................................................24

Entrevista Con el Consigliere de Bukele, El Grand Continent (May 6,
    2025), https://perma.cc/M7BF-TFUT .....................................................18

Gov't Application, *Trump v. J.G.G.*, No. 24A931 (Mar. 28, 2025).......................43

Lee Kovarsky & D. Theodore Rave, *Habeas Class Actions*, 139 Harv.
    L. Rev. 1501 (2026)...........................................................................46, 47

Order, *Soto Cedeno v. Blanche*, No. 24-1018 (9th Cir. May 28, 2026),
    ECF 73 ...........................................................................................55

Petitioners' Response to Stay Application, *J.G.G. v. Trump,* No. 25-
    5217 (D.C. Cir. June 16, 2025), Doc. 2120989 .................................45

Restatement (Third) of Agency § 1.01 cmt. b (2006)..................................14

Stay Application, *Noem v. Abrego Garcia*, No. 24A949 (Apr. 7, 2025) ....31, 53, 54

18A Wright & Miller, Fed. Prac. & Proc. Juris. § 4455.2 (3d ed. 2025) ................52

## INTRODUCTION

The government does not dispute that Petitioners received zero notice or opportunity to challenge their removals and that their removals were therefore unconstitutional. *A.A.R.P. v. Trump*, 605 U.S. 91, 95 (2025) (24 hours "surely does not pass muster" for due process). Instead, the government's litigation position parrots the Salvadoran President's post after Petitioners were brutally handed over to him: "Oopsie … Too late 😂." ECF 81 at 9-10 (reposted by Secretary Rubio).[1] The district court summed it up: the government, under its own logic, could "snatch anyone off the street, turn him over to a foreign country, and then effectively foreclose any corrective course of action." ECF 148 at 67.

The government asks this Court to believe it surrendered all control of Petitioners and therefore lacked constructive custody. But the district court (acting with the benefit of a more complete record after remand) correctly found that the United States was calling the shots and that El Salvador was no more than an indifferent intermediary acting, for a fee, at the United States' direction.

The government also argues that the district court erred in holding that if habeas jurisdiction were unavailable, it could alternatively provide relief in equity. In the government's view, a habeas petition is the exclusive means for Petitioners to

---

[1] All ECF references are to the district court docket, *J.G.G. v. Trump,* 1:25-cv-766-JEB (D.D.C.).

1

raise a claim that they were denied notice and an opportunity to seek habeas review in the first place. That is an extraordinary Catch-22 position for the United States to advance.

Courts have the power to remedy unconstitutional removals and regularly do so where necessary. Otherwise, the Executive Branch could act lawlessly, removing individuals through brute force, and simply outrun the courts. The district court was right to reject the government's far-reaching claim that it could unconstitutionally rush Petitioners out of the country and leave them with no recourse. *Cf. Abrego Garcia v. Noem*, No. 25-1345, 2025 WL 1021113, at *7 (4th Cir. Apr. 7, 2025) (Wilkinson, J., concurring) ("The facts of this case thus present the potential for a disturbing loophole: namely that the government could whisk individuals to foreign prisons in violation of court orders and then contend … that it is no longer their custodian, and there is nothing that can be done. … [T]his is a path of perfect lawlessness, one that courts cannot condone.").

## STATEMENT

### A.      AEA Removals and the Supreme Court's Rulings

On Friday, March 14, 2025, the President secretly signed the Alien Enemies Act ("AEA") Proclamation. JA323. That same day, the Department of Justice ("DOJ") issued an implementing memorandum describing an "immediate removal requirement," stating that AEA detainees are not entitled "to judicial review of the

removal order in any court of the United States." JA234-40. Also that day, according to a DOJ whistleblower's disclosure, then-Principal Associate Deputy Attorney General Emil Bove instructed attorneys that AEA departures would happen over the weekend and that the planes needed to take off no matter what. ECF 158-1 at 10.

Around 1:00 a.m. on Saturday, March 15, anticipating imminent removals under the AEA, five men, on behalf of a class, sought a temporary restraining order ("TRO"). JA40-42. The district court granted the TRO as to the named plaintiffs around 9:00 a.m. March 15 Minute Order 2. It scheduled an emergency hearing that evening regarding the class, March 15 Minute Order 3, over government counsel's protestations that the hearing was "premature" and that a Monday hearing would be more appropriate, ECF 205-1 at 3-4. That same DOJ counsel later acknowledged that he had been aware that the AEA planes would depart over the weekend. ECF 158-1 at 10.

Meanwhile, the government transported hundreds of Venezuelan men from a Texas detention center to the airport and loaded them onto planes, where they waited on the tarmac. ECF 81 at 4. Consistent with DOJ's March 14 memorandum, JA236, detainees either received no notice or were given English-only forms on the plane stating that they were "not entitled to a hearing, appeal, or judicial review of this notice and warrant of apprehension and removal," JA109.

Around 4:00 p.m., the government finally made the Proclamation public. 90 Fed. Reg. 13033; ECF 28-1 ¶ 5. At the 5:00 p.m. hearing, Petitioners' counsel raised concerns that AEA removal flights were imminent. ECF 20 at 12:17-25. When government counsel claimed no knowledge of whether there were flights in the next 24 to 48 hours, the court recessed to allow government counsel to determine the status of any such flights. *Id.* at 11:12-20, 13:17-25. Almost simultaneously, two planes took off with at least 137 people removable solely under the Proclamation. JA324; *see also* ECF 81 at 6. After the recess, government counsel stated he still could not provide information about any flights. ECF 20 at 16:17-21. The subsequent whistleblower disclosure stated that DOJ counsel was present when Bove said flights would depart over the weekend. ECF 158-1 at 10. Recognizing the urgency and receiving no help from government counsel, the district court issued a TRO under the Administrative Procedure Act ("APA") barring removal and dismissed Petitioners' habeas claim. ECF 20 at 22:23-25, 42:16-21; March 15 Minute Order 4.

The planes stopped at a U.S. military base in Honduras for several hours before continuing to El Salvador. *J.G.G. v. Trump*, 147 F.4th 1044, 1080 (D.C. Cir. 2025) (Pillard, J., dissenting); JA213 ¶¶ 5-8; JA216 ¶¶ 4-6. Once in El Salvador, Petitioners were deplaned and paraded into the notorious CECOT prison, where they were tortured, abused, and held incommunicado for months. JA218; ECF 148 at 2; ECF 53 at 34-35. The government subsequently told the district court that it did not

4

read the court's TRO as applying to planes outside of U.S. airspace when the order was issued. ECF 25 at 21:10-13, 23:15-16; ECF 58 at 2-4.

It quickly became apparent that many men received AEA designations based on "flimsy, even frivolous, accusations." ECF 148 at 4-5. DHS used a scoring worksheet to identify Tren de Aragua ("TdA") members based on factors such as tattoos. JA105-08. But TdA experts have explained that the criteria used by the government bear little connection to actual gang membership. ECF 102-2 ¶¶ 21-27; ECF 102-3 ¶ 14; ECF 102-4 ¶ 25; *see also* JA117 (Homeland Security Investigations Chicago field office identifying Chicago Bulls jersey as TdA identifier). Subsequent reporting indicated that approximately 75% of individuals on the March 15 flights had no criminal record in the United States or abroad, and that a substantial number entered the country legally. JA376; ECF 67-21 at Exhs. 4-18 (stories of erroneous AEA designations).

The Supreme Court vacated the TRO, holding that the government was likely to succeed in showing that AEA removals must be challenged in habeas. *Trump v. J.G.G.*, 604 U.S. 670, 671-72 (2025). The Court emphasized, however, that due process requires individuals to "receive notice … that they are subject to removal under the Act," and that such "notice must be afforded within a reasonable time and in such a manner as will allow them to *actually* seek habeas relief in the proper venue before such removal occurs." *Id.* at 673 (emphasis added).

Despite the Supreme Court's order in *J.G.G.* that AEA detainees receive meaningful notice to contest removal, the government again sought to hurriedly remove another group under the AEA, informing them that they would be removed "tonight or tomorrow." *A.A.R.P.*, 605 U.S. at 92. The next day, those men were loaded onto buses to the airport. *Id.* at 97. The Supreme Court issued a midnight administrative stay, *id.* at 93, and after full briefing issued an injunction as to the putative habeas class, enjoining their removal under the AEA. *Id.* at 98-99. The Court held, 7-2, that "[i]n order to 'actually seek habeas relief,' a detainee must have sufficient time and information to reasonably be able to contact counsel, file a petition, and pursue appropriate relief." *Id.* at 95. The Court stressed that "notice roughly 24 hours before removal, devoid of information about how to exercise due process rights to contest that removal, surely does not pass muster." *Id.*

## B.      The CECOT Petitioners

In May, a new set of named AEA Petitioners detained at CECOT filed an amended complaint and habeas petition on behalf of a class, alleging that Petitioners had been unconstitutionally removed without notice or opportunity to contest their designations or removal. JA61-100. Petitioners sought an order requiring the government to provide the process they had been denied. JA99-100. While the court acknowledged that the constructive custody question was a "close" one, it declined to find habeas jurisdiction on "the current record" and held instead that it had

jurisdiction over Petitioners' due process claim in equity. ECF 148 at 23, 31. On the merits, it found that removal without *any* opportunity to contest Petitioners' designations and removal violated due process under the Supreme Court's *J.G.G.* and *A.A.R.P.* rulings. *Id.* at 31-39. The government has never contested that merits ruling. Accordingly, the court ordered the government to facilitate the opportunity for class members to seek habeas relief. *Id.* at 67.

