ORAL ARGUMENT NOT YET SCHEDULED

**No. 26-5074**

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

J.G.G. et al.,
*Petitioners-Appellees*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, et al.,
*Respondents-Appellants*.

On Appeal from the United States District Court
for the District of Columbia, No. 1:25-CV-00766-JEB
Before the Honorable James E. Boasberg

# BRIEF OF FORMER STATE DEPARTMENT OFFICIALS AS AMICI CURIAE IN SUPPORT OF PETITIONERS-APPELLEES

GIBSON, DUNN & CRUTCHER LLP

*Attorneys for Amici Curiae*

Amer S. Ahmed
Richard W. Mark
Marryum Kahloon
Leesa Haspel
Apratim Vidyarthi
Nabil Shaikh
200 Park Avenue
New York, NY 10166-0193
(212) 351-4000

Sarah M. Kushner
Arthur Halliday
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000

Teddy Rube
1700 M Street, N.W.
Washington, D.C. 20036-4504
(202) 887-3532

## TABLE OF CONTENTS

**Page**

STATEMENT OF INTEREST OF AMICI CURIAE ................................ 5

INTRODUCTION ........................................................................................ 7

ARGUMENT ................................................................................................ 11

I. In the past, the United States has used clear and unambiguous language to define the custodial status of detainees transferred to a foreign government. ............................ 11

II. In this case, the State Department does not describe transferring exclusive control over Petitioners to El Salvador. ......................................................................................... 17

III. If the United States had relinquished custody and control over CECOT detainees, the Government would have said so clearly and unambiguously. ......................................................... 27

CONCLUSION .......................................................................................... 31

CERTIFICATE OF COMPLIANCE ........................................................ 33

CERTIFICATE OF SERVICE .................................................................. 34

APPENDIX A: LIST OF AMICI CURIAE AND THEIR RELEVANT EXPERIENCE AT U.S. DEPARTMENT OF STATE ............................ 35

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Al Hajji v. Obama*,
2009 WL 4251108 (D.D.C. Nov. 23, 2009) .................................... 16, 17

*Chaman v. Obama*,
2012 WL 3797596 (D.C. Cir. Aug. 10, 2012) ...................................... 16

*E.D.Q.C. v. Warden, Stewart Det. Ctr.*,
2025 WL 1829416 (M.D. Ga. July 2, 2025) ........................................ 24

*Gul v. Bush*,
No. 05-cv-888, ECF No. 87-1 (D.D.C. Feb. 23, 2009) .................. 13, 14

*Gul v. Obama*,
652 F.3d 12 (D.C. Cir. 2011) ............................................................. 15

*Hamidullah v. Obama*,
No. 12-5410, Document No. 1468218, Ex. 1 (D.C. Cir. Nov. 27, 2013) ........................................................................................ 15, 24

*Hamidullah, v. Obama*,
2014 WL 1384375 (D.D.C. Apr. 9, 2014) ............................................ 16

*J.G.G. v. Trump*,
No. 25-cv-766 (JEB), ECF No. 263 (D.D.C. June 4, 2026) ........... 20, 30

*Kiyemba v. Obama*,
561 F.3d 509 (D.C. Cir. 2009) ................................................. 15, 16, 28

*Kiyemba v. Bush*,
No. 05-cv-1509, ECF No. 95 (D.D.C. Apr. 19, 2007) .................... 12, 23

*Munaf v. Geren*,
553 U.S. 674 (2008) ............................................................................ 28

*Obaydullah v. Bush*,
No. 08-cv-1173, ECF No. 15-1 (D.D.C. Aug. 12, 2008) ....................... 13

*In re Petitioners Seeking Habeas Corpus Relief in Rel. to Prior Detentions at Guantanamo Bay*,
700 F. Supp. 2d 119 (D.D.C. 2010) ........................................ 16, 27, 28

*In re Petitioners Seeking Habeas Corpus Relief in Rel. to Prior Detentions at Guantanamo Bay*,
No. 08-mc-444 (D.D.C. Feb. 6, 2009) .......................... 12, 13, 14, 23, 24

*Sliti v. Bush*,
No. 05-cv-429, ECF No. 98-1 (D.D.C. Aug. 12, 2008) .......................... 13

**TREATIES AND OTHER INTERNATIONAL AGREEMENTS**

International Covenant on Civil and Political Rights art. 9(1) ............. 28

## STATEMENT OF INTEREST OF AMICI CURIAE[1]

Amici curiae ("*Amici*") are former officials of the United States Department of State who served in senior diplomatic, legal, national-security, human-rights, and foreign policy roles. Collectively, they have substantial experience with sensitive government-to-government negotiations, detainee transfers, diplomatic assurances, Western Hemisphere affairs, and the legal and practical consequences of the United States' statements in matters involving foreign sovereigns. They file this brief in their individual capacities to provide institutional context for the Government's public statements about the transfer of Petitioners to the Terrorism Confinement Center ("CECOT") in El Salvador.