While the government's appeal was pending, three significant developments occurred: (1) the former Acting Deputy Director for DOJ's Office of Immigration Litigation, Erez Reuveni, who was government counsel in this case, submitted a whistleblower complaint describing the events of March 14 through 16, ECF 158-1, ECF 177-8; (2) the United Nations issued a report in which El Salvador stated that "the jurisdiction and legal responsibility for these persons lie exclusively with the competent foreign authorities [the United States]," JA189; JA193; JA197; and (3) the United States brokered a deal to free a group of Americans and political prisoners in Venezuela in exchange for transferring Petitioners—Venezuelans imprisoned at CECOT—to Venezuela. As part of this deal, the United States obtained assurances from Venezuela that it "will not impose obstacles" to the return of any of the CECOT detainees needed in U.S. courts. JA203-07; JA287-89; ECF 169 at 14:25-15:5.

Given intervening events, this Court vacated the preliminary injunction and remanded the case. Per Curiam Order, *J.G.G. v. Trump*, No. 25-5217 (D.C. Cir. Aug. 8, 2025).

## C. The District Court's Due Process Ruling

On cross-motions for summary judgment, the district court again held that equity jurisdiction would remain available "if habeas were not." JA329-30. But this time the court also found habeas jurisdiction available, citing new evidence Petitioners submitted regarding their constructive custody while at CECOT. The court "fully credited" the government's declarations, but found based on the new, more complete record that Petitioners were in constructive U.S. custody at CECOT when they filed the petition. JA330-46. The district court further held that Petitioners continue to suffer collateral consequences from their AEA designations, including the inability to enter the United States. JA346-48. The court certified a class of "[a]ll noncitizens removed from U.S. custody and transferred to the Terrorism Confinement Center (CECOT) in El Salvador on March 15 and 16, 2025, pursuant solely to the [AEA] Proclamation[.]" JA358. Citing *A.A.R.P.* and the government's failure to contest the lack of due process, the court again held on the merits that Petitioners' due process rights were violated. JA359-61.

The court ordered the government to "facilitat[e] a meaningful opportunity [for Petitioners] to contest their designation and the Proclamation's validity." JA362.

After a subsequent hearing, the court permitted Petitioners outside the United States to submit supplemental habeas filings while reserving any related jurisdictional and logistical questions. JA447. The court ordered the government to submit a status report describing (1) its plan for providing for return of Petitioners who had escaped to a third country and wished to return for habeas proceedings, and (2) the feasibility of doing so for those stuck in Venezuela. JA447-48. The government instead appealed.

## STANDARD OF REVIEW

A challenge to subject matter jurisdiction under Rule 12(b)(1) is reviewed de novo, *Hulley Enters. Ltd. v. Russian Fed'n*, 149 F.4th 682, 687 (D.C. Cir. 2025), and factual findings bearing on jurisdiction for clear error, *Price v. Socialist People's Libyan Arab Jamahiriya*, 389 F.3d 192, 197 (D.C. Cir. 2004). The Court reviews the grant of summary judgment de novo. *United States v. Regenerative Scis., LLC*, 741 F.3d 1314, 1318 (D.C. Cir. 2014). The district court's entry of a permanent injunction is reviewed for abuse of discretion and its factual findings for clear error. *Id.*

## SUMMARY OF ARGUMENT

The government understandably does not appeal the merits of the district court's decision given that Petitioners had *no* notice and opportunity to challenge their removals. *See A.A.R.P.*, 605 U.S. at 95 (24 hours' notice violates due process).

Instead, it takes the extraordinary position that the courts are powerless to remedy its (conceded) due process violation. That is untenable and lacks any support in logic or law.

**1. HABEAS JURISDICTION.** The district court properly concluded it had constructive habeas custody because the United States did not relinquish all custody over Petitioners; indeed, none of the diplomatic notes or declarations comes close to stating that the United States relinquished all custody. Rather, the record shows that the United States outsourced Petitioners' detention to El Salvador for money; that El Salvador was indifferent to the fate of the Venezuelans; and that the United States had the ability to secure their release from CECOT—and, in fact, did secure their release (after months of abuse and torture) as part of the U.S.–Venezuela prisoner swap. There is likewise no merit to the government's speculation that Petitioners do not suffer collateral consequences, given the travel and other restrictions that flow from their removal and AEA designations.

**2. EQUITY.** The district court correctly held that *if* habeas jurisdiction is not available, then it can provide relief in equity. It would make little sense for habeas jurisdiction to be the exclusive means of raising a claim that a person was denied the opportunity to file a habeas petition in the first place.

**3. CLASS ACTION.** Every circuit to address the issue, including this one, has found that a habeas class action is permissible. The government's suggestion

that habeas is inherently individualized has no basis—especially in this case, where there are obvious threshold common questions (including the right to due process) and a common remedy (an individualized hearing). Alternatively, Petitioners' equitable due-process claim can be certified under Rule 23. Contrary to the government's argument, every class member will suffer collateral consequences. Moreover, *Refugee & Immigrant Center for Education & Legal Services v. Mullin*, 174 F.4th 81 (D.C. Cir. 2026) ("*RAICES*"), confirms that every class member need not show standing in a Rule 23(b)(2) action for injunctive relief, and certainly not to *certify* the class. Further, the government's speculation about potential downstream differences among class members is irrelevant to the common legal questions that unite the class and cannot defeat class certification.

**4. REMEDY.** The district court's remedial orders were not an abuse of discretion. The court proceeded methodically, giving the government an opportunity for input at each stage. The government's amorphous foreign policy and practical objections reveal that the government is not prepared to accept any remedy for its blatantly unconstitutional actions.

# ARGUMENT

## I. THE DISTRICT COURT HAD HABEAS JURISDICTION.

### A. "Custody" Turns on Multiple Factors.

While at CECOT, Petitioners were "in custody" under 28 U.S.C. § 2241(c)(1) and (c)(3). Courts have found habeas jurisdiction under Section 2241(c) in a variety of circumstances where "the respondent was responsible for significant restraints on the petitioner's liberty." *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 47-48 (D.D.C. 2004) (collecting cases).

In *Abu Ali*, Judge Bates surveyed decades of habeas law and provided a non-exhaustive list of the various factors that courts have examined in assessing whether constructive custody exists, including:

- Whether detention is at the "**behest**" or "**direction**" of the United States where another country acts as an "**indifferent**" "**agent or intermediary**";

- Whether detention abroad is used to **prevent review** "**in a United States tribunal**";

- Whether the detainees "**would be released upon nothing more than a request by the United States**";

- The "**formal**" nature of the arrangement.

350 F. Supp. 2d at 48, 68 & n.42.

These factors allow courts to account for the different arrangements the government might employ to outsource detention and avoid the Great Writ.

Applying these factors, the district court correctly concluded that, at the time of the Amended Petition in April 2025, the United States had constructive custody of Petitioners at CECOT. *See infra* Section I.B.

The government urges this Court not to apply these factors, arguing that the "dispositive" test is whether the United States had "control" over Petitioners at CECOT, such that it could produce Petitioners "immediately" and "on command." OB.19, 21, 31. The government contends that it did not have "on command" control over the sovereign nation of El Salvador and therefore lacked constructive custody.

But no case requires that type of complete, immediate, on-command control to establish constructive custody. And for good reason. One sovereign will never have complete control over another, absent a military invasion. *See also* ECF 148 at 19-20. If the test for habeas jurisdiction required *complete* U.S. control, the United States could evade the reach of the Great Writ simply by contracting with foreign nations to outsource U.S. detention. No case supports that result or the government's manufactured test.

Indeed, the Supreme Court has found habeas jurisdiction where two sovereigns share custody. In *Braden v. 30th Judicial Circuit Court of Kentucky*, 410 U.S. 484, 485-86 (1973), the Court held that a detainer issued by Kentucky for an Alabama prisoner was sufficient to find habeas custody. Alabama was acting as Kentucky's "agent" and was "presumably indifferent" to petitioner's legal challenge

in Kentucky. *Id.* at 498-99. The two sovereign states thus had shared custody: Alabama had physical custody, while Kentucky had constructive custody by virtue of the detainer. But plainly Kentucky could not produce the prisoner "on command" if Alabama chose not to comply with the request. And contrary to the government's suggestion, OB.19, nothing in *Braden* or *Abu Ali* requires a formal principal–agent relationship. *See Abu Ali*, 350 F. Supp. 2d at 41, 48-49 (custody where respondents work through an "intermediary"); *cf.* Restatement (Third) of Agency § 1.01 cmt. b (2006) ("[M]any cases use agency terminology when the underlying relationship falls outside the common-law definition.").

This Court has likewise recognized that habeas jurisdiction may attach where two sovereigns share custody. In *Al Maqaleh v. Hagel*, the United States filed a declaration stating that it had relinquished "*all* legal and physical custody and control" of a petitioner in detention in Pakistan. 738 F.3d 312, 322 (D.C. Cir. 2013) (emphasis added), *judgments concerning other petitioners vacated as moot sub nom.*, *Al Najar v. Carter*, 575 U.S. 908 (2015). The United States no more had on-command control over Pakistan than it does El Salvador. Yet this Court remanded for further factfinding, framing the constructive custody test as whether the detainee was in the "*sole* custody of the government of Pakistan." *Id.* at 323 (emphasis added). It did so, moreover, even though the government's declaration there was unequivocal about the transfer of custody—unlike the ones submitted in this case.

*Infra* Section I.B. Under *Al Maqaleh*, if the U.S. government retains some custody or control, jurisdiction attaches.[2]

The government incorrectly seeks support from *Munaf v. Geren*, where the Court found custody because the United States had "the power to produce" petitioners. 553 U.S. 674, 686 (2008); *see* OB.19. Here, as discussed below, the United States plainly did have the power to produce Petitioners, and in fact did secure their release from CECOT through the prisoner swap. But insofar as the government claims that *Munaf* stands for the view that there must be complete "on command" custody, that is wrong. *Munaf* nowhere says that is the test for custody, much less the dispositive one. Indeed, *Munaf* did not address *constructive* custody at all, because there petitioners were "in the immediate 'physical custody' of American soldiers who answer[ed] only to an American chain of command." *Id.* at 685. *Munaf* was therefore a straight case of actual U.S. custody, not constructive custody.