*Amici* have served across administrations of both political parties and in a variety of State Department roles, including as U.S. Ambassadors to Ecuador, Guatemala, Panama, and the Slovak Republic; Assistant Secretary of State for Western Hemisphere Affairs; Assistant

---

[1] *Amici* state that this brief was not authored in whole or in part by counsel for any party, and that no person or entity other than *Amici* or their counsel made a monetary contribution intended to fund the preparation or submission of this brief. Counsel for *Amici* conferred with counsel of record for the parties, and they have consented to our filing of this *amicus* brief.

Secretary of State for International Narcotics and Law Enforcement Affairs; Principal Deputy Assistant Secretary of State for Western Hemisphere Affairs; Deputy Assistant Secretary of State for Western Hemisphere Affairs, including for Brazil / Southern Cone and Andean Affairs; Chargé d'Affaires at the U.S. Embassy in Managua, Nicaragua; Deputy Chief of Mission and Chargé d'Affaires at the U.S. Embassy in Panama City, Panama; Summit of the Americas National Coordinator; Special Envoy for Guantánamo Closure; Deputy and Acting Special Envoy for Guantánamo Closure; and attorney-adviser in the State Department's Office of the Legal Adviser.

*Amici* include career diplomats who served in the State Department for decades and were involved in diplomatic efforts to transfer detainees. Their roles included advising on U.S. military detention operations and detainee transfers, including in Iraq and Afghanistan. Several of the *Amici* were posted in El Salvador and have experience coordinating and negotiating with the Salvadoran government.

*Amici* do not submit this brief as fact witnesses to any nonpublic arrangement between the United States and El Salvador, nor do they ask the Court to speculate about undisclosed diplomatic communications.

Their position is grounded in public record materials and their collective expertise and experience at the State Department regarding the transfer of detained persons through diplomatic arrangements.

## INTRODUCTION

In this case, the Government seeks to defeat habeas jurisdiction on the basis that it had no custody or control over Petitioners once those detainees were transferred from the United States of America to El Salvador. *Amici* know from past experience that when the United States means to relinquish custody and control of a detainee to a foreign country, it says so unequivocally. When such transfers occurred in the past, the United States has implemented them under terms that define precisely the custodial responsibility for the individual. Courts in this Circuit have relied on such clear statements about custodial status to reject arguments from habeas petitioners that the United States had retained constructive custody over a detainee transferred to a third country.

Words are not window dressing in this context; rather, they determine which sovereign is responsible for the individual after transfer. Thus, in past detainee transfers the United States represented that individuals were transferred "entirely" to the receiving government's

"exclusive custody and control"; that the individuals were "no longer" in U.S. custody and control; that any continued detention was pursuant to the receiving country's own laws and "not on behalf of the United States"; and that the United States retained "no control" over future disposition of the individuals.

The language the Government used in this case to describe Petitioners' detention at CECOT breaks from the U.S.'s longstanding practice in cases of custodial transfer. So while the Government in this court proceeding seeks to disclaim custody or control over Petitioners and denies that the District Court has jurisdiction over Petitioners' requests for habeas relief, the sworn declarations of Ambassador Michael G. Kozak, Ambassador Christopher Landau, and Secretary of State Marco Rubio are notable for what they do *not* say about the actual circumstances of the transfer: Unlike prior cases, the Government does not state that upon arrival at CECOT, Petitioners were transferred to the exclusive or entire control of El Salvador, and subject exclusively to that nation's laws. Ambassadors Kozak and Landau and Secretary Rubio do

not state that the detainees are no longer in U.S. custody and control.[2] And the declarations do not deny that Petitioners were detained at CECOT on behalf of the United States, with the United States covering the cost of detention, or that the United States had a role in Petitioners' future disposition. Rather, the facts set forth in these declarations merely describe El Salvador's "custody," "sovereign discretion," and "legal authority" over Petitioners *without* stating the State Department's position (as was regularly stated in the past) that such control is entire or exclusive of other authority. These omissions are meaningful and support the District Court's determination that the United States retained constructive custody over Petitioners.