The government's other cases are equally far afield. OB.20-21. In *Hirota v. MacArthur*, 338 U.S. 197 (1948) (per curiam), petitioners were convicted by the

---

[2] *See also*, *e.g.*, *Dickerson v. Louisiana*, 816 F.2d 220, 225 (5th Cir. 1987) ("[T]he federal government was acting as the agent of Louisiana when it held [the habeas petitioner] pursuant to the Louisiana detainer."); *Steinberg v. Police Ct.*, 610 F.2d 449, 453 (6th Cir. 1979) (sufficient for constructive custody that "imprisoning sovereign is the respondent's agent"); *cf. Tavarez v. U.S. Att'y Gen.*, 668 F.2d 805, 809 (5th Cir. 1982) ("A sovereign does not lose its power to keep a convict in custody by turning the convict over to another sovereign for service of a sentence.").

International Military Tribunal for the Far East, which was "not a tribunal of the United States," and thus its sentences were not subject to review by U.S. courts. In stark contrast, Petitioners here were not sought—let alone convicted—by El Salvador.[3] *See also Munaf*, 553 U.S. at 686 (declining to rely on *Hirota*: "[t]hat slip of a case cannot bear the weight the Government would place on it"). Similarly, in *United States ex rel. Keefe v. Dulles*, 222 F.2d 390 (D.C. Cir. 1954), the petitioner was convicted and sentenced under French law by a French court for stealing a taxicab in France. This Court held only that any failure to "prevent[] the French" from convicting Keefe was not enough to make U.S. respondents proper habeas custodians. *Id.* at 391-92.[4]

In short, the government gets the legal test wrong. Looking at all the relevant factors, as the district court did, leaves no doubt the United States had constructive custody. But even under the government's manufactured test, there was custody. The

---

[3] ██████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████

[4] The government cites Suspension Clause cases to suggest that Petitioners must show U.S. government control over the CECOT prison itself. OB.20-21 & n.11. That is a misunderstanding of those cases. *See, e.g., Boumediene v. Bush*, 553 U.S. 723, 766-71 (2008) (using multi-factor test). Regardless, constitutional and statutory habeas are distinct. ECF 148 at 18-19. The government likewise errs in arguing that Section 2241 should conform to "historical habeas." OB.21 n.11. While habeas was historically a broad remedy, *INS v. St. Cyr*, 533 U.S. 289, 301-02 (2001) (habeas used "to emancipate slaves" and "obtain the freedom of apprentices"); *Jones v. Cunningham*, 371 U.S. 236, 238-40 (1963) (similar), the remedy has expanded even further under Section 2241, *Hensley v. Mun. Ct.*, 411 U.S. 345, 349-50 (1973).

United States not only could have secured Petitioners' release (as evidenced by their release), but it could have done so immediately with one phone call from President Trump, who said that was all it would have taken to return Abrego Garcia. JA341.

## B. Petitioners Were in Constructive Custody.

### 1. Petitioners were detained at the United States' behest by an indifferent intermediary.

The evidence shows that El Salvador was acting as an indifferent agent for the United States. The United States unilaterally chose Petitioners; Petitioners were all Venezuelan; none were sought by El Salvador; ███████████████████ ███████████████████████ and it paid El Salvador millions for that purpose. ███████ JA222-27. Critically, moreover, the carefully worded diplomatic notes and State Department declarations outlining the arrangement conspicuously avoided stating that the United States relinquished complete control. JA226-30; JA309-19; JA468-72. This evidence stands in stark contrast to past instances where the United States sought to transfer all custody. *See infra* at 24-25.

Despite this evidence, the government claims that it lost all custody after handing Petitioners over to El Salvador, that it did not "direct[]" their detention, and that El Salvador made a unilateral decision to detain them. OB.29. But the record shows that the U.S. government paid for Petitioners' detention. It did not relinquish all control, simply choosing to pay for whatever El Salvador decided on its own to do with *Venezuelans* exclusively selected and labeled by the *United States* as enemy

17

aliens of the *United States*—and whose detention was highly publicized by the *United States* to threaten other immigrants with the same fate.

**a.** The diplomatic notes pointedly state that El Salvador agreed not only to "accept," but also to "accommodate," hundreds of TdA members. JA226; *see also* JA228. El Salvador's Vice President explained that the country provides "services" to nations and the service to the United States is a "prison accommodation," elaborating that "[t]he quality of the inmates or the person coming is not assessed by El Salvador; it is assessed by the state requesting the service."[5]

In a U.N. report (which surfaced *after* the district court's original constructive custody ruling), Salvadoran officials further confirmed that El Salvador simply "facilitated the use of the Salvadoran prison infrastructure." JA189; JA193; JA197; JA201. The government contends that the report refers only to removals, not detention, OB.34-35, but the face of the report shows otherwise, JA189 (explaining that Salvadoran prison infrastructure was being used "for the custody of persons detained within the scope of the justice system and law enforcement of" the United States); JA193; JA197; JA201. Similarly, the government's bald suggestion that El Salvador's statements were materially "edited" by the U.N., OB.34, is baseless. The

---

[5] Entrevista Con el Consigliere de Bukele, El Grand Continent (May 6, 2025), https://perma.cc/M7BF-TFUT (cited in Pet's.' Sealed Resp. to Juris. Discov. at 7, ECF 145). English version submitted as attachment to concurrently filed unopposed Motion to Supplement the Record.

government additionally seeks to undermine the report on the ground that the statements were made by an "unknown" yet supposedly "low-level" official. OB.34-35. But that official spoke to the U.N. on behalf of the Salvadoran government. JA189; JA193; JA197; JA201.[6]

Moreover, the arrangement between the two countries contemplated payment of at least $4.76 million. JA222. A U.S. grant letter explained that "[t]he purpose of this grant … is to support costs related to *detention* of members of TdA[.]" JA224 (emphasis added). ███████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████ A U.S. diplomatic note to El Salvador referenced the "treatment of prisoners," underscoring that detention was always the plan. JA226.

---

[6] The government criticizes the district court for ignoring the State Department's "testimony" to a different international body. OB.35. But those statements came three months after the Amended Petition's filing, and there U.S. officials relied on the *district court's* prior determination that the government lacked custody. *See* Comisión Interamericana de Derechos Humanos ("CIDH Video"), at 36:47-37:11, https://www.youtube.com/watch?v=5zJpvgzxnwg. Nor is there any evidence that the statements were made under oath.

Public statements by high-level officials likewise confirm that El Salvador detained Petitioners at the United States' behest. Secretary Rubio stated that "El Salvador has agreed to hold [alleged TdA members] in their very good jails at a fair price that will also save our taxpayer dollars." JA138. President Bukele posted that El Salvador "offered the United States of America the opportunity *to outsource part of its prison system*," and that the United States "will pay a very low fee" to detain alleged TdA members at CECOT. JA148 (emphasis added).

Then-Secretary Noem engaged in a highly publicized tour of CECOT, stating that the Salvadoran prison is "one of the tools in our toolkit." JA154; *see also* JA255 (similar statement by DHS spokesperson). Secretary Noem also stated: "If you do not leave, we will hunt you down, arrest you, and you could end up in this El Salvadorian prison." JA165; *see also* JA247 ("If you are in America illegally, you could find yourself in CECOT[.]"); JA252. As the district court observed, if El Salvador had complete discretion over the individuals sent there, a U.S. official could not ensure that an individual removed to El Salvador would be imprisoned in CECOT. JA337-38.

The government claims that these official statements are "not sound evidence." OB.28 (citing *Trump v. Hawaii*, 585 U.S. 667, 701-02 (2018)). Courts routinely rely on such public statements, however. *See, e.g.*, *ACLU v. CIA*, 710 F.3d 422, 429 (D.C. Cir. 2013) (public statements by President and advisor "le[ft] no

20

doubt" about U.S. involvement in drone strikes). In *Trump v. Hawaii*, the Court considered the President's statements; it simply concluded that those statements did not, under rational basis review, fatally undermine a policy with a "legitimate grounding." 585 U.S. at 701-02, 705-06.

The evidence leaves no doubt that Petitioners were detained at the United States' behest. It likewise shows that the United States did not relinquish complete control to El Salvador. The diplomatic notes, for example, provided that El Salvador would "accommodate" Petitioners "for a duration of one year unless or until a determination concerning their long-term disposition is made." JA226; *see also* JA228. El Salvador was thus not free to dispose of Petitioners however it chose, because the agreement precluded El Salvador from releasing Petitioners prior to a decision on their long-term disposition. *See Al Maqaleh*, 738 F.3d at 323 (remanding for consideration of whether Pakistan would have "sole custody" of petitioner).

The government argues that "[t]he year-long period would allow the two countries to review the arrangement as necessary[.]" OB.28. But that proves the point: the U.S. government had an ongoing role in Petitioners' custody. The government additionally argues that "[t]he United States clarified during the development of the notes that it would retain no decision-making authority." OB.27. But that is not what the notes say. The original note from El Salvador referred to a commitment to "house these individuals for one (1) year pending the United States'

21

decision on their long-term disposition." JA469 ¶ 4. El Salvador later issued a new note, replacing "United States' decision" with "further decisions," JA470 ¶ 5—but it conspicuously declined to specify that the decision would be El Salvador's *alone*, JA226-28 (emphasis added); *see also* JA222 (grant letter).[7] If El Salvador had complete authority over Petitioners, there would have been no reason to reference "further decisions" at all. Regardless, the "one year" term in the diplomatic notes shows that El Salvador was not free to dispose of Petitioners as it wished.

The government characterizes the notes as "nonbinding," OB.7, but the "formal" nature of the agreement supports constructive custody regardless of its legally binding character, *Abu Ali*, 350 F. Supp. 2d at 68 n.42.