A March 22, 2025 letter grant between the United States and El Salvador memorializing El Salvador's agreement regarding Petitioners further demonstrates the United States' continued control. The letter reflects that El Salvador agreed to "accept and house approximately 300

---

[2] In one of the declarations filed in this case, Secretary Rubio states: "As Judge Boasberg found with respect to the Venezuelan nationals deported, to El Salvador on March 15, the United States did not retain custody, constructive or otherwise, over the deported individuals." JA316 ¶ 2. This statement merely repeats *a legal conclusion reached by the District Court*, and does not represent as the State Department's position that the United States did not have custody over Petitioners.

members of TdA removed for up to one year or until another decision is made on their disposition." JA222. Nothing in the letter reflects that El Salvador has exclusive custody of the detainees. The letter further reflects the United States' agreement to provide a financial grant to El Salvador for the "purpose" of "support[ing] costs related to [the] detention of members of TdA." JA224. Stated differently, the "purpose" of the grant is to cover, "[i]n recognition of El Salvador's assistance on this matter," JA227, "costs associated with the detention of" Petitioners "whom El Salvador accepted from the United States." JA222. This language is not typical of detainee transfers in two respects.

First, it is passive as to which sovereign authority will make the later "decision . . . on [petitioners'] disposition." *Id.* Second, the financial arrangement puts El Salvador in the position of custodial agent for the United States. The change in framing from prior detainee transfers appears to reflect a deliberate policy choice by the United States: to underwrite the cost of detention in El Salvador in exchange, *inter alia*, for a continued say in the disposition of the detainees. Indeed, that is exactly how Secretary Rubio and Salvadoran President Nayib Bukele described the arrangement: that El Salvador would "hold [alleged TdA

members] in their very good jails at a fair price *that will also save our taxpayer dollars*," JA138, JA158 (emphasis added), and provide the U.S. with "the opportunity *to outsource part of its prison system* . . . . in exchange for a fee." JA148 (emphasis added).

The Government asks this Court to ignore statements like this that demonstrate the intent of the two governments that El Salvador would detain the transferred individuals on behalf of the United States. The Government asks this Court to conclude, like previous courts, that the United States has no ongoing custodial interest in regard to Petitioners, despite record evidence that those courts addressed transfers carried out (unlike here) with express disclaimers of U.S. custody and control. The Government's argument fails under the materially different language governing the transfer of Petitioners.

## ARGUMENT

### I. In the past, the United States has used clear and unambiguous language to define the custodial status of detainees transferred to a foreign government.

Over the past several decades, under both Republican and Democratic administrations, the United States has spoken clearly and unambiguously when it has transferred custody of noncitizen detainees

to foreign governments. These pronouncements have appeared in declarations filed in litigation concerning whether transferred detainees, physically in a foreign location, remained under U.S. custody and control. For instance, in a 2005 declaration explaining the process for transferring detainees at the United States Naval Base at Guantanamo Bay, Cuba ("GTMO") from U.S. custody and control to the custody and control of a foreign government, the Deputy Assistant Secretary of Defense for Detainee Affairs at the Department of Defense declared:

> In all such cases of transfer for continued detention, investigation, and/or prosecution, as appropriate, as well as situations in which the detainee is transferred for release, the detainee is transferred *entirely to the custody and control* of the other government, and once transferred, is *no longer in the custody and control of the United States*; the individual is detained, if at all, by the foreign government *pursuant to its own laws and not on behalf of the United States*.

Matthew C. Waxman Decl. of June 2, 2005 ¶ 5, *Kiyemba v. Bush*, No. 05-cv-1509, ECF No. 95 (D.D.C. Apr. 19, 2007) (emphases added). This same language appears in five other Department of Defense declarations regarding GTMO transfers in the 2005–2009 timeframe.[3]

---

[3] *See* Joseph Benkert Decl. of June 8, 2007 ¶ 5, *In re Petitioners Seeking Habeas Corpus Relief in Rel. to Prior Detentions at Guantanamo Bay* ("*In re Petitioners*"), No. 08-mc-444, ECF 89-1, Ex. A at 13 (D.D.C. Feb. 6,

Similarly, the United States spoke clearly and unambiguously in 2008 (and again in 2009) regarding the transfer of Afghan nationals detained at the Afghan National Detention Facility at Pol-e-Charki ("ANDF") from U.S. custody and control to the sole and exclusive custody and control of Afghanistan. In that context, Lieutenant Colonel David F. Koonce declared:

- "The United States and Afghanistan have agreed to transfer, in appropriate circumstances, Afghan nationals detained by the United States to the *exclusive custody and control of* Afghanistan";
- "[W]ithin *Afghanistan's sole discretion*, a transferred detainee may be released or subject to continued detention, investigation, and/or prosecution by Afghanistan under Afghan law";