Consistent with the diplomatic notes, El Salvador also told the U.N. that "the jurisdiction and legal responsibility for these persons l[ay] exclusively with the competent foreign authorities." JA189; JA193; JA197; JA201 (Salvadoran prison was used "for the reception and custody of persons detained within the scope of the justice system and law enforcement of [the United States]"). Petitioners themselves received the same message while detained at CECOT, including from the CECOT Director. JA211 ¶¶ 3-6; JA213 ¶¶ 9-10; JA216 ¶¶ 7-8; JA218 ¶ 3. The government argues these statements are hearsay, OB.34-35, but they are admissible evidence of

---

[7] On June 4, 2026, on the parties' joint motion, the district court unsealed the Kozak Declaration, JA468-72, in its entirety, ECF 263.

El Salvador's intent to detain Petitioners until the United States said otherwise. *See, e.g., McKenna v. Weinberger*, 729 F.2d 783, 792 (D.C. Cir. 1984) (evidence used "to illuminate … motives and actions" was "not hearsay"); *see also* Fed. R. Evid. 803(3).

The government points to "contemporaneous documents" ▮▮▮▮▮ ▮▮▮▮▮ that the district court did not address. OB.23. ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮

The government additionally argues the Court cannot consider "the intentions of foreign sovereigns." OB.25. That is incorrect. *See, e.g., Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686, 697 (D.C. Cir. 2022). Here, the district court did not "psychoanalyze" foreign officials, OB.32; instead, it looked to objective facts to assess whether the U.S. government appears to be outsourcing its detention

---



apparatus. The government's cases, OB.25, are inapposite. Unlike in *Hourani v. Mirtchev*, 796 F.3d 1, 11-12 (D.C. Cir. 2015), which concerned the "Act of State" doctrine, the district court here did not need to evaluate the *validity* of El Salvador's acts. In *Munaf*, the Supreme Court simply declined to second-guess the executive branch's conclusion that the Iraqi prison facilities met international standards. 553 U.S. at 702. And in *Kiyemba v. Obama*, this Court expressed concern about "shield[ing]" petitioners from the foreign sovereign's criminal justice system and the related judicial inquiry into that system. 561 F.3d 509, 515-16 (D.C. Cir. 2009). Here, in contrast, Petitioners were not seeking to "compel[] the United States to harbor fugitives from the criminal justice system of a sovereign with undoubted authority to prosecute them." *Id.* at 516 (quoting *Munaf*, 553 U.S. at 697).

**b.** Contrary to the government's suggestion, OB.21-22, the district court gave full credit to the declaration by State Department official Michael Kozak ("Kozak Declaration"), but correctly concluded that it came nowhere near establishing that the United States relinquished all custody. JA342-43. As the district court explained, when the United States wishes to cede all control, it states so clearly. JA335 (collecting cases); *see, e.g.*, Decl. of Paul Lewis ¶ 3, *Hamidullah v. Obama*, No. 12-5410 (D.C. Cir. Nov. 27, 2013), Doc. No. 1468218 (United States "relinquish[ed] all legal and physical custody and control"); Decl. of Sandra L. Hodgkinson ¶ 5, *Gul v. Bush*, No. 05-cv-888 (D.D.C. Feb. 23, 2009), ECF 87-1 ("[T]he detainee is

transferred entirely to the custody and control of the other government, and once transferred, is no longer in the custody and control of the United States … ."); Decl. of Matthew Waxman ¶ 5, *Kiyemba v. Obama*, No. 05-cv-1509 (D.D.C. Apr. 19, 2007), ECF 95, Exh. F (same).

In contrast, Kozak merely states: the "detention and ultimate disposition of those detained in CECOT and other Salvadoran detention facilities are matters within the legal authority of El Salvador in accordance with its domestic and international legal obligations." JA182 ¶ 9. In other words, the detention was consistent with Salvadoran law. That heavily lawyered and vague language says nothing about whether the United States *also* had a say in these "matters." Given that Kozak had clear blueprints for relinquishing "all legal and physical custody and control" (*Hamidullah*), and for transferring custody and control "entirely" to El Salvador (*Gul*), the absence of similar language is telling. Remarkably, Kozak's declaration is also limited to his "understanding," which appears to be based on public events. JA182 ¶¶ 9, 10.

Notably, the government had previously filed an even more modest declaration from Deputy Secretary of State Christoper Landau, which stated only the obvious: that El Salvador "makes its own sovereign decisions, including with respect to detention." ECF 108-1 ¶ 3. Petitioners noted the inadequacy of that declaration and the fact that it looked nothing like the declaration in *Gul v. Obama*, 652 F.3d 12,

25

18 (D.C. Cir. 2011), the case on which the government relies so heavily, OB.21-22; ECF 111 at 4. Several days later, the government responded with the Kozak Declaration. ECF 118. The Kozak Declaration was thus the government's second bite at the apple, and yet it still did not state that Petitioners had been "transferred entirely to the custody and control" of El Salvador. *Gul*, 652 F.3d at 18.

The two other declarations on which the government relies, drafted for different cases and filed months after Petitioners' Amended Petition, fail to move the needle. OB.21; JA310-19. As the district court observed, neither "contains any statement that the United States relinquished all control over Plaintiffs or that El Salvador was solely responsible for them." JA344. A second Landau Declaration states only that Venezuelan detainees "were in the custody of El Salvador"— obviously true insofar as El Salvador had *physical* custody. JA310 ¶ 4. The declaration's statement that "El Salvador had sovereign discretion over their ultimate disposition," *id.*, is likewise consistent with El Salvador's *physical* custody of Petitioners and the United States' constructive custody in April 2025. Secretary Rubio's Declaration (first submitted in *Abrego Garcia*) relies on the *district court's* prior legal conclusion concerning custody and cannot be credited as an independent evaluation of U.S. custody, much less viewed as dispositive evidence. JA316 ¶ 2.

In short, the declarations do not come close to demonstrating that the United States had ceded complete custody. But even if they had contained clearer

statements, they would not be entitled to conclusive weight given Petitioners' contrary evidence. *See Kiyemba*, 561 F.3d at 515 n.7 (relying on government's representations in declarations "*in the absence of contrary evidence*," and noting the "detainees' failure to present anything that contradicts them" (emphasis added)); *Gul*, 652 F.3d at 18 ("credit[ing]" government declaration but not treating it as conclusive); *Al Maqaleh*, 738 F.3d at 323 n.5 (explaining that government declaration would be sufficient evidence if detainee's evidence "fails to impugn [its] accuracy").

### 2. The government removed and detained Petitioners to deny them access to U.S. courts.

The government sought to deny Petitioners access to U.S. courts twice over. Not only did the government invoke the AEA to circumvent Petitioners' rights in immigration proceedings, but it also summarily removed Petitioners before any federal court could review the government's unprecedented peacetime use of the AEA, or even whether Petitioners were TdA members in the first place.

During the presidential campaign, Stephen Miller endorsed use of the AEA because it "allows you to suspend … due process" and "to instantaneously remove any non-citizen foreigner from an invading country age 14 or older." JA273 (criticizing removal proceedings for giving noncitizens access to "federal Article III appellate courts"). Similarly, President Trump has justified his reliance on the AEA on the theory that "[w]e cannot give everyone a trial, because to do so would take,

without exaggeration, 200 years." @realDonaldTrump, Truth Social (Apr. 21, 2025), https://perma.cc/EC4X-RKWD.

According to a former DOJ attorney's whistleblower evidence, DOJ leadership told lawyers that if courts attempted to block AEA removals, the government would need to consider telling the courts "fuck you." ECF 158-1 at 10; *see also* ECF 177-8 at 7. With the knowledge of AEA transfers over the weekend and the directive "that the planes needed to take off no matter what," ECF 158-1 at 10, DOJ counsel nonetheless told the district court early on March 15, 2025, that a weekend hearing was "premature," ECF 205-1 at 3-4. *See also* ECF 20 at 11:12-20 (statements by arguing attorney that he had no information about the planes' departure time); ECF 158-1 at 10, ECF 177-9 at 9 (contrary evidence). Between the due process violations, the flight timing, and the whistleblower evidence, the record here overwhelmingly shows that the government sought to outrun judicial review, as the district court correctly held. JA339-40.[9]

---

[9] The district court found it "less clear" that Petitioners' detention (as opposed to removal) was motivated by the government's desire to escape judicial review. JA340-41. But that is immaterial here given the government's intention to detain Petitioners at CECOT and its position that Petitioners could not seek review from Salvadoran custody (even assuming Petitioners had access to the outside world, plainly an impossibility from CECOT). In this context, "removal" and "detention" are part and parcel of the same scheme to deny access to U.S. courts.

The government resorts to arguing that an intent to deprive Petitioners of access to the courts has "no bearing on control over the petitioner." OB.24-25. But it is entirely appropriate for the Court to consider efforts to thwart judicial review given the centrality of the Great Writ to the preservation of liberty. The government's intent to evade the courts bears directly on the credibility of its claims that it did not retain control. Indeed, this Court has warned against the government's use of a "ruse … designed to maintain control over the detainees beyond the reach of the writ," *Kiyemba*, 561 F.3d at 515 n.7; *see also Schick v. Reed*, 419 U.S. 256, 260 (1974) ("abuse" to "transport[] a prisoner overseas to evade the Habeas Corpus Act" and thus "drain the Great Writ of its vitality"). The government's shell game continues today, as it seeks to prevent Petitioners from vindicating their rights.

### 3.     Petitioners were released on the United States' request.

Any doubt about U.S. custody over Petitioners is eliminated by the fact that the United States ultimately did get them released. In July 2025, U.S. officials arranged Petitioners' transfer from CECOT to Venezuela in a prisoner swap. In return, ten Americans detained in Venezuela were released. JA296; JA300 (article reporting email from Kozak stating that "we did ask for and receive 10" Americans). ICE official Mellissa Harper stated about the swap: "As part of these negotiations, *the United States* obtained assurances *from the Maduro regime*"—underscoring the direct negotiations between the United States and Venezuela. JA206 ¶ 9 (emphasis

added); JA312 ¶ 8. There is no indication that any Salvadorans were released, or that El Salvador received any payment from the Maduro regime. The United States' central role in the U.S.-Venezuela prisoner swap, the direct benefits it received, and the use of Petitioners as human bargaining chips leave no doubt that the United States retained constructive custody and control.