---

2009); Sandra L. Hodgkinson Decl. of July 9, 2008 ¶ 5, *Sliti v. Bush*, No. 05-cv-429, ECF No. 98-1 (D.D.C. Aug. 12, 2008); Sandra L. Hodgkinson Decl. of July 9, 2008 ¶ 5, *Obaydullah v. Bush*, No. 08-cv-1173, ECF No. 15-1 (D.D.C. Aug. 12, 2008); Sandra L. Hodgkinson Decl. of July 9, 2008 ¶ 5, *Gul v. Bush*, No. 05-cv-888, ECF No. 87-1 (D.D.C. Feb. 23, 2009); Sandra L. Hodgkinson Decl. of July 9, 2008 ¶ 5, *In re Petitioners*, No. 08-mc-444, ECF No. 92-1 (D.D.C. Feb. 23, 2009).

- “The United States . . . *has no role in, or any control over, the future disposition* of detainees transferred to the ANDF.”

David F. Koonce Decl. of Oct. 31, 2008 ¶¶ 6–8, *Gul v. Bush*, No. 05-cv-888, ECF No. 87-2, (D.D.C. Feb. 23, 2009) (emphases added); *see also* David F. Koonce Decl. of Oct. 31, 2008 ¶¶ 6, 8, *In re Petitioners*, No. 08-mc-444, ECF No. 92-2 (D.D.C. Feb. 23, 2009) (identical).

A 2013 declaration prepared by the Special Envoy for Detainee Transfers at the Department of Defense regarding the transfer of detainees at a detention facility in Parwan, Afghanistan states, *inter alia*:

- “The United States and Pakistan have agreed to transfer, in appropriate circumstances, Pakistan nationals detained by the United States *to the exclusive custody and control of Pakistan*”;
- “[W]ithin the government of *Pakistan’s sole discretion*, a transferred detainee may be released or subject to continued detention, investigation, and/or prosecution by Pakistan under its laws”; and
- “On November 16, 2013, pursuant to the agreement described [above], the United States transferred Hamidullah,

> who was a detainee at the detention facility in Parwan . . . to the Government of Pakistan along with five other Pakistani national detainees, *relinquishing all legal and physical custody and control* over Hamidullah and the other transferred detainees."

Paul Lewis Decl. of Nov. 26, 2013 ¶¶ 2–3, *Hamidullah v. Obama*, No. 12-5410, Doc. No. 1468218, Ex. 1 (D.C. Cir. Nov. 27, 2013) (emphases added).

The clarity of these pronouncements led this Court to conclude, in two cases, that the United States had transferred custody and control over detainees to the exclusive custody and control of a foreign government. For instance, in *Kiyemba v. Obama*, 561 F.3d 509 (D.C. Cir. 2009), this Court held that the Department of Defense declaration discussed *supra* pp. 10–11 precluded GTMO detainees from habeas relief because the declaration explained that in cases of "'continued detention . . . the individual is detained, if at all, by the foreign government pursuant to its own laws and not on behalf of the United States.'" *Kiyemba,* 561 F.3d at 515 n.7 (quoting Waxman Decl. ¶ 5). And in *Gul v. Obama*, 652 F.3d 12 (D.C. Cir. 2011), this Court relied on identical language in a declaration to hold that the United States

relinquished custody and control over GTMO detainees, reasoning that "[t]he Government has submitted declarations explaining that when a detainee is transferred out of Guantanamo, he is 'transferred entirely to the custody and control of the [receiving] government.'" *Gul*, 652 F.3d at 18 (quoting *Kiyemba*, 561 F.3d at 515 n.7).

District courts have reached the same conclusion where the petitioners put forth no contrary evidence. *See, e.g.*, *Hamidullah, v. Obama*, 2014 WL 1384375, at *1 (D.D.C. Apr. 9, 2014) (dismissing habeas claim as moot based on "the government's representation that the United States has 'relinquish[ed] all legal and physical custody and control over [petitioner]'" where the petitioners "acknowledg[ed] that they cannot satisfy the standard for jurisdiction") (alteration in original); *In re Petitioners Seeking Habeas Corpus Relief in Rel. to Prior Detentions at Guantanamo Bay*, 700 F. Supp. 2d 119, 132 (D.D.C. 2010) (rejecting constructive custody claim on the basis of declaration stating "detainee is transferred entirely to the custody and control of the other government" where the petitioners merely put forth "blanket allegations . . . that the United States is responsible for their continued detention") (quoting Hodgkinson Decl. ¶ 5), *aff'd sub nom. Chaman v. Obama*, 2012 WL

3797596 (D.C. Cir. Aug. 10, 2012); *Al Hajji v. Obama*, 2009 WL 4251108, at *2 (D.D.C. Nov. 23, 2009) (same holding where declaration "represented that any detention . . . is pursuant to [the foreign government's] own laws and not on behalf of the United States" and there was "no basis" in the "record to conclude that petitioners are in the constructive custody of the United States") (quoting Hodgkinson Decl. ¶ 5).