The government concedes, as it must, that the United States "had involvement in negotiating [the deal] and obviously got the return of prisoners out of it." JA342 (quoting transcript). The government further concedes that the United States "secured" Petitioners' release, notwithstanding "complicated negotiations." OB.33. The State Department presentation does not alter this conclusion. OB.31. As to the prisoner swap, the State Department employee acknowledged that the United States "urged" the swap, but asserted that it was El Salvador's "decision[] … to make." CIDH Video at 38:20-38:34. That bare assertion says nothing about the *United States'* role in negotiating, approving, and securing the deal. In fact, the official described the assurances the *United States* obtained from Venezuela and noted that U.S. aircraft picked up Americans held in Venezuela. *Id.* at 38:34-39:10.

████████████████████████████████████████

████████████████████

Similarly, the government acknowledges that it secured Abrego Garcia's release from CECOT, but again claims that it took some time and effort. OB.31. In the government's view, if it had constructive custody, it could have secured his release "immediately," *id.*, and "on command," OB.19. But, as explained, that is not the test. *Supra* Section I.A. Notably, in *Abrego Garcia*, the Supreme Court upheld the district court's order to "facilitate" release and did so despite the government's emphatic statement that "neither a federal district court nor the United States has authority to tell the Government of El Salvador what to do." Stay App. at 13, *Noem v. Abrego Garcia*, No. 24A949 (Apr. 7, 2025) ("*Abrego Garcia* App."). Moreover, Abrego Garcia was a *Salvadoran national* in whom El Salvador obviously had a greater interest. And the United States did in fact secure his release.[10]

The government faults the district court for "second-guessing" El Salvador's "motives" for the prisoner swap that led to Petitioners' release. OB.32. But the

---

[10] That *some* members of Congress were denied a visit to CECOT, JA182-83 ¶ 10; OB.23, says nothing about *Executive Branch* control over Petitioners—particularly given then-Secretary Noem's highly publicized tour, JA155, 165. The government also cites the timeline for release of the J.O.P. plaintiff. OB.23, 31. But Respondents have refused to say whether they even *requested* his release apart from the U.S.–Venezuela prisoner swap. *J.O.P. v. DHS*, No. 19-cv-1944, 2025 WL 3240078, at *6 (D. Md. Nov. 20, 2025) (court "s[aw] no evidence that the United States government ever made a good faith request to the government of El Salvador for [plaintiff's] return"); JA311-12.

district court's analysis was based on the objective facts, and the government's *own* concessions show that its negotiations secured Petitioners' release. Regardless of what El Salvador did or did not obtain from the deal, those concessions establish the government's ongoing custody.

* * *

El Salvador behaved like, and was, an indifferent intermediary doing the United States' bidding for money—essentially the same as a private prison operator contracted by the government. *Cf. United States v. Jung Ah Lung*, 124 U.S. 621, 626 (1888) (habeas action could proceed where immigrant held by private party at direction of the United States). The government's claim that it ceded all control to El Salvador blinks reality. "There comes a point where we should not be ignorant as judges of what we know to be true as citizens." *United States v. Zubaydah*, 595 U.S. 195, 237-38 (2022) (Gorsuch, J., dissenting).

### C.    The District Court Applied the Correct Legal Standards to Resolve Jurisdiction.

The government argues that, in granting summary judgment, the district court erred by viewing the jurisdictional facts in the light most favorable to Petitioners. OB.36-38. That is wrong for two reasons.

First, because the issue was one of jurisdiction, the district court properly noted that the Rule 12(b)(1) standard rather than the summary judgment standard applied. *See, e.g.*, *Maleng v. Cook*, 490 U.S. 488, 493-94 (1989) (custody relates to

"subject-matter jurisdiction of the habeas court"); *Dist. No. 1 v. Liberty Mar. Corp.*, 815 F.3d 834, 839, 842 (D.C. Cir. 2016) (affirming summary judgment for plaintiff, noting that court had to first "address [defendant's] challenge to the district court's jurisdiction," and reciting Rule 12(b)(1) standard); *Kirkham v. Société Air France*, 429 F.3d 288, 291 (D.C. Cir. 2005) (treating motion for summary judgment as motion to dismiss because the issue was jurisdictional).

Second, and in any event, the district court did not resolve facts but properly concluded that there was no dispute of material fact and that the constructive custody determination turned on the "legal significance" of those facts. JA332. For instance, the government claims the district court "reinterpreted" the diplomatic notes and "cabined" their declarations. OB.37. But as noted, the court took them at face value and concluded that they failed to state that the United States relinquished all custody, in direct contrast to prior instances in which the United States *had* done so. *Supra* Section I.B.1. The government simply disagrees with the district court's conclusion that the notes and declarations were legally insufficient to establish that custody had been transferred in its entirety.[11]

---

[11] If this Court concludes that summary judgment for Petitioners was error, the case should be remanded for further discovery, especially given the government's woefully inadequate production. *See, e.g.*, Pet'rs' Sealed Resp. at 15-20, ECF 145 (cataloging deficiencies in Respondents' production).

**D. Petitioners Continue to Suffer Collateral Consequences.**

The district court correctly found that Petitioners' cases are not moot because they continue to suffer collateral consequences, including travel restrictions and ineligibility to seek asylum. *See* JA346-48.

Habeas petitioners no longer in custody retain live claims if collateral consequences remain. *See, e.g.*, *Carafas v. LaVallee*, 391 U.S. 234, 237-38 (1968). Courts recognize a wide array of collateral consequences. *See, e.g.*, *id.* (business restrictions; voting disqualification; ineligibility to serve in labor union or on jury); *Fiswick v. United States*, 329 U.S. 211, 221-22 & n.7 (1946) ("hazards of deportation," including under AEA; ineligibility to naturalize).

Among other disabilities, the AEA Proclamation prohibits Petitioners from attempting to enter the United States, makes them liable to detention and removal if found here, and prohibits them from obtaining residence. JA346-47; 90 Fed. Reg. 13034-35, §§ 1, 3, 6(a)-(b). Courts routinely recognize similar restrictions as collateral consequences. *See, e.g.*, *Zegarra-Gomez v. INS*, 314 F.3d 1124, 1127 (9th Cir. 2003) ("inability to seek to return to the United States"); *Umanzor v. Lambert*, 782 F.2d 1299, 1301 (5th Cir. 1986) (prohibition on being "found in the United States"); *Leitao v. Reno*, 311 F.3d 453, 456 (1st Cir. 2002); *Swaby v. Ashcroft*, 357 F.3d 156, 160 (2d Cir. 2004); *Chong v. Dist. Dir.*, 264 F.3d 378, 385 (3d Cir. 2001).

The government has made clear its intention to treat Petitioners as inadmissible under the INA as well. JA400 (citing 8 U.S.C. § 1182(a)(3)(B)(i)).

Barring Petitioners' entry also prevents them from seeking asylum. With limited exceptions, the INA "guarantees the right to apply for asylum." *RAICES*, 174 F.4th at 94 (citing 8 U.S.C. § 1158(a)). But asylum cannot be sought unless one is "present or arriving" in the United States. *Id.* at 106. Additionally, because the terrorism-related inadmissibility grounds may also prevent a person from applying for asylum, Petitioners are "prevented from applying for asylum as a result of their [TdA] designation." JA347 (citing 8 U.S.C. § 1158(b)(2)(A)(v)). The inability to apply for an immigration benefit is a clear collateral consequence. *See, e.g.*, *Zegarra-Gomez*, 314 F.3d at 1127 (ineligibility for cancellation of removal); *Kamagate v. Ashcroft*, 385 F.3d 144, 150-51 (2d Cir. 2004) (same); *Umanzor*, 782 F.2d at 1301 (ineligibility for visa).

The AEA Proclamation also subjects Petitioners to "seizure and forfeiture" of certain property. 90 Fed. Reg. 13035, § 6(d); JA213 ¶ 3 ("ICE took my money, my phone, and my documents."). And because the government considers Petitioners to be members of an FTO based on their AEA designations as TdA members, Petitioners face continuing restrictions on their ability to hold funds in financial institutions. *See* 18 U.S.C. § 2339B(a)(2).

The government wrongly claims that the FTO-related restrictions are not redressable because the AEA designations that Petitioners challenge are "separate and independent" of their designations as FTO members. OB.41-42. But if Petitioners establish that they are not members of TdA for purposes of the AEA, then they also could not be deemed members of an FTO, because both designations rest solely on TdA gang membership. *See* 90 Fed. Reg. 13033-34; JA244. The government skips over this flaw in its argument. *See* OB.42 (arguing only that Petitioners' challenge to the AEA's "statutory predicates" would not affect FTO membership).

*Gul* does not help the government. OB.40-42. As the district court noted, *Gul* is "markedly different" from this case for two reasons. JA347-48. First, the petitioners claimed that placement on the "No Fly List" and inadmissibility under the INA were collateral consequences of their enemy-combatant status, but these restrictions would have remained "regardless" of whether they prevailed in their challenge to their enemy-combatant designations. *Gul*, 652 F.3d at 19-20. Here, the FTO and AEA designations rest or fall on the same determination: TdA membership. Second, in *Gul*, there was no evidence that any petitioner "actually wishe[d]" to enter the United States, *id.* at 19; that is not the case here, JA212 ¶ 11; JA215 ¶ 21; JA217 ¶ 16; JA220 ¶ 16; JA486-87; JA489. That makes sense, given that Petitioners face

danger in Venezuela, JA476 ¶¶ 14-17; JA478-79 ¶¶ 2, 10-12; JA481-82 ¶¶ 8-12, and were seeking asylum, JA212 ¶ 11; JA213 ¶ 2; JA215 ¶ 21; JA220 ¶ 16.