## II. In this case, the State Department does not describe transferring exclusive control over Petitioners to El Salvador.

The official pronouncements the State Department has made regarding Petitioners' detention at CECOT diverge markedly from the clear and unambiguous statements discussed above in that they fail to state that the United States relinquished all custody over Petitioners. In fact, a March 13, 2025 diplomatic note, a March 22, 2025 letter grant, and the sworn declarations filed by State Department officials in this case, especially when read in light of prior U.S. Government practice and the broader context of the transfer, compel the conclusion that the arrangement at issue here allowed the United States to retain control over

Petitioners while they were housed in CECOT—even as it denied in this litigation that it had any such control.

For instance, the March 13, 2025 diplomatic note from the U.S. Embassy to El Salvador's Ministry of Foreign Affairs states that "with regard to [Petitioners], the United States understands El Salvador intends to accommodate them for a duration of one year unless or until *a determination* concerning their long-term disposition is made." JA226 (emphasis added). A subsequent letter grant dated March 22, 2025 similarly states that El Salvador had "communicated its willingness to accept and house approximately 300 members of TdA for up to one year or until *another decision* is made on their disposition." JA222 (emphasis added).[4] The deliberate use of the passive voice in these sentences breaks sharply with historical examples where exclusive and entire control over detainees passed to the receiving sovereign upon transfer.

[4] This letter grant also confirms that the United States agreed to pay El Salvador $4.76 million "for El Salvador's law enforcement and anticrime needs, which may include costs associated with the detention of members of . . . Tren de Aragua," *viz.*, the Petitioners. JA222; *see also* JA224 ("The purpose of this grant, which is to support costs related to detention of members of TdA, will be met upon disbursement.").

Simply put, there is no stated exclusivity here. Unlike the unambiguous official government statements discussed above regarding the transfer of detainees at GTMO and U.S. facilities in Afghanistan, the contemporaneous grant letter and diplomatic note do not state that El Salvador had *sole authority* to decide what to do with Petitioners once they arrived at CECOT (or that El Salvador was free to do with Petitioners what it wanted once they arrived there). They do not state that the detainees will be transferred *to the exclusive custody and control of El Salvador*. Nor do they state that the United States will *relinquish custody and control* over the detainees. El Salvador merely agreed to accommodate the detainees for "a duration of one year" or until "a determination . . . is made." In context, El Salvador's "assistance in this matter" and "accommodation" encompasses the United States making some future "determination" as to the "disposition" of these detainees.

The post hoc State Department declarations filed in this case do not disclaim that the United States retained custody or control over Petitioners either. To the contrary, the declarations of Ambassador Michael G. Kozak (a senior State Department official whose tenure at the department spans more than 50 years), Ambassador Christopher Landau (the

Deputy Secretary of State), and Secretary of State Marco Rubio indicate that the United States had an ongoing role in Petitioners' continued detention at CECOT. The Kozak Declaration, for instance, states that it is Ambassador Kozak's "understanding that the detention and ultimate disposition of those detained in CECOT . . . are matters *within the legal authority of El Salvador*." JA182 ¶ 9 (emphasis added). The dispositive term "exclusive" is noticeably absent from that phrasing. That omission reflects a change from past practice in exclusive transfer cases and fails disclaim the United States' continued custody and control over these detainees. That El Salvador has "legal authority" over Petitioners is a truism as they are within its territory and jurisdiction. But, it does not suggest El Salvador has *exclusive* authority over the detainees. Indeed, it suggests that the United States could dictate or influence what to do with Petitioners, which bears on the question of custody and control. *See* JA344 (Judge Boasberg making a similar point).

Ambassador Kozak submits that the diplomatic notes between the United States and El Salvador should not be read to imply "that the United States retained some sort of decision-making authority over [Petitioners'] long-term disposition." Michael G. Kozak Decl. of May 9, 2025

¶ 5, *J.G.G. v. Trump*, No. 25-cv-766 (JEB), ECF No. 263 (D.D.C. June 4, 2026).[5] But his declaration fails to substantiate that interpretation. The Kozak Declaration states that in response to the March 13 diplomatic note discussed *supra* p. 17, El Salvador confirmed in a diplomatic note dated March 14 its agreement to "house these individuals for one (1) year pending *the United States' decision* on their long-term disposition." *Id.* ¶ 4 (emphasis added). It adds that at the United States' request, El Salvador "withdrew" this note and "issued a replacement note" in which it confirmed its agreement to "house these individuals for one (1) year pending *further decisions* on their long-term disposition." *Id.* ¶ 5 (emphasis added). According to the Kozak Declaration, the United States made this request because the "possible implication" from El Salvador's original note "that the United States retained some sort of decision-making authority over [Petitioners'] long-term disposition ran contrary to the United States' understanding of what leadership of both countries had negotiated[.]" *Id.*

[5] The District Court unsealed the Kozak Declaration on June 4, 2026. Petitioners-Appellees' brief states that the unredacted declaration is available at JA468–72.