The government also argues that Petitioners' travel restrictions are not sufficient to establish collateral consequences because the United States might devise other ways to bar Petitioners' entry. *See* OB.39-41. The government speculates about INA inadmissibility grounds that "could apply" or "may apply." OB.40. But there is no basis for finding that these grounds *would* apply—especially if Petitioners prevail in establishing that they are not TdA members. Regardless, ongoing habeas jurisdiction does not require certainty: it is enough that the person retains a "chance at reentering the United States." *Swaby*, 357 F.3d at 161; *see also Smith v. Ashcroft*, 295 F.3d 425, 428 (4th Cir. 2002) (continuing habeas jurisdiction given "possibility that [habeas petitioner could] beneficially unravel his untoward immigration status"); *Kamagate*, 385 F.3d at 150-51 (similar); *Del Cid Marroquin v. Lynch*, 823 F.3d 933, 936 (9th Cir. 2016) (petition for review not moot because success would "at least increase [petitioner's] chances" of return).

The government repeats the same error when it asserts that redress is impossible because Petitioners will be removed again if they return. *See* OB.39.[12]

---

[12] The government misstates the record when it asserts that Petitioners "acknowledge they would be removed again if they return." OB.39. The government cites an observation by Petitioners' counsel that Petitioners were "fearful of what happens" if they were to return to the United States only to be forcibly sent "somewhere

But in fact that is far from certain. Not only were some Petitioners *already* granted refugee status, JA376, but even those who are potentially removable are likely to seek asylum as well as certain mandatory forms of relief like withholding of removal or relief under the Convention Against Torture ("CAT"). *RAICES*, 174 F.4th at 112 (withholding and CAT relief are mandatory for those eligible); JA212 ¶ 11; JA215 ¶ 21; JA216 ¶ 3; JA220 ¶ 16. And Petitioners here are more likely to need and receive such relief in light of their designations under the AEA, which place them in danger in Venezuela. JA209 ¶¶ 9-10; JA216 ¶ 11. Contrary to the government's contention, OB.42-43, the prospect of even discretionary relief is enough to maintain a live claim. *See, e.g.*, *Chong*, 264 F.3d at 386 (habeas petition not moot given prospect that "Attorney General could exercise his discretion" and "allow [petitioner] to reenter the United States"); *Zegarra-Gomez*, 314 F.3d at 1127 (habeas petition not moot because success would determine whether petitioner was "ineligible to seek cancellation of removal"); *Kamagate*, 384 F.3d at 150-51; *Leitao*, 311 F.3d at 456; *Swaby*, 357 F.3d at 159, 161 (collecting cases holding that a person who "seek[s] a discretionary waiver of removal" "presents a live case or controversy").

The government cites *Perez v. Greiner*, 296 F.3d 123, 126 (2d Cir. 2002), and *Abreu v. Superintendent Smithfield SCI*, 971 F.3d 403, 408 (3d Cir. 2020). OB 40-

---

remote," such as CECOT or South Sudan. JA408. Those understandable fears are in no way a concession that the government would succeed in removing them.

41. But petitioners in both cases had drug convictions that rendered relief unavailable. *See Blandino-Medina v. Holder*, 712 F.3d 1338, 1342 (9th Cir. 2013) ("independent basis for … inability to reenter" could only moot petition for review if discretionary relief was impossible). Here, the government has not shown that an independent bar on entry would apply, let alone that a Petitioner would have no prospect of relief from removal; instead, it speculatively asserts that bars on entry "may" or "could" apply. OB.40.

As habeas courts routinely find, the government cannot unlawfully remove a noncitizen and then claim the removal is harmless. *See, e.g.*, *Umanzor*, 782 F.2d at 1301 (prohibition on being "found in the United States" is collateral consequence).

## II.   ALTERNATIVELY, THE DISTRICT COURT MAY PROCEED IN EQUITY.

If habeas is unavailable, then the relief Petitioners seek is available in equity, directly under the Constitution or under the APA. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (recognizing that a plaintiff's "ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action"); 5 U.S.C §§ 704-06; JA329-30; ECF 148 at 27-31 (discussing equity).[13]

---

[13] In either case, 28 U.S.C. § 1331 supplies jurisdiction.

The government concedes that Petitioners received *no* notice or opportunity to file a habeas petition to challenge their removal. Logically, therefore, they could not have brought their due process notice claim by habeas in advance of their removal. Yet the government argues that Petitioners are stuck: in its view, habeas is the only basis for someone to claim that they were given no opportunity to file a petition, but habeas, the government claims, is unavailable for those it swiftly disappeared to CECOT. The district court properly rejected that Catch-22 scenario and held that *if* habeas jurisdiction is unavailable, the court may proceed in equity to address Petitioners' due process claim. JA330 ("Nothing in this Opinion should be read to upend the Court's prior due-process jurisdictional analysis … and that pathway would remain available to [Petitioners] if habeas were not.").[14]

The government contends that the Supreme Court effectively blessed its Catch-22 scenario in *J.G.G.* in holding that AEA challenges must be brought in habeas. OB 44 n.12. But the Court unanimously held that individuals must *first* receive due process, with meaningful notice, precisely so they could in fact bring a habeas challenge to their AEA designations. As the Court emphasized, "notice must be afforded within a reasonable time and in such a manner as will allow [AEA

---

[14] While the district court's June 4 opinion was vacated due to Petitioners' intervening transfer to Venezuela, Per Curiam Order, *J.G.G. v. Trump*, No. 25-5217 (D.C. Cir. Aug. 8, 2025), the court subsequently reaffirmed its equity analysis and thus found alternative jurisdictional grounds. JA330. In any event, Petitioners advanced both grounds below, and thus both are available to the Court here.

detainees] to actually seek habeas relief in the proper venue before such removal occurs." *J.G.G.*, 604 U.S. at 673. Notice and an opportunity to file a petition are thus necessary preconditions. Nothing in *J.G.G.* remotely suggests that the Court intended to provide a blueprint for the government to eliminate judicial review of AEA removals by hurrying detainees out of the country before they could file a habeas petition.

In fact, just weeks later in *A.A.R.P.*, the Supreme Court recognized the Catch-22 problem with the government's attempts to remove people without sufficient notice and opportunity to file habeas petitions. It rejected as "self-defeating" the "notion that the right to the *notice* necessary to 'actually seek habeas relief' must *itself* be vindicated through individual habeas petitions, somehow by plaintiffs who have not received notice." *A.A.R.P.*, 605 U.S. at 98 (quoting *J.G.G.*, 604 U.S. at 673). As noted, *supra* at 6, in *A.A.R.P.*, the government had again tried to hurriedly remove another set of Venezuelans under the AEA, providing less than 24 hours' notice. When that group of detainees filed a class-action habeas case, the government argued that the petitioners could not bring a class-action habeas challenge to their AEA removal, even to raise a due process notice claim. The Supreme Court issued a midnight injunction blocking the removals on a classwide basis, *see A.A.R.P. v. Trump*, 145 S. Ct. 1034 (2025), and in its subsequent 7-2 opinion made clear that individuals who were deprived of notice could not reasonably be required to

vindicate that right through the filing of an individual habeas petition, *A.A.R.P.*, 605 U.S. at 98. In doing so, the Court left no doubt that it would not countenance any attempt to deprive AEA detainees of the ability to seek habeas relief by denying them meaningful notice.

Petitioners' ability to raise their due process claim in equity is consistent, moreover, with a long line of cases holding that habeas is not the exclusive basis for procedural challenges. *See, e.g.*, *Wilkinson v. Dotson*, 544 U.S. 74, 78-83 (2005); *Spencer v. Kemna*, 523 U.S. 1, 17 (1998) (claim need not be brought in habeas if based on "procedural defect" that does not "necessarily imply the invalidity" of punishment); ECF 148 at 28-29 (collecting cases). As the Supreme Court stated in *J.G.G*, only claims that "necessarily imply the invalidity of [one's] confinement and removal under the AEA" must be brought in habeas. *J.G.G.*, 604 U.S. at 672. But Petitioners' success on their procedural due process claim does not "necessarily imply" the invalidity of removal. Rather, success would merely grant Petitioners an opportunity to pursue an additional process: the AEA challenge to which they are constitutionally entitled.[15]

---

[15] The government also ignores that the Supreme Court had no habeas claim before it when it unanimously held that Petitioners were entitled to meaningful notice in *J.G.G. See* 604 U.S. at 671 (noting the district court had earlier dismissed the habeas claims). Consequently, *J.G.G.* cannot be read to hold that a *notice* claim must be brought exclusively in habeas.

In any event, even if a procedural notice claim must be brought in habeas where habeas *is* available, no plausible reading of *J.G.G.* suggests the Court was making habeas the exclusive means for relief where it is *not* available due to the government's unconstitutional actions. Indeed, *A.A.R.P.* dispels any suggestion that the Court intended to provide a roadmap for the government to thwart a detainee's ability to raise a notice claim by denying notice in the first place.

The APA's structure also makes clear that equitable relief is available where habeas is not. In *J.G.G.*, the government argued that Petitioners' claim must be brought in habeas and that APA review was unavailable because habeas provided an "adequate" means of review. Gov't App. at 20, *Trump v. J.G.G.*, No. 24A931 (Mar. 28, 2025) (quoting 5 U.S.C § 704). But if habeas is *not* available as an alternative, then equitable relief under the APA is available. *See J.G.G.*, 604 U.S. at 674 (Kavanaugh, J., concurring) (citing the availability of habeas jurisdiction as basis for finding APA claims unavailable).