But the replacement language that El Salvador adopted *(i.e.,* "pending *further decisions*")—which is materially identical to the language the United States included in its March 13 note (*i.e.*, "until *a decision*") and its March 22 letter grant (*i.e.*, "until *another decision*")—gives rise to the exact implication that the United States purportedly sought to avoid. Namely, these statements do not negate ongoing U.S. control of, or involvement in, decisions about Petitioners' detention. Had the United States wanted to negate that possibility, it could have done what it did so often in the past—explicitly transferred exclusive control to El Salvador. It did not. And, notably, none of the government declarations describing the transfer of detainees from GTMO and Afghanistan leave room for *any* U.S. decision-making after transfer, as discussed above. *Supra* pp. 10–14.

The Landau Declaration states that after Petitioners were flown to El Salvador, they "were in the *custody* of El Salvador" and that "El Salvador had *sovereign discretion* over their ultimate disposition." JA310 ¶ 4 (emphasis added). Relatedly, one of the Rubio Declarations states that "El Salvador, in its *sovereign discretion*, released" Petitioners from CECOT in July 2025. JA369 ¶ 2 (emphasis added). But declaring that

El Salvador has "custody" over Petitioners, and exercised its "sovereign discretion" to release Petitioners, only reveals selected facts. And the other Rubio Declaration does not state *the State Department's position* that the United States did not have custody or control (as declarations in prior transfer cases have stated); rather, it merely reiterates the District Court's prior legal conclusion regarding custody and control. JA316 ¶ 2.

Ultimately, given the departure from the declarations in prior transfer cases, the statements in the sworn declarations filed by the Government in this case imply continued and/or shared custody and control *by the United States* as each avoids using the term "exclusive." "Custody" is not the same as "*exclusive* custody and control." *Compare* David F. Koonce Decl. of Oct. 31, 2008 ¶¶ 6, 8, *In re Petitioners*, No. 08-mc-444, ECF No. 92-2 (D.D.C. Feb. 23, 2009) (emphasis added). Nor is "sovereign discretion" the same as "*sole* discretion." *Id.* (emphasis added).

Thus, although the Government contends that it has no continuing control over Petitioners, none of the declarations states that the detainees were "transferred entirely to the custody and control" of El Salvador upon arrival at CECOT, or the State Department's position that those detainees were "no longer in the custody and control of the United States"

once there. *Compare* Matthew C. Waxman Decl. of June 2, 2005 ¶ 5, *Kiyemba v. Bush*, No. 05-cv-1509, ECF No. 95 (D.D.C. Apr. 19, 2007). None declares that Petitioners' detention at CECOT was "not on behalf of the United States." *Compare id.* None declares that the United States has "relinquish[ed] all legal and physical custody and control" over CECOT detainees. *Compare* Paul Lewis Decl. of Nov. 26, 2013 Ex. 1 ¶¶ 2–3, *Hamidullah v. Obama*, No. 12-5410, Doc. No. 1468218 (D.C. Cir. Nov. 27, 2013). And none declares that the United States has "no control . . . regarding the disposition of transferred detainees." *Compare* David F. Koonce Decl. of Oct. 31, 2008 ¶¶ 6, 8, *In re Petitioners*, No. 08-mc-444, ECF No. 92-2 (D.D.C. Feb. 23, 2009).

Based on their collective decades of experience at the State Department, and consistent with precedent, *Amici* would expect State Department officials, particularly State Department lawyers, to describe the transfers as conferring El Salvador with exclusive custody and control (or, alternatively, to state that the United States relinquished custody and control) over Petitioners, if that were the case. *See infra* pp. 27–31; *see also E.D.Q.C. v. Warden, Stewart Det. Ctr.*, 2025 WL 1829416, at *3 (M.D. Ga. July 2, 2025) ("The bottom line is that if the United States had

intended to wash its hands of responsibility for the alien detainees sent to El Salvador, it could have clearly and explicitly done so in its agreement with El Salvador.").