In short, while detainees generally must challenge their AEA removal in habeas, a claim of insufficient notice and opportunity to file the habeas petition cannot *itself* be restricted to habeas. If it were, the government would wield complete control over whether anyone ever gets to challenge their removal. *See* ECF 148 at 67 (the government's theory would allow it to "snatch anyone off the street" without a remedy); *Abrego Garcia*, 2025 WL 1021113, at *7 (Wilkinson, J., concurring)

(recognizing "the potential for a disturbing loophole"); *cf. Armstrong*, 575 U.S. at 327 ("[I]n a proper case, relief may be given in a court of equity … to prevent an injurious act by a public officer." (quoting *Carroll v. Safford*, 44 U.S. (3 How.) 441, 463 (1845))); *Demjanjuk v. Meese*, 784 F.2d 1114, 1116 (D.C. Cir. 1986) ("[I]t is essential that petitioner not be denied the right to petition for a writ of habeas corpus.").

Although the district court held that its prior equity analysis would apply in the absence of habeas, *see* JA329-30, the government confines its objections to a footnote, *see* OB.44 n.12. First, the government cites *J.G.G.*, 604 U.S. at 672, to assert that equity is unavailable because Petitioners seek to challenge "the validity of removal." But requiring habeas for a *notice* claim is illogical for the reasons explained above and in *A.A.R.P.* and *J.G.G.*; in any event, success on Petitioners' notice claim would merely restore them to a position where they could challenge the substantive validity of their removal.

The government also claims that facilitating habeas "makes no sense" as a remedy because it would require Respondents to regain custody over free individuals. OB.44 n.12. But if Petitioners are permitted to return to the United States as part of that remedy and the government seeks to re-detain them—as seems all but certain— Petitioners can pursue the habeas (and immigration) claims the government short-

circuited. *See* 90 Fed. Reg. 13034 (ordering that "every Alien Enemy" be "restrain[ed]"). It would simply restore Petitioners to their prior position.[16]

## III. THE CLASS IS PROPERLY CERTIFIED, AND PETITIONERS HAVE STANDING.

Petitioners can proceed as a class on their equitable due-process cause of action, regardless of the availability of a habeas class action.

In any event, class habeas relief is available, as every circuit, including this one, has agreed. The government claims habeas is inherently individualized, but that is not true here. Petitioners all received the same constitutionally deficient notice, thus raising identical legal questions arising from an identical set of facts. Nor does standing pose a barrier to class certification here.

### A. Class Habeas Is Available.

This Court has expressly rejected the argument that "there is no equivalent to class actions in habeas." *LoBue v. Christopher*, 82 F.3d 1081, 1085 (D.C. Cir. 1996).

---

[16] In its prior stay motion, the government raised a series of scattershot, meritless arguments concerning the availability of equitable relief. It has not made those arguments in this appeal and thus the points should be deemed waived. But should the government try to revive them on reply, Petitioners have already explained why they are wrong. *See* Pet'rs' Resp. to Stay App. at 7-13, *J.G.G. v. Trump,* No. 25-5217, (D.C. Cir. June 16, 2025), Doc. 2120989.

While the Court ultimately dismissed that case, it did so on alternative grounds (as the government acknowledges). *Id.* at 1082; OB.53-54.[17]

The five other circuits to consider the issue have all held that habeas petitioners can litigate common questions as a class. *See United States ex rel. Sero v. Preiser*, 506 F.2d 1115, 1125 (2d Cir. 1974); *Bijeol v. Benson*, 513 F.2d 965, 968 (7th Cir. 1975); *Bonner v. Cir. Ct.*, 526 F.2d 1331, 1335 n.4 (8th Cir. 1975); *Betschart v. Oregon*, 103 F.4th 607, 615-16 (9th Cir. 2024); *Napier v. Gertrude*, 542 F.2d 825, 827 & n.2 (10th Cir. 1976); *see also* Lee Kovarsky & D. Theodore Rave, *Habeas Class Actions*, 139 Harv. L. Rev. 1501, 1514 (2026) (noting absence of "a single appellate decision disputing that class treatment is available in appropriate habeas cases"). The government does not even attempt to distinguish *Sero*, dismissing it as "simply wrong," wholly ignores *Bijeol*, and incorrectly argues that the remaining circuit cases were dicta. OB.53.

Contrary to Respondents' argument, a historical analog is not required to proceed with a habeas class. In *Harris v. Nelson*, the Supreme Court held that habeas courts can "fashion appropriate modes of procedure, by analogy to existing rules" *precisely* where a procedure is not part of "the history of habeas corpus." 394 U.S. 286, 293, 298-99 (1969); *see also Price v. Johnston*, 334 U.S. 266, 281 (1948) ("we

---

[17] The government points to *LoBue*'s statement that a habeas class might not include individuals not in custody. OB.54. But that is a question about jurisdiction, not the propriety of habeas classes.

do not believe that the forms of the habeas corpus writ authorized by [All Writs Act predecessor] are only those recognized in this country in 1789"). As *Harris* explained, even where a procedure was not historically used in habeas, the All Writs Act and § 2243 "expressly confirm[]" that such procedures can still apply by analogy. 394 U.S. at 299; *cf. Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 333 (1999) (addressing remedies, not procedural tools); *Trump v. CASA, Inc.*, 606 U.S. 831, 841 (2025) (same). Relying on *Harris*, the Second Circuit thus explained that courts could adjudicate habeas class actions "by analogy" to Rule 23. *Sero*, 506 F.2d at 1125.[18]

The government claims that this would expand the district court's jurisdiction. OB.50-51. But class certification does not expand jurisdiction; it is simply a procedural rule that serves as a "species" of joinder. *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010).

The government grasps for support in the habeas statute's use of the singular, but that argument has rightly been rejected. *See Sero*, 506 F.2d at 1126 n.8; *see also Califano v. Yamasaki*, 442 U.S. 682, 700 (1979) ("a wide variety of federal

---

[18] In any event, American courts have long adjudicated multiparty habeas litigation. *See, e.g.*, *Respublica v. Betsey*, 1 U.S. (1 Dall.) 469 (Pa. 1789) (granting habeas petition by multiple enslaved people); Kovarsky & Rave, *supra*, at 1526-27 (courts have "entertained multiparty habeas petitions since long before the FRCP were adopted").

jurisdictional provisions speak in terms of individual plaintiffs, but class relief has never been thought to be unavailable under them").

The government's attempt to import the next-friend standard into the class action context is also wrong. Rule 23 requires neither "a significant preexisting relationship" between class representatives and class members nor that class representatives be "truly dedicated to the best interests of class members." OB.47-49. Rather, adequacy, commonality, and typicality are the relevant inquiries, Fed. R. Civ. P. 23(a)(2)-(4), all of which are satisfied here (as is numerosity with 137 Petitioners). And Rule 23 considers whether joinder is "impracticable," Fed. R. Civ. P. 23(a)(1), not whether "the real party in interest *cannot* appear," OB.47 (emphasis added).

Finally, class treatment is especially necessary where Petitioners were held incommunicado at CECOT and now face significant barriers to litigating individual cases in the United States. *See Sero*, 506 F.2d at 1126 (habeas class appropriate where "it is not improbable that more than a few [class members] would otherwise never receive the relief here sought on their behalf"). And, as the district court observed, class treatment is additionally important here because "the Government has the sole discretion to exempt named Petitioners from the effects of the policy they challenge, thereby selectively mooting their claims and depriving this Court of jurisdiction." JA350.

**B.** **Petitioners Have Standing and Satisfy Requirements for Class Certification.**

Relying on *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), the government's principal standing argument speculates that not every class member can show collateral consequences and, consequently, not every class member has Article III standing. OB.54. The argument is factually wrong and foreclosed by this Court's recent decision in *RAICES*.

As discussed, every class member continues to suffer collateral consequences arising directly from their AEA designations and removal. Indeed, the government itself insists that the class members remain subject to terrorism-related inadmissibility bars and other immigration restrictions because of their alleged TdA membership. The government cannot simultaneously argue that class members remain burdened by FTO restrictions while contending that those same restrictions are too speculative to constitute injury for Article III standing.

The government also misreads *TransUnion*, which involved a claim for "individual damages" in a Rule 23(b)(3) class—not a case, like this one, where Petitioners seek injunctive relief in a 23(b)(2) class. 594 U.S. at 431. To certify a (b)(2) class seeking only injunctive relief, it is sufficient that at least one plaintiff has standing. Indeed, the government entirely ignores this Court's recent *RAICES* decision reaffirming that rule and rejecting the government's identical argument under *TransUnion*. As *RAICES* explained, the government's argument "clashes with

the established law that courts may award class-wide injunctive or declaratory relief under Rule 23(b)(2) so long as one member of the class has standing." 174 F.4th at 114 (affirming summary judgment for injunctive class). Indeed, *TransUnion* did not "mention anything about the prevailing rule requiring only one plaintiff to establish Article III standing to certify a class seeking only declaratory or injunctive relief." *Id.*; *see also, e.g.*, *D.S. ex rel. Ford v. Wilson*, 60 F.4th 770, 779 (4th Cir. 2023) (where "at least one class representative … has Article III standing" for each form of relief requested, "[n]othing more is required on that score").[19]

The government alternatively argues that even if collateral consequences suffice to avoid mootness, class certification would still fail, based on speculation that some class members may have different downstream circumstances, such as independent immigration bars to reentry and removal. But the government's theories are based on circumstances that would arise only after—and directly because of— the very conduct challenged in this case: Petitioners are seeking a hearing to show that they are not in fact TdA members. In any event, the extent to which factual differences among the class may arise downstream does not defeat the appropriateness of proceeding as a class on the common question (the due process

---

[19] Even in the (b)(3) context, *TransUnion* declined to "address the distinct question whether every class member must demonstrate standing *before* a court *certifies* a class." 594 U.S. at 431 n.4 (second emphasis added). Even were there a question, the inability of any individual class member to show collateral consequences could be taken into account at the individual relief stage.

violation) and common relief (a hearing). *See DL v. Dist. of Columbia*, 860 F.3d 713, 723-26 (D.C. Cir. 2017) (Rule 23(b)(2) certification requirements); *J.D. v. Azar*, 925 F.3d 1291, 1312-15, 1323 (D.C. Cir. 2019) (speculation about individualized circumstances does not defeat class certification where class members are entitled to relief based on a common injury and even where some members may be uninterested in or unable to seek relief); ECF 148 at 59-60 (the individualized scenarios the government hypothesizes about, including potential immigration obstacles, "are irrelevant to whether each Class member was removed from the United States before he could 'actually seek habeas relief'" (quoting *J.G.G.*, 604 U.S. at 673). Redressability likewise does not require certainty that every class member will ultimately prevail on every downstream immigration issue. A remedy need only create "a significant increase in the likelihood" that the injury will be alleviated. *Utah v. Evans*, 536 U.S. 452, 464 (2002); *Massachusetts v. EPA*, 549 U.S. 497, 525 (2007) ("While it may be true that regulating motor-vehicle emissions will not by itself reverse global warming, it by no means follows that we lack jurisdiction to decide whether EPA has a duty to take steps to slow or reduce it.").