As the District Court recognized in its summary judgment order, these distinctions between the State Department declarations filed in this case and the declarations filed by the United States in prior transfer cases distinguish this case: "in describing and detailing the nature of the arrangement" between the United States and El Salvador, "Defendants' declarations on their face make no mention of the United States relinquishing control over [Petitioners], whereas all the other arrangements where [the United States] did cede control over detainees do." JA335; *see also* JA344 (noting that the Kozak and Landau declarations do not "contain[] any statement that the United States relinquished all control over [Petitioners] or that El Salvador was solely responsible for them"). *Amici* agree.

The lack of language confirming El Salvador's exclusive control is particularly salient given the many sources that confirm the United States *did* retain custody and control here. The United Nations, for instance, issued a report in which El Salvador stated that "the jurisdiction

and legal responsibility for [Petitioners] *lie exclusively with the competent foreign authorities*." JA189; JA193; JA197; JA201 (emphasis added). And Secretary Rubio stated in a March 16, 2025 post on X that "El Salvador has agreed to hold [alleged TdA members] in their very good jails at a fair price *that will save our taxpayer dollars*." JA138 (emphasis added). An X post by El Salvador's President (Nayib Bukele) confirms the same point: "We have offered the United States of America the opportunity *to outsource part of its prison system*" by agreeing to house alleged TdA members in "our mega-prison (CECOT) in exchange for a fee." JA148 (emphasis added).

In sum, the language the Government used to describe Petitioners' detention at CECOT differs markedly from the language it has used in prior transfer cases. This is not accidental, and it implies that the United States in fact did not relinquish custody and control over these individuals. Other contemporaneous evidence in the record confirms that the United States did not.

## III. If the United States had relinquished custody and control over CECOT detainees, the Government would have said so clearly and unambiguously.

In *Amici*'s experience, when the United States transfers a detainee to the custody of a foreign government, government agencies such as the Department of Defense and the State Department pay close attention to the language they use to describe the transfer. Letter grants, diplomatic notes, and the terms of a transfer are typically painstakingly negotiated between the United States and the receiving country. That precision matters because custody-transfer language does real work: It avoids later disputes over whether the United States retained constructive custody or control (such as in habeas proceedings) and reflects the relevant governments' intentions to ensure that the transfer complies with their international obligations.

*First*, as described above, the Government knows how to speak clearly when the United States is relinquishing control, and uses specific and unambiguous language to avoid later arguments that the United States retained custody over a detainee. Clear language provides courts with a concrete basis to reject constructive-custody arguments in possible habeas litigation, thereby maximizing judicial efficiency and preserving

Government resources by avoiding protracted disputes regarding custody (like this one). *See, e.g.*, *In re Petitioners*, 700 F. Supp. 2d at 128, 132–33 (D.D.C. 2010) (denying habeas relief in reliance on Government declarations stating that transferred detainees were detained by foreign governments) (citing *Kiyemba*, 561 F.3d at 515 n.7).

*Second*, the Government also uses clear and specific, unambiguous language in connection with detainee transfers to comply with its international obligations. For example, the international law prohibition on arbitrary detention requires that a State have a lawful basis to detain an individual. *See* International Covenant on Civil and Political Rights art. 9(1); *Kiyemba*, 561 F.3d at 515–16; *see also Munaf v. Geren,* 553 U.S. 674, 694–95 (2008). If, for instance, a transferee has committed a crime within the jurisdiction of the receiving country and is sought by the receiving country for the purpose of subjecting him to criminal legal process, the receiving country may detain the individual for violating its own law—which is different from detaining that individual *on behalf of* the United States (as is the case here, *see supra* pp. 11–17). *See In re Petitioners*, 700 F. Supp. 2d at 132 ("[C]onditions imposed on Petitioners by foreign governments are made 'pursuant to [their] own domestic law and

independent determinations.'"). The United States could be liable for aiding and abetting a violation of the prohibition on arbitrary detention, on the other hand, if it intended for the receiving State to detain a transferred individual on its behalf without a legal basis to do so.

Accordingly, in situations like the present case, *Amici*'s experience suggests that it would be particularly important that the United States specify clearly, if true, that it was relinquishing all control over the detainees, such that any continued detention was pursuant to El Salvador's independent legal authority alone. Expressing this clear understanding would be important given the prohibition on arbitrary detention.

It is striking that the Government did not do that here. As discussed *supra,* documents filed in this case and public statements by Secretary Rubio and Salvadoran President Bukele indicate that Petitioners' incarceration at CECOT was an accommodation of United States interests, not an act expressing El Salvador's sovereign authority to hold these individuals accountable for unlawful conduct under Salvadoran law.