In short, nothing in the district court's ruling turned on individual determinations, and the court correctly concluded Petitioners satisfied Rule 23 requirements for class certification. *See* JA 352-58. Numerosity is undisputed, as the class consists of over 130 individuals. JA353-54. Commonality and typicality are

readily met because all members seek injunctive relief to redress the same injury arising from common facts and legal questions—whether their removal under the AEA without an opportunity to seek habeas relief violated due process. JA354-56. The government's adequacy argument merely repackages their mistaken premise that class certification turns on uniform collateral consequences, but adequacy is easily satisfied where, as here, Petitioners seek the same relief for the same injury as class members and have no interests antagonistic to the class. *Twelve John Does v. Dist. of Columbia*, 117 F.3d 571, 575 (D.C. Cir. 1997). And Rule 23(b)(2) is appropriate because a "single injunction" remedies the relevant harm all members suffered. *DL*, 860 F.3d at 726. It is black-letter law that a class can litigate common claims, including the legality of a policy, and save any individualized back-end claims for later litigation. *See* 6 Newberg & Rubenstein on Class Actions § 18:17 (6th ed. 2025); 18A Wright & Miller, Fed. Prac. & Proc. Juris. § 4455.2 (3d ed. 2025).

Accepting the government's theory would effectively require individualized mini-trials regarding the downstream circumstances for each of the 137 class members—precisely what Rule 23 is intended to avoid. *See, e.g.*, *DL*, 860 F.3d at 726 ("Rule 23(b)(2) exists so that parties and courts, especially in civil rights cases like this, can avoid piecemeal litigation when common claims arise from systemic harms that demand injunctive relief.").

## IV. THE DISTRICT COURT'S REMEDIAL ORDERS WERE NOT AN ABUSE OF DISCRETION.

The district court's step-by-step remedial orders sought to return Petitioners to the position they would have been in absent the government's concededly unconstitutional actions. Those orders accord with Supreme Court precedent and the government's own policies. In *Abrego Garcia*, the Supreme Court ordered the government to "facilitate" an individual's return to the United States and "ensure that his case is handled as it would have been had he not been improperly sent to El Salvador." 145 S. Ct. at 1018. The same remedial logic applies here.

The district court's order that the government "transport any Plaintiff seeking return to the United States from a third country," JA448 ¶ 5, is directly in line with *Abrego Garcia*'s facilitation remedy and the government's own policies, 145 S. Ct. at 1019 (statement of Sotomayor, J.) ("[I]t has been the Government's own well-established policy to 'facilitate an alien's return to the United States if … the alien's presence is necessary for continued administrative removal proceedings.'" (quoting ICE Directive 11061.1)); *see also Abrego Garcia* App. 16-17 (government acknowledging that ICE Directive 11061.1 includes actions to permit a removed individual "to travel to the United States (such as by issuing a Boarding Letter to permit commercial air travel) and, if warranted, parole the alien into the United States" (quoting directive)).

The government's claim that it cannot facilitate Petitioners' return because it has *accused* Petitioners of FTO membership based on gang membership in TdA, OB.60-61, puts the cart before the horse: the very reason for a hearing is so Petitioners can show that they are not TdA members and their FTO/AEA designations are wrong. Notably, in *Abrego Garcia*, the government also argued against return of an accused FTO member, citing foreign policy concerns. *Abrego Garcia* App. 12-15. The Supreme Court acknowledged this accusation but nevertheless ordered facilitation. *Abrego Garcia*, 145 S. Ct. at 1018-19. The government's objection based on statutory inadmissibility related to FTO membership again "present[s] the potential for a disturbing loophole," *Abrego Garcia*, 2025 WL 1021113, at *7 (Wilkinson, J., concurring), and in any event is obviated by parole. The reason for a hearing is to determine *if* Petitioners are TdA members in the first place.

The same is true for the government's speculation that Petitioners would be removed anyway if returned. OB.63. The government cannot prejudge the outcomes of Petitioners' AEA hearings or immigration proceedings. *Supra* Section I.D; *cf. Abrego Garcia* App. 21 (government arguing that "Abrego Garcia is certainly removable now").

The government also objects to the district court's order that the government update it with information about the "feasibility" of transporting Petitioners from

Venezuela. OB.60. Secretary Rubio previously filed a conclusory declaration stating that the United States could not facilitate remote hearings or Petitioners' return from Venezuela at that time. JA369-70. The district court simply requested an updated status report one month later in light of the evolving situation. JA448 ¶ 5. The government offers no legitimate reason for objecting to a status report. *See* Order at 1, *Soto Cedeno v. Blanche*, No. 24-1018 (9th Cir. May 28, 2026), ECF 73 (describing government status report on efforts to facilitate return from Venezuela in wrongful removal case).

The government's practical objections to remote hearings are premature and unfounded. The district court did not even reach the questions of "[w]hether hearings will be required and the logistics of such hearings." JA447. And if the district court *had* done so, the habeas filings need not necessarily proceed to evidentiary hearings—many, if not most, may be resolved on the papers. ECF 148 at 4-5 ("flimsy" evidence of gang membership); *see supra* at 5 (TdA designations based largely on innocuous tattoos); JA114 (government's own intelligence showing that using tattoos and attire as indicia of TdA membership is patently absurd); *see, e.g.*, *Abdah v. Obama*, 717 F. Supp. 2d 21, 36 (D.D.C. 2010) (granting habeas relief because government presented "no evidence that [petitioner] has any connection to Al Qaeda").

The government's objections to remote hearings are also conclusory and speculative, at best. For example, the government claims that it would be unable to verify witness identity. But courts regularly rely on identity documents or sworn testimony for this purpose. Moreover, class members were in the government's physical custody prior to their removal, and the government surely collected personal information—including photographs—that would allow it to confirm Petitioners' identity in video proceedings. As to the government's complaint that the court could not meaningfully enforce perjury laws or other procedural rules, this Court has rejected an almost identical argument. *See El-Hadad v. United Arab Emirates*, 496 F.3d 658, 669 (D.C. Cir. 2007) (permitting video testimony from abroad despite argument that "with no extradition treaty between the United States and Egypt" witness "could not be prosecuted for perjury"). The government also provides no justification for the claim that conducting a remote hearing regarding TdA membership in a U.S. embassy would infringe on the foreign state's sovereignty. That claim is belied by ICE's own guidance contemplating "participation in your immigration hearing by either video teleconferencing or by phone" at "foreign embassies." JA387.

The government objects that return and remote hearings are contrary to habeas law. These objections, of course, do not apply to Petitioners' claims if they proceed in equity rather than habeas. Regardless, the arguments also fail in the habeas context.

Habeas is itself "an equitable remedy," *Schlup v. Delo*, 513 U.S. 298, 319 (1995), and it must "be administered with the initiative and flexibility essential to insure that miscarriages of justices within its reach are surfaced and corrected," in a manner that "cut[s] through barriers of form and procedural mazes," *Harris*, 394 U.S. at 291.

To the extent the government refuses to return Petitioners to the United States but complains that individual remote proceedings would exceed the district court's habeas jurisdiction, that claim is obviously premature. The district court said as much. JA447 (government may raise claims about lack of jurisdiction over any supplemental habeas filings in future).

Finally, the balance of equities favors Petitioners. The public has a critical interest in "preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken v. Holder*, 556 U.S. 418, 436 (2009). And there is a "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). The government can make no comparable claim to harm. *A.A.R.P.*, 605 U.S. at 95-96. And Congress has provided ample and specific authorities to address the problems the government claims, including specifically for the detention and removal of any FTO members.

The government blatantly denied Petitioners due process, had them held incommunicado for more than four months at one of the world's most notorious

prisons, and then sent them to Venezuela—the country from which they originally fled. The district court's careful and calibrated remedies to address this shell game were not an abuse of discretion.

**CONCLUSION**

The Court should affirm the district court's order.

Date: June 8, 2026

Respectfully submitted,

/s/ *Lee Gelernt*

Noelle Smith
Oscar Sarabia Roman
My Khanh Ngo
Spencer Amdur
AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770

Kathryn Huddleston*
AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION
915 15th Street, NW, 7th Floor
Washington, D.C. 20005
(212) 549-2500

*Barred in Texas and Arizona only;
supervised by a member of the D.C. Bar.*

Lee Gelernt
   *Counsel of Record*
Daniel Galindo
Ashley Gorski
Patrick Toomey
Sidra Mahfooz
Sean M. Lau
Omar Jadwat
Hina Shamsi
AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org

Arthur B. Spitzer
Scott Michelman
Aditi Shah
AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION OF
   THE DISTRICT OF COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800

*Counsel for Petitioners–Appellees*

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 12,586 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced and easy-to-read typeface using Microsoft Word in 14-point size font.

/s/ *Lee Gelernt*
Lee Gelernt
June 8, 2026
*Counsel for Petitioners–Appellees*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 8, 2026, I electronically filed the foregoing Response with the Clerk for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. A true and correct copy of this brief has been served via the Court's CM/ECF system on all counsel of record.

/s/ *Lee Gelernt*
Lee Gelernt
June 8, 2026
*Counsel for Petitioners–Appellees*