The March 22 letter grant and March 13 diplomatic note confirm as much.[6] The letter grant states that the United States will provide El Salvador with a grant of $4,760,000 that can be used for, among other things, "costs associated with the detention of" Petitioners "whom El Salvador accepted from the United States." JA222–23. Stated differently, the "*purpose of* th[e] grant . . . is to support costs related to [the] detention of members of TdA." JA224 (emphasis added).

In *Amici*'s experience, it is notable that the United States did not unequivocally state that it was relinquishing complete control over Petitioners given the confluence of unique circumstances undergirding the transfer and custody here: (1) Petitioners were transferred to a country that is not their home country; (2) the Government knew that El Salvador would detain Petitioners and impose severe restrictions on their liberty

[6] As discussed *supra*, although the Kozak Declaration states that the U.S. Embassy rejected proposed diplomatic note language from El Salvador referring to "the United States' decision on [Petitioners'] long-term disposition" because "[t]he possible implication . . . that the United States retained some sort of decision-making authority over the TdA members' long-term disposition ran contrary to the United States' understanding of what leadership of both countries had negotiated," Michael G. Kozak Decl. of May 9, 2025 ¶ 5, *J.G.G. v. Trump*, No. 25-cv-766 (JEB), ECF No. 263 (D.D.C. June 4, 2026), the final agreed-to language in fact implies that the U.S. retained some authority to make decisions regarding Petitioners.

(and not for any illegal conduct under Salvadoran law); and (3) the United States provided El Salvador with funds that could be used to pay for the detention.

Based on *Amici*'s experience and expertise, the Government's failure to use express language transferring Petitioners to the exclusive custody of El Salvador demonstrates that the State Department intended to retain some control over Petitioners. The Government's litigation position—that El Salvador has sole custody and control while the United States nevertheless controls the duration and location of the detainees' incarceration—is inconsistent and cannot stand in the face of constitutional guarantees. Accordingly, the District Court correctly found that the United States retained constructive custody for purposes of habeas jurisdiction after Petitioners' removal to El Salvador.

## CONCLUSION

The Court should affirm the District Court's orders.

Date: June 15, 2026

Respectfully submitted,

/s/ *Amer S. Ahmed*

Amer S. Ahmed
Richard W. Mark
Marryum Kahloon
Leesa Haspel
Apratim Vidyarthi
Nabil Shaikh
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-4000
aahmed@gibsondunn.com

Sarah M. Kushner
Arthur Halliday
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000

Teddy Rube
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036-4504
(202) 887-3532

*Attorneys for Amici Curiae Former State Department Officials*

## CERTIFICATE OF COMPLIANCE

This amicus brief complies with the type-volume limitation of Fed R. App. P. 29(a)(5) because it contains 5,338 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Cir. R. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this opposition has been prepared in a proportionally spaced typeface using Microsoft Word in New Century Schoolbook 14-point font.

*/s/ Amer S. Ahmed*
Amer S. Ahmed
GIBSON, DUNN & CRUTCHER LLP

*Attorneys for Amici Curiae Former State Department Officials*

## CERTIFICATE OF SERVICE

I hereby certify that, on June 15, 2026, I caused this document to be electronically filed with the Clerk of Court using this Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

Date: June 15, 2026

Respectfully submitted,

*/s/ Amer S. Ahmed*
Amer S. Ahmed
GIBSON, DUNN & CRUTCHER LLP

*Attorneys for Amici Curiae Former State Department Officials*

## APPENDIX A: LIST OF AMICI CURIAE AND THEIR RELEVANT EXPERIENCE AT U.S. DEPARTMENT OF STATE

*The Hon. John D. Feeley*
Former United States Ambassador to Panama
Former Principal Deputy Assistant Secretary of State for Western Hemisphere Affairs

*Kevin M. O'Reilly*
Former Deputy Assistant Secretary of State for Western Hemisphere Affairs
Former Chargé d'Affaires, United States Embassy Managua, Nicaragua
Former Deputy Chief of Mission and Chargé d'Affaires, United States Embassy Panama City, Panama

*The Hon. Todd D. Robinson*
Former Assistant Secretary of State for International Narcotics and Law Enforcement Affairs
Former United States Ambassador to Guatemala

*The Hon. Peter F. Romero*
Former Assistant Secretary of State for Western Hemisphere Affairs
Former United States Ambassador to Ecuador

*The Hon. Theodore Sedgwick*
Former United States Ambassador to the Slovak Republic

*Clifford Sloan*
Former U.S. Special Envoy for Guantánamo Closure

*Charles Trumbull*
Former Acting Special Envoy for Guantánamo Closure
Former Attorney-Adviser, Office of the Legal Adviser